# EXHIBIT A

**Exit Facility Documents**

300465264v2

# EXHIBIT A-1

**Promissory Note**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## PROMISSORY NOTE

$[_____]                                              New York, New York

[_____], 2024

FOR VALUE RECEIVED [_____ , a _____, as maker, having its principal place of business at _____ ] ("**Borrower**"), hereby unconditionally promises to pay to the order of **[BSPRT CRE FINANCE, LLC]**, a Delaware limited liability company, having an address at 1345 Avenue of the Americas, Suite 32A, New York, New York 10105 (together with its successors and/or assigns, "**Lender**"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of [_____ ($_____)], or so much thereof as is advanced pursuant to that certain Loan Agreement dated the date hereof between Borrower and Lender (as the same may be amended, replaced, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), in lawful money of the United States of America, with interest thereon to be computed from the date of this Promissory Note (as amended, replaced, restated, supplemented or otherwise modified from time to time, this "**Note**") at the interest rate specified in the Loan Agreement, and to be paid in accordance with the terms of this Note and the Loan Agreement.  All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

## ARTICLE 1:  PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon and all other amounts due under the Loan Documents shall be due and payable on the Maturity Date.

## ARTICLE 2:  DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default.

## ARTICLE 3:  LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents.  All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.  In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ARTICLE 4:  SAVINGS CLAUSE

Notwithstanding anything to the contrary contained in this Note or in any of the other Loan Documents, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender, or if there is no such indebtedness, shall immediately be returned to Borrower.

## ARTICLE 5:  NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6:  WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind.  No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other Person who may become liable for the payment of all or any part of the Debt under this Note, the Loan Agreement or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower," as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder.  (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

transfers of interests in such partnership, limited liability company or corporation, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.)

## ARTICLE 7:  TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8:  EXCULPATION

The provisions of Article 12 of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

## ARTICLE 9:  GOVERNING LAW

The governing law and related provisions contained in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein.

## ARTICLE 10:  NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Article 15.5 of the Loan Agreement.

## ARTICLE 11:  SUCCESSORS AND ASSIGNS;
## JOINT AND SEVERAL LIABILITY

This Note shall be binding upon, and shall inure to the benefit of, Borrower and Lender and their respective successors and permitted assigns.  Lender may sell, assign, pledge, participate, transfer or delegate, as applicable, to one or more Persons, all or a portion of its rights and obligations under this Note and the other Loan Documents to any Person.  Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Note.  Borrower shall not have the right to assign, delegate or transfer its rights or obligations under this Note without the prior written consent of Lender (except to the extent otherwise expressly permitted pursuant to the terms and conditions of the Loan Agreement), and any attempted assignment, delegation or transfer without such consent shall be null and void.  If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.

## [NO FURTHER TEXT ON THIS PAGE]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, Borrower has duly executed this Note as of the day and year first above written.

**BORROWER**:

[Signature pages sent separately]

300569684v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

ADDENDUM TO NOTE
(TEXAS)

THE UNDERSIGNED AND ALL OTHER MAKERS, SIGNERS, SURETIES, GUARANTORS AND ENDORSERS OF THIS NOTE WAIVE DEMAND, PRESENTMENT, NOTICE OF DISHONOR, NOTICE OF INTENT TO DEMAND OR ACCELERATE PAYMENT HEREOF, DILIGENCE IN THE COLLECTING, GRACE (EXCEPT AS SPECIFICALLY ALLOWED UNDER THE LOAN AGREEMENT), NOTICE (EXCEPT AS SPECIFICALLY ALLOWED UNDER THE LOAN AGREEMENT) AND PROTEST AND AGREE TO ONE OF MORE EXTENSIONS FOR ANY PERIOD OR PERIODS OF TIME AND PARTIAL PAYMENTS, BEFORE OR AFTER MATURITY, WITHOUT PREJUDICE TO THE HOLDER HEREOF. IF COLLECTION PROCEDURES ARE EVER COMMENCED, BY ANY MEANS, INCLUDING LEGAL PROCEEDINGS OR THROUGH A PROBATE OR BANKRUPTCY COURT, OR IF THIS NOTE IS PLACED IN THE HANDS OF ANY ATTORNEY FOR COLLECTION AFTER DEFAULT BEYOND APPLICABLE NOTICE AND CURE PERIODS OR MATURITY, THE UNDERSIGNED AGREES TO PAY ALL REASONABLE AND NECESSARY COSTS OF COLLECTION OR ATTEMPTED COLLECTION, INCLUDING REASONABLE AND NECESSARY ATTORNEYS' FEES. THE TERM "REASONABLE AND NECESSARY ATTORNEYS' FEES" OR SIMILAR TERM USED HEREIN OR IN ANY OTHER LOAN DOCUMENT SHALL MEAN REASONABLE AND NECESSARY ATTORNEYS' FEES ACTUALLY INCURRED AND IN NO EVENT SHALL BE CALCULATED AS A PERCENTAGE OF THE INDEBTEDNESS OR FACTOR OTHER THAN A REASONABLE HOURLY RATE AND THE TIME SPENT ON THE MATTER.

[Signature pages sent separately]

# EXHIBIT A-2

**Loan Agreement**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

====================================================================

# LOAN AGREEMENT

dated as of [_____], 2024

between

## SILVER STAR CRE, LLC,

as Borrower

and

## [BSPRT CRE FINANCE, LLC],

as Lender

====================================================================

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

<u>Table of Contents</u>

ARTICLE 1 DEFINITIONS; PRINCIPLES OF CONSTRUCTION ........................................... 7

    Section 1.1    Definitions.................................................................................. 7

    Section 1.2    Principles of Construction........................................................ 37

ARTICLE 2 GENERAL TERMS.................................................................................... 38

    Section 2.1    No Loan Commitment .............................................................. 38

    Section 2.2    The Loan .................................................................................. 38

    Section 2.3    Disbursement to Borrower....................................................... 38

    Section 2.4    The Note and the other Loan Documents ................................ 38

    Section 2.5    Interest Rate ............................................................................ 38

    Section 2.6    Loan Payments........................................................................ 45

    Section 2.7    Prepayments............................................................................ 46

    Section 2.8    Interest Rate Cap Agreement .................................................. 48

    Section 2.9    Assignment of Security Instrument ......................................... 51

    Section 2.10    Payment of Exit Fee ................................................................ 51

ARTICLE 3 REPRESENTATIONS AND WARRANTIES........................................... 52

    Section 3.1    Existence and Authority........................................................... 52

    Section 3.2    Borrower's Principal Place of Business.................................... 52

    Section 3.3    Validity of Documents............................................................. 53

    Section 3.4    Agreements.............................................................................. 53

    Section 3.5    Title; Permitted Encumbrances................................................ 54

    Section 3.6    Purchase Options..................................................................... 54

    Section 3.7    Condemnation.......................................................................... 54

    Section 3.8    Separate Lots; Flood Zone; Wetlands...................................... 54

    Section 3.9    Use of Property........................................................................ 54

    Section 3.10    Certain Additional Property Representations ........................... 54

    Section 3.11    Financial Condition.................................................................. 56

    Section 3.12    Financial Information............................................................... 57

    Section 3.13    Fraudulent Conveyance ........................................................... 57

    Section 3.14    Disclosure............................................................................... 57

    Section 3.15    No Plan Assets......................................................................... 57

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 3.16   Not a Foreign Person ............................................................................. 58

Section 3.17   Business Purposes ................................................................................. 58

Section 3.18   Litigation .............................................................................................. 58

Section 3.19   Leases and Rent Roll ........................................................................... 58

Section 3.20   Taxes .................................................................................................... 59

Section 3.21   Insurance .............................................................................................. 60

Section 3.22   Management Agreement ...................................................................... 60

Section 3.23   Illegal Activity/Forfeiture ................................................................... 60

Section 3.24   Special Purpose Entity ......................................................................... 60

Section 3.25   Federal Reserve Regulations ............................................................... 61

Section 3.26   Investment Company Act ..................................................................... 61

Section 3.27   Embargoed Person ............................................................................... 61

Section 3.28   Organizational Chart ............................................................................ 62

Section 3.29   Bank Holding Company ....................................................................... 62

Section 3.30   No Other Financing; Other Obligations and Liabilities...................... 62

Section 3.31   Contracts .............................................................................................. 62

Section 3.32   Property Document Representations..................................................... 63

Section 3.33   No Change in Facts or Circumstances; Disclosure ............................. 63

Section 3.34   Third Party Representations ................................................................. 63

Section 3.35   Non-Consolidation Opinion Assumptions ........................................... 63

ARTICLE 4 BORROWER COVENANTS ............................................................................ 64

Section 4.1    Existence .............................................................................................. 64

Section 4.2    Change of Name, Identity or Structure ............................................... 64

Section 4.3    Business and Operations ...................................................................... 64

Section 4.4    Title to Property; Legal Requirements................................................. 64

Section 4.5    Waste .................................................................................................... 65

Section 4.6    Maintenance and Use of Property ........................................................ 65

Section 4.7    Taxes and Other Charges ..................................................................... 66

Section 4.8    Labor and Materials ............................................................................. 67

Section 4.9    Property Access .................................................................................... 68

Section 4.10   Litigation .............................................................................................. 68

Section 4.11   Performance by Borrower..................................................................... 68

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 4.12   Books and Records ..................................................................... 68

Section 4.13   Contracts ................................................................................... 70

Section 4.14   Cooperation in Proceedings ....................................................... 71

Section 4.15   Estoppel Certificates ................................................................. 71

Section 4.16   Leases and Rents ....................................................................... 72

Section 4.17   Notice of Default ....................................................................... 74

Section 4.18   Other Agreements ...................................................................... 74

Section 4.19   Alterations ................................................................................. 74

Section 4.20   Management Agreement ............................................................ 74

Section 4.21   No Joint Assessment .................................................................. 76

Section 4.22   ERISA ....................................................................................... 76

Section 4.23   Special Purpose Entity .............................................................. 77

Section 4.24   Debt Cancellation ...................................................................... 77

Section 4.25   Property Documents ................................................................... 77

Section 4.26   Embargoed Person ..................................................................... 77

Section 4.27   Patriot Act ................................................................................. 78

Section 4.28   No Plan Assets; Illegal Activity/Forfeiture ................................ 78

Section 4.29   O&M Program ........................................................................... 78

Section 4.30   Property Releases ....................................................................... 78

ARTICLE 5 INSURANCE; CASUALTY; CONDEMNATION; RESTORATION .................. 79

Section 5.1   Insurance ..................................................................................... 79

Section 5.2   Casualty ....................................................................................... 84

Section 5.3   Condemnation .............................................................................. 84

Section 5.4   Restoration ................................................................................... 86

Section 5.5   Business Interruption Proceeds .................................................... 90

ARTICLE 6 NO SALE OR ENCUMBRANCE; PERMITTED TRANSFERS ...................... 91

Section 6.1   No Sale/Encumbrance .................................................................. 91

Section 6.2   Intentionally Omitted ................................................................... 91

Section 6.3   Permitted Equity Transfers .......................................................... 91

Section 6.4   Replacement Guarantor ................................................................ 92

Section 6.5   Lender's Rights ............................................................................ 93

Section 6.6   Economic Sanctions, Anti-Money Laundering; Prohibited Entities ......... 93

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 6.7    Partial Release .................................................................... 94

Section 6.8    Costs and Expenses............................................................. 96

ARTICLE 7 RESERVE FUNDS .............................................................................. 97

Section 7.1    Immediate Repair Funds ..................................................... 97

Section 7.2    Tax and Insurance Funds ..................................................... 98

Section 7.3    Capital Expenditures Reserve Funds ................................... 98

Section 7.4    Leasing Reserve Funds ...................................................... 100

Section 7.5    Operating Expense Funds .................................................. 101

Section 7.6    Excess Cash Flow Funds ................................................... 101

Section 7.7    Intentionally Omitted ......................................................... 101

Section 7.8    The Accounts Generally ..................................................... 101

Section 7.9    Intentionally Omitted ......................................................... 104

Section 7.10   Interest and Operating Expense Reserve Funds.................. 104

Section 7.11   Intentionally Omitted ......................................................... 104

Section 7.12   ........................................................................................... 104

Section 7.13   Disbursements to Mezzanine Lender .................................. 104

Section 7.14   Interest Rate Cap Reserve Funds ....................................... 104

ARTICLE 8 CASH MANAGEMENT ..................................................................... 105

Section 8.1    Establishment of Certain Accounts..................................... 105

Section 8.2    Deposits into and Maintenance of Clearing Account ........... 105

Section 8.3    Disbursements from the Cash Management Account............ 107

Section 8.4    Withdrawals from the Debt Service Account ....................... 108

Section 8.5    Payments Received Under this Agreement........................... 108

Section 8.6    Borrower Distributions; Acknowledgement ......................... 108

ARTICLE 9 SECONDARY MARKET ..................................................................... 109

Section 9.1    Securitization .................................................................... 109

Section 9.2    Disclosure and Indemnification ......................................... 113

Section 9.3    Reserves/Escrows ............................................................. 115

Section 9.4    Servicer ............................................................................ 116

Section 9.5    Lender Mezzanine Option.................................................. 116

Section 9.6    REMIC Savings Clause ..................................................... 117

Section 9.7    Syndication; Registered Form............................................ 118

iv

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

ARTICLE 10 EVENTS OF DEFAULT; REMEDIES .............................................................. 119

Section 10.1    Event of Default ............................................................................ 119

Section 10.2    Remedies ....................................................................................... 124

ARTICLE 11 INDEMNIFICATIONS ................................................................................... 126

Section 11.1    General Indemnification ............................................................... 126

Section 11.2    Mortgage and Intangible Tax Indemnification ............................ 127

Section 11.3    ERISA Indemnification ................................................................ 127

Section 11.4    Duty to Defend, Legal Fees and Other Fees and Expenses .................... 127

Section 11.5    Survival ......................................................................................... 127

Section 11.6    CFIUS Indemnification ................................................................. 127

ARTICLE 12 EXCULPATION ............................................................................................. 128

Section 12.1    Exculpation ................................................................................... 128

ARTICLE 13 FURTHER ASSURANCES ............................................................................ 131

Section 13.1    Replacement Documents .............................................................. 131

Section 13.2    Recording of Security Instrument, etc ......................................... 131

Section 13.3    Further Acts, etc ........................................................................... 131

Section 13.4    Changes in Tax, Debt, Credit and Documentary Stamp Laws .............. 132

ARTICLE 14 WAIVERS ...................................................................................................... 132

Section 14.1    Remedies Cumulative; Waivers.................................................... 132

Section 14.2    Modification, Waiver in Writing .................................................. 133

Section 14.3    Delay Not a Waiver ...................................................................... 133

Section 14.4    Waiver of Trial by Jury................................................................. 133

Section 14.5    Waiver of Notice........................................................................... 133

Section 14.6    Remedies of Borrower .................................................................. 134

Section 14.7    Marshalling and Other Matters .................................................... 134

Section 14.8    Waiver of Statute of Limitations.................................................. 134

Section 14.9    Waiver of Counterclaim................................................................ 134

Section 14.10   Sole Discretion of Lender ............................................................ 134

ARTICLE 15 MISCELLANEOUS ....................................................................................... 135

Section 15.1    Survival ......................................................................................... 135

Section 15.2    Expenses; Indemnity ..................................................................... 135

Section 15.3    Brokers .......................................................................................... 137

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 15.4    Governing Law ...................................................................... 137

Section 15.5    Notices ................................................................................... 138

Section 15.6    Headings ................................................................................ 139

Section 15.7    Severability ........................................................................... 139

Section 15.8    Preferences ............................................................................ 139

Section 15.9    Cost of Enforcement .............................................................. 139

Section 15.10   Exhibits Incorporated ............................................................ 140

Section 15.11   Offsets, Counterclaims and Defenses .................................... 140

Section 15.12   No Joint Venture or Partnership; No Third Party Beneficiaries ............. 140

Section 15.13   Disclosure ............................................................................. 141

Section 15.14   Limitation of Liability ........................................................... 142

Section 15.15   Conflict; Construction of Documents; Reliance ..................... 143

Section 15.16   Entire Agreement ................................................................... 143

Section 15.17   Liability ................................................................................. 143

Section 15.18   Duplicate Originals; Counterparts .......................................... 143

Section 15.19   Set-Off ................................................................................... 143

ARTICLE 16 CROSS-DEFAULT; CROSS-COLLATERALIZATION ................................... 144

Section 16.1    Cross-Default and Cross-Collateralization of Property. ......... 144

Section 16.2    Marshalling and Other Matters. ............................................. 144

Section 16.3    Uncross of Individual Properties. ........................................... 145

ARTICLE 17 MEZZANINE LOAN ................................................................ 146

Section 17.1    Mezzanine Loan Notice ......................................................... 146

Section 17.2    Mezzanine Loan Estoppels ..................................................... 146

Section 17.3    Mezzanine Intercreditor ......................................................... 146

Section 17.4    Direction of Mezzanine Borrower ........................................... 147

Section 17.5    Notices from Mezzanine Lender ............................................. 147

Section 17.6    Mezzanine Loan Separate ....................................................... 147

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of **[_____]**, 2024 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **[BSPRT CRE FINANCE, LLC]**, a Delaware limited liability company, having an address at 1345 Avenue of the Americas, Suite 32A, New York, New York 10105 (together with its successors and/or assigns, "**Lender**") and **SILVER STAR CRE, LLC**, a Delaware limited liability company, having its principal place of business at [_____] (together with its successors and/or assigns, "**Borrower**").

### RECITALS:

**WHEREAS,** Borrower desires to obtain the Loan (defined below) from Lender; and

**WHEREAS,** Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of the Loan Documents (defined below).

**NOW, THEREFORE,** in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

### ARTICLE 1

### DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1    Definitions**.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Account Collateral**" shall mean (i) the Accounts, and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) any and all amounts invested in Permitted Investments; (iii) all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iv) to the extent not covered by clauses (i) - (iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"**Accounts**" shall mean the Cash Management Account, the Debt Service Account, the Clearing Account, the Casualty and Condemnation Account, the Reserve Accounts and any other account established by this Agreement or the other Loan Documents.

"**Affiliate**" shall mean, as to any Person, any other Person that (i) owns directly or indirectly twenty percent (20%) or more of all equity interests in such Person, (ii) is in Control of, is Controlled by or is under common ownership or Control with such Person, (iii) is a director or executive officer of such Person or of an Affiliate of such Person, and/or (iv) is the spouse, issue or parent of such Person.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Affiliated Manager**" shall mean any managing agent of the Property in which Borrower, Guarantor, Sponsor, any SPE Component Entity (if any) or any Affiliate of such entities has, directly or indirectly, any legal, beneficial or economic interest.

"**Allocated Loan Amount**" shall mean, with respect to each Individual Property, the amount shown on Exhibit F attached hereto.

"**Allocated Loan Ratio**" shall mean, with respect to each Individual Property, the ratio of (a) the Allocated Loan Amount with respect to such Individual Property to (b) the original face amount of the Note.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" shall mean an amount equal to 5% of the outstanding principal amount of the Loan multiplied by the Allocated Loan Ratio for the applicable Individual Property.

"**Annual Budget**" shall mean the operating and capital budget for the Property and each Individual Property setting forth, on a month-by-month basis, in reasonable detail, each line item of Borrower's good faith estimate of anticipated Gross Rents, Operating Expenses and Capital Expenditures for the applicable Fiscal Year.

"**Appraisal**" shall mean an appraisal of the Property prepared not more than ninety (90) days prior to the relevant date with respect to which an appraisal shall be required hereunder by a member of the American Institute of Real Estate Appraisers selected by Lender, which appraisal shall (i) meet the minimum appraisal standards for national banks promulgated by the Comptroller of the Currency pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended (FIRREA), (ii) be prepared on as "as is" basis, and (iii) otherwise be in form and substance satisfactory to Lender.

"**Approved Accounting Method**" shall mean GAAP, federal tax basis accounting or such other method of accounting, in each case consistently applied, as may be reasonably acceptable to Lender.

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.12 hereof.

"**Approved Extraordinary Expense**" shall mean an operating expense of the Property not set forth on the Approved Annual Budget but approved by Lender in writing (which such approval shall not be unreasonably withheld or delayed).

"**Approved Operating Expense**" shall mean an operating expense of the Property set forth on the Approved Annual Budget.

"**Assignment of Leases**" shall mean, each individually and/or collectively, as the context may require, those certain first priority Assignments of Leases and Rents, each dated as of the date hereof, from the applicable Borrower, as assignor, to Lender, as assignee, as any of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees dated as of the date hereof among Lender, Borrower and Manager, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bank**" shall be deemed to refer to the bank or other institution maintaining the Clearing Account pursuant to the Clearing Account Agreement.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "**Bankruptcy**", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Bankruptcy Event**" shall mean the occurrence of any one or more of the following:  (i) Borrower or any SPE Component Entity shall commence any case, proceeding or other action (A) under the Bankruptcy Code and/or any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets; (ii) Borrower or any SPE Component Entity shall make a general assignment for the benefit of its creditors; (iii) any Restricted Party (or Affiliate thereof) files, or joins or colludes in the filing of, (A) an involuntary petition against Borrower or any SPE Component Entity under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition under the Bankruptcy Code or any other Creditors Rights Laws against Borrower or any SPE Component Entity or (B) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of Borrower's or any SPE Component Entity's assets; (iv) Borrower or any SPE Component Entity files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition from any Person; (v) any Restricted Party (or Affiliate thereof) consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower, any SPE Component Entity or any portion of the Property; (vi) Borrower or any SPE Component Entity makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (vii) any Restricted Party (or Affiliate thereof) contesting or opposing any motion made by Lender to obtain relief from the automatic stay or seeking to reinstate the automatic stay in the event of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Sponsor or its subsidiaries; (viii) any Restricted Party (or Affiliate thereof) taking any action in furtherance of, in collusion with respect to or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in items (i) through (vii) above; and (ix) in the event Lender receives less than the full value of its claim in any proceeding under the Bankruptcy Code or any other Creditors Rights Laws,

Sponsor or any of its Affiliates receiving an equity interest or other financial benefit of any kind as a result of a "new value" plan or equity contribution.

"**Benchmark**" shall mean (i) initially, Term SOFR and (ii) on and after the occurrence of a Benchmark Transition Event and the related Benchmark Transition Date, the Benchmark Replacement determined in accordance with the terms and conditions hereof.

"**Benchmark Floor**" shall mean [four percent (4.0%)]**.**

"**Benchmark Rate**" shall mean the sum of (i) the greater of (A) the Benchmark and (B) the Benchmark Floor, and (ii) the Benchmark Spread.

"**Benchmark Rate Loan**" shall mean the Loan at all such times as interest thereon accrues at a rate of interest based upon the Benchmark pursuant to Section 2.5 hereof.

"**Benchmark Replacement**" shall mean, with respect to any Benchmark Transition Event, a variable rate or index selected by Lender (which may be, at Lender's option, without limitation, "Daily Simple SOFR," "Daily Compounded SOFR," or "30-Day SOFR Average").

"**Benchmark Replacement Adjustment**" shall mean, with respect to any Benchmark Replacement and its related Determination Date(s), a spread adjustment (which may be a positive or negative value, or zero) that has been selected by Lender, giving due consideration to (i) any selection or recommendation of a spread adjustment (including, without limitation, a "benchmark replacement spread adjustment") or method for calculating or determining the same, by the Relevant Governmental Body for the applicable Benchmark Replacement and its related Determination Date(s), (ii) any evolving or then-prevailing market convention for determining a spread adjustment (including, without limitation, a "benchmark replacement spread adjustment") or method for calculating or determining the same, for the applicable Benchmark Replacement and its related Determination Date(s) in U.S. dollar-denominated syndicated or bilateral commercial real estate credit facilities, and/or (iii) the spread adjustment (including, without limitation, a "benchmark replacement spread adjustment") or method for calculating or determining the same, then being utilized by Lender or its Affiliates with respect to variable rate commercial real estate loans for the applicable Benchmark Replacement and its related Determination Date(s).

"**Benchmark Replacement Conforming Changes**" shall mean, with respect to any Benchmark Transition Event, any technical, administrative or operational changes (including changes to the definitions of "Business Day," "Interest Period," "Monthly Payment Date" and "Determination Date," the timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, the applicability of adjustments to the interest rate due to the effect of reserve requirements, preceding and succeeding business day conventions and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption and implementation of the applicable Benchmark Replacement and to permit the administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of the applicable Benchmark

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Replacement exists, in such other manner as Lender determines is necessary in connection with the administration of the Loan).

"**Benchmark Spread**" shall mean [ten percent (10.0%)**]**, subject to the provisions of Section 2.5(b)(vi) hereof (including, without limitation, the adjustment of the Benchmark Spread by the addition thereto of the Benchmark Replacement Adjustment, when applicable hereunder)**.** Lender's computation of the Benchmark Spread shall be conclusive and binding on Borrower for all purposes, absent manifest error.

"**Benchmark Transition Date**" shall mean any date designated by Lender for conversion of the then-current Benchmark to a Benchmark Replacement, the selection of which date may be based on, or determined with due consideration for, any of the events described in clauses (1) – (7) of the definition of "Benchmark Transition Event" below (in Lender's sole discretion), as applicable.

"**Benchmark Transition Event**" shall mean any election by Lender to convert the then-existing Benchmark to a Benchmark Replacement, which such election may be based on, or determined with due consideration for, any of the following (in Lender's sole discretion):

(1)     a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark announcing that the administrator has ceased or will cease to provide such Benchmark permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark;

(2)     a public statement or publication of information by the regulatory supervisor for the administrator of the then-current Benchmark, the central bank for the currency of the such Benchmark, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, which states that the administrator of such Benchmark has ceased or will cease to provide such Benchmark permanently or indefinitely (so long as, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark);

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of the then-current Benchmark announcing that such Benchmark is no longer representative;

(4)     any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body;

(5)     any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for U.S. dollar-denominated syndicated or bilateral credit facilities at such time;

(6)     Lender's determination in good faith that the then-current Benchmark is not, or is no longer, the prevailing rate being used by commercial real estate lenders for

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

floating rate mortgage loans or by issuers of floating rate commercial mortgage securities; and/or

(7)    any variable rate or index then generally being utilized by Lender or its Affiliates with respect to the origination of variable rate commercial real estate loans.

"**Benchmark Unavailability Event**" shall mean that one or more of the following has occurred, at any time or from time to time during the term of the Loan, as determined by Lender (which determination shall be conclusive and binding upon Borrower absent manifest error): (i) at any time while the Loan is a Benchmark Rate Loan and the applicable Benchmark is Term SOFR, the Term SOFR Administrator either temporarily or permanently fails to report Term SOFR on a daily basis; (ii) at any time while the Loan is a Benchmark Rate Loan and the applicable Benchmark is not Term SOFR, the applicable administrator of the then-applicable Benchmark either temporarily or permanently fails to report such Benchmark on a daily basis; (iii) due to any Change in Law, it is unlawful (or asserted by any Governmental Authority to be unlawful) for Lender to maintain the Loan as a Benchmark Rate Loan using the then-current Benchmark; or (iv) adequate and reasonable means do not exist for ascertaining the then-current Benchmark.

"**Borrower Party**" and "**Borrower Parties**" shall mean each of Borrower, any SPE Component Entity, Mezzanine Borrower Sponsor, any Affiliated Manager and Guarantor.

"**Borrower's Debt Liability**" shall have the meaning set forth in Section 12.1(c) hereof.

"**Breakage Costs**" shall have the meaning set forth in Section 2.5(b) hereof.

"**Broker**" shall have the meaning set forth in Section 15.3 hereof.

"**Business Day**" shall mean a day on which commercial banks are not authorized or required by applicable law to close in New York, New York.

"**Capital Expenditures Reserve Account**" shall have the meaning set forth in Section 7.3 hereof.

"**Capital Expenditures Reserve Funds**" shall have the meaning set forth in Section 7.3 hereof.

"**Capital Expenditures Reserve Monthly Deposit**" shall have the meaning set forth in Section 7.3 hereof.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under the Approved Accounting Method (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements). If the context of this Agreement or Lender requires, Capital Expenditures shall also be calculated on an Individual Property basis.

"**Cash Management Account**" shall have the meaning set forth in Section 8.1 hereof.

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, executed by Borrower, Lender and Cash Management Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Management Bank**" shall mean PNC Bank, National Association.

"**Casualty**" shall have the meaning set forth in Section 5.2.

"**Casualty and Condemnation Account**" shall mean an Account into which any Net Proceeds collected after the occurrence of a Casualty or Condemnation, as required pursuant to Article 5 hereof, shall be deposited.

"**Casualty Consultant**" shall have the meaning set forth in Section 5.4 hereof.

"**Change in Law**" shall mean the occurrence, after the Closing Date, of any of the following: (i) the adoption or taking effect of any law, rule, regulation or treaty, (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (iii) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Clearing Account**" shall have the meaning set forth in Section 8.1 hereof.

"**Clearing Account Agreement**" shall mean that certain Deposit Account Control Agreement (Hard Agreement) by and among Borrower, Lender and PNC Bank, National Association dated as of the date hereof, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**CFIUS**" shall mean (i) the Committee on Foreign Investment in the United States first established pursuant to Executive Order 11858 of May 7, 1975, and (ii) any replacement or successor thereto, including, without limitation, pursuant to FIRRMA.

"**CFIUS Approval**" shall mean, with respect to any given transaction: (a) written confirmation provided by CFIUS that such transaction is not a Covered Transaction under the DPA, (b) written confirmation provided by CFIUS that it has completed its review or, if applicable, investigation of the matter(s) in question under the DPA, and determined, with respect to such transaction, that there are no unresolved national security concerns, or (c) CFIUS shall have sent a report to the President of the United States requesting the President's decision under the DPA, and the President shall have announced a decision not to take any action to suspend, prohibit or place any limitations on such transaction.

"**CFIUS Review**" shall have the meaning set forth in Section 4.14(b) hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Co-Lender**" shall have the meaning set forth in Section 9.7 hereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Collateral Assignment of Interest Rate Cap Agreement**" shall mean that certain Collateral Assignment of Interest Rate Cap Agreement, dated as of the date hereof, executed by Borrower in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Condemnation**" shall mean any permanent or temporary taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Contract**" shall mean any contract or agreement with any architect, engineer, contractor, subcontractor, management agent, leasing agent, sales agent, service and maintenance agent, or any other third party, whether existing as of the Closing Date or thereafter arising, relating to the design, construction, ownership, condition, use, occupancy, possession, management, operation, space leasing, service, maintenance or repair of, or otherwise in respect of, the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (but the same shall not be deemed to include any Lease or the Management Agreement).

"**Contract of Sale**" shall have the meaning set forth in Section 4.31 hereof.

"**Control**" as to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of such Person, whether through ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "controlled" or "controlling" shall have a correlative meaning.

"**Counterparty**" shall mean the counterparty under any Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement, which counterparty shall satisfy the Minimum Counterparty Rating and otherwise be acceptable to Lender.

"**Covered Rating Agency Information**" shall mean any Provided Information furnished to the NRSROs in connection with issuing, monitoring and/or maintaining the Securities.

"**Covered Transaction**" shall have the meaning set forth in the DPA.

"**Creditors Rights Laws**" shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Crowdfunded Person**" shall mean a Person capitalized primarily by monetary contributions (i) of less than \$35,000 each from more than 35 investors who are individuals or (ii) which are funded primarily (A) in reliance upon Regulation Crowdfunding promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

and/or (B) through internet-mediated registries, platforms or similar portals, mail-order subscriptions, benefit events and/or other similar methods.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums (including the Minimum Interest Payment, Exit Fee and Breakage Costs, if applicable) due to Lender in respect of the Loan under the Loan Documents.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal (if applicable) and interest payments hereunder.

"**Debt Service (Combined)**" shall mean, with respect to any particular period of time, the sum of (A) Debt Service and (B) the Mezzanine Loan Monthly Debt Service and all other sums (including, without limitation, any accelerated principal balance) due under the Mezzanine Loan.

"**Debt Service Account**" shall have the meaning set forth in Section 8.1 hereof.

"**Debt Service Coverage Ratio (Combined)**" shall mean the ratio calculated by Lender of (i) the Underwritable Cash Flow to (ii) the aggregate amount of Debt Service (Combined) which would be due for the twelve (12) month period immediately succeeding the date of calculation; provided, that, the foregoing shall be calculated by Lender assuming that each of the Loan and the Mezzanine Loan will be in place for the entirety of said period.

"**Debt Yield (Combined)**" shall mean, as of any date of calculation, a ratio conveyed as a percentage in which (i) the numerator is the Underwritable Cash Flow and (ii) the denominator is the then aggregate outstanding principal balances of the Loan and the Mezzanine Loan.

"**Deemed Approval Requirements**" shall mean, with respect to any matter, that (i) no Event of Default shall have occurred and be continuing (either at the date of any notices specified below or as of the effective date of any deemed approval), (ii) Borrower shall have sent Lender a written request for approval with respect to such matter in accordance with the applicable terms and conditions hereof (the "**Initial Notice**"), which such Initial Notice shall have been (A) accompanied by any and all required information and documentation relating thereto as may be reasonably required in order to approve or disapprove such matter (the "**Approval Information**") and (B) marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the Initial Notice shall have been marked "PRIORITY-DEEMED APPROVAL MAY APPLY"; (iii) Lender shall have failed to respond to the Initial Notice within the aforesaid time frame; (iv) Borrower shall have submitted a second request for approval with respect to such matter in accordance with the applicable terms and conditions hereof (the "**Second Notice**"), which such Second Notice shall have been (A) accompanied by the Approval Information and (B) marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A

LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the Second Notice shall have been marked "PRIORITY-DEEMED APPROVAL MAY APPLY"; and (v) Lender shall have failed to respond to the Second Notice within the aforesaid time frame.  For purposes of clarification, Lender requesting additional and/or clarified information, in addition to approving or denying any request (in whole or in part), shall be deemed a response by Lender for purposes of the foregoing.

"**Default**" shall mean the occurrence of any event hereunder or under the Note or the other Loan Documents which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the Maximum Legal Rate, and (ii) the greatest of the following that applies: (A) five percent (5%) above the Interest Rate, (B) if an Event of Default has occurred due to the failure to pay a sum of money owed under the Loan Documents, or that causes liability pursuant to the terms of Section 12.1 hereof, the sum of (1) the Interest Rate that would otherwise be in effect but for the existence of any Event of Default plus (2) an amount sufficient to cause the total Default Rate to equal eighteen percent (18%), or (C) if the full repayment of the Debt as required hereunder has not occurred on the Maturity Date, the sum of (x) the Interest Rate that would otherwise be in effect but for the existence of any Event of Default plus (y) an amount sufficient to cause the total Default Rate to equal twenty-four percent (24%).

"**Determination Date**" shall mean, with respect to any Interest Period, either (i) if the then-applicable Benchmark is Term SOFR, the date that is two (2) Term SOFR Business Days prior to the first day of such Interest Period; provided, however, that if Term SOFR does not so appear on the date specified above, then the applicable Determination Date for such Interest Period shall instead be the Term SOFR Business Day first preceding such date specified above, or (ii) if the then-applicable Benchmark is not Term SOFR, the date and time determined by Lender in accordance with the provisions of Section 2.5 hereof relating to Benchmark Replacement Conforming Changes.

"**Disclosure Documents**" shall mean, collectively, any written materials used or provided to any prospective investors and/or NRSROs in connection with any public offering or private placement in connection with a Securitization, including, but not limited to, any preliminary or final offering circular, prospectus, prospectus supplement, free writing prospectus, private placement memorandum or other offering documents, marketing materials or information.

"**DPA**" shall mean the Defense Production Act of 1950, 50 U.S.C. § 4565, as amended (as the same may have been or may hereafter be amended, restated, supplemented or otherwise modified), all laws and regulations related thereto and all mandates, requirements, powers and similar requirements imposed or exercised thereunder (including, without limitation, FIRRMA and any of the foregoing implemented by and/or otherwise relating to CFIUS), as the foregoing may be amended from time to time, any successor statute or statutes and all rules and regulations from time to time promulgated in connection with the foregoing.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts maintained with a federal or state-chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state-chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by S&P, "P-1" by Moody's, and "F-1" by Fitch in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "A" by Fitch and S&P and "A2" by Moody's.

"**Embargoed Person**" shall have the meaning set forth in Section 4.26 hereof.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" shall have the meaning set forth in the Environmental Indemnity.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may heretofore have been or shall be amended, restated, replaced or otherwise modified.

"**Event of Default**" shall have the meaning set forth in Section 10.1 hereof.

"**Excess Cash Flow**" shall have the meaning set forth in Section 8.3 hereof.

"**Excess Cash Flow Account**" shall have the meaning set forth in Section 7.6 hereof.

"**Excess Cash Flow Funds**" shall have the meaning set forth in Section 7.6 hereof.

"**Excess Operating Expense Disbursement**" shall mean, with respect to any applicable Monthly Payment Date, the amount received by Borrower pursuant to Section 8.3**[**(j)**]** less the amount thereof actually spent on Approved Operating Expenses and Approved Extraordinary Expenses, which such determination shall be made by Lender in good faith and shall be final absent manifest error.

"**Exchange Act**" shall mean the Securities and Exchange Act of 1934, as amended.

"**Exchange Act Filing**" shall have the meaning set forth in Section 9.1 hereof.

"**Exculpated Parties**" shall have the meaning set forth in Section 12.1 hereof.

"**Exit Fee**" shall mean an amount equal to two (2) percent (2.0%) of the face amount of the Note.

"**FATCA**" shall means Sections 1471 through 1474 of the IRS Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the IRS Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the IRS Code.

"**FIRRMA**" shall mean the Foreign Investment Risk Review Modernization Act of 2018 (as the same may have been or may hereafter be amended, restated, supplemented or otherwise modified).

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Foreign Taxes**" shall have the meaning set forth in Section 2.5(b) hereof.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**Government Lists**" shall have the meaning set forth in Section 3.27 hereof.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Rents**" shall mean an amount equal to the sum of (i) annual rental income reflected in a current rent roll for all Tenants paying rent and (ii) all income, computed in accordance with the Approved Accounting Method, derived from the ownership and operation of the Property from whatever source for the trailing twelve (12) month period, including, but not limited to common area maintenance, real estate tax recoveries, utility recoveries, other miscellaneous expense recoveries, rent concessions or credits, if any, and other miscellaneous income, but excluding rental income, sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

uncollectible accounts, sales of furniture, fixtures and equipment, interest income, insurance proceeds (other than business interruption or other loss of income insurance), Awards, unforfeited security deposits, utility and other similar deposits, non-recurring or extraordinary income, including, without limitation lease termination payments, and any disbursements to Borrower from the Reserve Funds. Gross Rents shall not be diminished as a result of the Security Instrument or the creation of any intervening estate or interest in the Property or any part thereof. For purposes of clarity, income calculated under clause (ii) shall not include any income calculated under clause (i) above. If the context of this Agreement or Lender requires, Gross Rent shall also be calculated on an Individual Property basis.

"**Guarantor**" shall mean **[**Silver Star Properties REIT, Inc.**]** and any successor to and/or replacement of any of the foregoing (including, without limitation, following the occurrence of a Mezzanine Foreclosure, the applicable substitute for Guarantor provided by Mezzanine Lender in connection with such Mezzanine Foreclosure (subject to the applicable terms and conditions of the Mezzanine Intercreditor), in each case, pursuant to and in accordance with the applicable terms and conditions of the Loan Documents.

"**Guaranty**" shall mean, individually and/or collectively, each of the Guaranty of Recourse Obligations and the Guaranty of Payment.

"**Guaranty of Payment**" shall mean that certain Guaranty of Payment dated as of the date hereof and executed by Guarantor in favor of Lender, together with all extensions, substitutions, restatements, modifications and amendments thereto.

"**Guaranty of Recourse Obligations**" shall mean that certain Guaranty of Recourse Obligations dated as of the date hereof and executed by Guarantor in favor of Lender, together with all extensions, substitutions, restatements, modifications and amendments thereto.

"**Immediate Repair Account**" shall have the meaning set forth in Section 7.1 hereof.

"**Immediate Repair Funds**" shall have the meaning set forth in Section 7.1 hereof.

"**Immediate Repairs**" shall have the meaning set forth in Section 7.1 hereof.

"**Improvements**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Indebtedness**" shall mean, for any Person, without duplication: (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Indemnified Parties**" shall mean (i) Lender, (ii) any successor owner or holder of the Loan or participations in the Loan, (iii) any Servicer or prior Servicer of the Loan, (iv) any Investor or any prior Investor in any Securities, (v) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (vi) any receiver or other fiduciary appointed in a foreclosure or other Creditors Rights Laws proceeding, (vii) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates or subsidiaries of any and all of the foregoing, and (viii) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 15.2 hereof.

"**Individual Property**" shall mean each parcel of real property as is described on Exhibit F attached hereto, the Improvements thereon and all personal property owned by the Borrower in connection therewith and encumbered by the applicable Security Instrument, together with all rights pertaining to such property and Improvements, as more particularly described in the granting clauses of the applicable Security Instrument and referred to therein as the "Property."

"**Individual Properties**" shall mean every Individual Property, collectively.

"**Insurance Account**" shall have the meaning set forth in Section 7.2 hereof.

"**Insurance Payment Date**" shall mean, with respect to any applicable Policies, the date occurring 30 days prior to the date the applicable Insurance Premiums associated therewith are due and payable.

"**Insurance Premiums**" shall have the meaning set forth in Section 5.1 hereof.

"**Interest Period**" shall have the meaning set forth in Section 2.6.

"**Interest Rate**" shall mean the rate or rates at which the outstanding principal amount of the Loan bears interest from time to time as determined in accordance with the provisions of Section 2.5 hereof.

"**Interest Rate Cap Agreement**" shall mean, as applicable, any interest rate cap agreement (together with the confirmation and schedules relating thereto) in form and substance satisfactory to Lender between Borrower and Counterparty or any Replacement Interest Rate Cap Agreement, in each case which also satisfies the requirements set forth in Section 2.8.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Interest Rate Cap Reserve Account**" shall have the meaning set forth in Section 7.14 hereof.

"**Interest Rate Cap Reserve Funds**" shall have the meaning set forth in Section 7.14 hereof.

"**Interest and Operating Expense Reserve Account**" shall have the meaning set forth in Section 7.10 hereof.

"**Interest and Operating Expense Reserve Additional Deposit**" shall mean [$_____].

"**Interest and Operating Expense Reserve Funds**" shall have the meaning set forth in Section 7.10 hereof.

"**Interest Shortfall**" shall have the meaning set forth in Section 2.7 hereof.

"**Investor**" shall mean any investor or potential investor in the Loan (or any portion thereof or interest therein) in connection with any Secondary Market Transaction.

"**IRS Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time or any successor statute.

"**Labor and Materials Charge**" shall have the meaning set forth in Section 4.8 hereof.

"**Land**" shall have the meaning set forth in the Security Instrument.

"**Lease**" shall have the meaning set forth in the Security Instrument.

"**Leasing Reserve Account**" shall have the meaning set forth in Section 7.4 hereof.

"**Leasing Reserve Funds**" shall have the meaning set forth in Section 7.4 hereof.

"**Leasing Reserve Monthly Deposit**" shall have the meaning set forth in Section 7.4 hereof.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities affecting the Loan, any Secondary Market Transaction with respect to the Loan, Borrower, any Guarantor or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Securities Act, the Exchange Act, Regulation AB, the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws and the Americans with Disabilities Act of 1990, the rules and regulations promulgated pursuant to any of the foregoing, and all permits, licenses and authorizations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time

300569686v1

in force affecting Borrower, any Guarantor or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof or (ii) in any way limit the use and enjoyment thereof.

"**Lender Affiliate**" shall mean the Affiliate of Lender that has filed a Registration Statement.

"**Lender Group**" shall mean Lender, each of its directors, officers, employees, representatives, agents and affiliates (including, without limitation, those who have signed the applicable Registration Statement), and each Person that controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act.

"**Lender Mezzanine Option**" shall have the meaning set forth in Section 9.5 hereof.

"**Lender Party**" shall mean (i) Lender, (ii) any Servicer, (iii) any receiver or other fiduciary appointed in a foreclosure or other proceeding pursuant to any Creditors Rights Laws, (iv) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates or subsidiaries of any and all of the foregoing, and (v) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of any Lender Party's assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

"**Liabilities**" shall have the meaning set forth in Section 9.2 hereof.

"**LTV**" shall mean a ratio, as determined by Lender, in which, as of any date of determination by Lender:  (i) the numerator is equal to the sum of the outstanding principal balance of the Loan plus the outstanding principal balance of the Mezzanine Loan and (ii) the denominator is equal to the appraised value of the Property based on an Appraisal.

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"**Loan Bifurcation**" shall have the meaning set forth in Section 9.1 hereof.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Assignment of Management Agreement, the Collateral Assignment of Interest Rate Cap Agreement, the Guaranty, the Cash Management Agreement and all other documents executed and/or delivered in connection with the Loan, as each of the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Losses**" shall mean any and all losses, damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including but not limited to strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, amounts paid in settlement, foreseeable and unforeseeable consequential damages, litigation costs and attorneys' fees, in the case of each of

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

the foregoing, of whatever kind or nature and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

"**Major Contract**" shall mean (i) any management (other than the Management Agreement), brokerage or leasing agreement or (ii) any cleaning, maintenance, service or other contract or agreement of any kind (other than Leases) of a material nature (materiality for these purposes to include contracts in excess of $100,000.00 per year or which extend beyond two (2) years (unless cancelable by Borrower on sixty (60) days or less notice without penalty)), in either case relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property, whether written or oral.

"**Major Lease**" shall mean (i) any Lease which, individually or when aggregated with all other leases at the Property with the same Tenant or its Affiliate, demises ten percent (10%) or more of (A) any applicable Individual Property's gross leasable area or (B) the aggregate gross leasable area of the Property as a whole, (ii) any Lease which contains any option, offer, right of first refusal or other similar entitlement to acquire or encumber (but excluding options and rights of first refusal to lease additional space in any Individual Property) all or any portion of the Property and (iii) any instrument guaranteeing or providing credit support for any Lease meeting the requirements of (i) and/or (ii) above.

"**Management Agreement**" shall mean the management agreement entered into by and between Borrower and Manager, pursuant to which Manager is to provide management and other services with respect to the Property, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Manager**" shall mean [Silver Star Property Management, Inc., a Texas corporation,] or such other entity selected as the manager of the Property or any Individual Property in accordance with the terms of this Agreement or the other Loan Documents.

"**Material Action**" shall mean, with respect to any Person, to institute proceedings to have such Person be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against such Person or file a petition seeking, or consent to, reorganization or relief with respect to such Person under any applicable federal, state, local or foreign law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of such Person or a substantial part of its property, or take any action to consolidate or merge such Person with or into any other Person, or take any action to divide, dissolve or liquidate such Person, or make any assignment for the benefit of creditors of such Person, or sell all or substantially all of such Person's assets, or admit in writing such Person's inability to pay its debts generally as they become due, or declare or effectuate a moratorium on the payment of any obligation, or take action in furtherance of any such action.

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, prospects, material agreements or results of operations of Borrower, any SPE Component Entity, any Guarantor, the Property or any Individual Property, (ii) the ability of

23

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Borrower or any Guarantor to perform their respective obligations under any of the Loan Documents, (iii) the enforceability or validity of any of the Loan Documents, the perfection or priority of any lien created under any of the Loan Documents or the rights, interests or remedies of Lender under any of the Loan Documents, or (iv) the value, use operation of, or cash flows from, the Property or any Individual Property.

"**Maturity Date**" shall mean **[_____]** 9, 2025, or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Borrower**" shall mean the "Borrower" as defined in the Mezzanine Loan Agreement.

"**Mezzanine Equity Collateral**" shall mean the 100% direct and/or indirect equity ownership interest held by Mezzanine Borrower in Borrower (other than any equity interest in Borrower held directly by any SPE Component Entity or directly by any Senior Mezzanine Borrower), including all of Mezzanine Borrower's equity ownership interests in any SPE Component Entity.

"**Mezzanine Foreclosure**" shall mean the transfer of the Mezzanine Equity Collateral to Mezzanine Lender in connection with the exercise of Mezzanine Lender's rights and remedies under the Mezzanine Loan Documents, provided that such transfer is made in accordance with the applicable terms and conditions of the Mezzanine Intercreditor.

"**Mezzanine Intercreditor**" shall mean that certain intercreditor or other similar agreement by and among Lender and Mezzanine Lender relating to the Loan and the Mezzanine Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with its terms.

"**Mezzanine Lender**" shall mean RMWC Silver Star Mezzanine LLC, a Delaware limited liability company, in its capacity as mezzanine lender under the Mezzanine Loan, and its successors and/or assigns (to the extent permitted under the Mezzanine Intercreditor).

"**Mezzanine Loan**" shall mean that certain loan in the original principal amount of $**[_____]** made by Mezzanine Lender to Mezzanine Borrower.

"**Mezzanine Loan Agreement**" shall mean that certain Mezzanine Loan Agreement dated as of even date herewith between Mezzanine Lender and Mezzanine Borrower in respect of the Mezzanine Loan.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Mezzanine Loan Documents**" shall mean the documents, certificates and instruments evidencing, securing or otherwise executed in connection with the Mezzanine Loan (as the same exist as of the date hereof and as the same may be amended, restated, replaced, supplemented or otherwise modified, in each case, in accordance with the express terms thereof and of the Mezzanine Intercreditor).

"**Mezzanine Loan Event of Default**" shall mean the occurrence of an "Event of Default" as such term is defined in the Mezzanine Loan Agreement.

"**Mezzanine Loan Monthly Debt Service**" shall mean, with respect to any particular period of time, regularly scheduled monthly principal (if applicable) and interest payments due under the Mezzanine Loan Documents.

"**Mezzanine Loan Release Price**" shall have the meaning set forth in Section 2.7(e) hereof.

"**Mezzanine Transfer**" shall mean each of (i) the pledge of the Mezzanine Equity Collateral by Mezzanine Borrower to Mezzanine Lender in connection with the Mezzanine Loan, (ii) any transfer of the Mezzanine Equity Collateral in connection with the exercise of Mezzanine Lender's rights and remedies under the Mezzanine Loan Documents following the occurrence and during the continuance of a Mezzanine Loan Event of Default in accordance with the applicable terms and conditions of the Mezzanine Intercreditor and (iii) any exercise by Mezzanine Lender of Mezzanine Lender's rights and remedies under the Mezzanine Loan Documents following the occurrence and during the continuance of a Mezzanine Loan Event of Default whereby Mezzanine Lender assumes sole Control of Mezzanine Borrower or Borrower in accordance with the applicable terms and conditions of the Mezzanine Intercreditor, but excluding in all events, the acquisition by any Borrower Party or Affiliate thereof of any interest in the Mezzanine Loan.

"**Minimum Counterparty Rating**" shall mean (a) a long term credit rating from S&P of at least "A+", which rating shall not include a "t" or otherwise reflect a termination risk, and (b) a long term credit rating from Moody's of at least "A1" (and, after a Securitization, the equivalent of the foregoing by the other Rating Agencies). After a Securitization of the Loan, only the ratings of those Rating Agencies rating the Securities shall apply.

"**Minimum Disbursement Amount**" shall mean Twenty-Five Thousand and No/100 Dollars ($25,000).

"**Minimum Interest**" shall have the meaning set forth in Section 2.7(d) hereof.

"**Minimum Interest Payment**" shall have the meaning set forth in Section 2.7(d) hereof.

"**Monthly Debt Service Payment**" shall have the meaning set forth in Section 2.6 hereof.

"**Monthly Insurance Deposit**" shall have the meaning set forth in Section 7.2 hereof.

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Monthly Payment Date**" shall mean  [_____] 9, 2024 and the ninth (9th) day of every calendar month occurring thereafter during the term of the Loan.

"**Monthly Tax Deposit**" shall have the meaning set forth in Section 7.2 hereof.

"**Moody's**" shall mean Moody's Investor Service, Inc.

"**Net Proceeds**" shall mean:  (i) the net amount of all insurance proceeds payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees and costs), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees and costs), if any, in collecting such Award.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 5.4 hereof.

"**New Non-Consolidation Opinion**" shall mean a substantive non-consolidation opinion provided by outside counsel acceptable to Lender and the Rating Agencies and otherwise in form and substance acceptable to Lender and the Rating Agencies.

"**Non-Consolidation Opinion**" shall mean any substantive non-consolidation opinion delivered to Lender in connection with the Loan (including, without limitation, that certain substantive non-consolidation opinion delivered to Lender by  **Neuberger, Quinn, Gielen, Reuben, Gibber, P.A.** in connection with the closing of the Loan).

"**Note**" shall mean that certain Promissory Note of even date herewith in the principal amount of $[_____], made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"**NRSRO**" shall mean any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged by Lender or its designees in connection with, or in anticipation of, a Securitization.

"**Obligations**" shall have the meaning set forth in the Security Instrument.

"**OFAC**" shall have the meaning set forth in Section 3.27 hereof.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by Responsible Officer of Borrower.

"**Open Period Start Date**" shall mean the Closing Date.

"**Operating Expense Account**" shall have the meaning set forth in Section 7.5 hereof.

"**Operating Expense Funds**" shall have the meaning set forth in Section 7.5 hereof.

26

"**Operating Expense Monthly Deposit**" shall have the meaning set forth in Section 7.5 hereof.

"**Operating Expenses**" shall mean the total of all expenditures, computed in accordance with the Approved Accounting Method, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, (and without duplication) (a) utilities, ordinary repairs and maintenance, insurance, license fees, property taxes and assessments, advertising expenses, payroll and related taxes, computer processing charges, management fees (equal to the greater of (x) **[___]** percent (**[_]**%) of Gross Rents and (y) actual management fees payable under the Management Agreement), operational equipment or other lease payments as approved by Lender, but specifically excluding (i) depreciation, (ii) Debt Service, (iii) non-recurring or extraordinary expenses, and (iv) deposits into the Reserve Funds; (b) normalized capital expenditures equal to the greater of (i) the required deposits into the Capital Expenditures Reserve Account and (ii) $**[_____]** per annum; and (c) normalized tenant improvement and leasing commission expenditures equal to the greater of (i) the required deposits into the Leasing Reserve Account and (ii) $**[_____]** per annum**]**.  If the context of this Agreement or Lender requires, Operating Expenses shall also be calculated on an Individual Property basis.

"**Organizational Chart**" shall have the meaning set forth in Section 3.28 hereof.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**PACE Loan**" shall mean any Property-Assessed Clean Energy loan or any similar financing.

"**Partial Release**" shall have the meaning set forth in Section 6.7 hereof.

"**Partial Release Date**" shall have the meaning set forth in Section 6.7 hereof.

"**Partial Release Minimum Debt Yield**" shall mean [fifteen percent (15.0%)].

"**Partial Release Minimum LTV**" shall mean [fifty-five percent (55.0%)].

"**Partial Release Price**" shall mean the greater of (i) [_____ percent (___%)] of the aggregate Allocated Loan Amount for the applicable Partial Release Property and (ii) the Partial Release Property Net Sale Proceeds.

"**Partial Release Property**" shall mean each Individual Property that is the subject of a Partial Release as set forth herein.

"**Partial Release Property Net Sale Proceeds**" shall mean, in connection with the Partial Release of the Partial Release Property, the value of all consideration received by Borrower in connection with the sale of such Partial Release Property, including cash, notes,

assumed indebtedness, deferred payments (contingent or otherwise), prepaid expenses and non-customary prorations in favor of Borrower, less the reasonable and actual costs and expenses of such sale reasonably approved by Lender, including broker's commissions payable to a third party Person that is not an Affiliate of any Restricted Party which Person is reasonably acceptable to Lender under a marketing agreement reasonably acceptable to Lender, market rate sales and marketing expenses payable to Lender-approved third party sales and marketing service providers, legal fees and transfer, sales and recording taxes (but excluding income taxes attribute to such sale), all of which costs and expenses shall not exceed three percent (3%) of the gross contract price with respect to such sale.

"**Partial Release Remaining Property**" shall mean the portion of the Property remaining subject to the lien of the Security Instrument after giving effect to a Partial Release.

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

"**Patriot Act Offense**" shall have the meaning set forth in Section 3.27 hereof.

"**Performance Achievement Date**" shall mean the date that both (a) the Debt Service Coverage Ratio (Combined) has been greater than 1.15 to 1.00 for a period of six (6) consecutive calendar months and (b) the Debt Yield (Combined) has been greater than 17.5% for six (6) consecutive calendar months.

"**Permits**" shall mean all necessary certificates, licenses, permits, franchises, trade names, certificates of occupancy, consents, and other approvals (governmental and otherwise) required under applicable Legal Requirements for the operation of the Property and the conduct of Borrower's business (including, without limitation, all required zoning, building code, land use, environmental, public assembly and other similar permits or approvals).

"**Permitted Encumbrances**" shall mean collectively, (i) the lien and security interests created by this Agreement and the other Loan Documents, (ii) all liens, encumbrances and other matters disclosed in the Title Insurance Policy, (iii) liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent (other than liens securing a PACE Loan), (iv) any workers', mechanics' or similar liens on the Property provided any such lien is discharged or bonded in accordance with the terms and conditions of the Loan Documents, and (v) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Equipment Leases**" shall mean equipment leases or other similar instruments entered into with respect to the Personal Property; provided, that, in each case, such equipment leases or similar instruments (i) are entered into on commercially reasonable terms and conditions in the ordinary course of Borrower's business and (ii) relate to Personal Property which is (A) used in connection with the operation and maintenance of the applicable Individual

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Property in the ordinary course of Borrower's business and (B) readily replaceable without material interference or interruption to the operation of the applicable Individual Property.

"**Permitted Investments**" shall mean "permitted investments" as then defined and required by the Rating Agencies.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, real estate investment trust, unincorporated association, any other entity, any Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Policies**" shall have the meaning specified in Section 5.1 hereof.

"**Prepayment Notice**" shall have the meaning specified in Section 2.7(a) hereof.

"**Prime**" shall mean the rate of interest published in The Wall Street Journal from time to time as the "Prime Rate." If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest 1/100th of one percent (0.01%).  If The Wall Street Journal ceases to publish the "Prime Rate," Lender shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasigovernmental body, then Lender shall select a comparable interest rate index.

"**Prime Floor**" shall mean the Benchmark Floor.

"**Prime Rate**" shall mean the sum of (i) the greater of (A) Prime and (B) the Prime Floor, and (ii) the Prime Spread.

"**Prime Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon Prime pursuant to Section 2.5 hereof.

"**Prime Spread**" shall mean the difference (expressed as the number of basis points) between (a) the Benchmark Rate on the Determination Date that the Benchmark was last applicable to the Loan and (b) Prime on the Determination Date that the Benchmark was last applicable to the Loan; provided, however, in no event shall such difference be a negative number.

"**Prohibited Entity**" shall mean any Person which (i) is a statutory trust organized under 12 *Del.C.* § 3801 *et seq.* (or any successor statute thereto), or under any similar state or federal law excluding the Delaware Statutory Trusts previously disclosed by Borrower to Lender who are "sponsored" by Silver Star REIT Properties, Inc. , (ii) is a Crowdfunded Person or (iii) owns a direct or indirect interest in Borrower, any SPE Component Entity or the Property through a tenancy-in-common or other similar form of ownership interest.

29

"**Prohibited Transfer**" shall mean (i) a Sale or Pledge of the Property or any part thereof or any legal or beneficial interest therein, including, without limitation, any interest in the Loan and/or Loan Documents (but excluding any Permitted Encumbrance), (ii) a Sale or Pledge of an interest in any Restricted Party and/or (iii) Borrower's acquisition of any real property in addition to the real property owned by Borrower as of the Closing Date.  A Prohibited Transfer shall include, but not be limited to, (A) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (B) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any (1) Leases or any Rents or (2) Property Documents; (C) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (D) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new limited partnership interests; (E) if a Restricted Party is a limited liability company, any division, merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest, or the creation or issuance of new membership interests; (F) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (G) the removal or the resignation of Manager (including, without limitation, an Affiliated Manager) or the engagement of a new Manager, in each case, other than in accordance with the terms and conditions of this Agreement; (H) if Borrower enters into, or the Property is subjected to, any PACE Loan; (I) the incurrence of any mezzanine (or similar) financing secured by a pledge of, or other lien on, any direct or indirect interests in Borrower other than the Mezzanine Loan; or (J) any action for partition of the Property (or any portion thereof or interest therein) or any similar action instituted or prosecuted by Borrower or by any other Person, pursuant to any contractual agreement or other instrument or under applicable law (including, without limitation, common law) and/or any other action instituted by (or at the behest of) Borrower or its Affiliates or consented to or acquiesced in by Borrower or its Affiliates which results in a Property Document Event.

"**Property**" shall mean, collectively, all of the Individual Properties. For the avoidance of doubt, Property and Individual Properties may be used interchangeably.

"**Property Document**" shall mean, individually and collectively, each REA.

"**Property Document Event**" shall mean any event which would, directly or indirectly, cause a termination, termination right, right of first refusal, first offer or any other similar right, cause any termination fees to be due or would cause a Material Adverse Effect to occur under any Property Document (in each case, beyond any applicable notice and cure periods under the applicable Property Document); provided, however, any of the foregoing shall not be deemed a

Property Document Event to the extent Lender's prior written consent is obtained with respect to the same.

"**Property Document Provisions**" shall mean the representations, covenants and other terms and conditions of this Agreement and the other Loan Documents related to, in each case, any Property Document and/or other related matters (including, without limitation, Sections 3.32 and 4.25 of this Agreement).

"**Provided Information**" shall mean any information provided by or on behalf of any Borrower Party in connection with the Loan, the Property, such Borrower Party and/or any related matter or Person.

"**Prudent Lender Standard**" shall, with respect to any matter, be deemed to have been met if the matter in question (i) prior to a Securitization, is reasonably acceptable to Lender and (ii) after a Securitization, (A) if permitted by REMIC Requirements applicable to such matter, would be reasonably acceptable to Lender or (B) if the Lender discretion in the foregoing subsection (A) is not permitted under such applicable REMIC Requirements, would be acceptable to a prudent lender of securitized commercial mortgage loans.

"**Qualified Carrier**" shall have the meaning set forth in Section 5.1 hereof.

"**Qualified Management Agreement**" shall mean a management agreement with a Qualified Manager with respect to the Property which is approved by Lender in writing (which such approval may be conditioned upon Lender's receipt of (i) a Rating Agency Confirmation with respect to such management agreement and (ii) if such Qualified Manager is an Affiliated Manager, and a Non-Consolidation Opinion has been previously provided to Lender, a New Non-Consolidation Opinion with respect to such management agreement).

"**Qualified Manager**" shall mean a Person approved by Lender in writing (which such approval may be conditioned upon Lender's receipt of (i) a Rating Agency Confirmation with respect to such Person and (ii) if such Person is an Affiliated Manager, and a Non-Consolidation Opinion has been previously provided to Lender, a New Non-Consolidation Opinion with respect to such Person).

"**Rating Agencies**" shall mean each of S&P, Moody's, Fitch, DBRS, Inc., Kroll Bond Ratings and Morningstar Credit Ratings, LLC and any other nationally-recognized statistical rating agency designated by Lender (and any successor to any of the foregoing) in connection with and/or in anticipation of any Secondary Market Transaction.

"**Rating Agency Confirmation**" shall mean a written affirmation from each of the Rating Agencies that the credit rating of the Securities given by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion; provided, however, (i) if a Securitization has occurred and either (A) any Rating Agency fails to respond to any request for a Rating Agency

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Confirmation with respect to such event or otherwise elects (verbally or in writing) not to consider such event or (B) Lender (or Servicer) is not required to and has elected not to obtain (or cause to be obtained) a Rating Agency Confirmation with respect to such event, in each case, pursuant to and in compliance with the Securitization's pooling and servicing agreement (or similar agreement), then, notwithstanding anything contained in this Agreement to the contrary, Lender's written approval of such event shall be required in lieu of a Rating Agency Confirmation, in the case of clause (i)(A) above, from such Rating Agency or Rating Agencies (only) or, in the case of clause (i)(B) above, from each of the Rating Agencies or (ii) if a Securitization has not occurred, then, notwithstanding anything contained in this Agreement to the contrary, the term "Rating Agency Confirmation" shall be deemed instead to require Lender's written approval of such event.   In the event that either of clause (i) or (ii) of the foregoing proviso applies, Lender's approval shall be based on Lender's good faith determination of applicable Rating Agency standards and criteria, unless Lender has an independent approval right in respect of such event pursuant to the other terms of this Agreement or the other Loan Documents, in which case the discretion afforded to Lender in connection with such independent approval right shall apply.

"**REA**" shall mean, individually and collectively, each agreement described on <u>Exhibit D</u> hereto (if any), any amendment, restatement, replacement or other modification thereof, any future reciprocal easement agreement, declaration of covenants, conditions and/or restrictions or other similar agreement affecting the Property or any Individual Property entered into in accordance with the applicable terms and conditions hereof and any amendment, restatement, replacement or other modification thereof.

"**Recourse Amount**" shall mean an amount equal to the aggregate of all amounts by which the Mezzanine Loan is repaid or prepaid in violation of Section 2.7(e) hereof.

"**Register**" shall have the meaning set forth in Section 9.7 hereof.

"**Registrar**" shall have the meaning set forth in Section 9.7 hereof.

"**Registration Statement**" shall mean the registration statement relating to a Securitization.

"**Regulation AB**" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

"**Related Loan**" shall mean a loan to an Affiliate of Borrower or secured by a Related Property, that is included in a Securitization with the Loan (or any portion thereof or interest therein).

"**Related Property**" shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" within the meaning of the definition of Significant Obligor, to the Property.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Relevant Governmental Body**" shall mean the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York, or any successor thereto.

"**REMIC Opinion**" shall mean, as to any matter, an opinion as to the compliance of such matter with applicable REMIC Requirements (which such opinion shall be, in form and substance and from a provider, in each case, reasonably acceptable to Lender and acceptable to the Rating Agencies).

"**REMIC Requirements**" shall mean any applicable legal requirements relating to any REMIC Trust (including, without limitation, those relating to the continued treatment of the Loan (or the applicable portion thereof and/or interest therein) as a "qualified mortgage" held by such REMIC Trust, the continued qualification of such REMIC Trust as such under the IRS Code, the non-imposition of any tax on such REMIC Trust under the IRS Code (including, without limitation, taxes on "prohibited transactions" and "contributions") and any other constraints, rules and/or other regulations and/or requirements relating to the servicing, modification and/or other similar matters with respect to the Loan (or any portion thereof and/or interest therein) that may now or hereafter exist under applicable legal requirements (including, without limitation under the IRS Code)).

"**REMIC Trust**" shall mean any "real estate mortgage investment conduit" within the meaning of Section 860D of the IRS Code that holds any interest in all or any portion of the Loan.

"**Rent Roll**" shall have the meaning set forth in Section 3.19 hereof.

"**Rents**" shall have the meaning set forth in the Security Instrument.

"**Replacement Interest Rate Cap Agreement**" shall have the meaning set forth in Section 2.8(c) hereof.

"**Reserve Accounts**" shall mean the Tax Account, the Insurance Account, the Capital Expenditures Reserve Account, the Immediate Repair Account, the Leasing Reserve Account, the Excess Cash Flow Account, the Operating Expense Account, the Interest and Operating Expense Reserve Account, the Interest Rate Cap Reserve Account and any other escrow account established by this Agreement or the other Loan Documents (but specifically excluding the Cash Management Account, the Clearing Account and the Debt Service Account).

"**Reserve Funds**" shall mean the Tax and Insurance Funds, the Capital Expenditures Reserve Funds, the Immediate Repair Funds, the Leasing Reserve Funds, the Excess Cash Flow Funds, the Operating Expense Funds, the Interest and Operating Expense Reserve Funds, the Interest Rate Cap Reserve Funds and any other escrow funds established by this Agreement or the other Loan Documents.

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Responsible Officer**" means with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer or vice president of such Person or such other similar officer of such Person reasonably acceptable to Lender.

"**Restoration**" shall mean, following the occurrence of a Casualty or a Condemnation which is of a type necessitating the repair of the Property (or any portion thereof), the completion of the repair and restoration of the Property (or applicable portion thereof) as nearly as possible to the condition the Property (or applicable portion thereof) was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**Restoration Retainage**" shall have the meaning set forth in Section 5.4 hereof.

"**Restoration Threshold**" shall mean an amount equal to 5% of the outstanding principal amount of the Loan multiplied by the Allocated Loan Ratio for the affected Individual Property.

"**Restricted Party**" shall mean Borrower, Sponsor, Guarantor, any SPE Component Entity, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, Sponsor, Guarantor, any SPE Component Entity, any Affiliated Manager or any non-member manager.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest.

"**Satisfactory Replacement Guarantor**" shall have the meaning set forth in Section 6.4.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 9.1 hereof.

"**Securities**" shall have the meaning set forth in Section 9.1 hereof.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Securitization**" shall have the meaning set forth in Section 9.1 hereof.

"**Security Instrument**" shall mean, each individually and/or collectively, as the context may require, those certain first priority Deeds of Trust and Security Agreements dated as of the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as any of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Senior Mezzanine Borrower**" shall have the meaning set forth in Section 9.5 hereof.

"**Senior Mezzanine Equity Collateral**" shall have the meaning set forth in Section 9.5 hereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Senior Mezzanine Loan**" shall have the meaning set forth in Section 9.5 hereof.

"**Servicer**" shall have the meaning set forth in Section 9.4 hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 9.4 hereof.

"**Severed Loan Documents**" shall have the meaning set forth in Article 10.

"**Significant Obligor**" shall have the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

"**SPE Component Entity**" shall have the meaning set forth on Exhibit C attached hereto.

"**Sponsor**" shall mean [Guarantor**]**.

"**Springing Member LLC**" shall mean a Delaware limited liability company properly structured in accordance with applicable Rating Agency criteria with at least one springing member that shall, upon the dissolution, withdrawal or disassociation of such limited liability company's last remaining member, immediately become the sole member of such limited liability company.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"**State**" shall mean the state in which the Property or any part thereof is located.

"**Strike Rate**" shall mean **[_____ percent (___%)]**, subject to the provisions of Section 2.8(g) hereof.

"**Subject Transaction**" shall mean Borrower's acquisition of each Individual Property**.**

"**Substitution**" shall have the meaning set forth in Section 6.4.

"**Survey**" shall mean that certain survey of the Property certified and delivered to Lender in connection with the closing of the Loan.

"**Syndication**" shall have the meaning set forth in Section 9.7 hereof.

"**Tax Account**" shall have the meaning set forth in Section 7.2 hereof.

"**Tax and Insurance Funds**" shall have the meaning set forth in Section 7.2 hereof.

"**Taxes**" shall mean all taxes, assessments, water rates, sewer rents, and other governmental impositions, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Tax Payment Date**" shall mean, with respect to any applicable Taxes, the date occurring 30 days prior to the date the same are due and payable.

"**Tenant**" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Property under a Lease or other occupancy agreement.

"**Tenant Direction Notice**" shall have the meaning set forth in Section 8.2 hereof.

"**Term SOFR**" shall mean, with respect to each Interest Period, the rate identified as "1 Month CME Term SOFR" by the Term SOFR Administrator on the CME Market Data Platform https://www.cmegroup.com/market-data/cme-group-benchmark-administration/term-sofr.html (or any successor source for the rate currently identified as "1 Month CME Term SOFR" identified as such by the Term SOFR Administrator from time to time) as of 6:00 a.m. (New York City time) on the Determination Date (rounded upwards, if necessary, to the nearest 1/100th of 1%).

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited or a successor administrator of the rate currently identified as "1 Month CME Term SOFR" that has been broadly adopted by the commercial real estate finance industry as a successor administrator of such rate, as determined by Lender in good faith.

"**Term SOFR Business Day**" means any day except for a Saturday, Sunday, a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. governmental securities or a day for and on which the Term SOFR Administrator is not required to publish Term SOFR in accordance with the applicable guidelines, rules or requirements for, or announcements regarding, the publication of Term SOFR as issued and in force by, or with respect to, the Term SOFR Administrator from time to time.

"**Title Insurance Policy**" shall mean, individually and collectively, each ALTA (or TLTA, as applicable) mortgagee title insurance policy issued with respect to the Property and insuring the lien of the Security Instrument.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State.

"**Unaffiliated Third Party**" shall mean any Person (including, without limitation, the press or media, any bank, savings association, corporation, company, limited liability company, group, partnership, trust or other business entity or any individual), but specifically excluding any Restricted Party, Manager, and any Lender Party.

"**Underwritable Cash Flow**" shall mean an amount calculated by Lender on a monthly basis equal to Gross Rents, less the trailing twelve (12) months Operating Expenses, each of which shall be subject to Lender's application of the Underwriting Adjustments. Lender's calculation of Underwritable Cash Flow (including determination of items that do not qualify as Operating Expenses) shall be calculated by Lender in good faith based upon Lender's

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

determination of Rating Agency criteria and shall be final absent manifest error. If the context of this Agreement or Lender requires, Underwritable Cash Flow shall also be calculated on an Individual Property basis.

"**Underwriting Adjustments**" shall mean adjustments made by Lender in its calculation of Underwritable Cash Flow and the components thereof, in each case, based upon Lender and Rating Agency underwriting criteria, which such adjustments shall include, without limitation, adjustments (A) for (i) items of a non-recurring nature, and (ii) a credit loss/vacancy allowance equal to the greater of actual vacancy and **[___ percent (___%)]**, and (B) to exclude rental income attributable to any Tenant (1) in bankruptcy that has not affirmed its Lease in the applicable bankruptcy proceeding pursuant to a final, non-appealable order of a court of competent jurisdiction, (2) not paying rent under its Lease or otherwise in default under its Lease beyond any applicable notice and cure periods, (3) that has expressed its intention in writing to not renew, terminate, cancel and/or reject its applicable Lease, or that has failed to extend or renew its applicable Lease by the deadline prescribed under such Lease, (4) whose Lease is not in full force and effect, (5) whose tenancy at the Property is month-to-month, (6) who is not in actual occupancy of its respective demised space at the Property and/or (7) under a Lease which expires within 90 days or less of the applicable date of calculation hereunder.

"**Underwriter Group**" shall mean Lender Affiliate, any other placement agent or underwriter with respect to the applicable Securitization, each of their respective directors and each Person who controls the applicable Lender Affiliate or any other placement agent or underwriter within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act.

"**Updated Information**" shall have the meaning set forth in Section 9.1 hereof.

"**U.S. Obligations**" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption.

**Section 1.2    Principles of Construction**.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. References herein to the Property "or any portion thereof" and words of similar import shall, as applicable, be deemed to refer to any portion of the Property taken as a whole (including any Individual Property) and to any portion of any Individual Property.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ARTICLE 2

## GENERAL TERMS

**Section 2.1    No Loan Commitment**.  Except as expressly and specifically set forth herein, Lender has no obligation or other commitment to loan any funds to Borrower or otherwise make disbursements to Borrower.  Borrower hereby waives any right Borrower may have to make any claim to the contrary.

**Section 2.2    The Loan**.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

**Disbursement to Borrower**.  Borrower may request and receive only one borrowing hereunder in respect of the Loan. Any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.

**Section 2.3    The Note and the other Loan Documents**.  The Loan shall be evidenced by the Note and this Agreement and secured by this Agreement and the other Loan Documents.

**Section 2.4    Interest Rate**.

(a)    Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date at the Interest Rate until repaid in accordance with the applicable terms and conditions hereof.

(b)    The following additional provisions shall apply and, subject to Section 2.5(c) hereof, the Interest Rate shall be determined in accordance with this Section 2.5(b):

(i)    Subject to the terms and conditions hereof, the Loan shall be a Benchmark Rate Loan, and the Interest Rate with respect to each Interest Period shall be the Benchmark Rate, unless the Loan is converted to (and for so long as the Loan remains) a Prime Rate Loan pursuant to the provisions hereof, in which case the Interest Rate with respect to the applicable Interest Period shall be the Prime Rate.  Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a Benchmark Rate Loan to a Prime Rate Loan, or vice versa.

(ii)    Any change in the rate of interest hereunder due to (A) a change in the Benchmark or Prime, as applicable, or (B) a conversion of the Loan from a Benchmark Rate Loan to a Prime Rate Loan, or vice versa, shall, in each such case, become effective as of the opening of business on the first day on which such change or conversion shall become effective.

(iii)    Subject to the final sentence of this clause (iii), upon the occurrence of a Benchmark Unavailability Event, Lender shall forthwith give

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

notice thereof (which notice may be given by telephone, confirmed in writing) to Borrower at least one (1) day prior to the last day of the related Interest Period. If such notice is given, then the related outstanding Benchmark Rate Loan shall be converted, on the last day of the then current Interest Period, to a Prime Rate Loan and Borrower shall cooperate with any and all reasonable requests of Lender to make any necessary changes to this Agreement or the other Loan Documents to conform the same to such change in the interest rate hereunder. Notwithstanding the foregoing, in the event that both a Benchmark Unavailability Event and a Benchmark Transition Event have occurred, the provisions of this Agreement relating to the Benchmark Transition Event shall govern and control unless a Benchmark Unavailability Event has also occurred with respect to the applicable Benchmark Replacement, in which case the provisions of this Agreement relating to the Benchmark Unavailability Event shall govern and control.

(iv) Subject to the final sentence of this clause (iv), if, pursuant to the terms hereof, any portion of the Loan has been converted to a Prime Rate Loan and Lender shall determine that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice of such determination (which notice may be given by telephone, confirmed in writing), to Borrower at least one (1) day prior to the last day of the related Interest Period. If such notice is given, the related outstanding Prime Rate Loan shall be converted to a Benchmark Rate Loan on the last day of the then current Interest Period. Notwithstanding the foregoing, in the event that a Benchmark Transition Event has occurred, the provisions of this Agreement relating to the Benchmark Transition Event shall govern and control.

(v) Upon the occurrence of a Benchmark Transition Event, the applicable Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder as of the applicable Benchmark Transition Date, without the need for any amendment to, or further action or consent of any other party to, this Agreement or any of the other Loan Documents, and from and after such Benchmark Transition Date the Loan shall continue to be deemed to be a Benchmark Rate Loan, bearing interest at the new Benchmark. In no event shall Borrower have the right to change the Benchmark, or to unilaterally implement any Benchmark Replacement Adjustment.

(vi) In connection with any Benchmark Transition Event, Lender shall have the right to make Benchmark Replacement Conforming Changes to this Agreement or any of the other Loan Documents from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any such Benchmark Replacement Conforming Changes will become effective without any further action or consent of Borrower, Guarantor, or any other Person. In addition, within ten (10) Business Days after request by Lender, Borrower shall execute, acknowledge, and deliver, at Borrower's cost and expense, all further acts, deeds, conveyances, assignments, financing statements,

transfers, documents, agreements, assurances, and such other instruments as Lender may reasonably require from time to time in such manner as Lender determines is reasonably necessary to implement any applicable Benchmark Replacement Conforming Changes.  In no event shall Borrower have the right to unilaterally implement any Benchmark Replacement Conforming Changes.

(vii)    Lender shall promptly notify Borrower of (A) any occurrence of a Benchmark Transition Event and its related Benchmark Transition Date, (B) the implementation of any Benchmark Replacement and related Benchmark Replacement Adjustment and (C) the implementation of any Benchmark Replacement Conforming Changes; provided, however, that the failure of Lender to deliver any such notice to Borrower shall not in any way undermine the effectiveness of any of the foregoing.  Any determination, decision or election made by Lender pursuant to, or in connection with, this Section 2.5 (including, without limitation, any determination with respect to a tenor, rate or adjustment, or of the occurrence or non-occurrence of an event, circumstance or date, or any decision to take or refrain from taking any action, or to make or refrain from making any election or selection) will be conclusive and binding on Borrower and all other parties to the Loan Documents, absent manifest error, and may be made in Lender's sole discretion and without consent from, or consultation with, Borrower, Guarantor, or any other Person.

(viii)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, any and all present or future taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto, excluding (a) net income, franchise and branch profits taxes (x) imposed as a result of Lender being organized under the laws of, or having its principal office or applicable lending office located in, the jurisdiction imposing such tax (or any political subdivision thereof) or (y) that are imposed as a result of a present or former connection between Lender and the jurisdiction imposing such tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or Loan Document), (b) U.S. federal withholding taxes imposed on amounts payable to or for the account of Lender with respect to an applicable interest in the Loan (other than pursuant to an assignment request by Borrower) or Lender changes its lending office, except in each case to the extent that, pursuant to this Section 2.5(b)(viii), amounts with respect to such taxes were payable either to Lender's assignor immediately before Lender became a party hereto or to Lender immediately before it changed its lending office, (c) taxes attributable to Lender's failure to comply with Section 2.5(b)(xii) below, and (d) any withholding taxes imposed under FATCA  (such non-excluded taxes being referred to collectively

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

as "**Foreign Taxes**"). If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any Foreign Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Foreign Tax. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Foreign Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence. Borrower shall indemnify Lender, within 10 days after demand therefor, for the full amount of any Foreign Taxes (including Foreign Taxes imposed or asserted on or attributable to amounts payable under this Section 2.5(b)(viii)) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Foreign Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error. All amounts payable under this Section 2.5(b)(viii) shall constitute additional interest hereunder and shall be secured by the Security Instrument and the other Loan Documents. The provisions of this Section 2.5(b)(viii) shall survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument. Any reference under this Section 2.5(b)(viii) to "Lender" shall be deemed to include any participant, Co-Lender and any assignees.

(ix) If any Change in Law shall hereafter make it unlawful for Lender to make or maintain a Benchmark Rate Loan at the then-applicable Benchmark as contemplated hereunder, then (A) the obligation of Lender hereunder to make such a Benchmark Rate Loan, or to convert a Prime Rate Loan to a such a Benchmark Rate Loan, shall be canceled forthwith and (B) any outstanding Benchmark Rate Loan shall be converted automatically to a Prime Rate Loan on the last day of the then current Interest Period or within such earlier period as required by law. Borrower hereby agrees to promptly pay to Lender, within twenty (20) business days after demand, any additional amounts necessary to compensate Lender for any reasonable costs incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain such Benchmark Rate Loan hereunder. Lender's notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(x) If any Change in Law:

(A)    shall hereafter impose, modify or hold applicable any reserve, capital adequacy, tax, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the Benchmark hereunder;

(B)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(C)    shall hereafter impose on Lender any other condition, and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable as determined by Lender.  If Lender becomes entitled to claim any additional amounts pursuant to this subsection, Lender shall provide Borrower with not less than thirty (30) days' notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error.  This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(xi)    Borrower agrees to indemnify Lender and to hold Lender harmless from any loss or expense which Lender sustains or incurs (A) to the extent resulting from any default by Borrower in payment of the principal of, or interest on, a Benchmark Rate Loan, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by Lender in order to maintain such Benchmark Rate Loan, (B) as a consequence of any prepayment (whether voluntary or mandatory) of the Benchmark Rate Loan on a day that is not the last day of an Interest Period, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the Benchmark Rate Loan hereunder and (C) as a consequence of the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Interest Rate from the Benchmark Rate to the Prime Rate with respect to any portion of the outstanding principal amount of the Loan then bearing interest at the Benchmark Rate on a date other than the last day

42

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

of an Interest Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a Benchmark Rate Loan hereunder (the amounts referred to in clauses (A), (B) and (C) are herein referred to collectively as the "**Breakage Costs**"); provided, however, Borrower shall not indemnify Lender from any loss or expense arising from Lender's willful misconduct or gross negligence. This provision shall survive payment of the Note in full and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(xii)   If Lender is a U.S. Person (other than the lender originally named herein), Lender shall deliver to Borrower, on or about the date on which it becomes Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), two executed copies of Form W-9 certifying that it is not subject to U.S. federal backup withholding tax (unless it establishes to the reasonable satisfaction of Borrower that it is otherwise eligible for an exemption from backup withholding tax or other withholding tax). If Lender is not a U.S. Person, Lender shall deliver to Borrower, to the extent legally entitled to do so, on or about the date on which it becomes Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), whichever of the following is applicable: (A) two executed copies Form W-8BEN or W-8BEN-E, establishing an exemption from U.S. federal withholding tax under an applicable tax treaty, (B) two executed copies of Form W-8ECI, (C) if Lender is claiming the benefits of the exemption for portfolio interest under Section 881(c) of the IRS Code, (x) a certificate to the effect that Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the IRS Code, a "10 percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the IRS Code, or a "controlled foreign corporation" related to Borrower as described in Section 881(c)(3)(C) of the IRS Code (a "**U.S. Tax Compliance Certificate**") and (y) two executed copies of Form W-8BEN or IRS Form W-8BEN-E, or (D) two executed copies of Form W-8IMY, accompanied by Forms W-8BEN, W-8BEN-E, W-9, and U.S. Tax Compliance Certificates, for each beneficial owner, as applicable. If a payment made to Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA, Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by applicable law for Borrower to comply with its obligations under FATCA. Solely for purposes of the preceding sentence, "FATCA" shall include any amendments made to FATCA after the date of this Agreement. Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower in writing of its legal inability to do so. Any reference under this Section 2.5(b)(xii) to "Lender" shall be deemed to include any participant, Co-Lender and any assignees.

(c)    In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by applicable Legal Requirements, overdue interest in respect of the Loan, shall, at Lender's election, accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default, without regard to any grace or cure periods contained herein.  Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Lender shall elect.

(d)    Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (i) the actual number of days elapsed in the period for which the calculation is being made by (ii) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (iii) the outstanding principal balance of the Loan.  The accrual period for calculating interest due on each Monthly Payment Date shall be the Interest Period in which such Monthly Payment Date falls.  Borrower understands and acknowledges that such interest accrual requirement results in  more interest accruing on the Loan than if either a thirty (30) day month and a three hundred sixty (360) day year or the actual number of days and a three hundred sixty-five (365) day year were used to compute the accrual of interest on the Loan.

(e)    This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

(f)    In the event of a conversion of the Loan from a Benchmark Rate Loan to a Prime Rate Loan, or vice versa, or the replacement of the then-applicable Benchmark with a Benchmark Replacement, Borrower shall pay to Lender, upon demand, any additional amounts necessary to compensate Lender for out-of-pocket costs and expenses in making such conversion or replacement in accordance with this Section 2.5.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 2.5    Loan Payments**.

(a)    Borrower shall make a payment to Lender of interest only (calculated using the Closing Date as the Determination Date) on the Closing Date for the period from the Closing Date through and including the next succeeding fourteenth (14th) day of a calendar month, whether such fourteenth (14th) day shall occur in the calendar month in which the Closing Date occurs or in the month immediately succeeding the month in which the Closing Date occurs (unless the Closing Date is the fifteenth (15th) day of a calendar month, in which case no such separate payment of interest shall be due). Each interest accrual period (the "**Interest Period**") thereafter shall commence on the fifteenth (15th) day of each calendar month during the term of the Loan and shall end on and include the fourteenth (14th) day of the next occurring calendar month. No Interest Period shall be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

(b)    On each Monthly Payment Date throughout the term of the Loan, Borrower shall make a payment to Lender of interest accruing on the outstanding principal balance of the Loan during the Interest Period in which such Monthly Payment Date occurs (each such payment, a "**Monthly Debt Service Payment**"), which payments shall be applied to accrued and unpaid interest.

(c)    Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Security Instrument and the other Loan Documents.

(d)    If any principal, interest or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (i) five percent (5%) of such unpaid sum and (ii) the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Security Instrument and the other Loan Documents.

(e)    Additionally:

(i)    Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(ii)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

the due date thereof shall be deemed to be the immediately succeeding Business Day.

(iii)     All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

(iv)     Lender shall have the right one time during the term of the Loan, in its sole discretion, upon not less than thirty (30) days prior written notice to Borrower, to change the Monthly Payment Date to a different calendar day each month which is not earlier than the first (1st) of the calendar month and is not more than ten (10) days later than the originally scheduled Monthly Payment Date of each calendar month; provided, however, that (A) if Lender shall have elected to change the Monthly Payment Date as aforesaid, Lender shall have the option, but not the obligation, to adjust the Interest Period correspondingly and (B) if Lender shall have elected to change the Monthly Payment Date as aforesaid to any calendar day earlier than the originally scheduled Monthly Payment Date of each calendar month, Borrower shall have a grace period for any amounts due on a Monthly Payment Date through the originally scheduled Monthly Payment Date of each calendar month.

## Section 2.6     Prepayments.

(a)     Except as otherwise provided in this Section 2.7 hereof, Borrower shall not have the right to prepay the Loan in whole or in part.  On or after the Open Period Start Date, Borrower may, provided no Event of Default has occurred and is continuing, at its option and upon not less than forty-five (45) days (and not more than ninety (90) days) prior notice (except in the case of a Partial Release, in which case such notice shall be given in accordance with Section 6.7) to Lender (a "**Prepayment Notice**"), which notice must specify the date on which such prepayment is to be made, prepay the Debt in whole (but not in part other than partial prepayments made in connection with any Partial Release consummated in accordance with Section 6.7 hereof) on any date (other than a date from, and including, the tenth (10th) day of a calendar month through, and including, the fourteenth (14th) day of a calendar month); provided that such prepayment is accompanied by payment of the Breakage Costs, the Exit Fee and the Minimum Interest Payment, in each case to the extent applicable.  In addition to the foregoing, any prepayment received by Lender shall include interest which would have accrued thereon through the remainder of the Interest Period in which such prepayment occurs (such amounts, the "**Interest Shortfall**"). Lender shall not be obligated to accept any prepayment unless Borrower has delivered the Prepayment Notice required hereunder and such prepayment is accompanied by payment of [the Breakage Costs, the Exit Fee, the Minimum Interest Payment, in each case to the extent applicable, and the applicable Interest Shortfall due in connection therewith.  Borrower hereby further agrees that, in the event Borrower delivers a Prepayment Notice and fails to prepay the Loan in accordance with the terms of this Section 2.7 on the date specified in such Prepayment Notice,

Borrower shall (i) pay Lender all reasonable out-of-pocket costs and expenses incurred by Lender, including, without limitation, any Breakage Costs or similar expenses, as a result of such failure and (ii) be obligated to provide a new Prepayment Notice as a condition to any prepayment of the Loan pursuant to the requirements of this Section 2.7, except that such subsequent notice may be given with no less than thirty (30) days' notice or such shorter period as may be reasonably approved by Lender.

(b)    On each date on which Lender actually receives a distribution of Net Proceeds, and if Lender is not required pursuant to the terms and conditions of this Agreement to (and does not otherwise elect to) make such Net Proceeds available to Borrower for Restoration, Borrower shall, at Lender's option, prepay the Debt in an amount equal to one hundred percent (100%) of such Net Proceeds.  Any prepayment received by Lender under this Section 2.7(b) shall be accompanied by (i) any applicable Interest Shortfall , the applicable portion of the Exit Fee and any Breakage Costs, (ii) all other sums due and payable under the Loan Documents (including, without limitation, any amount due under Section 9.6 hereof), except that no Minimum Interest Payment shall be required in connection therewith, and (iii) all reasonable out-of-pocket costs and expenses incurred by Lender in connection with such prepayment.  No prepayment premium or penalty (which shall not be deemed to include the Exit Fee, which shall be owed as provided for in this Agreement) shall be due in connection with any prepayment made pursuant to this Section 2.7(b).

(c)    If concurrently with or after an Event of Default (including, without limitation, after acceleration of the Debt), payment of all or any part of the principal of the Loan is tendered by or on behalf of Borrower (including, without limitation, by virtue of an application of Reserve Funds or any other cash collateral for the Loan by Lender pursuant to the terms and conditions of the Loan Documents), a purchaser at foreclosure or any other Person, (i) such tender shall be deemed a voluntary prepayment made in violation of, and in an attempt to circumvent, the prohibition against prepayment set forth herein and (ii) Borrower, such purchaser at foreclosure or other Person shall pay the Minimum Interest Payment, the Exit Fee and the Breakage Costs, in each case to the extent applicable, in addition to (A) the outstanding principal balance of the Loan, and (B) all accrued and unpaid interest and other amounts payable under the Loan Documents (including, without limitation, the Interest Shortfall). Notwithstanding anything to the contrary contained herein or in any other Loan Document, any prepayment of the Debt shall be applied to the Debt in such order and priority as may be determined by Lender in its sole discretion.

(d)    In all events and under all circumstances Borrower shall be obligated to pay to Lender minimum interest in an amount equal to $[_____] (the "**Minimum Interest**").  Upon prepayment or repayment in full of the Obligations or the acceleration thereof in accordance with the terms of any of the Loan Documents, Borrower shall pay to Lender an amount (such amount, the "**Minimum Interest Payment**") equal to the positive difference, if any, between (i) the entire Minimum Interest, minus (ii) the aggregate total of all Monthly Debt Service Payments paid by

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Borrower during the term of the Loan (exclusive of any portions thereof constituting (A) interest accrued at the Default Rate in excess of the Interest Rate that would apply hereunder but for the existence of any Event of Default, or (B) payments of principal). In furtherance of the foregoing, Borrower expressly acknowledges and agrees that (x) Lender shall have no obligation to accept any prepayment or repayment of the Loan unless and until Borrower shall have complied with this Section 2.7(d), and (y) Lender shall have no obligation to release or, if requested by Borrower, assign the Note and Security Instrument upon payment of the Obligations unless and until Lender shall have received the entire Minimum Interest Payment. In the event that any Minimum Interest Payment is due hereunder, Lender shall deliver to Borrower a statement setting forth the amount and determination of the Minimum Interest Payment, and, provided that Lender shall have in good faith applied the formula described above, Borrower shall not have the right to challenge the calculation or the method of calculation set forth in any such statement in the absence of manifest error, which calculation may be made by Lender on any day during the fifteen (15) day period preceding the date of such prepayment. Lender shall not be obligated or required to have actually reinvested the prepaid principal balance at the Benchmark or otherwise as a condition to receiving the Minimum Interest Payment. Borrower expressly acknowledges and agrees that the Minimum Interest Payment shall constitute additional consideration for the Loan, and shall, upon payment, be the sole and exclusive property of Lender.

(e)      Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, in no event shall Borrower permit Mezzanine Borrower or any other Person to repay at maturity, or prepay (which shall be deemed to include any repayment in connection with any acceleration of the Mezzanine Loan and any acquisition of the Mezzanine Loan by Mezzanine Borrower, Guarantor, or any Affiliate of either of the foregoing), the Mezzanine Loan, in whole or in part, unless (i) the Debt is contemporaneously repaid or defeased in full in accordance with the applicable terms and conditions of this Agreement or (ii) the Debt has been previously repaid or defeased in full in accordance with the applicable terms and conditions of this Agreement; [*provided, however*, that the partial prepayments of the Mezzanine Loan required pursuant to Section [__] of the Mezzanine Loan Agreement in connection with any Partial Release (with respect to each applicable Partial Release, the "**Mezzanine Loan Release Price**") shall not be prohibited pursuant to this Section 2.7(e) so long as each applicable Partial Release is consummated by Borrower in accordance with the terms of Section 6.7 hereof] Borrower's failure to comply with the foregoing shall, at Lender's option, constitute an Event of Default hereunder.

**Section 2.7    Interest Rate Cap Agreement**.

(a)      Prior to or contemporaneously with the Closing Date, Borrower shall enter into an Interest Rate Cap Agreement with a Benchmark strike rate equal to the Strike Rate. The Interest Rate Cap Agreement (i) shall at all times be in a form and substance acceptable to Lender, (ii) shall at all times be with a Counterparty, (iii) shall at all times be for a period equal to the term of the Loan, and (iv) shall at all times have a notional

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

amount equal to or greater than the face amount of the Note and shall at all times provide for the applicable Benchmark strike rate to be equal to the Strike Rate.  Borrower shall direct such Counterparty to deposit directly into the Interest Rate Cap Reserve Account (or into such other Account as Lender may designate) any amounts due Borrower under such Interest Rate Cap Agreement so long as any portion of the Debt is outstanding, provided that the Debt shall be deemed to be outstanding if the Property is transferred by judicial or non-judicial foreclosure or deed-in-lieu thereof.  Additionally, Borrower shall collaterally assign to Lender, pursuant to the Collateral Assignment of Interest Rate Cap Agreement, all of its right, title and interest in and to the Interest Rate Cap Agreement (and any replacements thereof), including, without limitation, its right to receive any and all payments under the Interest Rate Cap Agreement (and any replacements thereof), and Borrower shall, and shall cause Counterparty to, deliver to Lender a fully executed Interest Rate Cap Agreement (which shall, by its terms, authorize the assignment to Lender and require that payments be deposited directly into the Interest Rate Cap Reserve Account, or into such other Account as Lender may designate).

(b)    Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement.  All amounts paid by the Counterparty under the Interest Rate Cap Agreement to Borrower or Lender shall be deposited immediately into the Interest Rate Cap Reserve Account (or into such other Account as Lender may designate).  Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(c)    In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty by any Rating Agency below (i) a long term rating of "A-" by S&P or (ii) a long term rating of "A3" by Moody's, Borrower shall (x) replace the Interest Rate Cap Agreement not later than ten (10) Business Days following receipt of notice of such downgrade, withdrawal or qualification with an Interest Rate Cap Agreement in form and substance reasonably satisfactory to Lender (and meeting the requirements set forth in this Section 2.8) (a "**Replacement Interest Rate Cap Agreement**") from a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating or (y) if provided for in such Interest Rate Cap Agreement, cause the Counterparty to deliver collateral to secure Borrower's exposure under the Interest Rate Cap Agreement in such amount and pursuant to such terms as are acceptable to the Rating Agencies.

(d)    In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or fails to maintain the Interest Rate Cap Agreement in accordance with the terms and provisions of this Agreement, Lender may purchase the Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is reimbursed by Borrower to Lender.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(e)      Each Interest Rate Cap Agreement shall contain the following language or its equivalent:  "In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below (i) a long term rating of "A-" by S&P or (ii) a long term rating of "A3" by Moody's, the Counterparty must, within ten (10) business days, either (x) post collateral on terms acceptable to each Rating Agency and Borrower, or (y) find a replacement Counterparty, at the Counterparty's sole cost and expense, acceptable to each Rating Agency and Borrower; provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Counterparty transfers the Interest Rate Cap Agreement to a replacement Counterparty pursuant to the foregoing clause (y), the Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement.  Failure to satisfy the foregoing shall constitute an "Additional Termination Event" as defined by Section 5(b)(v) of the ISDA Master Agreement, with the Counterparty as the "Affected Party." In the event that a Counterparty is required pursuant to the terms of an Interest Rate Cap Agreement to (i) deliver collateral as specified in the applicable Interest Rate Cap Agreement, or (ii) find a replacement Counterparty, Borrower covenants and agrees that Borrower shall seek Lender's approval with respect thereto and shall not approve or consent to the foregoing unless and until Borrower receives Lender's prior written approval and shall approve or consent to the foregoing upon receipt of Lender's prior written approval.  Borrower's failure to comply with the requirements of this Section 2.8(e) shall constitute, at Lender's option, an immediate Event of Default.

(f)      Borrower shall obtain and deliver to Lender an opinion from counsel (which counsel may be in house counsel for the Counterparty) for the Counterparty (upon which Lender and its successors and assigns may rely) which shall provide, in relevant part, that:

(i)      the Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)     the execution and delivery of the Interest Rate Cap Agreement by the Counterparty, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)    all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty and constitutes the legal, valid and binding obligation of the Counterparty, enforceable against the Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(g)    In the event of a conversion of the Loan from a Benchmark Rate Loan to a Prime Rate Loan, or vice versa, or the replacement of the Benchmark with a Benchmark Replacement, Borrower shall replace the Interest Rate Cap Agreement not later than ten (10) Business Days following the occurrence thereof with a Replacement Interest Rate Cap Agreement (or other hedge arrangement reasonably acceptable to Lender and generally accepted as industry standard, as reasonably determined by Lender) pursuant to the requirements of this Agreement and in form and substance reasonably acceptable to Lender (including, without limitation, with respect to the strike rate or swapped rate, as applicable).

(h)    Borrower shall deliver to Lender a new Collateral Assignment of Interest Rate Cap Agreement acceptable to Lender in connection with each Replacement Interest Rate Cap Agreement.

**Section 2.8    Assignment of Security Instrument**.    Upon payment in full of all principal and interest due on the Loan and all other amounts due and payable in accordance with the terms and provisions of the Loan Documents, and upon the written request and at the sole cost and expense of Borrower (including payment of Lender's reasonable legal fees and expenses and then customary administrative fee in connection therewith), Lender shall cooperate with Borrower to effect an assignment of the Note and the Security Instrument to a new lender by assigning the Note and the Security Instrument, each without recourse, covenant or warranty of any nature, express or implied, to such new lender designated by Borrower (other than Borrower or a nominee of Borrower) pursuant to documentation reasonably acceptable to Lender.

**Section 2.9    Payment of Exit Fee**.

(a)    Subject only to Section 2.9(d) below, Borrower shall be obligated to pay the Exit Fee to Lender as follows: (i) upon any (and each) partial prepayment of the Loan in accordance with the terms hereof, in addition to all other amounts payable to Lender under Section 2.7 hereof, Borrower shall pay to Lender, on account of the Exit Fee, an amount equal to two percent (2.0%) of the amount so prepaid; (ii) upon any (and each) application of any condemnation awards or Net Proceeds to the Debt in accordance with the terms of this Agreement and the Security Instrument, two percent (2.0%) of the

51

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

amount thereof shall be retained by Lender on account of the Exit Fee and the balance thereof shall be applied to the Debt; and (iii) upon repayment in full of the Debt or the acceleration thereof in accordance with the terms of any of the Loan Documents, Borrower shall pay to Lender the entire Exit Fee which would be due on such date, less any amounts on account thereof previously paid to Lender under the foregoing clauses (i) and (ii) of this Section 2.10(a).

(b)    In furtherance of the foregoing, Borrower expressly acknowledges and agrees that (i) Lender shall have no obligation to accept any prepayment of the Loan unless and until Borrower shall have complied with this Section 2.10, and (ii) Lender shall have no obligation to release or assign any Loan Document upon payment of the Debt unless and until Lender shall have received the Exit Fee then due and payable.

(c)    Borrower expressly acknowledges and agrees that the Exit Fee shall constitute additional consideration for the Loan.

(d)    Notwithstanding anything herein or in any other Loan Document to the contrary, upon any refinancing of the Loan with five (5) to ten (10) year fixed-rate financing by the initially-named Lender hereunder, or an Affiliate thereof, the Exit Fee due and payable in connection therewith shall be deemed to be zero (it being agreed, however, that in no event shall any refund be owed to Borrower on account of any amounts paid pursuant to Section 2.10(a) above).

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as of the Closing Date that:

**Section 3.1    Existence and Authority**.  Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of formation; (b) is duly qualified to transact business and is in good standing in the State; (c) has all necessary approvals, governmental and otherwise, and full power and authority to own, operate and lease the Property; and (d) has full power, authority and legal right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Agreement, the Note, the Security Instrument and the other Loan Documents on Borrower's part to be performed.



**Section 3.2    Borrower's Principal Place of Business**.  Borrower's principal place of business and its chief executive office as of the date hereof is 2909 Hillcroft, Suite 420. Houston, Texas 77057.  Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.  Borrower's organizational identification number, if any, assigned by the state of its incorporation or organization is [_____].  Borrower's federal tax identification number is [_____].  Borrower is not subject to back-up withholding taxes.

**Section 3.3    Validity of Documents**.  (a) The execution, delivery and performance of this Agreement, the Note, the Security Instrument and the other Loan Documents by Borrower and Guarantor and the borrowing evidenced by the Note and this Agreement (i) are within the power and authority of such parties; (ii) have been authorized by all requisite organizational action of such parties; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court or Governmental Authority, any license, certificate or other approval required to operate the Property, any applicable organizational documents, or any applicable indenture, agreement or other instrument, including, without limitation, the Management Agreement; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby and by the other Loan Documents; and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority (except for the recordation of the Security Instrument in appropriate land records in the State and except for Uniform Commercial Code filings relating to the security interest created hereby), (b) this Agreement, the Note, the Security Instrument and the other Loan Documents have been duly executed and delivered by Borrower and Guarantor and (c) this Agreement, the Note, the Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower and Guarantor.  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)).  Neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect to the Loan Documents.  The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Property.  No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.  No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, the Loan Documents or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

**Section 3.4    Agreements**.  Borrower has no material financial obligation under any agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and (b) obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents or as otherwise disclosed to the Lender or as contained in the Borrower's or any Borrower's affiliate's public disclosures.  Borrower is not a party to any agreement or instrument or subject to any restriction which would have a Material Adverse Effect.  Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a

party or by which Borrower or the Property is bound that would have a Material Adverse Effect. There is no agreement or instrument to which Borrower is a party or by which Borrower is bound that would require the subordination in right of payment of any of Borrower's obligations hereunder or under the Note to an obligation owed to another party.

Section 3.5    **Title; Permitted Encumbrances**.  Borrower has good, indefeasible and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property owned by it, free and clear of all liens whatsoever except the Permitted Encumbrances.  None of the Permitted Encumbrances, individually or in the aggregate, (a) materially interfere with the benefits of the security intended to be provided by the Loan Documents, (b) [intentionally deleted], (c) materially impair the use or operation of the Property, or (d) impair Borrower's ability to pay the Obligations in a timely manner.  The Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a valid, first priority, perfected lien on Borrower's interest in the Property, subject only to Permitted Encumbrances, and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to the Permitted Encumbrances.  To Borrower's knowledge, and except as otherwise disclosed in writing to Lender, there are no mechanics', materialman's or other similar liens or claims which have been filed for work, labor or materials affecting the Property which are or may become liens prior to, or equal or coordinate with, the lien of the Security Instrument other than such liens and claims as have been paid in full and discharged as of the Closing Date.

Section 3.6    **Purchase Options**.  Neither the Property nor any part thereof or interest therein are subject to any purchase options, rights of first refusal or offer to purchase or other similar rights in favor of third parties, except as disclosed to Lender in writing or is a Permitted Exception.

Section 3.7    **Condemnation**.  No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated by any applicable Governmental Authority with respect to all or any portion of the Property or for the relocation of the access to the Property.

Section 3.8    **Separate Lots; Flood Zone; Wetlands**.  The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.  Except as expressly disclosed on the Survey, to Borrower's knowledge, no portion of the Improvements is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards.  To Borrower's knowledge, no part of the Property consists of or is classified as wetlands, tidelands or swamp and overflow lands.

Section 3.9    **Use of Property**.  The Property is used exclusively as either shopping centerers or office buildings, and for other appurtenant and related uses.

Section 3.10    **Certain Additional Property Representations**.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(a)     To Borrower's knowledge, the Property and the present and contemplated use and occupancy thereof are in compliance in all material respects with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other similar Legal Requirements.

(b)     To Borrower's knowledge, the Property is served by public water and sewer systems and sanitary sewer and storm drain facilities, in each case adequate to service the Property for its intended uses.  All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Legal Requirements.  The Property is served by all utilities necessary or convenient for the full use and enjoyment of the Property, all of which (i) are provided by public utilities, (ii) either have been accepted by the Property or the Property is equipped to accept the same, (iii) are located in a public right of way abutting the Property and (iv) are connected so as to serve the Property without passing over other property absent a valid easement.

(c)     To Borrower's knowledge, all public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, dedicated to public use and accepted by all Governmental Authorities, are serviceable and all-weather and are physically and legally open for use by the public.  To Borrower's knowledge, the Property has either direct access to such public roads or streets or access to such public roads or streets by virtue of a perpetual easement or similar agreement inuring in favor of Borrower and any subsequent owners of the Property.

(d)     To Borrower's knowledge, Borrower has obtained all Permits, all of which are in full force and effect as of the date hereof and not subject to forfeiture, revocation, suspension or modification.

(e)     To Borrower's knowledge, except as may be disclosed in the property condition reports obtained by Lender in connection with the closing of the Loan, the Property is free from damage caused by fire or other casualty.  Except as may be disclosed in the property condition reports obtained by Lender in connection with the closing of the Loan, the Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair (excepting ordinary wear and tear).  To Borrower's knowledge, except as may be disclosed in the property condition reports obtained by Lender in connection with the closing of the Loan, there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

300569686v1

(f)     Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than Tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created by this Agreement, the Note, the Security Instrument and the other Loan Documents.

(g)     There are no pending or, to Borrower's knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(h)     To Borrower's knowledge, except as may be set forth on the Survey, all the Improvements lie within the boundaries of the Land and any building restriction lines applicable to the Land.  To Borrower's knowledge, all easements, cross easements, licenses, air rights and rights of way or other similar property interests, if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Insurance Policy and are in full force and effect without default thereunder.

(i)     Except as set forth on Schedule [____] attached hereto, Borrower has not (i) made, ordered or contracted for any construction, repairs, alterations or improvements to be made on or to the Property which have not been completed and paid for in full, (ii) ordered materials for any such construction, repairs, alterations or improvements which have not been paid for in full or (iii) attached any fixtures to the Property which have not been paid for in full.  Except as disclosed to the Lender, there is no such construction, repairs, alterations or improvements ongoing at the Property as of the Closing Date.  To Borrower's knowledge, there are no outstanding or disputed claims for any Labor and Materials Charges and there are no outstanding liens or security interests in connection with any Labor and Materials Charges.  All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full to the extent due and payable or will be paid in full prior to delinquency, as the case may be.

(j)     Either each Subject Transaction is (or, in the case of any Subject Transaction that occurred prior to the Closing Date, was) not a Covered Transaction, or CFIUS Approval has been (or, in the case of any Subject Transaction that occurred prior to the Closing Date, was previously) obtained with respect to the same.

**Section 3.11    Financial Condition**.

(a)     Borrower is solvent and Borrower has received reasonably equivalent value for the granting of the Security Instrument.  No proceeding under Creditors Rights Laws with respect to any Borrower Party has been initiated.

(b)     In the last ten (10) years, no (i) petition in bankruptcy has been filed by or against any Borrower Party and (ii) Borrower Party has ever made any assignment for the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

benefit of creditors or taken advantage of any Creditors Rights Laws, except as otherwise disclosed to Lender.

(c)     No Borrower Party is contemplating either the filing of a petition by it under any Creditors Rights Laws or the liquidation of its assets or property and Borrower has no knowledge of any Person contemplating the filing of any such petition against any Borrower Party.

**Section 3.12   Financial Information**.  All financial data, including, without limitation, the balance sheets, statements of cash flow, statements of income and operating expense and rent rolls, that have been delivered to Lender in respect of Borrower, Sponsor, Guarantor and/or the Property (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower, Sponsor, Guarantor or the Property, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with the Approved Accounting Method throughout the periods covered, except as disclosed therein.  Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a Material Adverse Effect, except as referred to or reflected in said financial statements.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower, Sponsor or Guarantor from that set forth in said financial statements.

**Section 3.13   Fraudulent Conveyance**.  Borrower (a) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**Section 3.14   Disclosure**.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

**Section 3.15   No Plan Assets**.

57

(a)     Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA;

(b)     Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA;

(c)     transactions by or with Borrower are not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans;

(d)     none of the assets of Borrower constitutes "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101; and

(e)     Neither Borrower, nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the IRS Code), maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA).

**Section 3.16   Not a Foreign Person**.   Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the IRS Code.

**Section 3.17   Business Purposes**.   The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

**Section 3.18   Litigation**.   Except as set forth on Schedule [____] attached hereto, there is no action, suit, proceeding or governmental investigation, in each case, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's actual knowledge, threatened in writing or contemplated in writing against Borrower, Sponsor or Guarantor or against or affecting the Property.

**Section 3.19   Leases and Rent Roll**.   Except as disclosed in the rent roll for the Property delivered to, certified to and approved by Lender in connection with the closing of the Loan (the "**Rent Roll**"), (a) the Property is not subject to any other Leases, (b) the Leases are in full force and effect, to Borrower's knowledge, there are no material defaults thereunder by either party, and Borrower has not received any written notice of termination with respect to any such Leases, (c) the copies of the Leases delivered to Lender are true and complete in all material respects, and there are no oral agreements with respect thereto, (d) no Rent has been paid more than one month in advance of its due date, (e) all work to be performed by Borrower under each Lease has been performed as required and has been accepted by the applicable Tenant, (f) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any Tenant has already been received by such Tenant, (g) the Tenants under the Leases have accepted possession and are in occupancy of, and are open for business and conducting normal business operations at, all of their respective demised premises, and are paying full, unabated rent under the Leases, (h) Borrower has delivered to Lender a true, correct and complete list of all security deposits made by Tenants at the Property which have not been applied (including accrued interest thereon), all of which are held by Borrower in accordance with the terms of the applicable Lease and applicable Legal

Requirements, (i) to Borrower's knowledge, each Tenant under a Major Lease is free from bankruptcy or reorganization proceedings, (j) to the best of Borrower's knowledge, no Tenant under any Lease (or any sublease) is an Affiliate of Borrower, any Guarantor or Manager, (k) to Borrower's knowledge, no Tenant under any Lease is in default in any material respect under the terms and conditions of such Lease, (l) there are no brokerage fees or commissions due and payable in connection with the leasing of space at the Property, except as has been previously disclosed to Lender in writing, and no such fees or commissions will become due and payable in the future in connection with the Leases, including by reason of any extension of such Lease or expansion of the space leased thereunder, except as has previously been disclosed to Lender in writing, (m) Borrower has not assigned or pledged any of the Leases, the rents thereunder or any interest therein except to Lender other than assignments to Borrower's prior lender which are no longer of any force or effect, (n) no Tenant has a right to expand the premises demised under its Lease, (o) no Tenant or other Person has any option, right of first refusal or offer or any other similar right to purchase all or any portion of, or interest in, the Property, (p) no Tenant has the right to terminate its Lease prior to the expiration of the stated term thereof except, to the extent contained in the Lease, in the event of the destruction or condemnation of substantially all of the Property, (q) to Borrower's knowledge, no Tenant has assigned its Lease or sublet all or any portion of the premises demised thereby, and (r) all existing Leases are subordinate to the Security Instrument and the Assignment of Leases and provide that the Tenant thereunder shall attorn to Lender and any purchaser at a foreclosure sale.

**Section 3.20   Taxes**.

(a)      Except as otherwise disclosed to Lender, all Taxes and governmental assessments owing in respect of the Property have been paid or an escrow of funds in an amount sufficient to cover such payments has been established hereunder.   To Borrower's knowledge or except as otherwise disclosed to Lender, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(b)      Borrower has filed all federal, state, county, municipal, and city income, personal property and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it.   Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

(c)      All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of this Agreement, the Security Instrument, the Note and the other Loan Documents, including, without limitation, the Security Instrument, have been paid or will be paid, and, under current Legal Requirements, the Security Instrument and the other Loan Documents are enforceable in accordance with their terms by Lender (or any subsequent holder thereof), except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights

Laws, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section 3.21   Insurance**.   Borrower has obtained and has delivered to Lender certified copies of all Policies (or such other evidence acceptable to Lender) reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.   There are no present claims of any material nature under any of the Policies, and to Borrower's knowledge, no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**Section 3.22   Management Agreement**.   The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and, to Borrower's knowledge, no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.   As of the date hereof, no management fees under the Management Agreement are due and payable.

**Section 3.23   Illegal Activity/Forfeiture**.

(a)   No portion of the Property has been purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

(b)   There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under this Agreement, the Note, the Security Instrument or the other Loan Documents.

**Section 3.24   Special Purpose Entity**.   Since Borrower's and any SPE Component Entity's creation and as of the date hereof, Borrower and each SPE Component Entity have complied with and are in compliance with the requirements set forth on <u>Exhibit C</u> attached hereto.   Additionally, Borrower represents and warrants to Lender that it and each SPE Component Entity:

(a)   is and always has been duly formed, validly existing, and in good standing in the state of its formation and in all other jurisdictions where it is qualified to do business, and has never been subject to any division;

(b)   has no judgments or liens of any nature against it except for tax liens not yet due;

(c)   is in compliance with all laws, regulations, and orders applicable to it and has received all permits necessary for it to operate;

(d)   is not aware of any pending or threatened litigation against it;

(e)     is not involved in any dispute with any taxing authority;

(f)     has paid all taxes that it owes;

(g)     has never owned any property other than the Property (or, in the case of any SPE Component Entity, its equity interest in Borrower) and personal property necessary or incidental to its ownership or operation of the Property (or, in the case of any SPE Component Entity, its equity interest in Borrower) and has never engaged in any business except the ownership and operation of the Property (or, in the case of any SPE Component Entity, its equity interest in Borrower);

(h)     is not now, nor has ever been, party to any lawsuit, arbitration, summons, or legal proceeding; and

(i)     has no material contingent or actual obligations not related to the Property.

**Section 3.25   Federal Reserve Regulations**.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement, the Security Instrument, the Note or the other Loan Documents.

**Section 3.26   Investment Company Act**.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**Section 3.27   Embargoed Person**.  Neither Borrower nor, to Borrower's knowledge, any owner of a direct or indirect interest in Borrower (below the level of Silver Star REIT, Inc.) (a) is listed on any Government Lists, (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of the Office of Foreign Assets Control ("**OFAC**") or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (d) is currently under investigation by any Governmental Authority for alleged criminal activity.  For purposes hereof, the term "**Patriot Act Offense**" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (i) the criminal laws against terrorism; (ii) the criminal laws against money laundering, (iii) the Bank Secrecy Act, as amended, (iv) the Money Laundering Control Act of 1986, as amended, or

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(v) the Patriot Act.  "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.  For purposes hereof, the term "**Government Lists**" means (A) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (B) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Government Lists", or (C) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Government Authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists".

**Section 3.28   Organizational Chart**.  The organizational chart attached as <u>Exhibit A</u> hereto (the "**Organizational Chart**"), relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.  Neither Borrower, nor any SPE Component Entity, is (i) a Prohibited Entity, (ii) Controlled (directly or indirectly) by any Prohibited Entity or (iii) more than 49% owned (directly or indirectly) by Prohibited Entities (whether individually or in the aggregate).

**Section 3.29   Bank Holding Company**.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**Section 3.30   No Other Financing; Other Obligations and Liabilities**.  Borrower has not borrowed any funds which have not heretofore been repaid in full, except for the Loan. Borrower has no liabilities or other obligations that arose or accrued prior to the date hereof that, either individually or in the aggregate, could have a Material Adverse Effect.  Borrower has no known contingent liabilities other than pursuant to the Loan Documents.

**Section 3.31   Contracts**.

(a)      Borrower has not entered into, and is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender.

(b)      Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to the knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto.  None of Borrower, Manager or any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.

(c)      Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(d)     No Major Contract has as a party an Affiliate of Borrower.  All fees and other compensation for services previously performed under the Management Agreement have been paid in full.

**Section 3.32   Property Document Representations**.  With respect to each Property Document, Borrower, to Borrower's knowledge, hereby represents that (a) each Property Document is in full force and effect and has not been amended, restated, replaced or otherwise modified (except, in each case, as expressly set forth herein), (b) there are no defaults under any Property Document by any party thereto and, to Borrower's knowledge, no event has occurred which, but for the passage of time, the giving of notice, or both, would constitute a default under any Property Document, (c) all rents, additional rents and other sums due and payable by Borrower or otherwise in respect of the Property under the Property Documents have been paid in full to the extent due and payable, (d) no party to any Property Document has commenced any action or given or received any notice for the purpose of terminating any Property Document and (e) to Borrower's knowledge, the representations made in any estoppel or similar document delivered with respect to any Property Document in connection with the Loan are true, complete and correct and are hereby incorporated by reference as if fully set forth herein.

**Section 3.33   No Change in Facts or Circumstances; Disclosure**.  All information submitted by (or on behalf of) Borrower, Guarantor or Sponsor to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower, Sponsor and/or Guarantor in this Agreement or in the other Loan Documents, are accurate, complete and correct in all material respects.  To Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise have a Material Adverse Effect.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

**Section 3.34   Third Party Representations**.  Each of the representations and the warranties made by Sponsor and Guarantor in the other Loan Documents (if any) are true, complete and correct in all material respects.

**Section 3.35   Non-Consolidation Opinion Assumptions.**  All of the assumptions made in any Non-Consolidation Opinion delivered in connection with the closing of the Loan (if any), including, but not limited to, any exhibits attached thereto and/or certificates delivered in connection therewith, are true, complete and correct, in all material respects.

Borrower agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower set forth in this Article 3 and elsewhere in this Agreement and the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lender.  All representations, warranties, covenants and agreements made in this Agreement and in the other Loan Documents shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ARTICLE 4

## BORROWER COVENANTS

Borrower hereby covenants and agrees with Lender that, from the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents:

**Section 4.1    Existence**.  Borrower will continuously maintain (a) its existence, (b) its rights to do business in the State and (c) its franchises and trade names, if any.  Borrower shall not (i) engage in any division, dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Property, (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents, or (iv) cause, permit or suffer any SPE Component Entity to (A) divide, dissolve, wind up or liquidate or take any action, or omit to take any action, as a result of which such SPE Component Entity would be dissolved, wound up or liquidated in whole or in part or (B) amend, modify, waive or terminate the organizational documents of such SPE Component Entity, in each case without obtaining the prior written consent of Lender.

**Section 4.2    Change of Name, Identity or Structure**.  Borrower shall not change (or permit to be changed) Borrower's or the SPE Component Entity's (a) name, (b) identity (including its trade name or names), (c) principal place of business set forth in this Agreement, or (d) corporate, partnership or other structure or state of formation, without, in each case, notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's or the SPE Component Entity's structure or state of formation, without first obtaining the prior written consent of Lender and, if required by Lender, a Rating Agency Confirmation with respect thereto.  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower or the SPE Component Entity intends to operate the Property, and representing and warranting that Borrower or the SPE Component Entity does business under no other trade name with respect to the Property.

**Section 4.3    Business and Operations**.  Borrower will continue to engage in the businesses now conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property.  Borrower will qualify to do business and will remain in good standing under the laws of the jurisdiction as and to the extent the same are required for the ownership, maintenance, management and operation of the Property.

**Section 4.4    Title to Property; Legal Requirements**.

(a)    Borrower shall warrant and defend the validity and priority of the liens of the Security Instrument and the Assignment of Leases on the Property against the claims of all Persons whomsoever, subject only to the Permitted Encumbrances.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(b)    Borrower shall promptly comply and shall cause the Property to comply with all Legal Requirements affecting the Property or the use thereof (which such covenant shall be deemed to (i) include Environmental Laws and (ii) require Borrower to keep all Permits in full force and effect).

(c)    Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Legal Requirements or is exempt from compliance with Legal Requirements.

(d)    Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements.

(e)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of such Legal Requirement, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be permitted by and conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith.  Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

**Section 4.5    Waste**.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security for the Loan. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof.

**Section 4.6    Maintenance and Use of Property**.  Borrower shall cause the Property to be maintained in a good and safe condition and repair, ordinary wear and tear excepted.  The

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property) without the consent of Lender or as otherwise permitted pursuant to Section 4.19 hereof.  Borrower shall perform (or cause to be performed) the prompt repair, replacement and/or rebuilding of any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any Condemnation or similar proceeding and shall complete and pay for (or cause the completion and payment for) any structure at any time in the process of construction or repair on the Land.  Borrower shall operate each Individual Property for the same uses as such Individual Property is currently operated and Borrower shall not, without the prior written consent of Lender, (i) change the use of the Property or any Individual Property or (ii) initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any Individual Property or any part thereof.  If under applicable zoning provisions the use of all or any portion of any Individual Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender.

**Section 4.7    Taxes and Other Charges**.

(a)    Borrower shall pay (or cause to be paid) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, prior to the occurrence and continuance of an Event of Default, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 7.2 hereof.  Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 7.2 hereof).  Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest (or permit to be contested) by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) intentionally omitted; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be permitted by and conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall

66

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

furnish such security as may be required in the proceeding, or deliver to Lender such reserve deposits as may be reasonably requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the lien of the Security Instrument being primed by any related lien.

**Section 4.8    Labor and Materials**.

(a)    Subject to Section 4.8(b) below, Borrower will promptly pay (or cause to be paid) when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property (any such bills and costs, a "**Labor and Materials Charge**") and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests created hereby and by the Security Instrument, except for the Permitted Encumbrances.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity of any Labor and Materials Charge, the applicability of any Labor and Materials Charge to Borrower or to the Property or any alleged non-payment of any Labor and Materials Charge and defer paying the same, provided that (i) intentionally omitted; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay (or cause to be paid) any such contested Labor and Materials Charge determined to be valid, applicable or unpaid; (v) such proceeding shall suspend the collection of such contested Labor and Materials Charge from the Property or Borrower shall have paid the same (or shall have caused the same to be paid) under protest; and (vi) Borrower shall furnish (or cause to be furnished) such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure payment of such Labor and Materials Charge, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to pay for such Labor and Materials Charge at any time when, in the judgment of Lender, the validity, applicability or non-payment of such Labor and Materials Charge is finally established or the Property (or any part thereof or interest therein) shall be in present danger of being sold, forfeited, terminated, cancelled or lost.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 4.9   Property Access**.   Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, subject to the rights of Tenants.

**Section 4.10   Litigation**.   Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower which might have a Material Adverse Effect.

**Section 4.11   Performance by Borrower**.   Borrower hereby acknowledges and agrees that Borrower's observance, performance and fulfillment of each and every covenant, term and provision to be observed and performed by Borrower under this Agreement, the Security Instrument, the Note and the other Loan Documents is a material inducement to Lender in making the Loan.

**Section 4.12   Books and Records**.

(a)   Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with the requirements set forth on Exhibit C hereof and the Approved Accounting Method, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make and retain such copies or extracts thereof as Lender shall desire.  After the occurrence of an Event of Default, Borrower shall pay any actual costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)   Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements prepared and reviewed by an independent certified public accountant acceptable to Lender (provided, however, that at any time an Event of Default exists or Lender has a reasonable basis to believe any such financial statements are inaccurate in any material respect or do not fairly represent the financial condition of Borrower or the Property, the same shall, upon Lender's written request, be audited by such independent certified public accountant) in accordance with the Approved Accounting Method covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower.  Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual net operating income, net cash flow, gross income, and operating expenses.

(c)   Borrower will furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate,

and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) a rent roll for the subject quarter and (ii) quarterly and year-to-date operating statements (including expenditures for Capital Expenditures) prepared for each calendar quarter, noting net operating income, gross income, and operating expenses (not including any contributions to the Capital Expenditures Reserve Funds and the Immediate Repair Funds), and (iii) other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar quarter, and containing a comparison of budgeted income and expenses and the actual income and expenses.  In addition, such certificate shall also be accompanied by an Officer's Certificate stating that Borrower is in compliance with the requirements set forth in Section 4.23 as of the date of such certificate.

(d)      Borrower will furnish, or cause to be furnished, to Lender on or before twenty (20) days after the end of each calendar month the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) a rent roll for the subject month, (ii) an accounts payable aging report and an accounts receivable aging report for the subject month and (iii) monthly and year-to-date operating statements (including expenditures for Capital Expenditures) prepared for each calendar month, noting net operating income, gross income, and operating expenses (not including any contributions to the Capital Expenditures Reserve Funds and the Immediate Repair Funds), and (iv) an updated ARGUS (or similar) cash flow projections model in form substantially similar to the model delivered to Lender prior to the Closing Date in connection with the closing of the Loan, and other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar month, and containing a comparison of budgeted income and expenses and the actual income and expenses.

(e)      For the partial year period commencing on the Closing Date, and for each Fiscal Year thereafter, Borrower shall submit to Lender an Annual Budget not later than forty-five (45) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Lender.  The Annual Budget shall be subject to Lender's written approval (each such Annual Budget so approved by Lender, an "**Approved Annual Budget**").  In the event that Lender objects to a proposed Annual Budget submitted by Borrower in accordance with this Section 4.12, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender.  Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget.  Until such time that Lender approves a proposed Annual Budget, (1) to the extent that an Approved

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Annual Budget does not exist for the immediately preceding calendar year, all operating expenses of the Property for the then current calendar year shall be deemed extraordinary expenses of the Property and shall be subject to Lender's prior written approval (not to be unreasonably withheld or delayed) and (2) to the extent that an Approved Annual Budget exists for the immediately preceding calendar year, such Approved Annual Budget shall apply to the then current calendar year; provided, that such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and utilities expenses;

(f)     Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, Guarantor and Sponsor as may be reasonably requested by Lender.

(g)     Borrower shall furnish to Lender, within ten (10) Business Days after Lender's request (or as soon thereafter as may be reasonably possible), financial and sales information from any Tenant designated by Lender (to the extent such financial and sales information is required to be provided under the applicable Lease and same is received by Borrower after request therefor).

(h)     If Borrower shall consist of more than one Person, then the annual financial statements required to be delivered hereunder shall be in the form of an annual combined balance sheet of each Borrower (and no other Person), together with the related combined statements of operations, members' capital and cash flows with respect to each Borrower, including a combined balance sheet and a statement of income for the Property on a combined basis.

(i)     Borrower agrees that all financial information delivered to Lender pursuant to this Section 4.12 shall:  (i) be complete and correct in all material respects; (ii) present fairly the financial condition of the applicable Person; (iii) disclose all liabilities that are required to be reflected or reserved against; and (iv) be prepared (A) in the form reasonably required by Lender and certified by a Responsible Officer of Borrower (B) in hardcopy and electronic formats and (C) in accordance with the Approved Accounting Method.  Borrower shall be deemed to warrant and represent that, as of the date of delivery of any such financial statement, there has been no material adverse change in financial condition, nor have any assets or properties been sold, transferred, assigned, mortgaged, pledged or encumbered since the date of such financial statement except as disclosed by Borrower in a writing delivered to Lender.  Borrower agrees that all financial information delivered hereunder shall not contain any misrepresentation or omission of a material fact.

**Section 4.13   Contracts**.

(a)     Borrower may enter into any Contract that is not a Major Contract without Lender's consent so long as such Contract (i) contains terms that are commercially reasonable and comparable to existing local market terms for similar contractual

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

agreements with respect to commercial properties similar to the Property as would be available from unaffiliated third parties and (ii) does not contain any terms which would have a Material Adverse Effect.  Borrower shall be required to obtain Lender's prior written approval of any and all Major Contracts affecting the Property (including any renewals or extensions thereof, or any amendments or modifications thereto), which approval shall not be unreasonably withheld, conditioned or delayed.  To the extent that the Deemed Approval Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section 4.13 and Lender thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

(b)    Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions to be performed and observed by it under each Contract to which it is a party, and do all things necessary to preserve and keep unimpaired its rights thereunder, (ii) promptly notify Lender of any notice of default given by any party under any Major Contract and deliver to Lender a true copy of each such notice, and (iii) enforce the performance and observance of all of the material terms, covenants and conditions required to be performed and/or observed by the other party to each Contract and to which Borrower is a party in a commercially reasonable manner.

**Section 4.14   Cooperation in Proceedings**.  (a) Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the Note, the Security Instrument or the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings; and (b) without in any way limiting the foregoing, Borrower shall (and shall cause the holders of the direct and/or indirect, legal and/or beneficial interests in Borrower to) (i) within five (5) days of receipt of the same, notify Lender of, and provide Lender with a copy of, any inquiry received from CFIUS or any other Governmental Authority related to any Subject Transaction, (ii) make any filing requested by CFIUS related to any Subject Transaction, (iii) cooperate with, and fully respond to any inquiries received from, CFIUS or any Governmental Authority related to CFIUS's review and/or investigation (the "**CFIUS Review**") related to any Subject Transaction, within the time permitted by CFIUS or such Governmental Authority, as applicable, and (iv) subject to the terms and conditions of this Agreement (including, without limitation, Article 6 hereof), take any mitigation measures requested by CFIUS and/or any Governmental Authority in connection with any CFIUS Review.

**Section 4.15   Estoppel Certificates**.

(a)    After request by Lender, Borrower, within ten (10) Business Days of such request, shall furnish Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the outstanding principal balance of the Note, (ii) the Interest Rate, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment and performance of the Obligations, and (v) any other matters reasonably requested by Lender and reasonably related to the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Leases, the obligations created and evidenced hereby and by the Security Instrument or the Property.

(b)      Borrower shall use commercially reasonable efforts to deliver to Lender, within thirty (30) days of request (but not more often than twice in any twelve (12) month period unless an Event of Default has occurred and is continuing), duly executed estoppel certificates from any one or more Tenants as required by Lender attesting to such facts regarding the Lease as Lender may reasonably require, including, but not limited to, attestations that each Lease covered thereby is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, except as security, no free rent or other concessions are due lessee and that the lessee claims no defense or offset against the full and timely performance of its obligations under the Lease.

(c)      Borrower shall use commercially reasonable efforts to deliver to Lender, within ten (10) Business Days of request, estoppel certificates from each party under any Property Document in form and substance reasonably acceptable to Lender.

(d)      In connection with any Secondary Market Transaction, within ten (10) Business days of Lender's request, Borrower shall provide an estoppel certificate to any Investor or any prospective Investor in such form, substance and detail as Lender, such Investor or prospective Investor may require.

## Section 4.16   Leases and Rents.

(a)      All Leases and all renewals of Leases executed after the date hereof shall (i) provide for rental rates comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms with unaffiliated, third parties (unless otherwise consented to by Lender), (iii) provide that such Lease is subordinate to the Security Instrument and that the lessee will attorn to Lender and any purchaser at a foreclosure sale, (iv) not permit payment of rent by anything other than lawful money of the United States of America and (v) not contain any terms which would have a Material Adverse Effect.  Notwithstanding anything to the contrary contained herein, in addition to the requirements set forth above, Borrower shall not, without the prior written approval of Lender (which approval may be given or withheld in Lender's sole discretion), enter into, renew, extend, amend, modify, permit any assignment of or subletting under, waive any provisions of, release any party to, terminate, reduce rents under, accept a surrender of space under, or shorten the term of, in each case, any (x) Major Lease, (y) any Lease other than a Major Lease which provides for either (A) a term (including all renewals/extensions thereunder) equal to or greater than seven (7) years or less than two (2) year, (B) rental of less than $**[____]** per square foot on a **[**"modified gross" or "triple net" basis**]**, as applicable, or (z) any other Lease in a manner that would cause such Lease to fall under either of the foregoing prongs (x) or (y).

(b)      Without limitation of subsection (a) above, Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially

300569686v1

reasonable manner for similar real estate assets; (ii) shall enforce the material terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner for similar real estate assets; (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not, without Lender's prior written consent, alter, modify or change any Lease to the extent the same would, individually or in the aggregate, (A) cause any such Lease to violate 4.16(a)(i) through (iii) above or (B) have a Material Adverse Effect; and (vi) shall hold all security deposits under all Leases in accordance with Legal Requirements.  Upon request, Borrower shall furnish Lender with executed copies of all Leases.

(c)     Notwithstanding anything contained herein to the contrary, Borrower shall not willfully withhold from Lender any information regarding renewal, extension, amendment, modification, waiver of provisions of, termination, rental reduction of, surrender of space of, or shortening of the term of, any Lease during the term of the Loan. Except with respect to any such matter otherwise previously disclosed to Lender, Borrower further agrees to provide Lender with written notice of any commercial Tenant (if any exist at the Property) "going dark" for more than 90 consecutive days under such Tenant's Lease within five (5) Business Days after Borrower becomes aware of such Tenant "going dark" and Borrower's failure to provide such notice shall constitute an Event of Default.

(d)     Borrower shall notify Lender in writing, within two (2) Business Days following receipt thereof, of Borrower's receipt of any early termination fee or payment or other termination fee or payment paid by any Tenant under any commercial Lease or any Major Lease, and Borrower further covenants and agrees that Borrower shall hold any such termination fee or payment in trust for the benefit of Lender and that any use of such termination fee or payment shall be subject in all respects to Lender's prior written consent in Lender's sole discretion (which consent may include, without limitation, a requirement by Lender that such termination fee or payment be placed in reserve with Lender to be disbursed by Lender for tenant improvement and leasing commission costs with respect to the Property and/or for payment of the Debt or otherwise in connection with the Loan evidenced by the Note and/or the Property, as so determined by Lender). The foregoing consent right of Lender (including, without limitation, any reserve requirement) shall not be subject to any "cap" or similar limit on the amount of Reserve Funds held by Lender.  In the event Lender requires that any such termination fee or payment be applied to partial prepayment of the Debt, no prepayment fee or charge (including, without limitation, any Interest Shortfall or Minimum Interest Payment but excluding the Exit Fee, which shall be payable as provided in Section 2.10) shall be payable in connection therewith

(e)     To the extent that the Deemed Approval Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section 4.16 and

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Lender thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

**Section 4.17  Notice of Default**.  Borrower shall promptly advise Lender of any material adverse change in Borrower's, Sponsor's and/or Guarantor's condition (financial or otherwise) or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

**Section 4.18  Other Agreements**.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing the Debt and any amendments, modifications or changes thereto, and not cured within any applicable grace or cure period.

**Section 4.19  Alterations**.  Notwithstanding anything contained herein (including, without limitation, Article 7 hereof) to the contrary, Lender's prior approval shall be required in connection with any alterations to any Improvements (a) that may have a Material Adverse Effect, (b) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold or (c) that are structural in nature, which approval may not be unreasonably withheld, conditioned or delayed.  If the total unpaid amounts incurred and to be incurred with respect to any alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following:  (i) cash, (ii) U.S. Obligations, (iii) other security acceptable to Lender (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same), or (iv) a completion bond (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same).  Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements over the Alteration Threshold, taking into account any Reserve Funds on deposit and available pursuant to the terms and conditions of the Loan Documents to pay such costs.

**Section 4.20  Management Agreement**.

(a)      Borrower shall (i) cause Manager to manage the Property in accordance with the Management Agreement, (ii) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (iii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, estimate, report and each material notice received by it under the Management Agreement, and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement in accordance with commercially reasonable real estate practices for similar properties.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then,

without limiting Lender's other rights or remedies under the Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.

(b)     Borrower shall not, without the prior written consent of Lender (which consent may be conditioned, without limitation, on Lender's receipt of evidence that the same would not result in a breach or violation of any Property Document), (i) surrender, terminate, cancel, modify, renew or extend the Management Agreement (other than a renewal or extension provided for in the Management Agreement); provided, that, so long as no Event of Default shall have occurred and be continuing or would occur as a result of such replacement, Borrower may replace Manager with a Qualified Manager pursuant to a Qualified Management Agreement, (ii) enter into any new or other agreement relating to the management or operation of the Property with Manager or any other Person, (iii) consent to the assignment by Manager of its interest under the Management Agreement, (iv) permit or suffer any transfer of the ownership, management or Control of an Affiliated Manager to occur, or (v) waive or release any of its rights and remedies under the Management Agreement in any material respect.

(c)     In the event that the Management Agreement expires or is surrendered, terminated or canceled (without limiting any obligation of Borrower to obtain Lender's consent to any surrender, termination, cancellation, modification, renewal or extension of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall enter into a Qualified Management Agreement with a Qualified Manager contemporaneously with such expiration, surrender, termination or cancellation.

(d)     Lender shall have the right to require Borrower to replace Manager with respect to the Property as a whole or any one or more Individual Properties designated by Lender from time to time with a Qualified Manager chosen by Borrower which is not an Affiliated Manager to manage the Property pursuant to a Qualified Management Agreement upon the occurrence of any one or more of the following events:  (i) at any time following the occurrence of an Event of Default, (ii) if at any time the Debt Yield (Combined) for the Property as a whole falls below 15% for any two (2) consecutive calendar quarters, (iii) if Manager shall be in default under the Management Agreement beyond any applicable notice and cure period, (iv) if Manager shall become insolvent or a debtor in any involuntary bankruptcy or insolvency proceeding that is not dismissed within ninety (90) days of the filing thereof, or any voluntary bankruptcy or insolvency proceeding, or (v) if at any time Manager has engaged in gross negligence, fraud or willful misconduct.

(e)     Upon the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

otherwise take any action under the Management Agreement without the prior written consent of Lender.

(f)    If at any time Lender consents to the appointment of a new manager and/or the execution of a management agreement under this Agreement, such manager and Borrower shall, as a condition of Lender's consent, execute an Assignment of Management Agreement and subordination of management fees substantially in the form then used by Lender (or in such other form and substance reasonably satisfactory to Lender).

**Section 4.21    No Joint Assessment**.  Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**Section 4.22    ERISA**.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights hereunder or under the other Loan Documents) to be a non exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Security Instrument, as requested by Lender in its reasonable discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, or other retirement arrangement, which is subject to Title I of ERISA or Section 4975 of the IRS Code, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(A)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3 101(b)(2);

(B)    Less than 25 percent of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R.§ 2510.3 101(f)(2); or

(C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R § 2510.3 101(c) or (e) or an investment company registered under The Investment Company Act of 1940, as amended.

(c)    Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any member of Borrower's "controlled group of

corporations" to maintain, sponsor, contribute to or become obligated to contribute to a "defined benefit plan" or a "multiemployer pension plan" (as each of the same is defined in Section 3.15 of this Agreement).

**Section 4.23   Special Purpose Entity.**   Borrower and each SPE Component Entity shall at all times comply with the requirements set forth on Exhibit C attached hereto and shall not take or permit any action that would result in Borrower or any SPE Component Entity not being in compliance with the representations, warranties and covenants set forth in Section 3.24 and Exhibit C attached hereto.

**Section 4.24   Debt Cancellation**.   Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**Section 4.25   Property Documents.**   Without limiting the other provisions of this Agreement and the other Loan Documents, Borrower shall (a) promptly perform and/or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under the Property Documents and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (b) promptly notify Lender of any material default under the Property Documents of which it is aware; (c) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under the Property Documents; (d) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed under the Property Documents in a commercially reasonable manner; (e) cause the Property to be operated, in all material respects, in accordance with the Property Documents; and (f) not, without the prior written consent of Lender, (i) enter into any new Property Document or replace or execute modifications to any existing Property Documents or renew or extend the same (exclusive of, in each case, any automatic renewal or extension in accordance with its terms), (ii) surrender, terminate or cancel the Property Documents, (iii) reduce or consent to the reduction of the term of the Property Documents, (iv) increase or consent to the increase of the amount of any charges under the Property Documents, (v) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Property Documents in any material respect or (vi) following the occurrence and during the continuance of an Event of Default, exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Property Documents.

**Section 4.26   Embargoed Person.**   At all times throughout the term of the Loan, including after giving effect to any transfers of all or any portion of the Property or any direct or indirect equity or beneficial interests in Borrower or any Guarantor that is not a natural person below the organizational level of Silver Star REIT Properties, Inc., (a) none of the funds or other assets of Borrower or any Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., the Patriot Act and any Executive Orders or regulations promulgated thereunder, each as may be amended from time to

time, with the result that the investment in Borrower, Sponsor or any Guarantor, as applicable (whether directly or indirectly), would be prohibited by law (each, an "**Embargoed Person**"), or the Loan made by Lender would be in violation of law, (b) no Embargoed Person shall have any interest of any nature whatsoever in Borrower, Sponsor or any Guarantor, as applicable, with the result that the investment in Borrower, Sponsor or any Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, Sponsor or any Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, Sponsor or any Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

**Section 4.27  Patriot Act**.  Borrower shall comply with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  Lender shall have the right to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Lender may, at its option, cause Borrower to comply therewith and any and all costs and expenses incurred by Lender in connection therewith shall be secured by the Security Instrument and the other Loan Documents and shall be immediately due and payable.

**Section 4.28  No Plan Assets; Illegal Activity/Forfeiture**.  Borrower shall take all necessary actions in order to remain in compliance with the representation contained in Sections 3.15 and 3.23 hereof at all times during the term of the Loan, and shall not take any actions that would cause Borrower to violate any of the same.  Borrower covenants and agrees not to commit, permit or suffer to exist any act or omission affording any right of forfeiture described in Section 3.23.

**Section 4.29  O&M Program**.  Intentionally deleted.

**Section 4.31  Property Releases.**  Borrower shall cause Partial Releases to be consummated in accordance with the terms of Section 6.7 hereof such that (a) by [DATE 6 MONTHS AFTER CLOSING DATE] Borrower (or Mezzanine Borrower, as applicable) shall have paid [Partial Release Prices and Mezzanine Loan Release Prices to Lender and Mezzanine Lender, as applicable, in accordance with the terms hereof and of the Mezzanine Loan Documents, as applicable] in an aggregate amount equal to at least $[1/3 of final principal balance of the Loan, (b) by the first anniversary of the Closing Date, Borrower (or Mezzanine Borrower, as applicable) shall have paid [Partial Release Prices and Mezzanine Loan Release Prices to Lender and Mezzanine Lender, as applicable, in accordance with the terms hereof and of the Mezzanine Loan Documents, as applicable]  in an aggregate amount equal to at least $[2/3 of the final principal balance of the Loan, (c) by [DATE 18 MONTHS AFTER CLOSING DATE] Borrower (or Mezzanine Borrower, as applicable) shall have paid [Partial Release Prices and Mezzanine Loan Release Prices to Lender and Mezzanine Lender, as applicable, in accordance with the terms hereof and of the Mezzanine Loan Documents, as applicable]  in an

aggregate amount equal to at least $[_____] (or such lesser amount as may be required to repay the Loan and the Mezzanine Loan in full).

**Section 4.32   Deposits Under Contracts of Sale**.  If in connection with the termination of any contract for the sale of an Individual Property (for each Individual Property, a **"Contract of Sale"**) Borrower shall be entitled pursuant to the terms of such Contract of Sale and applicable Legal Requirements to retain any amounts deposited by the purchaser thereunder, including, without limitation, as a result of any such purchaser's default in the performance of its obligations thereunder, Borrower shall give prompt written notice to Lender thereof and shall, within three (3) Business Days, remit to Lender any amounts so retained by Borrower, which amounts shall be applied to the partial repayment of the Debt (including any Exit Fee, Minimum Interest Payment, Breakage Costs, Interest Shortfall and/or other amounts payable in connection with such prepayment pursuant to the terms of Section 2.7).

## ARTICLE 5

### INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

**Section 5.1   Insurance**.

(a)      Borrower, at its sole cost and expense, shall obtain and maintain during the entire term of the Loan, or cause to be maintained, insurance policies for Borrower and the Property providing at least the following coverages:

(i)      property insurance against loss or damage by fire, wind (including named storms), lightning and such other perils as are included in a standard "all risk" or "special form" policy, including riot and civil commotion, vandalism, terrorist acts, malicious mischief, burglary and theft, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost" of the Property, which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) waiving depreciation.  The Full Replacement Cost must be adjusted annually to reflect increased value due to inflation.  If this is not provided, Inflation Guard Coverage shall be required; (B) written on a no co-insurance form or containing an agreed amount endorsement with respect to the Improvements and, if applicable, personal property at the Property waiving all co-insurance provisions; (C) providing for no deductible in excess of $100,000.00 (except for deductibles for windstorm and earthquake coverage, which deductibles may be up to five percent (5%) of the total insurable value of the Property set forth in the Policy); and (D) containing "Ordinance or Law Coverage" if any of the Improvements or the use of the Property shall at any time constitute legal non conforming structures or uses, including coverage for Loss to the Undamaged Portion, Demolition Costs and Increased Cost of Construction, all in amounts acceptable to Lender.  In addition, Borrower shall obtain:  (y) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal

to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended or such greater amount as Lender shall require; and (z) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity, provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i);

(ii)    commercial general liability insurance, including a broad form comprehensive general liability endorsement and coverages against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so called "occurrence" form and containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000.00), with a combined limit per policy year, excluding umbrella coverage, of not less than Two Million and No/100 Dollars ($2,000,000.00) applying "per location" if the policy covers more than one location; (B) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards:    (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for all insured contracts; and (5) contractual liability covering the indemnities contained in Article 11 hereof to the extent the same is available;

(iii)    rental loss and/or business income interruption insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above, subsections (iv) (if applicable), subsection (vi), subsection (x) and Section 5.1(h) below; (C) containing an extended period of indemnity endorsement which provides the continued loss of income shall be insured until such income either returns to the same level it was at prior to the loss, or the expiration of [_____] months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected Gross Rents from the Property for a period of [_____] months from the date of the Casualty.  The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the Gross Rents from the Property for the succeeding [_____] month period.  Subject to Section 5.5(b), all proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the Obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its Obligations to pay the Debt on the respective dates of payment provided for in the Loan Documents

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property and liability insurance coverage forms do not otherwise apply, coverage all in form and substance and with limits, terms and conditions acceptable to Lender including (A) commercial general liability and umbrella insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policies required in this Section 5.1(a); and (B) the insurance provided for in subsection (i) above written in a so called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsections (i), (iii), (vi), (x) and Section 5.1(h), (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v)    workers' compensation, subject to the statutory limits of the State in which the Property is located, and employer's liability insurance with limits which are required from time to time by Lender in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(vi)    boiler and machinery/equipment breakdown insurance in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance Policy required under subsection (i) above (if applicable);

(vii)    umbrella liability insurance in addition to primary coverage in an amount not less than [_____] Million and No/100 Dollars ($[__],000,000.00) per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) and, if applicable, the Policies required in subsection (v) above and (viii) below;

(viii)    commercial auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, with limits which are required from time to time by Lender (if applicable);

(ix)    if applicable, insurance against employee dishonesty in an amount not less than one month of Gross Rents from the Property and with a deductible not greater than Ten Thousand and No/100 Dollars ($10,000.00) (if applicable); and

(x)    upon sixty (60) days' notice, such other insurance and in such amounts as Lender from time to time may request against such other insurable

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(b)      All insurance provided for in Section 5.1(a) shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**") and shall be subject to the approval of Lender as to form and substance including deductibles, loss payees and insureds.  Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance and, if requested by Lender, other documentation, in each case acceptable to Lender, evidencing the Policies, accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "**Insurance Premiums**"), shall be delivered by Borrower to Lender.

(c)      Any blanket insurance Policy shall be subject to Lender's approval and shall provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.1(a).  Lender shall have determined based on a review of the schedule of locations and values that the amount of such coverage is sufficient in light of the other risks and properties insured under the blanket policy.

(d)      All Policies of insurance provided for or contemplated by Section 5.1(a) shall name Borrower as a named insured and, in the case of liability coverages (except for the Policies referenced in Sections 5.1(a)(v) and (viii)) shall name Lender and its successors and/or assigns as the additional insured, as its interests may appear, and in the case of property insurance coverages, including but not limited to boiler and machinery, terrorism, flood and earthquake insurance, shall contain a standard non-contributing mortgagee/lender's loss payable clause in favor of Lender providing that the loss thereunder shall be payable to Lender.  Additionally, if Borrower obtains property insurance coverage in addition to or in excess of that required by Section 5.1(a)(i), then such insurance policies shall also contain a standard non-contributing mortgagee/lender's loss payable clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)      All property insurance Policies provided for in Section 5.1(a) shall:

(i)      provide that no act or negligence of Borrower or any other insured under the Policy, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, or foreclosure or similar action, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)      provide that the Policy shall not be canceled without at least thirty (30) days' written notice to Lender, except ten (10) days' notice for non-payment of Insurance Premiums and, if obtainable by Borrower using commercially reasonable efforts, shall not be materially changed (other than to increase the coverage provided thereby) without such a thirty (30) day notice; and

300569686v1

(iii)     not contain any provision that would make Lender liable for any Insurance Premiums thereon or subject to any assessments thereunder, except that Lender is permitted to make payments to effect the continuation of such Policy upon notice of cancellation due to non-payment of Insurance Premiums pursuant to the mortgagee clause required herein.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, or Borrower shall fail to deliver certificates of insurance and, if requested by Lender, other documentation evidencing the Policies, evidence of payment and any other information required by Section 5.1(b), no less than ten (10) days prior to the expiration date of any Policies, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all Insurance Premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate.  Borrower shall promptly forward to Lender a copy of each written notice received by Borrower of any modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies.

(g)     In the event of foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(h)     If any of the all risk/special form property, rental loss and/or business interruption, commercial general liability or umbrella Policies include any exclusions for loss, cost, damage or liability caused by "terrorism" or "terrorist acts", Borrower shall obtain and maintain terrorism coverage to cover such exclusion(s) from a carrier which otherwise satisfies the rating criteria specified in Section 5.1(i) (a "**Qualified Carrier**") or, in the event that such terrorism coverage is not available from a Qualified Carrier, Borrower shall obtain such terrorism coverage from the highest rated insurance company providing such terrorism coverage.

(i)     All Policies required pursuant to Section 5.1(a): (i) shall be issued by companies authorized to do business in the State with a financial strength and claims paying ability rating of "A" or better by S&P; (ii) shall, with respect to the property, rental loss and/or business interruption, commercial general liability and umbrella Policies, contain a waiver of subrogation against Lender; (iii) shall contain such provisions as Lender deems reasonably necessary or desirable to protect its interest including endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under said Policies; and (iv) shall be satisfactory in form and substance to Lender and shall be approved by Lender as to amounts, form, risk coverage, deductibles,

loss payees and insureds.  Certified copies or other evidence acceptable to Lender of the Policies shall be delivered to Lender, at 1345 Avenue of the Americas, Suite 32A, New York, New York 10105, Attention:  Micah Goodman, General Counsel, on the date hereof with respect to the current Policies and within thirty (30) days after the effective date thereof with respect to all renewal Policies; provided, however, that if certified copies of the current Policies are not available on the date hereof, Borrower shall deliver to Lender on the date hereof documentation acceptable to Lender evidencing such Policies and shall deliver to Lender certified copies of such Policies within ten (10) days after such Policies are available.  Borrower shall pay the Insurance Premiums annually in advance as the same become due and payable and shall furnish to Lender evidence of the renewal of each of the Policies with receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Lender (provided, however, that Borrower shall not be required to pay such Insurance Premiums nor furnish such evidence of payment to Lender in the event that the amounts required to pay such Insurance Premiums have been deposited into the Insurance Account pursuant to Section 7.2 hereof).  In addition to the insurance coverages described in Section 5.1(a) above, Borrower shall obtain such other insurance as may from time to time be reasonably required by Lender in order to protect its interests.  Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

**Section 5.2    Casualty**.  If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the Property and otherwise comply with the provisions of Section 5.4.  Borrower shall pay all costs of Restoration (including, without limitation, any applicable deductibles under the Policies) whether or not such costs are covered by the Net Proceeds.  Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.  In the event of a Casualty where the loss does not exceed the Restoration Threshold, Borrower may settle and adjust such claim so long as no Event of Default has occurred and is continuing.  Any such adjustment must be carried out by Borrower in a commercially reasonable and timely manner.  In the event of a Casualty where the loss exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and adjust such claim only with the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any such adjustment; provided, however, if Borrower fails to settle and adjust such claim after diligently pursuing the same after the Casualty, Lender shall have the right to settle and adjust such claim at Borrower's cost and without Borrower's consent.  Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

**Section 5.3    Condemnation**.

(a)     Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of the Property of which Borrower has knowledge and shall deliver to Lender copies of any and all papers served in connection with such proceedings.  Provided no Event of Default has occurred and is continuing, in the event of a Condemnation where the amount of the taking does not exceed the Restoration Threshold, Borrower may settle and compromise such Condemnation.  Any such settlement and compromise must be carried out in a commercially reasonable and timely manner.  In the event of a Condemnation where the amount of the taking exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and compromise the Condemnation only with the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any litigation and settlement discussions in respect thereof, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation.  Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.

(b)     Following any Condemnation, Borrower shall promptly commence and diligently prosecute any Restoration of the Property that is required in order to restore the Property to as nearly as possible to the condition the Property was in immediately prior to such Condemnation, and Borrower shall otherwise comply with the provisions of Section 5.4.  Borrower shall pay all costs of Restoration whether or not such costs are covered by the Net Proceeds.  Notwithstanding anything to the contrary in Section 5.4, in the event that (i) no Restoration is applicable following a Condemnation, or (ii) there are excess Net Proceeds remaining after completion of the applicable Restoration pursuant to the provisions of Section 5.4, then all or such excess, as applicable, Net Proceeds shall be retained and applied by Lender toward the payment of the Debt pursuant to the terms and conditions of Section 2.7(b) hereof, whether or not then due and payable, in such order, priority and proportions as Lender in its discretion shall deem proper.  If Lender shall receive and retain any such Net Proceeds, the lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

(c)     Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt.  Lender shall not be limited to the interest paid on the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note.

**Section 5.4    Restoration**.  The following provisions shall apply in connection with the Restoration of the Property:

(a)    If the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, then provided that no Event of Default has occurred and is continuing and the condition in Section 9.6 hereof has been satisfied, subject to Section 5.5 hereof, the Net Proceeds will be disbursed by Lender to Borrower upon receipt.  Promptly after receipt of the Net Proceeds, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.  If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant to the terms hereof, such Net Proceeds shall, until completion of the Restoration, be held for the benefit of Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of Restoration in accordance with the terms hereof.

(b)    If the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration are equal to or greater than the Restoration Threshold, subject to Section 5.5 hereof, Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 5.4(b).

(i)    The Net Proceeds shall be made available for Restoration provided that each of the following conditions are met:

(A)    no Event of Default shall have occurred and be continuing;

(B)    (1) in the event the Net Proceeds are insurance proceeds, less than thirty percent (30%) of each of (i) fair market value of the affected Individual Property as reasonably determined by Lender, and (ii) rentable area of the affected Individual Property has been damaged, destroyed or rendered unusable as a result of a Casualty or (2) in the event the Net Proceeds are condemnation proceeds, less than ten percent (10%) of each of (i) the fair market value of the affected Individual Property as reasonably determined by Lender and (ii) rentable area of the affected Individual Property is taken, such land is located along the perimeter or periphery of such Individual Property, no portion of the Improvements is located on such land and such taking does not materially impair the existing access to such Individual Property;

(C)    Leases demising in the aggregate a percentage amount equal to or greater than seventy-five percent (75%) of the total rentable space in the affected Individual Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such fire or other casualty or taking, whichever the case may be, shall

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

remain in full force and effect during and after the completion of the Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and Borrower furnishes to Lender evidence satisfactory to Lender that all Tenants under Major Leases shall continue to operate their respective space at the Property after the completion of the Restoration;

(D)    Borrower shall commence (or shall cause the commencement of) the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after the issuance of a building permit with respect thereto) and shall diligently pursue the same to satisfactory completion in compliance with all applicable Legal Requirements, including, without limitation, all applicable Environmental Laws, and the applicable requirements of the Property Documents;

(E)    Lender shall be satisfied that any operating deficits which will be incurred with respect to the affected Individual Property as a result of the occurrence of any such fire or other casualty or taking will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 5.1(a)(iii) above, or (3) by other funds of Borrower;

(F)    Lender shall be satisfied that the Net Proceeds, together with any cash or cash equivalent deposited by Borrower with Lender, are sufficient to cover the cost of the Restoration;

(G)    Lender shall be satisfied that, upon the completion of the Restoration, the fair market value and cash flow of the affected Individual Property will not be less than the fair market value and cash flow of such Individual Property as the same existed immediately prior to the applicable Casualty or Condemnation;

(H)    Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) three (3) months prior to the Maturity Date, (2) nine (9) months after the occurrence of such fire or other casualty or taking, (3) the earliest date required for such completion under the terms of any Major Leases and the Property Documents, (4) such time as may be required under applicable Legal Requirements or (5) the expiration of the insurance coverage referred to in Section 5.1(a)(iii) above;

(I)    Intentionally deleted;

(J)    the affected Individual Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements and the Property Documents;

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(K)    the Restoration shall be done and completed in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements and the Property Documents;

(L)    the Property Documents will remain in full force and effect during and after the Restoration and a Property Document Event shall not occur as a result of the applicable Casualty, Condemnation and/or Restoration; and

(M)    Lender shall be satisfied that making the Net Proceeds available for Restoration shall be permitted pursuant to REMIC Requirements (including, without limitation, satisfaction of the condition in Section 9.6 hereof) and, in that regard, Lender may require Borrower to deliver a REMIC Opinion in connection therewith.

(ii)    The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Section 5.4(b), shall constitute additional security for the Debt and other obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents.  The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the related Restoration item have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)    All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**").    Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration shall be subject to prior review and acceptance by Lender and the Casualty Consultant.  All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower. Borrower shall have the right to settle all claims under the Policies jointly with Lender, provided that (a) no Event of Default exists, (b) Borrower promptly and with commercially reasonable diligence negotiates a settlement of any such claims and (c) the insurer with respect to the Policy under which such claim is

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

brought has not raised any act of the insured as a defense to the payment of such claim.  If an Event of Default exists, Lender shall, at its election, have the exclusive right to settle or adjust any claims made under the Policies in the event of a Casualty.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Restoration Retainage.  The term "**Restoration Retainage**" as used in this Subsection 5.4(b) shall mean an amount equal to 10% of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until such time as the Casualty Consultant certifies to Lender that Net Proceeds representing 50% of the required Restoration have been disbursed.  There shall be no Restoration Retainage with respect to costs actually incurred by Borrower for work in place in completing the last 50% of the required Restoration.  The Restoration Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Subsection 5.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration.  The Restoration Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 5.4(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Restoration Retainage, provided, however, that Lender will release the portion of the Restoration Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company insuring the lien of the Security Instrument.  If required by Lender, the release of any such portion of the Restoration Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)    Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)    If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender in consultation with the Casualty

Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.4(b) shall constitute additional security for the Debt and other obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents.

(vii)   Subject to Section 5.3(b) above, the excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under this Agreement, the Security Instrument, the Note or any of the other Loan Documents.

(c)   All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 5.4(b)(vii) shall be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper.  If Lender shall receive and retain Net Proceeds, the lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

(d)   Notwithstanding the foregoing or anything to the contrary contained herein, to the extent that Borrower is entitled to a disbursement of Net Proceeds hereunder for any purpose other than Restoration, Borrower hereby authorizes and directs Lender to pay the same to Mezzanine Lender to the extent that Mezzanine Lender is entitled to the same under the terms and conditions of the Mezzanine Loan Documents. Borrower further (i) agrees that Lender shall be entitled to conclusively rely on Mezzanine Lender's assertion that it is entitled to such Net Proceeds and (ii) hereby releases Lender and indemnifies Lender against any Losses that may be incurred by Lender as a result of any Person claiming that Lender improperly remitted such Net Proceeds to Mezzanine Lender.

**Section 5.5   Business Interruption Proceeds**.   Notwithstanding the foregoing provisions of this Article 5 to the contrary:

(b)   Subject to Section 5.5(b), payments received on account of the business interruption insurance specified in Section 5.1(a)(iii) above shall be deposited directly into the Casualty and Condemnation Account.  Notwithstanding the last sentence of

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 5.1(a)(iii) above, and provided that no Event of Default shall have occurred and be continuing, proceeds received by Lender on account of business or rental interruption or other loss of income insurance specified in Section 5.1(a)(iii) above shall be deposited by Lender into the Cash Management Account (in installments relating to the relevant period) to the extent such proceeds (or a portion thereof) reflect a replacement for lost Rents for the relevant period, as determined by Lender in good faith, and such proceeds shall be applied by Lender in accordance with Section 8.3 hereof. All other such proceeds not reflecting a replacement for lost Rents shall be held by Lender and disbursed in accordance with Section 5.4 hereof.

(c)    Notwithstanding the foregoing provisions of Section 5.5(a), if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrower, such payment shall not be treated as business or rental interruption insurance proceeds unless Borrower has demonstrated to Lender's reasonable satisfaction that the remaining Net Proceeds that will be received from the property insurance carriers are sufficient to pay one hundred percent (100%) of the cost of fully restoring the Improvements or, if such Net Proceeds are to be applied repay the Loan in accordance with the terms hereof, that such remaining Net Proceeds will be sufficient to pay off the Loan in full.

## ARTICLE 6

## NO SALE OR ENCUMBRANCE; PERMITTED TRANSFERS

**Section 6.1    No Sale/Encumbrance**. It shall be an Event of Default hereunder if, without the prior written consent of Lender, a Prohibited Transfer occurs, other than (i) pursuant to Leases in accordance with the provisions of this Agreement, (ii) as expressly permitted pursuant to the terms of this Article 6, and (iii) if (A) the applicable breach of the requirements of this Article 6 was immaterial (it being agreed that the failure to give a required notice shall, by itself, be deemed immaterial), (B) Borrower corrects such breach within thirty (30) days of Borrower's first awareness thereof, and (C) such breach is not a Sale or Pledge of all or any portion of the Property or a transfer which results in the ownership or control tests set forth in this Article 6 to be violated.

**Section 6.2    Intentionally Omitted**.

**Section 6.3    Permitted Equity Transfers**.

(a)    Notwithstanding Section 6.1 hereof, the following equity transfers shall be permitted without Lender's consent:

(i)    any Mezzanine Transfer; and

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(ii)    Any transfers of any equity interests in Silver Star REIT Properties, Inc.

(iii)    [TBD].

(b)    Upon request from Lender, Borrower shall promptly provide Lender a revised version of the Organizational Chart reflecting any equity transfer consummated in accordance with this Section 6.3.

**Section 6.4    Replacement Guarantor**.  To the extent that any Guarantor is a natural person, the death or incapacity of such Guarantor shall be an Event of Default hereunder unless such Guarantor is replaced in accordance with this Section 6.4.  Borrower shall be permitted to substitute a replacement guarantor (a "**Substitution**") and no Event of Default shall be deemed to have occurred hereunder, provided that each of the following terms and conditions are satisfied:  (a) no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Substitution; (b) within thirty (30) days after the occurrence of such death or incapacity, Borrower delivers to Lender notice of its intent to substitute such Guarantor and, concurrently therewith, gives Lender all such information concerning the proposed substitute guarantor as Lender may reasonably require, including, without limitation, certified financial statements detailing assets and liabilities; (c) the replacement guarantor is a Satisfactory Replacement Guarantor; (d) within fifteen (15) days after delivery of the written notice described in the preceding clause (b), such Satisfactory Replacement Guarantor (i) assumes the obligations of Guarantor under the Guaranty and the Environmental Indemnity for events or conditions occurring prior to, as of and after the Substitution or (ii) executes and delivers to Lender a replacement guaranty and a replacement environmental indemnity in each case in form and substance the same as the Guaranty and the Environmental Indemnity, respectively, and otherwise reasonably acceptable to Lender, for events or conditions occurring prior to, as of and after the Substitution; (e) concurrently with such assumption or execution and delivery (i) such Satisfactory Replacement Guarantor delivers to Lender a spousal consent in form and substance acceptable to Lender, as and to the extent applicable, and (ii) each of Borrower, each remaining Guarantor and/or such Satisfactory Replacement Guarantor, as applicable, affirms each of their respective obligations under the Loan Documents; (f) Borrower delivers to Lender a Rating Agency Confirmation with respect to such Substitution; (g) if required by Lender or the Rating Agencies, Borrower delivers to Lender an opinion from counsel, and in form and substance, in each case reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion stating, among other things, (i) that the Guaranty and the Environmental Indemnity (or the replacement guaranty and environmental indemnity, as the case may be) are enforceable against such Satisfactory Replacement Guarantor in accordance with their terms and (ii) that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code or be subject to tax as a result of such Substitution; and (h) if required by Lender or the Rating Agencies and a Non-Consolidation Opinion has previously been delivered in connection with the Loan, Borrower delivers to Lender a New Non-Consolidation Opinion.  No such death or replacement of a Guarantor shall hinder, impair, limit, terminate or effectuate a novation of the obligations or liabilities of any other Guarantor under any of the Loan Documents.  As used

herein, the term "**Satisfactory Replacement Guarantor**" shall mean a replacement guarantor that is acceptable to Lender, which determination shall be based upon, inter alia, (A) such replacement guarantor having (1) a direct or indirect ownership interest in Borrower, which is reasonably satisfactory to Lender, and (2) the ability to Control Borrower, (B) such replacement guarantor having a net worth and liquidity reasonably satisfactory to Lender, (C) Lender's receipt of searches (including credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) reasonably required by Lender on such replacement guarantor, the results of which must be reasonably acceptable to Lender, (D) such replacement guarantor otherwise satisfying Lender's then current applicable underwriting criteria and requirements, and (E) such replacement guarantor being an experienced operator and/or owner of properties similar in location, size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably requested by Lender or requested by the Rating Agencies.

**Section 6.5    Lender's Rights**.  Lender reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and on assumption of this Agreement and the other Loan Documents as so modified by the proposed Prohibited Transfer, (b) payment of a transfer fee and all of Lender's expenses incurred in connection with such Prohibited Transfer, (c) receipt of a Rating Agency Confirmation with respect to the Prohibited Transfer, (d) the proposed transferee's continued compliance with the covenants set forth in this Agreement, including, without limitation, the covenants in Section 4.23, (e) receipt of a New Non-Consolidation Opinion with respect to the Prohibited Transfer (if at such time a Non-Consolidation Opinion has previously been issued to Lender in connection with the Loan) and/or (f) such other conditions and/or legal opinions as Lender shall determine in its sole discretion to be in the interest of Lender.  All expenses incurred by Lender shall be payable by Borrower whether or not Lender consents to the Prohibited Transfer.  Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer without Lender's consent.  This provision shall apply to every Prohibited Transfer, whether or not Lender has consented to any previous Prohibited Transfer.

**Section 6.6    Economic Sanctions, Anti-Money Laundering; Prohibited Entities**. Borrower shall (and shall cause its direct and indirect constituent owners and Affiliates to) (a) at all times comply with the representations and covenants contained in Sections 3.27, 4.26 and 4.27 such that the same remain true, correct and not violated or breached and (b) not permit a Prohibited Transfer to occur and shall cause the ownership requirements specified in this Article 6 to be complied with at all times.  Borrower hereby represents that, other than in connection with the Loan, the Loan Documents and any Permitted Encumbrances, as of the date hereof, there exists no Sale or Pledge of (i) the Property or any part thereof or any legal or beneficial interest therein or (ii) any interest in any Restricted Party, except as otherwise disclosed in writing by Borrower to Lender.  Notwithstanding anything to the contrary contained herein or in any other Loan Document (including, without limitation Sections 6.3 and 6.4 hereof), in no event shall Borrower or any SPE Component Entity be (A) a Prohibited Entity, (B) Controlled (directly or indirectly) by any Prohibited Entity or (C) more than 49% owned (directly or indirectly) by Prohibited Entities (whether individually or in the aggregate), unless,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

in each of the foregoing cases, Lender's prior written consent is first obtained (which such consent shall be given or withheld in Lender's sole discretion and may be conditioned on, among other things, Lender's receipt of a Rating Agency Confirmation).

### Section 6.7    Partial Release.

(a)    Notwithstanding Section 6.1 hereof, Borrower may obtain a release of any Partial Release Property from the lien of the applicable Security Instrument and the other Loan Documents in connection with the sale of such Partial Release Property to a bona fide third party purchaser who is not an Affiliate of a Restricted Party pursuant to an arms-length contract and otherwise pursuant to the provisions of this Section 6.7 (each such release, a "**Partial Release**") so long as the following conditions precedent, and the other terms and conditions of this Section 6.7, are satisfied in connection with any such Partial Release:

(i)    no Default or Event of Default shall have occurred and be continuing or shall occur solely as a result of such Partial Release;

(ii)    Borrower shall have submitted to Lender a written request for such Partial Release at least thirty (30) days prior to the proposed Partial Release Date (other than with respect to those Individual Properties set forth on <u>Schedule 6.7</u> hereof, with respect to which such written request is deemed given as of the Closing Date and the applicable Partial Release Date shall be deemed to be the respective date set forth with respect to each such Individual Property on <u>Schedule 6.7</u>), accompanied by a processing fee of $7,500 which request (i) shall specify the Partial Release Property that Borrower intends to release and state the anticipated release date (the "**Partial Release Date**") and (ii) shall include an Officer's Certificate providing a certification that as of the date of such request, to the best of Borrower's knowledge, no Default or Event of Default shall have occurred and be continuing or shall occur solely as a result of such Partial Release;

(iii)    Borrower shall have paid, or shall have arranged to be paid contemporaneously with the Partial Release, to Lender, and Lender shall have received by wire transfer of immediately available federal funds contemporaneously with the Partial Release, an amount equal to the sum of (A) the Partial Release Price for the Partial Release Property, which shall be applied by Lender as a prepayment of the Debt, plus (B) any Interest Shortfall, plus (C) the Exit Fee due in respect of the principal amount prepaid, plus (D) all other sums then due and payable under the Loan Documents;

(iv)    Borrower shall have submitted to Lender, not less than five (5) Business Days prior to the Partial Release Date such releases, satisfactions, discharges and/or assignments for the Partial Release Property for execution by Lender, which shall be in form and substance reasonably satisfactory to Lender and appropriate in the jurisdiction in which the Partial Release Property is located;

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(v)     if the Loan shall then be held by a REMIC Trust formed pursuant to a Securitization, Borrower shall have delivered (A) a Rating Agency Confirmation with respect to such Partial Release, (B) a REMIC Opinion from counsel, and in form and substance, in each case acceptable to Lender and the Rating Agencies, and (C) evidence satisfactory to Lender that Borrower and each SPE Component Entity (if applicable) continues to be in compliance with each representation, warranty and covenant set forth in Section 3.24, Section 4.23 and Exhibit C following such Partial Release;

(vi)    after giving effect to the Partial Release, (A) the Debt Yield (Combined) for the Partial Release Remaining Property shall not be less than the greater of (i) the Partial Release Minimum Debt Yield and (ii) the Debt Yield (Combined) in effect immediately prior to the Partial Release, and (B) the LTV for the Partial Release Remaining Property shall not be greater than the lesser of (A) the Partial Release Minimum LTV and (B) the LTV in effect immediately prior to the Partial Release;

(vii)   Manager and other parties to the Management Agreement shall provide Lender with evidence satisfactory to Lender that the Partial Release Property will no longer be subject to the Management Agreement once such Partial Release has been completed and that Manager will no longer earn fees under the Management Agreement with respect to such Partial Release Property; provided, however, that Manager shall be permitted to enter into a separate management, leasing and/or development agreement with the owner of any such Partial Release Property;

(viii)  Borrower shall have delivered to Lender one or more endorsements to the Title Insurance Policy, in form and substance satisfactory to Lender, that (A) extend the date of the Title Insurance Policy to the effective date of the Partial Release and (B) insure the priority of the Security Instrument is not affected as to the Partial Release Remaining Property;

(ix)    Borrower shall have delivered an Officer's Certificate certifying that all of the requirements set forth in this Section 6.7 have been satisfied;

(x)     Borrower shall have executed and delivered to Lender such other certificates, documents or instruments as Lender may reasonably require in connection with the Partial Release;

(xi)    Borrower shall have delivered to Lender evidence reasonably acceptable to Lender that all conditions precedent to the Partial Release pursuant to the Mezzanine Loan Documents have been satisfied in full or waived by Mezzanine Lender; and

(xii)   Borrower shall have paid (A) all of Lender's actual, out-of-pocket costs and expenses (including attorneys' fees and disbursements) incurred in

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

connection with the Partial Release and the review and approval of the documents and information required to be delivered in connection therewith, and (B) all costs and expenses of third parties incurred in connection with the Partial Release (including, without limitation, the cost of title, survey charges and recording costs, the costs and fees of any zoning consultant, and the costs and expenses incurred by, and all fees and charges of, the Rating Agencies).

(b)    All documents, instruments, evidence, opinions, reports, information and other items specifically required to be delivered to Lender pursuant to Section 6.7 shall be delivered by Borrower to Lender not less than ten (10) Business Days prior to the Partial Release Date, unless otherwise specified herein.

(c)    If at the time Borrower exercises its rights under this Section 6.7, the Loan is included in a REMIC Trust, then:

(i)    if the LTV of the Partial Release Remaining Property would exceed one hundred twenty five percent (125%) immediately after such Partial Release (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust), Borrower shall pay down the principal balance of the Loan by a "qualified amount" as such term is defined in IRS Rev. Proc. 2010-30 (as the same may be modified, supplemented, superseded or amended, from time to time), unless the Lender receives an opinion of counsel in form and substance acceptable to Lender that, if the foregoing prepayment requirement is not followed, the applicable REMIC Trust will not fail to maintain its status as a REMIC Trust as a result of such Partial Release; and

(ii)    all conditions in this Section 6.7 which provide for the exercise of discretion by Lender (whether in Lender's reasonable discretion, sole discretion, or otherwise) shall be construed as permitting the Lender to reject a document or other item only if such document or other item fails to satisfy generally-applicable underwriting standards for securitized commercial mortgage loans, employed at the time such Partial Release occurs.

(d)    Upon the closing of any Partial Release, if all of the conditions set forth in this Section 6.7 with respect to such Partial Release have been satisfied or waived in writing by Lender, then (i) Lender, at the sole cost and expense of Borrower, shall execute and deliver to Borrower a partial release, satisfaction, discharge and/or assignment, as applicable and as reasonably requested by Borrower, of the applicable Security Instrument, the applicable Assignment of Leases and the other Loan Documents which solely relate to the Partial Release Property, and (ii) all references herein or in any of the other Loan Documents to the term "Property" shall be deemed to exclude the Partial Release Property.

**Section 6.8    Costs and Expenses**.  Borrower shall pay all actual, out-of-pocket costs and expenses of Lender in connection with any transfer, assumption and/or replacement of any

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Guarantor, including, without limitation, the cost of any Rating Agency Confirmation and all reasonable fees and expenses of Lender's counsel, and the cost of any counsel opinions required by the Rating Agencies.

## ARTICLE 7

## RESERVE FUNDS

**Section 7.1    Immediate Repair Funds**.

(a)    Borrower shall perform the repairs at the Property as set forth on Exhibit B hereto (all such repairs are hereinafter referred to as "**Immediate Repairs**") and shall complete each of the Immediate Repairs on or before the respective deadline for each repair as set forth on Exhibit B hereto (or, if no deadline is set forth, within ninety (90) days after the Closing Date. On the Closing Date, Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Immediate Repair Account**") an amount equal to $[_____], such amount representing 115% of the estimated costs of the Immediate Repairs. Amounts deposited pursuant to this Section 7.1 are referred to herein as the "**Immediate Repair Funds**".

(b)    Lender shall disburse to Borrower the Immediate Repair Funds upon satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the Immediate Repairs to be paid; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured; (iii) Lender shall have received a certificate from Borrower (A) stating that all Immediate Repairs to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with the Immediate Repairs, (B) identifying each Person that supplied materials or labor in connection with the Immediate Repairs to be funded by the requested disbursement, and (C) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers, invoices and/or other evidence of payment reasonably satisfactory to Lender; (iv) intentionally deleted; (v) at Lender's option, if the cost of the Immediate Repairs exceeds $100,000, Lender shall have received a report satisfactory to Lender in its reasonable discretion from an architect or engineer approved by Lender in respect of such architect or engineer's inspection of the required repairs; and (vi) Lender shall have received such other evidence as Lender shall reasonably request that the Immediate Repairs to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Lender shall not be required to disburse Immediate Repair Funds more frequently than once each calendar month nor in an amount less than the Minimum Disbursement Amount (or a lesser amount if the total Immediate Repair Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).

97

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 7.2    Tax and Insurance Funds**.  On the Closing Date, Borrower shall make an initial deposit with Lender with respect to Taxes and Insurance Premiums in an amount reasonably determined by Lender, to be held in Eligible Accounts by Lender or Servicer and hereinafter respectively referred to as the "**Tax Account**" and the "**Insurance Account**".  In addition, Borrower shall pay (or cause to be paid) to Lender on each Monthly Payment Date (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months assuming that said Taxes are to be paid in full on the Tax Payment Date (the "**Monthly Tax Deposit**"), each of which such deposits shall be held in the Tax Account, and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies on the Insurance Payment Date (the "**Monthly Insurance Deposit**"), each of which such deposits shall be held in the Insurance Account (amounts held in the Tax Account and the Insurance Account are collectively herein referred to as the "**Tax and Insurance Funds**").  If, at any time, Lender determines in its commercially reasonable discretion that amounts on deposit or scheduled to be deposited in (i) the Tax Account will be insufficient to pay all applicable Taxes in full on the Tax Payment Date and/or (ii) the Insurance Account will be insufficient to pay all applicable Insurance Premiums in full on the Insurance Payment Date, Borrower shall make a payment into the applicable Reserve Account in an amount which will be sufficient to make up such insufficiency, as reasonably determined by Lender.  Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes directly from the appropriate taxing authority.  Provided there are sufficient amounts in the Tax Account and Insurance Account, respectively, and no Event of Default exists, Lender shall be obligated to pay the Taxes and Insurance Premiums as they become due on their respective due dates on behalf of Borrower by applying the Tax and Insurance Funds to the payment of such Taxes and Insurance Premiums.  If the amount of the Tax and Insurance Funds shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 4.7 and 5.1 hereof, Lender shall either return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Funds (such election to be made by Lender in its discretion).

**Section 7.3    Capital Expenditures Reserve Funds**.

(a)    Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Capital Expenditures Reserve Account**") on each Monthly Payment Date an amount equal to $[_____] (the "**Capital Expenditures Reserve Monthly Deposit**") for Capital Expenditures.  Amounts deposited pursuant to this Section 7.3 are referred to herein as the "**Capital Expenditures Reserve Funds**".  Lender may reassess its estimate of the amount necessary for Capital Expenditures from time to time based on Lender's review of one or more updated property condition reports, and may require Borrower to increase the monthly deposits required pursuant to this Section 7.3 upon thirty (30) days' notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary to maintain proper operation of the Property.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(b)      Lender shall disburse Capital Expenditures Reserve Funds only for Capital Expenditures reasonably approved by Lender, not to be unreasonably withheld, conditioned or delayed.  Lender shall disburse to Borrower the Capital Expenditures Reserve Funds upon satisfaction by Borrower of each of the following conditions:  (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the Capital Expenditures to be paid; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have received  a certificate from Borrower (A) stating that the items to be funded by the requested disbursement are Capital Expenditures, (B) stating that all Capital Expenditures at the Property to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such certificate to be accompanied by a copy of any license, permit or other approval required by any Governmental Authority in connection with the Capital Expenditures, (C) identifying each Person that supplied materials or labor in connection with the Capital Expenditures to be funded by the requested disbursement and (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers, invoices and/or other evidence of payment satisfactory to Lender; (iv) at Lender's option, if the cost of any individual Capital Expenditure exceeds $100,000, Lender shall have received a title search for the Property indicating that the Property is free from all liens, claims and other encumbrances other than Permitted Encumbrances; (v) at Lender's option, if the cost of any individual Capital Expenditure exceeds $100,000, Lender shall have received a report satisfactory to Lender in its reasonable discretion from an architect or engineer approved by Lender in respect of such architect or engineer's inspection of the applicable work; and (vi) Lender shall have received such other evidence as Lender shall reasonably request that the Capital Expenditures at the Property to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Lender shall not be required to disburse Capital Expenditures Reserve Funds more frequently than once each calendar month nor in an amount less than the Minimum Disbursement Amount (or a lesser amount if the total amount of Capital Expenditures Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).

(c)      Nothing in this Section 7.3 shall (i) make Lender responsible for making or completing the Capital Expenditures; (ii) require Lender to expend funds in addition to the Capital Expenditures Reserve Funds to complete any Capital Expenditures; (iii) obligate Lender to proceed with the Capital Expenditures; or (iv) obligate Lender to demand from Borrower additional sums to complete any Capital Expenditures.

(d)      Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties to enter onto the Property during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Capital Expenditures and all materials being used in connection therewith and to examine all plans and shop drawings relating

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

to such Capital Expenditures.  Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section.

### Section 7.4    Leasing Reserve Funds.

(a)    Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Leasing Reserve Account**") on each Monthly Payment Date the sum of $[_____] (the "**Leasing Reserve Monthly Deposit**") for tenant improvements and leasing commissions that may be incurred following the date hereof.  Amounts deposited pursuant to this Section 7.4 are referred to herein as the "**Leasing Reserve Funds**".  Lender may reassess its estimate of the amount necessary for tenant improvements and leasing commissions from time to time, and may require Borrower to increase the monthly deposits required pursuant to this Section 7.4 upon thirty (30) days' notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary to maintain proper operation of the Property.

(b)    Lender shall disburse to Borrower the Leasing Reserve Funds upon satisfaction by Borrower of each of the following conditions:  (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the tenant improvement costs and leasing commissions to be paid; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured; (iii) in the case of a disbursement to pay for leasing commissions, Lender shall have reviewed and reasonably approved such leasing commissions; (iv) Lender shall have approved the Lease for which disbursement is sought if either (A) such approval is required pursuant to the terms and conditions of this Agreement or (B) such Lease provides for any of the following: (1) a term of less than [____] years, (2) rental of less than $[____] per square foot on a [ "modified gross" or "triple net"] basis, as applicable, (3) a tenant improvement allowance greater than $[____] per square foot for a new Lease or $[_____] per square foot for a renewal Lease, (4) more than [_____] months of free/abated rent for a new Lease or more than [_____] months of free/abated rent for a renewal Lease; (v) Lender shall have received and approved a budget for tenant improvement costs and a schedule of leasing commissions payments and the requested disbursement will be used to pay all or a portion of such costs and payments (and in no event shall Lender be obligated to disburse Leasing Reserve Funds on account of tenant improvement costs for any particular Tenant in excess of, per annum, $[_____] per square foot of space leased pursuant to such Tenant's Lease); (vi) Lender shall have received a certificate from Borrower (A) stating that all tenant improvements at the Property to be funded by the requested disbursement have been completed in good and workmanlike manner and in accordance with all applicable federal, state and local laws, rules and regulations, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with the tenant improvements, (B) identifying each Person that supplied materials or labor in connection with the tenant improvements to be funded by the requested disbursement and (C) stating

that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers, invoices and/or other evidence of payment satisfactory to Lender; (vii) at Lender's option, if the cost of any individual tenant improvement exceeds $100,000, Lender shall have received a title search for the Property indicating that the Property is free from all liens, claims and other encumbrances not previously approved by Lender; and (viii) Lender shall have received such other evidence as Lender shall reasonably request that the tenant improvements at the Property and/or leasing commissions to be funded by the requested disbursement have been completed (to the extent applicable), are due and payable and are paid for or will be paid upon such disbursement to Borrower.  Lender shall not be required to disburse Leasing Reserve Funds more frequently than once each calendar month nor in an amount less than the Minimum Disbursement Amount (or a lesser amount if the total amount of Leasing Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).

**Section 7.5    Operating Expense Funds**.  On each Monthly Payment Date, Borrower shall deposit (or shall cause there to be deposited) into an Eligible Account held by Lender or Servicer (the "**Operating Expense Account**") an amount equal to the aggregate amount of Approved Operating Expenses and Approved Extraordinary Expenses to be incurred by Borrower for the then current Interest Period (such amount, the "**Operating Expense Monthly Deposit**").  Amounts deposited pursuant to this Section 7.5 are referred to herein as the "**Operating Expense Funds**".  Provided no Event of Default has occurred and is continuing, Lender shall disburse the Operating Expense Funds to Borrower to pay Approved Operating Expenses and/or Approved Extraordinary Expenses upon Borrower's request (which such request shall be accompanied by an Officer's Certificate detailing the applicable expenses to which the requested disbursement relates and attesting that such expense shall be paid with the requested disbursement).

**Section 7.6    Excess Cash Flow Funds**.  On each Monthly Payment Date, Borrower shall deposit (or cause to be deposited) into an Eligible Account with Lender or Servicer (the "**Excess Cash Flow Account**") an amount equal to the Excess Cash Flow (the amounts on deposit in the Excess Cash Flow Account being herein referred to as the "**Excess Cash Flow Funds**").  Provided no Event of Default has occurred and is continuing, any Excess Cash Flow Funds remaining in the Excess Cash Flow Account upon the repayment in full of the Debt shall be disbursed to Borrower, unless any amount remains outstanding at such time pursuant to the Mezzanine Loan Documents, in which case such funds shall be, and Borrower hereby directs that such funds be, disbursed to Mezzanine Lender.

**Section 7.7    Intentionally Omitted**.

**Section 7.8    The Accounts Generally**.

(a)    Borrower grants to Lender a first-priority perfected security interest in each of the Accounts and any and all sums now or hereafter deposited in the Accounts as additional security for payment of the Debt.  Until expended or applied in accordance herewith, the Accounts and the funds deposited therein shall constitute additional security

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

for the Debt.    The provisions of this Section 7.8 (together with the other related provisions of the other Loan Documents) are intended to give Lender and/or Servicer "control" of the Accounts and the Account Collateral and serve as a "security agreement" and a "control agreement" with respect to the same, in each case, within the meaning of the UCC.    Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof, and Borrower shall have no right of withdrawal with respect to any Account except with the prior written consent of Lender or as otherwise provided herein. The funds on deposit in the Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.    Notwithstanding anything to the contrary contained herein, unless otherwise consented to in writing by Lender, Borrower shall only be permitted to request (and Lender shall only be required to disburse) Reserve Funds on account of the liabilities, costs, work and other matters (as applicable) for which said sums were originally reserved hereunder, in each case, as reasonably determined by Lender.

(b)    Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in the Accounts or the sums deposited therein or permit any lien to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.    Borrower hereby authorizes Lender to file a financing statement or statements under the UCC in connection with any of the Accounts and the Account Collateral in the form required to properly perfect Lender's security interest therein. Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or desirable, or that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Account or Account Collateral.

(c)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, (1) Lender shall have no obligation to disburse funds from any Reserve Account within the sixty (60) day period prior to the Maturity Date and (2) upon the occurrence and during the continuance of an Event of Default, without notice from Lender or Servicer (i) Borrower shall have no rights in respect of the Accounts, (ii) Lender may liquidate and transfer any amounts then invested in Permitted Investments pursuant to the applicable terms hereof to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or pursuant to the other Loan Documents or to enable Lender to exercise and enforce Lender's rights and remedies hereunder or under any other Loan Document with respect to any Account or any Account Collateral, and (iii) Lender shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Security Instrument, in addition to all of the rights and

remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the Security Instrument, may apply the amounts of such Accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt.

(d)    The insufficiency of funds on deposit in the Accounts shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(e)    Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorney's fees and expenses) arising from or in any way connected with the Accounts, the sums deposited therein or the performance of the obligations for which the Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees.  Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Accounts; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

(f)    Borrower and Lender (or Servicer on behalf of Lender) shall maintain each applicable Account as an Eligible Account, except as otherwise expressly agreed to in writing by Lender.  In the event that Lender or Servicer no longer satisfies the criteria for an Eligible Institution, Borrower shall cooperate with Lender in transferring the applicable Accounts to an institution that satisfies such criteria.  Borrower hereby grants Lender power of attorney (irrevocable for so long as the Loan is outstanding) with respect to any such transfers and the establishment of accounts with a successor institution.

(g)    Interest accrued on any Account shall be remitted either to Borrower or to any Account and shall not be retained by Lender.

(h)    Borrower acknowledges and agrees that it solely shall be, and shall at all times remain, liable to Lender or Servicer for all fees, charges, costs and expenses in connection with the Accounts, this Agreement and the enforcement hereof, including, without limitation, any monthly or annual fees or charges as may be assessed by Lender or Servicer in connection with the administration of the Accounts and the reasonable fees and expenses of legal counsel to Lender and Servicer as needed to enforce, protect or preserve the rights and remedies of Lender and/or Servicer under this Agreement.

(i)    Lender may, in its sole discretion, establish subaccounts maintained on ledger basis within each Reserve Account to allocate Reserve Funds with respect to each Individual Property. Any determination made by Lender pursuant to this Article 7 that the applicable Reserve Funds are insufficient to pay all costs for which a Reserve Account is established may be made by Lender, in its sole but reasonable

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

discretion, by either (1) aggregating all Reserve Funds in such Reserve Account (regardless of allocation to an Individual Property) or (2) solely on the basis of Reserve Funds allocated to an Individual Property. Lender shall have no obligation to make Reserve Funds allocated to an Individual Property available to pay costs associated with any other Individual Property.

**Section 7.9    Intentionally Omitted**.

**Section 7.10   Interest and Operating Expense Reserve Funds**.   Borrower shall deposit (or shall cause there to be deposited) into an Eligible Account held by Lender or Servicer (the "**Interest and Operating Expense Reserve Account**") on the Closing Date, the sum of $[_____], to be held as additional security for the Debt and all of the other Obligations.   In addition, if at any point in time the balance in the Interest and Operating Expense Reserve Account is less than $[_____], Borrower shall, on the immediately following Monthly Payment Date, deposit the Interest and Operating Expense Reserve Additional Deposit into the Interest and Operating Expense Reserve Account.  Amounts deposited pursuant to this Section 7.10 are referred to herein as the "**Interest and Operating Expense Reserve Funds**".   Provided no Event of Default has occurred and is continuing, on each Monthly Payment Date on which a shortfall exists in available revenues from the Property to pay all or any portion of the Monthly Debt Service Payment due on such Monthly Payment Date, required deposits into the Reserve Accounts due on such Monthly Payment Date, [the Mezzanine Loan Monthly Debt Service due on such Monthly Payment Date pursuant to the terms of the Mezzanine Loan Documents] and/or Approved Operating Expenses or Approved Extraordinary Expenses, as applicable (as demonstrated to Lender's reasonable satisfaction including, without limitation, by virtue of an Officer's Certificate detailing the applicable shortfall and the amount(s) to be paid by the disbursement of Interest and Operating Expense Reserve Funds), Lender shall disburse an amount of available Interest and Operating Expense Reserve Funds, up to the amount of such shortfall, in payment of such amount(s).  Upon the occurrence of the Performance Achievement Date (if ever), Borrower's obligation to deposit any Interest and Operating Expense Reserve Additional Deposit into the Interest and Operating Expense Reserve Account shall terminate and Lender shall apply any available Interest and Operating Expense Reserve Funds then remaining on deposit in the Interest and Operating Expense Reserve Account to the prepayment of the Debt (including any Exit Fee, Minimum Interest Payment, Breakage Costs, Interest Shortfall and/or other amounts payable in connection with such prepayment pursuant to the terms of Section 2.7).

**Section 7.11   Intentionally Omitted.**

**Section 7.13   Disbursements to Mezzanine Lender**.   In all instances in this Article 7 where any excess Reserve Funds are to be disbursed to Borrower, such Reserve Funds shall instead be, and Borrower hereby directs the same to be, disbursed to Mezzanine Lender, as a distribution permitted in accordance with applicable Legal Requirements, if Lender has received notice that a Mezzanine Loan Event of Default then exists.

**Section 7.14   Interest Rate Cap Reserve Funds**.  Unless otherwise directed by Lender, Borrower shall deposit (or shall cause to be deposited directly by Counterparty) into an Eligible

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Account held by Lender or Servicer (the "**Interest Rate Cap Reserve Account**") any and all amounts paid by Counterparty pursuant to any Interest Rate Cap Agreement, within one (1) Business Day of Borrower's receipt thereof (if received by Borrower and not directly deposited by Counterparty), all such amounts to be held as additional security for the Debt and all of the other Obligations.  Amounts deposited pursuant to this Section 7.13 are referred to herein as the "**Interest Rate Cap Reserve Funds**".  Provided no Event of Default has occurred and is continuing, on each Monthly Payment Date Lender shall disburse an amount of available Interest Rate Cap Reserve Funds in payment of the Monthly Debt Service Payment then due, up to the amount of such Monthly Debt Service Payment.

# ARTICLE 8

# CASH MANAGEMENT

**Section 8.1     Establishment of Certain Accounts**.

(a)     Borrower shall establish an Eligible Account (the "**Clearing Account**") simultaneously herewith, pursuant to the Clearing Account Agreement, in the name of Borrower for the sole and exclusive benefit of Lender, into which Borrower shall deposit (or cause to be deposited) all revenue generated by the Property.  Pursuant to the Clearing Account Agreement, funds on deposit in the Clearing Account shall be transferred on each Business Day to the Cash Management Account.

(b)     Simultaneously herewith, Lender, on Borrower's behalf, shall establish (i) an Eligible Account with Lender or Servicer, as applicable, in the name of Borrower for the sole and exclusive benefit of Lender (the "**Cash Management Account**") and (ii) an Eligible Account with Lender or Servicer into which Borrower shall deposit, or cause to be deposited, the amounts required for the payment of Debt Service under the Loan (the "**Debt Service Account**").  Notwithstanding anything herein to the contrary, in the event Borrower fails to cooperate with Lender, Servicer or Cash Management Bank, as applicable, within two (2) Business Days following written request to establish the Cash Management Account in the name of Borrower, Borrower hereby authorizes Lender or Servicer to establish the Cash Management Account in the name of Lender or Servicer.

**Section 8.2     Deposits into and Maintenance of Clearing Account**.

(a)     Borrower represents, warrants and covenants that, so long as the Debt remains outstanding, (i) Borrower shall, or shall cause Manager to, immediately deposit all revenue derived from the Property and received by Borrower or Manager, as the case may be, into the Clearing Account; (ii) Borrower shall instruct Manager to immediately deposit (A) all revenue derived from the Property collected by Manager, if any, pursuant to the Management Agreement (or otherwise) into the Clearing Account and (B) all funds otherwise payable to Borrower by Manager pursuant to the Management Agreement (or otherwise in connection with the Property) into the Clearing Account; (iii) (A) on or before the Closing Date, Borrower shall have sent (and hereby represents that it has sent) a notice, in a form approved by Lender, to all Tenants now occupying space at the

Property directing them to pay all rent and other sums due under the Lease to which they are a party into the Clearing Account (such notice, the "**Tenant Direction Notice**") (B) simultaneously with the execution of any Lease entered into on or after the date hereof in accordance with the applicable terms and conditions hereof, Borrower shall furnish each Tenant under each such Lease the Tenant Direction Notice and (C) Borrower shall continue to send the aforesaid Tenant Direction Notices until each addressee thereof complies with the terms thereof; (iv) there shall be no other accounts maintained by Borrower or any other Person into which revenues from the ownership and operation of the Property are directly deposited; and (v) neither Borrower nor any other Person shall open any other such account with respect to the direct deposit of income in connection with the Property.   Until deposited into the Clearing Account, any Rents and other revenues from the Property held by Borrower shall be deemed to be collateral and shall be held in trust by it for the benefit, and as the property, of Lender pursuant to the Security Instrument and shall not be commingled with any other funds or property of Borrower.  Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 8.2 without Lender's prior written consent.

(b)    Borrower shall maintain the Clearing Account for the term of the Loan, which Clearing Account shall be under the sole dominion and control of Lender (subject to the terms hereof and of the Clearing Account Agreement).  The Clearing Account shall have a title evidencing the foregoing in a manner reasonably acceptable to Lender. Borrower hereby grants to Lender a first-priority security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Clearing Account.  Borrower hereby authorizes Lender to file UCC Financing Statements and continuations thereof to perfect Lender's security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof.  All costs and expenses for establishing and maintaining the Clearing Account (or any successor thereto) shall be paid by Borrower.  All monies now or hereafter deposited into the Clearing Account shall be deemed additional security for the Debt.  Borrower shall pay all sums due under and otherwise comply with the Clearing Account Agreement. Borrower shall not alter or modify either the Clearing Account or the Clearing Account Agreement, in each case without the prior written consent of Lender.  The Clearing Account Agreement shall provide (and Borrower shall provide) Lender online access to bank and other financial statements relating to the Clearing Account (including, without limitation, a listing of the receipts being collected therein).  In connection with any Secondary Market Transaction, Lender shall have the right to cause the Clearing Account to be entitled with such other designation as Lender may select to reflect an assignment or transfer of Lender's rights and/or interests with respect to the Clearing Account. Lender shall provide Borrower with prompt written notice of any such renaming of the Clearing Account.  Borrower shall not further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

thereto.  The Clearing Account (i) shall be an Eligible Account and (ii) shall not be commingled with other monies held by Borrower or Bank.  Upon (A) Bank ceasing to be an Eligible Institution, (B) the Clearing Account ceasing to be an Eligible Account, (C) any resignation by Bank or termination of the Clearing Account Agreement by Bank or Lender and/or (D) the occurrence and continuance of an Event of Default, Borrower shall, within fifteen (15) days of Lender's request, (1) terminate the existing Clearing Account Agreement, (2) appoint a new Bank (which such Bank shall (I) be an Eligible Institution, (II) other than during the continuance of an Event of Default, be selected by Borrower and approved by Lender and (III) during the continuance of an Event of Default, be selected by Lender), (3) cause such Bank to open a new Clearing Account (which such account shall be an Eligible Account) and enter into a new Clearing Account Agreement with Lender on substantially the same terms and conditions as the previous Clearing Account Agreement and (4) send any new Tenant Direction Notices and other notices required pursuant to the terms hereof relating to such new Clearing Account Agreement and Clearing Account.  Borrower constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake any action required of Borrower under this Section 8.2 in the name of Borrower in the event Borrower fails to do the same.  Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

(c)    Subject to the terms and conditions of the Clearing Account Agreement, all funds on deposit in the Clearing Account shall be transferred into the Cash Management Account and applied as set forth in Section 8.3 below.

**Section 8.3    Disbursements from the Cash Management Account**.  On each Monthly Payment Date, Lender or Servicer, as applicable, shall allocate all funds, if any, on deposit in the Cash Management Account and disburse such funds in the following amounts and order of priority:

(a)    First, funds sufficient to pay the Monthly Tax Deposit due for the then applicable Monthly Payment Date, if any, shall be deposited in the Tax Account;

(b)    Then, funds sufficient to pay the Monthly Insurance Deposit due for the then applicable Monthly Payment Date, if any, shall be deposited in the Insurance Account;

(c)    Then, funds sufficient to pay any interest accruing at the Default Rate and late payment charges, if any, shall be deposited into the Debt Service Account;

(d)    Then, funds sufficient to pay the Debt Service due on the then applicable Monthly Payment Date shall be deposited in the Debt Service Account;

(e)    Then, funds sufficient to pay the Capital Expenditures Reserve Monthly Deposit for the then applicable Monthly Payment Date, if any, shall be deposited in the Capital Expenditures Reserve Account;

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(f)     Then, funds sufficient to pay the Leasing Reserve Monthly Deposit for the then applicable Monthly Payment Date, if any, shall be deposited in the Leasing Reserve Account;

(g)     Then, funds sufficient to pay any other amounts due and owing to Lender and/or Servicer pursuant to the terms hereof and/or of the other Loan Documents, if any, shall be deposited with or as directed by Lender;

(h)     Then, funds sufficient to pay the Approved Operating Expenses or Approved Extraordinary Expenses in accordance with the Approved Budget   shall be deposited in the Borrower's operating account (less and except the aggregate amount of any Excess Operating Expense Disbursement(s) received by Borrower for any prior Monthly Payment Date(s) that have not already been deducted pursuant to this clause (h));

(i)     Then, funds sufficient to pay the amount of the Mezzanine Loan Monthly Debt Service that is then due and payable shall be, and Borrower hereby directs such funds to be, disbursed to or at the direction of Mezzanine Lender in accordance with disbursement instructions provided by Mezzanine Lender to Lender; and

(j)     Lastly, all amounts remaining in the Cash Management Account after deposits for items (a) through **[(i)]** above ("**Excess Cash Flow**") shall be deposited into the Excess Cash Flow Account which Excess Cash Flow funds, to the extent existing, shall be applied to cover any shortfall payments under this Section 8.3.

**Section 8.4     Withdrawals from the Debt Service Account**.  Prior to the occurrence and continuance of an Event of Default, funds on deposit in the Debt Service Account, if any, shall be used to pay Debt Service when due, together with any late payment charges or interest accruing at the Default Rate.

**Section 8.5     Payments Received Under this Agreement**.  Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, provided no Event of Default has occurred and is continuing, Borrower's obligations with respect to the monthly payment of Debt Service and amounts due for the Reserve Accounts shall (provided Lender is not prohibited from withdrawing or applying any funds in the applicable Accounts by operation of law or otherwise) be deemed satisfied to the extent sufficient amounts are deposited in applicable Accounts to satisfy such obligations on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

**Section 8.6     Borrower Distributions; Acknowledgement**.

(a)     Any transfer of Borrower's funds from the Cash Management Account or other sources to or for the benefit of the Mezzanine Lender or the Mezzanine Borrower pursuant to this Agreement or any of the other Loan Documents, is intended by the parties to constitute, and shall constitute, a distribution from the Borrower to the Mezzanine Borrower and shall be treated as such on the books and records of each party.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

No provision of any Loan Document is intended to nor shall create a debtor-creditor relationship between Borrower and the Mezzanine Lender.

(b)        In the event Lender waives the requirement for Borrower to maintain the Clearing Account, the Cash Management Account or any of the Reserve Accounts, Lender consents to Borrower permitting the Mezzanine Borrower to establish and maintain (as applicable) a lockbox account, cash management account and/or reserve accounts, as the case may be, that would operate as provided in herein.  In connection with the foregoing, Borrower further consents to Lender transferring any available balances in the applicable Accounts to Mezzanine Lender.  Borrower further (i) agrees that Lender shall be entitled to conclusively rely on Mezzanine Lender's assertion that it is entitled to such available balances and (ii) hereby releases Lender and indemnifies Lender against any Losses that may be incurred by Lender as a result of any Person claiming that Lender improperly remitted such available balances to Mezzanine Lender.

(c)        Borrower and Lender hereby agree and acknowledge that if (i) the Debt has been paid in full, (ii) there are funds remaining in the Accounts, and (iii) the Mezzanine Loan (or any portion thereof) is outstanding, then Lender will not pay (or direct to be paid) any such remaining funds to Borrower, but rather shall deliver such funds (or direct the same to be delivered, as applicable), and Borrower hereby directs Lender to so deliver or cause to be delivered such funds, as a distribution permitted in accordance with applicable law, within ten (10) days after the Debt has been paid in full, to Mezzanine Lender to be held and/or applied in accordance with the terms of the Mezzanine Loan Documents.

## ARTICLE 9

## SECONDARY MARKET

### Section 9.1    Securitization.

(a)        Lender shall have the right (i) to sell or otherwise transfer the Loan (or any portion thereof and/or interest therein), (ii) to sell participation interests in the Loan (or any portion thereof and/or interest therein) or (iii) to securitize the Loan (or any portion thereof and/or interest therein) in a single asset securitization or a pooled asset securitization.  The transactions referred to in clauses (i), (ii) and (iii) above shall hereinafter be referred to collectively as "**Secondary Market Transactions**" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "**Securitization**".  Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**".  At Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions.

(b)        If requested by Lender in connection with any Secondary Market Transaction, Borrower shall assist Lender (at Borrower's sole cost and expense) in satisfying the market standards to which Lender customarily adheres or which may be

reasonably required in the marketplace or by the NRSROs in connection with such Secondary Market Transactions, including, without limitation, to:

(i)     provide (A) updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor, Sponsor, any SPE Component Entity and Manager including, without limitation, the information set forth on Exhibit E attached hereto, (B) updated budgets relating to the Property, (C) updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "**Updated Information**"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies and (D) revisions to and other agreements with respect to the Property Documents in form and substance acceptable to Lender and the Rating Agencies;

(ii)     provide new and/or updated opinions of counsel, which may be relied upon by Lender, the NRSROs and their respective counsel, agents and representatives, as may be customary in Secondary Market Transactions or required by the Rating Agencies, which counsel and opinions shall be satisfactory in form and substance to Lender and the Rating Agencies;

(iii)     provide updated (as of the closing date of the applicable Secondary Market Transaction) representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require;

(iv)     execute such amendments to the Loan Documents, the Property Documents and Borrower's or any SPE Component Entity's organizational documents as may be reasonably requested by Lender or requested by the Rating Agencies to effect any Secondary Market Transaction, including, without limitation, (A) to amend and/or supplement the independent director provisions provided on Exhibit C attached hereto, in each case, in accordance with the applicable requirements of the Rating Agencies, (B) bifurcating the Loan into two or more components and/or additional separate notes and/or creating additional senior/subordinate note structure(s) (any of the foregoing, a "**Loan Bifurcation**") and (C) to modify all operative dates (including but not limited to payment dates, interest period start dates and end dates, etc.) under the Loan Documents, by up to ten (10) days; provided, however, that Borrower shall not be required to so modify or amend any Loan Document if such modification or amendment would change the interest rate, the stated maturity (except as provided in subclause (C) above) or the amortization of principal set forth herein, or otherwise increase (to more than a de minimis extent) the obligations or decrease (to more than a de minimis extent) the rights of Borrower in each case from those contemplated under the Loan Documents, except in connection with a Loan Bifurcation which may result in varying interest rates and, as applicable, amortization schedules, but

110

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

which shall have the same initial weighted average coupon of the original Note; and

(v)     review any Disclosure Document or any interim draft thereof furnished by Lender to Borrower with respect to information contained therein that was furnished to Lender by or on behalf of Borrower specifically in connection with the preparation of such Disclosure Document and provide to Lender any revisions to such Disclosure Document or interim draft thereof necessary to insure that such reviewed information does not contain any untrue statement of a material fact or omit to state any material fact necessary to make statements contained therein not misleading.

(c)     If, at the time a Disclosure Document is being prepared for a Securitization, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and Related Properties collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request the following information:

(i)     if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization, net operating income for the Property and the Related Properties for the most recent Fiscal Year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB), or

(ii)     if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X, and statements of income and statements of cash flows with respect to the Property for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

determines that the Property is the Significant Obligor and the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) was acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

(d)     If Lender determines that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and Related Properties collectively, are a Significant Obligor, then Borrower shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) filing pursuant to the Exchange Act in connection with or relating to the Securitization (an "**Exchange Act Filing**") are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(e)     If requested by Lender, Borrower shall furnish to Lender financial data and/or financial statements for any tenant of the Property if, in connection with a Securitization, Lender expects there to be, with respect to such tenant or group of Affiliated tenants, a concentration within all of the mortgage loans included or expected to be included, as applicable, in the Securitization such that such tenant or group of Affiliated tenants would constitute a Significant Obligor.

(f)     The financial data and statements provided by Borrower under this Section 9.1 shall be furnished to Lender (A) with respect to information requested in connection with the preparation of Disclosure Documents for a Securitization, within ten (10) Business Days after notice from Lender, and (B) with respect to ongoing information required under Section 9.1(d) and (e) above, not later than thirty (30) days after the end of each fiscal quarter of Borrower and (B) not later than seventy-five (75) days after the end of each fiscal year of Borrower.

(g)     All financial data and statements provided by Borrower under Sections 9.1(c), (d), (e) and (f) shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation AB and other applicable legal requirements.  All financial statements referred to in such Sections shall be audited by independent accountants of Borrower acceptable to Lender in accordance with Regulation AB and all other applicable legal requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation AB and all other applicable legal requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing, all of which shall be

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

provided at the same time as the related financial statements are required to be provided. All financial data and statements (audited or unaudited) provided by Borrower under this Section shall be accompanied by an Officer's Certificate, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this subsection (g).

(h)     If requested by Lender, Borrower shall provide Lender, promptly upon request, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall determine to be required pursuant to Regulation AB or any amendment, modification or replacement thereto or other legal requirements in connection with any Disclosure Document or any Exchange Act Filing or as shall otherwise be reasonably requested by Lender.

(i)     In the event Lender determines, in connection with a Securitization, that the financial data and financial statements required in order to comply with Regulation AB or any amendment, modification or replacement thereto or other legal requirements are other than as provided herein, then notwithstanding the provisions of this Section, Lender may request, and Borrower shall promptly provide, such other financial data and financial statements as Lender determines to be necessary or appropriate for such compliance.

**Section 9.2     Disclosure and Indemnification**.

(a)     Borrower (on its own behalf and on behalf of each other Borrower Party) understands that information provided to Lender by Borrower, any other Borrower Party and/or their respective agents, counsel and representatives may be (i) included in (A) the Disclosure Documents and (B) filings under the Securities Act and/or the Exchange Act and (ii) made available to Investors, the NRSROs, investment banking firms, accounting firms, law firms and other third-party advisory and service providers, in each case, in connection with any Secondary Market Transaction.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by the Lender, the Issuer or the Securitization placement agent or underwriter may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

(b)     Borrower agrees to indemnify Lender, the Lender Group and the Underwriter Group against any losses, claims, damages or liabilities (collectively, the "**Liabilities**") to which Lender, the Lender Group or the Underwriter Group may become subject in connection with (x) any Disclosure Document and/or any Covered Rating Agency Information, in each case, insofar as such Liabilities arise out of or are based upon any untrue statement of any material fact in the Provided Information and/or arise out of or are based upon the omission to state a material fact in the Provided Information required to be stated therein or necessary in order to make the statements in the applicable Disclosure Document and/or Covered Rating Agency Information, in light of the circumstances under which they were made, not misleading and (y) after a

Securitization, any indemnity obligations incurred by Lender or Servicer in connection with any Rating Agency Confirmation.

(c)    If requested by Lender, Borrower shall provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an agreement (A) certifying that Borrower has examined such Disclosure Documents specified by Lender and that each such Disclosure Document, as it relates to Borrower, Borrower Affiliates, the Property, Manager, Sponsor, Guarantor and all other aspects of the Loan, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender, the Lender Group and the Underwriter Group for any Liabilities to which Lender, the Lender Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections, in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Lender Group and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower, operating statements and rent rolls with respect to the Property.   The indemnification provided for in clauses (B) and (C) above shall be effective whether or not the indemnification agreement described above is provided.  The aforesaid indemnity will be in addition to any liability which Borrower may otherwise have.

(d)    In connection with filings under Exchange Act and/or the Securities Act, Borrower shall (i) indemnify Lender, the Lender Group and the Underwriter Group for Liabilities to which Lender, the Lender Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Disclosure Document a material fact required to be stated in the Disclosure Document in order to make the statements in the Disclosure Document, in light of the circumstances under which they were made, not misleading and (ii) reimburse Lender, the Lender Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(e)    Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in

respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof (but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party). In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.2, such indemnifying party shall pay for any legal or other expenses subsequently incurred by such indemnifying party in connection with the defense thereof; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.

(f)     The liabilities and obligations of both Borrower and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt. Failure by Borrower and/or any Borrower Party to comply with the provisions of Section 9.1 and/or Section 9.2 within the timeframes specified therein and/or as otherwise required by Lender shall, at Lender's option, constitute a breach of the terms thereof and/or an Event of Default. Borrower (on its own behalf and on behalf of each Borrower Party) hereby expressly authorizes and appoints Lender its attorney-in-fact to take any actions required of any Borrower Party under Sections 9.1, 9.2 and/or 9.5 in the event any Borrower Party fails to do the same, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest. Notwithstanding anything to the contrary contained herein, (i) except as otherwise expressly provided to the contrary in this Article 9, each Borrower Party shall bear its own cost of compliance with this Article (including, without limitation, the costs of any ongoing financial reporting or similar provisions contained herein) and (ii) to the extent that the timeframes for compliance with such ongoing financial reporting and similar provisions are shorter than the timeframes allowed for comparable reporting obligations under Section 4.12 hereof (if any), the timeframes under this Article 9 shall control.

**Section 9.3    Reserves/Escrows**. In the event that Securities are issued in connection with the Loan, all funds held by Lender in escrow or pursuant to reserves in accordance with this Agreement and the other Loan Documents shall be deposited in "eligible accounts" at "eligible institutions" and, to the extent applicable, invested in "permitted investments" as then defined and required by the Rating Agencies.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 9.4    Servicer**.

(a)    At the option of Lender, the Loan may be serviced by a master servicer, primary servicer, special servicer and/or trustee (any such master servicer, primary servicer, special servicer and trustee, together with its agents, designees or nominees, collectively, "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under the Loan Documents to the Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement and/or other agreement providing for the servicing of one or more mortgage loans (collectively, the "**Servicing Agreement**") between Lender and Servicer.  Borrower shall pay a scheduled monthly servicing fee of $1,400.00 per month, as well as (i) any fees and expenses of Servicer (including, without limitation, attorneys' fees and disbursements) in connection with any release of the Property or a portion thereof, any prepayment, defeasance, transfer, assumption, amendment or modification of the Loan, any documents or other matters requested by Borrower or any Guarantor, any special servicing or workout of the Loan or enforcement of the Loan Documents, including, without limitation, any advances made by Servicer and interest on such advances, any liquidation fees in connection with the exercise of any or all remedies permitted under this Agreement and (ii) the costs of all property inspections and/or appraisals of the Property (or any updates to any existing inspection or appraisal) that a Servicer may be required to obtain (other than the cost of regular annual inspections required to be borne by Servicer under the Servicing Agreement); provided, however, that Borrower shall not be responsible for payment of any fees or expenses required to be borne by, and not reimbursable to, Servicer.  Without limiting the generality of the foregoing, Servicer shall be entitled to reimbursement of costs and expenses as and to the same extent (but without duplication) as Lender is entitled thereto pursuant to the terms of the Loan Documents.

(b)    Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and any Guarantor under the Loan Documents.

(c)    Provided Borrower shall have received notice from Lender of Servicer's address, Borrower shall deliver, and cause to be delivered, to Servicer duplicate originals of all notices and other documents and instruments which Borrower and/or any Guarantor deliver to Lender pursuant to the Loan Documents.  No delivery of any such notices or other documents shall be of any force or effect unless delivered to Lender and Servicer as provided in this Section 9.4(c).

**Section 9.5    Lender Mezzanine Option**.  Lender shall have the option (the "**Lender Mezzanine Option**") at any time to divide the Loan into two parts, a mortgage loan and a mezzanine loan, provided, that (i) the total loan amounts for such mortgage loan and such mezzanine loan shall equal the then outstanding amount of the Loan immediately prior to Lender's exercise of the Lender Mezzanine Option, and (ii) the weighted average interest rate of such mortgage loan and mezzanine loan shall initially equal the Interest Rate.  Borrower shall, at Borrower's sole cost and expense, cooperate with Lender in Lender's exercise of the Lender Mezzanine Option in good faith and in a timely manner, which such cooperation shall include,

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

but not be limited to, (i) executing such amendments to the Loan Documents and Borrower or any SPE Component Entity's organizational documents as may be reasonably requested by Lender or requested by the Rating Agencies, (ii) creating one or more entities satisfying applicable Rating Agency criteria for single-purpose entities (the "**Senior Mezzanine Borrower**"), which such Senior Mezzanine Borrower shall (A) own, directly or indirectly, 100% of the equity ownership interests in Borrower (the "**Senior Mezzanine Equity Collateral**"), and (B) together with such constituent equity owners of such Senior Mezzanine Borrower as may be designated by Lender, execute such agreements, instruments and other documents as may be required by Lender in connection with the mezzanine loan (including, without limitation, a promissory note evidencing the mezzanine loan consummated in connection with the Lender Mezzanine Option (the "**Senior Mezzanine Loan**") and a pledge and security agreement pledging the Senior Mezzanine Equity Collateral to Lender as security for the Senior Mezzanine Loan); and (iii) delivering such opinions, title endorsements, UCC title insurance policies, documents and/or instruments relating to the Property Documents and other materials as may be required by Lender or the Rating Agencies; and (iv) delivering Replacement Interest Rate Cap Agreements and the related Collateral Assignments of Interest Rate Cap Agreement for the Loan and the Senior Mezzanine Loan.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, Borrower hereby acknowledges and agrees that (1) the Mezzanine Loan shall at all times be junior and subordinate to the Senior Mezzanine Loan, (2) without limitation of the foregoing, the Senior Mezzanine Equity Collateral will be of a more direct interest in Borrower and any SPE Component Entity than the Mezzanine Equity Collateral, (3) Lender, in its capacity as Lender under the Senior Mezzanine Loan shall be a party to the Mezzanine Intercreditor, (4) to the extent that the Mezzanine Loan is consummated prior to the Senior Mezzanine Loan, the Mezzanine Loan Documents shall provide for the terms and conditions set forth in this Section 9.5 and shall further require Mezzanine Borrower and Mezzanine Lender to cooperate in connection therewith (which such cooperation shall include, to the extent required, executing such amendments to the Loan Documents, Mezzanine Loan Documents, Mezzanine Intercreditor and the organizational documents of such direct or indirect owners of Borrower, in each case, as may be required by Lender or the Rating Agencies in connection therewith) and (5) Borrower shall cooperate (and shall cause Mezzanine Borrower to cooperate) in connection with the foregoing (which such cooperation shall include, to the extent required, executing such amendments to the Loan Documents, Mezzanine Loan Documents, Mezzanine Intercreditor and the organizational documents of such direct or indirect owners of Borrower, in each case, as may be required by Lender or the Rating Agencies in connection therewith).  Lender acknowledges that its rights under this Section 9.5 may be subject to certain requirements set forth in the Mezzanine Intercreditor, but Lender's direction to Borrower requesting compliance with the terms and conditions of this Section 9.5 shall be deemed to confirm that any such requirements in the Mezzanine Intercreditor have been satisfied and Borrower shall comply with any such request as set forth in this Section 9.5.

 **Section 9.6    REMIC Savings Clause**.    Notwithstanding anything herein to the contrary, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the real property relating to the Property, the ratio of the unpaid principal balance of the Loan to the value of the remaining real property relating to the Property is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable

method permitted to a REMIC Trust and it being agreed and acknowledged that such loan-to-value determination shall be based on the value of only real property and shall exclude any personal property or going-concern value, if any), the principal balance of the Loan must be paid down by Borrower by an amount sufficient to satisfy REMIC Requirements, unless the Lender receives an opinion of counsel acceptable to Lender that the Loan will not fail to maintain its status as a "qualified mortgage" within the meaning of Section 860G(a)(3)(A) of the IRS Code as a result of the related release of lien.

**Section 9.7    Syndication; Registered Form**.

(a)    Borrower acknowledges that Lender and any Co-Lender may, at their option and without the consent of Borrower, sell with novation all or any part of their right, title and interest in and to the Loan (the "**Syndication**") to one or more additional lenders (each a "**Co-Lender**"). In connection therewith, Borrower will take all actions as Lender and any such Co-Lender may request to assist Lender and /or such Co-Lender in consummating any such Syndication including, without limitation: (i) facilitating the review of the Loan and the Property by any prospective Co-Lender; (ii) assisting and cooperating with Lender in the preparation of information offering materials in connection with any such Syndication (which assistance may include reviewing and commenting on drafts of such materials and drafting portions thereof); (iii) delivering updated financial information, operating statements and other information with respect to Borrower and the Property (including, without limitation, appraisals); (iv) making representatives of Borrower available at reasonable times and upon reasonable notice to meet with prospective Co-Lenders (for tours of the Property or otherwise); (v) facilitating direct contact between the senior management and advisors of Borrower and any prospective Co-Lender; (vi) providing Lender with all information reasonably deemed necessary by Lender to complete any such Syndication; and (vii) executing such modifications to the Loan Documents as may be required by Lender or any Co- Lender in connection with any such Syndication (provided that such modifications will not, change in the aggregate any economic terms or other material terms of the Loan Documents, or otherwise materially increase the obligations or materially decrease the rights of Borrower from those contemplated in the Loan Documents). The liabilities of Lender and each of the Co-Lenders shall be several and not joint, and neither Lender nor any Co-Lender shall be responsible for the obligations of any other Co-Lender. Lender and each Co-Lender shall be liable to Borrower only for their respective proportionate shares of the Loan. Borrower acknowledges and agrees, with respect to any co-lending agreement (or similar agreement) among the Co-Lenders, that (A) any such agreement shall be solely for the benefit of the Co-Lenders, and that Borrower shall not be a third-party beneficiary (intended or otherwise) of any of the provisions therein, shall not have any rights thereunder, and shall not be entitled to rely on any of the provisions contained therein, (B) Borrower's obligations under the Loan Documents are and will be independent of any such agreement and shall remain unmodified by the terms and provisions thereof, (C) any such agreement may contain provisions which require that amendments, waivers, extensions, modifications, and other decisions with respect to the Loan Documents shall require the approval of all or a number of the Co-Lenders holding

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

in the aggregate a specified percentage of the Loan or any one or more Co-Lenders that are specifically affected by such amendment, waiver, extension, modification or other decision, and (D) the Co-Lenders shall have no obligation to disclose to Borrower the contents of any such agreement.  All costs incurred in connection with any Syndication shall be paid by Borrower.

(b)     At the request of Lender, Borrower shall appoint, as its agent, a registrar and transfer agent (the "**Registrar**") acceptable to Lender which shall maintain, subject to such reasonable regulations as it shall provide, a register (the "**Register**") for the recordation of the names and addresses of Lender and any other lender or Co-Lender, and the principal amounts (and stated interest) under the Loan Documents owing to Lender and each other lender or Co-Lender pursuant to the terms of the Loan Documents from time to time, in a manner that shall cause the Loan to be considered to be in registered form for purposes of Sections 163(f), 871(h)(2) and 881(c)(2) of the IRS Code.  The entries in the Register shall be conclusive absent manifest error, and Borrower, Lender and other lenders and Co-Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Borrower, Lender and any other lender of Co-Lender, at any reasonable time and from time to time upon reasonable prior notice.  Any agreement setting out the rights and obligation of the Registrar shall be subject to the reasonable approval of Lender.  Borrower may revoke the appointment of any particular person as Registrar, effective upon the effectiveness of the appointment of a replacement Registrar.  The Registrar shall not be entitled to any fee from Borrower or Lender or any other lender in respect of transfers of the Note and other Loan Documents. If the Registrar has not been appointed to maintain the Register, the transfer of the Note may be effected only by surrender of the Note and the reissuance by Borrower of the Note to the transferee.

## ARTICLE 10

## EVENTS OF DEFAULT; REMEDIES

**Section 10.1   Event of Default**.

The occurrence of any one or more of the following events shall constitute an "**Event of Default**":

(a)     if (i) any monthly Debt Service payment or the payment due on the Maturity Date is not paid when due, (ii) any fixed monthly deposit to any of the Accounts required hereunder or under the other Loan Documents is not paid when due or (iii) any other portion of the Debt is not paid when due and, in the case of the foregoing clauses (ii) or (iii), such non-payment continues for five (5) Business Days following notice to Borrower that the same is due and payable;

(b)     if any of the Taxes or Other Charges are not paid when the same are due and payable except to the extent either (A) the same are being contested pursuant to the

terms and conditions of Section 4.7(b) hereof (but for no more than a period of 120 days past the due date thereof) or (B)(i) sums sufficient to pay the Taxes or Other Charges in question had been reserved hereunder prior to the applicable due date for the Taxes or Other Charges in question for the express purpose of paying the Taxes or Other Charges in question and Lender failed to pay the Taxes or Other Charges in question when required hereunder, (ii) Lender's access to such sums was not restricted or constrained in any manner and (iii) no Event of Default was continuing;

(c)      if (i) the Policies are not kept in full force and effect, except to the extent (A) the failure to maintain such Policies resulted solely from failure to pay the applicable Insurance Premiums therefor, (B) sums sufficient to pay such Insurance Premiums had been reserved hereunder prior to the applicable due date for the express purpose of paying such Insurance Premiums and Lender failed to pay the same when required hereunder, (C) Lender's access to such sums was not restricted or constrained in any manner and (D) no Event of Default was continuing, or (ii) evidence of the Policies being in full force and effect is not delivered to Lender as and when required in Section 5.1 hereof and either (A) such failure continues for five (5) Business Days following written notice thereof to Borrower or (B) such failure continues beyond the date that is two (2) Business Days prior to the scheduled expiration date of such Policies;

(d)      if (i) any of the representations or covenants are breached or violated (provided, however, that, with respect to breaches or violations of any such covenants, or representations or warranties, under the Loan Documents, such breach or violation shall not result in an Event of Default hereunder if (A) such breach or violation was inadvertent, non-recurring and immaterial and (B) within twenty (20) days of the earlier to occur of notice from Lender or Borrower's knowledge of such breach or violation thereof, Borrower (x) cures such breach or violation, (y) provides Lender with written evidence of such cure and (z) if requested by Lender, delivers to Lender a New Non-Consolidation Opinion relating to such breach or violation), or (ii) any of the representations or covenants contained in Sections 3.32, 4.25, 4.30 or Article 6 hereof or in the Property Document Provisions are breached or violated;

(e)      if any representation or warranty made herein, in the Guaranty or in the Environmental Indemnity or in any other guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender in connection with the Loan shall have been false or misleading in any material adverse respect when made (provided, however, that such breach or violation shall not result in an Event of Default hereunder if (A) such breach or violation does not constitute an Event of Default under any other clause of this Section 10.1, (B) such breach or violation was inadvertent and non-recurring and not reasonably likely to cause a Material Adverse Effect and (C) within twenty (20) days of the earlier to occur of written notice from Lender or Borrower obtaining actual knowledge of such breach or violation thereof, Borrower (x) cures such breach or violation without the occurrence of any Material Adverse Effect with respect thereto (it being acknowledged and agreed that any such breach may only be cured by curing the underlying facts or circumstances which caused such representation or

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

warranty to be untrue or incorrect in a manner which causes such representation or warranty to be true and correct) and (y) provides Lender with written evidence of such cure);

(f)      if (i) Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall commence any case, proceeding or other action (A) under any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or any managing member or general partner of Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall make a general assignment for the benefit of its creditors; (ii) there shall be commenced against Borrower or any managing member or general partner of Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; (iii) there shall be commenced against Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; (iv) Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall take any action in furtherance of, in collusion with respect to, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; (v) Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; (vi) any of Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor is substantively consolidated with any other entity in connection with any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Sponsor or its subsidiaries; or (vii) a Bankruptcy Event occurs;

(g)      if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument;

(h)      if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of forty-five (45)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

days (subject to Borrower's right to contest the same pursuant to the terms and conditions of Section 4.8(b) hereof, but for no more than a period of 120 days past the filing date thereof);

(i)     if any federal tax lien is filed against Borrower, any SPE Component Entity, Sponsor, Guarantor or the Property and same is not discharged of record (by payment, bonding or otherwise) within sixty (60) days after same is filed (which such period will be deemed extended for so long as such tax lien is being contested pursuant to the terms and conditions of Section 4.7(b) hereof, as if the same were a lien for Taxes, but for no more than a period of 120 days past the filing date thereof);

(j)     if any litigation or similar proceeding is filed against Borrower or the Property which (i) claims an amount in excess of $10,000,000.00 (in the aggregate together with the amount claimed with respect to any other litigation or similar proceeding filed against Borrower or the Property) and (ii) alleges facts which, if true, would constitute an Event of Default hereunder (after the delivery of any applicable notice and the passage of any applicable cure period), and such litigation or proceeding is not (A) fully covered by the Policies or (B) dismissed (or otherwise addressed to Lender's satisfaction in Lender's sole discretion) within one hundred twenty (120) days after the same is filed;

(k)     if Borrower shall fail to deliver to Lender any financial reporting item required by this Agreement (including without limitation any of the items required by Section 4.12 hereof), on the date the same is due, and such failure continues for ten (10) Business Days after written notice thereof from Lender;

(l)     Intentionally Deleted;

(m)     if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Environmental Indemnity and/or the Guaranty) and such default continues after the expiration of applicable grace periods, if any;

(n)     if any of the assumptions contained in any Non-Consolidation Opinion, or in any New Non-Consolidation Opinion (including, without limitation, in any schedules thereto and/or certificates delivered in connection therewith) are untrue or shall become untrue in any material respect that would cause the stated opinions set forth in such Non-Consolidation Opinion or New Non-Consolidation Opinion to change when taken into account;

(o)     if Borrower defaults under the Management Agreement beyond the expiration of applicable notice and grace periods, if any, thereunder or if the Management Agreement is canceled, terminated or surrendered, expires pursuant to its terms or otherwise ceased to be in full force and effect, unless, in each such case, Borrower, contemporaneously with such cancellation, termination, surrender, expiration or

cessation, enters into a Qualified Management Agreement with a Qualified Manager in accordance with the applicable terms and provisions hereof;

(p)     if Borrower fails to appoint a replacement Manager upon the request of Lender and/or fails to comply with any limitations on instructing the Manager, each as required by and in accordance with, as applicable, the terms and provisions of, this Agreement, the Assignment of Management Agreement and the Security Instrument;

(q)     if any representation and/or covenant herein relating to ERISA, CFIUS or DPA matters is breached;

(r)     if (i) any Interest Rate Cap Agreement is terminated for any reason by Borrower or Counterparty or (ii) Borrower shall fail to observe, perform or discharge any of Borrower's obligations, covenants, conditions or agreements under the Interest Rate Cap Agreement (subject to any applicable notice and/or cure periods set forth therein) and otherwise comply with the covenants set forth in Section 2.8 hereof;

(s)     if (A) Borrower shall fail (beyond any applicable notice or grace period) to pay any rent, additional rent or other charges payable under any Property Document as and when payable thereunder, (B) Borrower defaults under the Property Documents beyond the expiration of applicable notice and grace periods, if any, thereunder, (C) any of the Property Documents are amended, supplemented, replaced, restated or otherwise modified without Lender's prior written consent or if Borrower consents to a transfer of any party's interest thereunder without Lender's prior written consent, (D) any Property Document and/or the estate created thereunder is canceled, rejected, terminated, surrendered or expires pursuant to its terms, unless in such case Borrower enters into a replacement thereof in accordance with the applicable terms and provisions hereof or (E) a Property Document Event occurs;

(t)     with respect to any default or breach of any term, covenant or condition of this Agreement not specified in subsections (a) through [(s)] above or not otherwise expressly specified as an Event of Default in this Agreement, if the same is not cured (i) within ten (10) days after the earlier of (1) Borrower's knowledge thereof or (2) notice from Lender (in the case of any default which can be cured by the payment of a sum of money) or (ii) for thirty (30) days after the earlier of (1) Borrower's knowledge thereof or (2) notice from Lender (in the case of any other default or breach); provided, that, with respect to any default or breach specified in subsection (ii), if the same cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure the same within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure the same, it being agreed that no such extension shall be for a period in excess of ninety (90) days; or

(u)     if any default shall exist under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

**Section 10.2   Remedies**.

(a)   Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in Section 10.1(f) above with respect to Borrower or any SPE Component Entity) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement, the Security Instrument, the Note and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in this Agreement, the Security Instrument, the Note and the other Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity.  Upon any Event of Default described in Section 10.1(f) above with respect to Borrower or any SPE Component Entity, the Debt and all other obligations of Borrower under this Agreement, the Security Instrument, the Note and the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in the Security Instrument, the Note and the other Loan Documents to the contrary notwithstanding.

(b)   Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement, the Security Instrument, the Note or the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under this Agreement, the Security Instrument, the Note or the other Loan Documents with respect to the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by applicable law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by applicable law, equity or contract or as set forth herein or in the Security Instrument, the Note or the other Loan Documents.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(c)     Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(d)     With respect to Borrower and the Individual Properties, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to any Individual Property for the satisfaction of any of the Debt in preference or priority to any other Individual Property, and Lender may seek satisfaction out of all of the Individual Properties or any part thereof, in its absolute discretion in respect of the Debt.

(e)     Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, security instruments and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents, and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date, and the Severed Loan Documents shall not increase the Borrower's liabilities under the Loan Documents.

(f)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, any amounts recovered from the Property or any other collateral for the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Loan and/or paid to or received by Lender may, after an Event of Default, be applied by Lender toward the Debt in such order, priority and proportions as Lender in its sole discretion shall determine.

(g)   Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or being deemed to have cured any Event of Default hereunder, make, do or perform any obligation of Borrower hereunder in such manner and to such extent as Lender may deem necessary.  Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by applicable law), with interest as provided in this Section, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender.  All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

## ARTICLE 11

## INDEMNIFICATIONS

**Section 11.1   General Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any applicable Legal Requirements; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease, management agreement or any Property Document; (f) the payment of any commission, charge or brokerage fee to anyone (other than a broker or other agent retained by Lender) which may be payable in connection with the funding of the Loan evidenced by the Note and secured by the Security Instrument; and/or (g) the holding or investing of the funds on deposit in the Accounts or the performance of any work or the disbursement of funds in each case in connection with the Accounts.  Any amounts payable to Lender by reason of the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

application of this Section 11.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.

**Section 11.2   Mortgage and Intangible Tax Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of the Security Instrument, the Note or any of the other Loan Documents.

**Section 11.3   ERISA Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that any Indemnified Party may incur, directly or indirectly, as a result of a default under Sections 3.15 or 4.22 of this Agreement.

**Section 11.4   Duty to Defend, Legal Fees and Other Fees and Expenses**.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.   Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding.  Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

**Section 11.5   Survival**.  The obligations and liabilities of Borrower under this Article 11 shall fully survive indefinitely notwithstanding any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery of a deed in lieu of foreclosure of the Security Instrument.

**Section 11.6   CFIUS Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses) that any Indemnified Party may incur, directly or indirectly, as a result of (a) any Subject Transaction being a Covered Transaction, or otherwise arising under the DPA, and/or (b) a default under Sections 3.10(j) and/or 4.14(b) hereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ARTICLE 12

## EXCULPATION

**Section 12.1   Exculpation**.

(a)      Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Security Instrument or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower or any principal, director, officer, employee, beneficiary, shareholder, partner, member, trustee, agent, or Affiliate of Borrower or any legal representatives, successors or assigns of any of the foregoing (collectively, the "**Exculpated Parties**"), except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Security Instrument and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Security Instrument and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower or any of the Exculpated Parties in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Security Instrument or the other Loan Documents.  The provisions of this Section shall not, however, (1) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (2) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (3) affect the validity or enforceability of any guaranty or indemnity made in connection with the Loan (including, without limitation, indemnities set forth in Article 11 hereof, Section 9.2 hereof, in the Guaranty and in the Environmental Indemnity) or any of the rights and remedies of Lender thereunder; (4) impair the right of Lender to obtain the appointment of a receiver or to enforce its rights and remedies provided in Articles 7 and 8 hereof; (5) impair the enforcement of any assignment of leases contained in the Security Instrument; (6) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Security Instrument (provided, that, such deficiency judgment will only be enforceable against Borrower to the extent of its interest in the Property) or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property; or (7) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any Loss actually incurred by Lender (including attorneys' fees and expenses reasonably incurred) arising out of or in connection with the following:

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(i)        fraud or willful misrepresentation by any Borrower Party in connection with the Loan;

(ii)        the gross negligence or willful misconduct of any Borrower Party;

(iii)        any litigation or other legal proceeding related to the Debt filed by any Borrower Party or any other action of any Borrower Party that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein and in the other Loan Documents unless a court of competent jurisdiction finds that such action is not frivolous, not brought in bad faith, not wholly without merit, and not wholly without basis in fact or law;

(iv)        material physical waste to the Property caused by the intentional acts or intentional omissions of any Borrower Party and/or the removal or disposal of any portion of the Property after an Event of Default;

(v)        the misapplication, misappropriation or conversion by any Borrower Party of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property (or any portion thereof), (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, (C) any Rents, (D) any Tenant security deposits or Rents collected in advance or (E) any other monetary collateral for the Loan (including, without limitation, any Reserve Funds and/or any portion thereof disbursed to (or at the direction of) Borrower);

(vi)        failure to pay Taxes, charges for labor or materials or other charges that can create superior liens on any portion of the Property (except, in the case of Taxes, to the extent that (x) the revenue from the Property is insufficient to pay such amounts or (y) amounts sufficient to pay such Taxes have been deposited with Lender hereunder in the Tax Account and Lender does not apply the same in payment thereof in violation of the terms and conditions of the Loan Documents);

(vii)        failure to pay Insurance Premiums (except to the extent that (x) the revenue from the Property is insufficient to pay such amounts or (y) amounts sufficient to pay such Insurance Premiums have been deposited with Lender hereunder in the Insurance Account and Lender does not apply the same in payment thereof in violation of the terms and conditions of the Loan Documents), to maintain the Policies in full force and effect and/or to provide Lender evidence of the same, in each case, as expressly provided herein;

(viii)        any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(ix)    any tax on the making and/or recording of the Security Instrument, the Note or any of the other Loan Documents or any transfer or similar taxes (whether due upon the making of the same or upon Lender's exercise of its remedies under the Loan Documents), but excluding any income, franchise or other similar taxes;

(x)    any forfeiture or seizure of the Property (or any portion thereof and/or interest therein) resulting from a violation or breach of any applicable law;

(xi)    any violation or breach of any representation, warranty or covenant contained in Sections 3.24 or 4.23 hereof or Exhibit C attached hereto;

(xii)    any violation or breach of any representation, warranty or covenant contained in Article 6 hereof including the occurrence of a Prohibited Transfer;

(xiii)    any violation or breach by a Borrower Party of any exclusivity (or similar) provision in any Major Lease that permits or could permit the Tenant thereunder the right to terminate such Major Lease or abate rent thereunder;

(xiv)    the failure to purchase or replace (as applicable) any Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement (as applicable), in each case, as and when required by the terms hereof;

(xv)    in the event the Property (or any portion thereof) suffers a Casualty, the failure of Borrower to then maintain Policies with coverage in an amount equal to the original principal amount of the Note;

(xvi)    any violation or breach by a Borrower Party of the requirements of Section 9.1 hereof; and/or

(xvii)    any violation or breach by a Borrower Party of the Property Document Provisions and/or any Property Document Event.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that: (i) any representation, warranty or covenant contained in Sections 3.24 or 4.23 hereof or Exhibit C attached hereto is violated or breached, and (a) a court of competent jurisdiction orders a substantive consolidation of Borrower based, in whole or in part, on such violation or breach or (b) the Property or any portion thereof or interest therein

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

becomes an asset in a bankruptcy or insolvency proceeding of a Person other than Borrower as a result of (in whole or in part) or due to (in whole or in part) such violation or breach; (ii) any Prohibited Transfer occurs in violation of Section 6.1 hereof; (iv) a Bankruptcy Event occurs;

# ARTICLE 13

# FURTHER ASSURANCES

**Section 13.1   Replacement Documents**.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note, this Agreement or any of the other Loan Documents which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of the Note, this Agreement or such other Loan Document, Borrower will issue, in lieu thereof, a replacement thereof, dated the date of the Note, this Agreement or such other Loan Document, as applicable, in the same principal amount thereof and otherwise of like tenor.

**Section 13.2   Recording of Security Instrument, etc**.  Borrower forthwith upon the execution and delivery of the Security Instrument and thereafter, from time to time, will cause the Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, the Security Instrument, this Agreement, the other Loan Documents, any note, deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Security Instrument, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by applicable law so to do.

**Section 13.3   Further Acts, etc**.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording the Security Instrument, or for complying with all Legal Requirements including, without limitation, the execution and delivery of all such writings necessary to transfer any licenses with

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

respect to the Property into the name of Lender or its designee after the occurrence of an Event of Default. Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements to evidence more effectively the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation, such rights and remedies available to Lender pursuant to this Section 13.3.

**Section 13.4    Changes in Tax, Debt, Credit and Documentary Stamp Laws**.

(a)    If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Property for the purpose of taxation and which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than ninety (90) days to declare the Debt immediately due and payable without any prepayment fee or charge, including the Exit Fee.

(b)    Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of the Security Instrument or the Debt. If such claim, credit or deduction shall be required by applicable law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(c)    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

# ARTICLE 14

# WAIVERS

**Section 14.1   Remedies Cumulative; Waivers**. The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement, the Security Instrument, the Note or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

**Section 14.2   Modification, Waiver in Writing**.   Except as otherwise expressly provided herein, no modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Security Instrument, the Note and the other Loan Documents, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.   Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 14.3   Delay Not a Waiver**.   Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under this Agreement, the Security Instrument, the Note or the other Loan Documents, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.   In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Security Instrument, the Note or the other Loan Documents, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Security Instrument, the Note and the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 14.4   Waiver of Trial by Jury**.   BORROWER AND LENDER, BY ACCEPTANCE OF THIS AGREEMENT, HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THIS AGREEMENT, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

**Section 14.5   Waiver of Notice**.   Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 14.6   Remedies of Borrower**.  In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by applicable law or under this Agreement, the Security Instrument, the Note and the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Lender agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

**Section 14.7   Marshalling and Other Matters**.  Borrower hereby waives, to the extent permitted by applicable Legal Requirements, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale under the Security Instrument of the Property or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of the Security Instrument and on behalf of all persons to the extent permitted by applicable Legal Requirements.

**Section 14.8   Waiver of Statute of Limitations**.  To the extent permitted by applicable Legal Requirements, Borrower hereby expressly waives and releases to the fullest extent permitted by applicable Legal Requirements, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its obligations hereunder, under the Note, Security Instrument or other Loan Documents.

**Section 14.9   Waiver of Counterclaim**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

**Section 14.10 Sole Discretion of Lender**.   Wherever pursuant to this Agreement (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender, except as may be otherwise expressly and specifically provided herein.  Except to the extent expressly provided otherwise herein or in any other Loan Document, any calculation or computation made by Lender under the Loan Documents shall be conclusive and binding on Borrower for all purposes, absent manifest error.

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ARTICLE 15

## MISCELLANEOUS

**Section 15.1   Survival**.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth in this Agreement, the Security Instrument, the Note or the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 15.2   Expenses; Indemnity**.

(a)    Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) except to the extent otherwise expressly set forth in this Agreement or any of the other Loan Documents, the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to the Loan Documents and any other documents or matters requested by Borrower or any Guarantor; (ii) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the liens in favor of Lender pursuant to the Loan Documents; (iii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Lender, Borrower, the Loan Documents, the Property or any other security given for the Loan; (iv) enforcing any Obligations of, or collecting any payments due from, Borrower or any Guarantor under the Loan Documents or with respect to the Property; (v) any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws; (vi) protecting Lender's interest in the Property or any other security given for the Loan; and (vii) Lender's participation (including, without limitation, responding to any service of process, subpoena, or other request) in any litigation or other proceeding involving or related to any Borrower Party, the Loan or the Loan Documents and/or Lender's response to any other service of process, subpoena, or other request from any Governmental Authority involving or related to any Borrower Party, the Loan or the Loan Documents (including, without limitation, in each case, any legal fees incurred in connection therewith); provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender, as determined by a final non appealable judgment

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

of a court of competent jurisdiction.  Any costs due and payable to Lender may be paid, at Lender's election in its sole discretion, from any amounts in the Cash Management Account.

(b)     Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for any Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto, or any settlement in furtherance of any of the foregoing), that may be imposed on, incurred by, or asserted against any Indemnified Party in any manner relating to or arising out of (i) any default or breach by Borrower of its Obligations under, or any material misrepresentation by Borrower contained in, the Loan Documents; (ii) the use or intended use of the proceeds of the Loan; (iii) any materials or information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Instrument, the Property or any interest therein, or receipt of any Rents; (v) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against such Indemnified Party with respect thereto; and (vi) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to the Indemnified Parties hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Indemnified Parties, as determined by a final non appealable judgment of a court of competent jurisdiction. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Parties.  The provisions of Section 15.2(a) and this Section 15.2(b) shall (A) survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument and (B) apply equally in favor of the then-current Lender hereunder and any prior Lender hereunder (regardless of whether any such prior Lender has retained any obligations hereunder following the applicable assignment of the Loan, this Agreement and the other Loan Documents).

(c)     Borrower hereby agrees to pay for or, if Borrower fails to pay, to reimburse Lender for, any fees imposed, and costs and expenses incurred, by any Rating Agency in connection with any Rating Agency review of the Loan or any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of the Loan Documents, and Lender shall be entitled to require payment of such fees, costs and expenses as a condition precedent to obtaining any such consent, approval, waiver or confirmation.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 15.3    Brokers**.  Borrower agrees (i) to pay any and all fees imposed or charged by all brokers, mortgage bankers and advisors (each a "**Broker**") hired or contracted by any Borrower Party or their Affiliates in connection with the transactions contemplated by this Agreement and (ii) to indemnify and hold Lender harmless from and against any and all claims, demands and liabilities for brokerage commissions, assignment fees, finder's fees or other compensation whatsoever arising from this Agreement or the making of the Loan which may be asserted against Lender by any Person.  The foregoing indemnity shall survive the termination of this Agreement and the payment of the Debt.  Borrower hereby represents and warrants that the only Broker engaged by any Borrower Party in connection with the transactions contemplated by this Agreement is Raymond James. Lender hereby agrees to pay any and all fees imposed or charged by any Broker hired solely by Lender.  Borrower acknowledges and agrees that (a) any Broker is not an agent of Lender and has no power or authority to bind Lender, (b) Lender is not responsible for any recommendations or advice given to any Borrower Party by any Broker, (c) Lender and the Borrower Parties have dealt at arms-length with each other in connection with the Loan, (d) no fiduciary or other special relationship exists or shall be deemed or construed to exist among Lender and the Borrower Parties and (e) none of the Borrower Parties shall be entitled to rely on any assurances or waivers given, or statements made or actions taken, by any Broker which purport to bind Lender or modify or otherwise affect this Agreement or the Loan, unless Lender has, in its sole discretion, agreed in writing with any such Borrower Party to such assurances, waivers, statements, actions or modifications.  Borrower acknowledges and agrees that Lender may, in its sole discretion, pay fees or compensation to any Broker in connection with or arising out of the closing and funding of the Loan.  Such fees and compensation, if any, (i) shall be in addition to any fees which may be paid by any Borrower Party to such Broker and (ii) create a potential conflict of interest for Broker in its relationship with the Borrower Parties. Such fees and compensation, if applicable, may include a direct, one-time payment, servicing fees and/or incentive payments based on volume and size of financings involving Lender and such Broker.

**Section 15.4    Governing Law**.

**THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND DELIVERED TO LENDER BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION AND**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5 1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5 1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.**

**Section 15.5   Notices**.  All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person, (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | Silver Star CRE, LLC |
| | 2909 Hillcroft, Suite 420 |
| | Houston, Texas 77057 |
| | Attention: Chief Executive Officer |
| With a copy to: | Hartman CRE, LLC |
| | 2909 Hillcroft, Suite 420 |
| | Houston, Texas 77057 |
| | Attention: Adrienne Collins, General Counsel |

138

If to Lender:

        [BSPRT CRE Finance, LLC]
        1345 Avenue of the Americas, Suite 32A
        New York, New York 10105
        Attention:  Micah Goodman, General Counsel

With a copy to:

        Holland & Knight  LLP
        10 St. James Avenue, 11th Floor
        Boston, Massachusetts 02116
        Attention:  Sean M. O'Brien, Esq.

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

**Section 15.6   Headings**.  The Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 15.7   Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid under applicable Legal Requirements, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 15.8   Preferences**.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 15.9   Cost of Enforcement**.  In the event (a) that the Security Instrument is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, or (c) Lender exercises any of its other remedies under this Agreement, the Security Instrument, the Note and the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post judgment action involved therein, together with all required service or use taxes.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 15.10 Exhibits Incorporated**.    The Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 15.11 Offsets, Counterclaims and Defenses**.  Any assignee of Lender's interest in and to this Agreement, the Security Instrument, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 15.12 No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a)    Borrower and Lender intend that the relationships created under this Agreement, the Security Instrument, the Note and the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)    This Agreement, the Security Instrument, the Note and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement, the Security Instrument, the Note or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

(c)    The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property.  Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.  Furthermore, each Borrower Party has obtained advice of counsel, accountants, and other professionals sufficient, in the judgment of such Borrower Party, to approve the Loan, the Loan Documents, and any transaction related to the closing of the Loan (including, without limitation, allocations of funds and the organizational structure of Borrower as each of the same relate to tax matters affecting

140

such Borrower Party and the constituent direct and indirect owners of Borrower), and no Borrower Party is relying on Lender or any counsel or other professionals engaged by Lender with respect thereto.

(d)    Notwithstanding anything to the contrary contained herein, Lender is not undertaking the performance of (i) any obligations related to the Property (including, without limitation, under the Leases); or (ii) any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents to which any Borrower Party and/or the Property is subject.

(e)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Agreement, the Security Instrument, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

(f)    Borrower recognizes and acknowledges that in accepting this Agreement, the Note, the Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in Article 3 of this Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Agreement, the Note, the Security Instrument and the other Loan Documents in the absence of the warranties and representations as set forth in Article 3 of this Agreement.

**Section 15.13  Disclosure**.

(a)    Except as expressly set forth herein or otherwise expressly approved by Lender in writing (which approval shall not be unreasonably withheld, conditioned or delayed), Borrower shall not, and shall not permit any Borrower Party, or any of their respective Affiliates and/or agents to: (i) provide a copy of this Agreement or any of the other Loan Documents, or any portion of any of the foregoing, to any Unaffiliated Third Party; (ii) disclose any of the terms or provisions of this Agreement or any of the other Loan Documents to any Unaffiliated Third Party; or (iii) disclose any of the prospective parts of this Agreement or any of the other Loan Documents which were discussed in negotiations prior to the execution of this Agreement or such other Loan Documents to any Unaffiliated Third Party.  Notwithstanding the foregoing, (1) Borrower may, and may permit any Borrower Party, or one of their respective Affiliates or agents, to make the following disclosures: (A) disclosures mandated by legislative, judicial and/or administrative order, rule or regulation; and (B) disclosures to current or, in Borrower's reasonable and good faith opinion, prospective members, partners, shareholders, lenders

141

and/or investors of Borrower or any Affiliates of Borrower, any provider of an Interest Rate Cap Agreement, or any tax preparers, tax advisors, independent public accountants, attorneys and insurers, past, present and prospective, provided that (x) with respect to any provider of an Interest Rate Cap Agreement, or such tax preparers, tax advisors, independent public accountants, attorneys and insurers only, such parties are engaged to work on behalf of the Person making such disclosure and (y) such parties agree to keep all such information in strict confidence (except as required by this Agreement, law, regulation, or the standards of the accounting or auditing profession), and (2) no disclosure resulting solely by virtue of the filing or recording in the relevant official records office, as applicable, of the Security Instrument, the Assignment of Leases, the UCC financing statements or any other Loan Documents that are recorded or filed with Lender's approval, shall be deemed a violation of this Section 15.13. Borrower agrees and acknowledges that a breach of this Section 15.13 by any Borrower Party, or any of their Affiliates or agents, may cause irreparable damage to Lender. Therefore, in addition to all other rights and remedies available to Lender in accordance with applicable law, Lender shall be entitled to equitable and injunctive relief to prevent the unauthorized use or disclosure of the confidential information in violation of this Section 15.13.

(b)     All news releases, publicity or advertising by any Borrower Party or any of their Affiliates and/or agents through any media intended to reach the general public which refers to this Agreement, the Note or the other Loan Documents or the financing evidenced by this Agreement or the other Loan Documents, to Lender or any of its Affiliates shall be subject to the prior written approval of Lender, not to be unreasonably withheld.

(c)     Borrower agrees, on its behalf and on behalf of each Borrower Party and their respective Affiliates, that none of the foregoing shall publish, participate in the publication of, or direct others to make or publish, any statements, accounts or stories disparaging or denigrating the conduct or character of any Lender Party. The foregoing includes, but is not limited to, a prohibition on posting or otherwise disclosing defamatory or disparaging statements about any Lender Party on the internet or in any other paper or electronic media outlet, including but not limited to news organizations, blogs, websites, newspapers, external email or social media websites.

(d)     The obligations and liabilities of each Borrower Party, their Affiliates, and agents under this Section 15.13 shall fully survive indefinitely notwithstanding any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery of a deed in lieu of foreclosure of the Security Instrument.

**Section 15.14 Limitation of Liability**. No claim may be made by Borrower, or any other Person against Lender or its Affiliates, directors, officers, employees, attorneys or agents of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**Section 15.15 Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and the Security Instrument, the Note or any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Agreement, the Note, the Security Instrument and the other Loan Documents and this Agreement, the Note, the Security Instrument and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under this Agreement, the Note, the Security Instrument and the other Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse-to or competitive with the business of Borrower or its Affiliates.

**Section 15.16 Entire Agreement**.  This Agreement, the Note, the Security Instrument and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower and Lender are superseded by the terms of this Agreement, the Note, the Security Instrument and the other Loan Documents.

**Section 15.17 Liability**.  If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.  This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 15.18 Duplicate Originals; Counterparts**.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**Section 15.19 Set-Off**.  In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case

whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower; provided, however, Lender may only exercise such right during the continuance of an Event of Default. Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided, that, the failure to give such notice shall not affect the validity of such set-off and application.

## ARTICLE 16

## CROSS-DEFAULT; CROSS-COLLATERALIZATION

### Section 16.1    Cross-Default and Cross-Collateralization of Property.

Borrower acknowledges that Lender has made the Loan to Borrower upon the security of its collective interest in the Property and in reliance upon the aggregate of the Individual Properties taken together being of greater value as collateral security than the sum of each Individual Property taken separately. Borrower agrees that each of the Loan Documents are and will be cross-collateralized and cross-defaulted with each other so that (i) an Event of Default under any of the Loan Documents shall constitute an Event of Default under each of the other Loan Documents; (ii) an Event of Default hereunder shall constitute an Event of Default under the Security Instruments; (iii) the Security Instruments shall constitute security for the Note as if a single blanket lien were placed on all of the Individual Properties as security for the Note; and (iv) such cross-collateralization shall in no event be deemed to constitute a fraudulent conveyance and Borrower waives any claims related thereto.

### Section 16.2    Marshalling and Other Matters.

To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of the Security Instruments, or any one of them, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property, or any one of them, for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property, or any one of them, in preference to every other claimant whatsoever. In addition, to the fullest extent permitted by applicable law, Borrower, for itself and its successors and assigns, waives in the event of foreclosure of the Security Instruments, or any one of them, any equitable right otherwise available to Borrower which would require the separate sale of the Individual Properties or require Lender to exhaust its remedies against any Individual Property or any combination of the Individual Properties before proceeding against any other Individual Property or combination of Individual Properties; and further in the event of such foreclosure Borrower does hereby expressly consent to and authorize, at the option of Lender, the foreclosure and sale either separately or together of any combination of the Individual Properties.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 16.3    Uncross of Individual Properties**.

(a)    Borrower agrees that at any time Lender shall have the unilateral right to elect to, from time to time, uncross any of the Individual Properties (such uncrossed Individual Property or Individual Properties, collectively, the "**Affected Property**" and the remaining Individual Property or Individual Properties, collectively, the "**Unaffected Property**") in order to separate the Loan from the portion of the Debt to be secured by the Affected Property (such portion of the Debt to be secured by the Affected Property, the "**Uncrossed Loan**" and the remaining portion of the Debt secured by the Unaffected Property, the "**Remaining Loan**").  In furtherance thereof, Lender shall have the right to (i) sever and/or divide the Note and the other Loan Documents so that (A) the original Loan Documents (collectively, the "**Remaining Loan Documents**") evidence and secure only the Remaining Loan and relate only to the Unaffected Property and (B) amended and/or new documents and other instruments (collectively, the "**Uncrossed Loan Documents**") evidence and secure only the Uncrossed Loan and relate only to the Affected Property, (ii) allocate the applicable portion of each of the Reserve Funds relating to the Affected Property to the Uncrossed Loan, (iii) release any cross-default and/or cross-collateralization provisions applicable to such Affected Property (but such Affected Property shall be cross-defaulted and cross-collateralized with each other Affected Property) and (iv) take such additional actions consistent therewith (including, without limitation, requiring delivery of the Uncrossed Loan Documents and amendments to the Loan Documents, in each case, to give effect to the foregoing); provided, that the Uncrossed Loan Documents and the Remaining Loan Documents, shall not, in the aggregate, increase (A) any material monetary obligation of Borrower or Guarantor under the Loan Documents or (B) any other material obligation of Borrower or Guarantor under the Loan Documents in any material respect, or decrease any of the rights of Borrower or Guarantor under the Loan Documents.  In connection with the uncrossing of any such Affected Property as provided for in this Section 17.3 (an "**Uncrossing Event**"), the Remaining Loan shall be reduced by an amount equal to the amount of the Uncrossed Loan and the Uncrossed Loan shall be in an amount equal to the Allocated Loan Amount applicable to the Affected Property.

(b)    Borrower shall reasonably cooperate with Lender to effectuate each Uncrossing Event.  Without limitation of the foregoing, upon receipt of Lender's written request, Borrower shall, among other things, (i) convey the Affected Property and/or Unaffected Property to a newly formed single purpose entity which satisfies the requirements set forth on Exhibit C attached hereto, (ii) deliver to Lender such legal opinions and updated legal opinions as Lender or the Rating Agencies shall reasonably require; (iii) take the actions contemplated in subsection (a) above (including, without limitation, executing the Uncrossed Loan Documents and amendments to the Loan Documents); and (iv) deliver such title endorsements, title insurance policies, documents and/or instruments relating to the operating agreements and other materials as may be required by Lender or the Rating Agencies.  Provided that no Event of Default has occurred and is continuing, such Lender shall be responsible for the costs and expenses of

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

any such Uncrossing Event (except that Borrower shall pay its own legal fees and other expenses).

# ARTICLE 17

## MEZZANINE LOAN.

**Section 17.1    Mezzanine Loan Notice.**

(a)    Promptly after receipt (but no more than five (5) Business Days after receipt), Borrower will deliver (or cause Mezzanine Borrower to deliver) to Lender a true, correct and complete copy of all material notices (including, without limitation, any notice of a Mezzanine Loan Event of Default or any other default under the Mezzanine Loan Documents), demands, requests or material correspondence (including electronically transmitted items) received from Mezzanine Lender by Mezzanine Borrower or any guarantor under the Mezzanine Loan Documents.

(b)    Unless otherwise delivered to Lender pursuant to the provisions of Section 4.12 hereof, Borrower will deliver (or cause Mezzanine Borrower to deliver) to Lender all of the financial statements and material reports, certificates and related items delivered or required to be delivered by Mezzanine Borrower to Mezzanine Lender under the Mezzanine Loan Documents as and when due under the Mezzanine Loan Documents.

**Section 17.2    Mezzanine Loan Estoppels.**    After written request by Lender made no more than one time in any calendar year, Borrower shall (or shall cause Mezzanine Borrower to) from time to time, use reasonable efforts to obtain from Mezzanine Lender such estoppel certificates with respect to the status of the Mezzanine Loan and compliance by Mezzanine Borrower with the terms of the Mezzanine Loan Documents as may reasonably be requested by Lender.  In the event or to the extent that Mezzanine Lender is not legally obligated to deliver such estoppel certificates and is unwilling to deliver the same, or is legally obligated to deliver such estoppel certificates but breaches such obligation, then Borrower shall not be in breach of this provision so long as such Borrower furnishes to Lender estoppels executed by Mezzanine Borrower, each expressly representing to Lender the information requested by Lender regarding the status of the Mezzanine Loan and the compliance by Mezzanine Borrower with the terms of the Mezzanine Loan Documents.  Borrower hereby indemnifies Lender from and against all Losses which may be imposed on, incurred by, or asserted against Lender based in whole or in part upon any fact, event, condition, or circumstances relating to the Mezzanine Loan which was misrepresented in any material respect by Borrower in, or which warrants disclosure and was omitted from, such estoppel executed by Mezzanine Borrower.

**Section 17.3    Mezzanine Intercreditor.**    Borrower hereby acknowledges and agrees that the Mezzanine Intercreditor is solely for the benefit of Lender and Mezzanine Lender, and that neither Borrower nor Mezzanine Borrower shall be third-party beneficiaries (intended or otherwise) of any of the provisions therein, have any rights thereunder, or be entitled to rely on any of the provisions contained therein.  Lender and Mezzanine Lender have no obligation to disclose to Borrower or Mezzanine Borrower the contents of the Mezzanine Intercreditor.

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Borrower's obligations under the Loan Documents are and will be independent of the Mezzanine Intercreditor and shall remain unmodified by the terms and provisions thereof.

**Section 17.4   Direction of Mezzanine Borrower**.   Borrower and Lender hereby acknowledge and agree that, as to any clauses or provisions contained in this Agreement or any other Loan Documents to the effect that (a) Borrower shall cause, direct, permit or allow Mezzanine Borrower to act or to refrain from acting in any manner or (b) Borrower shall cause to occur or not to occur, or otherwise be obligated in any manner with respect to, any matters pertaining to Mezzanine Borrower, or (c) other similar effect, such clause or provision, in each case, is intended to mean, and shall be construed as meaning, with respect to Borrower, and to the fullest extent permitted by applicable law, the power (whether direct or indirect) of Borrower to direct Mezzanine Borrower (through ownership of voting securities or partnership or limited liability company or other ownership interests), to bring about or effect a desired result.   Lender hereby specifically acknowledges that Borrower does not, directly or indirectly, hold or own any voting securities or partnership or limited liability company or other ownership interest in Mezzanine Borrower, or have any other contractual relationship or agreement with Mezzanine Borrower, and therefore Borrower, cannot, through ownership of voting securities or partnership or limited liability company or other ownership interests, or other contract or agreement, direct Mezzanine Borrower to bring about or effect a desired result.

**Section 17.5   Notices from Mezzanine Lender**.   Borrower and Lender hereby acknowledge and agree that Lender may conclusively rely on any notice delivered by Mezzanine Lender without any inquiry into the validity thereof, including, without limitation, a notice from Mezzanine Lender that a Mezzanine Loan Event of Default has occurred or is continuing.

**Section 17.6   Mezzanine Loan Separate**.   Borrower acknowledges and agrees that the Mezzanine Loan is a separate and distinct financing from the Loan, and is made separately by Mezzanine Lender to Mezzanine Borrower, a separate legal entity, as the obligor thereunder. Borrower acknowledges and agrees that no exercise of any rights or remedies by Mezzanine Lender under the Mezzanine Loan shall give rise to any defense of Borrower to the rights and remedies of Lender under the Loan pursuant to the Loan Documents.

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

    **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

[Signature pages sent separately]

**LENDER**:

[Signature pages sent separately]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT A**

**ORGANIZATIONAL CHART**

**(attached hereto)**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT B**

**IMMEDIATE REPAIRS**

| **Description of Work** | **Estimated Cost** | **Deadline** |
|---|---|---|
| 1.    [_____] | $[_____] | |
| 2.    [_____] | $[_____] | |
| 3.    [_____] | $[_____] | |
| 4.    [_____] | $[_____] | |

B-1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## EXHIBIT C

## <u>SPECIAL PURPOSE ENTITY REQUIREMENTS</u>

Borrower covenants and agrees that:

(a)     Borrower has not and will not:

(i)     engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto;

(ii)     acquire or own any assets other than (A) the Property, and (B) such incidental Personal Property as may be necessary for the ownership, leasing, maintenance and operation of the Property;

(iii)     incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) unsecured trade payables and operational debt not evidenced by a note and incurred in the ordinary course of business with trade creditors, provided any indebtedness incurred pursuant to subclause (B) shall be not more than sixty (60) days past due, and/or (C) Permitted Equipment Leases; <u>provided</u>, <u>however</u>, the aggregate amount of the indebtedness described in (B) and (C) shall not exceed at any time (in the aggregate among all Borrowers, if more than one exist) two percent (2%) of the outstanding principal amount of the Debt.  No Indebtedness other than the Debt may be secured (subordinate or <u>pari passu</u>) by the Property;

(iv)     commingle its funds or assets with the funds or assets of any other Person, or maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(v)     use the stationery, invoices or checks of any other Person as its own or fail to allocate shared expenses (including, without limitation, shared office space);

(vi)     fail to maintain a sufficient number of employees in light of its contemplated business operations or fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds (in each case to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower);

(vii)     fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) correct any known misunderstanding

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

regarding its separate identity or (C) hold its assets and conduct its business solely in its own name;

(viii)    fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents (provided, that, such organizational documents may be amended or modified to the extent that, in addition to the satisfaction of the requirements related thereto set forth therein, Lender's prior written consent and, if required by Lender, a Rating Agency Confirmation are first obtained);

(ix)    merge into or consolidate with any Person, or divide, dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(x)    have any obligation to indemnify any of its officers, directors, managers, members, shareholders or partners, as the case may be, unless such obligation is fully subordinated to the Debt and will not constitute a claim against Borrower if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xi)    own any subsidiary, or make any investment in, any Person (other than, with respect to any SPE Component Entity, in Borrower);

(xii)    fail to file its own tax returns (to the extent Borrower is required to file any such tax returns pursuant to applicable Legal Requirements) or file a consolidated federal income tax return with any other Person;

(xiii)    fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates).  Borrower's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet. Borrower has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)    enter into any contract or agreement with any partner, member, shareholder, principal or Affiliate, except, in each case, upon terms and conditions

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(xv)    assume or guaranty or otherwise become obligated for the debts of any other Person, hold itself out to be responsible for, or have its credit available to satisfy the debts or obligations of, any other Person, or otherwise pledge its assets for the benefit of any other Person;

(xvi)    except as provided in the Loan Documents, have any of its obligations guaranteed by any Affiliate;

(xvii)    make any loans or advances to any Person;

(xviii) fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Property to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower);

(xix)    fail to consider the interests of Borrower's creditors in connection with all company actions;

(xx)    without the prior unanimous written consent of all of its partners, shareholders or members, as applicable, and the prior unanimous written consent of its board of directors or managers, as applicable, and the prior written consent of each Independent Director (as defined below), regardless of whether such Independent Director is engaged at the Borrower or SPE Component Entity level, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors Rights Laws, (B) seek or consent to the appointment of a receiver, liquidator or any similar official, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors or (E) take any Material Action with respect to Borrower or any SPE Component Entity [(provided, that, none of any member, shareholder or partner (as applicable) of Borrower or any SPE Component Entity or any board of directors or managers (as applicable) of Borrower or any SPE Component Entity may vote on or otherwise authorize the taking of any of the foregoing actions unless, in each case, at least two (2) Independent Directors are then serving in such capacity in accordance with the terms of the applicable organizational documents and each of such Independent Directors has consented to such foregoing action);

(xxi)    acquire obligations or securities of its partners, members, shareholders or other Affiliates, as applicable;

C-3

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(xxii)  permit any Affiliate or constituent party independent access to its bank accounts;

(xxiii)  identify its partners, members, shareholders or other Affiliates, as applicable, as a division or part of it; or

(xxiv)  conduct its business and activities in such a way as to cause any of the assumptions made with respect to Borrower and its principals in any Non-Consolidation Opinion or in any New Non-Consolidation Opinion to be violated.

(b)     If Borrower is a partnership or limited liability company (other than a Springing Member LLC), each general partner (in the case of a partnership) and managing member (in the case of a limited liability company) of Borrower, as applicable, shall be a corporation or a Springing Member LLC (each an "**SPE Component Entity**") whose sole asset is its interest in Borrower.  Each SPE Component Entity (i) will at all times comply with each of the covenants, terms and provisions contained in clauses (a)(iv) - (xxiv) of this <u>Exhibit C</u> and, if such SPE Component Entity is a Springing Member LLC, clauses (c) and (d) of this <u>Exhibit C</u>, as if such representation, warranty or covenant was made directly by such SPE Component Entity; (ii) will not engage in any business or activity other than owning an interest in Borrower; (iii) will not acquire or own any assets other than its partnership, membership, or other equity interest in Borrower; (iv) will at all times continue to own no less than a 0.5% direct equity ownership interest in Borrower; (v) will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (vi) will cause Borrower to comply with the provisions of this <u>Exhibit C</u>.

(c)     In the event Borrower or the SPE Component Entity is a Springing Member LLC, the limited liability company agreement of Borrower or the SPE Component Entity (as applicable) (the "**LLC Agreement**") shall provide that (i) upon the occurrence of any event that causes the last remaining member of Borrower or the SPE Component Entity (as applicable) ("**Member**") to cease to be the member of Borrower or the SPE Component Entity (as applicable) (other than (A) upon an assignment by Member of all of its limited liability company interest in Borrower or the SPE Component Entity (as applicable) and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Borrower or the SPE Component Entity (as applicable) in accordance with the terms of the Loan Documents and the LLC Agreement), **[**any natural person duly designated under the applicable organizational documents**][**any person acting as Independent Director of Borrower or the SPE Component Entity (as applicable)**]** shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower or the SPE Component Entity (as applicable) automatically be admitted to Borrower or the SPE Component Entity (as applicable) as a member with a 0% economic interest ("**Special Member**") and shall continue Borrower or the SPE Component Entity (as applicable) without dissolution and (ii) Special Member may not resign from Borrower or the SPE Component Entity (as applicable) or transfer its rights as Special Member unless (A) a

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

successor Special Member has been admitted to Borrower or the SPE Component Entity (as applicable) as a Special Member in accordance with requirements of Delaware law and (B) after giving effect to such resignation or transfer, there remain at least two (2) Independent Directors of the SPE Component Entity or Borrower (as applicable) in accordance with clauses (e) and (f) below. The LLC Agreement shall further provide that (i) Special Member shall automatically cease to be a member of Borrower or the SPE Component Entity (as applicable) upon the admission to Borrower or the SPE Component Entity (as applicable) of the first substitute member, (ii) Special Member shall be a member of Borrower or the SPE Component Entity (as applicable) that has no interest in the profits, losses and capital of Borrower or the SPE Component Entity (as applicable) and has no right to receive any distributions of the assets of Borrower or the SPE Component Entity (as applicable), (iii) pursuant to the applicable provisions of the limited liability company act of the State of Delaware (the "**Act**"), Special Member shall not be required to make any capital contributions to Borrower or the SPE Component Entity (as applicable) and shall not receive a limited liability company interest in Borrower or the SPE Component Entity (as applicable), (iv) Special Member, in its capacity as Special Member, may not bind Borrower or the SPE Component Entity (as applicable) and (v) except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower or the SPE Component Entity (as applicable) including, without limitation, the merger, division, consolidation or conversion of Borrower or the SPE Component Entity (as applicable)**[;** provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Director, to vote on such matters required by the Loan Documents or the LLC Agreement**]**. In order to implement the admission to Borrower or the SPE Component Entity (as applicable) of Special Member, Special Member shall execute a counterpart to the LLC Agreement. Prior to its admission to Borrower or the SPE Component Entity (as applicable) as Special Member, Special Member shall not be a member of Borrower or the SPE Component Entity (as applicable), but Special Member may serve as an Independent Director of Borrower or the SPE Component Entity (as applicable).

(d)     The LLC Agreement shall further provide that (i) upon the occurrence of any event that causes the Member to cease to be a member of Borrower or the SPE Component Entity (as applicable) to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower or the SPE Component Entity (as applicable) agree in writing (A) to continue Borrower or the SPE Component Entity (as applicable) and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower or the SPE Component Entity (as applicable) effective as of the occurrence of the event that terminated the continued membership of Member in Borrower or the SPE Component Entity (as applicable), (ii) any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Borrower or the SPE Component Entity (as applicable) and upon

the occurrence of such an event, the business of Borrower or the SPE Component Entity (as applicable) shall continue without dissolution and (iii) each of Member and Special Member waives any right it might have to agree in writing to dissolve Borrower or the SPE Component Entity (as applicable) upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Borrower or the SPE Component Entity (as applicable).

(e)     The organizational documents of Borrower (to the extent Borrower is a corporation or a Springing Member LLC) or the SPE Component Entity, as applicable, shall provide that at all times there shall be at least two (2) duly appointed independent directors or managers of such entity (each, an "**Independent Director**") who each shall (I) not have been at the time of each such individual's initial appointment, and shall not have been at any time during the preceding five years, and shall not be at any time while serving as Independent Director, either (i) a shareholder (or other equity owner) of, or an officer, director (other than in its capacity as Independent Director), partner, member or employee of, Borrower or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (ii) a customer of, or supplier to, or other Person who derives any of its purchases or revenues from its activities with, Borrower or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (iii) a Person who Controls or is under common Control with any such shareholder, officer, director, partner, member, employee supplier, customer or other Person, or (iv) a member of the immediate family of any such shareholder, officer, director, partner, member, employee, supplier, customer or other Person, (II) shall have, at the time of their appointment, had at least three (3) years' experience in serving as an independent director and (III) be employed by, in good standing with and engaged by Borrower in connection with, in each case, an Acceptable ID Provider (defined below).

(f)     The organizational documents of each Borrower and the SPE Component Entity shall further provide that (I) the board of directors or managers of Borrower and the SPE Component Entity and the constituent equity owners of such entities (constituent equity owners, the "**Constituent Members**") shall not take any action set forth in clause (a)(xx) of this Exhibit C or any other action which, under the terms of any organizational documents of Borrower or the SPE Component Entity, requires the vote of the Independent Directors unless, in each case, at the time of such action there shall be at least two Independent Directors engaged as provided by the terms hereof and each such Independent Director votes in favor of or otherwise consent to such action; (II) any resignation, removal or replacement of any Independent Director shall not be effective without (1) prior written notice to Lender and the Rating Agencies (which such prior written notice must be given on the earlier of five (5) days or three (3) Business Days prior to the applicable resignation, removal or replacement) and (2) evidence that the replacement Independent Director satisfies the applicable terms and conditions hereof and of the applicable organizational documents (which such evidence must accompany the aforementioned notice); (III) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

at law or in equity, the Independent Directors shall consider only the interests of the Constituent Members and Borrower and any SPE Component Entity (including Borrower's and any SPE Component Entity's respective creditors) in acting or otherwise voting on the matters provided for herein and in Borrower's and SPE Component Entity's organizational documents (which such fiduciary duties to the Constituent Members and Borrower and any SPE Component Entity (including Borrower's and any SPE Component Entity's respective creditors), in each case, shall be deemed to apply solely to the extent of their respective economic interests in Borrower or SPE Component Entity (as applicable) exclusive of (x) all other interests (including, without limitation, all other interests of the Constituent Members), (y) the interests of other Affiliates of the Constituent Members, Borrower and SPE Component Entity and (z) the interests of any group of Affiliates of which the Constituent Members, Borrower or SPE Component Entity is a part)); (IV) other than as provided in subsection (III) above, the Independent Directors shall not have any fiduciary duties to any Constituent Members, any directors of Borrower or SPE Component Entity or any other Person; (V) the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; and (VI) to the fullest extent permitted by applicable law, including Section 18 1101(e) of the Act, an Independent Director shall not be liable to Borrower, SPE Component Entity, any Constituent Member or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

(g)    Notwithstanding the foregoing, no Independent Director of Borrower or any SPE Component Entity may also serve as an independent director of Mezzanine Borrower or any special purpose component entity of Mezzanine Borrower.

**"Acceptable ID Provider"** shall mean (i) any of the following unless any of the same are ever disapproved by the Rating Agencies: CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company and Lord Securities Corporation and (ii) any other national provider of Independent Directors that is approved in writing by Lender and the Rating Agencies.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT D**

**<u>DESCRIPTION OF REA'S</u>**

**[TBD]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT E**

**SECONDARY MARKET TRANSACTION INFORMATION**

(A)     Any proposed program for the renovation, improvement or development of the Property, or any part thereof, including the estimated cost thereof and the method of financing to be used.

(B)     The general competitive conditions to which the Property is or may be subject.

(C)     Management of the Property.

(D)     Occupancy rate expressed as a percentage for each of the last five years.

(E)     Principal business, occupations and professions carried on in, or from the Property.

(F)     Number of Tenants occupying 10% or more of the total rentable square footage of the Property and principal nature of business of such Tenant, and the principal provisions of the leases with those Tenants including, but not limited to: rental per annum, expiration date, and renewal options.

(G)     The average effective annual rental per square foot or unit for each of the last three years prior to the date of filing.

(H)     Schedule of the lease expirations for each of the ten years starting with the year in which the registration statement is filed (or the year in which the prospectus supplement is dated, as applicable), stating:

   (1)     The number of Tenants whose leases will expire.

   (2)     The total area in square feet covered by such leases.

   (3)     The annual rental represented by such leases.

   (4)     The percentage of gross annual rental represented by such leases.

300569686v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT F**

**INDIVIDUAL PROPERTIES AND ALLOCATED LOAN AMOUNTS**

**(attached hereto)**

**[TBD]**

F-1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Schedule 6.7**

**Scheduled Partial Releases**

# EXHIBIT A-3

**Deed of Trust, Assignment of Leases and Rents,
Security Agreement and Fixture Filing**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

========================================================================

**SILVER STAR CRE, LLC**, as grantor

to

**[_____]**, as trustee

for the benefit of

**[BSPRT CRE FINANCE, LLC]**, as beneficiary

---

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

---

Dated:  As of [_____], 2024

Location:  [_____]
[_____], Texas

County:  [_____]

PREPARED BY AND UPON
RECORDATION RETURN TO:

Holland & Knight LLP
10 St. James Avenue, 11th Floor
Boston, Massachusetts 02116
Attention: Sean M. O'Brien, Esq.

========================================================================

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**THIS SECURITY INSTRUMENT COVERS GOODS WHICH ARE OR ARE TO BECOME FIXTURES RELATED TO THE REAL ESTATE DESCRIBED HEREIN AND IS TO BE RECORDED IN THE DEED RECORDS AND IS ALSO TO BE INDEXED IN THE INDEX OF FIXTURE FILINGS FOR THE COUNTY OF [_____] TEXAS**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**PURSUANT TO SECTION 9.502(c) OF THE TEXAS BUSINESS AND COMMERCE CODE. REFER TO THE INTRODUCTORY PARAGRAPH OF THIS SECURITY INSTRUMENT FOR ADDITIONAL INFORMATION CONCERNING THE BORROWER AND LENDER.**

**THIS SECURITY INSTRUMENT SECURES FUTURE ADVANCES.**

**THIS SECURITY INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS.**

**THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING** (this "**Security Instrument**") is made as of this [  ] day of [_____], 2024, by **SILVER STAR CRE, LLC**, a Delaware limited liability company, having its principal place of business at 2909 Hillcroft, Suite 420, Houston, Texas 77057, as grantor (together with its successors and/or permitted assigns, "**Borrower**") to [_____], having an address at [_____], as trustee (together with its successors and assigns, "**Trustee**") for the benefit of [**BSPRT CRE FINANCE, LLC**], a Delaware limited liability company, having an address at 1345 Avenue of the Americas, Suite 32A, New York, New York 10105 (together with its successors and assigns, "**Lender**"), as beneficiary. All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement (defined below).

**RECITALS:**

A.    This Security Instrument is given to Lender to secure a certain loan in the original principal amount of up to $[_____] (the "**Loan**") advanced pursuant to that certain Loan Agreement dated as of the date hereof between Borrower and Lender (as the same may have been or may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), which such Loan is evidenced by, among other things, that certain Promissory Note executed in connection with the Loan Agreement (together with all extensions, renewals, replacements, restatements or other modifications thereof, whether one or more being hereinafter collectively referred to as the "**Note**"). The stated maturity date of the Note (exclusive of any acceleration thereof as provided in the Loan Documents) is [_____] 9, 202[6];

B.    Borrower desires to secure the payment of the outstanding principal amount set forth in, and evidenced by, the Loan Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, the Loan Agreement, this Security Instrument or any of the other Loan Documents (defined below) (collectively, the "**Debt**") and the performance of all of the obligations due under the Note, the Loan Agreement and all other documents, agreements and certificates executed and/or delivered in connection with the Loan (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, collectively, the "**Loan Documents**"); and

C.    This Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance of the obligations due thereunder and under the other Loan Documents are secured hereby in accordance with the terms hereof.

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Security Instrument:

**Article 1 - GRANTS OF SECURITY**

**Section 1.1**    PROPERTY CONVEYED. Borrower does hereby irrevocably release, grant, bargain, sell, pledge, assign, warrant, transfer, confirm and convey to Trustee, its successors and assigns, in trust, with Power of Sale, for the use and benefit of Lender and its successors and

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

assigns in and to the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a)    <u>Land</u>.  The real property described in <u>Exhibit A</u> attached hereto and made a part hereof (collectively, the "**Land**");

(b)    <u>Additional Land</u>.  All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c)    <u>Improvements</u>.    The buildings, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "**Improvements**");

(d)    <u>Easements</u>.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements, and the reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, rights of dower, rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements, and every part and parcel thereof, with the appurtenances thereto;

(e)    <u>Equipment, Fixtures and Personal Property</u>.  All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications, elevator fixtures, inventory and goods), furniture, software used in or to operate any of the foregoing and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (those portions of the foregoing constituting equipment under applicable Legal Requirements, the "**Equipment**", those portions of the foregoing constituting personal property under applicable Legal Requirements, the "**Personal Property**", those portions of the foregoing constituting fixtures under applicable Legal Requirements, the "**Fixtures**" and all of the foregoing, collectively, the "**Equipment, Fixtures and Personal Property**"), and the right, title and interest of Borrower in and to any of the foregoing which may be subject to any security interests, as defined in the

2

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "**Uniform Commercial Code**"), and all proceeds and products of the above;

(f)     <u>Leases and Rents</u>.  All leases, subleases, subsubleases, lettings, licenses, rental agreements, registration cards and agreements, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under any Creditors Rights Laws (collectively, the "**Leases**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, along with all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits (including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder)), accounts, cash, issues, profits, charges for services rendered, registration fees, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property (or any portion thereof), including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and/or occupancy of the Property (or any portion thereof) or rendering of services by Borrower or Manager and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Borrower of any petition for relief under any Creditors Rights Laws (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(g)     <u>Insurance Proceeds</u>.  All insurance proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property (collectively, the "**Insurance Proceeds**");

(h)     <u>Condemnation Awards</u>.  All condemnation awards, including interest thereon, which may heretofore and hereafter be made with respect to the Property by reason of any taking or condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property (collectively, the "**Awards**");

(i)     <u>Tax Certiorari</u>.    All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)     <u>Rights</u>.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(k)     <u>Agreements</u>.  All agreements, contracts, certificates, instruments, franchise agreements, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the occurrence of any default hereunder, to receive and collect any sums payable to Borrower thereunder; all to the extent assignable;

(l)     <u>Intangibles</u>.  All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property; all to the extent assignable;

(m)     <u>Accounts</u>.    All reserves, escrows and deposit accounts maintained by Borrower with respect to the Property, including without limitation, the Accounts and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof (collectively, the "**Accounts**");

(n)     <u>Proceeds</u>.    All proceeds of any of the foregoing items set forth in subsections (a) through (m) including, without limitation, Insurance Proceeds and Awards, whether cash, liquidation claims (or other claims) or otherwise; and

(o)     <u>Other Rights</u>.  Any and all other rights of Borrower in and to the items set forth in subsections (a) through (n) above.

**Section 1.2**    <u>ASSIGNMENT OF RENTS</u>.  Borrower hereby absolutely and unconditionally assigns to Lender and Trustee all of Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Nevertheless, subject to the terms of the Loan Agreement and Section 8.1(h) of this Security Instrument, Lender grants to Borrower a revocable license to (i) collect, receive, use and enjoy the Rents and Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums, and (ii) enforce the terms of the Leases.

**Section 1.3**    <u>SECURITY AGREEMENT</u>.  This Security Instrument is a real property deed of trust, a "security agreement," a "financing statement" and a "fixture filing", and Lender is a

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"secured party", within the meaning of the Uniform Commercial Code.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property.  By executing and delivering this Security Instrument, Borrower hereby grants to Lender and Trustee, a security interest in all of Borrower's right, title and interest in, to and under, the foregoing property and any portion of the Property that may be subject to the Uniform Commercial Code.  Borrower and Lender agree that the foregoing is intended to grant in favor of Lender a continuing lien and security interest in all of Borrower's assets.  Borrower authorizes Lender and its counsel to file Uniform Commercial Code financing statements describing the collateral as "all assets of the debtor, whether now owned or existing or hereafter acquired or arising and all proceeds and products thereof, including, without limitation, all fixtures on the Land", and any limitations on such collateral description, notwithstanding that such collateral description may be broader in scope than the collateral described in this Security Instrument.  If an Event of Default shall occur and be continuing, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code.

    **Section 1.4**   FIXTURE FILING.  Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

    **Section 1.5**   PLEDGE OF MONIES HELD.  Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender or on behalf of Lender in connection with the Loan, including, without limitation, any sums deposited in the Accounts and Net Proceeds, as additional security for the Obligations until expended or applied as provided in the Loan Documents.

    **Section 1.6**   CONDITIONS TO GRANT.  TO HAVE AND TO HOLD the above granted and described Property unto Trustee for and on behalf of Lender and to the use and benefit of Lender and Trustee and their respective successors and assigns, forever; IN TRUST, WITH POWER OF SALE, to secure payment to Lender of the Debt at the time and in the manner provided for its payments in the Note and the Loan Agreement; PROVIDED, HOWEVER, these presents are upon the express condition that, if Lender shall be well and truly paid the Debt at the time and in the manner provided in the Note, the Loan Agreement and this Security Instrument, if Borrower shall well and truly perform the Other Obligations as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, the Loan Agreement and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void.

**Article 2 - DEBT AND OBLIGATIONS SECURED**

    **Section 2.1**   DEBT.  This Security Instrument and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the Debt.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 2.2**    OTHER OBLIGATIONS.    This Security Instrument and the grants, assignments and transfers made in Article 1 are also given for the purpose of securing the performance of the following (the "**Other Obligations**"):  (a) all other obligations of Borrower contained herein; (b) each obligation of Borrower contained in the Loan Agreement and any other Loan Document; and (c) each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document.

**Section 2.3**    DEBT AND OTHER OBLIGATIONS.  Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the "**Obligations**."

**Section 2.4**    PAYMENT OF DEBT.  Borrower will pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and this Security Instrument.

**Section 2.5**    INCORPORATION BY REFERENCE.    All the covenants, conditions and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

**Section 2.6**    FUTURE ADVANCES. In addition to securing the full, prompt and complete payment when due of the Debt, this Security Instrument shall also secure any and all other, further or future loans, advances, readvances, reborrowings and borrowings made to or at the request of Borrower from or by Lender and all other debts, obligations and liabilities of every kind and character of Borrower now or hereafter existing in favor of Lender (including, without limitation, all indebtedness incurred or arising pursuant to any Loan Document) whether such debts, obligations or liabilities be direct or indirect, primary or secondary, joint or several, fixed or contingent, and whether originally payable to any of such parties or to a third party, and subsequently acquired by any of such parties, and whether such debts, obligations and liabilities are evidenced by note, open account, overdraft, endorsement, surety agreement or otherwise, it being presently contemplated by Borrower and such other parties that Borrower may and will hereafter become indebted to Lender in other, further and future sum or sums.

**Article 3 - PROPERTY COVENANTS**

Borrower covenants and agrees that:

**Section 3.1**    INSURANCE.  Borrower shall obtain and maintain, or cause to be obtained and maintained, in full force and effect at all times insurance with respect to Borrower and the Property as required pursuant to the Loan Agreement.

**Section 3.2**    TAXES AND OTHER CHARGES.  Borrower shall pay all real estate and personal property taxes, assessments, water rates or sewer rents (collectively "**Taxes**"), ground rents, maintenance charges, impositions (other than Taxes), and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas

adjoining the Property (collectively, "**Other Charges**"), now or hereafter levied or assessed or imposed against the Property or any part thereof in accordance with the Loan Agreement.

Section 3.3    LEASES.  Borrower shall not (and shall not permit any other applicable Person to) enter in any Leases for all or any portion of the Property unless in accordance with the provisions of the Loan Agreement.

Section 3.4    WARRANTY OF TITLE.  Borrower has good, indefeasible and insurable title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same.  Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements except for the Permitted Encumbrances, such other liens as are permitted pursuant to the Loan Documents and the liens created by the Loan Documents. This Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, perfected first priority lien on the Property, subject only to Permitted Encumbrances and the liens created by the Loan Documents and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other liens as are permitted pursuant to the Loan Documents and the liens created by the Loan Documents.  Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all Persons whomsoever.

## Article 4 - FURTHER ASSURANCES

Section 4.1    COMPLIANCE WITH LOAN AGREEMENT.  Borrower shall comply with all covenants set forth in the Loan Agreement relating to acts or other further assurances to be made on the part of Borrower in order to protect and perfect the lien or security interest hereof upon, and in the interest of Lender in, the Property.

Section 4.2    AUTHORIZATION TO FILE FINANCING STATEMENTS; POWER OF ATTORNEY. Borrower hereby authorizes Lender at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements as authorized by applicable law, as applicable to all or part of the Personal Property and as necessary or required in connection herewith.  For purposes of such filings, Borrower agrees to furnish any information requested by Lender promptly upon request by Lender.  Borrower also ratifies its authorization for Lender to have filed any like initial financing statements, amendments thereto or continuation statements, if filed prior to the date of this Security Instrument.  Borrower hereby irrevocably constitutes and appoints Lender and any officer or agent of Lender, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Borrower or in Borrower's own name to execute in Borrower's name any such documents and otherwise to carry out the purposes of this Section 4.2, to the extent that Borrower's authorization above is not sufficient and Borrower fails or refuses to promptly execute such documents.  To the extent permitted by law, Borrower hereby ratifies all acts said attorneys-in-fact have lawfully done in the past or shall lawfully do or cause to be done in the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

future by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable.

## Article 5 - Due On Sale/Encumbrance

**Section 5.1**    No Sale/Encumbrance.  Except in accordance with the express terms and conditions contained in the Loan Agreement, Borrower shall not cause or permit a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a direct or indirect legal or beneficial interest in the Property or any part thereof, Borrower, any constituent owner or other holder of a direct or indirect equity interest in Borrower, any indemnitor or other guarantor of the Loan, any constituent owner or other holder of a direct or indirect equity interest in such indemnitor or guarantor, any manager or operating lessee of the Property that is affiliated with Borrower or any constituent owner or other holder of a direct or indirect equity interest in such manager or such operating lessee.

## Article 6 - Prepayment; Release of Property

**Section 6.1**    Prepayment.  The Debt may not be prepaid in whole or in part except in strict accordance with the express terms and conditions of the Note and the Loan Agreement.

**Section 6.2**    Release of Property.  Borrower shall not be entitled to a release of any portion of the Property from the lien of this Security Instrument except in accordance with terms and conditions of the Loan Agreement.

## Article 7 - Default

**Section 7.1**    Event of Default.  The term "**Event of Default**" as used in this Security Instrument shall have the meaning assigned to such term in the Loan Agreement.

## Article 8 - Rights and Remedies Upon Default

**Section 8.1**    Remedies.  Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may or acting by or through Trustee may take such action, without notice or demand as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender or Trustee may determine, in their sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender or Trustee:

(a)    declare the entire unpaid Debt to be immediately due and payable;

(b)    institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

(d)     sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement or in the other Loan Documents;

(f)     recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)     seek and obtain the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor or indemnitor under the Loan or any other Person liable for the payment of the Debt;

(h)     the license granted to Borrower under Section 1.2 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)     apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement, this Security Instrument or any other Loan Document and/or the Accounts to the payment of the following items in any order in its sole discretion:  (i) Taxes and Other Charges; (ii) insurance premiums; (iii) interest on the unpaid principal balance of the Debt; (iv) amortization of the unpaid principal balance of the Debt; (v) all other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation advances made by Lender pursuant to the terms of this Security Instrument;

(j)     surrender the insurance policies maintained pursuant to the Loan Agreement, collect the unearned insurance premiums for such insurance policies and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such insurance premiums;

(k)     apply the undisbursed balance of any deposit made by Borrower with Lender in connection with the restoration of the Property after a casualty thereto or condemnation thereof, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion; and/or

(l)     pursue such other remedies as Lender may have under applicable law.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.  Notwithstanding the provisions of this Section to the contrary, if any Event of Default as described in Section 10.1(f) of the Loan Agreement shall occur with respect to Borrower or any SPE Component Entity, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender.

**Section 8.2**   APPLICATION OF PROCEEDS.   Upon the occurrence and during the continuance of any Event of Default, the purchase money, proceeds and avails of any disposition of the Property (or any part thereof) and any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents may, in each case, be applied by Lender to the payment of the Debt in such order, priority and proportions as Lender in its sole discretion shall determine.

10

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 8.3**    RIGHT TO CURE DEFAULTS.    Upon the occurrence and during the continuance of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make any payment or do any act required of Borrower hereunder in such manner and to such extent as Lender may deem necessary to protect the security hereof.  Lender or Trustee is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 8.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.  All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at any default rate specified in the Loan Agreement, if any (the "**Default Rate**"), for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender.  All such reasonable costs and expenses incurred by Lender or Trustee together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

**Section 8.4**    ACTIONS AND PROCEEDINGS.  Lender or Trustee has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

**Section 8.5**    RECOVERY OF SUMS REQUIRED TO BE PAID.  Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

**Section 8.6**    OTHER RIGHTS, ETC.  (a) The failure of Lender or Trustee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender or Trustee to comply with any request of Borrower or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any Person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)    It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in the value of the Property, for failure to maintain the insurance policies required to be maintained pursuant to the Loan Agreement, or for failure to determine whether insurance in force is adequate as to the

amount of risks insured.  Possession by Lender shall not be deemed an election of judicial relief if any such possession is requested or obtained with respect to any Property or collateral not in Lender's possession.

(c)    Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender or Trustee may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender or Trustee thereafter to foreclose this Security Instrument.  The rights of Lender or Trustee under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender or Trustee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Neither Lender nor Trustee shall be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

**Section 8.7**    RIGHT TO RELEASE ANY PORTION OF THE PROPERTY.  Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

**Section 8.8**    RIGHT OF ENTRY.  Upon reasonable notice to Borrower, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times, subject to any tenant's rights under the Leases.

**Section 8.9**    BANKRUPTCY.  (a) Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b)    If there shall be filed by or against Borrower a petition under the Bankruptcy Code and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease.  Lender shall have the right, but not the obligation, to serve upon Borrower within such ten-day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease.  If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

**Section 8.10**   SUBROGATION.   If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of the Other Obligations.

## Article 9 - ENVIRONMENTAL HAZARDS

**Section 9.1**   ENVIRONMENTAL COVENANTS.   Borrower has provided representations, warranties and covenants regarding environmental matters set forth in the Environmental Indemnity and Borrower shall comply with the aforesaid covenants regarding environmental matters.

## Article 10 - WAIVERS

**Section 10.1**   MARSHALLING AND OTHER MATTERS.   Borrower hereby waives, to the extent permitted by law, the benefit of all Legal Requirements now or hereafter in force regarding appraisement, valuation, stay, extension, reinstatement and redemption and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein.   Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all Persons to the extent permitted by Legal Requirements.

**Section 10.2**   WAIVER OF NOTICE.   Borrower shall not be entitled to any notices of any nature whatsoever from Lender or Trustee except with respect to matters for which this Security Instrument or the Loan Agreement specifically and expressly provides for the giving of notice by Lender or Trustee to Borrower and except with respect to matters for which Borrower is not permitted by Legal Requirements to waive its right to receive notice, and Borrower hereby expressly waives the right to receive any notice from Lender or Trustee with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender or Trustee to Borrower.

**Section 10.3**   WAIVER OF STATUTE OF LIMITATIONS.   To the fullest extent permitted by applicable law, Borrower hereby expressly waives and releases its right to plead any statute of limitations as a defense to the payment of the Debt or performance of its Other Obligations.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 10.4**    WAIVER OF COUNTERCLAIM.  To the extent permitted by applicable law, Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Loan Agreement, the Note, any of the other Loan Documents, or the Obligations.

**Section 10.5**    WAIVER OF TRIAL BY JURY.  **BORROWER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF LENDER AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND LENDER.**

**Section 10.6**    WAIVER OF FORECLOSURE DEFENSE.  Borrower hereby waives any defense Borrower might assert or have by reason of Lender's failure to make any tenant or lessee of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

**Section 10.7**    OTHER WAIVERS.  To the extent not prohibited by applicable law, Borrower waives and relinquishes any and all rights and remedies which Borrower may have or be able to assert by reason of the provisions of: (i) Rule 31 of the Texas Rules of Civil Procedure (Surety Not to be Sued Alone), Section 17.001 of the Texas Civil Practice and Remedies Code (Suit on Contract with Several Obligors or Parties Conditionally Liable), and/or Section 43.002 of the Texas Civil Practice and Remedies Code (Suit on Accrued Right of Action), or any other provision of applicable law pertaining to the rights and remedies of sureties, (ii) Section 64.060 of the Texas Property Code, and (iii) Sections 51.003, 51.004 and 51.005 of the Texas Property Code, as amended. After consultation with an attorney of Borrower's own selection, Borrower voluntarily consents to this waiver.  Borrower expressly warrants and represents that each person (x) is not in a significantly disparate bargaining position relative to Lender, and (y) has been represented by legal counsel in connection with the transactions contemplated by this Security Instrument and the Loan Documents.  If any applicable law referred to in this Section 10.7 and now in force, of which Borrower or Borrower's heirs, devisees, representatives, successors or assigns or any other persons claiming any interest in the Property might take advantage despite this Section 10.7, shall hereafter be repealed or cease to be in force, such applicable law shall not thereafter be deemed to preclude the application of this Section 10.7.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## Article 11 - EXCULPATION

**Section 11.1**  EXCULPATION.  The provisions of Article 12 of the Loan Agreement are hereby incorporated by reference into this Security Instrument to the same extent and with the same force as if fully set forth herein.

## Article 12 - NOTICES

**Section 12.1**  NOTICES.  All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Loan Agreement.

Notices to the Trustee shall be sent as follows:

[ ]

## Article 13 - APPLICABLE LAW

**Section 13.1**  GOVERNING LAW.  The governing law and related provisions contained in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein.

**Section 13.2**  PROVISIONS SUBJECT TO APPLICABLE LAW.  All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law.  If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## Article 14 - DEFINITIONS

**Section 14.1**  GENERAL DEFINITIONS.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any of Lender's successors and assigns," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," "Trustee" shall mean "Trustee and any substitute Trustee of the estates, properties, powers, trusts and rights conferred upon Trustee pursuant to this Security Instrument," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in

15

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

### Article 15 - MISCELLANEOUS PROVISIONS

**Section 15.1** NO VERBAL CHANGE.  This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated verbally or by any act or failure to act on the part of Borrower, Lender or Trustee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**Section 15.2** SUCCESSORS AND ASSIGNS.  This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 15.3** INAPPLICABLE PROVISIONS.  If any term, covenant or condition of the Loan Agreement, the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Loan Agreement, the Note and this Security Instrument shall be construed without such provision.

**Section 15.4** HEADINGS, ETC.  The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**Section 15.5** NUMBER AND GENDER.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

**Section 15.6** ENTIRE AGREEMENT.  This Security Instrument and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Security Instrument and the other Loan Documents.

**Section 15.7** LIMITATION ON LENDER'S RESPONSIBILITY.  No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.  Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession."

**Section 15.8** JOINT AND SEVERAL LIABILITY.  If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 15.9**   SOLE DISCRETION OF LENDER.   Whenever pursuant to this Security Instrument, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

**Section 15.10** VARIABLE INTEREST RATE.   The Loan secured by this Security Instrument is a variable interest rate loan, as more particularly set forth in the Loan Agreement.

**Article 16 - DEED OF TRUST PROVISIONS**

**Section 16.1**   CONCERNING THE TRUSTEE.   Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction.   Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for gross negligence or willful misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof.   Trustee may resign at any time upon giving thirty (30) days' notice to Borrower and to Lender.   Lender may remove Trustee at any time or from time to time and select a successor trustee.   In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor.   Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender.   The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

**Section 16.2**   TRUSTEE'S FEES.   Borrower shall pay all reasonable costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.   Notwithstanding anything to the contrary contained herein or in any other Loan Documents, Trustee hereby acknowledges and agrees that no fees or other compensation shall be payable to Trustee hereunder or otherwise in connection with the Loan or Loan Documents except in connection with (a) a sale of the Property in connection with an exercise of remedies hereunder and/or under the other Loan Documents or (b) a release hereof in accordance with the applicable terms and conditions hereof.

**Section 16.3**   CERTAIN RIGHTS.   With the approval of Lender, Trustee shall have the right to take any and all of the following actions:   (i) to select, employ, and advise with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution, and interpretation of the Note, this Security Instrument or the Other

17

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his/her agents or attorneys, (iii) to select and employ, in and about the execution of his/her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee, and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for Trustee's gross negligence or bad faith, and (iv) any and all other lawful action as Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder.  Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property.  Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting an action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine.  Trustee shall be entitled to reimbursement for actual expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered.

**Section 16.4**  RETENTION OF MONEY.  All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

**Section 16.5**  PERFECTION OF APPOINTMENT.  Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute trustee to more fully and certainly vest in and confirm to Trustee or substitute trustee such estates rights, powers, and duties, then, upon request by Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

**Section 16.6**  SUCCESSION INSTRUMENTS.  Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his/her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in Trustee's place.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## Article 17 - STATE-SPECIFIC PROVISIONS

**Section 17.1** PRINCIPLES OF CONSTRUCTION.    In the event of any inconsistencies between the terms and conditions of this Article 17 and the terms and conditions of this Security Instrument, the terms and conditions of this Article 17 shall control and be binding.

**Section 17.2** FORECLOSURE.

(a)    Upon the occurrence of an Event of Default, Trustee, Trustee's successor or substitute, is authorized and empowered and it shall be its special duty at the request of Lender to sell the Property or any part thereof situated in the State of Texas at the courthouse of any county in the State of Texas in which any part of the Property is situated, at public venue to the highest bidder for cash between the hours of 10:00 a.m. and 4:00 p.m. on the first Tuesday in any month (or in the event the first Tuesday in such month is either January 1 or July 4, the first Wednesday in such month) after having given notice of such sale in accordance with the statutes of the State of Texas then in force governing sales of real estate under powers conferred by deed of trust.  The sale must begin at the time stated in the notice of sale or not later than three hours after that time.  Any sale made by Trustee hereunder may be as an entirety or in such parcels as Lender may request, and any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law. Further, any sale made by Trustee hereunder may, in lieu of cash, be upon such other terms and conditions as Lender may from time to time hereafter elect.  The sale by Trustee of less than the whole of the Property  shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Property shall be sold and, if the proceeds of such sale of less than the whole of the Property shall be less than the aggregate of the indebtedness secured hereby and the expense of executing this trust as provided herein, this Security Instrument and the lien hereof shall remain in full force and effect as to the unsold portion of the Property just as though no sale had been made; provided, however, that Borrower shall never have any right to require the sale of less than the whole of the Property but Lender shall have the right, at its sole election, to request Trustee to sell less than the whole of the Property.  After each sale, Trustee shall make to the purchaser or purchasers at such sale good and sufficient conveyances in the name of Lender, conveying the property so sold to the purchaser or purchasers in fee simple with general warranty of title, and shall receive the proceeds of said sale or sales and apply the same as herein provided.  Payment of the purchase price to Trustee shall satisfy the obligation of purchaser at such sale therefor, and such purchaser shall not be responsible for the application thereof.  In the event any sale hereunder is not completed or is defective in the opinion of Lender, such sale shall not exhaust the power of sale hereunder and Lender shall have the right to cause a subsequent sale or sales to be made hereunder.  Any and all statements of fact or other recitals made in any deed or deeds given by Trustee or any successor or substitute appointed hereunder as to nonpayment of the indebtedness secured hereby, or as to the occurrence of any Event of Default, or as to Lender having declared all of such indebtedness to be due and payable, or as to the request to sell, or as

19

to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to the refusal, failure or inability to act of Trustee or any substitute or successor, or as to the appointment of any substitute or successor trustee, or as to any other act or thing having been duly done by Lender or by such Trustee, substitute or successor, shall be taken as conclusive (absent manifest error) evidence of the truth of the facts so stated and recited. Trustee, his successor or substitute, may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Trustee, including the posting of notices and the conduct of sale, but in the name and on behalf of Trustee, his successor or substitute.

(b) RIGHT TO REQUIRE PROOF OF FINANCIAL ABILITY. At any time during the bidding of any sale conducted by Trustee under paragraph 17.2(a) above, Trustee may require a bidding party (a) to disclose its full name, state and city of residence, occupation, and specific business office location, and the name and address of the principal the bidding party is representing (if applicable); and (b) to demonstrate reasonable evidence of the bidding party's financial ability (or, if applicable, the financial ability of the principal of such bidding party), as a condition to the bidding party submitting bids at the foreclosure sale. If any such bidding party (the "**Questioned Bidder**") declines to comply with Trustee's requirement in this regard, or if such Questioned Bidder does respond but Trustee, in Trustee's sole and absolute discretion, deems the information or the evidence of the financial ability of the Questioned Bidder (or, if applicable, the principal of such bidding party) to be inadequate, Trustee may continue the bidding with reservation; and in such event (i) Trustee shall be authorized to caution the Questioned Bidder concerning the legal obligations to be incurred in submitting bids, and (ii) if the Questioned Bidder is not the highest bidder at the sale, or if having been the highest bidder the Questioned Bidder fails to deliver the cash purchase price payment promptly to Trustee, all bids by the Questioned Bidder shall be null and void. Trustee may, in Trustee's sole and absolute discretion, determine that a credit bid may be in the best interest of Borrower and Lender and elect to sell the Property for credit or for a combination of cash and credit; provided, however, that Trustee shall have no obligation to accept any bid except an all cash bid. In the event Trustee requires a cash bid and cash is not delivered within a reasonable time after conclusion of the bidding process, as specified by Trustee (but in no event later than 3:45 p.m. local time on the date of sale), then said contingent sale shall be null and void, the bidding process may be recommenced, and any subsequent bids or sale shall be made as if no prior bids were made or accepted.

(c) JUDICIAL FORECLOSURE. This Security Instrument shall be effective as a mortgage as well as a deed of trust and upon the occurrence of an Event of Default may be foreclosed as to any of the Property in any manner permitted by the laws of the State of Texas or of any other state in which any part of the Property is situated, and any foreclosure suit may be brought by Trustee or by Lender. In the event a foreclosure hereunder shall be commenced by Trustee or his substitute or successor, Lender may at any time before the sale of the Property direct the said Trustee to abandon the sale, and may then institute suit for the collection of the Note and the other secured indebtedness,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

and for the foreclosure of this Security Instrument.  It is agreed that if Lender should institute a suit for the collection of the Note or any other secured indebtedness and for the foreclosure of this Security Instrument, Lender may at any time before the entry of a final judgment in said suit dismiss the same, and require Trustee, his substitute or successor to sell the Property in accordance with the provisions of this Security Instrument.

(d)    PROCEEDS OF SALE.  The proceeds of any sale held by Trustee or any receiver or public officer in foreclosure of the liens evidenced hereby shall be applied:

FIRST, to the payment of all necessary costs and expenses incident to such foreclosure sale, including but not limited to all court costs and charges of every character in the event foreclosed by suit, and a reasonable fee to Trustee acting under the provisions of this Section 17.2 if foreclosed by power of sale as provided in said paragraph, not exceeding one percent (1%) of the proceeds of such sale;

SECOND, to the payment in full of the Debt (including specifically without limitation the principal, interest and attorneys' fees due and unpaid on the Note and the amounts due and unpaid and owed to Lender under this Security Instrument and the other Loan Documents) in such order as Lender may elect, in Lender's sole and absolute discretion; and

THIRD, the remainder, if any, there shall be, shall be paid to Borrower or to such other party or parties as may be entitled thereto by law.

(e)    LENDER AS PURCHASER.  Lender shall have the right to become the purchaser at any sale held by any Trustee or substitute or successor or by any receiver or public officer, and any Lender purchasing at any such sale shall have the right to credit upon the amount of the bid made therefor, to the extent necessary to satisfy such bid, the Debt owing to such Lender, or if such Lender holds less than all of the Debt the pro rata part thereof owing to such Lender, accounting to all other beneficiaries of this Security Instrument not joining in such bid in cash for the portion of such bid or bids apportionable to such non-bidding beneficiaries.

(f)    UNIFORM COMMERCIAL CODE.  Upon the occurrence of an Event of Default, Lender may exercise its rights of enforcement under the Uniform Commercial Code with respect to the Personal Property, and in conjunction with, in addition to or in substitution for those rights and remedies:

(i)    Lender may enter upon the Property to take possession of, assemble and collect the Personal Property or to render it unusable;

(ii)    Lender may require Borrower to assemble the Personal Property and make it available at a place Lender designates which is mutually convenient to allow Lender to take possession or dispose of the Personal Property;

(iii)    written notice mailed to Borrower as provided herein ten (10) days prior to the date of public sale of the Personal Property or prior to  the date after which private sale of the Personal Property will be made shall constitute reasonable notice;

(iv)    any sale made pursuant to the provisions of this paragraph shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the sale of the Property under power of sale as provided herein upon giving the same notice with respect to the sale of the Personal Property hereunder as is required for such sale of the Property under power of sale;

(v)    in the event of a foreclosure sale, whether made by Trustee under the terms hereof, or under judgment of a court, the Personal Property and the remainder of the Property may, at the option of Lender, be sold as a whole;

(vi)    it shall not be necessary that Lender take possession of the Personal Property or any part thereof prior to the time that any sale pursuant to the provisions of this paragraph is conducted and it shall not be necessary that the Personal Property or any part thereof be present at the location of such sale;

(vii)    prior to application of proceeds of disposition of the Personal Property to the secured indebtedness, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by Lender;

(viii)    any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to non-payment of the indebtedness or as to the occurrence of any Event of Default, or as to Lender having declared all of such indebtedness to be due and payable, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to any other act or thing having been duly done by Lender, shall absent manifest error be taken as conclusive evidence of the truth of the facts so stated and recited; and

(ix)    Lender may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Lender, including the sending of notices and the conduct of sale, but in the name and on behalf of Lender.

(g)    PARTIAL FORECLOSURE.  In the event of a default in the payment of any part of the Debt, Lender shall have the right to proceed with foreclosure of the liens and security interests evidenced hereby without declaring the entire Debt due, and in such event any such foreclosure sale may be made subject to the unmatured part of the Debt; and any such sale shall not in any manner affect the unmatured part of the Debt, but as to

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

such unmatured part, this Security Instrument shall remain in full force and effect just as though no sale had been made.  The proceeds of any such sale shall be applied as provided in Section 17.2(d) except that the amount paid under subparagraph SECOND thereof shall be only the matured portion of the Debt and any proceeds of such sale in excess of those provided for in subparagraphs FIRST and SECOND (modified as provided above) shall be applied to installments of principal of and interest on the Note in the inverse order of maturity.  Several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Debt.

(h)    <u>WAIVER</u>.

(i)    To the full extent Borrower may do so, Borrower agrees that Borrower will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force pertaining to the rights and remedies of sureties or providing for any appraisement, valuation, stay, extension or redemption, and Borrower, for Borrower and Borrower's heirs, devisees, representatives, successors and assigns, and for any and all persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, notice of intention to mature or declare due the whole of the secured indebtedness, notice of intent to accelerate, notice of acceleration, and all rights to a marshaling of the assets of Borrower, including the Property, or to a sale in inverse order of alienation in the event of foreclosure of the liens and security interests hereby created.

(ii)    Borrower shall not have or assert any right under any statute or rule of law pertaining to the marshaling of assets, sale in inverse order of alienation, the exemption of homestead, the administration of estates of decedents whatever to defeat, reduce or affect the right of Lender under the terms of this Security Instrument to a sale of the Property for the collection of the Debt without any prior or different resort for collection, or the right of Lender under the terms of this Security Instrument to the payment of such indebtedness out of the proceeds of sale of the Property in preference to every other claimant whatever.

(iii)    To the extent that Borrower, any partner thereof or any other entity responsible for the payment of the Debt is now, or at any time or from time to time hereafter is, a partnership, Borrower and Lender expressly acknowledge and agree that Lender is not required to comply with Section 3.05(d) of the Texas Revised Partnership Act, as same may be hereafter amended or modified, or any other or further laws, rules or regulations now or hereafter in effect which may limit the rights and remedies of a creditor to pursue partners of a partnership prior to the pursuit of such creditor's rights and remedies against such partnership.

(iv)    If any law referred to in this paragraph and now in force, of which Borrower or Borrower's heirs, devisees, representatives, successors  and assigns and such other persons claiming any interest in the Property might take advantage

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

despite this paragraph, shall hereafter be repealed and cease to be in force, such law shall not thereafter be deemed to preclude the application of this paragraph.

(v)     Borrower hereby waives notice of intent to accelerate and notice of acceleration, and agrees that Lender may foreclose the lien of this Security Instrument without sending either of such notices.

(i)     DELIVERY OF POSSESSION AFTER FORECLOSURE.  In the event there is a foreclosure sale hereunder and at the time of such sale Borrower or Borrower's heirs, devisees, representatives, successors or assigns or any other persons claiming any interest in the Property by, through or under Borrower are occupying or using the Property, or any part thereof, each and all shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser.  In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain an action for forcible entry and detainer of said property in the Justice of the Peace Court in the Justice Precinct in which such property, or any part thereof, is situated.

(j)     WAIVER OF DEFICIENCY STATUTE.

(i)     (1)     In the event an interest in any of the Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, Borrower agrees that notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Lender shall be entitled to seek a deficiency judgment from Borrower and any other party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale.  Borrower expressly recognizes that this paragraph constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Borrower and other persons against whom recovery of deficiencies is sought (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value.  Borrower further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower, and others against whom recovery of a deficiency is sought.

(2)     Alternatively, in the event the waiver provided for in subsection (1) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable laws, the following shall be the basis for the finder of fact's determination of the fair market value of the Property

24

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time);

(ii)         the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure;

(iii)         the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than twelve months) following the foreclosure sale;

(iv)         all reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance, a survey of the Property, tax prorations, seller's attorneys' fees and marketing costs;

(v)         the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including, without limitation, utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in subsection (iii) above) and other maintenance expenses; and

(vi)         any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five years' experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

**Section 17.3**    INTEREST LIMITATION. To the extent Texas law governs and controls the maximum rate of interest payable on the indebtedness evidenced by the Note, this Security Instrument and/or the Related Debt, then this Section 17.3 shall apply (and not otherwise); the parties acknowledging and agreeing to the governing law provisions contained in the Note, this Security Instrument and the other Loan Documents.  It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with the applicable Texas law governing the maximum rate of interest payable on the indebtedness evidenced by the Note, this Security Instrument and the Related Debt (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law).  If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to the Note, this Security Instrument, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Lender's exercise of the option to accelerate the maturity of the Note and/or the Related Debt, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of the Note and/or the Related Debt, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate

25

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(defined below) shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited on the principal balance of this Note and/or the Related Debt (or, if the Note and all Related Debt have been or would thereby be paid in full, refunded to Borrower), and the provisions of the Note, this Security Instrument and other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity for the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if the Note has been paid in full before the end of the stated term of the Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against the Note and/or any Related Debt then owing by Borrower to Lender.  Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against the Note and/or the Related Debt then owing by Borrower to Lender.  All sums contracted for, charged, taken, reserved or received by Lender for the use, forbearance or detention of any debt evidenced by the Note and/or Related Debt shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of the Note and/or Related Debt (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of the Note and/or the Related Debt does not exceed the Maximum Lawful Rate from time to time in effect and applicable to the Note and/or the Related Debt for so long as debt is outstanding.  In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to the Note and/or Related Debt.  Notwithstanding anything to the contrary contained herein or in any other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.  To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Lawful Rate payable on the Note and/or the Related Debt, Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended.  To the extent United States federal law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Lender will rely on United States federal law instead of such Chapter 303 for the purpose of determining the Maximum Lawful Rate.  Additionally, to the extent permitted by applicable law now or hereafter in effect, Lender may, at its option and from time to time, utilize any other method of establishing the Maximum Lawful Rate under such Chapter 303 or under applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect.  As used hereunder the term "**Maximum Lawful Rate**" shall mean the maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that such law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges made in connection with the transaction

26

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

evidenced by the Note and the other Loan Documents.  As used hereunder, the term "**Charges**" shall mean all fees, charges and/or any other things of value, if any, contracted for, charged, taken, received or reserved by Lender in connection with the transactions relating to the Note and the other Loan Documents, which are treated as interest under applicable law.  As used hereunder, the term "**Related Debt**" shall mean any and all indebtedness paid or payable by Borrower to Lender pursuant to the Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, except such indebtedness which has been paid or is payable by Borrower to Lender under the Note.

**Section 17.4**    Fixture Filing. Pursuant to the Uniform Commercial Code, this Security Instrument shall be effective as a Financing Statement filed as a fixture filing from the date of its filing for record covering and including any and all fixtures of every kind and type affixed to all or any portion of the Property or forming part of all or any portion of the Improvements.  The name and address of Borrower, as debtor, and Lender (where information concerning the security interest granted hereby may be obtained), as secured party, are as set forth on the first page of this Security Instrument.  The above described goods are or are to become fixtures related to the Property and the Improvements of which Borrower is the record title owner.  This Security Instrument shall also be effective as a financing statement covering minerals or the like (including oil and gas) and accounts subject to Section 9.103(e) of the Uniform Commercial Code, as amended.

**Section 17.5**    Miscellaneous.

(a)    Releases.  Upon payment in full of the Debt and all other indebtedness secured hereby, Lender shall, at Borrower's expense, cause the lien created by this Security Instrument to be released by an instrument in form and substance reasonably satisfactory to Lender.

(b)    No Partnership.  Notwithstanding anything to the contrary contained herein or otherwise, (i) the relationship between Borrower and Lender hereunder and otherwise shall be deemed, construed and treated by Borrower and Lender for all purposes to be solely that of debtor/creditor; (ii) the various consent, approval and other rights afforded to Lender under this Security Instrument have been granted and designed solely to protect the value of the Property and to assure Borrower's payment of the Debt and all of such rights are customarily granted lenders in a secured lending transactions; (iii) Borrower and Lender hereby expressly disclaim any sharing of liabilities, losses, costs or expenses with respect to the ownership or operation of all or any portion of the Property, or otherwise; and (iv) the terms contained herein are not intended by Borrower and Lender and shall not for any purpose be deemed, construed or treated by Borrower and Lender so as (A) to create a partnership or joint venture between Lender and Borrower or between Lender and any other party, or (B) to cause Lender to be or become liable in any way for the debts and obligations of Borrower (including, without limitation, any losses attributable to Borrower's operation of the Property) or any other party.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(c)  **INDEMNITY.  IT IS THE EXPRESS INTENTION OF BORROWER AND BORROWER HEREBY AGREES THAT THE INDEMNITIES SET FORTH IN THIS SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS WILL APPLY TO AND FULLY PROTECT EACH INDEMNIFIED PARTY EVEN THOUGH ANY CLAIMS, DEMANDS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF ACTION, JUDGMENTS, PENALTIES, COSTS AND EXPENSES (INCLUDING WITHOUT LIMITATION REASONABLE ATTORNEYS' FEES) THEN THE SUBJECT OF INDEMNIFICATION MAY HAVE BEEN CAUSED BY, ARISE OUT OF, OR ARE OTHERWISE ATTRIBUTABLE TO, DIRECTLY OR INDIRECTLY, THE NEGLIGENCE (EXCLUDING GROSS NEGLIGENCE) IN WHOLE OR IN PART OF SUCH INDEMNIFIED PARTY AND/OR ANY OTHER PARTY.**

**Borrower's Initials:  _____**

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(d)  INCORPORATION BY REFERENCE.  The terms, covenants and provisions of the Note and the other Loan Documents have been incorporated into this Security Instrument by this reference.  All persons from time to time having an interest in all or any portion of the Property are hereby placed on notice of all of the terms, covenants and provisions of the instruments incorporated herein and that copies of same may be obtained by those having an appropriate interest in the Property or any portion thereof upon written request to the Lender at the address set forth on the first page of this Security Instrument.  Any such request shall include the name and address of the requesting party and also contain a brief explanation of the nature and reason for such request.

(e)  WAIVER OF CONSUMER RIGHTS.  TO THE EXTENT NOW OR HEREAFTER APPLICABLE, BORROWER HEREBY WAIVES BORROWER'S RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF BORROWER'S OWN SELECTION, BORROWER VOLUNTARILY CONSENTS TO THIS WAIVER.

(f)  SECTION 26.02 NOTICE.  IN ACCORDANCE WITH SECTION 26.02 OF THE TEXAS BUSINESS AND COMMERCE CODE, THIS SECURITY INSTRUMENT AND THE OTHER DOCUMENTS EVIDENCING, SECURING OR PERTAINING TO ALL OR ANY PORTION OF THE DEBT REPRESENT THE FINAL AGREEMENT BETWEEN BORROWER AND LENDER AS TO THE SUBJECT MATTER THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF SUCH PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN SUCH PARTIES.

(g)  TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE:  (A) BORROWER IS REQUIRED TO: (I) KEEP THE PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT LENDER SPECIFIES; (II) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER; AND (III) NAME LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS; (B) BORROWER MUST, IF REQUIRED BY LENDER, DELIVER TO LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) IF BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN PARAGRAPH (A) OR (B), LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWER AT BORROWER'S EXPENSE.

(h)  COMPLIANCE WITH INSURANCE CODE. Notwithstanding any terms or provisions of this security instrument or any Loan Document to the contrary, it is

300569679v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

expressly stipulated and agreed to be the intent of Borrower and Lender to at all times comply with the requirements of Texas Insurance Code Chapter 549 and other applicable laws now or hereafter governing the applicable requirements relating to applicable notices with respect to the insurance maintained by Borrower.

(i)    DECEPTIVE TRADE PRACTICES. Without limiting any other term or provision of this Security Instrument, Borrower acknowledges that the Deceptive Trade Practices-Consumer Protection Act, § 17.41 et seq. Texas Business & Commerce Code gives consumers special rights and protections, and after consultation with an attorney of Borrower's own selection, Borrower voluntarily consents to the waiver of all rights arising under such act, and in furtherance of the foregoing, BORROWER REPRESENTS THAT (i) IT HAS KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT ENABLE IT TO EVALUATE THE MERITS AND RISKS OF THE TRANSACTION THAT IS THE SUBJECT OF THIS DEED OF TRUST, (ii) IT IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION IN RELATION TO LENDER, (iii) THE FOREGOING WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY BORROWER, AND BORROWER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL LICENSED IN TEXAS AND SELECTED OF ITS OWN FREE WILL IN CONNECTION WITH THE NEGOTIATIONS AND EXECUTION OF THIS DEED OF TRUST AND THIS WAIVER AND HAS HAD THE OPPORTUNITY TO DISCUSS THE FOREGOING WAIVER AND ITS MEANING WITH SUCH COUNSEL, (iv) BORROWER UNDERSTANDS THE LEGAL CONSEQUENCES OF SIGNING THIS WAIVER, AND (v) THE PROVISIONS OF THIS WAIVER SHALL SURVIVE THE TERMINATION OF THIS DEED OF TRUST AND THE CLOSING.

(j)    EXPRESS NEGLIGENCE RULE. BORROWER ACKNOWLEDGES THAT THIS SECURITY INSTRUMENT PROVIDES FOR INDEMNIFICATION OF LENDER AND TRUSTEE BY BORROWER, AND IT IS THE EXPRESS INTENTION OF BORROWER, AND BORROWER HEREBY ACKNOWLEDGES AND AGREES, WITHOUT EXPANDING IN ANY WAY THE SCOPE OF THE INDEMNITY PROVIDED FOR IN THE APPLICABLE LOAN DOCUMENTS (OR OTHERWISE INCREASING THE INDEMNITY OBLIGATIONS OF BORROWER WITH RESPECT THERETO) EXCEPT AS EXPRESSLY SET FORTH THEREIN, THAT IN CERTAIN CIRCUMSTANCES (AS PROVIDED FOR IN SUCH LOAN DOCUMENTS), SUCH INDEMNITY OBLIGATIONS MAY INCLUDE CLAIMS OR LOSSES ARISING AS A RESULT OF SUCH INDEMNIFIED PERSON'S OWN NEGLIGENCE OR OTHER FAULT, EXCEPT TO THE EXTENT ANY CLAIMS, DEMANDS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF ACTION, JUDGMENTS, PENALTIES, COSTS AND EXPENSES (INCLUDING WITHOUT LIMITATION REASONABLE ATTORNEYS' FEES) OTHERWISE THE SUBJECT OF INDEMNIFICATION ARE FOUND BY A COURT OF COMPETENT JURISDICTION, IN A FINAL DETERMINATION, TO HAVE BEEN CAUSED BY, ARISE OUT OF, OR OTHERWISE BE ATTRIBUTABLE TO, DIRECTLY OR INDIRECTLY, THE GROSS

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

NEGLIGENCE, WILLFUL MISCONDUCT, OR CRIMINAL ACTS OF SUCH INDEMNIFIED PERSON.

**Section 17.6**    TEXAS ASSIGNMENT OF RENTS ACT.  This Security Instrument is intended to create an "Assignment of rents" within the meaning of Chapter 64 of the Texas Property Code as well as a present and absolute assignment of the Leases, and in both cases, Lender's rights to same are not contingent or conditioned upon, and may be exercised without, possession of the Property.

### Article 18 - CROSS-DEFAULT; CROSS-COLLATERALIZATION

**Section 18.1**    Borrower acknowledges that Lender has made the Loan to Borrower upon the security of its interest in the Property described in this Security Instrument and the [Other Properties] and in reliance upon the aggregate of the Property and the [Other Properties] taken together being of greater value as collateral security than the sum of each such property taken separately.    Borrower agrees that each of the Loan Documents are and will be cross-collateralized and cross-defaulted with each other so that: (i) an Event of Default under any of the Loan Documents shall constitute an Event of Default under each of the other Loan Documents; (ii) an Event of Default hereunder shall constitute an Event of Default under the [Other Security Instrument]; and (iii) this Security Instrument and the [Other Security Instrument] shall constitute security for the Note as if a single blanket lien were placed on the Property and the [Other Properties] as security for the Note.

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, this Security Instrument has been executed by the undersigned as of the day and year first above written.

**BORROWER**

[Signature pages sent separately]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## EXHIBIT A

## LEGAL DESCRIPTION

ALL THE CERTAIN REAL PROPERTY LOCATED IN [_____] COUNTY, STATE OF TEXAS, DESCRIBED AS FOLLOWS:

[  ]

# EXHIBIT A-4

**Assignment of Leases and Rents**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

================================================================

[_____], as assignor

(Borrower)

to

[**BSPRT CRE FINANCE, LLC**], as assignee

(Lender)

**ASSIGNMENT OF
LEASES AND RENTS**

| | | |
|---|---|---|
| Dated: | As of [_____], 2024 |
| Location: | [_____] |
| | [_____] |
| County: | [_____] |

PREPARED BY AND UPON
RECORDATION RETURN TO:

Holland & Knight LLP
10 St. James Avenue, 11th Floor
Boston, Massachusetts  02116
Attention:  Sean O'Brien, Esq.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

===================================================================

300569673v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ASSIGNMENT OF LEASES AND RENTS

**THIS ASSIGNMENT OF LEASES AND RENTS** (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Assignment**") is made as of this [_____] day of [_____], 2024, by [_____], a [_____], having an address at [_____], as assignor (together with its successors and permitted assigns, "**Borrower**"), for the benefit of [**BSPRT CRE FINANCE, LLC**], a Delaware limited liability company, having an address at 1345 Avenue of the Americas, Suite 32A, New York, New York 10105, as assignee (together with its successors and assigns, "**Lender**").

**W I T N E S S E T H:**

A.     This Assignment is given to secure a loan (the "**Loan**") made by Lender to Borrower pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by that certain Promissory Note dated the date hereof, made by Borrower to Lender (together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter referred to as the "**Note**").

B.     The Note is secured by, *inter alia*, that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Security Instrument**"), made by Borrower for the benefit of Lender.

C.     Borrower desires to further secure the payment of the Debt and performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents.

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Assignment:

## ARTICLE 1
## ASSIGNMENT

Section 1.1     <u>Property Assigned</u>.     Borrower hereby absolutely and unconditionally assigns and grants to Lender the following property, rights, interests and estates, now owned, or hereafter acquired by Borrower, subject in all events to the terms and requirements of Chapter 64 (Assignment of Rents to Lienholder) of the Texas Property Code (as the same may be amended or replaced from time to time, the "**Property Code**"):

(a)     <u>Leases</u>.     All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use, enjoy or occupy all or any portion of any space in that certain lot or piece of land, more particularly described in <u>Exhibit A</u> annexed hereto and made a part hereof, or all or any

2

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

part of the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (collectively, the "**Property**"), and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto (collectively, the "**Leases**"), and all right, title and interest of Borrower, its successors and assigns, therein and thereunder.  The term "Leases" shall include all agreements, whether or not in writing, affecting the use, enjoyment or occupancy of the Property or any portion thereof now or hereafter made, whether made before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code, together with any extension, renewal or replacement of the same; this Assignment of existing and future Leases and other agreements being effective without any further or supplemental assignment.

(b)     Rents.  All rents, additional rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in the event a Bankruptcy Event occurs) or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits (including, without limitation, cash, letters of credit or securities deposited under Leases to secure the performance by the lessees of their obligations thereunder)), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Manager or any of their respective agents or employees from any and all sources arising from or attributable to the Property, including, without limitation, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower, Manager or any of their respective agents or employees and proceeds, if any, from business interruption or other loss of income insurance, whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code in each case (collectively, the "**Rents**")

(c)     Bankruptcy Claims.  All of Borrower's claims and rights (the "**Bankruptcy Claims**") to the payment of damages arising from any rejection by a lessee of any Lease under the Bankruptcy Code.

(d)     Lease Guaranties.  All of Borrower's right, title and interest in, and claims under, any and all lease guaranties, letters of credit and any other credit support (individually, a "**Lease Guaranty**", and collectively, the "**Lease Guaranties**") given by any guarantor in connection with any of the Leases or leasing commissions (individually, a "**Lease Guarantor**", and collectively, the "**Lease Guarantors**") to Borrower.

(e)     Proceeds.  All proceeds from the sale or other disposition of the Leases, the Rents, the Lease Guaranties and/or the Bankruptcy Claims.

(f)     Other.  All rights, powers, privileges, options and other benefits of Borrower as lessor under any of the Leases and beneficiary under any of the Lease Guaranties, including, without limitation, the immediate and continuing right to make claim for, receive, collect and receipt for all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt), and to do all other things which Borrower or any lessor is or may become entitled to do under any of the Leases or Lease Guaranties.

(g)     Entry.  The right, at Lender's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court appointed receiver, to collect the Rents.

(h)     Power Of Attorney.  Borrower's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in Section 3.1 of this Assignment and any or all other actions designated by Lender for the proper management and preservation of the Property.

(i)     Other Rights And Agreements.  Any and all other rights of Borrower in and to the items set forth in subsections (a) through (h) above, and all amendments, modifications, replacements, renewals and substitutions thereof.

## ARTICLE 2
## TERMS OF ASSIGNMENT

Section 2.1     Present Assignment and License Back.  It is intended by Borrower that this Assignment constitute a present, absolute assignment of the Leases, Rents, Lease Guaranties and Bankruptcy Claims, and not an assignment for additional security only.  Nevertheless, subject to the terms of this Section 2.1, the Loan Agreement, the Security Instrument and the Clearing Account Agreement, Lender grants to Borrower a revocable license to collect, receive, use and enjoy the Rents, as well as all other sums due under the Lease Guaranties.  Borrower shall hold the Rents, as well as all sums received pursuant to any Lease Guaranty, or a portion thereof sufficient to discharge all current sums due on the Debt, in trust for the benefit of Lender for use in the payment of such sums.

Section 2.2     Notice to Lessees.  Borrower hereby authorizes and directs the lessees named in the Leases or any other future lessees or occupants of the Property and all Lease Guarantors to pay over to Lender, or to such other party as Lender directs, all Rents and all sums due under any Lease Guaranties, upon receipt from Lender of written notice to the effect that Lender is then the holder of this Assignment and that an Event of Default exists, and to continue so to do until otherwise notified by Lender.

Section 2.3     Incorporation by Reference.  All representations, warranties, covenants, conditions and agreements contained in the Loan Agreement and the other Loan Documents, as

4

the same may be modified, renewed, substituted or extended from time to time, are hereby made a part of this Assignment to the same extent and with the same force as if fully set forth herein.

## ARTICLE 3
## REMEDIES

Section 3.1    Remedies of Lender – Collection of Rents.    Upon the occurrence of an Event of Default, the license granted to Borrower in Section 2.1 of this Assignment shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents and all sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property.  Such right of Lender to collect and possess all Rents may be accomplished by either:

(a)    Upon the occurrence of an Event of Default, Lender shall be entitled to provide Borrower with written notice demanding that Borrower pay to Lender all Rents that accrued before but remain unpaid as of the date of such notice, as well as all Rents that accrue on or after such date.  All such Rents shall be turned over to Lender within five (5) days after Borrower's receipt thereof; or

(b)    Upon the occurrence of an Event of Default, Lender shall be entitled to provide written notice to all lessees or occupants of the Property demanding that all unpaid accrued Rents and all unaccrued Rents as they accrue be paid directly to Lender. Such notice to the lessees or other occupants of the Property shall substantially comply with Section 64.056 of the Texas Property Code or any superseding statutory provision, and a copy of such notice shall be provided to Borrower.

Section 3.2    Remedies of Lender – Possession and Operation of Property.    In addition, Lender may, at its option, without waiving such Event of Default, without regard to the adequacy of the security for the Obligations, either in person or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a receiver appointed by a court, dispossess Borrower and its agents and servants from the Property, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto and have, hold, manage, lease and operate the Property on such terms and for such period of time as Lender may deem proper and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and all sums due under all Lease Guaranties, including, without limitation, those past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as Lender may deem proper, and may apply the Rents and sums received pursuant to any Lease Guaranties to the payment of the following in such order and proportion as Lender in its sole discretion may determine, any law, custom or use to the contrary notwithstanding: (a) all expenses of managing and securing the Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees or agents as Lender may deem necessary or desirable and all expenses of operating and maintaining the Property, including, without being limited thereto, all taxes, charges, claims, assessments, water charges, sewer rents and any other liens, and premiums for all insurance which Lender may deem necessary or desirable, and the

cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the Property; and (b) the Obligations, together with all costs and reasonable attorneys' fees.  In addition, upon the occurrence of an Event of Default, Lender, at its option, may (1) at Borrower's expense complete any construction on the Property in such manner and form as Lender deems advisable, (2) exercise all rights and powers of Borrower, including, without limitation, the right to negotiate, execute, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums due under any Lease Guaranties, (3) either require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in the possession of Borrower, or (4) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise.

Section 3.3    Other Remedies.  Nothing contained in this Assignment and no act done or omitted by Lender pursuant to the power and rights granted to Lender hereunder shall be deemed to be a waiver by Lender of its rights and remedies under the Loan Agreement, the Note, or the other Loan Documents and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Lender under the terms thereof.  The right of Lender to collect the Debt and to enforce any other security therefor held by it may be exercised by Lender either prior to, simultaneously with, or subsequent to any action taken by it hereunder.  Borrower hereby absolutely, unconditionally and irrevocably waives any and all rights to assert any setoff, counterclaim or crossclaim of any nature whatsoever with respect to the Obligations of Borrower under this Assignment, the Loan Agreement, the Note, the other Loan Documents or otherwise with respect to the Loan in any action or proceeding brought by Lender to collect same, or any portion thereof, or to enforce and realize upon the lien and security interest created by this Assignment, the Loan Agreement, the Note, the Security Instrument, or any of the other Loan Documents (provided, however, that the foregoing shall not be deemed a waiver of Borrower's right to assert any compulsory counterclaim if such counterclaim is compelled under local law or rule of procedure).

Section 3.4    Other Security.  Lender may take or release other security for the payment of the Debt, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the payment of the Debt without prejudice to any of its rights under this Assignment.

Section 3.5    Non-Waiver.    The exercise by Lender of the option granted it in Section 3.1 of this Assignment and the collection of the Rents and sums due under the Lease Guaranties and the application thereof as herein provided shall not be considered a waiver of any Default or Event of Default by Borrower under the Note, the Loan Agreement, the Security Instrument, the Leases, this Assignment or the other Loan Documents.  The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (a) the failure of Lender to comply with any request of Borrower or any other party to take any action to enforce any of the provisions hereof or of the Loan Agreement, the Note or the other Loan Documents, (b) the release regardless of consideration, of the whole or any part of the Property, or (c) any agreement or stipulation by Lender extending the time of payment or

otherwise modifying or supplementing the terms of this Assignment, the Loan Agreement, the Security Instrument, the Note or the other Loan Documents. Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its sole discretion, may elect. Lender may take any action to recover the Debt, or any portion thereof, without prejudice to the right of Lender thereafter to enforce its rights under this Assignment. The rights of Lender under this Assignment shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

Section 3.6    <u>Bankruptcy</u>. (a) Upon or at any time after the occurrence of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b)    If there shall be filed by or against Borrower a petition under the Bankruptcy Code, and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject such Lease. Lender shall have the right, but not the obligation, to serve upon Borrower within such ten (10) day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after Lender's notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

**ARTICLE 4**
**<u>NO LIABILITY, FURTHER ASSURANCES</u>**

Section 4.1    <u>No Liability of Lender</u>. This Assignment shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any Lease or Lease Guaranty or otherwise impose any obligation upon Lender. Lender shall not be liable for any loss sustained by Borrower resulting from Lender's failure to let the Property after an Event of Default or from any other act or omission of Lender in managing the Property after an Event of Default unless such loss is caused by the willful misconduct or bad faith of Lender. Lender shall not be obligated to perform or discharge any obligation, duty or liability under the Leases or any Lease Guaranties or under or by reason of this Assignment and Borrower shall indemnify the Indemnified Parties for, and hold the Indemnified Parties harmless from, any and all liability, loss or damage which may or might be incurred under the Leases, any Lease Guaranties or under or by reason of this Assignment and from any and all claims and demands whatsoever, including the defense of any such claims or demands which may be asserted against

7

any the Indemnified Parties by reason of any alleged obligations and undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases or any Lease Guaranties.  Should the Indemnified Parties incur any such liability, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured by this Assignment and by the Security Instrument and the other Loan Documents and Borrower shall reimburse such Indemnified Parties therefor immediately upon demand and upon the failure of Borrower so to do Lender may, at its option, declare all sums secured by this Assignment and by the Security Instrument and the other Loan Documents immediately due and payable.  This Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor for the carrying out of any of the terms and conditions of the Leases or any Lease Guaranties; nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other parties, or for any dangerous or defective condition of the Property including, without limitation, the presence of any Hazardous Substances (as defined in the Environmental Indemnity), or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.  The provisions of this Section 4.1 shall survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument.

Section 4.2    No Mortgagee In Possession.  Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession" in the absence of the taking of actual possession of the Property by Lender.  In the exercise of the powers herein granted Lender, no liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Borrower.

Section 4.3    Further Assurances.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, conveyances, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require for the better assuring, conveying, assigning, transferring and confirming unto Lender the property and rights hereby assigned or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Assignment or for filing, registering or recording this Assignment and, on demand, will execute and deliver and hereby authorizes Lender to execute in the name of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or comparable security instruments, to evidence more effectively the lien and security interest hereof in and upon the Leases.

## ARTICLE 5
## MISCELLANEOUS PROVISIONS

Section 5.1    Conflict of Terms.  In case of any conflict between the terms of this Assignment and the terms of the Loan Agreement, the terms of the Loan Agreement shall prevail.

Section 5.2    No Oral Change.  This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom the enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 5.3    General Definitions.  All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in singular or plural form and the word "**Borrower**" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or interest therein," the word "**Lender**" shall mean "Lender and any subsequent holder of the Note, the word "**Note**" shall mean "the Note and any other evidence of indebtedness secured by the Loan Agreement," the word "Property" shall include any portion of the Property and any interest therein, the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder; whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 5.4    Inapplicable Provisions.  If any provision of this Assignment is held to be illegal, invalid, or unenforceable under present or future laws effective during the terms of this Assignment, such provision shall be fully severable and this Assignment shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Assignment, and the remaining provisions of this Assignment shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Assignment, unless such continued effectiveness of this Assignment, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

Section 5.5    Governing Law.  The governing law and related provisions contained in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein.

Section 5.6    Termination of Assignment.  Upon payment in full of the Obligations, this Assignment shall become and be void and of no effect.

Section 5.7    Notices.  All notices or other written communications hereunder shall be delivered in accordance with Section 15.5 of the Loan Agreement.

Section 5.8    Waiver of Trial by Jury.  **BORROWER HEREBY, AND LENDER BY ACCEPTANCE HEREOF, EACH AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS ASSIGNMENT OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER**

**ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF BORROWER AND LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.**

Section 5.9    <u>Exculpation</u>.  The provisions of Article 12 of the Loan Agreement are hereby incorporated by reference into this Assignment to the same extent and with the same force as if fully set forth herein.

Section 5.10    <u>Successors and Assigns</u>.  This Assignment shall be binding upon and shall inure to the benefit of Borrower and Lender and their respective successors and permitted assigns forever.  Lender shall have the right to sell, assign, pledge, participate, transfer or delegate, as applicable, to one or more Persons, all or any portion of its rights and obligations under this Assignment and the other Loan Documents in connection with any assignment of the Loan and the Loan Documents to any Person.  Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Assignment.  Borrower shall not have the right to assign, delegate or transfer its rights or obligations under this Assignment without the prior written consent of Lender, as provided in the Loan Agreement, and any attempted assignment, delegation or transfer without such consent shall be null and void.

Section 5.11    <u>Headings, Etc</u>.  The headings and captions of the various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 5.12    <u>Joint and Several</u>.  If more than one Person has executed this Assignment as "Borrower," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

Section 5.13    <u>State Specific Provisions</u>. Where any provision of this Assignment is inconsistent with any provision of Texas law and such provision is governed by Texas law (the parties acknowledging the governing law provisions contained herein and in the Loan Agreement), the provisions of Texas law shall take precedence over such provisions of this Assignment, but shall not invalidate or render unenforceable any other provision of this Agreement that can be construed in a manner consistent with Texas law.

(a)    <u>Principles of Construction</u>. In the event any inconsistencies between the terms and provisions of this Section 5.13 and the other terms and provisions of this Assignment, the terms and provisions of this Section 5.13 shall control and be binding.

(b)    <u>Texas Assignment of Rents Act</u>.    Notwithstanding anything contained herein to the contrary, to the extent the terms of this Agreement conflict with Chapter 64 of the Property Code, the terms and provisions of Chapter 64 of the Property Code shall govern.

10

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(c)    NOTICE OF FINAL AGREEMENT. IN ACCORDANCE WITH SECTION 26.02 OF THE TEXAS BUSINESS AND COMMERCE CODE, THIS ASSIGNMENT, THE LOAN AGREEMENT, AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES

Section 5.14    Cross-Default; Cross-Collateralization.    Borrower acknowledges that Lender has made the Loan to Borrower upon the security of its interest in the Property described in this Assignment, including, without limitation, in the Leases, the Rents, the Bankruptcy Claims, the Lease Guaranties and the [Other Properties], which also includes interests in leases, rents, bankruptcy claims and lease guaranties and in reliance upon the aggregate of the Property and the [Other Properties] taken together being of greater value as collateral security than the sum of each such property taken separately.  Borrower agrees that each of the Loan Documents are and will be cross-collateralized and cross-defaulted with each other so that: (i) an Event of Default under any of the Loan Documents shall constitute an Event of Default under each of the other Loan Documents; (ii) an Event of Default hereunder shall constitute an Event of Default under the [Other Assignment of Leases]; and (iii) this Assignment, and the [Other Assignments of Leases] shall constitute security for the Note as if a single blanket lien were placed on the Property and the [Other Properties] as security for the Note.

**[NO FURTHER TEXT ON THIS PAGE]**

11

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, this Assignment has been executed by Borrower as of the day and year first above written.

BORROWER:

[Signature pages sent separately]

12

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

<u>**EXHIBIT A**</u>

<u>**LEGAL DESCRIPTION**</u>

(Attached hereto)

A-1

# EXHIBIT A-5

**Environmental Indemnity Agreement**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ENVIRONMENTAL INDEMNITY AGREEMENT

**THIS ENVIRONMENTAL INDEMNITY AGREEMENT** (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**") made as of the **[__]** day of **[_____]**, 2024 by **[_____]**, a **[_____]**, having an address at **[_____]** (together with its successors and permitted assigns, "**Borrower**"), and **SILVER STAR PROPERTIES REIT, INC.**, a Maryland corporation, having an address at **[_____]** (together with its successors and permitted assigns, "**Principal**", and together with Borrower and each of their respective successors and permitted assigns, collectively, "**Indemnitor**"), in favor of **[BSPRT CRE FINANCE, LLC]**, a Delaware limited liability company, having an address at 1345 Avenue of the Americas, Suite 32A, New York, New York 10105 (together with its successors and assigns, "**Indemnitee**"), and other Indemnified Parties (as defined below).

## RECITALS:

A.    Indemnitee is prepared to make a loan (the "**Loan**") to Borrower pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Indemnitee (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement.

B.    Principal acknowledges that it has a direct or indirect ownership interest in Borrower and will receive substantial economic and other benefits from Indemnitee's making the Loan to Borrower.

C.    Indemnitee is unwilling to make the Loan unless Indemnitor agrees to provide the indemnification, representations, warranties, covenants and other matters described in this Agreement for the benefit of the Indemnified Parties.

D.    Indemnitor is entering into this Agreement to induce Indemnitee to make the Loan.

## AGREEMENT

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Indemnitor hereby represents, warrants, covenants and agrees for the benefit of the Indemnified Parties as follows:

1.    <u>Environmental Representations and Warranties</u>.  Except for those matters disclosed in the environmental report(s) prepared and delivered to Indemnitee in connection with the closing of the Loan, or as otherwise disclosed in writing to Lender on or prior to the closing of the Loan (whether one or more, individually and collectively, as the context requires, the "**Environmental Report**"):

1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(a)    to Borrower's actual knowledge, there are no Hazardous Substances (as defined below) in, at, on, above or under the Property that violate applicable Environmental Law, except those that are stored and used in compliance with all Environmental Law (as defined below);

(b)    there are no past, present or threatened Releases (as defined below) of Hazardous Substances in, at, on, above, under or from the Property that violate applicable Environmental Law and which have not been fully remediated in accordance with Environmental Law;

(c)    to Borrower's actual knowledge, there is no imminent threat of any Release of Hazardous Substances migrating to the Property;

(d)    there are no nor have there been underground storage tanks or landfills in, on or under the Property;

(e)    the Property is not now nor has it ever been licensed under Environmental Law as a treatment, storage, disposal or transfer of hazardous waste facility;

(f)    there is no past nor present non-compliance with Environmental Law, or with permits issued pursuant thereto, in connection with the Property which has not been fully remediated in accordance with Environmental Law;

(g)    Indemnitor does not know of, and has not received, any written or oral notice, claim or other communication from any Person (including, but not limited to, a Governmental Authority) relating to (i) Hazardous Substances or Remediation (as defined below) thereof, (ii) possible liability of any Person pursuant to any Environmental Law relating to the Property, (iii) environmental conditions or non-compliance with Environmental Law in connection with the Property, or (iv) any actual or threatened administrative or judicial proceedings in connection with any of the foregoing;

(h)    Intentionally deleted;

(i)    except as otherwise disclosed in writing to Indemnitee, there are no prior or current complaints by tenants or occupants at the Property regarding water infiltration or water damage or leaks or odors related thereto that have not otherwise been remedied;

(j)    to Indemnitor's actual knowledge, no Microbial Matter (as defined below) is present in the indoor air of the Property at concentrations exceeding ambient air levels and the Property currently displays no evidence of the growth of Microbial Matter to any degree for which any Governmental Authority would recommend or require removal thereof by remediation professionals,;

(k)    there are no Environmental Liens existing or threatened with respect to the Property; and

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(l)      Indemnitor has truthfully and fully provided to Indemnitee, in writing, any and all information relating to conditions in, at, on, above, under or from the Property that is known to Indemnitor and that is contained in files and records of Indemnitor or a Person under the control of Indemnitor, including, but not limited to, any reports relating to Hazardous Substances in, at, on, above, under or from the Property and/or to the environmental condition of the Property.

2.      <u>Environmental Covenants</u>.  Indemnitor covenants and agrees that:

(a)      all uses and operations on or of the Property, whether by Indemnitor or any other Person, shall be in compliance with all Environmental Law and permits issued pursuant thereto;

(b)      that Indemnitor shall not cause or intentionally permit (i) any Releases or threatened Releases of Hazardous Substances in, at, on, above, under or from the Property, (ii) treatment, storage, disposal or transfer of hazardous waste operations at, on or under the Property, or (iii) underground storage tanks at, on or under the Property;

(c)      there shall be no Hazardous Substances in, at, on, above or under the Property, except those that are (i) in compliance with all Environmental Law and (ii) fully disclosed to Indemnitee in writing upon Indemnitor's receipt of knowledge of the same;

(d)      Indemnitor shall keep the Property free and clear of all Environmental Liens;

(e)      subject to the rights of Tenants under Leases, Indemnitor shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to <u>Paragraph 3</u> of this Agreement, including, but not limited to, providing all relevant information and making knowledgeable Persons available for interviews;

(f)      subject to the rights of Tenants under Leases, and upon Indemnitee's receipt of factual evidence that would reasonably indicate that there are Hazardous Substances on the Property that would violate applicable Environmental Law, Indemnitor shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with an Individual Property, by an independent environmental consultant approved by Indemnitee, pursuant to any reasonable written request of Indemnitee (including, but not limited to, sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), and share with Indemnitee the reports and other results thereof, and Indemnitee and the other Indemnified Parties shall be entitled to rely on such reports and other results thereof;

(g)      Indemnitor shall, at its sole cost and expense, comply with all reasonable written requests of Indemnitee to (i) effectuate Remediation or obtain a no further action letter for any condition (including, but not limited to, a Release or threatened Release of

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

any Hazardous Substances) in, at, on, above, under or from the Property in full compliance of Environmental Law or reasonably required by Indemnitee based upon recommendations and observations of an independent environmental consultant approved by Indemnitee; (ii) comply with any Environmental Law and with permits issued pursuant thereto; (iii) comply with any directive from any Governmental Authority; and (iv) take any other reasonable action necessary or appropriate for protection of human health and safety or the environment;

(h)     Indemnitor shall not do or knowingly allow any tenant or occupant or other user of the Property to do any act or omit to take any action that (i) causes or materially increases the dangers to human health and safety or the environment, (ii) poses an unreasonable risk of harm to any Person (whether on or off the Property), (iii) impairs or may impair the value of the Property (including any Individual Property), (iv) is contrary to any requirement of any insurer, (v) constitutes a public or private nuisance, (vi) constitutes physical waste, or (vii) violates any covenant, condition, agreement or easement applicable to the Property;

(i)     Indemnitor shall use commercially reasonable efforts to enforce the applicable provisions of the Leases in order to prevent tenants or occupants or other users of the Property from taking any action that violates any applicable Environmental Law, impairs or may impair the value of the Property (including any Individual Property), constitutes a public or private nuisance, constitutes waste or violates any covenant, condition, agreement or easement applicable to the Property;

(j)     Indemnitor shall immediately notify Indemnitee in writing of (i) any presence or Release or threatened Release of Hazardous Substances in, at, on, above, under, from or migrating towards the Property, which is either (A) in violation of or in excess of a reportable quantity under any Environmental Law or permit issued pursuant thereto, (B) in amounts that are not ordinarily and customarily used or stored in properties similar to the Property for the purposes of cleaning or other maintenance or operations, or (C) had not been previously fully disclosed to Indemnitee in writing; (ii) any non-compliance with any Environmental Law related in any way to the Property, including any operations thereon; (iii) any actual or potential imposition of an Environmental Lien; (iv) any required or proposed Remediation of environmental conditions relating to the Property; and/or (v) any written or oral notice, claim or other communication of which any Indemnitor becomes aware from any source whatsoever (including, but not limited to, a Governmental Authority) relating in any way to Hazardous Substances or Remediation thereof, possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Agreement;

(k)     Indemnitor shall comply with any and all local, state or federal laws, legislation, regulations, guidelines or statutes in effect with respect to Microbial Matter; and

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(l)      Indemnitor shall, within five (5) Business Days of receipt thereof, give written notice to Indemnitee of (i) any notice, advice or other communication from any Governmental Authority or any source whatsoever with respect to Hazardous Substances on, from or affecting the Property, and (ii) any legal action brought against Indemnitor or related to the Property, with respect to which Indemnitor may have liability under this Agreement.

3.      <u>Indemnified Rights/Cooperation and Access</u>.  In the event the Indemnified Parties have reason to believe that an environmental hazard or non-compliance with Environmental Law or permit issued pursuant thereto exists in, at, on, above, under or from or to the Property upon reasonable notice from Indemnitee, Indemnitor shall, at Indemnitor's sole cost and expense, promptly cause an independent engineer or consultant reasonably satisfactory to the Indemnified Parties to conduct any environmental assessment or audit (the scope of which shall be determined in the sole and absolute discretion of the Indemnified Parties) and take any samples of soil, groundwater or other water, air, or building materials or any other invasive testing requested by Indemnitee and promptly deliver to Indemnitee the results of any such assessment, audit, sampling or other testing; <u>provided</u>, <u>however</u>, if such results are not delivered to Indemnitee within a reasonable period or if the Indemnified Parties have reason to believe that any such environmental hazard or non-compliance exists on the Property that, in the reasonable judgment of the Indemnified Parties, endangers any tenant or occupant or other user of the Property or their guests or the general public or any other Person or may materially and adversely affect the value of the Property, upon reasonable notice to Indemnitor, the Indemnified Parties and any other Person designated by the Indemnified Parties, including, but not limited to, any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times (subject to the rights of Tenants under Leases) to assess any and all aspects of the environmental condition of the Property and its use, including, but not limited to, conducting any environmental assessment or audit (the scope of which shall be determined in the sole and absolute discretion of the Indemnified Parties) and taking samples of soil, groundwater or other water, air, or building materials, and reasonably conducting other invasive testing.  Indemnitor shall cooperate with and provide the Indemnified Parties and any such Person designated by the Indemnified Parties with access to the Property, subject to the rights of Tenants under Leases.

4.      <u>Indemnification</u>.  Indemnitor covenants and agrees, at its sole cost and expense, to protect, defend, indemnify, release and hold Indemnified Parties harmless from and against any and all Losses (as defined below) imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any presence of any Hazardous Substances in, at, on, above, under, from or migrating to the Property; (b) any past, present or threatened Release of Hazardous Substances in, at, on, above, under, from or migrating to the Property; (c) any activity by Indemnitor, any Person affiliated with Indemnitor and/or any tenant or occupant or other user of the Property in connection with any actual, proposed or threatened use, treatment, storage, holding, existence, disposition or other Release, generation, production, manufacturing, processing, refining, control, management, abatement, removal, handling, transfer or transportation to or from the Property of any Hazardous Substances at any time located in, at,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

under, on, above, from or migrating to the Property; (d) any activity by Indemnitor, any Person affiliated with Indemnitor and/or any tenant or occupant or other user of the Property in connection with any actual or proposed Remediation of any Hazardous Substances at any time located in, at, under, on, above, from or migrating to the Property, whether or not such Remediation is voluntary or pursuant to court or administrative order, including, but not limited to, any removal, remedial or corrective action; (e) any past, present or threatened non-compliance or violations of any Environmental Law (or permits issued pursuant to any Environmental Law) in connection with the Property or operations thereon, including, but not limited to, any failure by Indemnitor, any Person affiliated with Indemnitor and/or any tenant or occupant or other user of the Property to comply with any order of any Governmental Authority in connection with any Environmental Law; (f) the imposition, recording or filing or the threatened imposition, recording or filing of any Environmental Lien encumbering the Property; (g) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in this Agreement; (h) any past, present or threatened injury to, destruction or loss of natural resources in any way connected with the Property, including, but not limited to, costs to investigate and assess such injury, destruction or loss; (i) any acts of Indemnitor, any Person affiliated with Indemnitor and/or any tenant or occupant or other user of the Property in arranging for disposal or treatment, or arranging with a transporter for transport for disposal or treatment, of Hazardous Substances at any facility or incineration vessel containing such or similar Hazardous Substances; (j) any acts of Indemnitor, any Person affiliated with any Indemnitor and/or any tenant or occupant or other user of the Property in accepting any Hazardous Substances for transport to disposal or treatment facilities, incineration vessels or sites from which there is a Release, or a threatened Release of any Hazardous Substance which causes the incurrence of costs for Remediation; (k) any liability, Losses or claims arising under any statutory or common law or tort law theory, including, but not limited to, damages assessed for private or public nuisance or for the conducting of an abnormally dangerous activity on or near the Property, to the extent the same relates to Remediation, Hazardous Substances or Environmental Law; and (l) any misrepresentation or inaccuracy in any representation or warranty relating to Remediation, Hazardous Substances or Environmental Law or breach or failure to perform any covenants or other obligations pursuant to this Agreement, the Loan Agreement or the other Loan Documents, in each case to the extent the same relates to Remediation, Hazardous Substances or Environmental Law.

     5.    <u>Duty to Defend and Attorneys and Other Fees and Expenses</u>.  Upon written request by any Indemnified Party, Indemnitor shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals reasonably approved by the Indemnified Parties against any action, inquiry or other matter for which such Indemnified Party is indemnified pursuant to this Agreement. Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding, providing that no compromise or settlement shall be entered without Indemnitor's consent, which consent shall not be unreasonably withheld. Upon demand, Indemnitor shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

6.    <u>Definitions</u>.    As used in this Agreement, the following terms shall have the following meanings:

The term "**Environmental Law**" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances and/or relating to liability for or costs of other actual or threatened danger to human health or the environment. The term "**Environmental Law**" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including, but not limited to, Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; the Oil Pollution Act of 1990; and the Rivers and Harbors Appropriation Act.    The term "**Environmental Law**" also includes, but is not limited to, any present and future federal, state and local laws, statutes, ordinances, rules, regulations, permits or authorizations and the like, as well as common law: (a) conditioning transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property; (b) requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any Governmental Authority or other Person, whether or not in connection with transfer of title to or interest in property; (c) imposing conditions or requirements in connection with permits or other authorization for lawful activity; (d) relating to nuisance, trespass or other causes of action related to the Property involving environmental matters; or (e) relating to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Property and involving environmental matters.

The term "**Environmental Lien**" means any lien, restriction or other encumbrance imposed pursuant to any Environmental Law, regardless of whether due to any act or omission of Indemnitor or any other Person.

The term "**Hazardous Substances**" includes but is not limited to any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Law or that may have a negative impact on human health or the environment, including, but not limited to, Microbial Matter, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives, but excluding substances of kinds and in amounts ordinarily and customarily used or stored in

properties similar to the Property for the purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Law.

The term "**Indemnified Parties**" includes Indemnitee, any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved with the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, Investors or prospective Investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, but not limited to, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of, or following a foreclosure of, the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Indemnitee's assets and business).

The term "**Legal Action**" means any claim, suit or proceeding, whether administrative or judicial in nature.

The term "**Losses**" includes any losses, damages, natural resource damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including, but not limited, to strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, costs of Remediation (whether or not performed voluntarily), amounts paid in settlement, foreseeable and unforeseeable consequential damages, litigation costs, attorneys' fees, engineers' fees, environmental consultants' fees, and investigation costs (including, but not limited to, costs for sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), of whatever kind or nature, and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

The term "**Microbial Matter**" means fungi or bacterial matter which reproduces through the release of spores or splitting of cells or other means, including, but not limited to, mold, mildew, fungi, fungal spores, fragments and metabolites, such as mycotoxins and microbial organic compounds, and viruses, whether or not any of the same are living.

The term "**Release**" with respect to any Hazardous Substance includes, but is not limited to, any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing (including the abandonment or discarding of barrels, containers or other open or closed receptacles containing Hazardous Substances) into the environment or other movement of Hazardous Substances.

The term "**Remediation**" includes, but is not limited to, any response, remedial, removal, or corrective action; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to prevent, cure or mitigate any Release of any

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Hazardous Substance; any action to comply with any Environmental Law or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances or to anything referred to herein.

7.       <u>Unimpaired Liability</u>.  The liability of Indemnitor under this Agreement shall in no way be limited or impaired by, and Indemnitor hereby consents to and agrees to be bound by, any amendment or modification of the provisions of the Note, the Loan Agreement, the Security Instrument or any other Loan Document to or with Indemnitee by Borrower, Principal or any Person who succeeds Borrower, Principal or any Person as owner of the Property. In addition, the liability of Indemnitor under this Agreement shall in no way be limited or impaired by (i) any extensions of time for performance required by the Note, the Loan Agreement, the Security Instrument or any of the other Loan Documents, (ii) any sale or transfer of all or part of the Property, (iii) except as provided herein, any exculpatory provision in the Note, the Loan Agreement, the Security Instrument, or any of the other Loan Documents limiting Indemnitee's recourse to the Property or to any other security for the Note, or limiting Indemnitee's rights to a deficiency judgment against Indemnitor, (iv) the accuracy or inaccuracy of the representations and warranties made by Indemnitor herein and by Borrower and/or Principal under the Note, the Loan Agreement, the Security Instrument or any of the other Loan Documents or herein, (v) the release of Indemnitor or any other Person from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the other Loan Documents by operation of law, Indemnitee's voluntary act, or otherwise, (vi) the release or substitution in whole or in part of any security for the Note, or (vii) Indemnitee's failure to record the Security Instrument or file any UCC financing statements (or Indemnitee's improper recording or filing of any thereof) or to otherwise perfect, protect, secure or insure any security interest or lien given as security for the Note; and, in any such case, whether with or without notice to Indemnitor and with or without consideration.

8.       <u>Enforcement</u>.  Indemnified Parties may enforce the obligations of Indemnitor without first resorting to or exhausting any security or collateral or without first having recourse pursuant to the Note, the Loan Agreement, the Security Instrument, or any other Loan Documents or any of the Property, through foreclosure proceedings or otherwise, <u>provided</u>, <u>however</u>, that nothing herein shall inhibit or prevent Indemnitee from suing on the Note, foreclosing, or exercising any power of sale under, the Security Instrument, or exercising any other rights and remedies thereunder.  This Agreement is not collateral or security for the Obligations of Borrower pursuant to the Loan, unless Indemnitee expressly elects in writing to make this Agreement additional collateral or security for the Obligations of Borrower pursuant to the Loan, which Indemnitee is entitled to do in its sole and absolute discretion.  It is not necessary for an Event of Default to have occurred pursuant to and as defined in the Security Instrument or the Loan Agreement for Indemnified Parties to exercise their rights pursuant to this Agreement.  Notwithstanding any provision of the Loan Agreement (including, without limitation, Article 12 thereof), the obligations pursuant to this Agreement are exceptions to any non-recourse or exculpation provision of the Loan Agreement; Indemnitor expressly acknowledges and agrees that it is fully and personally liable for such obligations, and such

liability is not limited to the original or amortized principal balance of the Loan or the value of the Property (including any Individual Property).

9.  <u>Survival</u>.  The obligations and liabilities of Indemnitor under this Agreement shall fully survive indefinitely notwithstanding any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery of a deed in lieu of foreclosure of the Security Instrument.

10.  <u>Interest</u>.  Any amounts payable to any Indemnified Parties under this Agreement shall become immediately due and payable on demand and, if not paid within five (5) days of such demand therefor, shall bear interest at the Default Rate.

11.  <u>Waivers</u>.  Indemnitor hereby waives and relinquishes (i) any right or claim of right to cause a marshaling of Indemnitor's assets or to cause Indemnitee or other Indemnified Parties to proceed against any of the security for the Loan before proceeding under this Agreement against Indemnitor; (ii) all rights and remedies accorded by applicable law to indemnitors or guarantors, except any rights of subrogation which Indemnitor may have, provided that the indemnity provided for hereunder shall neither be contingent upon the existence of any such rights of subrogation nor subject to any claims or defenses whatsoever which may be asserted in connection with the enforcement or attempted enforcement of such subrogation rights, including, without limitation, any claim that such subrogation rights were abrogated by any acts of Indemnitee or other Indemnified Parties; (iii) the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against or by Indemnitee or other Indemnified Parties; (iv) notice of acceptance hereof and of any action taken or omitted in reliance hereon; (v) presentment for payment, demand of payment, protest or notice of nonpayment or failure to perform or observe, or other proof, or notice or demand; and (vi) all homestead exemption rights against the obligations hereunder and the benefits of any statutes of limitations or repose.  Notwithstanding anything to the contrary contained herein, Indemnitor hereby agrees to postpone the exercise of any rights of subrogation with respect to any collateral securing the Loan until the Loan shall have been paid in full.

12.  <u>Subrogation</u>.  Indemnitor hereby agrees to take any and all reasonable actions, including institution of legal action against third parties, necessary or appropriate to obtain reimbursement, payment or compensation from such Persons responsible for the presence of any Hazardous Substances in, at, under, on, above, from or migrating to the Property or otherwise obligated by law to bear the cost.  The Indemnified Parties shall be and hereby are subrogated to all of Indemnitor's rights now or hereafter in such claims.

13.  <u>Indemnitor's Representations and Warranties</u>.  Each Indemnitor represents and warrants that:

(a)  it has the full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; the execution, delivery and performance of this Agreement by Indemnitor has been duly and validly authorized; and all requisite action has been taken by Indemnitor to make this Agreement valid and binding upon Indemnitor, enforceable in accordance with its terms;

(b)      its execution of, and compliance with, this Agreement is in the ordinary course of business of Indemnitor and will not result in the breach of any term or provision of the charter, by-laws, partnership, operating or trust agreement, or other governing instrument of Indemnitor or result in the breach of any term or provision of, or conflict with or constitute a default under, or result in the acceleration of any obligation under, any agreement, indenture or loan or credit agreement or other instrument to which Indemnitor or the Property is subject, or result in the violation of any law, rule, regulation, order, judgment or decree to which Indemnitor or the Property is subject;

(c)      to the best of Indemnitor's knowledge, there is no action, suit, proceeding or investigation pending or threatened against it which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of Indemnitor, or in any material impairment of the right or ability of Indemnitor to carry on its business substantially as now conducted, or in any material liability on the part of Indemnitor, or which would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of Indemnitor contemplated herein, or which would be likely to impair materially the ability of Indemnitor to perform under the terms of this Agreement;

(d)      it does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(e)      to the best of Indemnitor's knowledge, no approval, authorization, order, license or consent of, or registration or filing with, any Governmental Authority or other Person, and no approval, authorization or consent of any other Person is required in connection with this Agreement; and

(f)      this Agreement constitutes a valid, legal and binding obligation of Indemnitor, enforceable against it in accordance with the terms hereof.

14.      <u>No Waiver</u>.  No delay by any Indemnified Party in exercising any right, power or privilege under this Agreement shall operate as a waiver of any such privilege, power or right.

15.      <u>Transfer of Loan</u>.  Article 9 of the Loan Agreement is hereby incorporated by reference as if fully set forth herein.  Indemnitor hereby agrees to cooperate in fulfilling any obligation of Borrower under Article 9 of the Loan Agreement.

16.      <u>Notices</u>.   All notices, demands, requests, consents, approvals or other communications permitted or required to be given under this Agreement shall be given in accordance with the applicable terms and conditions of the Loan Agreement (provided that the notice address for Principal shall be as set forth in the Guaranty).

17.      <u>Governing Law; Submission to Jurisdiction</u>.   The governing law and related provisions set forth in Section 15.4 of the Loan Agreement (including, without limitation, any authorized agent provisions thereof) are hereby incorporated by reference as if fully set forth herein (with Indemnitor substituted in all places where Borrower appears thereunder) and shall

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

be deemed fully applicable to Indemnitor hereunder.  Indemnitor hereby certifies that it has received and reviewed the Loan Agreement (including, without limitation, Section 15.4 thereof).  In the event of any conflict or inconsistency between any of the other terms and conditions of this Agreement and this Section 17, this Section 17 shall control.

18.    <u>**Waiver of Trial by Jury**</u>.  **INDEMNITOR HEREBY, AND INDEMNITEE BY ACCEPTANCE HEREOF, EACH AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE, TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.   THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY INDEMNITOR AND INDEMNITEE AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. INDEMNITOR AND INDEMNITEE EACH IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.**

19.    <u>Duplicate Originals; Counterparts</u>.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement.  The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

20.    <u>No Oral Change</u>.  This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Indemnitor or any Indemnified Party, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

21.    <u>Headings, Etc</u>.  The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

22.    <u>Joint and Several Liability</u>.  If Indemnitor consists of more than one Person or party, the obligations and liabilities of each such Person or party hereunder shall be joint and several.

23.    <u>Number and Gender</u>.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Person or Persons referred to may require.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

24.   <u>Successors and Assigns</u>.  Without limiting the effect of specific references in any provision of this Agreement, the term "**Indemnitor**" shall be deemed to refer to each and every Person comprising an Indemnitor from time to time, as the sense of a particular provision may require, and to include the heirs, executors, administrators, legal representatives, successors and permitted assigns of Indemnitor, all of whom shall be bound by the provisions of this Agreement, provided that no obligation of Indemnitor may be assigned except with the written consent of Indemnitee.  This Agreement shall be binding upon, and shall inure to the benefit of, Indemnitor and Indemnitee and their respective successors and permitted assigns (and each reference herein to Indemnitee shall be deemed to include its successors and assigns).  This Agreement shall also inure to the benefit of Indemnified Parties and their respective successors, permitted assigns, heirs and legal representatives forever.  Indemnitee may sell, assign, pledge, participate, transfer or delegate, as applicable, to one or more Persons, all or a portion of its rights and obligations under this Agreement and the other Loan Documents.  Any assignee or transferee of Indemnitee shall be entitled to all the benefits afforded to Indemnitee under this Agreement.  Indemnitor shall not have the right to assign, delegate or transfer its rights or obligations under this Agreement without the prior written consent of Indemnitee, and any attempted assignment, delegation or transfer without such consent shall be null and void.

25.   <u>Release of Liability</u>.  Any one or more parties liable upon or in respect of this Agreement may be released without affecting the liability of any party not so released.

26.   <u>Rights Cumulative</u>.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies which Indemnitee has under the Note, the Security Instrument, the Loan Agreement or the other Loan Documents or would otherwise have at law or in equity.

27.   <u>Inapplicable Provisions</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement, and the remaining provision of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement, unless such continued effectiveness of this Agreement, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

28.   <u>Miscellaneous</u>.  (a) Wherever pursuant to this Agreement (i) Indemnitee (or any other Indemnified Party) exercises any right given to it to approve or disapprove any matter, (ii) any arrangement or term is to be satisfactory to Indemnitee (or any other Indemnified Party), or (iii) any other decision or determination is to be made by Indemnitee (or any other Indemnified Party), the decision of Indemnitee (or such other Indemnified Party) to approve or disapprove such matter, all decisions that arrangements or terms are satisfactory to Indemnitee (or such other Indemnified Party) or not satisfactory and all other decisions and determinations made by Indemnitee (or such other Indemnified Party), shall be in the sole and absolute discretion of Indemnitee (or such other Indemnified Party) and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(b)     Wherever pursuant to this Agreement it is provided that Indemnitor pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees and disbursements of Indemnitee and the other Indemnified Parties, whether retained outside law firms, or as reimbursements for the expenses of in-house legal staff or otherwise.

(c)     All references herein to "the Property" shall be deemed to refer either to each Individual Property or to the Property as a whole, as the context may require.  It is the intent of the parties that the term Property be construed broadly to afford Indemnitee comprehensive coverage under this Agreement.

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, this Agreement has been executed by Indemnitor as of the day and year first above written.

**INDEMNITOR**:

[Signature pages sent separately]

# EXHIBIT A-6

**Cash Management Agreement**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## CASH MANAGEMENT AGREEMENT

This CASH MANAGEMENT AGREEMENT (this "**Agreement**") is entered into as of **[_____]**, 2024**,** by and among **SILVER STAR CRE, LLC**, a Delaware limited liability company ("**Borrower**"), PNC Bank, National Association, a national banking association (together with its successors and assigns, "**Deposit Bank**") and **[**BSPRT CRE FINANCE, LLC**]**, a Delaware limited liability company (together with its successors and assigns, "**Lender**").

### RECITALS:

A.    Pursuant to the terms of a Loan Agreement, dated as of  the date hereof, between Borrower and Lender (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), Lender has agreed to provide financing (the "**Loan**") to Borrower, which is secured by, among other things, the Property (as defined in the Loan Agreement).

NOW THEREFORE, in consideration of the mutual premises contained herein and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1
### Other Defined Terms

**Section 1.1.**    (a)  As used herein the following capitalized terms shall have the respective meanings set forth below:

"**Authorized Representative**" shall mean a natural person authorized to execute this Agreement, amendments to the Agreements or exhibits and to provide instructions, and who is identified on an incumbency certificate in the form of Exhibit B-1, B-2, or B-3, as applicable, delivered to Deposit Bank.

"**Business Day**" shall mean any day other than (i) a Saturday and a Sunday and (ii) a day on which federally insured depository institutions in New York, New York are authorized or obligated by law, governmental decree or executive order to be closed.

"**Cash Management Account**" shall have the meaning set forth in <u>Section 2.1</u> hereof.

"**Collateral**" shall have the meaning set forth in Section 6.2 hereof.

"**Loan Satisfaction Event**" shall mean the satisfaction in full of the Obligations.

"**Master User Agreement**" shall mean an agreement between the Deposit Bank and a Person that identifies such Person's designated users, including their access and permissions to the PNC PAID portal.

"**Servicer**" shall mean an entity designated by the Lender to exercise Lender's rights and responsibilities under this Agreement, by written notice to Deposit Bank. Deposit Bank

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

shall have the right to rely on instructions and other communications received from Servicer to the same extent as if such instructions or other communications were received directly from Lender.

**"UCC"** shall have the meaning set forth in <u>Section 2.4</u> hereof.

(b)    The meanings given to capitalized terms defined herein shall be equally applicable in both singular and plural forms of such terms.

(c)    Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Loan Agreement.

## ARTICLE 2
## Establishment of the Cash Management Account.

**Section 2.1.**    Borrower has established and maintains at Deposit Bank a deposit account bearing account number [_____] (the "**Cash Management Account**") and which is entitled "[_____], as Borrower, for the benefit of [BSPRT CRE Finance, LLC], as Secured Party – Cash Management Account."  Lender shall have the right to cause Deposit Bank to entitle the Cash Management Account with such other designation as Lender may select in its reasonable discretion to reflect any assignment or transfer by Lender of its rights hereunder.  The Cash Management Account shall be maintained throughout the term of this Agreement.  Borrower agrees to maintain in the Cash Management Account at all times a minimum balance of $5,000 (the "<u>Peg Balance</u>").  If at any time during the term of this Agreement, the balance in the Cash Management Account falls below the Peg Balance, Borrower shall immediately deposit into the Cash Management Account sufficient funds to meet the Peg Balance requirement.

**Section 2.2.**    The Cash Management Account shall be an interest-bearing account, which interest shall be become a part and be included in the amounts in Cash Management Account and distributed in accordance with the terms hereof.  All amounts then on deposit in the Cash Management Account are deemed an asset of Borrower, subject to the lien and security interest granted Lender hereunder, subject to Lender's sole dominion and control thereof and all of the terms and conditions of this Agreement.

**Section 2.3.**    In order to further secure the performance by Borrower of the Obligations, Borrower hereby (i) requests that the Cash Management Account be established on its behalf at Deposit Bank in the name set forth above and (ii) acknowledges that (A) the Cash Management Account will be subject to the sole dominion, control and discretion of Lender, subject to the terms, covenants and conditions of this Agreement  and the Loan Agreement, (B) Lender (or Servicer, if designated) shall have the sole right to direct disbursements from the Cash Management Account, and (C) neither Borrower nor any other Person claiming on behalf of or through Borrower shall have any right or authority, whether express or implied, to make use of, withdraw, or direct the use or withdrawal of any funds from the Cash Management Account or to give any instructions to Deposit Bank or any other Person with respect to the Cash Management Account.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 2.4.**    The Cash Management Account shall at all times be a "deposit account" as such term is defined in Section 9-102(a)(29) of the Uniform Commercial Code as in effect in the State of New York (the "**UCC**") and control of the Cash Management Account shall be vested in Lender in accordance with Section 9-104 of the UCC.

## ARTICLE 3
## Allocation and Disbursement of Funds in the Cash Management Account.

**Section 3.1.**    Borrower, Lender and Deposit Bank agree that Deposit Bank will comply with instructions originated by Lender or its Servicer directing disposition of funds in the Cash Management Account (including wire transfers of money from the Cash Management Account pursuant to standing transfer orders) and such other actions as shall from time to time be specified in writing by Lender or its Servicer without notice to or further consent of Borrower. Lender agrees that such instructions shall be in accordance with the Loan Agreement.  Requests from Lender or its Servicer will be facilitated through the PNC PAID portal by their designated users in accordance with users access and permissions listed in Exhibits B-2 and B-3.  Transfer orders processed by the Deposit Bank outside of the Lender or its Servicer's PNC PAID portal access is limited to an exception basis and Lender or its Servicer will follow instructions provided by Deposit Bank.

**Section 3.2.**    Payment instructions are to be provided in Exhibit A at closing, and amendments to Exhibit A will be accepted for modifications to payment instructions over the term of this Agreement.  Lender or its Servicer may submit modifications to payment instructions through the PNC PAID portal by their designated users in accordance with users access and permissions listed in Exhibits B-2 and B-3. Any modifications submitted by Lender or its Servicer through the PNC PAID portal will be deemed amendments to Exhibit A of this Agreement.

**Section 3.3.**    The insufficiency of funds on deposit in the Cash Management Account shall not relieve Borrower of the obligation to make any payments, as and when due pursuant to the Loan Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever. No provision of this Agreement shall require the Deposit Bank to (i) risk, expend or advance its own funds, or (ii) otherwise, incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Agreement.

## ARTICLE 4
## Fees of Deposit Bank

**Section 4.1.**    Borrower agrees to pay the fees of Deposit Bank on the last business day of each month in accordance with the fee schedule attached hereto as Schedule A. Deposit Bank shall be entitled to debit the Cash Management Account for its fees and any other amounts due under the fee schedule attached as Schedule A.

**Section 4.2.**    Upon the request of Borrower, Deposit Bank shall include its fees in an account analysis statement.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

# ARTICLE 5
## Termination.

**Section 5.1.**    Lender may replace Deposit Bank with a new cash management bank upon five (5) days' prior written notice to Borrower and Deposit Bank.  Borrower hereby agrees to take all reasonable action necessary to facilitate the transfer of the respective obligations, duties and rights of Deposit Bank to the successor bank thereof selected by Lender in its sole and absolute discretion.

**Section 5.2.**    Deposit Bank may resign from its obligations under this Agreement at any time after thirty (30) calendar days' prior written notice to the other parties hereto, but in no event shall Deposit Bank be released of its obligations hereunder unless and until (i) a bank has been designated by Lender as a successor to Deposit Bank and assumed the obligations of Deposit Bank hereunder and all funds in the Cash Management Account have been transferred to such successor bank or (ii) Lender consents to such release in writing.  Lender shall designate a successor to Deposit Bank in its sole and absolute discretion promptly after receipt of notice of resignation by Deposit Bank.  Borrower and Lender shall take all reasonable actions necessary to cause such designated successor bank promptly to assume the obligations of Deposit Bank hereunder. However, in the event no successor bank has been appointed (90) days after the Deposit Bank has provided written notice of such resignation,  this Agreement shall be terminated and Deposit Bank will transfer all collected and available balances (less any deductions permitted hereunder) in the Cash Management Account to Lender or Servicer or otherwise in accordance with Lender's or Servicer's written instructions, not to be unreasonably withheld, and the Deposit Bank shall thereupon be relieved of all further duties and obligations under this Agreement. Notwithstanding anything to the contrary contained in the foregoing, Deposit Bank may resign from this Agreement immediately upon written notice to Lender and Borrower in the event (i) of suspected fraud or illegal activity in connection with the Cash Management Account or this Agreement or (ii) in the sole judgement of the Deposit Bank, it is necessary or desirable to do so because of legal process, applicable law or regulation, or other government guidelines.

**Section 5.3.**    Notwithstanding anything to the contrary contained in the foregoing, Deposit Bank may resign from this Agreement upon ten (10) days' prior written notice to Lender and Borrower in the event of: (i) the insolvency, receivership, or voluntary or involuntary bankruptcy of the Borrower, or the institution of any proceeding therefor, or any assignment for the benefit of the Borrower's creditors, or (ii) in Deposit Bank's sole judgment, that the financial condition or business of the Borrower is impaired or Deposit Bank reasonably believes that Borrower may not have sufficient available funds in the Cash Management Account make payments due under Section 4.1, above. Notwithstanding any such termination, this Agreement shall continue in full force and effect as to all transactions for which we have commenced processing and as to all rights and liabilities arising prior to such termination.

**Section 5.4.**    Except following the effective date of Deposit Bank's resignation or the early replacement of Deposit Bank as set forth in Sections 5.1 and 5.2 above, Deposit Bank shall not cause or permit the Cash Management Account to be closed without the prior written consent of Lender.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 5.5.**    Lender may terminate this Agreement at any time upon prior written notice to Borrower and Deposit Bank; provided, however, the failure of any notice to be sent to Borrower or the lack of receipt by Borrower of any notice shall not diminish or otherwise affect the effectiveness of any notice received by Deposit Bank.  Lender agrees to terminate this Agreement promptly upon the occurrence of a Loan Satisfaction Event.

## ARTICLE 6
### Matters Concerning Borrower.

**Section 6.1.**    Borrower will provide Exhibit B-1 that will list its users, including their access and permissions to be granted access to the PNC PAID portal.  All users for the Borrower will have read only access in the PNC PAID portal.  Modifications to Borrower's users and/or their access and permissions will be accepted by amendments to Exhibit B-1.  If Borrower has a Master User Agreement in place with Deposit Bank, that Agreement will supersede any previous Exhibit B-1s for this Agreement unless it's stated in Exhibit B-1 that the Master User Agreement users and/or their access and permissions are not applicable to this Agreement.

**Section 6.2.**    Borrower hereby pledges, transfers and assigns to Lender, and grants to Lender, as additional security for the payment and performance of the Obligations, a continuing perfected first priority security interest in and to, and a first lien upon, the following property of Borrower (whether now owned or existing or hereafter acquired and regardless of where located) (all of the same, collectively, the "**Collateral**"): (i) all of Borrower's right, title and interest in and to the Cash Management Account and all cash, property or rights transferred to or deposited therein from time to time, and (ii) any and all proceeds (as defined in the UCC) of the foregoing. This Agreement and the pledge, assignment and grant of security interest made hereby shall secure payment of all amounts payable by Borrower to Lender under the Loan Documents. Borrower agrees to execute, acknowledge, deliver, file or do at its sole cost and expense, all other acts, assignments, notices, agreements or other instruments as Lender may reasonably require in order to effectuate, assure, convey, secure, assign, transfer and convey unto Lender any of the rights granted by this Agreement and to more fully perfect and protect any lien or security interest granted hereby.

## ARTICLE 7

### Certain Matters Regarding Lender.

**Section 7.1.**    Lender will provide Exhibit B-2 that will list its users, including their access and permissions to be granted access to the PNC PAID portal.  Modifications to Lender's users and/or their access and permissions will be accepted by amendments to Exhibit B-2.  If Lender has a Master User Agreement in place with Deposit Bank, that agreement will supersede any previous Exhibit B-2s for this Agreement unless it's stated in Exhibit B-2 that the Master User Agreement users and/or their access and permissions are not applicable to this Agreement.

**Section 7.2.**    Borrower agrees that Lender may exercise in respect of the Collateral all rights and remedies available to Lender hereunder or under the other Loan Documents or otherwise available at law or in equity. Borrower acknowledges and agrees that,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

upon the occurrence and during the continuance of any Event of Default, it will have no further right to request or otherwise require Lender to disburse funds from the Cash Management Account in accordance with the terms of this Agreement, it being agreed that Lender may, at its option, (i) direct Deposit Bank to continue to hold the funds in the Cash Management Account, (ii) continue from time to time to apply all or any portion of the funds held in the Cash Management Account to any payment(s) which such funds could have been applied to prior to such Event of Default, to the extent and in such order and manner as Lender in its sole and absolute discretion may determine, or (iii) direct Deposit Bank from time to time to disburse all or any portion of the funds held in the Cash Management Account or other Collateral then or thereafter held by Deposit Bank to Lender, in which event Lender may apply the funds held in the Cash Management Account or other Collateral to the Obligations in any order and in such manner as Lender may determine in its sole and absolute discretion.

**Section 7.3.**    Borrower agrees that, upon the occurrence and during the continuance of any Event of Default, Lender may, at any time or from time to time, collect, appropriate, redeem, realize upon or otherwise enforce its rights with respect to the Collateral in accordance with the Loan Agreement, without notice to Borrower and without the need to institute any legal action, make demand, exhaust any other remedies or otherwise proceed to enforce its rights.

**Section 7.4.**    No failure on the part of Lender to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver of such right thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right under this Agreement or the other Loan Documents.  The remedies provided in this Agreement, the Note, the Loan Agreement and the other Loan Documents are cumulative and not exclusive of any remedies provided at law or in equity.

**Section 7.5.**    In the event of any inconsistency between this Article VII and the provisions of the Loan Agreement, the provisions of the Loan Agreement shall prevail.

# ARTICLE 8

## Certain Matters Regarding Servicer.

**Section 8.1.**    At the option of Lender, the Loan may be serviced by a Servicer selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a written servicing agreement between Lender and Servicer.

**Section 8.2.**    Servicer will provide Exhibit B-3 that will list its users, including their access and permissions to be granted access to the PNC PAID portal.  Modifications to Servicer's users and/or their access and permissions will be accepted by amendments to Exhibit B-3.  If Servicer has a Master User Agreement in place with Deposit Bank, that agreement will supersede any previous Exhibit B-3s for this Agreement unless it's stated in Exhibit B-3 that the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Master User Agreement users and/or their access and permissions are not applicable to this Agreement.

## ARTICLE 9
## Amendment; Successor and Assigns; Assignments.

**Section 9.1.**   This Agreement may be amended only by a writing executed by Deposit Bank and Authorized Representatives of Borrower and Lender, with the exception of Exhibits A, B-1, B-2 and B-3.  Amendments to Exhibit A can be accepted by Deposit Bank from an Authorized Representative of Lender or its Servicer without notice to other parties to this Agreement.  Deposit Bank shall confirm amendments to Exhibit A by telephone call-back to an Authorized Representative specified on the respective Exhibit B-2 or B-3. Amendments to B-1, B-2 and B-3 can be accepted by Deposit Bank from an Authorized Representative of each respective party without notice to the other parties to this Agreement.

**Section 9.2.**   This Agreement shall bind and inure to the benefit of and be enforceable by Borrower, Lender and Deposit Bank and their respective successors and assigns.

**Section 9.3.**   Lender shall have the right to assign or transfer rights and obligations under this Agreement without limitation. Any assignee or transferee shall be entitled to all the benefits afforded Lender under this Agreement; provided, however, that such assignee or transferee shall upon written request deliver to the other parties hereto written confirmation that such assignee or transferee agrees to be bound by the terms of this Agreement.

**Section 9.4.**   Borrower shall have no right to assign or transfer its rights and obligations hereunder without the prior written consent of Lender and Deposit Bank. Deposit Bank shall have no right to assign or transfer its rights and obligations hereunder without the prior written consent of Lender; provided, however that no such consent will be required if such assignment of transfer takes place as part of a merger, acquisition or corporate reorganization affecting Deposit Bank.

## ARTICLE 10
## Notices.

**Section 10.1.**  Except as otherwise provided in this Agreement (such as directing the disbursement of funds by the Deposit Bank on behalf of the Lender), all notices, consents, approvals and requests permitted or required by this Agreement shall be in writing, delivered by personal delivery (whether by messenger or otherwise), facsimile transmission, overnight courier service, certified or registered mail or by electronic mail, and will be deemed to have been duly given (a) immediately upon personal delivery (whether by messenger, or otherwise), (b) immediately upon facsimile transmission (with a confirmation of receipt to the sending party), (c) when actually received, in the case of delivery overnight courier service or United States mail, or (d) when delivered to the e-mail address given below, in the case of electronic mail provided that written notification of receipt is obtained from the recipient after completion of the electronic mail transmission.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

If to Lender:

**[**BSPRT CRE Finance, LLC**]**
1345 Avenue of the Americas, Suite 32A
New York, New York 10105
Attention:  Micah Goodman, General Counsel

with a copy to:

Holland & Knight LLP
10 St. James Avenue, 11th Floor
Boston, Massachusetts 02116
Attention: Sean M. O'Brien, Esq.

If to Borrower:

Silver Star CRE, LLC
2909 Hillcroft, Suite 420
Houston, Texas 77057
Attention:  Chief Executive Officer

with a copy to:

Hartman CRE, LLC
2909 Hillcroft, Suite 420
Houston, Texas 77057
Attention:  Adrienne Collins, General Counsel

If to Deposit Bank:

PNC Bank, National Association
80 South Eighth Street, Suite 3715
Minneapolis, MN 55402
Attn: CMA PAID TEAM
Email: PAIDSolutions@pnc.com
Phone: 833-762-3855

PNC Bank, National Association
500 First Avenue
Mailstop: P7-PFSC-02-E
Pittsburgh, Pennsylvania 15219
Attention: TM Legal Liaison Team

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

In all cases, each party hereto shall be entitled to rely on a copy or electronic transmission of any document with the same legal effect as if it were the original of such document. The parties acknowledges that there are certain security, corruption, transmission error and access availability risks associated with using open networks such as the internet and Lender and each of Borrower and Lender assumes such risks.

## ARTICLE 11
## Limitation on Lender's Liability.

**Section 11.1.**  Lender shall not be liable for any acts, omissions, errors in judgment or mistakes of fact or law, including, without limitation, acts, omissions, errors or mistakes with respect to the Collateral, except for those arising as a result of Lender's gross negligence or willful misconduct.  Without limiting the generality of the foregoing, except as otherwise expressly provided for herein or as required by applicable law, Lender shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not Lender has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other right pertaining to any Collateral.  Lender is hereby authorized by Borrower to act on any written instruction believed by Lender in good faith to have been given or sent by Borrower.

## ARTICLE 12
## Mortgagee-in-Possession.

**Section 12.1.**  Borrower hereby confirms and agrees that notwithstanding the provisions of this Agreement, Borrower retains sole control of the operation and maintenance of the Property, subject to the obligations of Borrower under the Loan Agreement, the Security Instrument, the Assignment of Leases and the other Loan Documents, and Lender is not and shall not be deemed to be a mortgagee in possession nor shall Lender be subject to any liability with respect to the Property or otherwise based upon any claim of lender liability.

## ARTICLE 13
## Standard of Care; Indemnification.

**Section 13.1.**  Deposit Bank shall be responsible for the performance of only such duties as are specifically set forth herein or contained in instructions given to Deposit Bank which are not contrary to the provisions of this Agreement. Deposit Bank will use reasonable care with respect to the safekeeping of property in the Cash Management Account and, except as otherwise expressly provided herein, in carrying out its obligations under this Agreement. Deposit Bank's responsibility hereunder is limited to any loss occasioned directly by the gross negligence or willful misconduct of Deposit Bank.  In no event, however, shall Deposit Bank have any responsibility for consequential, indirect, special, punitive or exemplary damages, whether or not it has notice thereof, nor shall it have any responsibility or liability for the validity or

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

enforceability of any security interest or other interest of Lender or Borrower in the Cash Management Account.

**Section 13.2.**  Except where Deposit Bank has been grossly negligent or has committed willful misconduct, Borrower and Lender will release Deposit Bank from, and Borrower shall indemnify and hold Deposit Bank harmless from and against, any and all losses, claims, damages, liabilities, costs and expenses (including, without limitation, reasonable counsel fees, whether arising in an action or proceeding among the parties hereto or otherwise) to which Deposit Bank may become subject, or which it may suffer or incur, arising out of or based upon this Agreement or the actions contemplated hereby.  The provisions of this <u>Article XIII</u> shall survive termination of this Agreement.

## ARTICLE 14
## Certain Matters Affecting Deposit Bank.

**Section 14.1.**  Deposit Bank may rely and shall be protected in acting or refraining from acting upon any notice, instruction, demand or certificate believed by it to be genuine and to have been signed or presented by the proper party or parties, and it may be assumed that any person purporting to act on behalf of any party giving any of the foregoing in connection with the provisions hereof has been duly authorized to do so.  Deposit Bank may consult with legal counsel and is entitled to rely on the advice of such counsel; provided however, that the foregoing shall not be construed to affect or limit the responsibilities or liabilities of Deposit Bank under this Agreement.  This <u>Section 14.1</u> shall survive the termination of this Agreement.

**Section 14.2.**  The duties and obligations of Deposit Bank hereunder shall be determined solely by the express provisions of this Agreement.  Deposit Bank shall not be liable except for the performance of Deposit Bank's duties and obligations as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against Deposit Bank.

**Section 14.3.**  At the direction of Lender, Deposit Bank shall disburse funds in the Cash Management Account by wire transfer to Lender for final disposition including but not limited to all tax payments and insurance premiums.  Deposit Bank shall not be liable for any failure to timely pay tax payments or insurance premiums in any case in which Lender shall have directed Deposit Bank to make such payments directly.

**Section 14.4.**  Deposit Bank hereby acknowledges and agrees that (a) the Cash Management Account shall be held by Deposit Bank in the name as set forth in <u>Section 2.1</u> of this Agreement for the benefit of Lender as secured party, (b) all funds held in the Cash Management Account shall be held for the benefit of Lender, (c) Borrower has granted to Lender a first priority security interest in the Collateral, and (d) Deposit Bank shall not disburse any funds from the Cash Management Account except as provided herein. Deposit Bank hereby waives any right of offset, banker's lien or similar rights against, or any assignment of, or security interest or other interest in, the Collateral, except that Deposit Bank may charge or set off against the Cash Management Account for (i) any of Deposit Bank's charges, fees and expenses provided for herein for which Borrower is responsible that have not been paid or satisfied after written demand from Deposit

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Bank, (ii) all items deposited in and credited to the Cash Management Account and subsequently returned unpaid or with respect to which Deposit Bank fails to receive final settlement, (iii) all charges and obligations and liabilities arising out of any cash management services provided by Deposit Bank under this Agreement, including, but not limited to, transactions that have not been paid or satisfied after written demand from Deposit Bank, and (iv) any amounts deposited in the Cash Management Account in error or as necessary to correct processing errors. If there are insufficient collected funds in the Cash Management Account to cover the amount of any returned check or other adjustment or correction to be debited thereto, Borrower shall repay Deposit Bank the amount of such debit immediately upon demand.

**Section 14.5.**    If at any time: Deposit Bank (a) is in receipt of a notice from Lender or Servicer which causes a dispute or conflict regarding the disposition of funds in the Cash Management Account, or (b) is served with legal process or a bankruptcy notice which it in good faith believes prohibits the disbursement of the funds deposited in the Cash Management Account, then Deposit Bank shall have the right (i) to place a hold on the funds in the Cash Management Account until such time as it receives an appropriate court order or other assurance satisfactory to it as to the disposition of the funds in the Cash Management Account, or (ii) to commence, at Borrower's expense, an interpleader action in any competent Federal or State court located in the State of New York, and otherwise to take no further action except in accordance with joint written instructions from Borrower and Lender or Servicer or in accordance with the final order of a competent court, served on Deposit Bank.

**Section 14.6.**    Deposit Bank agrees to provide Borrower, Lender and/or Servicer access to view monthly account statements and daily account activity via Deposit Bank's online reporting facility, PNC PAID.  Borrower shall be deemed at all times to have consented to Deposit Bank's release of such account information to Lender (and Servicer, if applicable).

## ARTICLE 15
### Governing Law and Jury Trial Waiver.

**Section 15.1.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES APPLIED IN NEW YORK).  ALL PARTIES HERETO HEREBY SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF NEW YORK FOR THE PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  ALL PARTIES HERETO IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  NEW YORK SHALL BE DEEMED TO BE DEPOSIT BANK'S "JURISDICTION" WITHIN THE MEANING OF SECTION 9-304 OF THE UNIFORM COMMERCIAL CODE IN EFFECT IN THE STATE OF NEW YORK.**

**Section 15.2.  THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.**

**ARTICLE XVI**
**Miscellaneous**

**Section 16.1.** This Agreement may be executed in any number of counterparts each of which shall be deemed an original and all of which, taken together, shall constitute this Agreement.  Delivery of an executed counterpart of a signature page to this Agreement by pdf, facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart.  Any party so executing this Agreement by pdf, facsimile or other electronic transmission shall, upon request, promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by pdf, facsimile or electronic transmission.

**Section 16.2.** Borrower hereby acknowledges and agrees that Lender shall be permitted to request from Deposit Bank, and Deposit Bank shall be permitted to provide to Lender, at Borrower's sole cost and expense, (a) such information as Lender may reasonably request concerning the Cash Management Account, including without limitation, (i) amounts held on deposit in the Cash Management Account, (ii) receipts into the Cash Management Account, (iii) distributions from the Cash Management Account, and (iv) monthly statements and (b) online read-only  access to activity in the Cash Management Account via Deposit Bank's online banking portal; provided, however, nothing set forth above shall require Deposit Bank to provide Lender with any information concerning the Cash Management Account or~~which~~ is not typically provided by Deposit Bank in the ordinary course of its business.

**Section 16.3.**  To the extent that the terms of this Agreement are inconsistent with, or prohibited or unenforceable under, any applicable law or regulation, they will be deemed ineffective only to the extent of such prohibition or unenforceability and will be deemed modified and applied in a manner consistent with such law or regulation.  Any provision of this Agreement which is deemed unenforceable or invalid in any jurisdiction will not affect the enforceability or validity of the remaining provisions of this Agreement or the same provision in any other jurisdiction.

**Section 16.4.**  Any paragraph or other captions are inserted for convenience only and shall not be considered a part of or affect the interpretation or construction of any of the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

provisions of this Agreement. This Agreement constitutes the entire and final agreement among the parties with respect to the subject matter hereof, and no oral or prior written statements or representations not incorporated herein shall have any force or effect.  This Agreement shall not be effective until signed by Deposit Bank, Lender and Borrower.  This Agreement shall be effective even if the Schedules and Exhibits are not attached hereto.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in several counterparts (each of which shall be deemed an original) as of the date first above written.

**<u>BORROWER</u>:**

[Signature pages sent separately]

**[SIGNATURES CONTINUE ON FOLLOWING PAGES]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**<u>LENDER</u>:**

[Signature pages sent separately]

**[SIGNATURES CONCLUDE ON FOLLOWING PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**DEPOSIT BANK:**

**PNC BANK, NATIONAL ASSOCIATION**,
a national banking association

By: _____

       Name:

       Title:

**[END OF SIGNATURE PAGES]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## SCHEDULE A

### Deposit Bank Fees

**I.  Implementation Fee:**                                      **$1,500**

           A one-time fee, payable upon execution of the Cash Management Agreement, to cover the review of the Cash Management Agreement, initial set-up of the account, and other reasonably required services up to and including the closing.

**II.  Monthly Administration Fee:**                              **$500**

           The monthly administration fee covers routine duties of Deposit Bank associated with the administration of the account. Administration fees are payable monthly, starting on the closing date and will be deducted on an ongoing monthly basis.

**III. Out-of-Pocket Expenses (if any):**                        **At Cost**

           Reimbursement of expenses associated with Deposit Bank's acceptance of, administration of, or performance under the Cash Management Agreement, including without limitation fees and expenses of legal counsel, accountants and other agents, tax preparation, reporting and filing, publications, and filing and recording fees, will be billed at cost.

           The fee agreed upon for the services rendered hereunder is intended as compensation for the Deposit Bank's services as contemplated by this Cash Management Agreement; provided, however, that in the event that the conditions for the disbursement of funds under this Cash Management Agreement are not fulfilled, or the Deposit Bank renders any service not contemplated in this Cash Management Agreement, or there is any assignment of interest in the subject matter of this Cash Management Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Deposit Bank is made a party to any litigation pertaining to this Cash Management Agreement or the subject matter hereof, then the Deposit Bank shall be compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable out-of-pocket attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event. If any amount due to the Deposit Bank hereunder is not paid within thirty (30) days of the date due, the Deposit Bank in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law. Borrower acknowledges their obligations to pay any fees, expenses and other amounts owed to the Deposit Bank pursuant to this Cash Management Agreement. The Deposit Bank shall have,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

and is hereby granted, a prior lien upon the Cash Management Account Funds with respect to its incurred but unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights, superior to the interests of any other persons or entities and is hereby granted the right to set off and deduct any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from the Cash Management Account Funds. The terms of this paragraph shall survive termination of this Cash Management Agreement and shall not in any way limit the rights of the Deposit Bank to indemnification as set forth in this Cash Management Agreement.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**<u>EXHIBIT A</u>**

**Disposition Instructions**

*(attached hereto)*

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT B-1**

**Certificate of Incumbency**
**(List of Authorized Representatives of Borrower)**

Borrower Name: [_____]

Loan ID: [_____]

As an Authorized Representative of the above referenced entity name, I hereby certify that each person listed below is an authorized signor for Borrower and that the title, signature, e-mail and phone number appearing beside each name is true and correct.

| Name | Title | E-mail | Signature | Phone |
|------|-------|--------|-----------|-------|
| Louis T. Fox, III | CFO | lfox@silverstarreit.com | | 713-858-2556 |
| Robert Alex Board | Controller | aboard@silverstarreit.com | | 713-586-2637 |
| David Wheeler | President | dave@silverstarreit.com | | 469-831-4819 |

As an Authorized Representative of the above referenced entity name, I hereby request that each person

| Name | E-mail | Title | Address | Phone |
|------|--------|-------|---------|-------|
| Ali Bell | abell@silverstarreit.com | Controller | | |
| Debra Woods | dwoods@silverstarreit.com | Senior Accountant | | |
| Brittany Sharp | bsharp@silverstarreit.com | Accountant | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

listed below, as an authorized person for the Borrower, is granted access to the PNC PAID platform. All users for the Borrower will have read only access in the PNC PAID portal. This view only access will allow users to have access to documents related to the loan(s) (as applicable) as well as the ability to view the Cash Management Account balance, transaction history and monthly statements.

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

_____
Date

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

By:_____
Its: Authorized Officer

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

<u>**EXHIBIT B-2**</u>

**Certificate of Incumbency**
**(List of Authorized Representatives of Lender)**

Lender Name: [_____]
Loan ID: [_____]

As an Authorized Representative of the above referenced entity name, I hereby certify that each person listed below is an authorized signor for Lender and is authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of the above referenced entity, and that the title, signature, e-mail and phone number appearing beside each name is true and correct.

| Name | Title | E-mail | Signature | Phone |
|------|-------|--------|-----------|-------|
|      |       |        |           |       |
|      |       |        |           |       |
|      |       |        |           |       |

As an Authorized Representative of the above referenced entity name, I hereby request that each person listed below, as an authorized person for the Lender, is granted access to the PNC PAID platform and assigned the access rights as listed below.

***Loan Detail Access*** *allows the user to view applicable loan documents and applicable loan contact information,* ***Account Access*** *provides access to the Demand Deposit Account(s) balance(s), transaction*

| Name | E-mail | Title | Address | Phone | Loan Detail Access | Account Access | Payment Access |
|------|--------|-------|---------|-------|--------------------|----------------|----------------|
|      |        |       |         |       | Choose an item. | Choose an item. | Choose an item. |
|      |        |       |         |       |                    |                |                |
|      |        |       |         |       |                    |                |                |
|      |        |       |         |       |                    |                |                |
|      |        |       |         |       |                    |                |                |
|      |        |       |         |       |                    |                |                |
|      |        |       |         |       |                    |                |                |

*history and monthly statements, and* ***Payment Access*** *provides access to the payment information and actions such as initiating, approving and/or canceling payments.*

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

_____
Date

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

By:_____
Its: Authorized Officer

## EXHIBIT B-3

**(List of Authorized Representatives of Servicer)**

Servicer Name: [_____]
Loan ID: [_____]

As an Authorized Officer of the above referenced entity name, I hereby certify that each person listed below is an authorized signor for Servicer and is authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of the above referenced entity, and that the title, signature, e-mail and contact number appearing beside each name is true and correct.

| Name | Title | E-mail | Signature | Phone |
|------|-------|--------|-----------|-------|
|      |       |        |           |       |
|      |       |        |           |       |
|      |       |        |           |       |

As an Authorized Representative of the above referenced entity name, I hereby request that each person listed below, as an authorized person for the Servicer, is granted access to the PNC PAID platform and assigned the access rights as listed below.

| Name | E-mail | Title | Address | Phone | Loan Detail Access | Account Access | Payment Access |
|------|--------|-------|---------|-------|--------------------|----------------|----------------|
|      |        |       |         |       | Choose an item. | Choose an item. | Choose an item. |
|      |        |       |         |       |                    |                |                |
|      |        |       |         |       |                    |                |                |
|      |        |       |         |       |                    |                |                |
|      |        |       |         |       |                    |                |                |
|      |        |       |         |       |                    |                |                |
|      |        |       |         |       |                    |                |                |

*Loan Detail Access allows the user to view applicable loan documents and applicable loan contact information, **Account Access** provides access to the Demand Deposit Account(s) balance(s), transaction history and monthly statements, and **Payment Access** provides access to the payment information and actions such as initiating, approving and/or canceling payments.*

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

_____

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Date


By:_____
Its: Authorized Officer

# EXHIBIT A-7

**Deposit Account Control Agreement (Hard Agreement)**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## DEPOSIT ACCOUNT CONTROL AGREEMENT
## (Hard Agreement)



**THIS DEPOSIT ACCOUNT CONTROL AGREEMENT** (this "**Agreement**") is made as of the ___ day of _____, 2024, by and among **[_____, a _____]** ("**Customer**"), **PNC BANK, NATIONAL ASSOCIATION** ("**Bank**"), and **[BSPRT CRE FINANCE, LLC]**, a Delaware limited liability company ("**Secured Party**").

Customer, Bank and Secured Party, intending to be legally bound, agree as follows:

1. **Establishment of Accounts.**

(a)  Customer acknowledges and confirms that Customer established the deposit accounts identified on **Exhibit A** (which Exhibit is made a part hereof) in the name of Customer at Bank (individually, an "**Account**" and collectively, the "**Accounts**").  This Agreement refers to (i) the Accounts and (ii) all funds, checks, cash, items, instruments, and other things of value at any time paid, deposited, credited, or held in, any Account (whether for collection, provisionally, or otherwise) and all proceeds of all the foregoing (collectively, the "**Account Collateral**").

(b)  Notwithstanding anything in this Agreement to the contrary: (i) Customer will at all times maintain a collected balance of at least $5,000.00 (the "**Required Balance**") in each Account; (ii) Secured Party will not issue any instruction which will require Bank to transfer, or otherwise dispose of, funds from any Account which would result in the collected balance in that Account falling below the Required Balance; and (iii) Bank will not be required to follow any instruction to transfer, or otherwise dispose of, funds from any Account which would result in the collected balance in that Account falling below the Required Balance.

2. **Acknowledgement of Security Interest.**  Bank acknowledges that Customer granted a security interest in, lien upon, and pledge of the Accounts and the Account Collateral to Secured Party.  This Agreement constitutes a separate agreement for each Account and is intended to perfect Secured Party's security interest in, and give "control," as defined in Section 9-104 of the Uniform Commercial Code as in effect in the State of New York (the "**UCC**"), in favor of Secured Party with respect to the Accounts and the Account Collateral.  Bank agrees that it will not enter into any agreement with any person or entity in connection with the Accounts by which Bank is obligated to comply with instructions from the person or entity which conflict with this Agreement. Bank, for purposes of this Agreement, also confirms that it is a "Bank" as defined in Section 9-102(a)(8) of the UCC.

3. **Account Rules.**  The Accounts are subject to the following (together, the "**Account Rules**"): (a) Bank's right to place holds for uncollected funds pursuant to Federal Reserve Regulation CC, (b) Bank's account and applicable service agreements, disclosures, other deposit account documentation, and (c) Bank's related customary procedures and practices as in effect from time to time.  In the event of a conflict between the terms of this Agreement and the Account Rules, the terms of this Agreement govern.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

4. **Account Access.**   Customer and Secured Party agree that, until termination of this Agreement, Customer will not be entitled to access the Accounts or the Account Collateral, and Bank will comply with instructions originated by Secured Party regarding the Accounts and the Account Collateral, including wire transfers of funds from the Accounts pursuant to standing transfer orders, giving stop payment orders and such other actions as may be specified in writing by Secured Party consistent with the Account Rules, all without Customer's further consent. Customer irrevocably authorizes and directs Bank, and Bank agrees, to comply with any such instructions by Secured Party without notice to or further action or consent by Customer and notwithstanding any subsequent objection or contrary direction Bank may receive from Customer.   Beginning within five (5) Business Days following the date hereof, Bank agrees to electronically transfer the funds in the Accounts in excess of the Required Balance, in same day funds, with the frequency and to the account specified on **Exhibit B** hereto, or with such other frequency and/or to such other account as Secured Party may direct in writing from time to time. Customer acknowledges and agrees that it will not, and will not be permitted to, close any Account without the prior written consent of Secured Party.   Notwithstanding the foregoing, Bank reserves the right to suspend all activities in any Account in the event Bank reasonably believes that fraudulent or illegal activities have occurred in connection with any Account or this Agreement.

5. **Limitation of Liability of Bank**.

   (a)    Bank's duties and obligations are solely as set forth in, and governed by, this Agreement and the Account Rules.  Bank will have no responsibility or liability to Customer, Secured Party or any other person arising out of or relating to Bank's performance or failure to perform under this Agreement (including, without limitation, for complying with instructions concerning the Accounts or the Account Collateral originated by Secured Party), except to the extent such performance or failure to perform arises solely and directly out of the gross negligence or willful misconduct of Bank (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  Bank's obligations under this Agreement are that of a depository bank, and nothing in this Agreement creates custodial or bailee obligations.

   (b)    In no event will Bank be liable for any special, indirect, exemplary, punitive or consequential damages, including but not limited to lost profits, even if advised of the possibility or likelihood of such damages.

   (c)    Bank has no obligation to review or confirm that any actions taken pursuant to this Agreement comply with any other agreement or document.  Bank has no responsibility to investigate the appropriateness of any instruction, even if Customer notifies Bank that Secured Party is not legally entitled to originate any such instruction.  Bank may rely, and Bank is protected in acting, or refraining from acting, upon any notice (including but not limited to facsimile transmission of a notice) believed by Bank to be genuine and to have been given by the proper party or parties.

   (d)    In no event will Bank be liable for losses or delays resulting from computer malfunction, interruption of communication facilities, labor difficulties or other causes beyond Bank's reasonable control.

6. **Subordination of Rights; Setoff.**  Bank subordinates in favor of Secured Party all existing and future rights of recoupment or setoff and banker's liens against the Accounts and the Account Collateral, except those rights of setoff and banker's liens arising in connection with (a) processing or encoding errors arising in an Account, (b) items deposited in an Account that are subsequently returned to Bank unpaid, (c) automated clearing house ("**ACH**") credit entries initiated from an Account by Customer or Secured Party for which there are insufficient

funds in the applicable Account on the date required by the applicable agreement with the Bank for such services, or ACH debit entries initiated from an Account by Customer or Secured Party which are returned to Bank for any reason, (d) all other charges and obligations and liabilities arising out of any cash management services provided by Bank for Customer, and (e) any of Bank's charges, fees and expenses provided for in this Agreement or in any other agreement pursuant to which Bank provides services relating to the Accounts for which Customer is responsible. Customer and Secured Party understand and agree that Bank is authorized to collect any amount owing pursuant to the preceding sentence (a "**Chargeable Amount**") by debiting any of the Accounts. Customer will pay any Chargeable Amount immediately upon demand to the extent there are not sufficient funds in the Accounts to cover any Chargeable Amount on the day of the debit. If any Chargeable Amount has not been paid in full by Customer within fifteen (15) days after demand on Customer by Bank and there are still insufficient funds in the Accounts, then Secured Party will pay such Chargeable Amount to Bank, within fifteen (15) days after receipt of written demand therefor from Bank; provided, however, that Secured Party's liability hereunder shall be limited to the amount of funds disbursed from the Accounts at Secured Party's direction  If Bank is stayed or prohibited from making demand upon Customer for any reason, then Bank will not be required to: (i) make demand upon Customer or (ii) wait fifteen (15) days before making demand on Secured Party.

7. **Account Information.** To the extent practical, Bank will make available to Secured Party information with respect to the Accounts and Account Collateral as Secured Party may from time to time reasonably request, including, without limitation, duplicate copies of all bank statements provided concurrently with the delivery of them to Customer. Customer consents to the Bank providing such information to Secured Party.

8. **Indemnification of Bank.** Customer indemnifies and holds harmless Bank, its affiliates, and its and their directors, officers, agents and employees from and against any and all claims, damages, penalties, judgments, liabilities, losses or expenses (including reasonable attorneys' fees and disbursements) arising out of, resulting from, or in any way related to this Agreement or any action taken or not taken pursuant to this Agreement except to the extent such claims, damages, penalties, judgments, liabilities, losses or expenses are solely and directly caused by Bank's gross negligence or willful misconduct, as determined by a final non-appealable judgment by a court of competent jurisdiction.

9. **Notices.** Except as otherwise provided in this Agreement, all notices permitted or required by this Agreement will be in writing, will be delivered by personal delivery (whether by messenger or otherwise), facsimile transmission, overnight courier service or certified or registered mail, and will be deemed to have been duly given (a) immediately upon personal delivery (whether by messenger, or otherwise), (b) immediately upon facsimile transmission (with a confirmation of receipt to the sending party), or (c) when actually received, in the case of delivery overnight courier service or United States mail, in each case, and addressed to the respective addresses for Bank, Secured Party and Customer set forth on the signature page of this Agreement, or in accordance with other address information as the party to receive notice may provide in writing to the other parties in accordance with this notice provision. For purposes of this Agreement, "**Business Day**" will mean a day on which Bank's main office in New York, New York is open to the public for carrying on substantially all of its banking functions, but will not include Saturdays, Sundays, or legal holidays.

10. **Termination**. Secured Party may terminate this Agreement upon prior notice to Customer and Bank; provided, however, the failure of any notice to be sent to Customer and/or the lack of receipt by Customer of any notice will not diminish or otherwise affect the effectiveness of any notice received by Bank. Bank may terminate this Agreement upon at least thirty (30) days' prior notice to Customer and Secured Party. Notwithstanding the

foregoing, Bank may terminate this Agreement immediately if it becomes aware of fraud or illegal activity in connection with any Account or this Agreement.  The provisions of **paragraphs 5, 6 and 8** applicable to Customer and Secured Party will survive the termination of this Agreement.

11.  **Right to Place Hold; Bankruptcy; Interpleader**.  If at any time: (a) Bank, in good faith, is in doubt as to the action it should take under this Agreement, (b) Customer becomes subject to a voluntary or involuntary bankruptcy, reorganization, receivership or similar proceeding, or (c) Bank is served with legal process which it in good faith believes prohibits the disbursement of the funds deposited in any Account, then Bank will have the right to (i) place a hold on the funds in the Account until Bank receives an appropriate court order or other assurance satisfactory to it as to the disposition of the funds in the Account, or (ii) start, at Customer's expense, an interpleader action in any competent federal or state court located in the State of New York, and otherwise to take no further action except in accordance with joint written instructions from Customer and Secured Party or in accordance with the final order of a competent court served on Bank.

12. **Captions.**  Any paragraph headings or other captions are inserted for convenience only and are not to be considered a part of or affect the interpretation or construction of any provision of this Agreement.

13. **Entire Agreement; Amendments.**  This Agreement contains the entire agreement of the parties with respect to its subject matter, and no oral or prior written statements or representations not incorporated herein will have any force or effect.  This Agreement will not be effective until signed by Bank, Secured Party, and Customer.  This Agreement may not be modified without the written consent of all parties to this Agreement.

14. **Waiver.**  The failure of any party at any time to require performance by any other party of any provision of this Agreement will not affect in any way the right to require performance at any subsequent time.  Any waiver by any party of the breach of any provision of this Agreement will be effective only if in writing and will not operate as or be construed to be a waiver of any other breach of that provision or of any other provision of this Agreement.  No course of dealing or performance will be deemed to amend or otherwise affect any provision of this Agreement.

15. **Severability.**  If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal, or unenforceable, that determination will not affect any other provision of this Agreement, and each other provision will be construed and enforced as if the invalid, illegal, or unenforceable provision were not in this Agreement.

16. **Counterparts; Electronic Signatures.**  This Agreement may be executed in any number of counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by pdf, facsimile or other electronic transmission will be effective as delivery of a manually executed counterpart.  Any party executing this Agreement by pdf, facsimile or other electronic transmission will, upon request, promptly deliver a manually executed counterpart, provided that any failure to do so will not affect the validity of the counterpart executed by pdf, facsimile or electronic transmission.

17.  **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of Bank, Secured Party, and Customer and their permitted legal representatives, successors, and assigns.  Secured Party may assign or transfer its rights and obligations under this Agreement to any person or entity without the consent of Bank or

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Customer; provided that, no transfer will be binding upon Bank until Secured Party notifies Bank of the transfer in a writing or writings signed by Secured Party and the transferee that identifies the transferee, gives the transferee's address for communications under this Agreement, and states that the transferee is entitled to the benefit of Secured Party's rights and has assumed all of Secured Party's obligations under this Agreement, and Bank has had a reasonable period of time to act upon such notice. Customer may not assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Secured Party and Bank.  Bank may not assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Secured Party, which consent will not be unreasonably withheld or delayed; provided, however, that no such consent will be required if such assignment or transfer takes place as part of a merger, acquisition or corporate reorganization affecting Bank

18. **Governing Law; Jurisdiction; Jury Trial Waiver.**  The validity, construction, interpretation, and enforcement of this Agreement, and the rights of the parties hereto, in connection with each Account will be determined under, governed by, and construed in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law.  Customer and Secured Party each irrevocably consents and agrees that any action, suit or proceeding resulting from, arising out of or related to this Agreement will, except as otherwise provided in this Agreement, be instituted in any state or federal court in the State of New York and each waives any objection which it may now or hereafter have to the laying of the venue of any such action, suit or proceeding in any such jurisdiction, on the basis of a more convenient forum or otherwise.  Nothing contained in this Agreement will prevent Bank from bringing any action, suit or proceeding to enforce any award or judgment or to exercise any rights against Customer individually or against any property of Customer within any other county, state or other foreign or domestic jurisdiction.  Bank's jurisdiction for purposes of Section 9-304 of the UCC is the State of New York. **EACH OF THE PARTIES WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, REGARDLESS OF THE NATURE OF THE CLAIM OR FORM OF THE ACTION.**

[SIGNATURES ON FOLLOWING PAGES]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

IN WITNESS WHEREOF, each of the parties has executed and delivered this Agreement as of the day and year first above set forth.

Address for Notices:                                    **BANK:**

    PNC Bank, National Association          **PNC BANK, NATIONAL ASSOCIATION**
    500 First Avenue
    Mailstop: P7-PFSC-02-E                   By: _____
    Pittsburgh, PA 15219                    Print Name:_____
    Attention: TM Legal Liaison Team        Title:_____
    Facsimile:  (866) 830-1520
    Phone: (412) 768-5736

300569678

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Address for Notices:

    1345 Avenue of the Americas
    Suite 32A
    New York, New York 10105
    Attention: Micah Goodman, General Counsel

**SECURED PARTY:**

[NAME]

By: _____
Print Name:_____
Title:_____

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Address for Notices:                                    **CUSTOMER:**

_____        [NAME]
_____
_____        By: _____
Attention: _____        Print Name:_____
Facsimile:  _____        Title:_____
Phone: _____

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT A**

**List of Accounts**

| <u>Name on Account</u> | <u>Account Number</u> | <u>Account Type</u> |
|---|---|---|
| [_____] | [_____] | [_____] |

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT B**

**Funds Transfer Instructions**

 PNC

**1.  Secured Party**

| Secured Party Name | | | |
|---|---|---|---|
| Street Address | City | State | ZIP |
| Contact Name | | Telephone Number | |

**2. Company Information**

| Full Legal Company Name | | | |
|---|---|---|---|
| Company Street Address | City | State | ZIP |

**3. Repetitive Code Information \***

| Repetitive Code (Check ONE):        Add        Delete        Update | |
|---|---|
| If  "Delete"  or  "Update",  provide  your  current  repetitive  code: | |
| **Name of Originating Account** | Telephone Number |
| Debit Account Number **(REQUIRED FOR ALL REQUESTS)** | |
| **Name of Receiving Bank** | ABA or SWIFT of Receiving Bank |
| City, State, and Country of Receiving Bank | |
| **Name of Intermediary Bank (if applicable)** | ABA or SWIFT of Intermediary Bank |
| City, State, and Country of Intermediary Bank | |
| **Name and Address of Beneficiary** | Account Number of Beneficiary |
| Additional Originator to Beneficiary Information (OBI) (Must not exceed 140 characters) | |

**4. Standing Transfer Order Information \***

| Standing Transfer Order (Check ONE):        Add        Delete        Update | | |
|---|---|---|
| Debit Account Number | Current repetitive code (if applicable)* | |
| STO Start date | STO Expiration date (if applicable) | Daily transmission time (Eastern Time, 8:40 AM-5:30 PM) |
| Order Frequency (Select One):        Daily | BiWeekly (day of week_____) | |
| | Weekly   (day   of   week_____) | |

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Transfer Option (Select One):       Transfer    fixed    dollar    amount
$_____

Transfer available funds, leaving a balance of $_____

# EXHIBIT A-8

**Assignment of Management Agreement and Subordination of Management Fees**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**ASSIGNMENT OF MANAGEMENT AGREEMENT AND
SUBORDINATION OF MANAGEMENT FEES**

**THIS ASSIGNMENT OF MANAGEMENT AGREEMENT AND SUBORDINATION OF MANAGEMENT FEES** (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Assignment**") is made as of the [___] day of [_____], 2024, by [_____], a [_____], having an address at [_____] (together with its successors and permitted assigns, "**Borrower**"), to [**BSPRT CRE FINANCE, LLC**], a Delaware limited liability company, having an address at 1345 Avenue of the Americas, Suite 32A, New York, New York 10105 (together with its successors and assigns, "**Lender**"), and is consented and agreed to by **HARTMAN INCOME REIT MANAGEMENT, INC.**, a Texas corporation, having its principal place of business at 2909 Hillcroft, Suite 420, Houston, Texas 77057 (together with its successors and permitted assigns, "**Manager**").

**RECITALS:**

A.     Borrower, by its Promissory Note of even date herewith given to Lender (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "**Note**"), is indebted to Lender in the principal sum of $[_____] advanced pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), in lawful money of the United States of America, with interest from the date thereof at the rates set forth in the Loan Agreement and the Note (the indebtedness evidenced by the Loan Agreement and the Note, together with such interest accrued thereon, shall collectively be referred to as the "**Loan**"), principal and interest to be payable in accordance with the terms and conditions provided in the Loan Agreement and the Note.  Initially capitalized terms used but not defined herein shall have the meanings set forth in the Loan Agreement.

B.     The Loan is secured by, among other things, the Security Instrument, which grants Lender a first lien on the Property.

C.     Pursuant to a certain management agreement between Borrower and Manager (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Management Agreement**") (a true and correct copy of which Management Agreement is attached hereto as <u>Exhibit A</u>), Borrower employed Manager exclusively to rent, lease, operate and manage the Property and Manager is entitled to certain management fees (the "**Management Fees**") thereunder.

D.     Lender requires as a condition to the making of the Loan that Borrower assign the Management Agreement to Lender and that Manager subordinate its interest in the Management Fees in lien and payment to the Security Instrument as set forth below.

**AGREEMENT**

1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Assignment of Management Agreement</u>.  As additional collateral security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest in and to the Management Agreement, said transfer and assignment to automatically become a present, unconditional assignment, at Lender's option, in the event of a default under the Loan Agreement or any of the other Loan Documents and the failure of Borrower to cure such default within any applicable grace period.

2.    <u>Subordination of Management Agreement</u>.  Manager hereby agrees that the Management Agreement, the Management Fees and any and all liens, rights, privileges and interests (whether choate or inchoate and including, without limitation, all mechanic's and materialmen's liens under applicable law) owed, claimed or held by Manager in and to the Property pursuant to the Management Agreement or otherwise, are and shall be in all respects subordinate and inferior in lien, payment and terms to the lien, payment and terms of the Security Instrument, the Note, the Loan Agreement and the other Loan Documents, and to any renewals, extensions, modifications, assignments, replacements or consolidations thereof, and to the rights, privileges and powers of Lender thereunder.

3.    <u>Estoppel</u>.  Each of Borrower and Manager represents and warrants, as to itself, that (a) the Management Agreement is in full force and effect and has not been modified, amended or assigned other than pursuant to this Assignment and constitutes the entire agreement between Manager and Borrower with respect to management of the Property, (b) neither Manager nor Borrower is in default under any of the terms, covenants or provisions of the Management Agreement and neither Borrower or Manager knows of any event which, but for the passage of time or the giving of notice or both, would constitute an event of default by either Borrower or Manager under the Management Agreement, (c) neither Manager nor Borrower has commenced any action or given or received any notice for the purpose of terminating the Management Agreement, (d) the Management Fees and all other sums due and payable to Manager under the Management Agreement have been paid in full, as of the date hereof, and (e) Manager is aware that the Leases and the Rents relating to the Property have been assigned to Lender pursuant to the Loan Documents.

4.    <u>Agreement by Borrower and Manager</u>.  Borrower and Manager hereby agree (a) not to amend in any material respect, modify in any material respect, replace, substitute, cancel or terminate the Management Agreement without Lender's prior written consent and (b) that in the event of a default (continuing beyond any applicable grace or cure period) under the Note, the Security Instrument, the Loan Agreement or any of the other Loan Documents (each, an "**Event of Default**") during the term of this Assignment or upon the occurrence of any event which would entitle Lender to terminate, or cause the termination of, the Management Agreement in accordance with the Loan Agreement, Lender may require Borrower to terminate the Management Agreement and require Manager to transfer its responsibility for the management of the Property or such portion thereof as may be specified by Lender to a Qualified Manager in accordance with the terms of the Loan Agreement, effective as of the date set forth in Lender's notice to Manager.  In such event, Manager shall apply all rents, security deposits,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

issues, proceeds and profits of the Property in accordance with Lender's written directions to Manager.

5.     <u>Lender's Right to Replace Manager</u>.  In addition to the foregoing, in the event that Lender, in Lender's reasonable discretion, at any time during the term of this Assignment, determines that the Property (or any Individual Property) is not being managed in accordance with generally accepted management practices for properties similar in location, size, class, use, operation and value as the Property (or the applicable Individual Property), Lender may deliver written notice thereof to Borrower and Manager, which notice shall specify with particularity the grounds for Lender's determination.  If Lender reasonably determines that the conditions specified in Lender's notice are not remedied to Lender's reasonable satisfaction by Borrower or Manager within thirty (30) days from receipt of such notice or that Borrower or Manager have failed to diligently undertake correcting such conditions within such thirty (30) day period, Lender may direct Borrower to terminate Manager as manager of the Property (or any one or more of the Individual Properties, as designated by Lender) and terminate the Management Agreement and to replace Manager with a Qualified Manager in accordance with the terms of the Loan Agreement, in which event Manager shall apply all rents, security deposits, issues, proceeds and profits of the Property in accordance with Lender's written directions to Manager.

6.     <u>Management Fees</u>.

(a)     Borrower and Manager hereby agree that Manager shall not be entitled to receive any Management Fees or other fee, commission or other amount payable to Manager under the Management Agreement from and after the occurrence of an Event of Default; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary contained herein, Manager shall not be obligated to return or refund to Lender any Management Fees or other fee, commission or other amount received by Manager prior to the occurrence of the Event of Default, and to which Manager was entitled under the Management Agreement and this Assignment.

(b)     Neither Manager nor any other Person shall be entitled to a termination fee, liquidated damages or any other fees or payments as a result of the replacement of Manager, or termination of the Management Agreement, pursuant to the terms of this Assignment or the Loan Agreement.

(c)     Manager agrees that, notwithstanding anything to the contrary contained in the Management Agreement, Manager shall not be entitled to receive compensation for its services conducted in connection with any Individual Property in excess of **[___]**% of gross rent collected from such Individual Property.

7.     <u>Consent and Agreement by Manager</u>.  Manager hereby acknowledges and consents to the terms and provisions of this Assignment and Article 8 and Section 4.20 of the Loan Agreement.  Manager agrees that it will act in conformity with the provisions of this Assignment, such provisions of the Loan Agreement and Lender's rights hereunder or otherwise related to the Management Agreement.  In the event that the responsibility for the management of the Property is transferred from Manager in accordance with the provisions hereof or

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

otherwise, Manager shall fully cooperate in transferring its responsibility to a new management company and effectuate such transfer no later than thirty (30) days from the date the Management Agreement is terminated.  Further, Manager shall (a) not contest or impede the exercise by Lender of any right it has under or in connection with this Assignment and (b) give at least thirty (30) days prior written notice to Lender of its intention to terminate the Management Agreement or otherwise discontinue its management of the Property.  After exercise of Lender's rights under Section 1 of this Assignment, (i) Manager shall, subject to the terms and conditions contained herein, continue to provide management services in accordance with, and to the extent provided for in, the Management Agreement (and, if applicable, shall continue to maintain the liquor licenses at the Property for and on behalf of Lender and shall cooperate with Lender in any application by Lender to obtain new liquor licenses) and shall take no further instruction from Borrower or any Person (other than Lender) in connection therewith and (ii) neither Lender nor any successor owner of the Property shall be responsible or liable for any representation or warranty made by Borrower under the Management Agreement or for any act, omission or default by Borrower under the Management Agreement which occurred prior to exercise of Lender's rights under Section 1.

8.    <u>Termination</u>.  At such time as the Loan is paid in full and the Security Instrument is released or assigned of record, this Assignment and all of Lender's right, title and interest hereunder with respect to the Management Agreement shall terminate.

9.    <u>Notices</u>.  All notices or other communications hereunder shall be in writing and shall be given in accordance with Section 15.5 of the Loan Agreement.  Any notice or other communication to Manager shall be addressed as follows (or at such other address and Person as shall be designated by Manager from time to time):

If to Manager:    Hartman Income REIT Management, Inc.
2909 Hillcroft, Suite 420
Houston, Texas 77057
Attention: Chief Executive Officer

10.    <u>No Verbal Change</u>.  This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated verbally or by any act or failure to act on the part of Borrower, Lender or Manager, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

11.    <u>Liability</u>.  This Assignment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and permitted assigns forever.  Lender shall have the right to assign or transfer its rights under this Assignment in connection with any assignment of the Loan and the Loan Documents.  Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Assignment.  Neither Borrower nor Manager shall have the right to assign or transfer its rights or obligations under this Assignment without the prior written consent of Lender, as provided in the Loan Agreement, and any attempted assignment without such consent shall be null and void.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

12.    <u>Inapplicable Provisions</u>.  If any provision of this Assignment is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Assignment, such provision shall be fully severable and this Assignment shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Assignment, and the remaining provisions of this Assignment shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Assignment, unless such continued effectiveness of this Assignment, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

13.    <u>Governing Law; Submission to Jurisdiction</u>.  The governing law and related provisions set forth in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein (with Borrower and Manager substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to Borrower and Manager hereunder. Borrower and Manager hereby certify that they have received and reviewed the Loan Agreement (including, without limitation, Section 15.4 thereof).  In the event of any conflict or inconsistency between any of the other terms and conditions of this Assignment and this Section 13, this Section 13 shall control.

14.    <u>Headings, etc</u>.  The headings and captions of the various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

15.    **<u>Waiver Of Trial By Jury</u>.  BORROWER, MANAGER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS ASSIGNMENT OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, MANAGER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.**

16.    <u>Duplicate Originals, Counterparts</u>.  This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

300569674v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

17.     <u>Number and Gender</u>.   Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

18.     <u>Secondary Market</u>.   Lender may sell, transfer and deliver the Note and assign the Security Instrument, this Assignment and the other Loan Documents to one or more investors in the secondary mortgage market and, in connection with such sale, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Security Instrument, this Assignment and the other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

19.     <u>Lender's Reliance on Representations</u>.   Manager has executed this Assignment in order to induce Lender to accept the Security Instrument and the Loan Documents and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

20.     <u>Miscellaneous</u>.

(a)     Wherever pursuant to this Assignment (i) Lender exercises any right given to it to approve or disapprove any matter, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove such matter, all decisions that arrangements or terms are satisfactory or not satisfactory to Lender and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b)     Wherever pursuant to this Assignment it is provided that Borrower shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Lender.

(c)     If more than one Person has executed this Assignment as "Borrower" or as "Manager," the obligations of all such Persons hereunder shall be joint and several.

21.     <u>Inconsistencies</u>.   In the event of any inconsistency between the terms and conditions of this Assignment and the terms and conditions of the Management Agreement, the terms and conditions set forth in this Assignment shall govern.

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF** the undersigned have executed this Assignment as of the date and year first above written.

**BORROWER**:

[Signature pages sent separately]

**LENDER**:

[Signature pages sent separately]

**MANAGER:**

[Signature pages sent separately]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

<u>**EXHIBIT A**</u>

<u>**MANAGEMENT AGREEMENT**</u>

(Attached hereto)

A-1

# EXHIBIT A-9

**Collateral Assignment of Interest Rate Cap Agreement**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## COLLATERAL ASSIGNMENT OF
## INTEREST RATE CAP AGREEMENT

**COLLATERAL ASSIGNMENT OF INTEREST RATE CAP AGREEMENT**, dated as of **[_____]**, 2024 (this "**Assignment**"), made by **[_____]**, a **[_____]**, having its principal place of business at **[_____]** ("**Assignor**") in favor of **[BSPRT CRE FINANCE, LLC]**, a Delaware limited liability company, having an address at 1345 Avenue of the Americas, Suite 32A, New York, New York 10105 (together with its successors and assigns, "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings assigned such terms in that certain Loan Agreement, of even date herewith, between Assignor, as borrower, and Assignee, as lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").

1.      For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Assignor, Assignor hereby assigns, grants, delivers and transfers to Assignee, as collateral, all of its interest, whether now owned or hereafter acquired, now existing or hereafter arising, wherever located, in, to and under that certain Confirmation and Agreement (Reference Number **[_____]**), dated **[_____]**, 20**[__]**, between Assignor and **[_____]**, as the counterparty thereunder ("**Counterparty**") (together with that certain ISDA Master Agreement (Multicurrency-Cross Border) form deemed to have been executed by Assignor and Counterparty concurrently with the Confirmation and Agreement pursuant to the terms of such Confirmation and Agreement, the "**Interest Rate Cap Agreement**"), including, but not limited to, any and all rights that such Assignor may now or hereafter have to any and all payments, disbursements, distributions or proceeds (collectively, "**Payments**") owing, payable or required to be delivered to Assignor on account of the Interest Rate Cap Agreement with respect to the period commencing on the date hereof and ending on the date on which Borrower shall have repaid the Loan in its entirety, and all proceeds of any or all of the foregoing (collectively, the "**Cap Collateral**").  Assignor hereby grants to Assignee a security interest in and to the Interest Rate Cap Agreement, the Cap Collateral and all Proceeds (as defined in the Uniform Commercial Code adopted in the State of New York (the "**UCC**")) thereof, to have and to hold the same, unto Assignee, its successors and assigns, and Assignor covenants and agrees to cause all Payments to be made directly to Assignee.  This Assignment constitutes additional security for the obligations of Assignor secured by the Loan Agreement and secured or evidenced by the other Loan Documents.

2.      Counterparty hereby consents to the assignment contained in <u>Paragraph 1</u> hereof and agrees that it will make any Payments that become payable under or pursuant to the Interest Rate Cap Agreement directly into the Interest Rate Cap Reserve Account (or into such other Account as Lender may designate) until such time as this Assignment is terminated or otherwise canceled, at which time Counterparty will be instructed to make payments to or on behalf of Assignor.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

3.      Prior to the occurrence of an Event of Default, Payments received by Assignee shall be deposited into the Interest Rate Cap Reserve Account (or into such other Account as Lender may designate) and applied to payments becoming due under the Note, as and when such payments are due.  Upon the occurrence and during the continuance of an Event of Default (a) Payments received by Assignee may be applied by Assignee to any principal, interest and other amounts owing by Borrower under the Note and the other Loan Documents in such order and priority as Assignee shall determine in its sole and absolute discretion and (b) Assignee shall be entitled to exercise all remedies provided in the UCC with respect to the security interest being granted herein.

4.      Except in connection with permitted transfers or encumbrances that do not require Assignee's written consent or approval pursuant to the Loan Documents, Assignor hereby covenants and agrees that Assignor shall not, without first obtaining Assignee's or its successor's or assign's written consent, convey, assign, sell, mortgage, encumber, pledge, hypothecate, grant a security interest in, grant an option or options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration) the Interest Rate Cap Agreement.  Assignor and Counterparty hereby covenant and agree that neither Assignor nor Counterparty shall, without first obtaining Assignee's or its successor's or assign's written consent, amend, modify, cancel or terminate the Interest Rate Cap Agreement.  Assignee agrees to be bound by all of the terms, covenants and conditions of the Interest Rate Cap Agreement to which Assignor is bound.

5.      In the event that for any reason the Interest Rate Cap Agreement ever expires, or is terminated, rescinded or revoked and, as a result thereof, a termination fee or such similar payment is owing to Assignor by Counterparty, such sum is and shall be considered a Payment and a part of the Cap Collateral and shall be held and disbursed by Assignee in accordance with the terms hereof; provided, however, that so long as no Event of Default has occurred and is continuing, Assignee will (a) make such termination fee or similar payment available to Assignor to be applied to the reasonable and customary costs and expenses payable by Assignor in connection with Assignor's replacement of the Interest Rate Cap Agreement and (b) disburse the balance of such termination fee or similar payment to Assignor if Assignor has replaced the Interest Rate Cap Agreement in accordance with the terms and provisions of this Assignment and the other Loan Documents, and such replacement Interest Rate Cap Agreement is in fact in full force and effect.

6.      Assignor represents and warrants that:  (a) it has the full power, right and authority to assign its interest in the Cap Collateral, (b) Assignor owns the Cap Collateral free and clear of all liens and claims of others and Assignor has not transferred, assigned, granted a security interest in or otherwise encumbered its interest in and to the Cap Collateral other than in favor of Assignee, (c) no security agreement, financing statement or other document is on file or of record in any public office with respect to the Cap Collateral, other than in favor of Assignee, (d) the obligation of Counterparty under the Interest Rate Cap Agreement to make Payments is not subject to any defense or counterclaim arising from any act or omission of Assignor or any Affiliate of Assignor, (e) the location of its chief executive office is the address set forth in the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

caption to this Assignment and (f) upon the filing of UCC Financing Statements naming Assignor as debtor and Assignee as secured party in the Office of the Secretary of State of the State of Delaware, Assignee will have a first priority perfected lien on the Cap Collateral.

7.      Assignor covenants and agrees with Assignee as follows:  (a) it will comply with all terms of the Interest Rate Cap Agreement within the time periods provided therein, (b) it will not (i) waive any material provision of the Interest Rate Cap Agreement, (ii) fail to deliver a copy of any notice received from Counterparty to Assignee, or (iii) without the prior written consent of Assignee, fail to exercise any right thereunder and (c) it will not change the location of its state of organization from the location specified in the caption to this Assignment unless, in conjunction therewith, Assignor executes and delivers to Assignee such additional UCC Financing Statements as Assignee shall reasonably request to allow for Assignee's continued prior and perfected lien on the Cap Collateral.

8.      Assignor further covenants and agrees with Assignee that it will at any time and from time to time, upon the written request of Assignee, and at the sole expense of Assignor, promptly and duly execute and deliver such further instruments and documents and take such further action as Assignee may reasonably request for the purpose of obtaining or preserving the full benefits of this Assignment and of the rights and powers herein granted, including, without limitation, the filing of any financing or continuation statements under the UCC.  Assignor also hereby authorizes Assignee to file any such financing or continuation statement without the signature of Assignor to the extent permitted by applicable law.  A carbon, photographic or other reproduction of this Assignment shall be sufficient as a financing statement for filing in any jurisdiction.

9.      This Assignment does not include the delegation to Assignee of any of Assignor's duties, responsibilities or obligations under the Interest Rate Cap Agreement, Assignor remaining liable to perform all duties, responsibilities and obligations to be performed by Assignor thereunder, and Assignee shall not have any obligation or liability under the Interest Rate Cap Agreement or by reason of or arising out of this Assignment or the receipt by Assignee of any Payment and Assignor specifically agrees to indemnify and forever hold Assignee harmless from any claim or liability on account thereof, including, without limitation, attorneys' fees incurred, except to the extent arising from the fraud, gross negligence, illegal acts or willful misconduct of Assignee, its agents, employees or contractors.

10.      Assignee shall only be accountable for Payments actually received by it hereunder.  Assignee's sole duty with respect to the custody, safekeeping and physical preservation of the Cap Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Assignee deals with similar property for its own account.  Neither Assignee nor any of its directors, officers, employees or agents (i) shall be liable for failure to demand, collect or realize upon all or any part of the Cap Collateral, or for any delay in doing so, or (ii) shall be under any obligation to (a) sell or otherwise dispose of any Cap Collateral upon the request of any Assignor or any other person or (b) take any other action whatsoever with regard to the Cap Collateral or any part thereof.  The powers conferred on Assignee hereunder are solely to protect Assignee's interests in the Cap Collateral and shall not

3

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

impose any duty upon Assignee to exercise any such powers.  Assignee shall be accountable only for amounts it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to Assignor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

11.    Any notices required to be given under this Assignment shall be given in the manner provided in Section 15.5 of the Loan Agreement.

12.    This Assignment may not be modified, amended or terminated except by a written agreement executed by all of the parties hereto.

13.    Any provision of this Assignment that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

14.    Assignee shall not by any act (except by a written instrument), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof. No failure by Assignee to exercise, nor any delay by Assignee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by Assignee of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Assignee may otherwise have on any future occasion.  The rights and remedies of Assignee herein provided are cumulative, may be exercised singularly or concurrently, and are not exclusive of any rights or remedies provided by law.

15.    The parties hereto hereby notify Counterparty of this Assignment and the security interests granted to Assignee hereunder and instruct Counterparty to make all payments to be made under or pursuant to the terms of the Interest Rate Cap Agreement, without set-off, defense or counterclaim, to Assignee in accordance with written instructions (subject to the terms hereof) delivered by Assignee, its successors or assigns, to Counterparty at the address set forth under its signature hereto.

16.    The governing law and related provisions set forth in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein (with Borrower and Counterparty substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to Borrower and Counterparty hereunder.  In the event of any conflict or inconsistency between any of the other terms and conditions of this Agreement and this Section 16, this Section 16 shall control.

17.    This Assignment shall terminate upon the earlier to occur of (a) the termination or expiration of the Interest Rate Cap Agreement and (b) the payment in full of the Loan.

300569677v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

18.     This Assignment shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective successors and assigns.  If more than one Person has executed this Assignment as "Assignor," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

19.     This Assignment may be executed in any number of counterparts each of which shall be an original, but all of which shall constitute one instrument.

20.     Assignee shall have the right to assign this Assignment and its obligations hereunder in connection with an assignment of the Loan.  The parties hereto acknowledge that following the execution and delivery of this Assignment, Assignee may sell, transfer and assign this Assignment, the Loan and the other Loan Documents.  All references to "Assignee" hereunder shall be deemed to include the assigns of Assignee and the parties hereto acknowledge that actions taken by Assignee hereunder may be taken by Assignee's agents and by the agents of the assigns of Assignee.

21.     The provisions of <u>Section 12.1</u> of the Loan Agreement are hereby incorporated by reference as if fully set forth herein.

22.     In consideration of the foregoing agreement by Counterparty, Assignor agrees that (a) Counterparty shall be entitled to conclusively rely (without any independent investigation) on any notice or instructions from Assignee in respect of the Interest Rate Cap Agreement and (b) Counterparty shall be held harmless and shall be fully indemnified by Assignor, from and against any and all claims, other than those arising out of the gross negligence or willful misconduct of Counterparty, and from and against any damages, penalties, judgments, liabilities, losses or expenses (including attorney's fees and disbursements) reasonably incurred by Counterparty as a result of the assertion of any claim, by any person or entity, arising out of, or otherwise related to, any actions taken or omitted to be taken by Counterparty in reliance upon any such instructions or notice provided by Assignee.  Except as may be expressly permitted pursuant to the terms or provisions of the Interest Rate Cap Agreement, Counterparty covenants with Assignee that Counterparty shall not terminate or amend any of the terms or provisions of the Interest Rate Cap Agreement during the term of this Assignment without the prior written consent of Assignee, which consent may be withheld by Assignee in its reasonable discretion.

23.     THE PARTIES HEREBY AGREE THAT (A) COUNTERPARTY'S EXECUTION BELOW BY ELECTRONIC MEANS SHALL HAVE THE SAME LEGAL EFFECT AS COUNTERPARTY'S ORIGINAL SIGNATURE AND THE PARTIES MAY RELY UPON THE BINDING AND ENFORCEABLE EFFECT OF SUCH ELECTRONIC SIGNATURE, AND (B) THAT THE DELIVERY OF COUNTERPARTY'S SIGNATURE BY ELECTRONIC DELIVERY IN .PDF FORMAT SHALL HAVE THE SAME LEGAL EFFECT AS THE DELIVERY OF COUNTERPARTY'S ORIGINAL SIGNATURE AND THE PARTIES MAY RELY UPON THE BINDING AND ENFORCEABLE EFFECT OF SUCH DELIVERY.  AS SOON AS REASONABLY PRACTICAL, COUNTERPARTY SHALL PROVIDE AN ORIGINAL SIGNATURE TO ASSIGNEE.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**[NO FURTHER TEXT ON THIS PAGE]**

300569677v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, Assignor and Assignee have duly executed this Assignment on the day and year first written above.

**ASSIGNOR:**

[Signature pages sent separately]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**ASSIGNEE:**

[Signature pages sent separately]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**THE UNDERSIGNED HEREBY ACKNOWLEDGES RECEIPT OF NOTICE OF THE FOREGOING ASSIGNMENT AND CONSENTS THERETO AND AGREES THAT THE UNDERSIGNED SHALL HEREAFTER CAUSE ALL PAYMENTS REQUIRED TO BE MADE BY THE UNDERSIGNED PURSUANT TO THE TERMS OF THE INTEREST RATE CAP AGREEMENT TO BE MADE DIRECTLY TO ASSIGNEE, ITS SUCCESSORS OR ASSIGNS, IN ACCORDANCE WITH WRITTEN INSTRUCTIONS (BUT SUBJECT TO THE TERMS OF THE ASSIGNMENT) TO BE DELIVERED BY ASSIGNEE, ITS SUCCESSORS OR ASSIGNS, TO THE UNDERSIGNED AT THE ADDRESS SET FORTH BELOW.  THE UNDERSIGNED FURTHER AGREES THAT ALL SUCH PAYMENTS SHALL BE MADE TO ASSIGNEE WITHOUT SET-OFF, DEFENSE OR COUNTERCLAIM.  THE UNDERSIGNED AGREES THAT IT SHALL NOT AMEND OR MODIFY THE INTEREST RATE CAP AGREEMENT WITHOUT THE PRIOR WRITTEN CONSENT OF ASSIGNEE, ITS SUCCESSORS OR ASSIGNS.**

**COUNTERPARTY:**

[_____],
a [_____]
By: _____
      Name:
      Title:

Address:  [_____]
          [_____]
          [_____]
          [_____]
          Attention:  [_____]
          Email:  [_____]
          Facsimile No.:  (\_\_\_) \_\_\_-\_\_\_\_
          Telephone No.:  (\_\_\_) \_\_\_-\_\_\_\_

Date:  _____, 20\_\_\_\_

Reference No.:  _____

# EXHIBIT A-10

**Guaranty of Recourse Obligations**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## GUARANTY OF RECOURSE OBLIGATIONS

This **GUARANTY OF RECOURSE OBLIGATIONS** (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Guaranty**") is executed as of [_____] [__], 2024 by **SILVER STAR PROPERTIES REIT, INC.**, a Maryland corporation, having an address at [_____] (together with its successors and permitted assigns, "**Guarantor**"), for the benefit of **[BSPRT CRE FINANCE, LLC]**, a Delaware limited liability company, having an address at 1345 Avenue of the Americas, Suite 32A, New York, New York 10105 (together with its successors and assigns, "**Lender**").

### W I T N E S S E T H :

A.     Pursuant to that certain Promissory Note dated the date hereof executed by [_____] ("**Borrower**") and payable to the order of Lender (together with all renewals, modifications, increases and extensions thereof, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan (the "**Loan**") which is made pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is further evidenced, secured or governed by other instruments and documents executed in connection with the Loan.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

B.     Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined).

C.     Guarantor is the owner of direct or indirect equity or beneficial ownership interests in Borrower, and, therefore, Guarantor will directly benefit from Lender making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

### ARTICLE 1
### NATURE AND SCOPE OF GUARANTY

Section 1.1     <u>Guaranty of Obligations</u>.     Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations (defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 1.2 <u>Definition of Guaranteed Obligations</u>.   As used herein, the term "**Guaranteed Obligations**" shall mean all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to and to the extent expressly provided in Article 12 of the Loan Agreement.

Section 1.3   <u>Nature of Guaranty</u>.  This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs).  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment, sale, pledge, transfer, participation or negotiation of all or part of the Note.

Section 1.4   <u>Guaranteed Obligations Not Reduced by Offset</u>.   The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise (except in connection with Lender's receipt of payment thereof.

Section 1.5   <u>Payment By Guarantor</u>.  If all or any part of the Guaranteed Obligations shall not be paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, all such notices being hereby waived by Guarantor (except to the extent otherwise specifically provided in the Loan Documents), pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

Section 1.6   <u>No Duty To Pursue Others</u>.  It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

Section 1.7    Waivers. Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Security Instrument, the Loan Agreement or any other Loan Document, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory note or other document arising under the Loan Documents or in connection with the Property, (v) the occurrence of (A) any breach by Borrower of any of the terms or conditions of the Loan Agreement or any of the other Loan Documents, or (B) an Event of Default, (vi) Lender's transfer, sale, assignment, pledge, participation or disposition of the Guaranteed Obligations, or any part thereof, (vii) the sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed.

Section 1.8    Payment of Expenses. In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all reasonable costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder, together with interest thereon at the Default Rate from the date requested by Lender until the date of payment to Lender. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

Section 1.9    Effect of Bankruptcy. In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain (or shall be reinstated to be) in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

Section 1.10    Waiver of Subrogation, Reimbursement and Contribution. Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating the Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 1.11    <u>Borrower</u>.  The term "**Borrower**" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower, as permitted under the Loan Agreement.

Section 1.12    <u>Foreign Taxes</u>.  All payments made by Guarantor hereunder (including, without limitation, the Guaranteed Obligations) shall be made free and clear of, and without reduction for or on account of, income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority ("**Foreign Taxes**"), except to the extent such Foreign Taxes are imposed as a result of a change in Lender's principal place of business or the location of accounts used by Lender as of the date hereof.  If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender (including, without limitation, the Guaranteed Obligations) shall be increased to the extent necessary to yield to Lender (after payment of all such Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder.  Whenever any Foreign Taxes are payable pursuant to applicable law by Guarantor, within a reasonable time thereafter, Guarantor shall send to Lender a receipt, if available, or other reasonable documentary evidence thereof showing payment of the same.  Guarantor hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender as a direct result of any failure by Guarantor to pay any such Foreign Taxes when due or any failure by Guarantor to remit to Lender the required receipts or other required documentary evidence hereunder.

## ARTICLE 2
## <u>EVENTS AND CIRCUMSTANCES NOT REDUCING</u>
## <u>OR DISCHARGING GUARANTOR'S OBLIGATIONS</u>

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following (except to the extent expressly prohibited by applicable law):

Section 2.1    <u>Modifications/Sales</u>.  Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Security Instrument, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations, or any sale, assignment or foreclosure of the Note, the Loan Agreement, the Security Instrument, or any other Loan Documents or any sale or transfer of the Property, or any failure of Lender to notify Guarantor of any such action.

Section 2.2    <u>Adjustment</u>.  Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 2.3    Condition of Borrower or Guarantor.    The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members, as applicable, of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

Section 2.4    Invalidity of Guaranteed Obligations.    The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by Legal Requirements, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Security Instrument, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Security Instrument, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

Section 2.5    Release of Obligors.    Any full or partial release of the liability of Borrower for the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support from any other Person, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons (including Borrower) will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other Persons (including Borrower) to pay or perform the Guaranteed Obligations.

Section 2.6    Other Collateral.    The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

Section 2.7    Release of Collateral.    Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time

5

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

Section 2.8    Care and Diligence.  The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including, but not limited to, any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations, or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

Section 2.9    Unenforceability.  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

Section 2.10    Representation.  The accuracy or inaccuracy of the representations and warranties made by Guarantor herein or by Borrower in any of the Loan Documents.

Section 2.11    Offset.  The Note, the Guaranteed Obligations and the liabilities and obligations of the Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise (except to the extent of payments actually received by Lender).

Section 2.12    Merger.  The reorganization, merger or consolidation of Borrower or Guarantor into or with any other Person.

Section 2.13    Preference.  Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or to any other Person.

Section 2.14    Other Actions Taken or Omitted.  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it being the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and to extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

Section 3.1     <u>Benefit</u>.  Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

Section 3.2     <u>Familiarity and Reliance</u>.     Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

Section 3.3     <u>No Representation By Lender</u>.  Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce the Guarantor to execute this Guaranty.

Section 3.4     <u>Guarantor's Financial Condition</u>.  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities, including the Guaranteed Obligations.

Section 3.5     <u>Legality</u>.  The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor.  This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

Section 3.6     <u>Survival</u>.  All representations and warranties made by Guarantor herein shall survive the execution hereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

# ARTICLE 4
## SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 4.1    <u>Subordination of All Guarantor Claims</u>.    As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, and whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor.    The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.    So long as any portion of the Obligations or the Guaranteed Obligations remain outstanding, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other Person any amount upon the Guarantor Claims.

Section 4.2    <u>Claims in Bankruptcy</u>.    In the event of any receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceeding involving Guarantor as a debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender.    Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

Section 4.3    <u>Payments Held in Trust</u>.    Notwithstanding anything to the contrary in this Guaranty, in the event that any Guarantor should receive any funds, payments, claims or distributions which are prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

Section 4.4    <u>Liens Subordinate</u>.    Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach.    Without the prior written consent of

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Lender, Guarantor shall not (i) exercise or enforce any creditor's rights it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or the joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor. The foregoing shall in no manner vitiate or amend, nor be deemed to vitiate or amend, any prohibition in the Loan Documents against Borrower or Guarantor transferring any of its assets to any Person other than Lender.

## ARTICLE 5
## COVENANTS

Section 5.1    Definitions.  As used in this Article 5, the following terms shall have the respective meanings set forth below:

(a)    "**GAAP**" shall mean generally accepted accounting principles, consistently applied.

(b)    "**Liquid Assets**" shall mean assets in the form of cash, cash equivalents, obligations of (or fully guaranteed as to principal and interest by) the United States or any agency or instrumentality thereof (provided the full faith and credit of the United States supports such obligation or guarantee), certificates of deposit issued by a commercial bank having net assets of not less than $500 million, securities listed and traded on a recognized stock exchange or traded over the counter and listed in the National Association of Securities Dealers Automatic Quotations, or liquid debt instruments that have a readily ascertainable value and are regularly traded in a recognized financial market.

(c)    "**Net Worth**" shall mean, as of a given date, (x) the total assets of Guarantor as of such date less (y) Guarantor's total liabilities as of such date, determined in accordance with GAAP.

Section 5.2    Covenants.  Until all of the Obligations and the Guaranteed Obligations have been paid in full, Guarantor shall (i) maintain (A) a Net Worth (in the aggregate, if Guarantor consists of more than one Person), exclusive of any interest in the Property, of at least $[_____], and (B) Liquid Assets having a market value of at least $[_____] (in the aggregate, if Guarantor consists of more than one Person), (ii) deliver to Lender within five (5) Business Days of receipt, copies of any default notices received by Guarantor in respect of any material Indebtedness of Guarantor or any Affiliate thereof, (iii) deliver to Lender within forty-five (45) days of the end of each calendar quarter, Guarantor's financial statements prepared and certified by Guarantor as being true, correct and complete and fairly presenting the financial condition and results of operations of Guarantor in a manner consistent with GAAP (or in accordance with the accounting methodology used to prepare the financial statements of Guarantor delivered to Lender in connection with the closing of the Loan) and otherwise in form and substance acceptable to Lender (provided that at any time an Event of Default exists or Lender has a reasonable basis to believe any such financial statement is inaccurate in any material respect or does not fairly represent the financial condition

9

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

of Guarantor, any such financial statements shall, at Lender's request, be prepared and reviewed by an independent firm of certified public accountants acceptable to Lender), including quarterly and year-to-date statements of income and expense and cash flow, together with a balance sheet for such quarter for Guarantor, (iv) deliver to Lender within ninety (90) days of each Fiscal Year, Guarantor's annual financial statements audited by an independent firm of certified public accountants acceptable to Lender and prepared in accordance with GAAP (or in accordance with the accounting methodology used to prepare the financial statements of Guarantor delivered to Lender in connection with the closing of the Loan) and otherwise in form and substance acceptable to Lender, including statements of income and expense and cash flow and a balance sheet for Guarantor, and certified by Guarantor as being true, correct and complete and fairly presenting the financial condition and results of operations of Guarantor in a manner consistent with GAAP (or in accordance with the accounting methodology used to prepare the financial statements of Guarantor delivered to Lender in connection with the closing of the Loan), and (v) deliver to Lender, within forty-five (45) days of the end of each calendar quarter and within ninety (90) days of each Fiscal Year, a certificate of such Guarantor setting forth in reasonable detail Guarantor's Net Worth and Liquid Assets, based on such financial statement.

### ARTICLE 6
### MISCELLANEOUS

Section 6.1    Waiver.  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor any consent to any departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

Section 6.2    Notices.  All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") permitted or required to be given under this Guaranty shall be given in accordance with the applicable terms and conditions of the Loan Agreement.  Notices to Guarantor shall be addressed as follows:

| To: | Silver Star Properties REIT, Inc. |
| | 2909 Hillcroft, Suite 420 |
| | Houston, Texas 77057 |
| | Attention: Chief Executive Officer |

| with a copy to:: | Silver Star Properties REIT, Inc. |
| | 2909 Hillcroft, Suite 420 |
| | Houston, Texas 77057 |
| | Attention: Adrienne Collins, General Counsel |

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 6.3    <u>Governing Law; Submission to Jurisdiction</u>.  The governing law and related provisions set forth in Section 15.4 of the Loan Agreement (including, without limitation, any authorized agent provisions thereof) are hereby incorporated by reference as if fully set forth herein (with Guarantor substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to Guarantor hereunder.  Guarantor hereby certifies that it has received and reviewed the Loan Agreement (including, without limitation, Section 15.4 thereof).  In the event of any conflict or inconsistency between any of the other terms and conditions of this Guaranty and this Section 6.3, this Section 6.3 shall control.

Section 6.4    <u>Invalid Provisions</u>.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

Section 6.5    <u>Amendments</u>.  This Guaranty may be amended only by an instrument in writing executed by the party against whom such amendment is sought to be enforced.

Section 6.6    <u>Parties Bound; Assignment; Joint and Several</u>.  This Guaranty shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and legal representatives.  Lender may sell, assign, pledge, participate, transfer or delegate, as applicable to one or more Persons all or a portion of its rights and obligations under this Guaranty in connection with any assignment, sale, pledge, participation or transfer of the Loan and the Loan Documents.  Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Guaranty.  Guarantor shall not have the right to delegate, assign or transfer its rights or obligations under this Guaranty without the prior written consent of Lender, and any attempted assignment, delegation or transfer without such consent shall be null and void.  If Guarantor consists of more than one Person or party, the obligations and liabilities of each such Person or party hereunder shall be joint and several.

Section 6.7    <u>Headings</u>.  Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

Section 6.8    <u>Recitals</u>.  The recitals and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered *prima facie* evidence of the facts and documents referred to therein.

Section 6.9    <u>Counterparts</u>.  To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties

hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

Section 6.10  <u>Rights and Remedies</u>. If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

Section 6.11  **<u>Entirety</u>. THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.**

Section 6.12  **<u>Waiver of Right To Trial By Jury</u>. GUARANTOR HEREBY, AND LENDER BY ACCEPTANCE HEREOF, EACH AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE SECURITY INSTRUMENT, THE LOAN AGREEMENT, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF GUARANTOR AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF GUARANTOR AND LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 6.13    <u>Transfer of Loan</u>.  Article 9 of the Loan Agreement is hereby incorporated by reference as if fully set forth herein.  Guarantor hereby agrees to cooperate in fulfilling any obligation of Borrower under Article 9 of the Loan Agreement.

Section 6.14    <u>Reinstatement in Certain Circumstances</u>.  If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, the Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

Section 6.15    <u>Gender; Number; General Definitions</u>.    Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, (a) words used in this Guaranty may be used interchangeably in the singular or plural form, (b) any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, (c) the word "**Borrower**" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or interest therein", (d) the word "**Lender**" shall mean "Lender and any subsequent holder of the Note", (e) the word "**Note**" shall mean "the Note and any other evidence of indebtedness secured by the Loan Agreement, as amended, restated or otherwise modified", (f) the word "**Property**" shall include any portion of the Property and any interest therein, and (g) the phrases "**attorneys' fees**", "**legal fees**" and "**counsel fees**" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels, incurred or paid by Lender in protecting its interest in the Property, the Leases and/or the Rents and/or in enforcing its rights hereunder.

**[NO FURTHER TEXT ON THIS PAGE]**

13

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the day and year first above written.

**GUARANTOR:**

[Signature pages sent separately]

# EXHIBIT A-11

**Borrower's Certification**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

### BORROWER'S CERTIFICATION

In connection with that certain mortgage loan (the "**Loan**") being made by **[BSPRT CRE FINANCE, LLC]**, a Delaware limited liability company, having an address at 1345 Avenue of the Americas, Suite 32A, New York, New York 10105 (together with its successors and/or assigns, "**Lender**") to [_____] having an address at [_____] ("**Borrower**"), which Loan is secured by the Property, the undersigned hereby represents, warrants and certifies to Lender as of this [___] day of [_____], 2023:

1.       Attached hereto as <u>Exhibit A</u> is a true, complete and accurate copy of the rent roll of the Property and there has been no material adverse change in the rent roll since the date thereof.

2.       Attached hereto as <u>Exhibit B</u> is a true complete and correct copy of the current annual budget for the Property.

3.       Attached hereto as <u>Exhibit C</u> are true, complete and accurate copies (including all amendments thereto) of the following documents with respect to Borrower:  (i) articles of incorporation, articles of organization, certificate of formation or certificate of limited partnership (or similar document), as applicable, (ii) bylaws, operating agreement or partnership agreement (or similar document), as applicable, (iii) good standing certificate or certificate of existence (or similar document), as applicable, in the state in which Borrower is formed or organized, (iv) qualification to do business in the state in which the Property is located, if different from the state in which Borrower is formed or organized and (v) if applicable, authorizing consents or resolutions, as applicable.

4.       Intentionally Omitted.

5.       Attached hereto as <u>Exhibit E</u> is a true, complete and accurate copy (including all amendments thereto) of each operations and maintenance plan applicable to the Property (individually and, if more than one, collectively, the "**O&M Program**").

6.       Attached hereto as <u>Exhibit F</u> are true, complete and accurate copies (including all amendments thereto) of the following documents with respect to Guarantor:  (i) articles of incorporation, articles of organization, certificate of formation or certificate of limited partnership (or similar document), as applicable, (ii) bylaws, operating agreement or partnership agreement (or similar document), as applicable, (iii) good standing certificate or certificate of existence (or similar document), as applicable, in the state in which Guarantor is formed or organized and (iv) if applicable, authorizing consents or resolutions, as applicable.

7.       Attached hereto as <u>Exhibit G</u> is a true, complete and accurate copy (including all amendments thereto) of the Business Plan (including the related budget).

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed thereto in that certain Loan Agreement by and between Borrower and Lender of even date herewith (the "**Loan Agreement**").

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

     **IN WITNESS WHEREOF**, the undersigned has caused this certificate to be executed as of the day and year first above written.

BORROWER:

[Signature pages sent separately]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## EXHIBIT A

(RENT ROLL)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## EXHIBIT B

(ANNUAL BUDGET)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

# EXHIBIT C

(BORROWER ORGANIZATIONAL DOCUMENTS)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## EXHIBIT D

INTENTIONALLY OMITTED

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT E**

(O&M PROGRAM)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

# EXHIBIT F

(GUARANTOR ORGANIZATIONAL DOCUMENTS)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

# EXHIBIT G

(BUSINESS PLAN)

(attached hereto)

# EXHIBIT A-12

**Mezzanine Promissory Note**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## MEZZANINE PROMISSORY NOTE

$[_____.00]                                   New York, New York

[_____], 2023

      FOR VALUE RECEIVED **SILVER STAR MEZZANINE BORROWER, LLC**, a Delaware limited liability company as maker, having its principal place of business at _____] ("**Borrower**"), hereby unconditionally promises to pay to the order of **RMWC SILVER STAR MEZZANINE LLC**, a Delaware limited liability company, having an address at 130 East 59th Street, 13th Floor, Suite A, New York, New York 10022 (together with its successors and/or assigns, "**Lender**"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of [_____ MILLION AND NO/100 DOLLARS ($_____.00)], or so much thereof as is advanced pursuant to that certain Mezzanine Loan Agreement dated the date hereof between Borrower and Lender (as the same may be amended, replaced, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), in lawful money of the United States of America, with interest thereon to be computed from the date of this Mezzanine Promissory Note (as amended, replaced, restated, supplemented or otherwise modified from time to time, this "**Note**") at the interest rate specified in the Loan Agreement, and to be paid in accordance with the terms of this Note and the Loan Agreement.  All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

## ARTICLE 1:  PAYMENT TERMS

      Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon and all other amounts due under the Loan Documents shall be due and payable on the Maturity Date.

## ARTICLE 2:  DEFAULT AND ACCELERATION

      The Debt shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default.

## ARTICLE 3:  LOAN DOCUMENTS

      This Note is secured by the Pledge Agreement and the other Loan Documents.  All of the terms, covenants and conditions contained in the Loan Agreement, the Pledge Agreement and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.  In the event of a conflict or inconsistency

1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4:  SAVINGS CLAUSE

Notwithstanding anything to the contrary contained in this Note or in any of the other Loan Documents, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender, or if there is no such indebtedness, shall immediately be returned to Borrower.

## ARTICLE 5:  NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6:  WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind.  No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other Person who may become liable for the payment of all or any part of the Debt under this Note, the Loan Agreement or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term

2

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"Borrower," as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, which may be set forth in the Loan Agreement, the Pledge Agreement or any other Loan Document.)

## ARTICLE 7:  TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8:  EXCULPATION

The provisions of Article 12 of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

## ARTICLE 9:  GOVERNING LAW

The governing law and related provisions contained in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein.

## ARTICLE 10:  NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Article 15.5 of the Loan Agreement.

## ARTICLE 11:  SUCCESSORS AND ASSIGNS;
## JOINT AND SEVERAL LIABILITY

This Note shall be binding upon, and shall inure to the benefit of, Borrower and Lender and their respective successors and permitted assigns. Lender may sell, assign, pledge, participate, transfer or delegate, as applicable, to one or more Persons, all or a portion of its rights and obligations under this Note and the other Loan Documents to any Person. Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Note. Borrower shall not have the right to assign, delegate or transfer its rights or obligations under this Note without the prior written consent of Lender (except to the extent otherwise expressly permitted pursuant to the terms and conditions of the Loan Agreement), and any attempted assignment, delegation or transfer without such consent shall be null and void. If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.

3

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, Borrower has duly executed this Note as of the day and year first above written.

**BORROWER**:

[Signature pages sent separately]

300570051v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ADDENDUM TO NOTE
### (TEXAS)

THE UNDERSIGNED AND ALL OTHER MAKERS, SIGNERS, SURETIES, GUARANTORS AND ENDORSERS OF THIS NOTE WAIVE DEMAND, PRESENTMENT, NOTICE OF DISHONOR, NOTICE OF INTENT TO DEMAND OR ACCELERATE PAYMENT HEREOF, DILIGENCE IN THE COLLECTING, GRACE (EXCEPT AS SPECIFICALLY ALLOWED UNDER THE LOAN AGREEMENT), NOTICE (EXCEPT AS SPECIFICALLY ALLOWED UNDER THE LOAN AGREEMENT) AND PROTEST AND AGREE TO ONE OF MORE EXTENSIONS FOR ANY PERIOD OR PERIODS OF TIME AND PARTIAL PAYMENTS, BEFORE OR AFTER MATURITY, WITHOUT PREJUDICE TO THE HOLDER HEREOF. IF COLLECTION PROCEDURES ARE EVER COMMENCED, BY ANY MEANS, INCLUDING LEGAL PROCEEDINGS OR THROUGH A PROBATE OR BANKRUPTCY COURT, OR IF THIS NOTE IS PLACED IN THE HANDS OF ANY ATTORNEY FOR COLLECTION AFTER DEFAULT BEYOND APPLICABLE NOTICE AND CURE PERIODS OR MATURITY, THE UNDERSIGNED AGREES TO PAY ALL REASONABLE AND NECESSARY COSTS OF COLLECTION OR ATTEMPTED COLLECTION, INCLUDING REASONABLE AND NECESSARY ATTORNEYS' FEES. THE TERM "REASONABLE AND NECESSARY ATTORNEYS' FEES" OR SIMILAR TERM USED HEREIN OR IN ANY OTHER LOAN DOCUMENT SHALL MEAN REASONABLE AND NECESSARY ATTORNEYS' FEES ACTUALLY INCURRED AND IN NO EVENT SHALL BE CALCULATED AS A PERCENTAGE OF THE INDEBTEDNESS OR FACTOR OTHER THAN A REASONABLE HOURLY RATE AND THE TIME SPENT ON THE MATTER.

[Signature pages sent separately]

# EXHIBIT A-13

**Mezzanine Loan Agreement**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

===================================================================

# LOAN AGREEMENT

dated as of [_____], 2024

between

## SILVER STAR MEZZANINE BORROWER, LLC,

as Borrower

and

## RMWC SILVER STAR MEZZANINE LLC,

as Lender

===================================================================

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

<u>Table of Contents</u>

ARTICLE 1  DEFINITIONS; PRINCIPLES OF CONSTRUCTION ...........................................1

Section 1.1  Definitions.................................................................................................... 1

Section 1.2  Principles of Construction............................................................................ 28

ARTICLE 2  GENERAL TERMS ...............................................................................................29

Section 2.1  No Loan Commitment ................................................................................. 29

Section 2.2  The Loan ...................................................................................................... 29

Section 2.3  Disbursement to Borrower........................................................................... 29

Section 2.4  The Note and the other Loan Documents .................................................... 29

Section 2.5  Interest Rate ................................................................................................. 29

Section 2.6  Loan Payments............................................................................................. 36

Section 2.7  Prepayments ................................................................................................. 37

Section 2.8  Interest Rate Cap Agreement ...................................................................... 39

Section 2.9  Intentionally Omitted .................................................................................. 42

Section 2.10  Payment of Exit Fee .................................................................................. 42

ARTICLE 3  REPRESENTATIONS AND WARRANTIES.......................................................43

Section 3.1  Existence and Authority .............................................................................. 43

Section 3.2  Borrower's Principal Place of Business....................................................... 43

Section 3.3  Validity of Documents................................................................................. 43

Section 3.4  Agreements .................................................................................................. 44

Section 3.5  Collateral...................................................................................................... 44

Section 3.6  Purchase Options ......................................................................................... 45

Section 3.7  Intentionally Omitted .................................................................................. 46

Section 3.8  Intentionally Omitted .................................................................................. 46

Section 3.9  Intentionally Omitted .................................................................................. 46

Section 3.10  Subject Transaction ................................................................................... 46

Section 3.11  Financial Condition ................................................................................... 46

Section 3.12  Financial Information................................................................................. 46

Section 3.13  Fraudulent Conveyance ............................................................................. 47

Section 3.14  Disclosure .................................................................................................. 47

Section 3.15  No Plan Assets ........................................................................................... 47

300570050v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 3.16  Not a Foreign Person ................................................................................. 47

Section 3.17  Business Purposes .................................................................................... 47

Section 3.18  Litigation ................................................................................................... 48

Section 3.19  Intentionally Omitted ............................................................................... 48

Section 3.20  Taxes ......................................................................................................... 48

Section 3.21  Insurance ................................................................................................... 48

Section 3.22  Intentionally Omitted ............................................................................... 48

Section 3.23  Illegal Activity/Forfeiture ........................................................................ 48

Section 3.24  Special Purpose Entity .............................................................................. 48

Section 3.25  Federal Reserve Regulations .................................................................... 49

Section 3.26  Investment Company Act .......................................................................... 49

Section 3.27  Embargoed Person .................................................................................... 49

Section 3.28  Organizational Chart ................................................................................. 50

Section 3.29  Bank Holding Company ............................................................................ 50

Section 3.30  No Other Financing; Other Obligations and Liabilities............................ 50

Section 3.31  Contracts ................................................................................................... 50

Section 3.32  Intentionally Omitted ............................................................................... 51

Section 3.33  No Change in Facts or Circumstances; Disclosure ................................... 51

Section 3.34  Third Party Representations ...................................................................... 51

Section 3.35  Non-Consolidation Opinion Assumptions ................................................ 51

Section 3.36  Environmental Emissions ......................................................................... 51

Section 3.37  Mortgage Loan Representations ................................................................ 51

Section 3.38  No Default Under Mortgage Loan ............................................................ 52

ARTICLE 4  BORROWER COVENANTS.......................................................................52

Section 4.1  Existence ..................................................................................................... 52

Section 4.2  Change of Name, Identity or Structure ....................................................... 52

Section 4.3  Business and Operations ............................................................................. 53

Section 4.4  Title to Collateral ........................................................................................ 53

Section 4.5  Title Insurance Proceeds ............................................................................. 53

Section 4.6  Maintenance and Use of Property................................................................ 53

Section 4.7  Taxes and Other Charges ............................................................................ 53

Section 4.8  Labor and Materials .................................................................................... 55

300570050v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 4.9   Property Access ................................................................................................. 55

Section 4.10  Litigation......................................................................................................... 55

Section 4.11  Performance by Borrower ................................................................................ 56

Section 4.12  Books and Records .......................................................................................... 56

Section 4.13  Contracts ......................................................................................................... 58

Section 4.14  Cooperation in Proceedings ............................................................................ 59

Section 4.15  Estoppel Certificates ....................................................................................... 59

Section 4.16  Leases and Rents ............................................................................................. 60

Section 4.17  Notice of Default............................................................................................. 62

Section 4.18  Other Agreements ........................................................................................... 62

Section 4.19  Alterations ....................................................................................................... 62

Section 4.20  Management Agreement .................................................................................. 63

Section 4.21  No Joint Assessment ....................................................................................... 64

Section 4.22  ERISA .............................................................................................................. 64

Section 4.23  Special Purpose Entity .................................................................................... 65

Section 4.24  Debt Cancellation............................................................................................ 65

Section 4.25  Property Documents........................................................................................ 65

Section 4.26  Embargoed Person ........................................................................................... 66

Section 4.27  Patriot Act ....................................................................................................... 66

Section 4.28  No Plan Assets; Illegal Activity/Forfeiture..................................................... 67

Section 4.29  O&M Program ................................................................................................. 67

Section 4.30  Property Releases............................................................................................. 67

Section 4.31  Deposits Under Contracts of Sale ................................................................... 67

Section 4.32  Environmental Emissions ................................................................................ 67

ARTICLE 5  INSURANCE; CASUALTY; CONDEMNATION; RESTORATION..................68

Section 5.1  Insurance .......................................................................................................... 68

Section 5.2  Casualty............................................................................................................. 69

Section 5.3  Condemnation ................................................................................................... 69

Section 5.4  Restoration ........................................................................................................ 70

ARTICLE 6  NO SALE OR ENCUMBRANCE; PERMITTED TRANSFERS ..........................71

Section 1.1  No Sale/Encumbrance....................................................................................... 71

Section 6.1  Intentionally Omitted ....................................................................................... 71

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 6.2  Permitted Equity Transfers ............................................................................ 71

Section 6.3  Replacement Guarantor ................................................................................. 71

Section 6.4  Lender's Rights ............................................................................................. 72

Section 6.5  Economic Sanctions, Anti-Money Laundering; Prohibited Entities........................ 73

Section 6.6  Partial Release............................................................................................... 73

Section 6.7  Costs and Expenses ....................................................................................... 76

ARTICLE 7  RESERVE FUNDS........................................................................................76

Section 7.1  Reserve Funds ............................................................................................... 76

Section 7.2  The Accounts Generally ................................................................................. 76

Section 7.3  Transfer of Reserve Funds under Mortgage Loan ............................................. 78

Section 7.4  Excess Cash Flow Funds ............................................................................... 79

ARTICLE 8  CASH MANAGEMENT .................................................................................79

Section 8.1  Establishment of Certain Accounts................................................................. 79

Section 8.2  Cash Management Account ............................................................................. 79

Section 8.3  Payments Received Under this Agreement....................................................... 80

ARTICLE 9  SECONDARY MARKET ...............................................................................80

Section 9.1  Securitization ................................................................................................ 80

Section 9.2  Disclosure and Indemnification ...................................................................... 82

Section 9.3  Reserves/Escrows .......................................................................................... 83

Section 9.4  Servicer ........................................................................................................ 83

Section 9.5  Intervening Mezzanine Loan .......................................................................... 84

Section 9.6  REMIC Savings Clause .................................................................................. 85

Section 9.7  Syndication; Registered Form......................................................................... 85

ARTICLE 10  EVENTS OF DEFAULT; REMEDIES ...........................................................87

Section 10.1  Event of Default........................................................................................... 87

Section 10.2  Remedies..................................................................................................... 91

ARTICLE 11  INDEMNIFICATIONS .................................................................................94

Section 11.1  General Indemnification ............................................................................... 94

Section 11.2  Mortgage and Intangible Tax Indemnification ............................................... 95

Section 11.3  ERISA Indemnification ................................................................................ 95

Section 11.4  Duty to Defend, Legal Fees and Other Fees and Expenses ................................... 95

Section 11.5  Survival....................................................................................................... 95

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 11.6  CFIUS Indemnification ........................................................................ 95

ARTICLE 12  EXCULPATION ..................................................................................96

Section 12.1  Exculpation ......................................................................................... 96

ARTICLE 13  FURTHER ASSURANCES ................................................................100

Section 13.1  Replacement Documents ................................................................... 100

Section 13.2  Intentionally Omitted ........................................................................ 100

Section 13.3  Further Acts, etc ................................................................................ 100

Section 13.4  Changes in Tax, Debt, Credit and Documentary Stamp Laws ........... 100

ARTICLE 14  WAIVERS ..........................................................................................101

Section 14.1  Remedies Cumulative; Waivers ......................................................... 101

Section 14.2  Modification, Waiver in Writing ....................................................... 101

Section 14.3  Delay Not a Waiver ........................................................................... 101

Section 14.4  Waiver of Trial by Jury ..................................................................... 102

Section 14.5  Waiver of Notice ............................................................................... 102

Section 14.6  Remedies of Borrower ....................................................................... 102

Section 14.7  Marshalling and Other Matters ......................................................... 102

Section 14.8  Waiver of Statute of Limitations ....................................................... 103

Section 14.9  Waiver of Counterclaim .................................................................... 103

Section 14.10  Sole Discretion of Lender ................................................................ 103

ARTICLE 15  MISCELLANEOUS ...........................................................................103

Section 15.1  Survival ............................................................................................. 103

Section 15.2  Expenses; Indemnity ......................................................................... 103

Section 15.3  Brokers .............................................................................................. 105

Section 15.4  Governing Law .................................................................................. 106

Section 15.5  Notices .............................................................................................. 106

Section 15.6  Headings ............................................................................................ 107

Section 15.7  Severability ....................................................................................... 107

Section 15.8  Preferences ........................................................................................ 107

Section 15.9  Cost of Enforcement .......................................................................... 108

Section 15.10  Exhibits Incorporated ...................................................................... 108

Section 15.11  Offsets, Counterclaims and Defenses .............................................. 108

Section 15.12  No Joint Venture or Partnership; No Third Party Beneficiaries ....... 108

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 15.13  Disclosure ........................................................................................... 109

Section 15.14  Limitation of Liability......................................................................... 111

Section 15.15  Conflict; Construction of Documents; Reliance ................................. 111

Section 15.16  Entire Agreement ................................................................................ 111

Section 15.17  Liability............................................................................................... 111

Section 15.18  Duplicate Originals; Counterparts ..................................................... 112

Section 15.19  Set-Off................................................................................................. 112

Section 15.20  Certain Additional Rights of Lender (VCOC).................................... 112

ARTICLE 16  INTENTIONALLY OMITTED ...........................................................113

ARTICLE 17  ADDITIONAL PROVISIONS .............................................................113

Section 17.1  Mortgage Loan Notice ......................................................................... 113

Section 17.2  Mortgage Loan Estoppels .................................................................... 114

Section 17.3  Intercreditor Agreement....................................................................... 114

Section 17.4  Direction of Mortgage Borrower. ........................................................ 114

Section 17.5  Special Distributions ............................................................................ 114

Section 17.6  Curing ................................................................................................... 114

Section 17.7  Mortgage Borrower Covenants ............................................................ 115

Section 17.8  Limitations on Distributions ................................................................ 115

Section 17.9  Deed-In-Lieu, etc ................................................................................. 115

Section 17.10  Acquisition of the Mortgage Loan ...................................................... 115

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of **[_____]**, 2024 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **RMWC SILVER STAR MEZZANINE LLC**, a Delaware limited liability company, having an address at 130 East 59th Street, 13th Floor, Suite A, New York, New York 10022 (together with its successors and/or assigns, "**Lender**") and **SILVER STAR MEZZANINE BORROWER, LLC**, a Delaware limited liability company, having its principal place of business at [_____] (together with its successors and/or assigns, "**Borrower**").

### RECITALS:

**WHEREAS,** Borrower desires to obtain the Loan (defined below) from Lender; and

**WHEREAS,** Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of the Loan Documents (defined below).

**NOW, THEREFORE,** in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

### ARTICLE 1

### DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1    Definitions**.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Account Collateral**" shall mean (i) the Accounts, and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) any and all amounts invested in Permitted Investments; (iii) all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iv) to the extent not covered by clauses (i) - (iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"**Accounts**" shall mean, collectively, each reserve or escrow account (if any) established under this Agreement or the other Loan Documents from time to time.

"**Affiliate**" shall mean, as to any Person, any other Person that (i) owns directly or indirectly twenty percent (20%) or more of all equity interests in such Person, (ii) is in Control of, is Controlled by or is under common ownership or Control with such Person, (iii) is a director or executive officer of such Person or of an Affiliate of such Person, and/or (iv) is the spouse, issue or parent of such Person.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Affiliated Manager**" shall mean any managing agent of the Property in which Borrower, Mortgage Borrower, Guarantor, Sponsor, any SPE Component Entity (if any) or any Affiliate of such entities has, directly or indirectly, any legal, beneficial or economic interest.

"**Allocated Loan Amount**" shall mean, with respect to each Individual Property, the amount shown on Exhibit F attached hereto.

"**Allocated Loan Ratio**" shall mean, with respect to each Individual Property, the ratio of (a) the Allocated Loan Amount with respect to such Individual Property to (b) the original face amount of the Note.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" (x) so long as the Mortgage Loan is outstanding, shall have the meaning set forth in the Mortgage Loan Agreement, or (y) otherwise shall mean an amount equal to 5% of the outstanding principal amount of the Loan multiplied by the Allocated Loan Ratio for the applicable Individual Property.

"**Annual Budget**" shall mean the operating and capital budget for the Property and each Individual Property setting forth, on a month-by-month basis, in reasonable detail, each line item of Borrower's (or Mortgage Borrower's) good faith estimate of anticipated Gross Rents, Operating Expenses and Capital Expenditures for the applicable Fiscal Year.

"**Appraisal**" shall mean an appraisal of the Property prepared not more than ninety (90) days prior to the relevant date with respect to which an appraisal shall be required hereunder by a member of the American Institute of Real Estate Appraisers selected by Lender, which appraisal shall (i) meet the minimum appraisal standards for national banks promulgated by the Comptroller of the Currency pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended (FIRREA), (ii) be prepared on as "as is" basis, and (iii) otherwise be in form and substance satisfactory to Lender.

"**Approved Accounting Method**" shall mean GAAP, federal tax basis accounting or such other method of accounting, in each case consistently applied, as may be reasonably acceptable to Lender.

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.12 hereof.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "**Bankruptcy**", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Bankruptcy Event**" shall mean the occurrence of any one or more of the following: (i) Borrower, Mortgage Borrower or any SPE Component Entity shall commence any case,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

proceeding or other action (A) under the Bankruptcy Code and/or any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets; (ii) Borrower, Mortgage Borrower or any SPE Component Entity shall make a general assignment for the benefit of its creditors; (iii) any Restricted Party (or Affiliate thereof) files, or joins or colludes in the filing of, (A) an involuntary petition against Borrower or any SPE Component Entity under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition under the Bankruptcy Code or any other Creditors Rights Laws against Borrower, Mortgage Borrower or any SPE Component Entity or (B) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of Borrower's, Mortgage Borrower's or any SPE Component Entity's assets; (iv) Borrower, Mortgage Borrower or any SPE Component Entity files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition from any Person; (v) any Restricted Party (or Affiliate thereof) consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower, Mortgage Borrower, any SPE Component Entity or any portion of the Property; (vi) Borrower, Mortgage Borrower or any SPE Component Entity makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (vii) any Restricted Party (or Affiliate thereof) contesting or opposing any motion made by Lender to obtain relief from the automatic stay or seeking to reinstate the automatic stay in the event of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Sponsor or its subsidiaries; (viii) any Restricted Party (or Affiliate thereof) taking any action in furtherance of, in collusion with respect to or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in items (i) through (vii) above; and (ix) in the event Lender receives less than the full value of its claim in any proceeding under the Bankruptcy Code or any other Creditors Rights Laws, Sponsor or any of its Affiliates receiving an equity interest or other financial benefit of any kind as a result of a "new value" plan or equity contribution.

"**Benchmark**" shall mean (i) initially, Term SOFR and (ii) on and after the occurrence of a Benchmark Transition Event and the related Benchmark Transition Date, the Benchmark Replacement determined in accordance with the terms and conditions hereof.

"**Benchmark Floor**" shall mean **[_____ percent (__.0%)]**.

"**Benchmark Rate**" shall mean the sum of (i) the greater of (A) the Benchmark and (B) the Benchmark Floor, and (ii) the Benchmark Spread.

"**Benchmark Rate Loan**" shall mean the Loan at all such times as interest thereon accrues at a rate of interest based upon the Benchmark pursuant to Section 2.5 hereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**"Benchmark Replacement"** shall mean, with respect to any Benchmark Transition Event, a variable rate or index selected by Lender (which may be, at Lender's option, without limitation, "Daily Simple SOFR," "Daily Compounded SOFR," or "30-Day SOFR Average").

**"Benchmark Replacement Adjustment"** shall mean, with respect to any Benchmark Replacement and its related Determination Date(s), a spread adjustment (which may be a positive or negative value, or zero) that has been selected by Lender, giving due consideration to (i) any selection or recommendation of a spread adjustment (including, without limitation, a "benchmark replacement spread adjustment") or method for calculating or determining the same, by the Relevant Governmental Body for the applicable Benchmark Replacement and its related Determination Date(s), (ii) any evolving or then-prevailing market convention for determining a spread adjustment (including, without limitation, a "benchmark replacement spread adjustment") or method for calculating or determining the same, for the applicable Benchmark Replacement and its related Determination Date(s) in U.S. dollar-denominated syndicated or bilateral commercial real estate credit facilities, and/or (iii) the spread adjustment (including, without limitation, a "benchmark replacement spread adjustment") or method for calculating or determining the same, then being utilized by Lender or its Affiliates with respect to variable rate commercial real estate loans for the applicable Benchmark Replacement and its related Determination Date(s).

**"Benchmark Replacement Conforming Changes"** shall mean, with respect to any Benchmark Transition Event, any technical, administrative or operational changes (including changes to the definitions of "Business Day," "Interest Period," "Monthly Payment Date" and "Determination Date," the timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, the applicability of adjustments to the interest rate due to the effect of reserve requirements, preceding and succeeding business day conventions and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption and implementation of the applicable Benchmark Replacement and to permit the administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of the applicable Benchmark Replacement exists, in such other manner as Lender determines is necessary in connection with the administration of the Loan).

**"Benchmark Spread"** shall mean **[_____ percent (__.0%)]**, subject to the provisions of Section 2.5(b)(vi) hereof (including, without limitation, the adjustment of the Benchmark Spread by the addition thereto of the Benchmark Replacement Adjustment, when applicable hereunder) **.** Lender's computation of the Benchmark Spread shall be conclusive and binding on Borrower for all purposes, absent manifest error.

**"Benchmark Transition Date"** shall mean any date designated by Lender for conversion of the then-current Benchmark to a Benchmark Replacement, the selection of which date may be based on, or determined with due consideration for, any of the events described in clauses (1) –

4

(7) of the definition of "Benchmark Transition Event" below (in Lender's sole discretion), as applicable.

"**Benchmark Transition Event**" shall mean any election by Lender to convert the then-existing Benchmark to a Benchmark Replacement, which such election may be based on, or determined with due consideration for, any of the following (in Lender's sole discretion):

(1)      a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark announcing that the administrator has ceased or will cease to provide such Benchmark permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark;

(2)      a public statement or publication of information by the regulatory supervisor for the administrator of the then-current Benchmark, the central bank for the currency of the such Benchmark, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, which states that the administrator of such Benchmark has ceased or will cease to provide such Benchmark permanently or indefinitely (so long as, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark);

(3)      a public statement or publication of information by the regulatory supervisor for the administrator of the then-current Benchmark announcing that such Benchmark is no longer representative;

(4)      any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body;

(5)      any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for U.S. dollar-denominated syndicated or bilateral credit facilities at such time;

(6)      Lender's determination in good faith that the then-current Benchmark is not, or is no longer, the prevailing rate being used by commercial real estate lenders for floating rate mortgage loans or by issuers of floating rate commercial mortgage securities; and/or

(7)      any variable rate or index then generally being utilized by Lender or its Affiliates with respect to the origination of variable rate commercial real estate loans.

"**Benchmark Unavailability Event**" shall mean that one or more of the following has occurred, at any time or from time to time during the term of the Loan, as determined by Lender (which determination shall be conclusive and binding upon Borrower absent manifest error): (i) at any time while the Loan is a Benchmark Rate Loan and the applicable Benchmark is Term SOFR, the Term SOFR Administrator either temporarily or permanently fails to report Term SOFR on a daily basis; (ii) at any time while the Loan is a Benchmark Rate Loan and the applicable Benchmark is not Term SOFR, the applicable administrator of the then-applicable Benchmark either temporarily or permanently fails to report such Benchmark on a daily basis;

5

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(iii) due to any Change in Law, it is unlawful (or asserted by any Governmental Authority to be unlawful) for Lender to maintain the Loan as a Benchmark Rate Loan using the then-current Benchmark; or (iv) adequate and reasonable means do not exist for ascertaining the then-current Benchmark.

"**Borrower Party**" and "**Borrower Parties**" shall mean each of Borrower, any SPE Component Entity, Mortgage Borrower, Sponsor, any Affiliated Manager and Guarantor.

"**Borrower's Debt Liability**" shall have the meaning set forth in Section 12.1(c) hereof.

"**Breakage Costs**" shall have the meaning set forth in Section 2.5(b) hereof.

"**Broker**" shall have the meaning set forth in Section 15.3 hereof.

"**Business Day**" shall mean a day on which commercial banks are not authorized or required by applicable law to close in New York, New York.

"**Capital Expenditures Reserve Account**" shall have the meaning set forth in Mortgage Loan Agreement.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under the Approved Accounting Method (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements). If the context of this Agreement or Lender requires, Capital Expenditures shall also be calculated on an Individual Property basis.

"**Cash Management Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Cash Management Agreement**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Cash Management Bank**" shall mean PNC Bank, National Association.

"**Casualty**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Change in Law**" shall mean the occurrence, after the Closing Date, of any of the following: (i) the adoption or taking effect of any law, rule, regulation or treaty, (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (iii) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Clearing Account**" shall have the meaning set forth set forth in the Mortgage Loan Agreement.

"**Clearing Account Agreement**" shall have the meaning set forth set forth in the Mortgage Loan Agreement.

"**CFIUS**" shall mean (i) the Committee on Foreign Investment in the United States first established pursuant to Executive Order 11858 of May 7, 1975, and (ii) any replacement or successor thereto, including, without limitation, pursuant to FIRRMA.

"**CFIUS Approval**" shall mean, with respect to any given transaction: (a) written confirmation provided by CFIUS that such transaction is not a Covered Transaction under the DPA, (b) written confirmation provided by CFIUS that it has completed its review or, if applicable, investigation of the matter(s) in question under the DPA, and determined, with respect to such transaction, that there are no unresolved national security concerns, or (c) CFIUS shall have sent a report to the President of the United States requesting the President's decision under the DPA, and the President shall have announced a decision not to take any action to suspend, prohibit or place any limitations on such transaction.

"**CFIUS Review**" shall have the meaning set forth in Section 4.14(b) hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Co-Lender**" shall have the meaning set forth in Section 9.7 hereof.

"**Collateral**" shall have the meaning set forth in the Pledge Agreement.

"**Collateral Assignment of Interest Rate Cap Agreement**" shall mean that certain Mezzanine Collateral Assignment of Interest Rate Cap Agreement, dated as of the date hereof, executed by Borrower in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Condemnation**" shall mean any permanent or temporary taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Contract**" shall mean any contract or agreement with any architect, engineer, contractor, subcontractor, management agent, leasing agent, sales agent, service and maintenance agent, or any other third party, whether existing as of the Closing Date or thereafter arising, relating to the design, construction, ownership, condition, use, occupancy, possession, management, operation, space leasing, service, maintenance or repair of, or otherwise in respect of, the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (but the same shall not be deemed to include any Lease or the Management Agreement).

"**Contract of Sale**" shall have the meaning set forth in Section 4.31 hereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Control**" as to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of such Person, whether through ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "controlled" or "controlling" shall have a correlative meaning.

"**Counterparty**" shall mean the counterparty under any Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement, which counterparty shall satisfy the Minimum Counterparty Rating and otherwise be acceptable to Lender.

"**Covered Rating Agency Information**" shall mean any Provided Information furnished to the NRSROs in connection with issuing, monitoring and/or maintaining the Securities.

"**Covered Transaction**" shall have the meaning set forth in the DPA.

"**Creditors Rights Laws**" shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Crowdfunded Person**" shall mean a Person capitalized primarily by monetary contributions (i) of less than $35,000 each from more than 35 investors who are individuals or (ii) which are funded primarily (A) in reliance upon Regulation Crowdfunding promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended and/or (B) through internet-mediated registries, platforms or similar portals, mail-order subscriptions, benefit events and/or other similar methods.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums (including the Minimum Interest Payment, Exit Fee and Breakage Costs, if applicable) due to Lender in respect of the Loan under the Loan Documents.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal (if applicable) and interest payments hereunder.

"**Debt Service (Combined)**" shall mean, with respect to any particular period of time, the sum of (A) Debt Service and (B) the Mortgage Loan Monthly Debt Service and all other sums (including, without limitation, any accelerated principal balance) due under the Mortgage Loan.

"**Debt Service Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Debt Service Coverage Ratio (Combined)**" shall mean the ratio calculated by Lender of (i) the Underwritable Cash Flow to (ii) the aggregate amount of Debt Service (Combined) which would be due for the twelve (12) month period immediately succeeding the date of

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

calculation; <u>provided</u>, <u>that</u>, the foregoing shall be calculated by Lender assuming that each of the Loan and the Mortgage Loan will be in place for the entirety of said period**.**

"**Debt Yield (Combined)**" shall mean, as of any date of calculation, a ratio conveyed as a percentage in which (i) the numerator is the Underwritable Cash Flow and (ii) the denominator is the then aggregate outstanding principal balances of the Loan and the Mortgage Loan.

"**Deemed Approval Requirements**" shall mean, with respect to any matter, that (i) no Event of Default shall have occurred and be continuing (either at the date of any notices specified below or as of the effective date of any deemed approval), (ii) Borrower shall have sent Lender a written request for approval with respect to such matter in accordance with the applicable terms and conditions hereof (the "**Initial Notice**"), which such Initial Notice shall have been (A) accompanied by any and all required information and documentation relating thereto as may be reasonably required in order to approve or disapprove such matter (the "**Approval Information**") and (B) marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the Initial Notice shall have been marked "PRIORITY-DEEMED APPROVAL MAY APPLY"; (iii) Lender shall have failed to respond to the Initial Notice within the aforesaid time frame; (iv) Borrower shall have submitted a second request for approval with respect to such matter in accordance with the applicable terms and conditions hereof (the "**Second Notice**"), which such Second Notice shall have been (A) accompanied by the Approval Information and (B) marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the Second Notice shall have been marked "PRIORITY-DEEMED APPROVAL MAY APPLY"; and (v) Lender shall have failed to respond to the Second Notice within the aforesaid time frame.  For purposes of clarification, Lender requesting additional and/or clarified information, in addition to approving or denying any request (in whole or in part), shall be deemed a response by Lender for purposes of the foregoing.

"**Default**" shall mean the occurrence of any event hereunder or under the Note or the other Loan Documents which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the Maximum Legal Rate, and (ii) the greatest of the following that applies: (A) five percent (5%) above the Interest Rate, (B) if an Event of Default has occurred due to the failure to pay a sum of money owed under the Loan Documents, or that causes liability pursuant to the terms of Section 12.1 hereof, the sum of (1) the Interest Rate that would otherwise be in effect but for the existence of any Event of Default plus (2) an amount sufficient to cause the total Default Rate to equal eighteen percent (18%), or (C) if the full repayment of the Debt as required hereunder has not occurred on the Maturity Date, the sum of (x) the Interest Rate that would otherwise be in effect but for the existence of any Event of Default plus (y) an amount sufficient to cause the total Default Rate to equal twenty-four percent (24%).

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Determination Date**" shall mean, with respect to any Interest Period, either (i) if the then-applicable Benchmark is Term SOFR, the date that is two (2) Term SOFR Business Days prior to the first day of such Interest Period; provided, however, that if Term SOFR does not so appear on the date specified above, then the applicable Determination Date for such Interest Period shall instead be the Term SOFR Business Day first preceding such date specified above, or (ii) if the then-applicable Benchmark is not Term SOFR, the date and time determined by Lender in accordance with the provisions of Section 2.5 hereof relating to Benchmark Replacement Conforming Changes.

"**Disclosure Documents**" shall mean, collectively, any written materials used or provided to any prospective investors and/or NRSROs in connection with any public offering or private placement in connection with a Securitization, including, but not limited to, any preliminary or final offering circular, prospectus, prospectus supplement, free writing prospectus, private placement memorandum or other offering documents, marketing materials or information.

"**DPA**" shall mean the Defense Production Act of 1950, 50 U.S.C. § 4565, as amended (as the same may have been or may hereafter be amended, restated, supplemented or otherwise modified), all laws and regulations related thereto and all mandates, requirements, powers and similar requirements imposed or exercised thereunder (including, without limitation, FIRRMA and any of the foregoing implemented by and/or otherwise relating to CFIUS), as the foregoing may be amended from time to time, any successor statute or statutes and all rules and regulations from time to time promulgated in connection with the foregoing.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts maintained with a federal or state-chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state-chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by S&P, "P-1" by Moody's, and "F-1" by Fitch in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "A" by Fitch and S&P and "A2" by Moody's.

"**Embargoed Person**" shall have the meaning set forth in Section 4.26 hereof.

"**Environmental Indemnity**" shall mean that certain Mezzanine Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" shall have the meaning set forth in the Environmental Indemnity.

"**Equity Collateral Transfer Date**" shall have the meaning specified in Section 12.1.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may heretofore have been or shall be amended, restated, replaced or otherwise modified.

"**Event of Default**" shall have the meaning set forth in Section 10.1 hereof.

"**Excess Cash Flow**" shall mean the excess funds from the Property remaining following payment and deposit of all amounts required to be paid to, and deposited with, Mortgage Lender pursuant to the terms and conditions of the Mortgage Loan Agreement and Lender pursuant to the terms and conditions of this Agreement (other than deposits required to be made pursuant to Section 7.4 hereof).

"**Excess Cash Flow Account**" shall have the meaning set forth in Section 7.4 hereof.

"**Excess Cash Flow Funds**" shall have the meaning set forth in Section 7.4 hereof.

"**Exchange Act**" shall mean the Securities and Exchange Act of 1934, as amended.

"**Exculpated Parties**" shall have the meaning set forth in Section 12.1 hereof.

"**Exit Fee**" shall mean an amount equal to two (2) percent (2.0%) of the face amount of the Note.

"**FATCA**" shall means Sections 1471 through 1474 of the IRS Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the IRS Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the IRS Code.

"**Financing Statement**" shall mean, individually and collectively, the UCC Financing Statement naming Borrower, as debtor, and Lender, as secured party, pertaining to the Collateral, and filed in the appropriate filing office required under applicable state law.

"**FIRRMA**" shall mean the Foreign Investment Risk Review Modernization Act of 2018 (as the same may have been or may hereafter be amended, restated, supplemented or otherwise modified).

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Foreign Taxes**" shall have the meaning set forth in Section 2.5(b) hereof.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**Government Lists**" shall have the meaning set forth in Section 3.27 hereof.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Rents**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Guarantor**" shall mean  **[**Silver Star Properties REIT, Inc.**]** and any successor to and/or replacement of any of the foregoing  pursuant to and in accordance with the applicable terms and conditions of the Loan Documents.

"**Guaranty**" shall mean, individually and/or collectively, each of the Guaranty of Recourse Obligations and the Guaranty of Payment.

"**Guaranty of Payment**" shall mean that certain Mezzanine Guaranty of Payment dated as of the date hereof and executed by Guarantor in favor of Lender, together with all extensions, substitutions, restatements, modifications and amendments thereto.

"**Guaranty of Recourse Obligations**" shall mean that certain Mezzanine Guaranty of Recourse Obligations dated as of the date hereof and executed by Guarantor in favor of Lender, together with all extensions, substitutions, restatements, modifications and amendments thereto.

"**Immediate Repair Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Immediate Repairs**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Improvements**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Indebtedness**" shall mean, for any Person, without duplication:  (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred

purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Indemnified Parties**" shall mean (i) Lender, (ii) any successor owner or holder of the Loan or participations in the Loan, (iii) any Servicer or prior Servicer of the Loan, (iv) any Investor or any prior Investor in any Securities, (v) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (vi) any receiver or other fiduciary appointed in a foreclosure or other Creditors Rights Laws proceeding, (vii) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates or subsidiaries of any and all of the foregoing, and (viii) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 15.2 hereof.

"**Individual Property**" shall mean each parcel of real property as is described on <u>Exhibit F</u> attached hereto, the Improvements thereon and all personal property owned by the Borrower in connection therewith and encumbered by the applicable Security Instrument, together with all rights pertaining to such property and Improvements, as more particularly described in the granting clauses of the applicable Security Instrument and referred to therein as the "Property."

"**Individual Properties**" shall mean every Individual Property, collectively.

"**Insurance Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Insurance Premiums**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Intercreditor Agreement**" shall mean that certain intercreditor or other similar agreement by and among Lender and Mortgage Lender relating to the Loan and the Mortgage Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with its terms.

"**Interest Period**" shall have the meaning set forth in Section 2.6.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Interest Rate**" shall mean the rate or rates at which the outstanding principal amount of the Loan bears interest from time to time as determined in accordance with the provisions of Section 2.5 hereof.

"**Interest Rate Cap Agreement**" shall mean, as applicable, any interest rate cap agreement (together with the confirmation and schedules relating thereto) in form and substance satisfactory to Lender between Borrower and Counterparty or any Replacement Interest Rate Cap Agreement, in each case which also satisfies the requirements set forth in Section 2.8.

"**Interest Rate Cap Reserve Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Interest and Operating Expense Reserve Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Interest Shortfall**" shall have the meaning set forth in Section 2.7 hereof.

"**Investor**" shall mean any investor or potential investor in the Loan (or any portion thereof or interest therein) in connection with any Secondary Market Transaction.

"**IRS Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time or any successor statute.

"**Labor and Materials Charge**" shall have the meaning set forth in Section 4.8 hereof.

"**Land**" shall have the meaning set forth in the Security Instrument.

"**Lease**" shall have the meaning set forth in the Security Instrument.

"**Leasing Reserve Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities affecting the Loan, any Secondary Market Transaction with respect to the Loan, Borrower, Mortgage Borrower, any Guarantor or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Securities Act, the Exchange Act, Regulation AB, the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws and the Americans with Disabilities Act of 1990, the rules and regulations promulgated pursuant to any of the foregoing, and all permits, licenses and authorizations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, Mortgage Borrower, any Guarantor, the Collateral or any portion thereof or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof or (ii) in any way limit the use and enjoyment thereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Lender Affiliate**" shall mean the Affiliate of Lender that has filed a Registration Statement.

"**Lender Group**" shall mean Lender, each of its directors, officers, employees, representatives, agents and affiliates (including, without limitation, those who have signed the applicable Registration Statement), and each Person that controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act.

"**Lender Party**" shall mean (i) Lender, (ii) any Servicer, (iii) any receiver or other fiduciary appointed in a foreclosure or other proceeding pursuant to any Creditors Rights Laws, (iv) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates or subsidiaries of any and all of the foregoing, and (v) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of any Lender Party's assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

"**Liabilities**" shall have the meaning set forth in Section 9.2 hereof.

"**LTV**" shall mean a ratio, as determined by Lender, in which, as of any date of determination by Lender:  (i) the numerator is equal to the sum of the outstanding principal balance of the Loan plus the outstanding principal balance of the Mortgage Loan and (ii) the denominator is equal to the appraised value of the Property based on an Appraisal.

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"**Loan Bifurcation**" shall have the meaning set forth in Section 9.1 hereof.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Pledge Agreement, the Environmental Indemnity, the Subordination of Management Agreement, the Collateral Assignment of Interest Rate Cap Agreement, the Guaranty and all other documents executed and/or delivered in connection with the Loan, as each of the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Losses**" shall mean any and all losses, damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including but not limited to strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, amounts paid in settlement, foreseeable and unforeseeable consequential damages, litigation costs and attorneys' fees, in the case of each of the foregoing, of whatever kind or nature and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

"**LTV**" shall have the meaning set forth in the Mortgage Loan Agreement; provided, however, that the same shall be calculated, for purposes hereunder, by Lender (as opposed to Mortgage Lender), and Lender's calculation thereof shall be made in good faith and shall be final absent manifest error.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Major Contract**" shall mean (i) any management (other than the Management Agreement), brokerage or leasing agreement or (ii) any cleaning, maintenance, service or other contract or agreement of any kind (other than Leases) of a material nature (materiality for these purposes to include contracts in excess of $100,000.00 per year or which extend beyond two (2) years (unless cancelable by Borrower or Mortgage Borrower on sixty (60) days or less notice without penalty)), in either case relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property, whether written or oral.

"**Major Lease**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Management Agreement**" shall mean the management agreement entered into by and between Borrower and Manager, pursuant to which Manager is to provide management and other services with respect to the Property, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Manager**" shall mean [Silver Star Property Management, Inc., a Texas corporation,] or such other entity selected as the manager of the Property or any Individual Property in accordance with the terms of this Agreement or the other Loan Documents.

"**Material Action**" shall mean, with respect to any Person, to institute proceedings to have such Person be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against such Person or file a petition seeking, or consent to, reorganization or relief with respect to such Person under any applicable federal, state, local or foreign law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of such Person or a substantial part of its property, or take any action to consolidate or merge such Person with or into any other Person, or take any action to divide, dissolve or liquidate such Person, or make any assignment for the benefit of creditors of such Person, or sell all or substantially all of such Person's assets, or admit in writing such Person's inability to pay its debts generally as they become due, or declare or effectuate a moratorium on the payment of any obligation, or take action in furtherance of any such action.

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, prospects, material agreements or results of operations of Borrower, Mortgage Borrower, any SPE Component Entity, any Guarantor, the Collateral, the Property or any Individual Property, (ii) the ability of Borrower or any Guarantor to perform their respective obligations under any of the Loan Documents or the ability of Mortgage Borrower or any Guarantor to perform their respective obligations under any of the Mortgage Loan Documents, (iii) the enforceability or validity of any of the Loan Documents, the Mortgage Loan Documents, the perfection or priority of any lien created under any of the Loan Documents or the Mortgage Loan Documents,  or the rights, interests or remedies of Lender under any of the Loan Documents or of Mortgage Lender under any of the Mortgage Loan Documents, as applicable, or (iv) the value, use operation of, or cash flows from, the Collateral, the Property or any Individual Property.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Maturity Date**" shall mean **[_____]** 9, 2026, or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Minimum Counterparty Rating**" shall mean (a) a long term credit rating from S&P of at least "A+", which rating shall not include a "t" or otherwise reflect a termination risk, and (b) a long term credit rating from Moody's of at least "A1" (and, after a Securitization, the equivalent of the foregoing by the other Rating Agencies).  After a Securitization of the Loan, only the ratings of those Rating Agencies rating the Securities shall apply.

"**Minimum Interest**" shall have the meaning set forth in Section 2.7(d) hereof.

"**Minimum Interest Payment**" shall have the meaning set forth in Section 2.7(d) hereof.

"**Monthly Debt Service Payment**" shall have the meaning set forth in Section 2.6 hereof.

"**Monthly Payment Date**" shall mean  [_____] 9, 2024 and the ninth (9th) day of every calendar month occurring thereafter during the term of the Loan.

"**Moody's**" shall mean Moody's Investor Service, Inc.

"**Mortgage Borrower**" shall mean [Silver Star CRE LLC], a Delaware limited liability company.

"**Mortgage Borrower Company Agreement**" shall mean the limited liability company operating agreement of Mortgage Borrower.

"**Mortgage Lender**" shall mean [BSPRT CRE Finance, LLC], in its capacity as lender under the Mortgage Loan, and its successors and/or assigns.

"**Mortgage Loan**" shall mean that certain loan in the original principal amount of up to $[_____].00 made by Mortgage Lender to Mortgage Borrower.

"**Mortgage Loan Agreement**" shall mean that certain Loan Agreement dated as of even date herewith between Mortgage Lender and Mortgage Borrower, as amended, supplemented or otherwise modified from time to time.

"**Mortgage Loan Debt Service**" shall mean, with respect to any particular period of time, regularly scheduled monthly principal (if applicable) and interest payments due under the Mortgage Loan Documents.

17

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Mortgage Loan Default**" shall mean a "Default" under and as defined in the Mortgage Loan Agreement.

"**Mortgage Loan Documents**" shall mean the documents, certificates and instruments evidencing, securing or otherwise executed in connection with the Mortgage Loan (as the same exist as of the date hereof and as the same may be amended, restated, replaced, supplemented or otherwise modified).

"**Mortgage Loan Event of Default**" shall mean an "Event of Default" under and as defined in the Mortgage Loan Agreement.

"**Net Proceeds**" shall mean: (i) the net amount of all insurance proceeds payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees and costs), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees and costs), if any, in collecting such Award.

"**New Non-Consolidation Opinion**" shall mean a substantive non-consolidation opinion provided by outside counsel acceptable to Lender and the Rating Agencies and otherwise in form and substance acceptable to Lender and the Rating Agencies.

"**Non-Consolidation Opinion**" shall mean any substantive non-consolidation opinion delivered to Lender in connection with the Loan (including, without limitation, that certain substantive non-consolidation opinion delivered to Lender by Neuberger, Quinn, Gielen, Reuben, Gibber, P.A.  in connection with the closing of the Loan).

"**Note**" shall mean that certain Mezzanine Promissory Note of even date herewith in the principal amount of $[_____], made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"**NRSRO**" shall mean any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged by Lender or its designees in connection with, or in anticipation of, a Securitization.

"**Obligations**" shall have the meaning set forth in the Pledge Agreement.

"**OFAC**" shall have the meaning set forth in Section 3.27 hereof.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by Responsible Officer of Borrower.

"**Open Period Start Date**" shall mean the Closing Date.

"**Operating Expenses**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Organizational Chart**" shall have the meaning set forth in Section 3.28 hereof.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Ownership Certificates**" shall mean the certificate evidencing the Pledged Company Interests.

"**PACE Loan**" shall mean any Property-Assessed Clean Energy loan or any similar financing.

"**Partial Release**" shall have the meaning set forth in Section 6.7 hereof.

"**Partial Release Date**" shall have the meaning set forth in Section 6.7 hereof.

"**Partial Release Minimum Debt Yield**" shall mean [fifteen percent (15.0%)].

"**Partial Release Minimum LTV**" shall mean [fifty-five percent (55.0%)].

"**Partial Release Price**" shall mean the greater of (i) [_____ percent (___%)] of the aggregate Allocated Loan Amount for the applicable Partial Release Property and (ii) the Partial Release Property Net Sale Proceeds.

"**Partial Release Property**" shall mean each Individual Property that is the subject of a Partial Release as set forth herein.

"**Partial Release Property Net Sale Proceeds**" shall mean, in connection with the Partial Release of the Partial Release Property, the value of all consideration received by Borrower in connection with the sale of such Partial Release Property, including cash, notes, assumed indebtedness, deferred payments (contingent or otherwise), prepaid expenses and non-customary prorations in favor of Borrower, less the reasonable and actual costs and expenses of such sale reasonably approved by Lender, including broker's commissions payable to a third party Person that is not an Affiliate of any Restricted Party which Person is reasonably acceptable to Lender under a marketing agreement reasonably acceptable to Lender, market rate sales and marketing expenses payable to Lender-approved third party sales and marketing service providers, legal fees and transfer, sales and recording taxes (but excluding income taxes attribute to such sale), all of which costs and expenses shall not exceed three percent (3%) of the gross contract price with respect to such sale.

"**Partial Release Remaining Property**" shall mean the portion of the Property remaining subject to the lien of the Security Instrument after giving effect to a Partial Release.

300570050v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

"**Patriot Act Offense**" shall have the meaning set forth in Section 3.27 hereof.

"**Performance Achievement Date**" shall mean the date that both (a) the Debt Service Coverage Ratio (Combined) has been greater than [1.15 to 1.00] for a period of six (6) consecutive calendar months and (b) the Debt Yield (Combined) has been greater than [17.5%] for six (6) consecutive calendar months.

"**Permits**" shall mean all necessary certificates, licenses, permits, franchises, trade names, certificates of occupancy, consents, and other approvals (governmental and otherwise) required under applicable Legal Requirements for the operation of the Property and the conduct of Mortgage Borrower's business (including, without limitation, all required zoning, building code, land use, environmental, public assembly and other similar permits or approvals).

"**Permitted Encumbrances**" shall mean collectively, (i) with respect to the Collateral, the liens and security interests created by the Loan Documents, (ii) with respect to the Property, the lien and security interests created by the Mortgage Loan Documents, (iii) all liens, encumbrances and other matters disclosed in the Title Insurance Policy and the UCC Policy, (iv) liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent (other than liens securing a PACE Loan), (iv) any workers', mechanics' or similar liens on the Property provided any such lien is discharged or bonded in accordance with the terms and conditions of the Loan Documents and the Mortgage Loan Documents, and (v) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Equipment Leases**" shall mean equipment leases or other similar instruments entered into with respect to the Personal Property; provided, that, in each case, such equipment leases or similar instruments (i) are entered into on commercially reasonable terms and conditions in the ordinary course of Mortgage Borrower's business and (ii) relate to Personal Property which is (A) used in connection with the operation and maintenance of the applicable Individual Property in the ordinary course of Mortgage Borrower's business and (B) readily replaceable without material interference or interruption to the operation of the applicable Individual Property.

"**Permitted Investments**" shall mean "permitted investments" as then defined and required by the Rating Agencies.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, real estate investment trust, unincorporated association, any other entity, any Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Personal Property**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Pledge Agreement**" shall mean that certain Pledge and Security Agreement dated as of the date hereof by Borrower in favor of Lender.

"**Pledged Company Interests**" shall have the meaning set forth in the Pledge Agreement.

"**Policies**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Prepayment Notice**" shall have the meaning specified in Section 2.7(a) hereof.

"**Prime**" shall mean the rate of interest published in The Wall Street Journal from time to time as the "Prime Rate." If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest 1/100th of one percent (0.01%). If The Wall Street Journal ceases to publish the "Prime Rate," Lender shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasigovernmental body, then Lender shall select a comparable interest rate index.

"**Prime Floor**" shall mean the Benchmark Floor.

"**Prime Rate**" shall mean the sum of (i) the greater of (A) Prime and (B) the Prime Floor, and (ii) the Prime Spread.

"**Prime Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon Prime pursuant to Section 2.5 hereof.

"**Prime Spread**" shall mean the difference (expressed as the number of basis points) between (a) the Benchmark Rate on the Determination Date that the Benchmark was last applicable to the Loan and (b) Prime on the Determination Date that the Benchmark was last applicable to the Loan; provided, however, in no event shall such difference be a negative number.

"**Prohibited Entity**" shall mean any Person which (i) is a statutory trust organized under 12 *Del.C.* § 3801 *et seq.* (or any successor statute thereto), or under any similar state or federal law, (ii) is a Crowdfunded Person or (iii) owns a direct or indirect interest in Borrower, Mortgage Borrower, any SPE Component Entity, the Collateral or the Property through a tenancy-in-common or other similar form of ownership interest.

"**Prohibited Transfer**" shall mean (i) a Sale or Pledge of the Property or the Collateral or any part thereof or any legal or beneficial interest in the Property or the Collateral (including, without limitation, the Loan and/or Loan Documents or the Mortgage Loan and/or the Mortgage Loan Documents) other than the conveyance of the Collateral by foreclosure sale, assignment-in-lieu of foreclosure or similar exercise of Lender's remedies under the Loan Documents following

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

the occurrence and during the continuance of an Event of Default, (ii) a Sale or Pledge of an interest in any Restricted Party and/or (iii) Mortgage Borrower's acquisition of any real property in addition to the real property owned by Mortgage Borrower as of the Closing Date.   A Prohibited Transfer shall include, but not be limited to, (A) an installment sales agreement wherein (1) Mortgage Borrower agrees to sell the Property or any part thereof for a price to be paid in installments or (2) Borrower agrees to sell the Collateral or any part thereof for a price to be paid in installments;; (B) an agreement by Mortgage Borrower leasing all or a substantial part of the Property for other than actual occupancy by a Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Mortgage Borrower's right, title and interest in and to any (1) Leases or any Rents or (2) Property Documents; (C) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (D) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new limited partnership interests; (E) if a Restricted Party is a limited liability company, any division, merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest, or the creation or issuance of new membership interests; (F) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (G) the removal or the resignation of Manager (including, without limitation, an Affiliated Manager) or the engagement of a new Manager, in each case, other than in accordance with the terms and conditions of this Agreement; (H) if Mortgage Borrower enters into, or the Property is subjected to, any PACE Loan; (I) the incurrence of any mezzanine (or similar) financing secured by a pledge of, or other lien on, any direct or indirect interests in Borrower other than the Loan; or (J) any action for partition of the Property (or any portion thereof or interest therein) or any similar action instituted or prosecuted by Mortgage Borrower or by any other Person, pursuant to any contractual agreement or other instrument or under applicable law (including, without limitation, common law) and/or any other action instituted by (or at the behest of) Borrower, Mortgage Borrower or their Affiliates or consented to or acquiesced in by Borrower, Mortgage Borrower or their Affiliates which results in a Property Document Event.

"**Property**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Property Document**" shall mean, individually and collectively, each REA.

"**Property Document Event**" shall mean any event which would, directly or indirectly, cause a termination, termination right, right of first refusal, first offer or any other similar right, cause any termination fees to be due or would cause a Material Adverse Effect to occur under any Property Document (in each case, beyond any applicable notice and cure periods under the applicable Property Document); provided, however, any of the foregoing shall not be deemed a

22

Property Document Event to the extent Lender's prior written consent is obtained with respect to the same.

"**Property Document Provisions**" shall mean the representations, covenants and other terms and conditions of this Agreement and the other Loan Documents related to, in each case, any Property Document and/or other related matters (including, without limitation, Sections 3.32 and 4.25 of this Agreement).

"**Provided Information**" shall mean any information provided by or on behalf of any Borrower Party in connection with the Loan, the Collateral, the Property, such Borrower Party and/or any related matter or Person.

"**Prudent Lender Standard**" shall, with respect to any matter, be deemed to have been met if the matter in question (i) prior to a Securitization, is reasonably acceptable to Lender and (ii) after a Securitization, (A) if permitted by REMIC Requirements applicable to such matter, would be reasonably acceptable to Lender or (B) if the Lender discretion in the foregoing subsection (A) is not permitted under such applicable REMIC Requirements, would be acceptable to a prudent lender of securitized commercial mortgage loans.

"**Qualified Management Agreement**" shall mean a management agreement with a Qualified Manager with respect to the Property which is approved by Lender in writing (which such approval may be conditioned upon Lender's receipt of (i) a Rating Agency Confirmation with respect to such management agreement and (ii) if such Qualified Manager is an Affiliated Manager, and a Non-Consolidation Opinion has been previously provided to Lender, a New Non-Consolidation Opinion with respect to such management agreement).

"**Qualified Manager**" shall mean a Person approved by Lender in writing (which such approval may be conditioned upon Lender's receipt of (i) a Rating Agency Confirmation with respect to such Person and (ii) if such Person is an Affiliated Manager, and a Non-Consolidation Opinion has been previously provided to Lender, a New Non-Consolidation Opinion with respect to such Person).

"**Rating Agencies**" shall mean each of S&P, Moody's, Fitch, DBRS, Inc., Kroll Bond Ratings and Morningstar Credit Ratings, LLC and any other nationally-recognized statistical rating agency designated by Lender (and any successor to any of the foregoing) in connection with and/or in anticipation of any Secondary Market Transaction.

"**Rating Agency Confirmation**" shall mean a written affirmation from each of the Rating Agencies that the credit rating of the Securities given by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion; provided, however, (i) if a Securitization has occurred and either (A) any Rating Agency fails to respond to any request for a Rating Agency Confirmation with respect to such event or otherwise elects (verbally or in writing) not to consider such event or (B) Lender (or Servicer) is not required to and has elected not to obtain

(or cause to be obtained) a Rating Agency Confirmation with respect to such event, in each case, pursuant to and in compliance with the Securitization's pooling and servicing agreement (or similar agreement), then, notwithstanding anything contained in this Agreement to the contrary, Lender's written approval of such event shall be required in lieu of a Rating Agency Confirmation, in the case of clause (i)(A) above, from such Rating Agency or Rating Agencies (only) or, in the case of clause (i)(B) above, from each of the Rating Agencies or (ii) if a Securitization has not occurred, then, notwithstanding anything contained in this Agreement to the contrary, the term "Rating Agency Confirmation" shall be deemed instead to require Lender's written approval of such event. In the event that either of clause (i) or (ii) of the foregoing proviso applies, Lender's approval shall be based on Lender's good faith determination of applicable Rating Agency standards and criteria, unless Lender has an independent approval right in respect of such event pursuant to the other terms of this Agreement or the other Loan Documents, in which case the discretion afforded to Lender in connection with such independent approval right shall apply.

"**REA**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Register**" shall have the meaning set forth in Section 9.7 hereof.

"**Registrar**" shall have the meaning set forth in Section 9.7 hereof.

"**Registration Statement**" shall mean the registration statement relating to a Securitization.

"**Regulation AB**" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

"**Related Loan**" shall mean a loan to an Affiliate of Borrower or secured by a Related Property, that is included in a Securitization with the Loan (or any portion thereof or interest therein).

"**Related Property**" shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" within the meaning of the definition of Significant Obligor, to the Property.

"**Relevant Governmental Body**" shall mean the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York, or any successor thereto.

"**REMIC Opinion**" shall mean, as to any matter, an opinion as to the compliance of such matter with applicable REMIC Requirements (which such opinion shall be, in form and substance and from a provider, in each case, reasonably acceptable to Lender and acceptable to the Rating Agencies).

"**REMIC Requirements**" shall mean any applicable legal requirements relating to any REMIC Trust (including, without limitation, those relating to the continued treatment of the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Loan (or the applicable portion thereof and/or interest therein) as a "qualified mortgage" held by such REMIC Trust, the continued qualification of such REMIC Trust as such under the IRS Code, the non-imposition of any tax on such REMIC Trust under the IRS Code (including, without limitation, taxes on "prohibited transactions" and "contributions") and any other constraints, rules and/or other regulations and/or requirements relating to the servicing, modification and/or other similar matters with respect to the Loan (or any portion thereof and/or interest therein) that may now or hereafter exist under applicable legal requirements (including, without limitation under the IRS Code)).

"**REMIC Trust**" shall mean any "real estate mortgage investment conduit" within the meaning of Section 860D of the IRS Code that holds any interest in all or any portion of the Loan.

"**Rents**" shall have the meaning set forth in the Security Instrument.

"**Replacement Interest Rate Cap Agreement**" shall have the meaning set forth in Section 2.8(c) hereof.

"**Reserve Accounts**" shall mean the Tax Account, the Insurance Account, the Capital Expenditures Reserve Account, the Immediate Repair Account, the Leasing Reserve Account, the Excess Cash Flow Account, the Operating Expense Account, the Interest and Operating Expense Reserve Account, the Interest Rate Cap Reserve Account and any other escrow account established by this Agreement or the other Loan Documents (but specifically excluding the Cash Management Account, the Clearing Account and the Debt Service Account).

"**Responsible Officer**" means with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer or vice president of such Person or such other similar officer of such Person reasonably acceptable to Lender.

"**Restoration**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Restoration Threshold**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Restricted Party**" shall mean Borrower, Mortgage Borrower, Sponsor, Guarantor, any SPE Component Entity, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, Mortgage Borrower, Sponsor, Guarantor, any SPE Component Entity, any Affiliated Manager or any non-member manager.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Satisfactory Replacement Guarantor**" shall have the meaning set forth in Section 6.4.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 9.1 hereof.

"**Securities**" shall have the meaning set forth in Section 9.1 hereof.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Securitization**" shall have the meaning set forth in Section 9.1 hereof.

"**Security Instrument**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Senior Mezzanine Borrower**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Senior Mezzanine Loan**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Servicer**" shall have the meaning set forth in Section 9.4 hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 9.4 hereof.

"**Severed Loan Documents**" shall have the meaning set forth in Article 10.

"**Significant Obligor**" shall have the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

"**SPE Component Entity**" shall have the meaning set forth on <u>Exhibit C</u> attached hereto.

"**Sponsor**" shall mean [Guarantor**]**.

"**Springing Member LLC**" shall mean a Delaware limited liability company properly structured in accordance with applicable Rating Agency criteria with at least one springing member that shall, upon the dissolution, withdrawal or disassociation of such limited liability company's last remaining member, immediately become the sole member of such limited liability company.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"**State**" shall mean the state in which the Property or any part thereof is located.

"**Strike Rate**" shall mean **[_____ percent (___%)]**, subject to the provisions of Section 2.8(g) hereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

"**Subject Transaction**" shall mean, individually and collectively, each of the following: (i) Mortgage Borrower's acquisition of each Individual Property, (ii) the acquisition of the Property by Mortgage Borrower's immediate predecessor-in-interest, and (iii) Borrower's acquisition of the Collateral**.**

"**Subordination of Management Agreement**" shall mean a Mezzanine Subordination of Management Agreement and Management Fees substantially in the form then used by Lender, which is executed by Mortgage Borrower, Borrower, Manager and Lender as set forth in <u>Section 4.20(a)</u> of this Agreement, as the same may thereafter be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Substitution**" shall have the meaning set forth in Section 6.4.

"**Survey**" shall mean that certain survey of the Property certified and delivered to Lender in connection with the closing of the Loan.

"**Syndication**" shall have the meaning set forth in Section 9.7 hereof.

"**Tax Account**" shall have the meaning set forth in the Mortgage Loan Agreement.

"**Taxes**" shall mean all taxes, assessments, water rates, sewer rents, and other governmental impositions, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Tenant**" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Property under a Lease or other occupancy agreement.

"**Term SOFR**" shall mean, with respect to each Interest Period, the rate identified as "1 Month CME Term SOFR" by the Term SOFR Administrator on the CME Market Data Platform https://www.cmegroup.com/market-data/cme-group-benchmark-administration/term-sofr.html (or any successor source for the rate currently identified as "1 Month CME Term SOFR" identified as such by the Term SOFR Administrator from time to time) as of 6:00 a.m. (New York City time) on the Determination Date (rounded upwards, if necessary, to the nearest $1/100^{th}$ of 1%).

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited or a successor administrator of the rate currently identified as "1 Month CME Term SOFR" that has been broadly adopted by the commercial real estate finance industry as a successor administrator of such rate, as determined by Lender in good faith.

"**Term SOFR Business Day**" means any day except for a Saturday, Sunday, a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. governmental securities or a day for and on which the Term SOFR Administrator is not required to publish Term SOFR in accordance with the applicable guidelines, rules or requirements for, or

27

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

announcements regarding, the publication of Term SOFR as issued and in force by, or with respect to, the Term SOFR Administrator from time to time.

"**Title Insurance Policy**" shall mean, individually and collectively,(i)  each ALTA (or TLTA, as applicable) mortgagee title insurance policy issued with respect to the Property and insuring the lien of the Security Instrument and (ii) an ALTA title insurance policy in form acceptable to Lender issued with respect to the Financing Statement and insuring the lien of the Pledge Agreement.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State.

"**Unaffiliated Third Party**" shall mean any Person (including, without limitation, the press or media, any bank, savings association, corporation, company, limited liability company, group, partnership, trust or other business entity or any individual), but specifically excluding any Restricted Party, Manager, and any Lender Party.

"**Underwritable Cash Flow**" shall have the meaning set forth in the Mortgage Loan Agreement; provided, however, that the same shall be calculated, for purposes hereunder, by Lender (as opposed to Mortgage Lender), and Lender's calculation thereof (including determination of items that do not qualify as Operating Expenses) shall be made in good faith and shall be final absent manifest error.

"**Underwriting Adjustments**" shall have the meaning set forth in the Mortgage Loan Agreement; provided, however, that the same shall be calculated, for purposes hereunder, by Lender (as opposed to Mortgage Lender), and Lender's calculation thereof shall be made in good faith and shall be final absent manifest error.

"**Underwriter Group**" shall mean Lender Affiliate, any other placement agent or underwriter with respect to the applicable Securitization, each of their respective directors and each Person who controls the applicable Lender Affiliate or any other placement agent or underwriter within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act.

"**Updated Information**" shall have the meaning set forth in Section 9.1 hereof.

"**U.S. Obligations**" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption.

**Section 1.2    Principles of Construction**.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. References herein to the Property "or any portion thereof" and words of similar import shall, as applicable, be deemed to refer to any portion of the Property taken as a whole (including any Individual Property) and to any portion of any Individual Property. References herein to the Collateral "or any portion thereof" and words of similar import shall, as applicable, be deemed to refer to any portion of the Collateral taken as a whole.

## ARTICLE 2

## GENERAL TERMS

**Section 2.1     No Loan Commitment**. Except as expressly and specifically set forth herein, Lender has no obligation or other commitment to loan any funds to Borrower or otherwise make disbursements to Borrower. Borrower hereby waives any right Borrower may have to make any claim to the contrary.

**Section 2.2     The Loan**. Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

**Section 2.3     Disbursement to Borrower**. Borrower may request and receive only one borrowing hereunder in respect of the Loan. Any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.

**Section 2.4     The Note and the other Loan Documents**. The Loan shall be evidenced by the Note and this Agreement and secured by this Agreement and the other Loan Documents.

**Section 2.5     Interest Rate**.

(a)     Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date at the Interest Rate until repaid in accordance with the applicable terms and conditions hereof.

(b)     The following additional provisions shall apply and, subject to Section 2.5(c) hereof, the Interest Rate shall be determined in accordance with this Section 2.5(b):

(i)     Subject to the terms and conditions hereof, the Loan shall be a Benchmark Rate Loan, and the Interest Rate with respect to each Interest Period shall be the Benchmark Rate, unless the Loan is converted to (and for so long as the Loan remains) a Prime Rate Loan pursuant to the provisions hereof, in which case the Interest Rate with respect to the applicable Interest Period shall be the Prime Rate. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a Benchmark Rate Loan to a Prime Rate Loan, or vice versa.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(ii)     Any change in the rate of interest hereunder due to (A) a change in the Benchmark or Prime, as applicable, or (B) a conversion of the Loan from a Benchmark Rate Loan to a Prime Rate Loan, or vice versa, shall, in each such case, become effective as of the opening of business on the first day on which such change or conversion shall become effective.

(iii)    Subject to the final sentence of this clause (iii), upon the occurrence of a Benchmark Unavailability Event, Lender shall forthwith give notice thereof (which notice may be given by telephone, confirmed in writing) to Borrower at least one (1) day prior to the last day of the related Interest Period.  If such notice is given, then the related outstanding Benchmark Rate Loan shall be converted, on the last day of the then current Interest Period, to a Prime Rate Loan and Borrower shall cooperate with any and all reasonable requests of Lender to make any necessary changes to this Agreement or the other Loan Documents to conform the same to such change in the interest rate hereunder.  Notwithstanding the foregoing, in the event that both a Benchmark Unavailability Event and a Benchmark Transition Event have occurred, the provisions of this Agreement relating to the Benchmark Transition Event shall govern and control unless a Benchmark Unavailability Event has also occurred with respect to the applicable Benchmark Replacement, in which case the provisions of this Agreement relating to the Benchmark Unavailability Event shall govern and control.

(iv)    Subject to the final sentence of this clause (iv), if, pursuant to the terms hereof, any portion of the Loan has been converted to a Prime Rate Loan and Lender shall determine that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice of such determination (which notice may be given by telephone, confirmed in writing), to Borrower at least one (1) day prior to the last day of the related Interest Period.  If such notice is given, the related outstanding Prime Rate Loan shall be converted to a Benchmark Rate Loan on the last day of the then current Interest Period.  Notwithstanding the foregoing, in the event that a Benchmark Transition Event has occurred, the provisions of this Agreement relating to the Benchmark Transition Event shall govern and control.

(v)     Upon the occurrence of a Benchmark Transition Event, the applicable Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder as of the applicable Benchmark Transition Date, without the need for any amendment to, or further action or consent of any other party to, this Agreement or any of the other Loan Documents, and from and after such Benchmark Transition Date the Loan shall continue to be deemed to be a Benchmark Rate Loan, bearing interest at the new Benchmark.  In no event shall Borrower have the right to change the Benchmark, or to unilaterally implement any Benchmark Replacement Adjustment.

(vi)    In connection with any Benchmark Transition Event, Lender shall have the right to make Benchmark Replacement Conforming Changes to this

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Agreement or any of the other Loan Documents from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any such Benchmark Replacement Conforming Changes will become effective without any further action or consent of Borrower, Guarantor, or any other Person. In addition, within ten (10) Business Days after request by Lender, Borrower shall execute, acknowledge, and deliver, at Borrower's cost and expense, all further acts, deeds, conveyances, assignments, financing statements, transfers, documents, agreements, assurances, and such other instruments as Lender may reasonably require from time to time in such manner as Lender determines is reasonably necessary to implement any applicable Benchmark Replacement Conforming Changes. In no event shall Borrower have the right to unilaterally implement any Benchmark Replacement Conforming Changes.

(vii)    Lender shall promptly notify Borrower of (A) any occurrence of a Benchmark Transition Event and its related Benchmark Transition Date, (B) the implementation of any Benchmark Replacement and related Benchmark Replacement Adjustment and (C) the implementation of any Benchmark Replacement Conforming Changes; provided, however, that the failure of Lender to deliver any such notice to Borrower shall not in any way undermine the effectiveness of any of the foregoing. Any determination, decision or election made by Lender pursuant to, or in connection with, this Section 2.5 (including, without limitation, any determination with respect to a tenor, rate or adjustment, or of the occurrence or non-occurrence of an event, circumstance or date, or any decision to take or refrain from taking any action, or to make or refrain from making any election or selection) will be conclusive and binding on Borrower and all other parties to the Loan Documents, absent manifest error, and may be made in Lender's sole discretion and without consent from, or consultation with, Borrower, Guarantor, or any other Person.

(viii)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, any and all present or future taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto, excluding (a) net income, franchise and branch profits taxes (x) imposed as a result of Lender being organized under the laws of, or having its principal office or applicable lending office located in, the jurisdiction imposing such tax (or any political subdivision thereof) or (y) that are imposed as a result of a present or former connection between Lender and the jurisdiction imposing such tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or Loan Document), (b) U.S. federal withholding taxes imposed on amounts payable to or for the account of Lender with respect to an applicable interest in the Loan (other

31

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

than pursuant to an assignment request by Borrower) or Lender changes its lending office, except in each case to the extent that, pursuant to this Section 2.5(b)(viii), amounts with respect to such taxes were payable either to Lender's assignor immediately before Lender became a party hereto or to Lender immediately before it changed its lending office, (c) taxes attributable to Lender's failure to comply with Section 2.5(b)(xii) below, and (d) any withholding taxes imposed under FATCA  (such non-excluded taxes being referred to collectively as "**Foreign Taxes**").  If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder.  Whenever any Foreign Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Foreign Tax.  Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Foreign Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.  Borrower shall indemnify Lender, within 10 days after demand therefor, for the full amount of any Foreign Taxes (including Foreign Taxes imposed or asserted on or attributable to amounts payable under this Section 2.5(b)(viii)) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Foreign Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.  All amounts payable under this Section 2.5(b)(viii) shall constitute additional interest hereunder and shall be secured by the Pledge Agreement and the other Loan Documents.  The provisions of this Section 2.5(b)(viii) shall survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Pledge Agreement.  Any reference under this Section 2.5(b)(viii) to "Lender" shall be deemed to include any participant, Co-Lender and any assignees.

(ix)    If any Change in Law shall hereafter make it unlawful for Lender to make or maintain a Benchmark Rate Loan at the then-applicable Benchmark as contemplated hereunder, then (A) the obligation of Lender hereunder to make such a Benchmark Rate Loan, or to convert a Prime Rate Loan to a such a Benchmark Rate Loan, shall be canceled forthwith and (B) any outstanding Benchmark Rate Loan shall be converted automatically to a Prime Rate Loan on the last day of the then current Interest Period or within such earlier period as required by law.  Borrower hereby agrees to promptly pay to Lender, within twenty (20) business days after demand, any additional amounts necessary to compensate Lender for any reasonable costs incurred by Lender in making any

32

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain such Benchmark Rate Loan hereunder. Lender's notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(x)   If any Change in Law:

(A)   shall hereafter impose, modify or hold applicable any reserve, capital adequacy, tax, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the Benchmark hereunder;

(B)   shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(C)   shall hereafter impose on Lender any other condition, and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable as determined by Lender. If Lender becomes entitled to claim any additional amounts pursuant to this subsection, Lender shall provide Borrower with not less than thirty (30) days' notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error. This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(xi)   Borrower agrees to indemnify Lender and to hold Lender harmless from any loss or expense which Lender sustains or incurs (A) to the extent resulting from any default by Borrower in payment of the principal of, or interest on, a Benchmark Rate Loan, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by Lender in order to maintain such Benchmark Rate Loan, (B) as a consequence of any prepayment (whether voluntary or mandatory) of the Benchmark Rate Loan

33

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

on a day that is not the last day of an Interest Period, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the Benchmark Rate Loan hereunder and (C) as a consequence of the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Interest Rate from the Benchmark Rate to the Prime Rate with respect to any portion of the outstanding principal amount of the Loan then bearing interest at the Benchmark Rate on a date other than the last day of an Interest Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a Benchmark Rate Loan hereunder (the amounts referred to in clauses (A), (B) and (C) are herein referred to collectively as the "**Breakage Costs**"); provided, however, Borrower shall not indemnify Lender from any loss or expense arising from Lender's willful misconduct or gross negligence.  This provision shall survive payment of the Note in full and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(xii)    If Lender is a U.S. Person (other than the lender originally named herein), Lender shall deliver to Borrower, on or about the date on which it becomes Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), two executed copies of Form W-9 certifying that it is not subject to U.S. federal backup withholding tax (unless it establishes to the reasonable satisfaction of Borrower that it is otherwise eligible for an exemption from backup withholding tax or other withholding tax).  If Lender is not a U.S. Person, Lender shall deliver to Borrower, to the extent legally entitled to do so, on or about the date on which it becomes Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), whichever of the following is applicable: (A) two executed copies Form W-8BEN or W-8BEN-E, establishing an exemption from U.S. federal withholding tax under an applicable tax treaty, (B) two executed copies of Form W-8ECI, (C) if Lender is claiming the benefits of the exemption for portfolio interest under Section 881(c) of the IRS Code, (x) a certificate to the effect that Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the IRS Code, a "10 percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the IRS Code, or a "controlled foreign corporation" related to Borrower as described in Section 881(c)(3)(C) of the IRS Code (a "**U.S. Tax Compliance Certificate**") and (y) two executed copies of Form W-8BEN or IRS Form W-8BEN-E, or (D) two executed copies of Form W-8IMY, accompanied by Forms W-8BEN, W-8BEN-E, W-9, and U.S. Tax Compliance Certificates, for each beneficial owner, as applicable.  If a payment made to Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA, Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by applicable law for Borrower to comply with its obligations under FATCA.  Solely for purposes of the preceding sentence, "FATCA" shall include any amendments

34

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

made to FATCA after the date of this Agreement.  Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower in writing of its legal inability to do so.  Any reference under this Section 2.5(b)(xii) to "Lender" shall be deemed to include any participant, Co-Lender and any assignees.

(c)    In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by applicable Legal Requirements, overdue interest in respect of the Loan, shall, at Lender's election, accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default, without regard to any grace or cure periods contained herein.  Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Lender shall elect.

(d)    Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (i) the actual number of days elapsed in the period for which the calculation is being made by (ii) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (iii) the outstanding principal balance of the Loan.  The accrual period for calculating interest due on each Monthly Payment Date shall be the Interest Period in which such Monthly Payment Date falls.  Borrower understands and acknowledges that such interest accrual requirement results in  more interest accruing on the Loan than if either a thirty (30) day month and a three hundred sixty (360) day year or the actual number of days and a three hundred sixty-five (365) day year were used to compute the accrual of interest on the Loan.

(e)    This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

(f)    In the event of a conversion of the Loan from a Benchmark Rate Loan to a Prime Rate Loan, or vice versa, or the replacement of the then-applicable Benchmark

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

with a Benchmark Replacement, Borrower shall pay to Lender, upon demand, any additional amounts necessary to compensate Lender for out-of-pocket costs and expenses in making such conversion or replacement in accordance with this Section 2.5.

**Section 2.6    Loan Payments**.

(a)    Borrower shall make a payment to Lender of interest only (calculated using the Closing Date as the Determination Date) on the Closing Date for the period from the Closing Date through and including the next succeeding fourteenth (14th) day of a calendar month, whether such fourteenth (14th) day shall occur in the calendar month in which the Closing Date occurs or in the month immediately succeeding the month in which the Closing Date occurs (unless the Closing Date is the fifteenth (15th) day of a calendar month, in which case no such separate payment of interest shall be due).  Each interest accrual period (the "**Interest Period**") thereafter shall commence on the fifteenth (15th) day of each calendar month during the term of the Loan and shall end on and include the fourteenth (14th) day of the next occurring calendar month. No Interest Period shall be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

(b)    On each Monthly Payment Date throughout the term of the Loan, Borrower shall make a payment to Lender of interest accruing on the outstanding principal balance of the Loan during the Interest Period in which such Monthly Payment Date occurs (each such payment, a "**Monthly Debt Service Payment**"), which payments shall be applied to accrued and unpaid interest.

(c)    Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Pledge Agreement and the other Loan Documents.

(d)    If any principal, interest or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (i) five percent (5%) of such unpaid sum and (ii) the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Pledge Agreement and the other Loan Documents.

(e)    Additionally:

(i)    Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(ii)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be deemed to be the immediately succeeding Business Day.

(iii)    All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

(iv)    Lender shall have the right one time during the term of the Loan, in its sole discretion, upon not less than thirty (30) days prior written notice to Borrower, to change the Monthly Payment Date to a different calendar day each month which is not earlier than the first (1st) of the calendar month and is not more than ten (10) days later than the originally scheduled Monthly Payment Date of each calendar month; provided, however, that (A) if Lender shall have elected to change the Monthly Payment Date as aforesaid, Lender shall have the option, but not the obligation, to adjust the Interest Period correspondingly and (B) if Lender shall have elected to change the Monthly Payment Date as aforesaid to any calendar day earlier than the originally scheduled Monthly Payment Date of each calendar month, Borrower shall have a grace period for any amounts due on a Monthly Payment Date through the originally scheduled Monthly Payment Date of each calendar month.

## Section 2.7    Prepayments.

(a)    Except as otherwise provided in this Section 2.7 hereof, Borrower shall not have the right to prepay the Loan in whole or in part.  On or after the Open Period Start Date, Borrower may, provided no Event of Default has occurred and is continuing, at its option and upon not less than forty-five (45) days (and not more than ninety (90) days) prior notice (except in the case of a Partial Release, in which case such notice shall be given in accordance with Section 6.7) to Lender (a "**Prepayment Notice**"), which notice must specify the date on which such prepayment is to be made, prepay the Debt in whole (but not in part other than partial prepayments made in connection with any Partial Release consummated in accordance with Section 6.7 hereof) on any date (other than a date from, and including, the tenth (10th) day of a calendar month through, and including, the fourteenth (14th) day of a calendar month); provided that such prepayment is accompanied by payment of the Breakage Costs, the Exit Fee and the Minimum Interest Payment, in each case to the extent applicable.  In addition to the foregoing, any prepayment received by Lender shall include interest which would have accrued thereon through the remainder of the Interest Period in which such prepayment occurs (such amounts, the "**Interest Shortfall**"). Lender shall not be obligated to accept any prepayment unless Borrower has delivered the Prepayment Notice required hereunder

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

and such prepayment is accompanied by payment of [the Breakage Costs, the Exit Fee, the Minimum Interest Payment, in each case to the extent applicable, and the applicable Interest Shortfall due in connection therewith. Borrower hereby further agrees that, in the event Borrower delivers a Prepayment Notice and fails to prepay the Loan in accordance with the terms of this Section 2.7 on the date specified in such Prepayment Notice, Borrower shall (i) pay Lender all reasonable out-of-pocket costs and expenses incurred by Lender, including, without limitation, any Breakage Costs or similar expenses, as a result of such failure and (ii) be obligated to provide a new Prepayment Notice as a condition to any prepayment of the Loan pursuant to the requirements of this Section 2.7, except that such subsequent notice may be given with no less than thirty (30) days' notice or such shorter period as may be reasonably approved by Lender.

(b)     On each date on which Mortgage Borrower is entitled, pursuant to the terms and conditions of the Mortgage Loan Agreement, to receive any Net Loan Proceeds (i.e., such Net Proceeds are not required to be used for Restoration or to be applied to prepay the Mortgage Loan), Borrower shall, at Lender's option, prepay the Debt in an amount equal to one hundred percent (100%) of such Net Proceeds. Any prepayment received by Lender under this Section 2.7(b) shall be accompanied by (i) any applicable Interest Shortfall , the applicable portion of the Exit Fee and any Breakage Costs, (ii) all other sums due and payable under the Loan Documents (including, without limitation, any amount due under Section 9.6 hereof), except that no Minimum Interest Payment shall be required in connection therewith, and (iii) all reasonable out-of-pocket costs and expenses incurred by Lender in connection with such prepayment. No prepayment premium or penalty (which shall not be deemed to include the Exit Fee, which shall be owed as provided for in this Agreement) shall be due in connection with any prepayment made pursuant to this Section 2.7(b).

(c)     If concurrently with or after an Event of Default (including, without limitation, after acceleration of the Debt), payment of all or any part of the principal of the Loan is tendered by or on behalf of Borrower (including, without limitation, by virtue of application of amounts held in any Reserve Accounts or any other cash collateral for the Loan by Lender pursuant to the terms and conditions of the Loan Documents), a purchaser at a UCC foreclosure or any other Person, (i) such tender shall be deemed a voluntary prepayment made in violation of, and in an attempt to circumvent, the prohibition against prepayment set forth herein and (ii) Borrower, such purchaser at a UCC foreclosure or other Person shall pay the Minimum Interest Payment, the Exit Fee and the Breakage Costs, in each case to the extent applicable, in addition to (A) the outstanding principal balance of the Loan, and (B) all accrued and unpaid interest and other amounts payable under the Loan Documents (including, without limitation, the Interest Shortfall). Notwithstanding anything to the contrary contained herein or in any other Loan Document, any prepayment of the Debt shall be applied to the Debt in such order and priority as may be determined by Lender in its sole discretion.

(d)     In all events and under all circumstances Borrower shall be obligated to pay to Lender minimum interest in an amount equal to $[_____] (the

"**Minimum Interest**").  Upon prepayment or repayment in full of the Obligations or the acceleration thereof in accordance with the terms of any of the Loan Documents, Borrower shall pay to Lender an amount (such amount, the "**Minimum Interest Payment**") equal to the positive difference, if any, between (i) the entire Minimum Interest, minus (ii) the aggregate total of all Monthly Debt Service Payments paid by Borrower during the term of the Loan (exclusive of any portions thereof constituting (A) interest accrued at the Default Rate in excess of the Interest Rate that would apply hereunder but for the existence of any Event of Default, or (B) payments of principal).  In furtherance of the foregoing, Borrower expressly acknowledges and agrees that (x) Lender shall have no obligation to accept any prepayment or repayment of the Loan unless and until Borrower shall have complied with this Section 2.7(d), and (y) Lender shall have no obligation to release or, if requested by Borrower, assign the Note upon payment of the Obligations unless and until Lender shall have received the entire Minimum Interest Payment.  In the event that any Minimum Interest Payment is due hereunder, Lender shall deliver to Borrower a statement setting forth the amount and determination of the Minimum Interest Payment, and, provided that Lender shall have in good faith applied the formula described above, Borrower shall not have the right to challenge the calculation or the method of calculation set forth in any such statement in the absence of manifest error, which calculation may be made by Lender on any day during the fifteen (15) day period preceding the date of such prepayment.  Lender shall not be obligated or required to have actually reinvested the prepaid principal balance at the Benchmark or otherwise as a condition to receiving the Minimum Interest Payment. Borrower expressly acknowledges and agrees that the Minimum Interest Payment shall constitute additional consideration for the Loan, and shall, upon payment, be the sole and exclusive property of Lender.

(e)    Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, in no event shall Borrower cause or permit Mortgage Borrower or any other Person to repay at maturity, or prepay (which shall be deemed to include any repayment in connection with any acceleration of the Mortgage Loan and any acquisition of the Mortgage Loan by Mortgage Borrower, Guarantor, or any Affiliate of either of the foregoing), the Mortgage Loan, in whole or in part, unless (i) the Debt is contemporaneously repaid or defeased in full in accordance with the applicable terms and conditions of this Agreement or (ii) the Debt has been previously repaid or defeased in full in accordance with the applicable terms and conditions of this Agreement; [*provided, however*, that the partial prepayments of the Mortgage Loan required pursuant to Section [6.7] of the Mortgage Loan Agreement in connection with any Partial Release (with respect to each applicable Partial Release, the "**Mortgage Loan Release Price**") shall not be prohibited pursuant to this Section 2.7(e) so long as each applicable Partial Release is consummated by Mortgage Borrower in accordance with the terms of Section 6.7 of the Loan Agreement.  Borrower's or Mortgage Borrower's failure to comply with the foregoing shall, at Lender's option, constitute an Event of Default hereunder.

**Section 2.8    Interest Rate Cap Agreement**.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(a)      Prior to or contemporaneously with the Closing Date, Borrower shall enter into an Interest Rate Cap Agreement with a Benchmark strike rate equal to the Strike Rate.  The Interest Rate Cap Agreement (i) shall at all times be in a form and substance acceptable to Lender, (ii) shall at all times be with a Counterparty, (iii) shall at all times be for a period equal to the term of the Loan, and (iv) shall at all times have a notional amount equal to or greater than the face amount of the Note and shall at all times provide for the applicable Benchmark strike rate to be equal to the Strike Rate.  Borrower shall direct such Counterparty to deposit directly into the Interest Rate Cap Reserve Account (or into such other Account as Lender may designate) any amounts due Borrower under such Interest Rate Cap Agreement so long as any portion of the Debt is outstanding, provided that the Debt shall be deemed to be outstanding if the Collateral is transferred by judicial or non-judicial foreclosure or deed-in-lieu thereof.  Additionally, Borrower shall collaterally assign to Lender, pursuant to the Collateral Assignment of Interest Rate Cap Agreement, all of its right, title and interest in and to the Interest Rate Cap Agreement (and any replacements thereof), including, without limitation, its right to receive any and all payments under the Interest Rate Cap Agreement (and any replacements thereof), and Borrower shall, and shall cause Counterparty to, deliver to Lender a fully executed Interest Rate Cap Agreement (which shall, by its terms, authorize the assignment to Lender and require that payments be deposited directly into the Interest Rate Cap Reserve Account, or into such other Account as Lender may designate).

(b)      Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement.  All amounts paid by the Counterparty under the Interest Rate Cap Agreement to Borrower or Lender shall be deposited immediately with Lender pursuant to payment instructions furnished by Lender. Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(a)      In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty by any Rating Agency below (i) a long term rating of "A-" by S&P or (ii) a long term rating of "A3" by Moody's, Borrower shall (x) replace the Interest Rate Cap Agreement not later than ten (10) Business Days following receipt of notice of such downgrade, withdrawal or qualification with an Interest Rate Cap Agreement in form and substance reasonably satisfactory to Lender (and meeting the requirements set forth in this Section 2.8) (a "**Replacement Interest Rate Cap Agreement**") from a Counterparty reasonably acceptable to Lender having a Minimum Counterparty Rating or (y) if provided for in such Interest Rate Cap Agreement, cause the Counterparty to deliver collateral to secure Borrower's exposure under the Interest Rate Cap Agreement in such amount and pursuant to such terms as are acceptable to the Rating Agencies.

(b)      In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or fails to maintain the Interest Rate Cap Agreement in accordance with the terms and provisions of this Agreement, Lender may purchase the Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is reimbursed by Borrower to Lender.

(c)    Each Interest Rate Cap Agreement shall contain the following language or its equivalent:  "In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below (i) a long term rating of "A-" by S&P or (ii) a long term rating of "A3" by Moody's, the Counterparty must, within ten (10) business days, either (x) post collateral on terms acceptable to each Rating Agency and Borrower, or (y) find a replacement Counterparty, at the Counterparty's sole cost and expense, acceptable to each Rating Agency and Borrower; provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Counterparty transfers the Interest Rate Cap Agreement to a replacement Counterparty pursuant to the foregoing clause (y), the Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement.  Failure to satisfy the foregoing shall constitute an "Additional Termination Event" as defined by Section 5(b)(v) of the ISDA Master Agreement, with the Counterparty as the "Affected Party." In the event that a Counterparty is required pursuant to the terms of an Interest Rate Cap Agreement to (i) deliver collateral as specified in the applicable Interest Rate Cap Agreement, or (ii) find a replacement Counterparty, Borrower covenants and agrees that Borrower shall seek Lender's approval with respect thereto and shall not approve or consent to the foregoing unless and until Borrower receives Lender's prior written approval and shall approve or consent to the foregoing upon receipt of Lender's prior written approval.  Borrower's failure to comply with the requirements of this Section 2.8(e) shall constitute, at Lender's option, an immediate Event of Default.

(d)    Borrower shall obtain and deliver to Lender an opinion from counsel (which counsel may be in house counsel for the Counterparty) for the Counterparty (upon which Lender and its successors and assigns may rely) which shall provide, in relevant part, that:

(i)    the Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)    the execution and delivery of the Interest Rate Cap Agreement by the Counterparty, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)    all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty and constitutes the legal, valid and binding obligation of the Counterparty, enforceable against the Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e)    In the event of a conversion of the Loan from a Benchmark Rate Loan to a Prime Rate Loan, or vice versa, or the replacement of the Benchmark with a Benchmark Replacement, Borrower shall replace the Interest Rate Cap Agreement not later than ten (10) Business Days following the occurrence thereof with a Replacement Interest Rate Cap Agreement (or other hedge arrangement reasonably acceptable to Lender and generally accepted as industry standard, as reasonably determined by Lender) pursuant to the requirements of this Agreement and in form and substance reasonably acceptable to Lender (including, without limitation, with respect to the strike rate or swapped rate, as applicable).

(f)    Borrower shall deliver to Lender a new Collateral Assignment of Interest Rate Cap Agreement acceptable to Lender in connection with each Replacement Interest Rate Cap Agreement.  **[paragraph numbering to be fixed]**

**Section 2.9    Intentionally Omitted**.

**Section 2.10    Payment of Exit Fee**.

(a)    Subject only to Section 2.10(d) below, Borrower shall be obligated to pay the Exit Fee to Lender as follows: (i) upon any (and each) partial prepayment of the Loan in accordance with the terms hereof, in addition to all other amounts payable to Lender under Section 2.7 hereof, Borrower shall pay to Lender, on account of the Exit Fee, an amount equal to two percent (2.0%) of the amount so prepaid; (ii) upon any (and each) application of any condemnation awards or Net Proceeds to the Debt in accordance with the terms of this Agreement and the Pledge Agreement, two percent (2.0%) of the amount thereof shall be retained by Lender on account of the Exit Fee and the balance thereof shall be applied to the Debt; and (iii) upon repayment in full of the Debt or the acceleration thereof in accordance with the terms of any of the Loan Documents, Borrower shall pay to Lender the entire Exit Fee which would be due on such date, less

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

any amounts on account thereof previously paid to Lender under the foregoing clauses (i) and (ii) of this Section 2.10(a).

(b)    In furtherance of the foregoing, Borrower expressly acknowledges and agrees that (i) Lender shall have no obligation to accept any prepayment of the Loan unless and until Borrower shall have complied with this Section 2.10, and (ii) Lender shall have no obligation to release or assign any Loan Document upon payment of the Debt unless and until Lender shall have received the Exit Fee then due and payable.

(c)    Borrower expressly acknowledges and agrees that the Exit Fee shall constitute additional consideration for the Loan.

(d)    Notwithstanding anything herein or in any other Loan Document to the contrary, upon any refinancing of the Loan with five (5) to ten (10) year fixed-rate financing by the initially-named Lender hereunder, or an Affiliate thereof, the Exit Fee due and payable in connection therewith shall be deemed to be zero (it being agreed, however, that in no event shall any refund be owed to Borrower on account of any amounts paid pursuant to Section 2.10(a) above).

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as of the Closing Date that:

**Section 3.1    Existence and Authority**.    Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of formation; (b) intentionally omitted; (c) has all necessary approvals, governmental and otherwise, and full power and authority to own the Pledged Company Interests; and (d) has full power, authority and legal right to grant, bargain, sell, pledge, assign, warrant, transfer and convey the Collateral pursuant to the terms hereof and to keep and observe all of the terms of this Agreement, the Note, the Pledge Agreement and the other Loan Documents on Borrower's part to be performed.    Borrower is a "registered organization" within the meaning of the UCC.

**Section 3.2    Borrower's Principal Place of Business**.    Borrower's principal place of business and its chief executive office as of the date hereof is 2909 Hillcroft, Suite 420, Houston, Texas 77057.    Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.    Borrower's organizational identification number, if any, assigned by the state of its incorporation or organization is [_____].    Borrower's federal tax identification number is [_____].    Borrower is not subject to back-up withholding taxes.

**Section 3.3    Validity of Documents**.    (a) The execution, delivery and performance of this Agreement, the Note, the Pledge Agreement and the other Loan Documents by Borrower and Guarantor and the borrowing evidenced by the Note and this Agreement (i) are within the power and authority of such parties; (ii) have been authorized by all requisite organizational

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

action of such parties; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court or Governmental Authority, any license, certificate or other approval required to conduct its business, any applicable organizational documents, or any applicable indenture, agreement or other instrument, including, without limitation, the Management Agreement; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby and by the other Loan Documents; and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority (except for Uniform Commercial Code filings relating to the security interest created by the Loan Documents), (b) this Agreement, the Note, the Pledge Agreement and the other Loan Documents have been duly executed and delivered by Borrower and Guarantor and (c) this Agreement, the Note, the Pledge Agreement and the other Loan Documents constitute the legal, valid and binding obligations of Borrower and Guarantor. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)). Neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect to the Loan Documents. No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, the Loan Documents or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

Section 3.4    **Agreements**.  Borrower has no material financial obligation under any agreement or instrument to which Borrower is a party or by which Borrower, the Collateral or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the ownership of the Pledged Company Interests and (b) obligations under this Agreement, the Pledge Agreement, the Note and the other Loan Documents or as otherwise disclosed to the Lender or as contained in the Borrower's or any Borrower's affiliate's public disclosures. Borrower is not a party to any agreement or instrument or subject to any restriction which would have a Material Adverse Effect. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower, the Collateral or the Property is bound that would have a Material Adverse Effect. There is no agreement or instrument to which Borrower is a party or by which Borrower is bound that would require the subordination in right of payment of any of Borrower's obligations hereunder or under the Note to an obligation owed to another party.

Section 3.5    **Collateral**.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(a)     Borrower is the sole beneficial owner of, and has good and insurable title to, the Collateral, and no lien exists or will exist (except Permitted Encumbrances) upon the Collateral at any time, and no right or option to acquire the same exists in favor of any other Person.

(b)     The Collateral is not and will not be subject to any contractual restriction upon the transfer thereof (except for any such restriction contained in the Pledge Agreement, the Mortgage Loan Documents and the Mortgage Borrower Company Agreement).

(c)     The office where Borrower keeps its records concerning the Collateral, and where such records will be located at all times, is the address specified in Section 3.2 hereof.

(d)     There is no certificate or instrument evidencing or representing any of the Collateral other than the Ownership Certificates, which are being delivered to Lender on the date hereof.

(e)     The Pledge Agreement and the Financing Statement create a valid security interest in the Collateral, securing the payment of the Debt, and upon the filing in the appropriate filing offices of the Financing Statement and delivery of the Ownership Certificates to Lender, such security interest will be perfected, first priority security interests and all filings and other actions necessary to perfect such security interest will have been duly taken.  Upon the exercise of its rights and remedies under the Pledge Agreement and the Financing Statement, Lender will succeed to all of the rights, titles and interest of Borrower in Mortgage Borrower without the consent of any other Person and will, without the consent of any other Person, be admitted as a member in Mortgage Borrower.  Mortgage Borrower is not taxed as a corporation under the Code or any other applicable laws.

(f)     The Collateral is covered by a UCC insurance policy in the amount of the Loan, insuring that the Pledge Agreement creates a valid and perfected first lien on the Collateral, and that Borrower is the sole owner of the Collateral, with such endorsements and affirmative coverages as Lender shall have requested, which (i) is in full force and effect, (ii) is freely assignable to and will inure to the benefit of Lender and any successor or assignee of Lender, including the trustee in any Secondary Market Transaction, (iii) has been paid in full, (iv) has had no claims made against it, and (v) lists no exceptions. Mortgage Borrower's policy of owner's title insurance includes a "mezzanine lender's endorsement" naming Lender.

(g)     There are no prior assignments of the Collateral that are presently outstanding except in accordance with the Loan Documents.

**Section 3.6    Purchase Options**.  Neither the Collateral nor any part thereof or interest therein are subject to any purchase options, rights of first refusal or offer to purchase or other similar rights in favor of third parties.

**Section 3.7     Intentionally Omitted**.

**Section 3.8     Intentionally Omitted**.

**Section 3.9     Intentionally Omitted**.

**Section 3.10   Subject Transaction**.

(a)     Either each Subject Transaction is (or, in the case of any Subject Transaction that occurred prior to the Closing Date, was) not a Covered Transaction, or CFIUS Approval has been (or, in the case of any Subject Transaction that occurred prior to the Closing Date, was previously) obtained with respect to the same.

**Section 3.11   Financial Condition**.

(a)     Borrower and Mortgage Borrower are solvent and Borrower has received reasonably equivalent value for the granting of the Pledge Agreement.  No proceeding under Creditors Rights Laws with respect to any Borrower Party has been initiated.

(b)     In the last ten (10) years, no (i) petition in bankruptcy has been filed by or against any Borrower Party and (ii) Borrower Party has ever made any assignment for the benefit of creditors or taken advantage of any Creditors Rights La except as otherwise disclosed to Lender.

(c)     No Borrower Party is contemplating either the filing of a petition by it under any Creditors Rights Laws or the liquidation of its assets or property and Borrower has no knowledge of any Person contemplating the filing of any such petition against any Borrower Party.

**Section 3.12   Financial Information**.  All financial data, including, without limitation, the balance sheets, statements of cash flow, statements of income and operating expense and rent rolls, that have been delivered to Lender in respect of Borrower, Mortgage Borrower, Sponsor, Guarantor, the Collateral and/or the Property (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower, Mortgage Borrower, Sponsor, Guarantor, the Collateral or the Property, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with the Approved Accounting Method throughout the periods covered, except as disclosed therein.  Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a Material Adverse Effect, except as referred to or reflected in said financial statements.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower, Mortgage Borrower, Sponsor or Guarantor from that set forth in said financial statements.

46

**Section 3.13   Fraudulent Conveyance**.  Borrower (a) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**Section 3.14   Disclosure**.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

**Section 3.15   No Plan Assets**.

(a)   Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA;

(b)   Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA;

(c)   transactions by or with Borrower are not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans;

(d)   none of the assets of Borrower constitutes "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101; and

(e)   Neither Borrower, nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the IRS Code), maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA).

**Section 3.16   Not a Foreign Person**.  Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the IRS Code.

**Section 3.17   Business Purposes**.  The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 3.18   Litigation**.  Except as set forth on Schedule [____] attached hereto, there is no action, suit, proceeding or governmental investigation, in each case, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's actual knowledge, threatened in writing or contemplated in writing against Borrower, Mortgage Borrower, Sponsor or Guarantor or against or affecting the Property or the Collateral.

**Section 3.19   Intentionally Omitted**.

**Section 3.20   Taxes**.

(a)      Except as otherwise disclosed to Lender, all Taxes and governmental assessments owing in respect of the Collateral have been paid or an escrow of funds in an amount sufficient to cover such payments has been established hereunder.

(b)      Borrower has filed all federal, state, county, municipal, and city income, personal property and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it.  Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

**Section 3.21   Insurance**.  Borrower has obtained (or has caused Mortgage Borrower to obtain) and has delivered to Lender certified copies of all Policies (or such other evidence acceptable to Lender) reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  There are no present claims of any material nature under any of the Policies, and to Borrower's knowledge, no Person, including Borrower and Mortgage Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**Section 3.22   Intentionally Omitted**.

**Section 3.23   Illegal Activity/Forfeiture**.

(a)      No portion of the Collateral has been purchased, improved, equipped or furnished with proceeds of any illegal activity.

(b)      There has not been committed by Borrower or any other Person in occupancy of or involved with the ownership of the Collateral any act or omission affording the federal government or any state or local government the right of forfeiture as against the Collateral or any part thereof or any monies paid in performance of Borrower's obligations under this Agreement, the Note, the Pledge Agreement or the other Loan Documents.

**Section 3.24   Special Purpose Entity**.  Since Borrower's and any SPE Component Entity's creation and as of the date hereof, Borrower and each SPE Component Entity have complied with and are in compliance with the requirements set forth on <u>Exhibit C</u> attached hereto.  Additionally, Borrower represents and warrants to Lender that it and each SPE Component Entity:

(a)     is and always has been duly formed, validly existing, and in good standing in the state of its formation and in all other jurisdictions where it is qualified to do business, and has never been subject to any division;

(b)     has no judgments or liens of any nature against it except for tax liens not yet due;

(c)     is in compliance with all laws, regulations, and orders applicable to it and has received all permits necessary for it to operate;

(d)     is not aware of any pending or threatened litigation against it;

(e)     is not involved in any dispute with any taxing authority;

(f)     has paid all taxes that it owes;

(g)     has never owned any asset other than the Collateral (or, in the case of any SPE Component Entity, its equity interest in Borrower) and personal property necessary or incidental to its ownership of the Collateral (or, in the case of any SPE Component Entity, its equity interest in Borrower);

(h)     has never engaged in any business except the ownership of the Collateral (or, in the case of any SPE Component Entity, its equity interest in Borrower); and

(i)     has no material contingent or actual obligations not related to the Collateral.

**Section 3.25   Federal Reserve Regulations**.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement, the Pledge Agreement, the Note or the other Loan Documents.

**Section 3.26   Investment Company Act**.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**Section 3.27   Embargoed Person**.  Neither Borrower nor, to Borrower's knowledge, any owner of a direct or indirect interest in Borrower (below the level of Silver Star REIT, Inc.) (a) is listed on any Government Lists, (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of the

Office of Foreign Assets Control ("**OFAC**") or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (d) is currently under investigation by any Governmental Authority for alleged criminal activity. For purposes hereof, the term "**Patriot Act Offense**" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (i) the criminal laws against terrorism; (ii) the criminal laws against money laundering, (iii) the Bank Secrecy Act, as amended, (iv) the Money Laundering Control Act of 1986, as amended, or (v) the Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "**Government Lists**" means (A) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (B) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Government Lists", or (C) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Government Authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists".

**Section 3.28   Organizational Chart**.  The organizational chart attached as <u>Exhibit A</u> hereto (the "**Organizational Chart**"), relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof. Neither Borrower, nor any SPE Component Entity, is (i) a Prohibited Entity, (ii) Controlled (directly or indirectly) by any Prohibited Entity or (iii) more than 49% owned (directly or indirectly) by Prohibited Entities (whether individually or in the aggregate).

**Section 3.29   Bank Holding Company**.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**Section 3.30   No Other Financing; Other Obligations and Liabilities**.  Borrower has not borrowed any funds which have not heretofore been repaid in full, except for the Loan. Borrower has no liabilities or other obligations that arose or accrued prior to the date hereof that, either individually or in the aggregate, could have a Material Adverse Effect. Borrower has no known contingent liabilities other than pursuant to the Loan Documents.

**Section 3.31   Contracts**.

(a)      Neither Borrower nor Mortgage Borrower has entered into, and is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(b)     Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower or Mortgage Borrower thereunder and, to the knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto.  None of Borrower, Mortgage Borrower, Manager or any other Person acting on Borrower's or Mortgage Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.

(c)     Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.

(d)     No Major Contract has as a party an Affiliate of Borrower or Mortgage Borrower.  All fees and other compensation for services previously performed under the Management Agreement have been paid in full.

**Section 3.32   Intentionally Omitted**.

**Section 3.33   No Change in Facts or Circumstances; Disclosure**.  All information submitted by (or on behalf of) Borrower, Mortgage Borrower, Guarantor or Sponsor to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower, Mortgage Borrower, Sponsor and/or Guarantor in this Agreement or in the other Loan Documents, are accurate, complete and correct in all material respects. To Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise have a Material Adverse Effect.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

**Section 3.34   Third Party Representations**.   Each of the representations and the warranties made by Sponsor and Guarantor in the other Loan Documents (if any) are true, complete and correct in all material respects.

**Section 3.35   Non-Consolidation Opinion Assumptions.**  All of the assumptions made in any Non-Consolidation Opinion delivered in connection with the closing of the Loan (if any), including, but not limited to, any exhibits attached thereto and/or certificates delivered in connection therewith, are true, complete and correct, in all material respects.

**Section 3.36   Environmental Emissions.**  To Borrower's knowledge, and except as otherwise disclosed to the Lender, the Property is in compliance with all national, state or local environmental protection, energy efficiency, and carbon emissions regulations (and any similar regulations).

**Section 3.37   Mortgage Loan Representations**.   All of the representations and warranties contained in the Mortgage Loan Documents are hereby incorporated into this Agreement and deemed made hereunder for the benefit of Lender as and when made thereunder

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(including, for purposes of clarity, that any exceptions thereto for matters "otherwise disclosed to Lender" or words of similar effect shall be deemed to refer to Lender) and shall remain incorporated without regard to any waiver, amendment or other modification thereof by the Mortgage Lender or to whether the related Mortgage Loan Document has been repaid, defeased or otherwise terminated, unless otherwise consented to in writing by Lender.

**Section 3.38   No Default Under Mortgage Loan.**  No Mortgage Loan Event of Default has occurred and there exists no default that with the giving of notice would constitute a Mortgage Loan Event of Default.

Borrower agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower set forth in this Article 3 and elsewhere in this Agreement and the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lender. All representations, warranties, covenants and agreements made in this Agreement and in the other Loan Documents shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE 4

## BORROWER COVENANTS

Borrower hereby covenants and agrees with Lender that, from the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents:

**Section 4.1     Existence.**  Borrower will continuously maintain (a) its existence, (b) its rights to do business in its state of formation and (c) its franchises and trade names, if any. Borrower shall not (i) engage in any division, dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership of the Collateral, (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents, or (iv) cause, permit or suffer any SPE Component Entity to (A) divide, dissolve, wind up or liquidate or take any action, or omit to take any action, as a result of which such SPE Component Entity would be dissolved, wound up or liquidated in whole or in part or (B) amend, modify, waive or terminate the organizational documents of such SPE Component Entity, in each case without obtaining the prior written consent of Lender.

**Section 4.2     Change of Name, Identity or Structure.**  Borrower shall not change (or permit to be changed) Borrower's or the SPE Component Entity's (a) name, (b) identity (including its trade name or names), (c) principal place of business set forth in this Agreement, or (d) corporate, partnership or other structure or state of formation, without, in each case, notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's or the SPE Component Entity's structure or state of formation, without first obtaining the prior written consent of Lender and, if required by Lender, a Rating Agency Confirmation with respect thereto.  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

the validity, perfection and priority of the security interest granted herein. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower, Mortgage Borrower or the SPE Component Entity intends to operate the Property, and representing and warranting that Borrower, Mortgage Borrower or the SPE Component Entity does business under no other trade name with respect to the Property or the Collateral.

**Section 4.3    Business and Operations**.  Borrower will continue to engage in the businesses now conducted by it as and to the extent the same are necessary for the ownership of the Collateral.  Borrower will qualify to do business and will remain in good standing under the laws of the jurisdiction as and to the extent the same are required for the ownership of the Collateral.

**Section 4.4    Title to Collateral**.  Borrower shall warrant and defend Lender's security interest in the Collateral and the validity and priority of the liens of the Pledge Agreement against the claims of all Persons whomsoever, subject only to the Permitted Encumbrances.

**Section 4.5    Title Insurance Proceeds.**  Borrower covenants, subject to the Mortgage Lender's rights und the Mortgage Loan Documents, to remit (or cause the Mortgage Borrower to remit) to Lender all title insurance proceeds paid by the title insurance company insuring Mortgage Borrower's title to the Property upon the occurrence of any loss under such title insurance policy; provided however, in no event shall such title insurance proceeds paid to Lender exceed, in the aggregate, the outstanding amount of the Debt.

**Section 4.6    Maintenance and Use of Property**.  Borrower shall (or shall cause Mortgage Borrower to) cause the Property to be maintained in a good and safe condition and repair, ordinary wear and tear excepted.  The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property) without the consent of Lender or as otherwise permitted pursuant to Section 4.19 hereof.  Borrower shall perform (or cause to be performed) the prompt repair, replacement and/or rebuilding of any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any Condemnation or similar proceeding and shall complete and pay for (or cause the completion and payment for) any structure at any time in the process of construction or repair on the Land.  Borrower shall (or shall cause Mortgage Borrower to) operate each Individual Property for the same uses as such Individual Property is currently operated and Borrower shall not (and shall not cause Mortgage Borrower to), without the prior written consent of Lender, (i) change the use of the Property or any Individual Property or (ii) initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any Individual Property or any part thereof.  If under applicable zoning provisions the use of all or any portion of any Individual Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender.

**Section 4.7    Taxes and Other Charges**.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(a)     Borrower shall pay (or cause to be paid) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; <u>provided</u>, <u>however</u>, prior to the occurrence and continuance of an Event of Default, Borrower's obligation to cause Mortgage Borrower to directly pay Taxes shall be suspended for so long as either (i) Mortgage Borrower complies with the terms and provisions of Section 7.2 of the Mortgage Loan Agreement or (ii) Borrower deposits into an Account funds sufficient to pay such Taxes in an amount determined by Lender.  Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (<u>provided</u>, <u>however</u>, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Mortgage Lender pursuant to Section 7.2 of the Mortgage Loan Agreement or (ii) Borrower deposits into an Account funds sufficient to pay such Taxes as set forth above).  Borrower shall not suffer (and shall cause Mortgage Borrower not to suffer) and shall promptly cause to be paid and discharged (or cause Mortgage Borrower to cause to be paid and discharged) any lien or charge whatsoever which may be or become a lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.

(b)     After prior written notice to Lender, Borrower may permit Mortgage Borrower, at its own expense, to contest (or permit to be contested) by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) intentionally omitted; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or Mortgage Borrower is subject and shall not constitute a default thereunder and such proceeding shall be permitted by and conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Mortgage Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Mortgage Borrower shall furnish such security as may be required in the proceeding, or deliver to Lender such reserve deposits as may be reasonably requested by Lender (unless such security has been delivered by Mortgage Borrower to Mortgage Lender pursuant to the applicable terms and conditions of the Mortgage Loan Agreement), to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon.  Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the lien of the Pledge Agreement being primed by any related lien.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 4.8    Labor and Materials**.

(a)    Subject to Section 4.8(b) below, Borrower will (or will cause Mortgage Borrower to) promptly pay (or cause to be paid) when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property (any such bills and costs, a "**Labor and Materials Charge**") and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests created hereby and by the Pledge Agreement, except for the Permitted Encumbrances.

(b)    After prior written notice to Lender, Borrower may permit Mortgage Borrower, at its own expense, to contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity of any Labor and Materials Charge, the applicability of any Labor and Materials Charge to Borrower, Mortgage Borrower or to the Property or any alleged non-payment of any Labor and Materials Charge and defer paying the same, provided that (i) intentionally omitted; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower or Mortgage Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall (or shall cause Mortgage Borrower to) promptly upon final determination thereof pay (or cause to be paid) any such contested Labor and Materials Charge determined to be valid, applicable or unpaid; (v) such proceeding shall suspend the collection of such contested Labor and Materials Charge from the Property or Borrower or Mortgage Borrower shall have paid the same (or shall have caused the same to be paid) under protest; and (vi) Borrower shall furnish (or cause to be furnished) such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure payment of such Labor and Materials Charge, together with all interest and penalties payable in connection therewith (unless such security has been delivered by Mortgage Borrower to Mortgage Lender pursuant to the applicable terms and conditions of the Mortgage Loan Agreement).  Lender may apply any such security or part thereof, as necessary to pay for such Labor and Materials Charge at any time when, in the judgment of Lender, the validity, applicability or non-payment of such Labor and Materials Charge is finally established or the Property (or any part thereof or interest therein) shall be in present danger of being sold, forfeited, terminated, cancelled or lost.

**Section 4.9    Property Access**.  Borrower shall cause Mortgage Borrower to permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, subject to the rights of Tenants.

**Section 4.10   Litigation**.  Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower or Mortgage Borrower which might have a Material Adverse Effect.

300570050v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 4.11    Performance by Borrower**.  Borrower hereby acknowledges and agrees that Borrower's observance, performance and fulfillment of each and every covenant, term and provision to be observed and performed by Borrower under this Agreement, the Pledge Agreement, the Note and the other Loan Documents is a material inducement to Lender in making the Loan.

**Section 4.12    Books and Records**.

(a)    Borrower will (or will cause Mortgage Borrower to) keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with the requirements set forth on Exhibit C hereof and the Approved Accounting Method, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and Mortgage Borrower and all items of income and expense in connection with the operation of the Property.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make and retain such copies or extracts thereof as Lender shall desire.  After the occurrence of an Event of Default, Borrower shall pay any actual costs and expenses incurred by Lender to examine Borrower's and Mortgage Borrower's accounting records with respect to the Property and the Collateral, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)    Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower and Mortgage Borrower, a complete copy of Borrower's and Mortgage Borrower's annual financial statements prepared and reviewed by an independent certified public accountant acceptable to Lender (provided, however, that at any time an Event of Default exists or Lender has a reasonable basis to believe any such financial statements are inaccurate in any material respect or do not fairly represent the financial condition of Borrower, Mortgage Borrower, the Collateral or the Property, the same shall, upon Lender's written request, be audited by such independent certified public accountant) in accordance with the Approved Accounting Method covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower, Mortgage Borrower and the Property and a balance sheet for Borrower and Mortgage Borrower.  Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual net operating income, net cash flow, gross income, and operating expenses.

(c)    Borrower will furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower, Mortgage Borrower and the Property (subject to normal year-end adjustments) as applicable:  (i) a rent roll for the subject quarter and (ii) quarterly and year-to-date operating statements (including expenditures for Capital Expenditures) prepared for each calendar quarter, noting net operating income, gross income, and operating expenses (not

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

including any contributions to the reserve funds maintained under the Mortgage Loan Documents for Capital Expenditures or Immediate Repairs), and (iii) other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar quarter, and containing a comparison of budgeted income and expenses and the actual income and expenses.  In addition, such certificate shall also be accompanied by an Officer's Certificate stating that each of Borrower and Mortgage Borrower is in compliance with the requirements set forth in Section 4.23 and the corresponding requirements of the Mortgage Loan Agreement, respectively, as of the date of such certificate.

(d)     Borrower will furnish, or cause to be furnished, to Lender on or before twenty (20) days after the end of each calendar month the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower, Mortgage Borrower and the Property (subject to normal year-end adjustments) as applicable:  (i) a rent roll for the subject month, (ii) an accounts payable aging report and an accounts receivable aging report for the subject month and (iii) monthly and year-to-date operating statements (including expenditures for Capital Expenditures) prepared for each calendar month, noting net operating income, gross income, and operating expenses (not including any contributions to the reserve funds maintained under the Mortgage Loan Documents for Capital Expenditures or Immediate Repairs),, and (iv) an updated ARGUS (or similar) cash flow projections model in form substantially similar to the model delivered to Lender prior to the Closing Date in connection with the closing of the Loan, and other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar month, and containing a comparison of budgeted income and expenses and the actual income and expenses.  In addition, Borrower shall deliver to Lender simultaneously with the delivery thereof to Mortgage Lender, copies of all financials and other items which Mortgage Borrower is required to deliver to Mortgage Lender pursuant to clauses (b), (c) and (d) of Section 4.12 of the Mortgage Loan Agreement.

(e)     For the partial year period commencing on the Closing Date, and for each Fiscal Year thereafter, Borrower shall (or shall cause Mortgage Borrower to) submit to Lender an Annual Budget not later than forty-five (45) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Lender.  The Annual Budget shall be subject to Lender's written approval (each such Annual Budget so approved by Lender, an "**Approved Annual Budget**").  In the event that Lender objects to a proposed Annual Budget submitted by Borrower or Mortgage Borrower in accordance with this Section 4.12, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall (or shall cause Mortgage Borrower to) promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall (or shall cause Mortgage Borrower to) promptly

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget.  Until such time that Lender approves a proposed Annual Budget, (1) to the extent that an Approved Annual Budget does not exist for the immediately preceding calendar year, all operating expenses of the Property for the then current calendar year shall be deemed extraordinary expenses of the Property and shall be subject to Lender's prior written approval (not to be unreasonably withheld or delayed) and (2) to the extent that an Approved Annual Budget exists for the immediately preceding calendar year, such Approved Annual Budget shall apply to the then current calendar year; provided, that such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and utilities expenses;

(f)     Borrower shall (or shall cause Mortgage Borrower to) furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, Mortgage Borrower, Guarantor and Sponsor as may be reasonably requested by Lender.

(g)     Borrower shall (or shall cause Mortgage Borrower to) furnish to Lender, within ten (10) Business Days after Lender's request (or as soon thereafter as may be reasonably possible), financial and sales information from any Tenant designated by Lender (to the extent such financial and sales information is required to be provided under the applicable Lease and same is received by Borrower or Mortgage Borrower after request therefor).

(h)     If Borrower or Mortgage Borrower shall consist of more than one Person, then the annual financial statements required to be delivered hereunder shall be in the form of an annual combined balance sheet of each Borrower or Mortgage Borrower (and no other Person), together with the related combined statements of operations, members' capital and cash flows with respect to each Borrower or Mortgage Borrower, including a combined balance sheet and a statement of income for the Property on a combined basis.

(i)     Borrower agrees that all financial information delivered to Lender pursuant to this Section 4.12 shall:  (i) be complete and correct in all material respects; (ii) present fairly the financial condition of the applicable Person; (iii) disclose all liabilities that are required to be reflected or reserved against; and (iv) be prepared (A) in the form reasonably required by Lender and certified by a Responsible Officer of Borrower or Mortgage Borrower (B) in hardcopy and electronic formats and (C) in accordance with the Approved Accounting Method.  Borrower shall be deemed to warrant and represent that, as of the date of delivery of any such financial statement, there has been no material adverse change in financial condition, nor have any assets or properties been sold, transferred, assigned, mortgaged, pledged or encumbered since the date of such financial statement except as disclosed by Borrower or Mortgage Borrower in a writing delivered to Lender.  Borrower agrees that all financial information delivered hereunder shall not contain any misrepresentation or omission of a material fact.

**Section 4.13   Contracts**.

(a)       Borrower may cause Mortgage Borrower to enter into any Contract that is not a Major Contract without Lender's consent so long as such Contract (i) contains terms that are commercially reasonable and comparable to existing local market terms for similar contractual agreements with respect to commercial properties similar to the Property as would be available from unaffiliated third parties and (ii) does not contain any terms which would have a Material Adverse Effect.  Borrower shall be required to obtain Lender's prior written approval of any and all Major Contracts affecting the Property or the Collateral (including any renewals or extensions thereof, or any amendments or modifications thereto), which approval shall not be unreasonably withheld, conditioned or delayed.  To the extent that the Deemed Approval Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section 4.13 and Lender thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

(b)       Borrower shall (or shall cause Mortgage Borrower to) (i) diligently perform and observe all of the terms, covenants and conditions to be performed and observed by it under each Contract to which it is a party, and do all things necessary to preserve and keep unimpaired its rights thereunder, (ii) promptly notify Lender of any notice of default given by any party under any Major Contract and deliver to Lender a true copy of each such notice, and (iii) enforce the performance and observance of all of the material terms, covenants and conditions required to be performed and/or observed by the other party to each Contract and to which Borrower or Mortgage Borrower is a party in a commercially reasonable manner.

**Section 4.14   Cooperation in Proceedings**.   (a) Borrower shall (and shall cause Mortgage Borrower to) cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the Note, the Pledge Agreement or the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings; and (b) without in any way limiting the foregoing, Borrower shall cause Mortgage Borrower to (and shall cause the holders of the direct and/or indirect, legal and/or beneficial interests in Borrower to) (i) within five (5) days of receipt of the same, notify Lender of, and provide Lender with a copy of, any inquiry received from CFIUS or any other Governmental Authority related to any Subject Transaction, (ii) make any filing requested by CFIUS related to any Subject Transaction, (iii) cooperate with, and fully respond to any inquiries received from, CFIUS or any Governmental Authority related to CFIUS's review and/or investigation (the "**CFIUS Review**") related to any Subject Transaction, within the time permitted by CFIUS or such Governmental Authority, as applicable, and (iv) subject to the terms and conditions of this Agreement (including, without limitation, Article 6 hereof), take any mitigation measures requested by CFIUS and/or any Governmental Authority in connection with any CFIUS Review.

**Section 4.15   Estoppel Certificates**.

(a)       After request by Lender, Borrower, within ten (10) Business Days of such request, shall furnish Lender or any proposed assignee with (1) a statement, duly

acknowledged and certified, setting forth (i) the outstanding principal balance of the Note, (ii) the Interest Rate, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment and performance of the Obligations, and (v) any other matters reasonably requested by Lender and reasonably related to the Leases, the obligations created and evidenced hereby and by the Pledge Agreement, the Property or Collateral and (2) a similar written certification from Mortgage Borrower with respect to the Mortgage Loan.

(b)      Borrower shall (or shall cause Mortgage Borrower to) use commercially reasonable efforts to deliver to Lender, within thirty (30) days of request (but not more often than twice in any twelve (12) month period unless an Event of Default has occurred and is continuing), duly executed estoppel certificates from any one or more Tenants as required by Lender attesting to such facts regarding the Lease as Lender may reasonably require, including, but not limited to, attestations that each Lease covered thereby is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, except as security, no free rent or other concessions are due lessee and that the lessee claims no defense or offset against the full and timely performance of its obligations under the Lease.

(c)      Borrower shall use commercially reasonable efforts to deliver to Lender, within ten (10) Business Days of request, estoppel certificates from each party under any Property Document in form and substance reasonably acceptable to Lender.

(d)      In connection with any Secondary Market Transaction, within ten (10) Business days of Lender's request, Borrower shall (and shall cause Mortgage Borrower to) provide an estoppel certificate to any Investor or any prospective Investor in such form, substance and detail as Lender, such Investor or prospective Investor may require.

**Section 4.16   Leases and Rents**.

(a)      All Leases and all renewals of Leases executed after the date hereof shall (i) provide for rental rates comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms with unaffiliated, third parties (unless otherwise consented to by Lender), (iii) provide that such Lease is subordinate to the Security Instrument and that the lessee will attorn to Mortgage Lender and any purchaser at a foreclosure sale, (iv) not permit payment of rent by anything other than lawful money of the United States of America and (v) not contain any terms which would have a Material Adverse Effect.  Notwithstanding anything to the contrary contained herein, in addition to the requirements set forth above, Borrower shall not (and shall not cause or allow Mortgage Borrower to), without the prior written approval of Lender (which approval may be given or withheld in Lender's sole discretion), enter into, renew, extend, amend, modify, permit any assignment of or subletting under, waive any provisions of, release any party to, terminate, reduce rents under, accept a surrender of space under, or shorten the term of, in each case, any (x) Major Lease, (y) any Lease other than a Major Lease which provides for either (A) a term (including all renewals/extensions thereunder) equal to or greater than seven (7) years or less than two (2) year, (B) rental of less than $**[____]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

per square foot on a ["modified gross" or "triple net" basis], as applicable, or (z) any other Lease in a manner that would cause such Lease to fall under either of the foregoing prongs (x) or (y).

(b)    Without limitation of subsection (a) above, Borrower shall or shall cause Mortgage Borrower to (i) observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner for similar real estate assets; (ii) enforce the material terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner for similar real estate assets; (iii) not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents and the Mortgage Loan Documents); (v) not, without Lender's prior written consent, alter, modify or change any Lease to the extent the same would, individually or in the aggregate, (A) cause any such Lease to violate 4.16(a)(i) through (iii) above or (B) have a Material Adverse Effect; and (vi) hold all security deposits under all Leases in accordance with Legal Requirements.  Upon request, Borrower shall furnish Lender with executed copies of all Leases.

(c)    Notwithstanding anything contained herein to the contrary, Borrower shall not willfully withhold from Lender any information regarding renewal, extension, amendment, modification, waiver of provisions of, termination, rental reduction of, surrender of space of, or shortening of the term of, any Lease during the term of the Loan. Except with respect to any such matter otherwise previously disclosed to Lender, Borrower further agrees to provide (or cause Mortgage Borrower to provide) Lender with written notice of any commercial Tenant (if any exist at the Property) "going dark" for more than 90 consecutive days under such Tenant's Lease within five (5) Business Days after Borrower or Mortgage Borrower becomes aware of such Tenant "going dark" and Borrower's failure to provide (or cause Mortgage Borrower to provide) such notice shall constitute an Event of Default.

(d)    Borrower shall (or shall cause Mortgage Borrower to) notify Lender in writing, within two (2) Business Days following receipt thereof, of Borrower's or Mortgage Borrower's receipt of any early termination fee or payment or other termination fee or payment paid by any Tenant under any commercial Lease or any Major Lease, and Borrower further covenants and agrees that Borrower shall cause Mortgage Borrower to hold any such termination fee or payment in trust for the benefit of Lender and that any use of such termination fee or payment shall be subject in all respects to Lender's prior written consent in Lender's sole discretion (which consent may include, without limitation, a requirement by Lender that such termination fee or payment be placed in reserve with Lender (unless deposited with Mortgage Lender pursuant to the Mortgage Loan Agreement) to be disbursed by Lender for tenant improvement and leasing commission costs with respect to the Property and/or for payment of the Debt or otherwise in connection with the Loan evidenced by the Note and/or the Property, as so determined by Lender).  The foregoing consent right of Lender (including, without

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

limitation, any reserve requirement) shall not be subject to any "cap" or similar limit on the amount of any reserve funds held by Lender. In the event Lender requires that any such termination fee or payment be applied to partial prepayment of the Debt, no prepayment fee or charge (including, without limitation, any Interest Shortfall or Minimum Interest Payment but excluding the Exit Fee, which shall be payable as provided in Section 2.10) shall be payable in connection therewith.

(e)     To the extent that the Deemed Approval Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section 4.16 and Lender thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

**Section 4.17   Notice of Default**.   Borrower shall promptly advise Lender of any material adverse change in Borrower's, Mortgage Borrower's, Sponsor's and/or Guarantor's condition (financial or otherwise) or of the occurrence of any Default or Event of Default of which Borrower or Mortgage Borrower has knowledge.

**Section 4.18   Other Agreements**.   Borrower shall (and shall cause Mortgage Borrower to) observe and perform each and every term to be observed or performed by Borrower or Mortgage Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property or the Collateral, or given by Borrower or Mortgage Borrower to Lender for the purpose of further securing the Debt and any amendments, modifications or changes thereto, and not cured within any applicable grace or cure period..

**Section 4.19   Alterations**.   Notwithstanding anything contained herein (including, without limitation, Article 7 hereof) to the contrary, Lender's prior approval shall be required in connection with any alterations to any Improvements (a) that may have a Material Adverse Effect, (b) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold or (c) that are structural in nature, which approval may not be unreasonably withheld, conditioned or delayed. If the total unpaid amounts incurred and to be incurred with respect to any alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following (except to the extent any such security has been delivered by Mortgage Borrower to Mortgage Lender pursuant to the Mortgage Loan Documents): (i) cash, (ii) U.S. Obligations, (iii) other security acceptable to Lender (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same), or (iv) a completion bond (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same). Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements over the Alteration Threshold, taking into account any reserve funds on deposit and available pursuant to the terms and conditions of the Loan Documents or the Mortgage Loan Documents to pay such costs.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 4.20   Management Agreement.**

(a)      Borrower shall (and shall cause Mortgage Borrower to) (i) cause Manager to manage the Property in accordance with the Management Agreement, (ii) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Mortgage Borrower to be performed and observed, (iii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, estimate, report and each material notice received by it under the Management Agreement, and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement in accordance with commercially reasonable real estate practices for similar properties.  If Mortgage Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Mortgage Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under the Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Mortgage Borrower to be performed or observed.

(b)      Borrower shall not (and shall not cause or permit Mortgage Borrower to), without the prior written consent of Lender (which consent may be conditioned, without limitation, on Lender's receipt of evidence that the same would not result in a breach or violation of any Property Document), (i) surrender, terminate, cancel, modify, renew or extend the Management Agreement (other than a renewal or extension provided for in the Management Agreement); provided, that, so long as no Event of Default shall have occurred and be continuing or would occur as a result of such replacement, Borrower may cause Mortgage Borrower to replace Manager with a Qualified Manager pursuant to a Qualified Management Agreement, (ii) enter into any new or other agreement relating to the management or operation of the Property with Manager or any other Person, (iii) consent to the assignment by Manager of its interest under the Management Agreement, (iv) permit or suffer any transfer of the ownership, management or Control of an Affiliated Manager to occur, or (v) waive or release any of its rights and remedies under the Management Agreement in any material respect.

(c)      In the event that the Management Agreement expires or is surrendered, terminated or canceled (without limiting any obligation of Borrower to obtain Lender's consent to any surrender, termination, cancellation, modification, renewal or extension of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall cause Mortgage Borrower to enter into a Qualified Management Agreement with a Qualified Manager contemporaneously with such expiration, surrender, termination or cancellation.

(d)      Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender shall have the right to require Borrower to cause Mortgage Borrower

to replace Manager with respect to the Property as a whole or any one or more Individual Properties designated by Lender from time to time with a Qualified Manager chosen by Mortgage Borrower which is not an Affiliated Manager to manage the Property pursuant to a Qualified Management Agreement upon the occurrence of any one or more of the following events: (i) at any time following the occurrence of an Event of Default, (ii) if at any time the Debt Yield (Combined) for the Property as a whole falls below 15% for any two (2) consecutive calendar quarters, (iii) if Manager shall be in default under the Management Agreement beyond any applicable notice and cure period, (iv) if Manager shall become insolvent or a debtor in any involuntary bankruptcy or insolvency proceeding that is not dismissed within ninety (90) days of the filing thereof, or any voluntary bankruptcy or insolvency proceeding, or (v) if at any time Manager has engaged in gross negligence, fraud or willful misconduct.

(e)      Upon the occurrence and during the continuance of an Event of Default, Borrower shall not permit Mortgage Borrower to exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender.

(f)      If at any time Lender consents to the appointment of a new manager and/or the execution of a management agreement under this Agreement, such manager and Borrower shall, as a condition of Lender's consent, execute a Subordination of Management Agreement and subordination of management fees substantially in the form then used by Lender (or in such other form and substance reasonably satisfactory to Lender).

**Section 4.21   No Joint Assessment**.  Borrower shall not (and shall not cause or permit Mortgage Borrower) suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**Section 4.22   ERISA**.

(a)      Borrower shall not (and shall not cause or permit Mortgage Borrower) engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights hereunder or under the other Loan Documents) to be a non exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)      Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its reasonable discretion, that (i) neither Borrower nor Mortgage Borrower is an "employee benefit plan" as defined in Section 3(3) of ERISA, or other retirement arrangement, which is subject to Title I of ERISA or Section 4975 of the IRS Code, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

neither Borrower nor Mortgage Borrower is subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

> (A)    Equity interests in Borrower or Mortgage Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3 101(b)(2);

> (B)    Less than 25 percent of each outstanding class of equity interests in Borrower or Mortgage Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R.§ 2510.3 101(f)(2); or

> (C)    Borrower or Mortgage Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R § 2510.3 101(c) or (e) or an investment company registered under The Investment Company Act of 1940, as amended.

(c)    Borrower shall not cause or permit Mortgage Borrower maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any member of Borrower's or Mortgage Borrower's "controlled group of corporations" to maintain, sponsor, contribute to or become obligated to contribute to a "defined benefit plan" or a "multiemployer pension plan" (as each of the same is defined in Section 3.15 of this Agreement).

**Section 4.23   Special Purpose Entity.**  Borrower and each SPE Component Entity shall at all times comply with the requirements set forth on <u>Exhibit C</u> attached hereto and shall not take or permit any action that would result in Borrower or any SPE Component Entity not being in compliance with the representations, warranties and covenants set forth in Section 3.24 and <u>Exhibit C</u> attached hereto.

**Section 4.24   Debt Cancellation**.  Neither Borrower nor Mortgage Borrower shall cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower or Mortgage Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's or Mortgage Borrower's business.

**Section 4.25   Property Documents.** Without limiting the other provisions of this Agreement and the other Loan Documents, Borrower shall (and shall cause Mortgage Borrower to) (a) promptly perform and/or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under the Property Documents and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (b) promptly notify Lender of any material default under the Property Documents of which it is aware; (c) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under the Property Documents; (d) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed under the Property Documents in a commercially reasonable manner; (e) cause the Property to be operated, in all material respects, in accordance with the Property

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Documents; and (f) not, without the prior written consent of Lender, (i) enter into any new Property Document or replace or execute modifications to any existing Property Documents or renew or extend the same (exclusive of, in each case, any automatic renewal or extension in accordance with its terms), (ii) surrender, terminate or cancel the Property Documents, (iii) reduce or consent to the reduction of the term of the Property Documents, (iv) increase or consent to the increase of the amount of any charges under the Property Documents, (v) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Property Documents in any material respect or (vi) following the occurrence and during the continuance of an Event of Default, exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Property Documents.

**Section 4.26  Embargoed Person.**    At all times throughout the term of the Loan, including after giving effect to any transfers of all or any portion of the Property or any direct or indirect equity or beneficial interests in Borrower, Mortgage Borrower or any Guarantor that is not a natural person below the organizational level of Silver Star REIT Properties, Inc., (a) none of the funds or other assets of Borrower, Mortgage Borrower or any Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., the Patriot Act and any Executive Orders or regulations promulgated thereunder, each as may be amended from time to time, with the result that the investment in Borrower, Mortgage Borrower Sponsor or any Guarantor, as applicable (whether directly or indirectly), would be prohibited by law (each, an "**Embargoed Person**"), or the Loan made by Lender would be in violation of law, (b) no Embargoed Person shall have any interest of any nature whatsoever in Borrower, Mortgage Borrower, Sponsor or any Guarantor, as applicable, with the result that the investment in Borrower, Mortgage Borrower, Sponsor or any Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, Mortgage Borrower, Sponsor or any Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, Mortgage Borrower, Sponsor or any Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

**Section 4.27  Patriot Act**.    Borrower shall (and shall cause Mortgage Borrower to) comply with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower, Mortgage Borrower and/or the Property, including those relating to money laundering and terrorism. Lender shall have the right to audit Borrower's and Mortgage Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower, Mortgage Borrower and/or the Property, including those relating to money laundering and terrorism.  In the event that Borrower or Mortgage Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Lender may, at its option, cause Borrower and Mortgage Borrower to comply therewith and any and all costs and expenses incurred by Lender in connection therewith shall be secured by the Pledge Agreement and the other Loan Documents and shall be immediately due and payable.

300570050v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 4.28   No Plan Assets; Illegal Activity/Forfeiture**.  Borrower shall (and shall cause Mortgage Borrower to) take all necessary actions in order to remain in compliance with the representation contained in Sections 3.15 and 3.23 hereof at all times during the term of the Loan, and shall not take any actions that would cause Borrower and Mortgage Borrower to violate any of the same.  Borrower covenants and agrees not to (and not to cause or permit Mortgage Borrower to) commit, permit or suffer to exist any act or omission affording any right of forfeiture described in Section 3.23.

**Section 4.29   O&M Program.  Intentionally deleted.**

**Section 4.30   Property Releases.** Borrower shall cause Mortgage Borrower to cause Partial Releases to be consummated in accordance with the terms of Section 6.7 hereof and the Mortgage Loan Agreement such that (a) by [DATE 6 MONTHS AFTER CLOSING DATE] Borrower (or Mortgage Borrower, as applicable) shall have paid [Partial Release Prices and Mortgage Loan Release Prices to Lender and Mortgage Lender, as applicable, in accordance with the terms hereof and of the Mortgage Loan Documents, as applicable] in an aggregate amount equal to at least $[1/3 of final principal balance of the Loan], (b) by the first anniversary of the Closing Date, Borrower (or Mortgage Borrower, as applicable) shall have paid [Partial Release Prices and Mortgage Loan Release Prices to Lender and Mortgage Lender, as applicable, in accordance with the terms hereof and of the Mortgage Loan Documents, as applicable]  in an aggregate amount equal to at least 2/3 of the final principal balance of the Loan, (c) by [DATE 18 MONTHS AFTER CLOSING DATE] Borrower (or Mortgage Borrower, as applicable) shall have paid [Partial Release Prices and Mortgage Loan Release Prices to Lender and Mortgage Lender, as applicable, in accordance with the terms hereof and of the Mortgage Loan Documents, as applicable]  in an aggregate amount equal to at least $_____ (or such lesser amount as may be required to repay the Loan and the Mortgage Loan in full).

**Section 4.31   Deposits Under Contracts of Sale**.  If in connection with the termination of any contract for the sale of an Individual Property (for each Individual Property, a **"Contract of Sale"**) Mortgage Borrower shall be entitled pursuant to the terms of such Contract of Sale and applicable Legal Requirements to retain any amounts deposited by the purchaser thereunder, including, without limitation, as a result of any such purchaser's default in the performance of its obligations thereunder, Borrower shall (or shall cause Mortgage Borrower to) give prompt written notice to Lender thereof and shall, within three (3) Business Days, cause Mortgage Borrower to remit to Mortgage Lender any amounts so retained by Mortgage Borrower, which amounts shall be applied to the partial repayment of the Debt (including any Exit Fee, Minimum Interest Payment, Breakage Costs, Interest Shortfall and/or other amounts payable in connection with such prepayment pursuant to the terms of Section 2.7 hereof and of the Mortgage Loan Agreement).

**Section 4.32   Environmental Emissions**.  The Property shall be in compliance with all national, state or local environmental protection, energy efficiency, and carbon emissions regulations (and any similar regulations) and Borrower shall take, or cause Mortgage Borrower to take, any and all actions necessary to ensure such compliance at its sole cost and expense.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ARTICLE 5

## INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

**Section 5.1    Insurance**.

(a)    Borrower shall cause Mortgage Borrower to maintain at all times during the term of the Loan the insurance required under Section 5.1 of the Mortgage Loan Agreement, including, without limitation, meeting all insurer requirements thereunder.  In addition, Borrower shall cause Lender to be named as loss payee on property coverages and named as an additional insured, together with Mortgage Lender, as their interest may appear, under such of the insurance policies required under of the Mortgage Loan Agreement as Lender shall require.  Borrower shall also cause all insurance policies required under this Section 5.1 to provide for at least thirty (30) days prior notice to Lender in the event of policy cancellation or material changes.  Not less than five (5) Business Days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to the terms hereof, certificates of insurance accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder shall be delivered by Borrower to Lender; provided, however, that in the case of renewal Policies, Borrower may furnish Lender with certificates of insurance therefor to be followed by the original Policies when issued.

(b)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder and under the Mortgage Loan Agreement is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Collateral, including the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Pledge Agreement and shall bear interest at the Default Rate.

(c)    For purposes of this Agreement, Lender shall have the same approval rights over the insurance referred to above (including, without limitation, the insurers, deductibles and coverages thereunder, as well as the right to require other reasonable insurance pursuant thereto) as are provided in favor of the Mortgage Lender in the Mortgage Loan Agreement.  The Policies delivered pursuant to the Mortgage Loan Agreement shall include endorsements pursuant to which Lender shall have the same rights as the Mortgage Lender as referred to in Section 5.1.1(e) of the Mortgage Loan Agreement.

(d)    In the event that the Mortgage Loan has been paid in full, except during the continuance of an Event of Default, Borrower shall permit Mortgage Borrower to settle any insurance or condemnation claims with respect to the insurance proceeds or condemnation awards which in the aggregate are less than or equal to the Restoration Threshold.  Lender shall have the right to participate in and reasonably approve any settlement for insurance or condemnation claims with respect to the insurance proceeds or condemnation awards which in the aggregate are equal to or greater than the Restoration Threshold.  If an Event of Default shall have occurred and be continuing, Borrower hereby irrevocably empowers Lender, in the name of

68

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Mortgage Borrower as its true and lawful attorney in fact, to file and prosecute such claim and to collect and to make receipt for any such payment.

(e)    Upon repayment in full of the Mortgage Loan, the provisions of Section 5.1 of the Mortgage Loan Agreement shall be deemed incorporated into this Agreement in their entirety.

**Section 5.2    Casualty**.  If the Property shall sustain a Casualty, Borrower shall give prompt notice of such Casualty to Lender and shall cause Mortgage Borrower to promptly commence and diligently prosecute the completion of the Restoration of the Property in accordance with the applicable terms and conditions of the Mortgage Loan Agreement. Borrower shall cause Mortgage Borrower to pay all costs of Restoration (including, without limitation, any applicable deductibles under the Policies) whether or not such costs are covered by the Net Proceeds.  In the event of a Casualty where the loss does not exceed the Restoration Threshold, Borrower may (or may cause Mortgage Borrower to) settle and adjust such claim so long as no Event of Default has occurred and is continuing.  Any such adjustment must be carried out in a commercially reasonable and timely manner.  In the event of a Casualty where the loss exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may (and may cause or permit Mortgage Borrower to) settle and adjust such claim only with the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any such adjustment; provided, however, if Borrower fails to (and fails to cause Mortgage Borrower) settle and adjust such claim after diligently pursuing the same after the Casualty, Lender shall have the right to settle and adjust such claim at Borrower's cost and without Borrower's consent. Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

**Section 5.3    Condemnation**.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of the Property of which Borrower has knowledge and shall cause Mortgage Borrower to deliver to Lender copies of any and all papers served in connection with such proceedings.  Provided no Event of Default has occurred and is continuing, in the event of a Condemnation where the amount of the taking does not exceed the Restoration Threshold, Borrower may (or may cause Mortgage Borrower to) settle and compromise such Condemnation.  Any such settlement and compromise must be carried out in a commercially reasonable and timely manner.  In the event of a Condemnation where the amount of the taking exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may (and may cause or permit Mortgage Borrower to) settle and compromise the Condemnation only with the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any litigation and settlement discussions in respect thereof, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation.  Borrower shall, at its expense, cause Mortgage Borrower to diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.  Notwithstanding any taking by any public or quasi public authority through Condemnation or otherwise (including but not

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall cause Mortgage Borrower to promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the applicable provisions of the Mortgage Loan Agreement. Borrower shall cause Mortgage Borrower to pay all costs of Restoration whether or not such costs are covered by the Net Proceeds.

**Section 5.4    Restoration**.

(a)    Borrower shall deliver, or shall cause Mortgage Borrower to deliver, to Lender all reports, plans, specifications, documents and other materials that are delivered to Mortgage Lender under the applicable terms and conditions of the Mortgage Loan Agreement in connection with a Restoration of the Property after a Casualty or Condemnation, simultaneously with any such delivery to Mortgage Lender.  Subject only to the rights of Mortgage Lender pursuant to the Mortgage Loan Agreement, all Net Proceeds that are permitted by the terms of the Mortgage Loan Documents to be paid to Mortgage Borrower or otherwise distributed to Borrower or Mortgage Borrower (rather than being used to rebuild or improve the Property in accordance with the Mortgage Loan Documents) shall be immediately paid over to Lender and are hereby assigned to Lender as additional collateral security hereunder.

(b)    Borrower shall (or shall cause Mortgage Borrower to) keep Lender timely informed of the progress of any Restoration and the status of any negotiations with insurers relating to any such Casualty or Condemnation.  In addition, Borrower shall (or shall cause Mortgage Borrower to) provide Lender with any and all documentation reasonably requested by Lender relating to any Casualty or Condemnation or Restoration.  If any Net Proceeds are to be disbursed by Mortgage Lender for Restoration, Borrower shall deliver or cause to be delivered to Lender copies of all written correspondence delivered to and received from Mortgage Lender that relates to the Restoration and release of the Net Proceeds. If, in connection with a Restoration, Mortgage Lender does not require the deposit by Mortgage Borrower of any Net Proceeds pursuant to the applicable terms and conditions of the Mortgage Loan Agreement, Lender shall have the right to demand that Borrower make a deposit of such Net Proceeds in accordance with those same terms and conditions, such Net Proceeds to then be governed by such terms and conditions as if each reference therein to "Lender" and "Borrower" referred to Lender and Borrower, respectively.

(c)    Notwithstanding any provision in this Agreement to the contrary, all Net Proceeds will be made available to Mortgage Borrower in accordance with the Mortgage Loan Agreement. In the event the Mortgage Loan has been paid in full and Lender receives any Net Proceeds, Lender shall either apply such proceeds to the Debt or for the Restoration in accordance with the same terms and conditions contained in the Mortgage Loan Agreement.  Upon repayment in full

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

of the Mortgage Loan, the provisions of the Mortgage Loan Agreement governing Restoration and use of Net Proceeds shall be incorporated into this Agreement in their entirety.

## ARTICLE 6

## NO SALE OR ENCUMBRANCE; PERMITTED TRANSFERS

**Section 6.1    No Sale/Encumbrance**.  It shall be an Event of Default hereunder if, without the prior written consent of Lender, a Prohibited Transfer occurs, other than (i) pursuant to Leases in accordance with the provisions of this Agreement, (ii) as expressly permitted pursuant to the terms of this Article 6, and (iii) if (A) the applicable breach of the requirements of this Article 6 was immaterial (it being agreed that the failure to give a required notice shall, by itself, be deemed immaterial), (B) Borrower corrects such breach within thirty (30) days of Borrower's first awareness thereof, and (C) such breach is not a Sale or Pledge of all or any portion of the Property or a transfer which results in the ownership or control tests set forth in this Article 6 to be violated.

**Section 6.2    Intentionally Omitted**.

**Section 6.3    Permitted Equity Transfers**.

(a)    Notwithstanding Section 6.1 hereof, the following equity transfers shall be permitted without Lender's consent:

(i)    [TBD].

(b)    Upon request from Lender, Borrower shall promptly provide Lender a revised version of the Organizational Chart reflecting any equity transfer consummated in accordance with this Section 6.3.

**Section 6.4    Replacement Guarantor**.  To the extent that any Guarantor is a natural person, the death or incapacity of such Guarantor shall be an Event of Default hereunder unless such Guarantor is replaced in accordance with this Section 6.4.  Borrower shall be permitted to substitute a replacement guarantor (a "**Substitution**") and no Event of Default shall be deemed to have occurred hereunder, provided that each of the following terms and conditions are satisfied:  (a) no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Substitution; (b) within thirty (30) days after the occurrence of such death or incapacity, Borrower delivers to Lender notice of its intent to substitute such Guarantor and, concurrently therewith, gives Lender all such information concerning the proposed substitute guarantor as Lender may reasonably require, including, without limitation, certified financial statements detailing assets and liabilities; (c) the replacement guarantor is a Satisfactory Replacement Guarantor; (d) within fifteen (15) days after delivery of the written notice described in the preceding clause (b), such Satisfactory Replacement Guarantor (i) assumes the obligations of Guarantor under the Guaranty and the Environmental Indemnity for events or conditions occurring prior to, as of and after the Substitution or (ii) executes and delivers to Lender a replacement guaranty and a replacement environmental indemnity in each case in form and

71

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

substance the same as the Guaranty and the Environmental Indemnity, respectively, and otherwise reasonably acceptable to Lender, for events or conditions occurring prior to, as of and after the Substitution; (e) concurrently with such assumption or execution and delivery (i) such Satisfactory Replacement Guarantor delivers to Lender a spousal consent in form and substance acceptable to Lender, as and to the extent applicable, and (ii) each of Borrower, each remaining Guarantor and/or such Satisfactory Replacement Guarantor, as applicable, affirms each of their respective obligations under the Loan Documents; (f) Borrower delivers to Lender a Rating Agency Confirmation with respect to such Substitution; (g) if required by Lender or the Rating Agencies, Borrower delivers to Lender an opinion from counsel, and in form and substance, in each case reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion stating, among other things, (i) that the Guaranty and the Environmental Indemnity (or the replacement guaranty and environmental indemnity, as the case may be) are enforceable against such Satisfactory Replacement Guarantor in accordance with their terms and (ii) that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code or be subject to tax as a result of such Substitution; and (h) if required by Lender or the Rating Agencies and a Non-Consolidation Opinion has previously been delivered in connection with the Loan, Borrower delivers to Lender a New Non-Consolidation Opinion.  No such death or replacement of a Guarantor shall hinder, impair, limit, terminate or effectuate a novation of the obligations or liabilities of any other Guarantor under any of the Loan Documents.  As used herein, the term "**Satisfactory Replacement Guarantor**" shall mean a replacement guarantor that is acceptable to Lender, which determination shall be based upon, inter alia, (A) such replacement guarantor having (1) a direct or indirect ownership interest in Borrower, which is reasonably satisfactory to Lender, and (2) the ability to Control Borrower and Mortgage Borrower, (B) such replacement guarantor having a net worth and liquidity reasonably satisfactory to Lender, (C) Lender's receipt of searches (including credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) reasonably required by Lender on such replacement guarantor, the results of which must be reasonably acceptable to Lender, (D) such replacement guarantor otherwise satisfying Lender's then current applicable underwriting criteria and requirements, and (E) such replacement guarantor being an experienced operator and/or owner of properties similar in location, size, class, use, operation and value as the Collateral, as evidenced by financial statements and other information reasonably requested by Lender or requested by the Rating Agencies.

**Section 6.5    Lender's Rights**.  Lender reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and on assumption of this Agreement and the other Loan Documents as so modified by the proposed Prohibited Transfer, (b) payment of a transfer fee and all of Lender's expenses incurred in connection with such Prohibited Transfer, (c) receipt of a Rating Agency Confirmation with respect to the Prohibited Transfer, (d) the proposed transferee's continued compliance with the covenants set forth in this Agreement, including, without limitation, the covenants in Section 4.23, (e) receipt of a New Non-Consolidation Opinion with respect to the Prohibited Transfer (if at such time a Non-Consolidation Opinion has previously been issued to Lender in connection with the Loan) and/or (f) such other conditions and/or legal opinions as Lender shall determine in its sole discretion to be in the interest of Lender.  All expenses incurred by Lender shall be

payable by Borrower whether or not Lender consents to the Prohibited Transfer. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer without Lender's consent. This provision shall apply to every Prohibited Transfer, whether or not Lender has consented to any previous Prohibited Transfer.

**Section 6.6    Economic Sanctions, Anti-Money Laundering; Prohibited Entities**. Borrower shall (and shall cause its direct and indirect constituent owners and Affiliates to) (a) at all times comply with the representations and covenants contained in Sections 3.27, 4.26 and 4.27 such that the same remain true, correct and not violated or breached and (b) not permit a Prohibited Transfer to occur and shall cause the ownership requirements specified in this Article 6 to be complied with at all times. Borrower hereby represents that, other than in connection with the Loan, the Loan Documents and any Permitted Encumbrances, as of the date hereof, there exists no Sale or Pledge of (i) the Collateral or any part thereof or any legal or beneficial interest therein or (ii) any interest in any Restricted Party, except as otherwise disclosed in writing by Borrower to Lender. Notwithstanding anything to the contrary contained herein or in any other Loan Document (including, without limitation Sections 6.3 and 6.4 hereof), in no event shall Borrower or any SPE Component Entity be (A) a Prohibited Entity, (B) Controlled (directly or indirectly) by any Prohibited Entity or (C) more than 49% owned (directly or indirectly) by Prohibited Entities (whether individually or in the aggregate), unless, in each of the foregoing cases, Lender's prior written consent is first obtained (which such consent shall be given or withheld in Lender's sole discretion and may be conditioned on, among other things, Lender's receipt of a Rating Agency Confirmation).

**Section 6.7    Partial Release**.

(a)    Notwithstanding Section 6.1 hereof, Borrower may permit Mortgage Borrower to obtain a release of any Partial Release Property from the lien of the applicable Security Instrument and the other Mortgage Loan Documents in connection with the sale of such Partial Release Property to a bona fide third party purchaser who is not an Affiliate of a Restricted Party pursuant to an arms-length contract and otherwise pursuant to the provisions of this Section 6.7 of Section 6.7 of the Mortgage Loan Agreement (each such release, a "**Partial Release**") so long as the following conditions precedent, and the other terms and conditions of this Section 6.7, and the provisions of Section 6.7 of the Mortgage Loan Agreement, are satisfied in connection with any such Partial Release:

(i)    no Default or Event of Default shall have occurred and be continuing or shall occur solely as a result of such Partial Release;

(ii)    Borrower shall have (or shall have caused Mortgage Borrower to have) submitted to Lender a written request for such Partial Release at least thirty (30) days prior to the proposed Partial Release Date (other than with respect to those Individual Properties set forth on Schedule 6.7 hereof, with respect to which such written request is deemed given as of the Closing Date and the applicable Partial Release Date shall be deemed to be the respective date set forth with

respect to each such Individual Property on <u>Schedule 6.7</u>), accompanied by a processing fee of $7,500, which request (i) shall specify the Partial Release Property that Mortgage Borrower intends to release and state the anticipated release date (the "**Partial Release Date**") and (ii) shall include an Officer's Certificate providing a certification that as of the date of such request, to the best of Borrower's knowledge, no Default, Event of Default or Mortgage Loan Event of Default shall have occurred and be continuing or shall occur solely as a result of such Partial Release;

(iii)    Borrower shall have caused Mortgage Borrower to have paid, or shall have arranged to be paid contemporaneously with the Partial Release, to Mortgage Lender, and Mortgage Lender shall have received by wire transfer of immediately available federal funds contemporaneously with the Partial Release, an amount equal to the sum of (A) the Partial Release Price for the Partial Release Property, which shall be applied by Mortgage Lender and Lender as a prepayment of the Debt, plus (B) any Interest Shortfall, plus (C) the Exit Fee due in respect of the principal amount prepaid, plus (D) all other sums then due and payable under the Loan Documents;

(iv)    Intentionally omitted;

(v)    Intentionally omitted;

(vi)    after giving effect to the Partial Release, (A) the Debt Yield (Combined) for the Partial Release Remaining Property shall not be less than the greater of (i) the Partial Release Minimum Debt Yield and (ii) the Debt Yield (Combined) in effect immediately prior to the Partial Release, and (B) the LTV for the Partial Release Remaining Property shall not be greater than the lesser of (A) the Partial Release Minimum LTV and (B) the LTV in effect immediately prior to the Partial Release;

(vii)    Manager and other parties to the Management Agreement shall provide Lender with evidence satisfactory to Lender that the Partial Release Property will no longer be subject to the Management Agreement once such Partial Release has been completed and that Manager will no longer earn fees under the Management Agreement with respect to such Partial Release Property; <u>provided</u>, <u>however</u>, that Manager shall be permitted to enter into a separate management, leasing and/or development agreement with the owner of any such Partial Release Property;

(viii)    Intentionally omitted;

(ix)    Borrower shall have delivered an Officer's Certificate certifying that all of the requirements set forth in this Section 6.7 and Section 6.7 of the Mortgage Loan Agreement have been satisfied;

(x)     Borrower shall have executed and delivered to Lender such other certificates, documents or instruments as Lender may reasonably require in connection with the Partial Release;

(xi)    Borrower shall have delivered to Lender evidence reasonably acceptable to Lender that all conditions precedent to the Partial Release pursuant to the Mortgage Loan Documents have been satisfied in full or waived by Mortgage Lender; and

(xii)   Borrower shall have paid (A) all of Lender's actual, out-of-pocket costs and expenses (including attorneys' fees and disbursements) incurred in connection with the Partial Release and the review and approval of the documents and information required to be delivered in connection therewith, and (B) all costs and expenses of third parties incurred in connection with the Partial Release (including, without limitation, the cost of title, survey charges and recording costs, the costs and fees of any zoning consultant, and the costs and expenses incurred by, and all fees and charges of, the Rating Agencies).

(b)     All documents, instruments, evidence, opinions, reports, information and other items specifically required to be delivered to Lender pursuant to Section 6.7 shall be delivered by Borrower (or Mortgage Borrower) to Lender not less than ten (10) Business Days prior to the Partial Release Date, unless otherwise specified herein.

(c)     If at the time Borrower exercises its rights under this Section 6.7, the Loan is included in a REMIC Trust, then:

(i)     if the LTV of the Partial Release Remaining Property would exceed one hundred twenty five percent (125%) immediately after such Partial Release (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust), Borrower shall pay down the principal balance of the Loan by a "qualified amount" as such term is defined in IRS Rev. Proc. 2010-30 (as the same may be modified, supplemented, superseded or amended, from time to time), unless the Lender receives an opinion of counsel in form and substance acceptable to Lender that, if the foregoing prepayment requirement is not followed, the applicable REMIC Trust will not fail to maintain its status as a REMIC Trust as a result of such Partial Release; and

(ii)    all conditions in this Section 6.7 which provide for the exercise of discretion by Lender (whether in Lender's reasonable discretion, sole discretion, or otherwise) shall be construed as permitting the Lender to reject a document or other item only if such document or other item fails to satisfy generally-applicable underwriting standards for securitized commercial mortgage loans, employed at the time such Partial Release occurs.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 6.8    Costs and Expenses**.  Borrower shall pay all actual, out-of-pocket costs and expenses of Lender in connection with any transfer, assumption and/or replacement of any Guarantor, including, without limitation, the cost of any Rating Agency Confirmation and all reasonable fees and expenses of Lender's counsel, and the cost of any counsel opinions required by the Rating Agencies.

**ARTICLE 7**

**RESERVE FUNDS**

**Section 7.1    Reserve Funds**.

(a)    Borrower shall make the deposits of reserve funds that are required of Mortgage Borrower under the Mortgage Loan Agreement into applicable Accounts established therefor, as and when such deposits are required thereunder, which reserve funds shall be subject to the applicable terms and conditions of the Mortgage Loan Agreement (including definitions of terms) with respect to disbursements thereof and Borrower and Lender's respective rights thereto (in all instances as if the terms "Borrower" and "Lender" in the Mortgage Loan Agreement referred to Borrower and Lender, respectively); provided, however that notwithstanding the foregoing, Borrower shall be relieved of its obligation to make any such deposits so long as Mortgage Borrower is required to, and actually does, make such deposits pursuant to the Mortgage Loan Agreement and Lender, upon request, receives reasonably satisfactory evidence of the same and of Mortgage Borrower's payment and/or performance of the costs and obligations to which such funds are allocable pursuant to the terms of the Mortgage Loan Agreement.

**Section 7.2    The Accounts Generally**.

(a)    Borrower grants to Lender a first-priority perfected security interest in each of the Accounts and any and all sums now or hereafter deposited in the Accounts as additional security for payment of the Debt.  Until expended or applied in accordance herewith, the Accounts and the funds deposited therein shall constitute additional security for the Debt.  The provisions of this Section 7.2 (together with the other related provisions of the other Loan Documents) are intended to give Lender and/or Servicer "control" of the Accounts and the Account Collateral and serve as a "security agreement" and a "control agreement" with respect to the same, in each case, within the meaning of the UCC.  Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof, and Borrower shall have no right of withdrawal with respect to any Account except with the prior written consent of Lender or as otherwise provided herein.  The funds on deposit in the Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  Notwithstanding anything to the contrary contained herein, unless otherwise consented to in writing by Lender, Borrower shall only be permitted to request (and Lender shall only be required to disburse) amounts deposited in the Reserve Accounts on account of the liabilities, costs, work and other

76

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

matters (as applicable) for which said sums were originally reserved hereunder, in each case, as reasonably determined by Lender.

(b)     Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in the Accounts or the sums deposited therein or permit any lien to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.  Borrower hereby authorizes Lender to file a financing statement or statements under the UCC in connection with any of the Accounts and the Account Collateral in the form required to properly perfect Lender's security interest therein. Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or desirable, or that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Account or Account Collateral.

(c)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, (1) Lender shall have no obligation to disburse funds from any Account within the sixty (60) day period prior to the Maturity Date and (2) upon the occurrence and during the continuance of an Event of Default, without notice from Lender or Servicer (i) Borrower shall have no rights in respect of the Accounts, (ii) Lender may liquidate and transfer any amounts then invested in Permitted Investments pursuant to the applicable terms hereof to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or pursuant to the other Loan Documents or to enable Lender to exercise and enforce Lender's rights and remedies hereunder or under any other Loan Document with respect to any Account or any Account Collateral, and (iii) Lender shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Pledge Agreement, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the Pledge Agreement, may apply the amounts of such Accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt.

(d)     The insufficiency of funds on deposit in the Accounts shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(e)     Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorney's fees and expenses) arising from or in any way connected with the Accounts, the sums

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

deposited therein or the performance of the obligations for which the Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees.  Borrower shall cause Mortgage Borrower to assign to Lender all rights and claims Borrower and Mortgage Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Accounts; underlined provided, underlined however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

(f)    Borrower and Lender (or Servicer on behalf of Lender) shall maintain each applicable Account as an Eligible Account, except as otherwise expressly agreed to in writing by Lender.  In the event that Lender or Servicer no longer satisfies the criteria for an Eligible Institution, Borrower shall cooperate with Lender in transferring the applicable Accounts to an institution that satisfies such criteria.  Borrower hereby grants Lender power of attorney (irrevocable for so long as the Loan is outstanding) with respect to any such transfers and the establishment of accounts with a successor institution.

(g)    Interest accrued on any Account shall be remitted either to Borrower or to any Account and  shall not be retained by Lender.

(h)    Borrower acknowledges and agrees that it solely shall be, and shall at all times remain, liable to Lender or Servicer for all fees, charges, costs and expenses in connection with the Accounts, this Agreement and the enforcement hereof, including, without limitation, any monthly or annual fees or charges as may be assessed by Lender or Servicer in connection with the administration of the Accounts and the reasonable fees and expenses of legal counsel to Lender and Servicer as needed to enforce, protect or preserve the rights and remedies of Lender and/or Servicer under this Agreement.

(i)    Lender may, in its sole discretion, establish subaccounts maintained on ledger basis within each Reserve Account to allocate Reserve Funds with respect to each Individual Property. Any determination made by Lender pursuant to this Article 7 that the applicable Reserve Funds are insufficient to pay all costs for which a Reserve Account is established may be made by Lender, in its sole but reasonable discretion, by either (1) aggregating all Reserve Funds in such Reserve Account (regardless of allocation to an Individual Property) or (2) solely on the basis of Reserve Funds allocated to an Individual Property. Lender shall have no obligation to make Reserve Funds allocated to an Individual Property available to pay costs associated with any other Individual Property.

**Section 7.3    Transfer of Reserve Funds under Mortgage Loan**.  If Mortgage Lender waives any reserves or escrow accounts required in accordance with the terms of the Mortgage Loan Agreement, or if the Mortgage Loan is refinanced or repaid in full (and the Loan is not repaid in full simultaneously therewith) and reserve funds that are required under the Mortgage Loan Agreement are not required under any such new mortgage loan, then Borrower shall cause any and all amounts that would have been deposited into any reserves or escrow accounts in accordance with the terms of the Mortgage Loan Agreement to be transferred to and deposited with Lender in accordance with the terms of this Article 7 (and Borrower shall enter into a clearing account agreement and, if applicable, a cash management agreement, for the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

benefit of Lender substantially similar to the arrangements entered into by Mortgage Borrower at the time of the closing of the Mortgage Loan), and, if any letters of credit have been delivered by Mortgage Borrower in substitution of any such cash reserves or escrows as may be specifically permitted by the Mortgage Loan Agreement, then Borrower shall also cause such letters of credit to be transferred to Lender to be held by Lender upon the same terms and provisions as set forth in the Mortgage Loan Agreement.  Borrower will execute all amendments and other documents necessary to give effect to the terms and conditions of this Article 7.  All of the foregoing shall be at the sole cost and expense of Borrower.

Section 7.4    **Excess Cash Flow Funds**    On each Monthly Payment Date, Borrower shall deposit (or cause to be deposited) into an Eligible Account with Mortgage Lender or Servicer (the "**Excess Cash Flow Account**") an amount equal to the Excess Cash Flow (the amounts on deposit in the Excess Cash Flow Account being herein referred to as the "**Excess Cash Flow Funds**").  Provided no Event of Default has occurred and is continuing, any Excess Cash Flow Funds remaining in the Excess Cash Flow Account upon the repayment in full of the Debt and the Mortgage Loan shall be disbursed to Borrower or Mortgage Borrower, as applicable, unless any amount remains outstanding at such time pursuant to this Agreement or the Mortgage Loan Documents, in which case such funds shall be, and Borrower hereby directs that such funds be, disbursed to Lender or Mortgage Lender, as applicable.

# ARTICLE 8

# CASH MANAGEMENT

Section 8.1    **Establishment of Certain Accounts**.    Borrower shall cause Mortgage Borrower to establish and maintain the Clearing Account pursuant to and in accordance with the applicable terms and conditions of the Clearing Account Agreement and the applicable terms and conditions of the Mortgage Loan Agreement.  Other than as required pursuant to the Mortgage Loan Documents, Borrower shall not permit or cause Mortgage Borrower to further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any financing statements to be filed with respect thereto.

Section 8.2    **Cash Management Account**.    Borrower shall cause Mortgage Borrower to comply with the applicable terms and conditions of the Mortgage Loan Agreement relating to the Cash Management Account.  Other than as required pursuant to the Mortgage Loan Documents, Borrower shall not permit or cause Mortgage Borrower to further pledge, assign or grant any security interest in the Cash Management Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any financing statements to be filed with respect thereto.  Mortgage Lender shall have the sole right to make withdrawals and/or direct disbursements from the Cash Management Account, to be applied in accordance with the terms and conditions of the Mortgage Loan Documents.  All costs and expenses for establishing and maintaining the Cash Management Account shall be paid by Mortgage Borrower.  Lender may direct Mortgage Lender to make all distributions from the Cash Management Account that would, pursuant to the Mortgage Loan

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Documents, go to Mortgage Borrower, directly to Lender pursuant to written instructions provided by Lender, to pay any amounts owed to Lender by Borrower hereunder.

**Section 8.3    Payments Received Under this Agreement**. Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, provided no Event of Default has occurred and is continuing, at any time Borrower is required, pursuant to the terms and conditions of this Agreement, to make deposits into applicable Accounts maintained by Lender, Borrower's obligations with respect to the monthly payment of Debt Service and amounts due for the Reserve Accounts shall (provided Lender is not prohibited from withdrawing or applying any funds in the applicable Accounts by operation of law or otherwise) be deemed satisfied to the extent sufficient amounts are deposited in applicable Accounts to satisfy such obligations on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

## ARTICLE 9

## SECONDARY MARKET

**Section 9.1    Securitization**.

(a)    Lender shall have the right (i) to sell or otherwise transfer the Loan (or any portion thereof and/or interest therein), (ii) to sell participation interests in the Loan (or any portion thereof and/or interest therein) or (iii) to securitize the Loan (or any portion thereof and/or interest therein) in a single asset securitization or a pooled asset securitization.  The transactions referred to in clauses (i), (ii) and (iii) above shall hereinafter be referred to collectively as "**Secondary Market Transactions**" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "**Securitization**".  Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**".  At Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions.

(b)    If requested by Lender in connection with any Secondary Market Transaction, Borrower shall assist Lender (at Borrower's sole cost and expense) in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the NRSROs in connection with such Secondary Market Transactions, including, without limitation, to:

(i)    provide (A) updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Mortgage Borrower, Guarantor, Sponsor, any SPE Component Entity and Manager including, without limitation, the information set forth on Exhibit E attached hereto, (B) updated budgets relating to the Property, (C) updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "**Updated Information**"), together, if customary, with appropriate

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies and (D) revisions to and other agreements with respect to the Property Documents in form and substance acceptable to Lender and the Rating Agencies;

(ii)     provide new and/or updated opinions of counsel, which may be relied upon by Lender, the NRSROs and their respective counsel, agents and representatives, as may be customary in Secondary Market Transactions or required by the Rating Agencies, which counsel and opinions shall be satisfactory in form and substance to Lender and the Rating Agencies;

(iii)    provide updated (as of the closing date of the applicable Secondary Market Transaction) representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require;

(iv)     execute such amendments to the Loan Documents, the Property Documents, Borrower and Mortgage Borrower's or any SPE Component Entity's organizational documents as may be reasonably requested by Lender or requested by the Rating Agencies to effect any Secondary Market Transaction, including, without limitation, (A) to amend and/or supplement the independent director provisions provided on Exhibit C attached hereto, in each case, in accordance with the applicable requirements of the Rating Agencies, (B) bifurcating the Loan into two or more components and/or additional separate notes and/or creating additional senior/subordinate note structure(s) (any of the foregoing, a "**Loan Bifurcation**") and (C) to modify all operative dates (including but not limited to payment dates, interest period start dates and end dates, etc.) under the Loan Documents, by up to ten (10) days; provided, however, that Borrower shall not be required to so modify or amend any Loan Document if such modification or amendment would change the interest rate, the stated maturity (except as provided in subclause (C) above) or the amortization of principal set forth herein, or otherwise increase (to more than a de minimis extent) the obligations or decrease (to more than a de minimis extent) the rights of Borrower in each case from those contemplated under the Loan Documents, except in connection with a Loan Bifurcation which may result in varying interest rates and, as applicable, amortization schedules, but which shall have the same initial weighted average coupon of the original Note; and

(v)      review any Disclosure Document or any interim draft thereof furnished by Lender to Borrower with respect to information contained therein that was furnished to Lender by or on behalf of Borrower specifically in connection with the preparation of such Disclosure Document and provide to Lender any revisions to such Disclosure Document or interim draft thereof necessary to insure that such reviewed information does not contain any untrue statement of a material fact or omit to state any material fact necessary to make statements contained therein not misleading.

(c)    Upon request, Borrower shall furnish to Lender from time to time such financial data and financial statements as Lender determines to be necessary, advisable or appropriate for complying with any applicable legal requirements (including those applicable to Lender or any Servicer (including, without limitation and to the extent applicable, Regulation AB)) within the timeframes necessary, advisable or appropriate in order to comply with such legal requirements.

**Section 9.2    Disclosure and Indemnification**.

(a)    Borrower (on its own behalf and on behalf of each other Borrower Party) understands that information provided to Lender by Borrower, any other Borrower Party and/or their respective agents, counsel and representatives may be (i) included in (A) the Disclosure Documents and (B) filings under the Securities Act and/or the Exchange Act and (ii) made available to Investors, the NRSROs, investment banking firms, accounting firms, law firms and other third-party advisory and service providers, in each case, in connection with any Secondary Market Transaction.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by the Lender, the Issuer or the Securitization placement agent or underwriter may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

(b)    Borrower agrees to indemnify Lender, the Lender Group and the Underwriter Group against any losses, claims, damages or liabilities (collectively, the "**Liabilities**") to which Lender, the Lender Group or the Underwriter Group may become subject in connection with (x) any Disclosure Document and/or any Covered Rating Agency Information, in each case, insofar as such Liabilities arise out of or are based upon any untrue statement of any material fact in the Provided Information and/or arise out of or are based upon the omission to state a material fact in the Provided Information required to be stated therein or necessary in order to make the statements in the applicable Disclosure Document and/or Covered Rating Agency Information, in light of the circumstances under which they were made, not misleading and (y) after a Securitization, any indemnity obligations incurred by Lender or Servicer in connection with any Rating Agency Confirmation.

(c)    Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof (but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party).  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this Section 9.2, such indemnifying party shall pay for any legal or other expenses subsequently incurred by such indemnifying party in connection with the defense thereof; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.

(d)     The liabilities and obligations of both Borrower and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.  Failure by Borrower and/or any Borrower Party to comply with the provisions of Section 9.1 and/or Section 9.2 within the timeframes specified therein and/or as otherwise required by Lender shall, at Lender's option, constitute a breach of the terms thereof and/or an Event of Default.  Borrower (on its own behalf and on behalf of each Borrower Party) hereby expressly authorizes and appoints Lender its attorney-in-fact to take any actions required of any Borrower Party under Sections 9.1, 9.2 and/or 9.5 in the event any Borrower Party fails to do the same, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.   Notwithstanding anything to the contrary contained herein, (i) except as otherwise expressly provided to the contrary in this Article 9, each Borrower Party shall bear its own cost of compliance with this Article (including, without limitation, the costs of any ongoing financial reporting or similar provisions contained herein) and (ii) to the extent that the timeframes for compliance with such ongoing financial reporting and similar provisions are shorter than the timeframes allowed for comparable reporting obligations under Section 4.12 hereof (if any), the timeframes under this Article 9 shall control.

**Section 9.3     Reserves/Escrows**.  In the event that Securities are issued in connection with the Loan, all funds held by Lender in escrow or pursuant to reserves in accordance with this Agreement and the other Loan Documents shall be deposited in "eligible accounts" at "eligible institutions" and, to the extent applicable, invested in "permitted investments" as then defined and required by the Rating Agencies.

**Section 9.4     Servicer**.

(a)     At the option of Lender, the Loan may be serviced by a master servicer, primary servicer, special servicer and/or trustee (any such master servicer, primary servicer, special servicer and trustee, together with its agents, designees or nominees, collectively, "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under the Loan Documents to the Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement and/or other agreement providing for the servicing of one or more mortgage loans (collectively, the "**Servicing Agreement**") between Lender and Servicer.  Borrower shall pay a scheduled monthly servicing fee of $1,400.00 per month, as well as (i) any fees and expenses of

83

Servicer (including, without limitation, attorneys' fees and disbursements) in connection with any release of the Property, the Collateral or a portion thereof, any prepayment, defeasance, transfer, assumption, amendment or modification of the Loan, any documents or other matters requested by Borrower or any Guarantor, any special servicing or workout of the Loan or enforcement of the Loan Documents, including, without limitation, any advances made by Servicer and interest on such advances, any liquidation fees in connection with the exercise of any or all remedies permitted under this Agreement and (ii) the costs of all property inspections and/or appraisals of the Property and/or the Collateral (or any updates to any existing inspection or appraisal) that a Servicer may be required to obtain (other than the cost of regular annual inspections required to be borne by Servicer under the Servicing Agreement); provided, however, that Borrower shall not be responsible for payment of any fees or expenses required to be borne by, and not reimbursable to, Servicer.  Without limiting the generality of the foregoing, Servicer shall be entitled to reimbursement of costs and expenses as and to the same extent (but without duplication) as Lender is entitled thereto pursuant to the terms of the Loan Documents.

(b)    Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and any Guarantor under the Loan Documents.

(c)    Provided Borrower shall have received notice from Lender of Servicer's address, Borrower shall deliver, and cause to be delivered, to Servicer duplicate originals of all notices and other documents and instruments which Borrower and/or any Guarantor deliver to Lender pursuant to the Loan Documents.  No delivery of any such notices or other documents shall be of any force or effect unless delivered to Lender and Servicer as provided in this Section 9.4(c).

**Section 9.5        Intervening Mezzanine Loan**.  Lender acknowledges and agrees that (a) the exercise of Mortgage Lender's right pursuant to Section 9.5 of the Mortgage Loan Agreement to require a Senior Mezzanine Loan, the performance by Mortgage Borrower of its obligations thereunder and Borrower's cooperation therewith in accordance with the terms thereof shall not constitute a Default or Event of Default hereunder provided that, in connection therewith, Borrower shall enter into such modifications to the Loan Documents as may be reasonably required by Lender  to reflect the Senior Mezzanine Loan, which amendments shall not result in any increase in Borrower's obligations under the Loan Documents or any decrease in Borrower's rights under the Loan Documents, in each case, except to a de minimis extent and (b) Mezzanine Lender shall cooperate with the exercise of Mortgage Lender's rights pursuant to Section 9.5 of the Mortgage Loan Agreement as required by the terms thereof and subject to any limitations set forth therein. Notwithstanding anything in this Agreement to the contrary, Mortgage Lender and Lender may agree that, in lieu of a Senior Mezzanine Loan pursuant to Section 9.5 of the Mortgage Loan Agreement, Lender will increase the amount of the Loan.  In such case: (i) the references in Section 9.5 of the Mortgage Loan Agreement to the Senior Mezzanine Loan shall be deemed to refer to the amount of the increase of the Loan (and resultant reduction in the amount of the Mortgage Loan); (ii) Borrower shall continue as the obligor with

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

respect to the Loan, in lieu of requiring a Senior Mezzanine Borrower; and (iii) Borrower shall cooperate with Lender and Mortgage Lender pursuant to the terms of Section 9.5 of the Mortgage Loan Agreement.    In furtherance thereof, Borrower shall (A) cause Mortgage Borrower to prepay the outstanding principal of the Mortgage Loan in an amount equal to the increase in the principal amount in the Loan, (B) cooperate (and cause Mortgage Borrower to cooperate) with all reasonable requests of Lender and Mortgage Lender in order to increase the principal balance of the Loan and prepay the Mortgage Loan as required hereby and pursuant to Section 9.5 of the Mortgage Loan Agreement, and (C) execute and deliver, and cause to be executed and delivered, such documents as shall reasonably be required by Lender, Mortgage Lender and/or any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and Mortgage Lender and, if applicable, satisfactory to such Rating Agency (including, without limitation, such opinions, title endorsements, UCC title insurance policies, documents and/or instruments relating to the Property Documents and the modification of organizational documents and loan documents, as may be required in connection therewith). Each of Borrower and Lender shall pay their own costs and expenses incurred in connection with this Section 9.5, including legal fees and expenses.

**Section 9.6    REMIC Savings Clause**.    Notwithstanding anything herein to the contrary, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the real property relating to the Property, the ratio of the unpaid principal balance of the Loan to the value of the remaining real property relating to the Property is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust and it being agreed and acknowledged that such loan-to-value determination shall be based on the value of only real property and shall exclude any personal property or going-concern value, if any), the principal balance of the Loan must be paid down by Borrower by an amount sufficient to satisfy REMIC Requirements, unless the Lender receives an opinion of counsel acceptable to Lender that the Loan will not fail to maintain its status as a "qualified mortgage" within the meaning of Section 860G(a)(3)(A) of the IRS Code as a result of the related release of lien.

**Section 9.7    Syndication; Registered Form**.

(a)    Borrower acknowledges that Lender and any Co-Lender may, at their option and without the consent of Borrower, sell with novation all or any part of their right, title and interest in and to the Loan (the "**Syndication**") to one or more additional lenders (each a "**Co-Lender**").  In connection therewith, Borrower will take all actions as Lender and any such Co-Lender may request to assist Lender and /or such Co-Lender in consummating any such Syndication including, without limitation: (i) facilitating the review of the Loan and the Property by any prospective Co-Lender; (ii) assisting and cooperating with Lender in the preparation of information offering materials in connection with any such Syndication (which assistance may include reviewing and commenting on drafts of such materials and drafting portions thereof); (iii) delivering updated financial information, operating statements and other information with respect to Borrower and the Property (including, without limitation, appraisals); (iv) making representatives of Borrower available at reasonable times and upon reasonable notice to

meet with prospective Co-Lenders (for tours of the Property or otherwise); (v) facilitating direct contact between the senior management and advisors of Borrower and any prospective Co-Lender; (vi) providing Lender with all information reasonably deemed necessary by Lender to complete any such Syndication; and (vii) executing such modifications to the Loan Documents as may be required by Lender or any Co-Lender in connection with any such Syndication (provided that such modifications will not, change in the aggregate any economic terms or other material terms of the Loan Documents, or otherwise materially increase the obligations or materially decrease the rights of Borrower from those contemplated in the Loan Documents).  The liabilities of Lender and each of the Co-Lenders shall be several and not joint, and neither Lender nor any Co-Lender shall be responsible for the obligations of any other Co-Lender.  Lender and each Co-Lender shall be liable to Borrower only for their respective proportionate shares of the Loan.  Borrower acknowledges and agrees, with respect to any co-lending agreement (or similar agreement) among the Co-Lenders, that (A) any such agreement shall be solely for the benefit of the Co-Lenders, and that Borrower shall not be a third-party beneficiary (intended or otherwise) of any of the provisions therein, shall not have any rights thereunder, and shall not be entitled to rely on any of the provisions contained therein, (B) Borrower's obligations under the Loan Documents are and will be independent of any such agreement and shall remain unmodified by the terms and provisions thereof, (C) any such agreement may contain provisions which require that amendments, waivers, extensions, modifications, and other decisions with respect to the Loan Documents shall require the approval of all or a number of the Co-Lenders holding in the aggregate a specified percentage of the Loan or any one or more Co-Lenders that are specifically affected by such amendment, waiver, extension, modification or other decision, and (D) the Co-Lenders shall have no obligation to disclose to Borrower the contents of any such agreement.  All costs incurred in connection with any Syndication shall be paid by Borrower.

(b)      At the request of Lender, Borrower shall appoint, as its agent, a registrar and transfer agent (the "**Registrar**") acceptable to Lender which shall maintain, subject to such reasonable regulations as it shall provide, a register (the "**Register**") for the recordation of the names and addresses of Lender and any other lender or Co-Lender, and the principal amounts (and stated interest) under the Loan Documents owing to Lender and each other lender or Co-Lender pursuant to the terms of the Loan Documents from time to time, in a manner that shall cause the Loan to be considered to be in registered form for purposes of Sections 163(f), 871(h)(2) and 881(c)(2) of the IRS Code.  The entries in the Register shall be conclusive absent manifest error, and Borrower, Lender and other lenders and Co-Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Borrower, Lender and any other lender of Co-Lender, at any reasonable time and from time to time upon reasonable prior notice.  Any agreement setting out the rights and obligation of the Registrar shall be subject to the reasonable approval of Lender.  Borrower may revoke the appointment of any particular person as Registrar, effective upon the effectiveness of the appointment of a replacement Registrar.  The Registrar shall not be entitled to any fee from Borrower or

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Lender or any other lender in respect of transfers of the Note and other Loan Documents. If the Registrar has not been appointed to maintain the Register, the transfer of the Note may be effected only by surrender of the Note and the reissuance by Borrower of the Note to the transferee.

## ARTICLE 10

## EVENTS OF DEFAULT; REMEDIES

**Section 10.1   Event of Default**.

The occurrence of any one or more of the following events shall constitute an "**Event of Default**":

(a)      if (i) any monthly Debt Service payment or the payment due on the Maturity Date is not paid when due, (ii) any fixed monthly deposit to any of the Accounts required hereunder or under the other Loan Documents is not paid when due or (iii) any other portion of the Debt is not paid when due and, in the case of the foregoing clauses (ii) or (iii), such non-payment continues for five (5) Business Days following notice to Borrower that the same is due and payable;

(b)      if any of the Taxes or Other Charges are not paid when the same are due and payable except to the extent either (A) the same are being contested pursuant to the terms and conditions of Section 4.7(b) hereof (but for no more than a period of 120 days past the due date thereof) or (B)(i) sums sufficient to pay the Taxes or Other Charges in question had been reserved hereunder or under the Mortgage Loan Documents prior to the applicable due date for the Taxes or Other Charges in question for the express purpose of paying the Taxes or Other Charges in question and Lender or Mortgage Lender, as applicable, failed to pay the Taxes or Other Charges in question when required hereunder, (ii) Lender's or Mortgage Lender's, as applicable, access to such sums was not restricted or constrained in any manner and (iii) no Event of Default or Mortgage Loan Event of Default, as applicable, was continuing;

(c)      if (i) the Policies are not kept in full force and effect, except to the extent (A) the failure to maintain such Policies resulted solely from failure to pay the applicable Insurance Premiums therefor, (B) sums sufficient to pay such Insurance Premiums had been reserved hereunder or under the Mortgage Loan Documents prior to the applicable due date for the express purpose of paying such Insurance Premiums and Lender or Mortgage Lender, as applicable, failed to pay the same when required hereunder, (C) Lender's or Mortgage Lender's (as applicable) access to such sums was not restricted or constrained in any manner and (D) no Event of Default or Mortgage Loan Event of Default, as applicable, was continuing, or (ii) evidence of the Policies being in full force and effect is not delivered to Lender as and when required in Section 5.1 hereof and either (A) such failure continues for two (2) Business Days following written notice thereof to Borrower or (B) such failure continues beyond the date that is two (2) Business Days prior to the scheduled expiration date of such Policies;

(d)      if (i) any of the representations or covenants are breached or violated (<u>provided</u>, <u>however</u>, that, with respect to breaches or violations of any such covenants or representations or warranties, under the Loan Documents, such breach or violation shall not result in an Event of Default hereunder if (A) such breach or violation was inadvertent, non-recurring and immaterial and (B) within twenty (20) days of the earlier to occur of notice from Lender or Borrower's knowledge of such breach or violation thereof, Borrower (x) cures such breach or violation, (y) provides Lender with written evidence of such cure and (z) if requested by Lender, delivers to Lender a New Non-Consolidation Opinion relating to such breach or violation), or (ii) any of the representations or covenants contained in Sections 3.32, 4.25, 4.30 or Article 6 hereof or in the Property Document Provisions are breached or violated;

(e)      if any representation or warranty made herein, in the Guaranty or in the Environmental Indemnity or in any other guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender in connection with the Loan shall have been false or misleading in any material adverse respect when made (provided, however, that such breach or violation shall not result in an Event of Default hereunder if (A) such breach or violation does not constitute an Event of Default under any other clause of this Section 10.1, (B) such breach or violation was inadvertent and non-recurring and not reasonably likely to cause a Material Adverse Effect and (C) within twenty (20) days of the earlier to occur of written notice from Lender or Borrower obtaining actual knowledge of such breach or violation thereof, Borrower (x) cures such breach or violation without the occurrence of any Material Adverse Effect with respect thereto (it being acknowledged and agreed that any such breach may only be cured by curing the underlying facts or circumstances which caused such representation or warranty to be untrue or incorrect in a manner which causes such representation or warranty to be true and correct) and (y) provides Lender with written evidence of such cure);

(f)      if (i) Borrower, Mortgage Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall commence any case, proceeding or other action (A) under any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower, Mortgage Borrower or any managing member or general partner of Borrower, Mortgage Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall make a general assignment for the benefit of its creditors; (ii) there shall be commenced against Borrower, Mortgage Borrower or any managing member or general partner of Borrower, Mortgage Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

period of sixty (60) days; (iii) there shall be commenced against Borrower, Mortgage Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; (iv) Borrower, Mortgage Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall take any action in furtherance of, in collusion with respect to, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; (v) Borrower, Mortgage Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; (vi) any of Borrower, Mortgage Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor is substantively consolidated with any other entity in connection with any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Sponsor or its subsidiaries; or (vii) a Bankruptcy Event occurs;

(g)     if Mortgage Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument;

(h)     if the Property or any portion thereof becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of forty-five (45) days (subject to Borrower's right to contest the same pursuant to the terms and conditions of Section 4.8(b) hereof and Mortgage Borrower's right to contest the same pursuant to the terms of the Mortgage Loan Agreement, but for no more than a period of 120 days past the filing date thereof);

(i)     if any federal tax lien is filed against Borrower, Mortgage Borrower, any SPE Component Entity, Sponsor, Guarantor, the Collateral or the Property and same is not discharged of record (by payment, bonding or otherwise) within sixty (60) days after same is filed (which such period will be deemed extended for so long as such tax lien is being contested pursuant to the terms and conditions of Section 4.7(b) hereof or the applicable terms of the Mortgage Loan Agreement, as if the same were a lien for Taxes, but for no more than a period of 120 days past the filing date thereof);

(j)     if any litigation or similar proceeding is filed against Borrower, Mortgage Borrower, the Collateral or the Property which (i) claims an amount in excess of $10,000,000.00 (in the aggregate together with the amount claimed with respect to any other litigation or similar proceeding filed against Borrower, Mortgage Borrower, the Collateral or the Property) and (ii) alleges facts which, if true, would constitute an Event of Default hereunder (after the delivery of any applicable notice and the passage of any

applicable cure period), and such litigation or proceeding is not (A) fully covered by the Policies or (B) dismissed (or otherwise addressed to Lender's satisfaction in Lender's sole discretion) within one hundred twenty (120) days after the same is filed;

(k)     if Borrower shall fail to deliver to Lender any financial reporting item required by this Agreement (including without limitation any of the items required by Section 4.12 hereof), on the date the same is due, and such failure continues for ten (10) Business Days after written notice thereof from Lender;

(l)     Intentionally deleted;

(m)     if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Environmental Indemnity and/or the Guaranty) and such default continues after the expiration of applicable grace periods, if any;

(n)     if any of the assumptions contained in any Non-Consolidation Opinion, or in any New Non-Consolidation Opinion (including, without limitation, in any schedules thereto and/or certificates delivered in connection therewith) are untrue or shall become untrue in any material respect that would cause the stated opinions set forth in such Non-Consolidation Opinion or New Non-Consolidation Opinion to change when taken into account;

(o)     if Borrower or Mortgage Borrower defaults under the Management Agreement beyond the expiration of applicable notice and grace periods, if any, thereunder or if the Management Agreement is canceled, terminated or surrendered, expires pursuant to its terms or otherwise ceased to be in full force and effect, unless, in each such case, Mortgage Borrower, contemporaneously with such cancellation, termination, surrender, expiration or cessation, enters into a Qualified Management Agreement with a Qualified Manager in accordance with the applicable terms and provisions hereof;

(p)     if Borrower or Mortgage Borrower fails to appoint a replacement Manager upon the request of Lender and/or fails to comply with any limitations on instructing the Manager, each as required by and in accordance with, as applicable, the terms and provisions of, this Agreement, the Assignment of Management Agreement and the Pledge Agreement;

(q)     if any representation and/or covenant herein relating to ERISA, CFIUS or DPA matters is breached;

(r)     if (i) any Interest Rate Cap Agreement is terminated for any reason by Borrower or Counterparty or (ii) Borrower shall fail to observe, perform or discharge any of Borrower's obligations, covenants, conditions or agreements under the Interest Rate Cap Agreement (subject to any applicable notice and/or cure periods set forth therein) and otherwise comply with the covenants set forth in Section 2.8 hereof;

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(s)    if (A) Borrower or Mortgage Borrower shall fail (beyond any applicable notice or grace period) to pay any rent, additional rent or other charges payable under any Property Document as and when payable thereunder, (B) Borrower or Mortgage Borrower defaults under the Property Documents beyond the expiration of applicable notice and grace periods, if any, thereunder, (C) any of the Property Documents are amended, supplemented, replaced, restated or otherwise modified without Lender's prior written consent or if Borrower or Mortgage Borrower consents to a transfer of any party's interest thereunder without Lender's prior written consent, (D) any Property Document and/or the estate created thereunder is canceled, rejected, terminated, surrendered or expires pursuant to its terms, unless in such case Borrower or Mortgage Borrower enters into a replacement thereof in accordance with the applicable terms and provisions hereof or (E) a Property Document Event occurs;

(t)    if a Mortgage Loan Event of Default shall occur or any other event or condition shall occur the effect of which is to accelerate or permit Mortgage Lender to accelerate all or any portion of the Mortgage Loan;

(u)    if the Mortgage Loan is repaid in full (unless the Loan is paid in full contemporaneously therewith in accordance with the terms and conditions of the Loan Documents);

(v)    If Mortgage Borrower opts out of Article 8 of the applicable Uniform Commercial Code;

(w)    with respect to any default or breach of any term, covenant or condition of this Agreement not specified in subsections (a) through **[(v)]** above or not otherwise expressly specified as an Event of Default in this Agreement, if the same is not cured (i) within ten (10) days after the earlier of (1) Borrower's knowledge thereof or (2) notice from Lender (in the case of any default which can be cured by the payment of a sum of money) or (ii) for thirty (30) days after the earlier of (1) Borrower's knowledge thereof or (2) notice from Lender (in the case of any other default or breach); provided, that, with respect to any default or breach specified in subsection (ii), if the same cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure the same within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure the same, it being agreed that no such extension shall be for a period in excess of ninety (90) days; or

(x)    if any default shall exist under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

**Section 10.2   Remedies**.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(a)    Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in Section 10.1(f) above with respect to Borrower or any SPE Component Entity) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement, the Pledge Agreement, the Note and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in the Collateral, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in this Agreement, the Pledge Agreement, the Note and the other Loan Documents against Borrower and the Collateral, including, without limitation, all rights or remedies available at law or in equity.  Upon any Event of Default described in Section 10.1(f) above with respect to Borrower or any SPE Component Entity, the Debt and all other obligations of Borrower under this Agreement, the Pledge Agreement, the Note and the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in the Pledge Agreement, the Note and the other Loan Documents to the contrary notwithstanding.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default occurs, Lender may, at its option, and without prior notice or demand, do and hereby is authorized and empowered by Borrower so to do, any or all of the following:

(i)    Lender may institute proceedings, judicial or otherwise, for the complete or partial foreclosure of the Pledge Agreement or the complete or partial sale of the Collateral under power of sale or under any applicable provision of law.  In connection with any such proceeding, Lender may sell the Collateral as an entirety or in parts and at such times and place (at one or more sales) and upon such terms as it may deem expedient unless prohibited by law from so acting.

(ii)    Lender may exercise with respect to the Collateral, each right, power or remedy granted to a secured party under the UCC as enacted in the state or states applicable to any of the Collateral, including the right to foreclose upon the Collateral.  Any notice of sale, disposition or other intended action by Lender with respect to the Collateral sent to Borrower in accordance with the provisions hereof at least ten (10) days prior to such action shall constitute reasonable notice to Borrower.

(b)    Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement, the Pledge Agreement, the Note or the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under this Agreement, the Pledge Agreement, the Note or the other Loan Documents with respect to the Collateral.  Any such actions taken by Lender shall

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by applicable law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by applicable law, equity or contract or as set forth herein or in the Pledge Agreement, the Note or the other Loan Documents.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

(c)     Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose upon the Collateral in any manner and for any amounts secured by the Pledge Agreement then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose upon the Collateral to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose upon the Collateral to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Pledge Agreement as Lender may elect.  Notwithstanding one or more partial foreclosures, the Collateral shall remain subject to the Pledge Agreement to secure payment of sums secured by the Pledge Agreement and not previously recovered.

(d)     Intentionally omitted.

(e)     Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, security instruments and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Borrower shall not be obligated to pay any costs or expenses incurred in

connection with the preparation, execution, recording or filing of the Severed Loan Documents and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date and the Severed Loan Documents shall not increase the Borrower's liabilities under the Loan Documents.

(f)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, any amounts recovered from the Collateral or any other collateral for the Loan and/or paid to or received by Lender may, after an Event of Default, be applied by Lender toward the Debt in such order, priority and proportions as Lender in its sole discretion shall determine.

(g)     Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or being deemed to have cured any Event of Default hereunder, make, do or perform any obligation of Borrower hereunder in such manner and to such extent as Lender may deem necessary.  Lender is authorized to appear in, defend, or bring any action or proceeding to protect its interest in the Collateral for such purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by applicable law), with interest as provided in this Section, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.  All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender.  All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

## ARTICLE 11

## INDEMNIFICATIONS

**Section 11.1   General Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any applicable Legal Requirements; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations

94

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease, management agreement or any Property Document; (f) the payment of any commission, charge or brokerage fee to anyone (other than a broker or other agent retained by Lender) which may be payable in connection with the funding of the Loan evidenced by the Note and secured by the Pledge Agreement; and/or (g) the holding or investing of the funds on deposit in the Accounts or the performance of any work or the disbursement of funds in each case in connection with the Accounts.  Any amounts payable to Lender by reason of the application of this Section 11.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.

**Section 11.2   Mortgage and Intangible Tax Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of the financing statements, the Note or any of the other Loan Documents.

**Section 11.3   ERISA Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that any Indemnified Party may incur, directly or indirectly, as a result of a default under Sections 3.15 or 4.22 of this Agreement.

**Section 11.4   Duty to Defend, Legal Fees and Other Fees and Expenses**.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.  Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding.  Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

**Section 11.5   Survival**.  The obligations and liabilities of Borrower under this Article 11 shall fully survive indefinitely notwithstanding any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery of an assignment in lieu of foreclosure of the Collateral.

**Section 11.6   CFIUS Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses) that any Indemnified Party may incur,

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

directly or indirectly, as a result of (a) any Subject Transaction being a Covered Transaction, or otherwise arising under the DPA, and/or (b) a default under Sections 3.10(j) and/or 4.14(b) hereof.

## ARTICLE 12

## EXCULPATION

**Section 12.1  Exculpation**.

(a)     Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Pledge Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower or any principal, director, officer, employee, beneficiary, shareholder, partner, member, trustee, agent, or Affiliate of Borrower or any legal representatives, successors or assigns of any of the foregoing (collectively, the "**Exculpated Parties**"), except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Pledge Agreement and the other Loan Documents, or in the Collateral, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Collateral and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Pledge Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower or any of the Exculpated Parties in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Pledge Agreement or the other Loan Documents.  The provisions of this Section shall not, however, (1) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (2) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Pledge Agreement; (3) affect the validity or enforceability of any guaranty or indemnity made in connection with the Loan (including, without limitation, indemnities set forth in Article 11 hereof, Section 9.2 hereof, in the Guaranty and in the Environmental Indemnity) or any of the rights and remedies of Lender thereunder; (4) impair the right of Lender to obtain the appointment of a receiver or to enforce its rights and remedies provided in Articles 7 and 8 hereof; (5) intentionally omitted; (6) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Pledge Agreement (provided, that, such deficiency judgment will only be enforceable against Borrower to the extent of its interest in the Collateral) or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Collateral; or (7) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

extent of any Loss actually incurred by Lender (including attorneys' fees and expenses reasonably incurred) arising out of or in connection with the following:

(i)    fraud or willful misrepresentation by any Borrower Party in connection with the Loan;

(ii)    the gross negligence or willful misconduct of any Borrower Party;

(iii)    any litigation or other legal proceeding related to the Debt filed by any Borrower Party or any other action of any Borrower Party that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein and in the other Loan Documents unless a court of competent jurisdiction finds that such action is not frivolous, not brought in bad faith, not wholly without merit, and not wholly without basis in fact or law;

(iv)    material physical waste to the Property caused by the intentional acts or intentional omissions of any Borrower Party and/or the removal or disposal of any portion of the Property after an Event of Default;

(v)    the misapplication, misappropriation or conversion by any Borrower Party of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property (or any portion thereof), (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, (C) any Rents, (D) any Tenant security deposits or Rents collected in advance or (E) any other monetary collateral for the Loan (including, without limitation, any amounts deposited in the Reserve Accounts and/or any portion thereof disbursed to (or at the direction of) Borrower) or (F) any distribution or other payments made in connection with any part of the Collateral);

(vi)    failure to pay Taxes, charges for labor or materials or other charges that can create superior liens on any portion of the Property (except, in the case of Taxes, to the extent that (x) the revenue from the Property is insufficient to pay such amounts or (y) amounts sufficient to pay such Taxes have been deposited with Lender hereunder or with Mortgage Lender under the Mortgage Loan Agreement and, in either case, allocated for the payment of such Taxes, and Lender or Mortgage Lender, as applicable, does not apply the same in payment thereof in violation of the Mortgage Loan Agreement;

(vii)    failure to pay Insurance Premiums (except to the extent that (x) the revenue from the Property is insufficient to pay such amounts or (y) amounts sufficient to pay such Insurance Premiums have been deposited with Lender hereunder or with Mortgage Lender under the Mortgage Loan Agreement and, in either case, allocated for the payment of such Insurance Premiums, and Lender or Mortgage Lender, as applicable, does not apply the same in payment thereof in violation of the Mortgage Loan Agreement, to maintain the Policies in full force

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

and effect and/or to provide Lender evidence of the same, in each case, as expressly provided herein;

(viii)  any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender or Mortgage Lender in accordance with the Mortgage Loan Documents, as applicable, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default or a Mortgage Loan Event of Default that gave rise to the requirement that such deposits be delivered;

(ix)  any tax on the making of the Loan, the Note or any of the other Loan Documents or the Mortgage Loan Documents or any transfer or similar taxes (whether due upon the making of the same or upon Lender's exercise of its remedies under the Loan Documents), but excluding any income, franchise or other similar taxes;

(x)  any forfeiture or seizure of the Property (or any portion thereof and/or interest therein) or the Collateral (or any portion thereof and/or interest therein) resulting from a violation or breach of any applicable law;

(xi)  any violation or breach of any representation, warranty or covenant contained in Sections 3.24 or 4.23 hereof or Exhibit C attached hereto;

(xii)  any violation or breach of any representation, warranty or covenant contained in Article 6 hereof including the occurrence of a Prohibited Transfer;

(xiii)  any violation or breach by a Borrower Party of any exclusivity (or similar) provision in any Major Lease that permits or could permit the Tenant thereunder the right to terminate such Major Lease or abate rent thereunder;

(xiv)  the failure to purchase or replace (as applicable) any Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement (as applicable), in each case, as and when required by the terms hereof;

(xv)  Intentionally deleted;

(xvi)  in the event the Property (or any portion thereof) suffers a Casualty, the failure of Mortgage Borrower to then maintain Policies with coverage as required pursuant to the provisions hereof and the Mortgage Loan Documents;

(xvii)  any violation or breach by a Borrower Party of the requirements of Section 9.1 hereof;

(xviii)  any violation or breach by a Borrower Party of the Property Document Provisions and/or any Property Document Event;

(xix) any assertion by Borrower of a defense, seeking judicial intervention or injunctive or other equitable relief of any kind with respect to Lender (except as otherwise permitted in the Loan Documents) that the court in such action or proceeding conclusively determines in a final, non-appealable judgment was frivolous or is wholly without merit (in respect of a defense; and and/or.

(xx) any obligation of Borrower to indemnify any Person that, immediately prior to any acquisition of title to the Collateral pursuant to a UCC foreclosure sale, a UCC strict foreclosure, an assignment in lieu of foreclosure or other enforcement action under the Loan Documents (collectively, an "**Equity Collateral Enforcement Action**"; and the date on which an Equity Collateral Enforcement Action is consummated, an "**Equity Collateral Transfer Date**"), was an Affiliate of Borrower, to the extent such obligation continues to be the obligation of the transferee at such Equity Collateral Enforcement Action and is not expressly waived in writing by the Persons covered by such indemnification obligation.

(b) Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that: (i) any representation, warranty or covenant contained in Sections 3.24 or 4.23 hereof or Exhibit C attached hereto (or any similar representation, warranty or covenant contained in the Mortgage Loan Agreement) is violated or breached, and (a) a court of competent jurisdiction orders a substantive consolidation of Borrower or Mortgage Borrower based, in whole or in part, on such violation or breach or (b) the Property or the Collateral or any portion thereof or interest therein becomes an asset in a bankruptcy or insolvency proceeding of a Person other than Borrower (with respect to the Collateral), or Mortgage Borrower (with respect to the portion of the Property owned by Mortgage Borrower) as a result of (in whole or in part) or due to (in whole or in part) such violation or breach; (ii) any Prohibited Transfer occurs in violation of Section 6.1 hereof; (iii) a Bankruptcy Event occurs; (iv) Borrower or any other Borrower Party, as applicable, fails to comply with the requirements of Section 9.5 hereof; (v) if Mortgage Borrower opts out of Article 8 of the applicable Uniform Commercial Code in contravention of its organizational documents in effect as of the date hereof or if Borrower or any Affiliate of Borrower causes Mortgage Borrower to amend or otherwise modify its organizational documents in order to amend or repeal its election to be governed by Article 8 of the applicable Uniform Commercial Code, or Borrower or any Affiliate of Borrower causes any termination or cancellation of the limited liability company membership certificate evidencing Borrower's one hundred percent (100%) ownership interest in Mortgage Borrower, as delivered to Lender on the Closing Date in connection with the Pledge

99

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Agreement, or otherwise causes such limited liability company membership certificate to not be treated as "securities" governed by and within the meaning of Article 8..

## ARTICLE 13

## FURTHER ASSURANCES

**Section 13.1    Replacement Documents**.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note, this Agreement or any of the other Loan Documents which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of the Note, this Agreement or such other Loan Document, Borrower will issue, in lieu thereof, a replacement thereof, dated the date of the Note, this Agreement or such other Loan Document, as applicable, in the same principal amount thereof and otherwise of like tenor.

**Section 13.2    Intentionally Omitted**.

**Section 13.3    Further Acts, etc**.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement, or for complying with all Legal Requirements.  Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements to evidence more effectively the security interest of Lender in the Collateral.  Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation, such rights and remedies available to Lender pursuant to this Section 13.3.

**Section 13.4    Changes in Tax, Debt, Credit and Documentary Stamp Laws**.

(a)    If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Collateral for the purpose of taxation and which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Collateral, Borrower will pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than ninety (90) days to declare the Debt immediately due and payable without any prepayment fee or charge, including the Exit Fee.

(b)       Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Collateral, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Collateral, or any part thereof, by reason of the Pledge Agreement or the Debt.  If such claim, credit or deduction shall be required by applicable law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(c)       If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Pledge Agreement, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

## ARTICLE 14

## WAIVERS

**Section 14.1   Remedies Cumulative; Waivers**.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement, the Pledge Agreement, the Note or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

**Section 14.2   Modification, Waiver in Writing**.  Except as otherwise expressly provided herein, no modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Pledge Agreement, the Note and the other Loan Documents, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 14.3   Delay Not a Waiver**.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under this Agreement, the Pledge Agreement, the Note or the other Loan Documents, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude

101

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Pledge Agreement, the Note or the other Loan Documents, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Pledge Agreement, the Note and the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 14.4  Waiver of Trial by Jury**.   BORROWER AND LENDER, BY ACCEPTANCE OF THIS AGREEMENT, HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THIS AGREEMENT, THE NOTE, THE PLEDGE AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

**Section 14.5   Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 14.6   Remedies of Borrower**.  In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by applicable law or under this Agreement, the Pledge Agreement, the Note and the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Lender agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

**Section 14.7   Marshalling and Other Matters**.  Borrower hereby waives, to the extent permitted by applicable Legal Requirements, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale under the Pledge Agreement of the Collateral or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Collateral under the Pledge Agreement on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Collateral subsequent to the date of the Pledge Agreement and on behalf of all persons to the extent permitted by applicable Legal Requirements.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 14.8  Waiver of Statute of Limitations**.  To the extent permitted by applicable Legal Requirements, Borrower hereby expressly waives and releases to the fullest extent permitted by applicable Legal Requirements, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its obligations hereunder, under the Note, Pledge Agreement or other Loan Documents.

**Section 14.9  Waiver of Counterclaim**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

**Section 14.10 Sole Discretion of Lender**.  Wherever pursuant to this Agreement (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender, except as may be otherwise expressly and specifically provided herein.  Except to the extent expressly provided otherwise herein or in any other Loan Document, any calculation or computation made by Lender under the Loan Documents shall be conclusive and binding on Borrower for all purposes, absent manifest error.

# ARTICLE 15

# MISCELLANEOUS

**Section 15.1  Survival**.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth in this Agreement, the Pledge Agreement, the Note or the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 15.2  Expenses; Indemnity**.

(a)      Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) except to the extent otherwise expressly set forth in this Agreement or any of the other Loan Documents, the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to the Loan Documents and any other documents or matters requested by Borrower or any Guarantor; (ii) the filing and recording fees and expenses, title insurance, UCC title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar

expenses incurred, in creating and perfecting the liens in favor of Lender pursuant to the Loan Documents; (iii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Lender, Borrower, the Loan Documents, the Property, the Collateral or any other security given for the Loan; (iv) enforcing any Obligations of, or collecting any payments due from, Borrower or any Guarantor under the Loan Documents or with respect to the Property or the Collateral; (v) any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws; (vi) protecting Lender's interest in the Property or any other security given for the Loan; and (vii) Lender's participation (including, without limitation, responding to any service of process, subpoena, or other request) in any litigation or other proceeding involving or related to any Borrower Party, the Loan or the Loan Documents and/or Lender's response to any other service of process, subpoena, or other request from any Governmental Authority involving or related to any Borrower Party, the Loan or the Loan Documents (including, without limitation, in each case, any legal fees incurred in connection therewith); provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender, as determined by a final non appealable judgment of a court of competent jurisdiction.  Any costs due and payable to Lender may be paid, at Lender's election in its sole discretion, from any amounts in any Account.

(b)     Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for any Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto, or any settlement in furtherance of any of the foregoing), that may be imposed on, incurred by, or asserted against any Indemnified Party in any manner relating to or arising out of (i) any default or breach by Borrower of its Obligations under, or any material misrepresentation by Borrower contained in, the Loan Documents; (ii) the use or intended use of the proceeds of the Loan; (iii) any materials or information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Pledge Agreement, the Property, the Collateral or any interest therein, or receipt of any Rents; (v) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against such Indemnified Party with respect thereto; and (vi) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to the Indemnified Parties hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the

Indemnified Parties, as determined by a final non appealable judgment of a court of competent jurisdiction. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Parties. The provisions of Section 15.2(a) and this Section 15.2(b) shall (A) survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Pledge Agreement and (B) apply equally in favor of the then-current Lender hereunder and any prior Lender hereunder (regardless of whether any such prior Lender has retained any obligations hereunder following the applicable assignment of the Loan, this Agreement and the other Loan Documents).

(c)    Borrower hereby agrees to pay for or, if Borrower fails to pay, to reimburse Lender for, any fees imposed, and costs and expenses incurred, by any Rating Agency in connection with any Rating Agency review of the Loan or any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of the Loan Documents, and Lender shall be entitled to require payment of such fees, costs and expenses as a condition precedent to obtaining any such consent, approval, waiver or confirmation.

**Section 15.3   Brokers**. Borrower agrees (i) to pay any and all fees imposed or charged by all brokers, mortgage bankers and advisors (each a "**Broker**") hired or contracted by any Borrower Party or their Affiliates in connection with the transactions contemplated by this Agreement and (ii) to indemnify and hold Lender harmless from and against any and all claims, demands and liabilities for brokerage commissions, assignment fees, finder's fees or other compensation whatsoever arising from this Agreement or the making of the Loan which may be asserted against Lender by any Person. The foregoing indemnity shall survive the termination of this Agreement and the payment of the Debt. Borrower hereby represents and warrants that the only Broker engaged by any Borrower Party in connection with the transactions contemplated by this Agreement is Raymond James. Lender hereby agrees to pay any and all fees imposed or charged by any Broker hired solely by Lender. Borrower acknowledges and agrees that (a) any Broker is not an agent of Lender and has no power or authority to bind Lender, (b) Lender is not responsible for any recommendations or advice given to any Borrower Party by any Broker, (c) Lender and the Borrower Parties have dealt at arms-length with each other in connection with the Loan, (d) no fiduciary or other special relationship exists or shall be deemed or construed to exist among Lender and the Borrower Parties and (e) none of the Borrower Parties shall be entitled to rely on any assurances or waivers given, or statements made or actions taken, by any Broker which purport to bind Lender or modify or otherwise affect this Agreement or the Loan, unless Lender has, in its sole discretion, agreed in writing with any such Borrower Party to such assurances, waivers, statements, actions or modifications. Borrower acknowledges and agrees that Lender may, in its sole discretion, pay fees or compensation to any Broker in connection with or arising out of the closing and funding of the Loan. Such fees and compensation, if any, (i) shall be in addition to any fees which may be paid by any Borrower Party to such Broker and (ii) create a potential conflict of interest for Broker in its relationship with the Borrower Parties. Such fees and compensation, if applicable, may include a direct, one-time payment, servicing

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

fees and/or incentive payments based on volume and size of financings involving Lender and such Broker.

**Section 15.4   Governing Law**.

**THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND DELIVERED TO LENDER BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5 1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5 1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.**

**Section 15.5   Notices**.  All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person, (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Borrower:          Silver Star Mezzanine Borrower, LLC
                         2909 Hillcroft, Suite 420

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

|  |  |
|---|---|
|  | Houston, Texas 77057 |
|  | Attention: Chief Executive Officer |

| With a copy to: | Hartman CRE, LLC |
|---|---|
|  | 2909 Hillcroft, Suite 420 |
|  | Houston, Texas 77057 |
|  | Attention: Adrienne Collins, General Counsel |

| If to Lender: | RMWC Silver Star Mezzanine LLC |
|---|---|
|  | 130 East 59th Street, 13th Floor, Suite A |
|  | New York, New York 10022 |
|  | Attention:  Steven Fischler |

| With a copy to: | Windels Marx Lane & Mittendorf, LLP |
|---|---|
|  | 156 West 56th Street |
|  | New York, New York 10019 |
|  | Attention: Wayne S. Cook, Jr., Esq |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

**Section 15.6   Headings**.  The Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 15.7   Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid under applicable Legal Requirements, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 15.8   Preferences**.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 15.9   Cost of Enforcement**.  In the event (a) that the Pledge Agreement is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, or (c) Lender exercises any of its other remedies under this Agreement, the Pledge Agreement, the Note and the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post judgment action involved therein, together with all required service or use taxes.

**Section 15.10 Exhibits Incorporated**.   The Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 15.11 Offsets, Counterclaims and Defenses**.  Any assignee of Lender's interest in and to this Agreement, the Pledge Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 15.12 No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a)     Borrower and Lender intend that the relationships created under this Agreement, the Pledge Agreement, the Note and the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)     This Agreement, the Pledge Agreement, the Note and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement, the Pledge Agreement, the Note or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(c)     The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property.  Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Collateral.  Furthermore, each Borrower Party has obtained advice of counsel, accountants, and other professionals sufficient, in the judgment of such Borrower Party, to approve the Loan, the Loan Documents, and any transaction related to the closing of the Loan (including, without limitation, allocations of funds and the organizational structure of Borrower as each of the same relate to tax matters affecting such Borrower Party and the constituent direct and indirect owners of Borrower), and no Borrower Party is relying on Lender or any counsel or other professionals engaged by Lender with respect thereto.

(d)     Notwithstanding anything to the contrary contained herein, Lender is not undertaking the performance of (i) any obligations related to the Property (including, without limitation, under the Leases) or the Collateral; or (ii) any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents to which any Borrower Party and/or the Property is subject.

(e)     By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Agreement, the Pledge Agreement, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

(f)     Borrower recognizes and acknowledges that in accepting this Agreement, the Note, the Pledge Agreement and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in Article 3 of this Agreement without any obligation to investigate the Property or the Collateral and notwithstanding any investigation of the Property or the Collateral by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Agreement, the Note, the Pledge Agreement and the other Loan Documents in the absence of the warranties and representations as set forth in Article 3 of this Agreement.

**Section 15.13  Disclosure**.

(a)     Except as expressly set forth herein or otherwise expressly approved by Lender in writing (which approval shall not be unreasonably withheld, conditioned or delayed), Borrower shall not, and shall not permit any Borrower Party, or any of their respective Affiliates and/or agents to: (i) provide a copy of this Agreement or any of the

other Loan Documents, or any portion of any of the foregoing, to any Unaffiliated Third Party; (ii) disclose any of the terms or provisions of this Agreement or any of the other Loan Documents to any Unaffiliated Third Party; or (iii) disclose any of the prospective parts of this Agreement or any of the other Loan Documents which were discussed in negotiations prior to the execution of this Agreement or such other Loan Documents to any Unaffiliated Third Party. Notwithstanding the foregoing, (1) Borrower may, and may permit any Borrower Party, or one of their respective Affiliates or agents, to make the following disclosures: (A) disclosures mandated by legislative, judicial and/or administrative order, rule or regulation; and (B) disclosures to current or, in Borrower's reasonable and good faith opinion, prospective members, partners, shareholders, lenders and/or investors of Borrower or any Affiliates of Borrower, any provider of an Interest Rate Cap Agreement, or any tax preparers, tax advisors, independent public accountants, attorneys and insurers, past, present and prospective, provided that (x) with respect to any provider of an Interest Rate Cap Agreement, or such tax preparers, tax advisors, independent public accountants, attorneys and insurers only, such parties are engaged to work on behalf of the Person making such disclosure and (y) such parties agree to keep all such information in strict confidence (except as required by this Agreement, law, regulation, or the standards of the accounting or auditing profession), and (2) no disclosure resulting solely by virtue of the filing or recording in the relevant official records office, as applicable, of the UCC financing statements or any other Loan Documents that are recorded or filed with Lender's approval, shall be deemed a violation of this Section 15.13. Borrower agrees and acknowledges that a breach of this Section 15.13 by any Borrower Party, or any of their Affiliates or agents, may cause irreparable damage to Lender. Therefore, in addition to all other rights and remedies available to Lender in accordance with applicable law, Lender shall be entitled to equitable and injunctive relief to prevent the unauthorized use or disclosure of the confidential information in violation of this Section 15.13.

(b)    All news releases, publicity or advertising by any Borrower Party or any of their Affiliates and/or agents through any media intended to reach the general public which refers to this Agreement, the Note or the other Loan Documents or the financing evidenced by this Agreement or the other Loan Documents, to Lender or any of its Affiliates shall be subject to the prior written approval of Lender, not to be unreasonably withheld.

(c)    Borrower agrees, on its behalf and on behalf of each Borrower Party and their respective Affiliates, that none of the foregoing shall publish, participate in the publication of, or direct others to make or publish, any statements, accounts or stories disparaging or denigrating the conduct or character of any Lender Party. The foregoing includes, but is not limited to, a prohibition on posting or otherwise disclosing defamatory or disparaging statements about any Lender Party on the internet or in any other paper or electronic media outlet, including but not limited to news organizations, blogs, websites, newspapers, external email or social media websites.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(d)      The obligations and liabilities of each Borrower Party, their Affiliates, and agents under this Section 15.13 shall fully survive indefinitely notwithstanding any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery of an assignment in lieu of foreclosure of the Collateral under the Pledge Agreement.

**Section 15.14 Limitation of Liability**.  No claim may be made by Borrower, or any other Person against Lender or its Affiliates, directors, officers, employees, attorneys or agents of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**Section 15.15 Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and the Pledge Agreement, the Note or any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Agreement, the Note, the Pledge Agreement and the other Loan Documents and this Agreement, the Note, the Pledge Agreement and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under this Agreement, the Note, the Pledge Agreement and the other Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse-to or competitive with the business of Borrower or its Affiliates.

**Section 15.16 Entire Agreement**.  This Agreement, the Note, the Pledge Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower and Lender are superseded by the terms of this Agreement, the Note, the Pledge Agreement and the other Loan Documents.

**Section 15.17 Liability**.  If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.  This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 15.18 Duplicate Originals; Counterparts**.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**Section 15.19 Set-Off**.  In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower; provided, however, Lender may only exercise such right during the continuance of an Event of Default.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided, that, the failure to give such notice shall not affect the validity of such set-off and application.

**Section 15.20 Certain Additional Rights of Lender (VCOC).**   Notwithstanding anything to the contrary contained in this Agreement, Lender shall have:

(a)     the right to routinely consult with and advise Borrower's management regarding the significant business activities and business and financial developments of Borrower; provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of Hazardous Substances.  Consultation meetings should occur on a regular basis with Lender having the right to call special meetings at any reasonable times upon reasonable notice;

(b)     the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any reasonable times upon reasonable notice;

(c)     the right, in accordance with the terms of this Agreement to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness;

(d)     the right to receive written notice of and attend as an observer meetings of Borrower;

(e)     upon reasonable request and at reasonable times during normal business hours, the right to visit and inspect any physical properties owned by Borrower and pledged as collateral for the Loan; and

(f)     the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

other significant property (other than personal property required for the day to day operation of the Property).

The rights described above in this <u>Section 15.20</u> may be exercised by any entity which owns and controls, directly or indirectly, substantially all of the interests in Lender.

Borrower hereby represents to Lender, as of the date hereof, that (i) at least fifty percent (50%) of Borrower's assets, valued at cost (other than short-term investments pending long-term commitment or distribution to investors), are invested, directly or indirectly, in real estate, and (ii) Borrower has the right to, and actually does on a continuous basis, regularly and substantially participate directly in management and/or development activities with respect to such real estate. If any part of the foregoing sentence ceases to be true and correct in any respect after the date hereof, Borrower will promptly notify Lender of such change.

The aforementioned rights are intended to satisfy the requirement of "management rights" for purposes of qualifying the Loan as a "venture capital investment" for purposes of the DOL "plan assets" regulation, 29 C.F.R. § 2510.3-101., and in the event such rights are not satisfactory for such purpose, Borrower and Lender shall reasonably cooperate in good faith to agree upon mutually satisfactory management rights which satisfy such regulations.

The rights described herein shall apply and continue for so long as Lender continues to own any interest in the Loan, which shall be deemed to be so owned and to remain outstanding notwithstanding any conversion, exercise or exchange of such Loan for securities ("**Derivative Securities**").  The rights described herein shall terminate and be of no further force or effect as of the date upon which Lender ceases to maintain any interest in the Loan or any Derivative Securities.

**ARTICLE 16**

**INTENTIONALLY OMITTED**

**ARTICLE 17**

**ADDITIONAL PROVISIONS**.

**Section 17.1    Mortgage Loan Notice.**

(a)    Promptly after receipt (but no more than five (5) Business Days after receipt), Borrower will deliver (or cause Mortgage Borrower to deliver) to Lender a true, correct and complete copy of all material notices, demands, requests or material correspondence (including electronically transmitted items) received from Mortgage Lender by Mortgage Borrower or any guarantor under the Mortgage Loan Documents.

(b)    Unless otherwise delivered to Lender pursuant to the provisions of Section 4.12 hereof, Borrower will deliver (or cause Mortgage Borrower to deliver) to Lender all of the financial statements and material reports, certificates and related items

113

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

delivered or required to be delivered by Mortgage Borrower to Mortgage Lender under the Mortgage Loan Documents as and when due under the Mortgage Loan Documents.

**Section 17.2    Mortgage Loan Estoppels.**

**Section 17.3    Intercreditor Agreement.** Borrower hereby acknowledges and agrees that the Intercreditor Agreement is solely for the benefit of Lender and Mortgage Lender, and that neither Borrower nor Mortgage Borrower shall be third-party beneficiaries (intended or otherwise) of any of the provisions therein, have any rights thereunder, or be entitled to rely on any of the provisions contained therein. Lender and Mortgage Lender have no obligation to disclose to Borrower or Mortgage Borrower the contents of the Intercreditor Agreement. Borrower's obligations under the Loan Documents are and will be independent of the Intercreditor Agreement and shall remain unmodified by the terms and provisions thereof. Lender and Mortgage Lender may amend, modify, cancel, terminate, supplement or waive, in any respect, the Intercreditor Agreement at any time and without notice to, or the consent of, Borrower, Mortgage Borrower or any other Person.

**Section 17.4    Direction of Mortgage Borrower.** Borrower and Lender hereby acknowledge and agree that, as to any clauses or provisions contained in this Agreement or any other Loan Documents to the effect that (i) Borrower shall cause, direct, permit or allow Mortgage Borrower to act or to refrain from acting in any manner, (ii) Borrower shall cause to occur or not to occur, or otherwise be obligated in any manner with respect to, any matters pertaining to Mortgage Borrower, or (iii) other similar effect, such clause or provision, in each case, is intended to mean, and shall be construed as meaning, with respect to Borrower, and to the fullest extent permitted by applicable law, the power (whether direct or indirect) of Borrower to direct Mortgage Borrower (through ownership of voting securities or partnership or limited liability company or other ownership interests), to bring about or effect a desired result.

**Section 17.5    Special Distributions.** On each date on which amounts are required to be disbursed pursuant to the terms of the Mortgage Loan Agreement to or for the benefit of Lender, or otherwise to pay any obligation of Borrower under the Loan Documents, Borrower shall exercise its rights under the Mortgage Borrower Company Agreement to cause Mortgage Borrower to make to Borrower a distribution in an aggregate amount such that Lender shall receive the amount required to be disbursed or otherwise paid to Lender on such date.

**Section 17.6    Curing.** Lender shall have the right, but shall not have the obligation, to exercise Borrower's rights under the Mortgage Borrower Company Agreement (a) to cure a Mortgage Loan Default or Mortgage Loan Event of Default and (b) to satisfy any liens, claims or judgments against the Property (except for liens permitted by the Mortgage Loan Documents), in the case of either (a) or (b), unless Borrower or Mortgage Borrower shall be diligently pursuing remedies to cure to Lender's sole satisfaction. Borrower shall reimburse Lender on demand for any and all costs incurred by Lender in connection with curing any such Mortgage Loan Default or Mortgage Loan Event of Default or satisfying any such liens, claims or judgments against the Property.

300570050v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 17.7  Mortgage Borrower Covenants.**   Borrower shall cause Mortgage Borrower to comply with all obligations with which Mortgage Borrower has covenanted to comply under the Mortgage Loan Agreement and all other Mortgage Loan Documents whether or not the Mortgage Loan has been repaid or such Mortgage Loan Document has been otherwise terminated, and regardless of whether Mortgage Lender is requiring such compliance, unless otherwise consented to in writing by Lender.  In the event of any conflict between the requirements of this Agreement or the other Loan Documents and the requirements of the Mortgage Loan Agreement or the other Mortgage Loan Documents, the requirements of the Mortgage Loan Agreement and/or the other Mortgage Loan Documents, as applicable**, shall control and Borrower shall cause Mortgage Borrower to comply therewith.**

**Section 17.8    Limitations on Distributions.**

(a)    Borrower agrees that there shall be no distributions to any of its direct or indirect owners (legal or beneficial) until Borrower satisfies all of its then current due and payable obligations hereunder and under the other Loan Documents, including without limitation, Borrower's obligation to pay Debt Service, deposits into Reserve Accounts, and maintenance costs.

(b)    Following the occurrence and during the continuance of a Cash Sweep Period, Borrower shall not make any distributions.

**Section 17.9   Deed-In-Lieu, etc**.   Without the prior written consent of Lender, Borrower shall not, and shall not cause or permit Mortgage Borrower to, enter into any deed-in-lieu or consensual foreclosure or transfer or assignment with or for the benefit of Mortgage Lender or any of Mortgage Lender's Affiliates or designees.  Without the express prior written consent of Lender, Borrower shall not, and shall not cause or permit Mortgage Borrower to, enter into any consensual sale or transfer or assignment or other similar transaction, impair or otherwise adversely affect the interests of Lender in the Collateral or any portion thereof or any interest therein.

**Section 17.10 Acquisition of the Mortgage Loan**.   Neither Borrower nor Mortgage Borrower nor any Affiliate of any of them shall acquire or agree to acquire the Mortgage Loan, or any portion thereof or any interest therein, or any direct or indirect ownership interest in the holder of the Mortgage Loan, via purchase, transfer, exchange or otherwise, and any breach or attempted breach of this provision shall constitute an Event of Default hereunder.  If, solely by operation of applicable subrogation law, Borrower or Mortgage Borrower or any Affiliate of any of them shall have failed to comply with the foregoing, then Borrower: (i) shall immediately notify Lender of such failure; (ii) shall cause any and all such prohibited parties acquiring any interest in the Mortgage Loan Documents: (A) not to enforce the Mortgage Loan Documents; and (B) upon the request of Lender, to the extent any of such prohibited parties has or have the power or authority to do so, to promptly: (1) cancel the promissory note evidencing the Mortgage Loan, (2) reconvey and release the lien securing the Mortgage Loan and any other collateral under the Mortgage Loan Documents, and (3) discontinue and terminate any enforcement proceeding(s) under the Mortgage Loan Documents.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

[Signature pages sent separately]

**LENDER**:

[Signature pages sent separately]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT A**

**<u>ORGANIZATIONAL CHART</u>**

**(attached hereto)**

A-1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT B**

**<u>INTENTIONALLY OMITTED</u>**

300570050v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT C**

**SPECIAL PURPOSE ENTITY REQUIREMENTS**

Borrower covenants and agrees that:

(a)    Borrower has not and will not:

(i)    engage in any business or activity other than the ownership of the Collateral and activities incidental thereto;

(ii)    acquire or own any assets other than (A) the Collateral, and (B) such incidental Personal Property as may be necessary for the ownership of the Collateral;

(iii)    incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt and de minimis expenses relating to the administration of Borrower's books and records and compliance with the Loan Documents;

(iv)    commingle its funds or assets with the funds or assets of any other Person, or maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(v)    use the stationery, invoices or checks of any other Person as its own or fail to allocate shared expenses (including, without limitation, shared office space);

(vi)    fail to maintain a sufficient number of employees in light of its contemplated business operations or fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds (in each case to the extent there exists sufficient cash flow from the Collateral to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower);

(vii)    fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) correct any known misunderstanding regarding its separate identity or (C) hold its assets and conduct its business solely in its own name;

(viii)    fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the

300570050v1

provisions of its organizational documents (provided, that, such organizational documents may be amended or modified to the extent that, in addition to the satisfaction of the requirements related thereto set forth therein, Lender's prior written consent and, if required by Lender, a Rating Agency Confirmation are first obtained);

(ix)    merge into or consolidate with any Person, or divide, dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(x)    have any obligation to indemnify any of its officers, directors, managers, members, shareholders or partners, as the case may be, unless such obligation is fully subordinated to the Debt and will not constitute a claim against Borrower if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xi)    own any subsidiary, or make any investment in, any Person (other than, (A) with respect to Borrower, in Mortgage Borrower and (B) with respect to any SPE Component Entity, in Borrower);

(xii)    fail to file its own tax returns (to the extent Borrower is required to file any such tax returns pursuant to applicable Legal Requirements) or file a consolidated federal income tax return with any other Person;

(xiii)    fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates).  Borrower's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet. Borrower has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)    enter into any contract or agreement with any partner, member, shareholder, principal or Affiliate, except, in each case, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(xv)    assume or guaranty or otherwise become obligated for the debts of any other Person, hold itself out to be responsible for, or have its credit available to satisfy the debts or obligations of, any other Person, or otherwise pledge its assets for the benefit of any other Person;

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(xvi)   except as provided in the Loan Documents, have any of its obligations guaranteed by any Affiliate;

(xvii)   make any loans or advances to any Person;

(xviii)   fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Collateral to do so, and provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower);

(xix)   fail to consider the interests of Borrower's creditors in connection with all company actions;

(xx)   without the prior unanimous written consent of all of its partners, shareholders or members, as applicable, and the prior unanimous written consent of its board of directors or managers, as applicable, and the prior written consent of each Independent Director (as defined below), regardless of whether such Independent Director is engaged at the Borrower or SPE Component Entity level, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors Rights Laws, (B) seek or consent to the appointment of a receiver, liquidator or any similar official, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors or (E) take any Material Action with respect to Borrower or any SPE Component Entity [(provided, that, none of any member, shareholder or partner (as applicable) of Borrower or any SPE Component Entity or any board of directors or managers (as applicable) of Borrower or any SPE Component Entity may vote on or otherwise authorize the taking of any of the foregoing actions unless, in each case, at least two (2) Independent Director**s** are then serving in such capacity in accordance with the terms of the applicable organizational documents and each of such Independent Directors has consented to such foregoing action);

(xxi)   acquire obligations or securities of its partners, members, shareholders or other Affiliates, as applicable (other than, with respect to Borrower, its ownership of Mortgage Borrower);

(xxii)   permit any Affiliate or constituent party independent access to its bank accounts;

(xxiii)   identify its partners, members, shareholders or other Affiliates, as applicable, as a division or part of it; or

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(xxiv)  conduct its business and activities in such a way as to cause any of the assumptions made with respect to Borrower and its principals in any Non-Consolidation Opinion or in any New Non-Consolidation Opinion to be violated.

(b)     If Borrower is a partnership or limited liability company (other than a Springing Member LLC), each general partner (in the case of a partnership) and managing member (in the case of a limited liability company) of Borrower, as applicable, shall be a corporation or a Springing Member LLC (each an "**SPE Component Entity**") whose sole asset is its interest in Borrower.  Each SPE Component Entity (i) will at all times comply with each of the covenants, terms and provisions contained in clauses (a)(iv) - (xxiv) of this <u>Exhibit C</u> and, if such SPE Component Entity is a Springing Member LLC, clauses (c) and (d) of this <u>Exhibit C</u>, as if such representation, warranty or covenant was made directly by such SPE Component Entity; (ii) will not engage in any business or activity other than owning an interest in Borrower; (iii) will not acquire or own any assets other than its partnership, membership, or other equity interest in Borrower; (iv) will at all times continue to own no less than a 0.5% direct equity ownership interest in Borrower; (v) will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (vi) will cause Borrower to comply with the provisions of this <u>Exhibit C</u>.

(c)     In the event Borrower or the SPE Component Entity is a Springing Member LLC, the limited liability company agreement of Borrower or the SPE Component Entity (as applicable) (the "**LLC Agreement**") shall provide that (i) upon the occurrence of any event that causes the last remaining member of Borrower or the SPE Component Entity (as applicable) ("**Member**") to cease to be the member of Borrower or the SPE Component Entity (as applicable) (other than (A) upon an assignment by Member of all of its limited liability company interest in Borrower or the SPE Component Entity (as applicable) and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Borrower or the SPE Component Entity (as applicable) in accordance with the terms of the Loan Documents and the LLC Agreement), **[**any natural person duly designated under the applicable organizational documents**][**any person acting as Independent Director of Borrower or the SPE Component Entity (as applicable)**]** shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower or the SPE Component Entity (as applicable) automatically be admitted to Borrower or the SPE Component Entity (as applicable) as a member with a 0% economic interest ("**Special Member**") and shall continue Borrower or the SPE Component Entity (as applicable) without dissolution and (ii) Special Member may not resign from Borrower or the SPE Component Entity (as applicable) or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to Borrower or the SPE Component Entity (as applicable) as a Special Member in accordance with requirements of Delaware law and (B) after giving effect to such resignation or transfer, there remain at least two (2) Independent Directors of the SPE Component Entity or Borrower (as applicable) in accordance with clauses (e) and (f) below.  The LLC Agreement shall further provide that

C-4

(i) Special Member shall automatically cease to be a member of Borrower or the SPE Component Entity (as applicable) upon the admission to Borrower or the SPE Component Entity (as applicable) of the first substitute member, (ii) Special Member shall be a member of Borrower or the SPE Component Entity (as applicable) that has no interest in the profits, losses and capital of Borrower or the SPE Component Entity (as applicable) and has no right to receive any distributions of the assets of Borrower or the SPE Component Entity (as applicable), (iii) pursuant to the applicable provisions of the limited liability company act of the State of Delaware (the "**Act**"), Special Member shall not be required to make any capital contributions to Borrower or the SPE Component Entity (as applicable) and shall not receive a limited liability company interest in Borrower or the SPE Component Entity (as applicable), (iv) Special Member, in its capacity as Special Member, may not bind Borrower or the SPE Component Entity (as applicable) and (v) except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower or the SPE Component Entity (as applicable) including, without limitation, the merger, division, consolidation or conversion of Borrower or the SPE Component Entity (as applicable)**[**; provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Director, to vote on such matters required by the Loan Documents or the LLC Agreement**]**.  In order to implement the admission to Borrower or the SPE Component Entity (as applicable) of Special Member, Special Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to Borrower or the SPE Component Entity (as applicable) as Special Member, Special Member shall not be a member of Borrower or the SPE Component Entity (as applicable), but Special Member may serve as an Independent Director of Borrower or the SPE Component Entity (as applicable).

(d)    The LLC Agreement shall further provide that (i) upon the occurrence of any event that causes the Member to cease to be a member of Borrower or the SPE Component Entity (as applicable) to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower or the SPE Component Entity (as applicable) agree in writing (A) to continue Borrower or the SPE Component Entity (as applicable) and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower or the SPE Component Entity (as applicable) effective as of the occurrence of the event that terminated the continued membership of Member in Borrower or the SPE Component Entity (as applicable), (ii) any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Borrower or the SPE Component Entity (as applicable) and upon the occurrence of such an event, the business of Borrower or the SPE Component Entity (as applicable) shall continue without dissolution and (iii) each of Member and Special Member waives any right it might have to agree in writing to dissolve Borrower or the SPE Component Entity (as applicable) upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

occurrence of an event that causes Member or Special Member to cease to be a member of Borrower or the SPE Component Entity (as applicable).

(e)    The organizational documents of Borrower (to the extent Borrower is a corporation or a Springing Member LLC) or the SPE Component Entity, as applicable, shall provide that at all times there shall be at least two (2) duly appointed independent directors or managers of such entity (each, an "**Independent Director**") who each shall (I) not have been at the time of each such individual's initial appointment, and shall not have been at any time during the preceding five years, and shall not be at any time while serving as Independent Director, either (i) a shareholder (or other equity owner) of, or an officer, director (other than in its capacity as Independent Director), partner, member or employee of, Borrower or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (ii) a customer of, or supplier to, or other Person who derives any of its purchases or revenues from its activities with, Borrower or any of its respective shareholders, partners, members, subsidiaries or Affiliates, (iii) a Person who Controls or is under common Control with any such shareholder, officer, director, partner, member, employee supplier, customer or other Person, or (iv) a member of the immediate family of any such shareholder, officer, director, partner, member, employee, supplier, customer or other Person, (II) shall have, at the time of their appointment, had at least three (3) years' experience in serving as an independent director and (III) be employed by, in good standing with and engaged by Borrower in connection with, in each case, an Acceptable ID Provider (defined below).

(f)    The organizational documents of each Borrower and the SPE Component Entity shall further provide that (I) the board of directors or managers of Borrower and the SPE Component Entity and the constituent equity owners of such entities (constituent equity owners, the "**Constituent Members**") shall not take any action set forth in clause (a)(xx) of this Exhibit C or any other action which, under the terms of any organizational documents of Borrower or the SPE Component Entity, requires the vote of the Independent Directors unless, in each case, at the time of such action there shall be at least two Independent Directors engaged as provided by the terms hereof and each such Independent Director votes in favor of or otherwise consent to such action; (II) any resignation, removal or replacement of any Independent Director shall not be effective without (1) prior written notice to Lender and the Rating Agencies (which such prior written notice must be given on the earlier of five (5) days or three (3) Business Days prior to the applicable resignation, removal or replacement) and (2) evidence that the replacement Independent Director satisfies the applicable terms and conditions hereof and of the applicable organizational documents (which such evidence must accompany the aforementioned notice); (III) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Directors shall consider only the interests of the Constituent Members and Borrower and any SPE Component Entity (including Borrower's and any SPE Component Entity's respective creditors) in acting or otherwise voting on the matters provided for herein and in Borrower's and SPE Component Entity's organizational documents (which such fiduciary duties to the Constituent Members and

Borrower and any SPE Component Entity (including Borrower's and any SPE Component Entity's respective creditors), in each case, shall be deemed to apply solely to the extent of their respective economic interests in Borrower or SPE Component Entity (as applicable) exclusive of (x) all other interests (including, without limitation, all other interests of the Constituent Members), (y) the interests of other Affiliates of the Constituent Members, Borrower and SPE Component Entity and (z) the interests of any group of Affiliates of which the Constituent Members, Borrower or SPE Component Entity is a part)); (IV) other than as provided in subsection (III) above, the Independent Directors shall not have any fiduciary duties to any Constituent Members, any directors of Borrower or SPE Component Entity or any other Person; (V) the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; and (VI) to the fullest extent permitted by applicable law, including Section 18 1101(e) of the Act, an Independent Director shall not be liable to Borrower, SPE Component Entity, any Constituent Member or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

(g)     Notwithstanding the foregoing, no Independent Director of Borrower or any SPE Component Entity may also serve as an independent director of Mortgage Borrower or any special purpose component entity of Mortgage Borrower.

**"Acceptable ID Provider"** shall mean (i) any of the following unless any of the same are ever disapproved by the Rating Agencies: CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company and Lord Securities Corporation and (ii) any other national provider of Independent Directors that is approved in writing by Lender and the Rating Agencies.

C-7

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT D**

**<u>INTENTIONALLY OMITTED</u>**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT E**

**SECONDARY MARKET TRANSACTION INFORMATION**

(A)     Any proposed program for the renovation, improvement or development of the Property, or any part thereof, including the estimated cost thereof and the method of financing to be used.

(B)     The general competitive conditions to which the Property is or may be subject.

(C)     Management of the Property.

(D)     Occupancy rate expressed as a percentage for each of the last five years.

(E)     Principal business, occupations and professions carried on in, or from the Property.

(F)     Number of Tenants occupying 10% or more of the total rentable square footage of the Property and principal nature of business of such Tenant, and the principal provisions of the leases with those Tenants including, but not limited to: rental per annum, expiration date, and renewal options.

(G)     The average effective annual rental per square foot or unit for each of the last three years prior to the date of filing.

(H)     Schedule of the lease expirations for each of the ten years starting with the year in which the registration statement is filed (or the year in which the prospectus supplement is dated, as applicable), stating:

   (1)     The number of Tenants whose leases will expire.

   (2)     The total area in square feet covered by such leases.

   (3)     The annual rental represented by such leases.

   (4)     The percentage of gross annual rental represented by such leases.

300570050v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT F**

**INDIVIDUAL PROPERTIES AND ALLOCATED LOAN AMOUNTS**

**(attached hereto)**

**[TBD]**

F-1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Schedule 6.7**

**Scheduled Partial Releases**

# EXHIBIT A-14

**Mezzanine Pledge and Security Agreement**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## `PLEDGE AND SECURITY AGREEMENT

This PLEDGE AND SECURITY AGREEMENT (this "**Agreement**") dated as of [_____], 2023 is made by [_____, a _____], having its principal place of business at [_____] ("**Borrower**") to [_____], a Delaware limited liability company, having an address at c/o RMWC, 130 East 59th Street, 13th Floor, Suite A, New York, New York 10022 (together with its successors and assigns, "**Lender**").

### RECITALS:

A.      Pursuant to that certain Mezzanine Loan Agreement of even date herewith between Lender and Borrower (the "**Loan Agreement**"), Lender agreed to make a Loan to Borrower in the amount of $[25,000,000.00] (the "**Loan**").  The Loan is evidenced by a Mezzanine Promissory Note (the "**Note**") of even date herewith in the principal amount of the Loan from Borrower to Lender.  The Loan Agreement, Note, this Agreement and all other documents and instruments existing now or after the date hereof that evidence, secure or otherwise relate to the Loan, any security agreements, financing statements, other guaranties, indemnity agreements (including environmental indemnity agreements), letters of credit, or escrow/holdback or similar agreements or arrangements, together with all amendments, modifications, substitutions or replacements thereof, are sometimes herein collectively referred to as the "**Loan Documents**" or each individually as a "**Loan Document**."

B.      [_____], a Delaware limited liability company ("**Mortgage Borrower**") owns the Property, and is the borrower under the Mortgage Loan made by Mortgage Lender and secured by, among other things, the Security Instrument encumbering the Property.

C.      Borrower is the sole member of Mortgage Borrower and owns 100% of the Equity Interests (as hereinafter defined) in Mortgage Borrower and is the sole manager of the Mortgage Borrower.

D.      Mortgage Borrower is referred to herein as the "**Pledged Entity**".

E.      To secure Borrower's obligations under the Loan Documents and to ensure the timely payment of the Loan and the performance of Borrower's other obligations under and in accordance with the Loan Documents, Borrower is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Pledged Company Interests.

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ARTICLE 1 – DEFINED TERMS

**Section 1.1**    <u>DEFINED TERMS</u>.  Unless otherwise provided herein, all capitalized terms used but not defined in this Agreement shall have the respective meanings ascribed thereto in the Loan Agreement and, for the purposes of this Agreement, in addition to the terms defined above, the following terms shall have the following meanings:

(a)    "**Article 8 Matter**" means any action, decision, determination or election by the Pledged Entity or its equity holders that its Equity Interests be, or cease to be, a "security" as defined in and governed by Article 8 of the Uniform Commercial Code, and all other matters related to any such action, decision, determination or election.

(b)    "**Article 8 Interests**" has the meaning set forth in <u>Article 9</u>.

(c)    "**Cash Distributions**" has the meaning set forth in <u>Section 5.3</u>.

(d)    "**Certificated Securities**" has the meaning set forth in <u>Section 2.2</u>.

(e)    "**Collateral**" has the meaning set forth in <u>Section 2.1</u>.

(f)    "**Distributions**" has the meaning set forth in <u>Section 5.3</u>.

(g)    "**Equity Interests**" means, as applicable, (i) partnership interests (whether general or limited) in an entity that is a partnership; (ii) membership interests in an entity that is a limited liability company; (iii) the shares or stock interests in an entity that is a corporation; or (iv) the beneficial ownership interests in any entity that is a trust.

(h)    "**Event of Default**" has the meaning set forth in <u>Article 6</u>.

(i)    "**Governing Documents**" means for an entity, the organizational documents of such entity, including: (i) the operating agreement and articles of organization for a limited liability company; (ii) the partnership agreement and articles of limited partnership for a limited partnership; (iii) the bylaws and articles of incorporation for a corporation; and (iv) the trust agreement for a trust.

(j)    "**Non-Cash Distributions**" has the meaning set forth in <u>Section 5.1</u>.

(k)    "**Obligations**" has the meaning set forth in <u>Section 2.1</u>.

(l)    "**Pledged Company Interests**" means one hundred percent (100%) of the limited liability company interests in the Pledged Entity.

(m)    "**Proceeds**" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Pledged Company Interests, collections thereon or distributions with respect thereto.

(n)    "**Securities Act**" means the Securities Act of 1933, as amended.

(o)    "**Strict Foreclosure Agreement**" has the meaning set forth in Section 7.11.

(p)    "**Strict Foreclosure Proposal**" has the meaning set forth in Section 7.11.

(q)    "**UCC**" means the Uniform Commercial Code as in effect in the State of New York, as amended, modified, revised or restated from time to time; provided, that, if, by reason of mandatory provisions of law, the validity or perfection of Lender's security interest in the Collateral or any part thereof is governed by the Uniform Commercial Code or other similar law as in effect in a jurisdiction other than New York, the "UCC" means the Uniform Commercial Code or such similar law as in effect in such other jurisdiction for purposes of the provisions hereof relating to such validity or perfection.

**Section 1.2**    PRINCIPLES OF CONSTRUCTION.    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

**Section 1.3**    DEFINITION CONFLICTS.  Unless otherwise defined herein or the context otherwise requires, each term defined in the UCC is used in this Agreement with the same meaning; provided that, if the definition given to such term in the Loan Agreement conflicts with the definition given to such term in the UCC, the Loan Agreement definition shall control to the extent legally allowable; and if any definition given to such term in Article 9 of the UCC conflicts with the definition given to such term in any other chapter of the UCC, the Article 9 definition shall prevail.

## ARTICLE 2– GRANT OF SECURITY INTEREST

**Section 2.1**    COLLATERAL.    As security for the full and punctual payment and performance of the Debt (whether at the stated maturity, by acceleration, or otherwise), each obligation of Borrower contained herein, each obligation of Borrower contained in the Loan Agreement and any other Loan Document, and each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document (collectively, the "**Obligations**"), Borrower hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest in, all of Borrower's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising, and wherever located (collectively, the "**Collateral**"):

(a)     all Pledged Company Interests and all other ownership interests of Borrower in Pledged Entity;

(b)     all securities, moneys or property representing dividends or interest on any of the Pledged Company Interests, or representing a distribution in respect of the Pledged Company Interests, or resulting from a split-up, revision, reclassification or other like change of the Pledged Company Interests or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Company Interests;

(c)     any policy of insurance payable by reason of loss or damage to the Pledged Company Interests and any other Collateral;

(d)     all "securities," "accounts," "general intangibles," "instruments" and "investment property" (in each case as defined in the UCC) constituting or relating to the foregoing;

(e)     the Governing Documents of Pledged Entity and any other agreement or instrument relating to the Pledged Company Interests, including, without limitation, (i) all rights of Borrower to receive moneys or distributions with respect to the Pledged Company Interests due and to become due under or pursuant to such Governing Documents, (ii) all rights of Borrower to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Pledged Company Interests, (iii) all claims of Borrower for damages arising out of or for breach of or default under such Governing Documents, (iv) any right of Borrower to perform under such Governing Documents and to compel performance and otherwise exercise all rights and remedies thereunder, and (v) all of the right, title and interest of Borrower as an equity holder to participate in the operation or management of Pledged Entity and all of Borrower's ownership interests under the Governing Documents of Pledged Entity; and

(f)     all Proceeds of any of the foregoing property of Borrower, including, without limitation, any proceeds of insurance thereon.

**Section 2.2**     PERFECTION OF SECURITY INTEREST.    On or before the Closing Date, Borrower shall (a) deliver to Lender for filing one or more financing statements in connection with the Collateral in the form required to properly perfect Lender's security interest in the Collateral in all jurisdictions deemed appropriate by Lender, to the full extent that such security interest in the Collateral may be perfected by such a filing, (b) with respect to any Equity Interest in a Pledged Entity that is represented by a partnership certificate, member certificate or stock certificate, or any other instrument, note, chattel paper or certificate qualifying as investment property ("**Certificated Securities**"), deliver to Lender such Certificated Securities in Pledged Entity, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, or enter into such other arrangement, as necessary to give control of any such investment property to Lender within the meaning of Section 8-106 of the UCC (in each case, if Lender so requests, with signature guaranteed), and

4

(c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.

**Section 2.3**    POST-CLOSING COLLATERAL.    After the Closing Date, Borrower shall concurrently take the actions contemplated by clauses (a) through (c) of Section 2.2 above with respect to any and all additional collateral acquired by Borrower (including, without limitation, any newly issued Equity Interests of a Pledged Entity, any conversion of a pre-existing Equity Interest, and any Non-Cash Distributions, as applicable).

**Section 2.4**    BORROWER REMAINS LIABLE.    Anything herein to the contrary notwithstanding until and to the extent Lender forecloses its security interest in the Collateral, or an unrelated third party takes control or ownership thereof in accordance with the Loan Documents:  (a) Borrower shall remain liable under the Governing Documents of Pledged Entity to the extent set forth therein and shall perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed; (b) the exercise by Lender of any of the rights hereunder shall not release Borrower from any of its duties or obligations under any of such Governing Documents; and (c) Lender shall not have any obligation or liability under any of such Governing Documents by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder; provided that, upon foreclosure thereof, Lender and any other transferee of the Collateral shall take the same subject to such Governing Documents.

**ARTICLE 3 - POWERS OF BORROWER PRIOR TO AN EVENT OF DEFAULT**

**Section 3.1**    PRE-DEFAULT POWERS.  Subject to the terms of the Loan Documents and this Agreement, Borrower shall be entitled to, unless an Event of Default has occurred and is continuing, exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document, or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Borrower with respect to the Collateral under the Governing Documents of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder).

**Section 3.2**    TERMINATION OF POWERS.

(a)    Upon the occurrence and continuation of an Event of Default, all powers, rights and remedies of Borrower which are conditionally permitted pursuant to Section 3.1, shall cease and the provisions of Section 5.3 and Article 7 shall apply, and without limiting the generality of the foregoing:

(i)    Intentionally omitted;

(ii)    all Distributions and other payments which are received by Borrower shall be received in trust for the benefit of the Lender, shall be segregated from other funds of the Borrower and shall be forthwith paid over to

5

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

the Lender as Collateral in the same form as so received (with any necessary endorsement);

(iii)    Lender shall, after providing written notice to Borrower and Pledged Entity, (A) have the exclusive right to vote or give consents with respect to the Pledged Company Interests, and (B) have all rights that Borrower had under the Governing Documents of Pledged Entity to operate and manage Pledged Entity, including all rights relating to voting, consent, administration, management and all other powers, rights and remedies of Borrower under such Governing Documents, whether in Borrower's name or otherwise, including the right to appoint officers, directors, managers and other similar positions and the right to exercise Borrower's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Company Interests, including the right to exchange, at Lender's discretion, any and all of the Pledged Company Interests upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender.

(b)    All amounts advanced by, or on behalf of, Lender in exercising its rights under this <u>Section 3.2</u> (including, but not limited to, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon from the date of each such advance at the Default Rate, shall be deemed made pursuant to contract, shall be payable by Borrower to Lender on demand and shall be deemed part of the Debt and secured by the Collateral.

**ARTICLE 4 - REPRESENTATIONS, WARRANTIES AND COVENANTS OF BORROWER**

Borrower hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

**Section 4.1**    <u>NO CONFLICT</u>.    The exercise by Lender of its rights and remedies hereunder does not violate any provision of the organizational documents of Borrower or the Governing Documents of Pledged Entity, or any agreement or instrument to which Borrower or Pledged Entity is a party or by which Borrower or Pledged Entity or any of their respective property is bound, and upon Lender's exercise of its remedies, under such documents, Lender is entitled to (a) automatically become a member, partner, stockholder or other owner, as applicable, of the Pledged Entity and exercise all rights and powers of a member, partner, stockholder or other owner, as applicable, under the Governing Documents of Pledged Entity, to the same effect as Borrower was entitled prior to Lender's exercise of its remedies, (b) receive all Distributions to the same effect as Borrower was entitled prior to Lender's exercise of its remedies, and (c) control and manage the Pledged Entity, to the same effect as Borrower was entitled prior to Lender's exercise of its remedies.

300570053v1

**Section 4.2**    PERCENTAGE OWNERSHIP.    Borrower owns the Pledged Company Interests, which consist of one hundred percent (100%) of the limited liability company interests in the Pledged Entity.

**Section 4.3**    DEFENSE OF TITLE.    Borrower shall defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

**Section 4.4**    PERFECTED SECURITY INTEREST.    Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Borrower on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Borrower and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.  All instruments of transfer are duly executed and provide the Lender the authority they purport to confer.  Assuming the Lender is an accredited investor under the Securities Act and other applicable laws, the grant and perfection of the security interests in the Pledged Company Interests and other Collateral for the benefit of Lender, in accordance with the terms hereof, are not made in violation of the registration requirements of the Securities Act, any applicable provisions of other federal securities laws, state securities or "blue sky" laws, foreign securities law, or applicable general corporation law or any other applicable law.

**Section 4.5**    NO FINANCING STATEMENTS.    Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

**Section 4.6**    CERTIFICATED SECURITIES.

(a)    Borrower represents and warrants that all of the Equity Interests in Pledged Entity are issued in the form of Certificated Securities that constitute "security certificates" as defined in the UCC.  Borrower further covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities satisfying the foregoing requirements. Notwithstanding the foregoing, Borrower shall promptly notify Lender if any Equity Interest with respect to a Pledged Entity (whether now owned or hereafter acquired by Borrower) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Equity Interest under applicable law as required herein.  Borrower further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder, and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender.

(b)    The parties acknowledge and agree that the Pledged Company Interests constitute "securities" (as defined in Section 8-102(a)(15) of the UCC), and Borrower covenants and agrees that (i) the Pledged Company Interests are not and will not be dealt

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

in or traded on securities exchanges or securities markets, (ii) the terms of the Pledged Company Interests are not and will not be "investment company securities" within the meaning of Section 8-103 of the UCC, (iii) the Pledged Company Interests constitute "certificated securities" within the meaning of Section 8-102(a)(4) of the UCC, (iv) the Pledged Company Interests shall at all times be certificated and evidenced by certificates in a form reasonably acceptable to Lender (including, without limitation, that such certificates state that such Pledged Company Interests are "securities", as defined in Section 8-102(a)(15) of the UCC); (v) Lender may perfect its security interest in the Pledged Company Interests by taking delivery thereof under Section 8-301 of the UCC, as applicable; and (vi) the Governing Documents of each Pledged Entity shall at all times state that the Pledged Company Interests are "securities" (as defined in Section 8-102(a)(15) of the UCC).

(c)     By executing and delivering this Agreement, the parties hereto intend to establish Lender's control over the Collateral for purposes of Article 8 of the UCC.

**Section 4.7**   FULLY PAID AND NON-ASSESSABLE.   All of the Pledged Company Interests have been duly authorized and validly issued and are fully paid and non-assessable. Borrower is not, and shall not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the Governing Documents of the Pledged Entity, which restricts in any manner the rights of any present or future holder of any of the Pledged Company Interests with respect thereto.

**Section 4.8**   CHANGE IN LOCATION OF PRINCIPAL PLACE OF BUSINESS.   Borrower shall not relocate its chief executive office and/or principal place of business to a new location without first notifying Lender by giving at least ten (10) days' prior written notice.

**Section 4.9**   PRESERVATION OF RELATED COLLATERAL.   Borrower shall not allow any default for which it is responsible, and has the reasonable ability to control, to occur under and in respect of the Collateral, and shall fully perform or cause to be performed when due all of its obligations under and in respect of the Collateral.

**Section 4.10**   PAPERS; RECORDS AND FILES.

(a)     Borrower shall acquire and shall assemble, maintain and have available a complete file relating to the Equity Interests, including all statements and other information delivered to Borrower pursuant to the Governing Documents of Pledged Entity or otherwise.  Borrower shall maintain all such papers, records and files not in the possession of Lender in good and complete condition and shall preserve them against loss.

(b)     Upon reasonable advance notice from Lender and during regular business hours, Borrower shall make any or all such papers, records or files available to Lender in order that Lender may examine any such papers, records and files, either by its employees or by its agents or contractors, or both, and make copies of all or any portion thereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 4.11**    PROHIBITION ON TRANSFERS, ADDITIONAL LIENS AND AMENDMENTS TO GOVERNING DOCUMENTS.  Borrower shall not:

(a)    except for the lien effected by this Agreement, cause, permit or suffer to exist, and shall defend the Collateral against and take such other action as is necessary to remove or unwind, any Sale or Pledge of the Collateral or any part thereof, including entering into any lock-up or any other arrangement with respect to the Collateral, in all cases other than in accordance with the terms and conditions of the Loan Agreement, and (i) any Sale or Pledge made in violation of the foregoing (A) shall be an immediate Event of Default hereunder without notice or opportunity to cure, (B) shall be void and of no force and effect, and (C) upon demand of Lender, shall forthwith be cancelled or satisfied by an appropriate instrument in writing, and (ii) if Borrower fails to do so, Lender may, but shall be under no obligation to, without waiving or releasing any obligation or liability of Borrower hereunder or any Event of Default, at any time thereafter make any necessary payment or any part thereof, obtain any necessary discharge, or otherwise defend Borrower's title to the Collateral;

(b)    permit Pledged Entity to issue any replacement Equity Interest certificate without the prior written consent of Lender;

(c)    vote to enable, or take any other action to permit, Pledged Entity to issue, or fail to take any available action to prevent Pledged Entity from issuing, any Equity Interests in Pledged Entity or issuing any other securities convertible into or granting the right to purchase or exchange for any Equity Interests in Pledged Entity;

(d)    cause or permit Pledged Entity to terminate Pledged Entity's "opt in" election under Article 8 of the UCC; or

(e)    cause or permit an amendment, modification or other change to the Governing Documents of Pledged Entity, without the prior written consent of Lender, unless required pursuant to the Senior Loan.

**Section 4.12**    NOTICES.  Borrower shall, and insofar as it is able, cause Pledged Entity to, as appropriate, promptly give Lender:

(a)    written notice of any default or event of default under any contractual obligation of Pledged Entity that could be reasonably expected to have a Material Adverse Effect, or any litigation, investigation or proceeding which may exist at any time between Pledged Entity and any Governmental Authority or any other Person, which, if not cured or if adversely determined, as the case may be, could reasonably be expected to result in a Material Adverse Effect;

(b)    written notice of a change in the business, operations, property or financial or other condition or prospects of Borrower or Pledged Entity which could result in a Material Adverse Effect; and

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(c)    a copy of any notice or other communication sent by Pledged Entity to Borrower or to any other members of Pledged Entity related to any Article 8 Matter.

**Section 4.13**    ADDITIONAL CONSENTS.    Borrower shall, and insofar as it is able, cause Pledged Entity to, (a) consent to (i) the pledge by Borrower to Lender of the Equity Interests, (ii) the transfer of the Equity Interests and the right of Lender to exercise all voting and management rights appurtenant or relating to that Equity Interest in each case, by or in lieu of, foreclosure of the pledge (it being agreed that Lender may, in its discretion, foreclose solely on the voting or management rights) and (iii) upon the aforesaid transfer of the Equity Interests, the change in control of Pledged Entity, (b) acknowledge and agree that the foreclosure of the Equity Interests by Lender or other transfer of the Equity Interests in lieu of foreclosure, shall not constitute a prohibited transfer under any of the Governing Documents of Pledged Entity and (c) execute and deliver, contemporaneously with Borrower's execution and delivery of this Agreement, an Acknowledgement and Consent substantially in the form of Exhibit A attached hereto.

## ARTICLE 5 - DISTRIBUTIONS

**Section 5.1**    NON-CASH DISTRIBUTIONS.    Lender shall be entitled to receive directly, and to retain as further Collateral, the following non-cash distributions with respect to the Equity Interests of any Pledged Entity ("**Non-Cash Distributions**"):

(a)    all Equity Interests, or other securities or property (other than cash) paid or distributed by way of dividend or distribution in respect of the Collateral;

(b)    all other or additional Equity Interests or other securities or property (other than cash) paid or distributed in respect of the Collateral by way of split, spin-off, split-up, recapitalization, reclassification, combination of Equity Interests, or similar rearrangement; and

(c)    all other or additional Equity Interests or other securities or property which may be paid in respect of the Collateral by reason of any consolidation, merger, exchange, exchange offers, conveyance of assets, exercise of options, contribution of capital, liquidation or similar reorganization.

**Section 5.2**    NON-CASH DISTRIBUTION HELD IN TRUST.    If Borrower shall become entitled to receive or shall receive from any Pledged Entity any Non-Cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, Borrower shall hold the same as the agent and in trust for Lender, and shall immediately deliver it to Lender in the exact form received, with Borrower's endorsement or assignment or other instrument as Lender may deem appropriate, to be held by Lender, subject to the terms hereof, as further Collateral.

**Section 5.3**    CASH DISTRIBUTIONS HELD IN TRUST.    Any cash distributions, dividends, interests and other cash payments payable to Borrower with respect to the Collateral then held or thereafter received by Borrower at any time during the term of the Loan ("**Cash Distributions**",

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

and collectively with Non-Cash Distributions "**Distributions**"), shall immediately be remitted to Lender for application to the Debt or held and/or applied by Lender pursuant to the provisions of the Loan Agreement, and until so remitted shall be received and held by Borrower in trust for Lender.

## ARTICLE 6 - EVENTS OF DEFAULT

An event of default ("**Event of Default**") shall occur under this Agreement if: (a) Borrower fails to fully and timely perform any obligation under this Agreement when due (subject to any notice or cure permitted under the Loan Agreement or any other Loan Document), or (b) an "Event of Default" as that term is defined under the Loan Agreement has occurred and remains uncured.

## ARTICLE 7 – REMEDIES; SALES OF COLLATERAL

**Section 7.1**    REMEDIES.  If an Event of Default shall occur and be continuing, in addition to the remedies contained in the Loan Agreement and other Loan Documents:

(a)    Lender shall have the right, at any time and from time to time, to effect the transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(i)    Register the Collateral in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender;

(ii)    Sell, resell, assign and deliver, in Lender's discretion, any or all of the Collateral or any other security for Borrower's obligations under the Loan Documents (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit bid (by Lender only), in accordance with the UCC and this Agreement; and

(iii)    Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral, or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights, including all rights under applicable law and all rights made under this Agreement, with respect to the Collateral.

(b)    Lender may exercise, either by itself or by its nominee or designee, including in the name of Borrower, at Lender's discretion, the rights, powers and remedies granted to Lender hereunder and under the other Loan Documents in respect of the Collateral at any time prior to effecting the transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Subsections 7.1(a)(i) and (ii) above, and whether or not any judicial action as

11

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

contemplated in <u>Subsection 7.1(a)(iii)</u> above has been commenced or is continuing prior to a final non-appealable judgment.  Such rights and remedies shall include, without limitation, and Borrower hereby grants to Lender, the right to exercise, by delivering notice to Borrower and any Pledged Entity, (i) all voting, consent, managerial and other rights relating to the Pledged Company Interests, whether in Borrower's name or otherwise, and (ii) the right to exercise Borrower's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Company Interests, including, without limitation, the right to exchange, at Lender's discretion, any or all of the Pledged Company Interests upon the merger, consolidation, reorganization, recapitalization or other readjustment of any Pledged Entity, all without liability, except to account for property actually received by Lender. Borrower irrevocably authorizes and directs any Pledged Entity, on receipt of any such notice (A) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable (and not merely an assignee of a member, partner or shareholder) of the such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to any Pledged Entity matters pursuant to the Governing Documents thereof) to receive all distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Borrower would have been entitled had Borrower not executed this Agreement, and (B) to file an amendment to the Governing Documents of any Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Borrower.

(c)    Lender may (but shall not be obligated or required to):

(i)    ask for, demand, collect, sue for, recover, compromise, receive and give acquittances and receipts for monies due or to become due under or in respect of any of the Collateral and hold the same as part of the Collateral, or apply the same to any of the Debt in such manner as the Lender may determine in accordance with the terms of the Loan Agreement;

(ii)    receive, endorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (i) above (including, without limitation, all instruments representing dividends, interest payments or other Distributions or any part thereof and give full discharge for the same);

(iii)    file any claims or take any actions or institute any proceedings that Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce compliance with the rights of the Lender with respect to any of the Collateral;

(iv)    enter into any extension, subordination, reorganization, deposit, merger, or consolidation agreement, or any other agreement relating to or affecting the Collateral, and in connection therewith deposit or surrender control of such Collateral thereunder, and accept other property in exchange therefor and

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

hold and apply such property or money so received in accordance with the provisions hereof; and

(v)    discharge any taxes or liens levied on the Collateral or otherwise pay for the maintenance and preservation of the Collateral.

(d)    Lender may at such time and from time to time thereafter, without notice to, or consent of, Borrower or any other Person, but without affecting any of Borrower's obligations under the Loan Documents, in the name of Borrower or in the name of Lender:  (i) notify any other party to make payment and performance directly to Lender; (ii) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Borrower, or claims of Borrower under any Governing Documents of any Pledged Entity, as applicable; (iii) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Governing Documents of any Pledged Entity; and (iv) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect, preserve, or realize upon the Collateral or any portion thereof and to protect and preserve the other rights contemplated hereby.

(e)    Lender shall have the right, without notice to or consent of Borrower, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

(f)    Lender may exercise all of the rights and remedies of a secured party under the UCC.  Except as otherwise expressly provided in the Loan Documents or the UCC, Lender may enforce its rights hereunder without any other notice and without compliance with any other condition precedent now or hereunder imposed by statute, rule of law or otherwise (all of which are hereby expressly waived by Borrower, to the fullest extent permitted by law).  Lender may buy any part or all of the Collateral at any public sale conducted in accordance with the UCC and as set forth herein.

(g)    Lender shall have the right, but not the obligation, to take any appropriate action as it may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Borrower, or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents.  All amounts advanced by, or on behalf of, Lender in exercising its rights under this Article 7 (including, without limitation, legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Borrower to Lender upon demand therefor and shall be secured by the Collateral.

13

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 7.2**    POWER OF ATTORNEY.

(a)    Borrower hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, as its true and lawful attorney-in-fact and as its agent with full power of substitution for Borrower to proceed from time to time in Borrower's name, in order to more fully vest in Lender the rights and remedies provided for herein and subject to the terms of the Other Loan Documents, in any statutory or non-statutory legal or other proceeding, including any bankruptcy proceeding affecting Borrower, any Pledged Entity, or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may either pursuant to such power-of-attorney or otherwise, but subject to the terms hereof and the other Loan Documents,  take any action and execute any instrument which Lender determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation:  (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Borrower representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements as appropriate, including on account of, or in exchange for, any or all of the Collateral or any payment or distribution received by Borrower, or by Lender on Borrower's behalf.

(c)    The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Borrower in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked. The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

**Section 7.3**    LENDER RIGHTS.  The obligations of Borrower under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement or the other Loan Documentsz.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's discretion.  Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so

14

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

doing.  Notwithstanding anything to the contrary contained in this Agreement, (a) Lender shall not be obligated to perform or discharge any obligation of Borrower or any Pledged Entity, either as a result of this Agreement or otherwise, and (b) the acceptance by Lender of this Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action, expend any money, incur any expenses, or perform or discharge any obligation, duty or liability with respect to the Collateral.

Section 7.4    NO RELEASE, ETC.  No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender.  Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Borrower shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things:  (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any invalidity, irregularity or unenforceability of all or any part of Borrower's obligations under the Loan Documents or of any security therefor.

Section 7.5    PREFERENCES.  Lender shall have no obligation to marshal any assets in favor of Borrower or any other party or against, or in payment of, any or all of the obligations of Borrower pursuant to this Agreement, the Loan Agreement, the Note or any other Loan Document.  To the extent Borrower makes a payment or payments to Lender for Borrower's benefit, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations (or part thereof) of Borrower intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 7.6    RIGHT TO CONDUCT PARTIAL SALE OF COLLATERAL.  In connection with any sale of the Collateral, Lender may grant options and may impose conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only.  If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may accept the next

15

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

greatest bid placed at the sale or may resell such Collateral.  Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral, provided, however, that such partial exercise shall in no way restrict Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times.  Borrower hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

**Section 7.7**     SALE PROCEDURES.

(a)     No demand, advertisement or notice, all of which are hereby expressly waived by Borrower, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Borrower at least ten (10) days' prior notice of the time and place of any public sale or of the time after which any private sale or other disposition is to be made, which notice Borrower hereby agrees is reasonable.  All other demands, advertisements and notices are hereby irrevocably waived by Borrower.  The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion thereof so being sold, first will be offered for sale, and (c) in the case of a private sale, state the date after which such sale may be consummated.

(b)     Borrower agrees that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Pledged Company Interests sold by Lender pursuant to this Agreement.  Lender, may, in its sole discretion, among other things, accept the first offer received, or decide to approach or not to approach any potential purchasers.  Without in any way limiting Lender's right to conduct a foreclosure sale in any manner which is considered commercially reasonable, Borrower hereby agrees that any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i)     Lender conducts the foreclosure sale in the State of New York;

(ii)     The foreclosure sale is conducted in accordance with the laws of the State of New York;

(iii)     Not more than twenty (20) days before, and not less than ten (10) days in advance of the foreclosure sale, Lender notifies Borrower, in accordance with the requirements of this Agreement for the giving of notice, of the time and place of such foreclosure sale;

(iv)     The foreclosure sale is conducted by an auctioneer licensed in the State of New York and is conducted in front of the New York Supreme Court located in New York City or such other New York State Court having jurisdiction over the Collateral on any Business Day between the hours of 9 a.m. and 5 p.m.;

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(v)     The notice of the date, time and location of the foreclosure sale is published in the New York Times or Wall Street Journal (or such other newspaper widely circulated in New York, New York) for seven (7) consecutive days prior to the date of the foreclosure sale; and

(vi)     Lender sends notification of the foreclosure sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the State in which Pledged Entity is formed conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(c)     Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market.  Borrower hereby waives any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Debt, even if Lender accepts the first offer received and does not offer any Collateral to more than one offeree, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

**Section 7.8**    ADJOURNMENT; CREDIT SALE.  Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Borrower, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of Borrower's obligations under the Loan Documents in lieu of cash or any other obligations.

**Section 7.9**    EXPENSES OF SALE; APPLICATION OF COLLATERAL AND DISTRIBUTIONS.  In the case of any sale, public or private, of all or any portion of the Collateral, Borrower shall be responsible for the payment of all costs and expenses of every kind incurred in connection with the sale or the delivery of the Collateral, including brokers' and attorneys' fees and any taxes imposed in connection with the sale.  All proceeds of the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement (including, without limitation, the provisions of this Article 7), shall be applied by Lender to the satisfaction of the Debt (including, without limitation, any of the aforementioned costs and expenses) in such order and priority as determined by Lender in its sole discretion.

17

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 7.10**   NO PUBLIC REGISTRATION OF SALE.   Pursuant to Section 9-603 of the UCC, Borrower specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in the applicable No-Action Letters issued by the SEC describing procedures which permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act, (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC, (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Borrower, or any Pledged Entity agree to pay all costs of the registration process, and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

**Section 7.11**   STRICT FORECLOSURE.   Lender may, in its discretion, either negotiate an agreement ("**Strict Foreclosure Agreement**") with Borrower, or make a written proposal ("**Strict Foreclosure Proposal**") to Borrower, to retain the Collateral in full or partial satisfaction of the obligations in accordance with the procedures specified in Section 9-620 of the UCC.   Borrower and each Pledged Entity shall fully cooperate, at their sole expense, in all matters deemed reasonably necessary by Lender to effect the transfer of ownership on the records of the applicable Pledged Entity in accordance with any applicable requirements of the Governing Documents of such Pledged Entity or the Mortgage Loan Documents in connection with any Strict Foreclosure Agreement or Strict Foreclosure Proposal.   Such cooperation shall include using Borrower's best efforts to assist Lender in obtaining any necessary review, approvals and other administrative action from such Pledged Entity or Mortgage Lender.   Such assistance shall include at Lender's request (i) attending all meetings with, and providing all related financial and operational documents and materials to such third parties, and (ii) providing such assurances and executing such documentation as is required by such third parties or Lender to effect such transfer.

**Section 7.12**   RECEIPT OF SALES PROCEEDS.   Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

## ARTICLE 8 - SECURITIES ACT

**Section 8.1**   SECURITIES REGISTRATION.   If an Event of Default shall have occurred and be continuing and Borrower shall have received from Lender a written request that Borrower effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Borrower agrees, at its sole expense, to use its best efforts to effect, as soon as practicable (and thereafter keep effective), such registration, qualification and compliance as required under:   (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in

18

effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws, and (c) other government requirements. Lender shall furnish to Borrower such information regarding Lender as Borrower may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance. Borrower shall cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, shall furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and shall indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been caused by an untrue statement or omission based upon information furnished in writing to Borrower by Lender expressly for use therein.

**Section 8.2**    PRIVATE SECURITIES SALE.    Lender may, in its discretion, sell the Collateral or any part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Borrower in accordance with the private sale notice provisions of Article 7. Without limiting the generality of the foregoing, in any such event Lender, in its discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof. In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

## ARTICLE 9 – IRREVOCABLE PROXY

Borrower hereby irrevocably constitutes and appoints Lender, from the date of this Agreement until the termination of this Agreement in accordance with its terms, as Borrower's true and lawful proxy, for and in each Borrower's name, place and stead to vote the Pledged Company Interests and any and all other equity interests in Pledged Entity owned by Borrower whether directly or indirectly, beneficially or of record, now owned or hereafter acquired (the Pledged Company Interests together with all such other equity interests, the "**Article 8 Interests**"), solelywith respect to any Article 8 Matter. The foregoing proxy shall include the right to sign Borrower's name (as an owner of Pledged Entity) to any consent, certificate or other document relating to Pledged Entity that applicable law may permit or require, to cause the Article 8 Interests to be voted in accordance with the preceding sentence. Borrower hereby

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

revokes all other proxies and powers of attorney with respect to the Article 8 Interests that Borrower may have previously appointed or granted, to the extent such proxies or powers extend to any Article 8 Matter. Borrower shall not give a subsequent proxy or power of attorney (and if given, it will not be effective) or enter into any other voting agreement with respect to the Article 8 Interests with respect to any Article 8 Matter. Unless an Event of Default shall have occurred and be continuing, Borrower shall be entitled to exercise any and all voting and other consensual rights pertaining to the Article 8 Interests or any part thereof in accordance with the terms and conditions of Section 3.1 hereof.

THE PROXIES AND POWERS GRANTED BY BORROWER PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE BORROWER'S OBLIGATIONS UNDER THIS AGREEMENT.

## ARTICLE 10 – MISCELLANEOUS PROVISIONS

**Section 10.1** FURTHER ASSURANCES; PRESERVATION AND PERFECTION OF SECURITY INTEREST. At its own expense, Borrower agrees to do, and cause Pledged Entity to do, all such further acts and things and to execute and deliver to Lender with respect to the Collateral such additional conveyances, assignments, agreements, certificates, documents and instruments as Lender from time to time may reasonably require, or may deem reasonably advisable, necessary or expedient, to give full effect to this Agreement, and to further assure and confirm to Lender the rights, powers and remedies intended to be granted hereunder or under any other Loan Document, and for the purpose of effectively perfecting, maintaining and preserving Lender's security interest and the benefits intended to be granted to Lender hereunder. Borrower hereby agrees to, and to cause Pledged Entity to, sign (as applicable) and deliver to Lender financing statements, continuation statements and other documents, in form acceptable to Lender, as Lender may from time to time reasonably request or which are reasonably necessary or desirable in the opinion of Lender to establish and maintain a valid and perfected security interest in the Collateral, and to pay any filing fees relative thereto. Borrower also authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto relating to all or any part of the Collateral without the consent of Borrower, and further authorizes Lender, to the extent permitted by law, to file a photographic or other reproduction of this Agreement or of a financing statement in lieu of a financing statement. In addition, Borrower agrees at any time and from time to time upon not less than ten (10) days' prior notice by Lender to Borrower, to execute, acknowledge and deliver to Lender or any other party specified in such notice, a statement, in writing, certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications hereto) and stating whether or not any default or Event of Default has occurred, and, if so, specifying each such default or Event of Default.

**Section 10.2** HEADINGS; EXHIBITS. The Article and Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. All exhibits are incorporated herein by reference. Any reference to the "Collateral" shall be deemed to refer to all or a portion of the Collateral, as applicable, now held, or hereafter received, by Lender.

20

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**Section 10.3**    Governing Law.  The governing law and related provisions set forth in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein and shall be deemed fully applicable to Borrower and each additional pledgor hereunder, if any.  Borrower and each additional pledgor hereunder, if any, hereby certify that they have received and reviewed the Loan Agreement (including, without limitation, Section 15.4 thereof). In the event of any conflict or inconsistency between any of the other terms and conditions of this Agreement and this Section 10.3, this Section 10.3 shall control.

**Section 10.4**    Notices.  Notices by Lender to Borrower or Pledged Entity to be effective shall be in writing, addressed or transmitted to Borrower or Pledged Entity at the address of Borrower set forth in the introductory paragraph hereto, and shall be deemed to have been duly given if made in accordance with the terms and provisions of Section 15.5 of the Loan Agreement.

**Section 10.5**    Termination.  Upon the indefeasible payment in full of the Debt and all other amounts due in connection therewith, if any, this Agreement shall terminate.  Upon such payment, Lender shall promptly execute and deliver to Borrower any termination documents prepared by Borrower in order to, upon such execution and delivery, terminate Lender's lien on the Collateral, which documents shall be in form and substance reasonably acceptable to Lender. This Section 10.5 and any termination effected hereunder shall be subject to the provisions of Sections 7.5 and 10.6(f) hereof.

**Section 10.6**    Waivers.

(a)    In the event of any legal action between Borrower and Lender hereunder, Borrower expressly waives, to the extent permitted by law, any and all rights Borrower may have under the law as now constituted or hereafter amended that may constitute a limitation on prejudgment remedies, and Lender may invoke any prejudgment remedy available to it, including garnishment, attachment, foreign attachments and request, with respect to the Collateral, to enforce the provisions of this Agreement.

(b)    The powers conferred on Lender hereunder are solely for Lender's benefit and do not impose any duty on Lender to exercise any such powers.  Borrower waives, to the fullest extent permitted by law, all rights whatsoever against Lender for any loss, expense, liability or damage suffered by Borrower as a result of actions taken pursuant to this Agreement, including those arising under any "mortgagee in possession" doctrine or the like, except to the extent such losses, expenses, liabilities or damages result from the gross negligence or willful misconduct of Lender, or to the extent otherwise expressly provided herein.

(c)    Borrower hereby waives, to the fullest extent permitted by law, every statute of limitation, any right of redemption, any moratorium or redemption period, and any right which Borrower may have to direct the order in which any of the Collateral shall be disposed of in the event of any disposition thereof pursuant hereto, except as otherwise expressly provided herein or in the other Loan Documents.

300570053v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(d)    Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents does not specifically and expressly provide for the giving of notice by Lender to Borrower.  No release of any security for the Loan or one or more extensions of time for payment of the Note or any installment thereof, and no alteration, amendment or waiver of any provision of this Agreement, the Note or the other Loan Documents made by agreement between Lender or any other person, shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other person who may become liable for the payment of all or any part of the Loan under the Note, this Agreement or the other Loan Documents.

(e)    Borrower hereby waives and releases all errors, defects and imperfections in any proceedings instituted by Lender under the Loan Documents, as well as any and all benefit that might accrue to Borrower by virtue of any present or future laws exempting any property, real or personal, or any part of the proceeds arising from any sale of such property, from attachment, levy, or sale under execution, or providing for any stay of execution, exemption from civil process, or extensions of time for payment.

(f)    Borrower hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

**Section 10.7    <u>WAIVER OF JURY TRIAL</u>.    BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.**

**Section 10.8**    <u>OFFSETS, COUNTERCLAIMS AND DEFENSES</u>.    Borrower hereby knowingly waives the right to assert any counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against Borrower by Lender.  Any assignee of the Loan Documents or any successor of Lender shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to the Loan Documents which Borrower may otherwise have against any assignor of the Loan Documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee under such Loan Document.  Any such right to interpose or assert any such unrelated offset,

counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 10.9  SECURITY AGREEMENT.  This Agreement is intended to be a security agreement pursuant to the UCC for any and all of the Collateral purported to be covered by this Agreement, and, prior to the occurrence of and continuation of an Event of Default hereunder, any assignment of the Collateral by the Borrower pursuant to this Agreement is an assignment for security purposes only.  All rights of Lender hereunder, the grant of a security interest in the Collateral and all obligations of Borrower hereunder, shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Governing Documents; (b) any change in time, manner or place of payment of, or in any other term of, all or any of the Debt, or any release, amendment or waiver of or any consent to any departure from the Loan Agreement or any other of the Loan Documents; (c) any exchange, release or nonperfection of any other collateral, or any release, amendment or waiver of or consent to or departure from any guarantee, for all or any of the Debt; or (d) any other similar circumstance which might otherwise constitute a defense available to, or a discharge of, Pledged Entity or Borrower in respect of the Debt or in respect of this Agreement.

Section 10.10  SOLE DISCRETION OF LENDER.  Wherever pursuant to this Agreement Lender takes any of the following actions, each action shall be taken or decision made in Lender's sole and absolute discretion, unless expressly provided otherwise:  (a) Lender exercises any right to approve or disapprove or to grant or withhold consent; (b) Lender exercises any right to determine whether an arrangement or term is satisfactory to Lender; (c) a waiver is requested from Lender, or (d) any other decision is made or action is taken by Lender.  Notwithstanding any provision hereunder which provides Lender the opportunity to approve or disapprove any action or decision by Borrower, Lender is not undertaking the performance of any obligation of Borrower.

Section 10.11  REMEDIES OF BORROWER.  If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents or nominees, shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender, its agents or nominees has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 10.12  LIMITATION ON DUTIES REGARDING COLLATERAL.  All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents.  Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, if any, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Lender deals with similar Equity Interests and other similar property for its own account. Lender shall not have any other duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

rights pertaining thereto.  Neither Lender nor any of its directors, officers, partners, members, employees, agents or counsel shall be (a) liable for (i) failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or (ii) any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct or (b) under any obligation to sell or otherwise dispose of any Collateral upon the request of Borrower or otherwise.  Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may in its discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 10.13 RIGHT TO RELEASE INFORMATION.  During the occurrence of any Event of Default, Lender may forward to any broker, prospective purchaser of the Collateral, the Property or the Loan, or other Person or entity all documents and information which Lender now has or may hereafter acquire relating to the Debt, Borrower, any pledgor hereunder, Mortgage Borrower, any Guarantor, any indemnitor, the Collateral, the Property and any other matter in connection with the Loan, whether furnished by such parties or otherwise, as Lender determines necessary or desirable.  The undersigned irrevocably waives any and all rights it may have to limit or prevent such disclosure, including any right of privacy or any claims arising therefrom.

Section 10.14 SECONDARY MARKET COOPERATION.  Lender shall have the right, but not the obligation, to effectuate one or more Secondary Market Transactions (and, at Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions).  The provisions contained in Article 9 of the Loan Agreement are hereby incorporated herein by reference, as if the same had been fully set forth herein, with each pledgor under this Agreement equally bound by the obligations of Borrower thereunder.

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

IN WITNESS WHEREOF, the undersigned has caused this Pledge and Security Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

BORROWER:


[Signature pages sent separately]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT A**

**ACKNOWLEDGEMENT AND CONSENT**

Mortgage Borrower hereby acknowledges receipt of a copy of that certain Pledge and Security Agreement, dated as of the date hereof, by and between Borrower and Lender (the "**Pledge Agreement**") and agrees that Borrower is bound thereby.  Terms used herein but not otherwise defined herein shall have the respective meanings ascribed to them in the Pledge Agreement.

Mortgage Borrower shall give copies of any notices or other communications that it sends to Borrower or to any other owners of Mortgage Borrower related to any Article 8 Matter to Lender at the same time as such notices or other communications are sent to Borrower or any such other owners of Mortgage Borrower.  Mortgage Borrower acknowledges the powers and proxies granted in the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Company Interests with respect to any Article 8 Matter.

Dated:  [_____], 2023

**EXHIBIT ONLY, NOT FOR SIGNATURE**

A-1

# EXHIBIT A-15

**Mezzanine Acknowledgement and Consent**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ACKNOWLEDGEMENT AND CONSENT

[_____], a Delaware limited liability company ("**Mortgage Borrower**") hereby acknowledges receipt of a copy of that certain Pledge and Security Agreement, dated as of the date hereof, by and between Borrower and Lender (the "**Pledge Agreement**") and agrees that Borrower is bound thereby.  Terms used herein but not otherwise defined herein shall have the respective meanings ascribed to them in the Pledge Agreement.

Mortgage Borrower shall give copies of any notices or other communications that it sends to Borrower or to any other owners of Mortgage Borrower related to any Article 8 Matter to Lender at the same time as such notices or other communications are sent to Borrower or any such other owners of Mortgage Borrower.  Mortgage Borrower acknowledges the powers and proxies granted in the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Company Interests with respect to any Article 8 Matter.

Dated: [_____, 2023]

**[SIG BLOCK TO BE INSERTED]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## INSTRUCTION TO REGISTER PLEDGE

[_____ __], 2023

To: [_____] LLC

In accordance with the requirements of that certain Pledge and Security Agreement, dated as of the date hereof (as amended, supplemented, replaced, amended and restated or otherwise modified from time to time, the "**Pledge Agreement**"), by [_____] LLC, a Delaware limited liability company ("**Borrower**"), in favor of [_____ LLC], a Delaware limited liability company, (terms used but not defined herein are as defined in the Pledge Agreement), you are instructed, notwithstanding your and our understanding that your limited liability company interests are securities under Article 8 of the Uniform Commercial Code, to register the pledge of the following interests in the name of Lender as follows:

The 100% limited liability company interest of [_____] LLC, a Delaware limited liability company, in [_____] LLC, a Delaware limited liability company (the "**Issuer**"), including all of the related Collateral now owned or at any time hereafter arising or acquired by Borrower or in which Borrower now has or at any time in the future may acquire any right, title or interest or is deemed by law to have rights in or the power to convey rights in, wherever located.

You are further authorized and instructed to execute and deliver to Lender a Confirmation Statement and Control Agreement, substantially in the form of Exhibit C to the Pledge Agreement, and, to the extent provided more fully therein, to comply with the instructions of Lender in respect of the Collateral without further consent of, or notice to, the undersigned Borrower.

**[Remainder of Page Intentionally Left Blank]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Very truly yours,

[_____], LLC, a Delaware limited
liability company


By: _____
Name:
Title:

**[Signatures continue on following page]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**[MEZZ BORROWER SIG BLOCK TO BE INSERTED]**

**[End of signatures]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## CONFIRMATION STATEMENT AND CONTROL AGREEMENT

[_____ __], 2023

**To:  [_____ LLC] [LENDER]**

Pursuant to the requirements of that certain Pledge and Security Agreement, dated as of the date hereof (as amended, supplemented, replaced, amended and restated or otherwise modified from time to time, the "**Pledge Agreement**"), by [_____] LLC, a Delaware limited liability company ("**Borrower**"), in favor of [_____ LLC], a Delaware limited liability company, (terms used but not defined herein are as defined in the Pledge Agreement), this Confirmation Statement and Control Agreement relates to those limited liability company interests (the "**Pledged Company Interests**"), as further described on Schedule A, issued by [_____] LLC, a Delaware limited liability company.

The Pledged Company Interests are not (i) "investment company securities" (within the meaning of Section 8-103 of the Code) or (ii) dealt in or traded on securities exchanges or in securities markets.  The Pledged Company Interests are "securities" (within the meaning of Sections 8-102(a)(15) and 8-103 of the Code), and, therefore, for purposes of perfecting the security interest of Lender and Lender therein, the Issuer agrees as follows:

On the date hereof, the registered owner of 100% of the limited liability company interests in [_____] LLC is:

[_____] LLC, a Delaware limited liability company
Taxpayer I.D. Number: [_____]

The registered pledgee of the Pledged Company Interests is:

[_____, LLC]

There are no liens of the Issuer on the Pledged Company Interests or any adverse claims thereto for which the Issuer has a duty under Section 8-403 of the Code.  The Issuer has registered the Pledged Company Interests in the name of the registered pledgee on the date hereof.  No other pledge or other interest adverse to that of the registered pledgee is currently registered on the books and records of the Issuer with respect to the Pledged Company Interests.

Until the Debt is indefeasibly paid in full, Borrower, Lender and Issuer agree that Issuer shall: (i) comply with the instructions of Lender, without any further consent from Borrower or any other Person, in respect of the Pledged Company Interests; and (ii) disregard any request made by Borrower or any other person which contravenes the instructions of Lender with respect to the Pledged Company Interests.

**[Remainder of page intentionally blank]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Very truly yours,

**[MORTGAGE BORROWER SIG BLOCK TO BE INSERTED]**

**[Signatures continue on following page]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

[MEZZ BORROWER SIG BLOCK TO BE INSERTED]

**[Signatures continue on following page]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

[_____] LLC, a Delaware limited liability company


By: _____
Name:
Title:

**[End of signatures]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**SCHEDULE A**

**DESCRIPTION OF PLEDGED LIMITED LIABILITY COMPANY INTERESTS**

| Issuer | Owner | Class of Interest | Initial Percentage of Limited Liability Company Interests |
|--------|-------|-------------------|-----------------------------------------------------------|
|        |       | Limited Liability Company Interest | 100% |

# EXHIBIT A-16

**Mezzanine Guaranty of Recourse Obligations**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## MEZZANINE GUARANTY OF RECOURSE OBLIGATIONS

This **MEZZANINE GUARANTY OF RECOURSE OBLIGATIONS** (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Guaranty**") is executed as of **[_____] [__]**, 2024 by **SILVER STAR PROPERTIES REIT, INC.**, a Maryland corporation, having an address at **[_____]** (together with its successors and permitted assigns, "**Guarantor**"), for the benefit of **RMWC SILVER STAR MEZZANINE LLC**, a Delaware limited liability company, having an address at 130 East 59th Street, 13th Floor, Suite A, New York, New York 10022 (together with its successors and assigns, "**Lender**").

### W I T N E S S E T H :

A.     Pursuant to that certain Mezzanine Promissory Note dated the date hereof executed by Silver Star Mezzanine Borrower, LLC, a Delaware limited liability company ("**Borrower**") and payable to the order of Lender (together with all renewals, modifications, increases and extensions thereof, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan (the "**Loan**") which is made pursuant to that certain Mezzanine Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is further evidenced, secured or governed by other instruments and documents executed in connection with the Loan.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

B.     Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined).

C.     Guarantor is the owner of direct or indirect equity or beneficial ownership interests in Borrower, and, therefore, Guarantor will directly benefit from Lender making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

### ARTICLE 1
### NATURE AND SCOPE OF GUARANTY

Section 1.1   <u>Guaranty of Obligations</u>.   Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations (defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 1.2 <u>Definition of Guaranteed Obligations</u>.  As used herein, the term "**Guaranteed Obligations**" shall mean all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to and to the extent expressly provided in Article 12 of the Loan Agreement.

Section 1.3    <u>Nature of Guaranty</u>. This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs).  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment, sale, pledge, transfer, participation or negotiation of all or part of the Note.

Section 1.4    <u>Guaranteed Obligations Not Reduced by Offset</u>.  The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise (except in connection with Lender's receipt of payment thereof).

Section 1.5    <u>Payment By Guarantor</u>.  If all or any part of the Guaranteed Obligations shall not be paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, all such notices being hereby waived by Guarantor (except to the extent otherwise specifically provided in the Loan Documents), pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

Section 1.6    <u>No Duty To Pursue Others</u>.  It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations.  Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

Section 1.7    Waivers.  Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Pledge Agreement, the Loan Agreement or any other Loan Document, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory note or other document arising under the Loan Documents or in connection with the Collateral, (v) the occurrence of (A) any breach by Borrower of any of the terms or conditions of the Loan Agreement or any of the other Loan Documents, or (B) an Event of Default, (vi) Lender's transfer, sale, assignment, pledge, participation or disposition of the Guaranteed Obligations, or any part thereof, (vii) the sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed.

Section 1.8    Payment of Expenses.  In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all reasonable costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder, together with interest thereon at the Default Rate from the date requested by Lender until the date of payment to Lender.  The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

Section 1.9    Effect of Bankruptcy.  In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain (or shall be reinstated to be) in full force and effect.  It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

Section 1.10    Waiver of Subrogation, Reimbursement and Contribution. Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating the Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

3

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 1.11    Borrower.  The term "**Borrower**" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower, as permitted under the Loan Agreement.

Section 1.12    Foreign Taxes.  All payments made by Guarantor hereunder (including, without limitation, the Guaranteed Obligations) shall be made free and clear of, and without reduction for or on account of, income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority ("**Foreign Taxes**"), except to the extent such Foreign Taxes are imposed as a result of a change in Lender's principal place of business or the location of accounts used by Lender as of the date hereof.  If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender (including, without limitation, the Guaranteed Obligations) shall be increased to the extent necessary to yield to Lender (after payment of all such Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder.  Whenever any Foreign Taxes are payable pursuant to applicable law by Guarantor, within a reasonable time thereafter, Guarantor shall send to Lender a receipt, if available, or other reasonable documentary evidence thereof showing payment of the same.  Guarantor hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender as a direct result of any failure by Guarantor to pay any such Foreign Taxes when due or any failure by Guarantor to remit to Lender the required receipts or other required documentary evidence hereunder.

## ARTICLE 2
## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following (except to the extent expressly prohibited by applicable law):

Section 2.1    Modifications/Sales.  Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Pledge Agreement, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations, or any sale, assignment or foreclosure of the Note, the Loan Agreement, the Pledge Agreement, or any other Loan Documents or any sale or transfer of the Collateral, or any failure of Lender to notify Guarantor of any such action.

Section 2.2    Adjustment.  Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 2.3    <u>Condition of Borrower or Guarantor</u>.    The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members, as applicable, of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

Section 2.4    <u>Invalidity of Guaranteed Obligations</u>.    The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by Legal Requirements, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Pledge Agreement, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Pledge Agreement, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

Section 2.5    <u>Release of Obligors</u>.    Any full or partial release of the liability of Borrower for the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support from any other Person, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons (including Borrower) will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other Persons (including Borrower) to pay or perform the Guaranteed Obligations.

Section 2.6    <u>Other Collateral</u>.  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

Section 2.7    <u>Release of Collateral</u>.  Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

Section 2.8    Care and Diligence.  The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including, but not limited to, any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations, or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

Section 2.9    Unenforceability.  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

Section 2.10    Representation.  The accuracy or inaccuracy of the representations and warranties made by Guarantor herein or by Borrower in any of the Loan Documents.

Section 2.11    Offset.  The Note, the Guaranteed Obligations and the liabilities and obligations of the Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise (except to the extent of payments actually received by Lender).

Section 2.12    Merger.  The reorganization, merger or consolidation of Borrower or Guarantor into or with any other Person.

Section 2.13    Preference.  Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or to any other Person.

Section 2.14    Other Actions Taken or Omitted.  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it being the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated,

and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and to extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

Section 3.1    Benefit.  Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

Section 3.2    Familiarity and Reliance.    Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

Section 3.3    No Representation By Lender.  Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce the Guarantor to execute this Guaranty.

Section 3.4    Guarantor's Financial Condition.  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities, including the Guaranteed Obligations.

Section 3.5    Legality.  The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor.  This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

Section 3.6    Survival.  All representations and warranties made by Guarantor herein shall survive the execution hereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## ARTICLE 4
## SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 4.1    <u>Subordination of All Guarantor Claims</u>.   As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, and whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor.  The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.   So long as any portion of the Obligations or the Guaranteed Obligations remain outstanding, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other Person any amount upon the Guarantor Claims.

Section 4.2    <u>Claims in Bankruptcy</u>.   In the event of any receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceeding involving Guarantor as a debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender.  Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

Section 4.3    <u>Payments Held in Trust</u>.  Notwithstanding anything to the contrary in this Guaranty, in the event that any Guarantor should receive any funds, payments, claims or distributions which are prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

Section 4.4    <u>Liens Subordinate</u>.   Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach.  Without the prior written consent of

8

Lender, Guarantor shall not (i) exercise or enforce any creditor's rights it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or the joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.  The foregoing shall in no manner vitiate or amend, nor be deemed to vitiate or amend, any prohibition in the Loan Documents against Borrower or Guarantor transferring any of its assets to any Person other than Lender.

## ARTICLE 5
## COVENANTS

Section 5.1    Definitions.  As used in this Article 5, the following terms shall have the respective meanings set forth below:

(a)    "**GAAP**" shall mean generally accepted accounting principles, consistently applied.

(b)    "**Liquid Assets**" shall mean assets in the form of cash, cash equivalents, obligations of (or fully guaranteed as to principal and interest by) the United States or any agency or instrumentality thereof (provided the full faith and credit of the United States supports such obligation or guarantee), certificates of deposit issued by a commercial bank having net assets of not less than $500 million, securities listed and traded on a recognized stock exchange or traded over the counter and listed in the National Association of Securities Dealers Automatic Quotations, or liquid debt instruments that have a readily ascertainable value and are regularly traded in a recognized financial market.

(c)    "**Net Worth**" shall mean, as of a given date, (x) the total assets of Guarantor as of such date less (y) Guarantor's total liabilities as of such date, determined in accordance with GAAP.

Section 5.2    Covenants.  Until all of the Obligations and the Guaranteed Obligations have been paid in full, Guarantor shall (i) maintain (A) a Net Worth (in the aggregate, if Guarantor consists of more than one Person), exclusive of any interest in the Collateral, of at least $[_____], and (B) Liquid Assets having a market value of at least $[_____] (in the aggregate, if Guarantor consists of more than one Person), (ii) deliver to Lender within five (5) Business Days of receipt, copies of any default notices received by Guarantor in respect of any material Indebtedness of Guarantor or any Affiliate thereof, (iii) deliver to Lender within forty-five (45) days of the end of each calendar quarter, Guarantor's financial statements prepared and certified by Guarantor as being true, correct and complete and fairly presenting the financial condition and results of operations of Guarantor in a manner consistent with GAAP (or in accordance with the accounting methodology used to prepare the financial statements of Guarantor delivered to Lender in connection with the closing of the Loan) and otherwise in form and substance acceptable to Lender (provided that at any time an Event of Default exists or Lender has a reasonable basis to believe any such financial statement is inaccurate in any material respect or does not fairly represent the financial condition

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

of Guarantor, any such financial statements shall, at Lender's request, be prepared and reviewed by an independent firm of certified public accountants acceptable to Lender), including quarterly and year-to-date statements of income and expense and cash flow, together with a balance sheet for such quarter for Guarantor, (iv) deliver to Lender within ninety (90) days of each Fiscal Year, Guarantor's annual financial statements audited by an independent firm of certified public accountants acceptable to Lender and prepared in accordance with GAAP (or in accordance with the accounting methodology used to prepare the financial statements of Guarantor delivered to Lender in connection with the closing of the Loan) and otherwise in form and substance acceptable to Lender, including statements of income and expense and cash flow and a balance sheet for Guarantor, and certified by Guarantor as being true, correct and complete and fairly presenting the financial condition and results of operations of Guarantor in a manner consistent with GAAP (or in accordance with the accounting methodology used to prepare the financial statements of Guarantor delivered to Lender in connection with the closing of the Loan), and (v) deliver to Lender, within forty-five (45) days of the end of each calendar quarter and within ninety (90) days of each Fiscal Year, a certificate of such Guarantor setting forth in reasonable detail Guarantor's Net Worth and Liquid Assets, based on such financial statement.

## ARTICLE 6
## MISCELLANEOUS

Section 6.1    Waiver.  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor any consent to any departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

Section 6.2    Notices.    All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") permitted or required to be given under this Guaranty shall be given in accordance with the applicable terms and conditions of the Loan Agreement.  Notices to Guarantor shall be addressed as follows:

| | |
|---|---|
| To: | Silver Star Properties REIT, Inc. |
| | 2909 Hillcroft, Suite 420 |
| | Houston, Texas 77057 |
| | Attention:  Chief Executive Officer |
| | |
| with a copy to: | Silver Star Properties REIT, Inc. |
| | 2909 Hillcroft, Suite 420 |
| | Houston, Texas 77057 |
| | Attention:  Adrienne Collins, General Counsel |

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 6.3    Governing Law; Submission to Jurisdiction.  The governing law and related provisions set forth in Section 15.4 of the Loan Agreement (including, without limitation, any authorized agent provisions thereof) are hereby incorporated by reference as if fully set forth herein (with Guarantor substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to Guarantor hereunder.  Guarantor hereby certifies that it has received and reviewed the Loan Agreement (including, without limitation, Section 15.4 thereof).  In the event of any conflict or inconsistency between any of the other terms and conditions of this Guaranty and this Section 6.3, this Section 6.3 shall control.

Section 6.4    Invalid Provisions.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

Section 6.5    Amendments.  This Guaranty may be amended only by an instrument in writing executed by the party against whom such amendment is sought to be enforced.

Section 6.6    Parties Bound; Assignment; Joint and Several.  This Guaranty shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and legal representatives.  Lender may sell, assign, pledge, participate, transfer or delegate, as applicable to one or more Persons all or a portion of its rights and obligations under this Guaranty in connection with any assignment, sale, pledge, participation or transfer of the Loan and the Loan Documents.  Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Guaranty.  Guarantor shall not have the right to delegate, assign or transfer its rights or obligations under this Guaranty without the prior written consent of Lender, and any attempted assignment, delegation or transfer without such consent shall be null and void.  If Guarantor consists of more than one Person or party, the obligations and liabilities of each such Person or party hereunder shall be joint and several.

Section 6.7    Headings.  Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

Section 6.8    Recitals.  The recitals and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered *prima facie* evidence of the facts and documents referred to therein.

Section 6.9    Counterparts.  To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties

11

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

hereto.  Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

Section 6.10   <u>Rights and Remedies</u>.  If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

Section 6.11   **<u>Entirety</u>.  THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF.  THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY.  THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.**

Section 6.12   **<u>Waiver of Right To Trial By Jury</u>.  GUARANTOR HEREBY, AND LENDER BY ACCEPTANCE HEREOF, EACH AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE PLEDGE AGREEMENT, THE LOAN AGREEMENT, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF GUARANTOR AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF GUARANTOR AND LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.**

300570604v1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Section 6.13    <u>Transfer of Loan</u>.  Article 9 of the Loan Agreement is hereby incorporated by reference as if fully set forth herein.  Guarantor hereby agrees to cooperate in fulfilling any obligation of Borrower under Article 9 of the Loan Agreement.

Section 6.14    <u>Reinstatement in Certain Circumstances</u>.  If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, the Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

Section 6.15    <u>Gender; Number; General Definitions</u>.    Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, (a) words used in this Guaranty may be used interchangeably in the singular or plural form, (b) any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, (c) the word "**Borrower**" shall mean "each Borrower and any subsequent owner or owners of the Collateral or any part thereof or interest therein", (d) the word "**Lender**" shall mean "Lender and any subsequent holder of the Note", (e) the word "**Note**" shall mean "the Note and any other evidence of indebtedness secured by the Loan Agreement, as amended, restated or otherwise modified", (f) the word "**Collateral**" shall include any portion of the Collateral and any interest therein, and (g) the phrases "**attorneys' fees**", "**legal fees**" and "**counsel fees**" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels, incurred or paid by Lender in protecting its interest in the Collateral, the Leases and/or the Rents and/or in enforcing its rights hereunder.

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the day and year first above written.

**GUARANTOR:**

[Signature pages sent separately]

# EXHIBIT A-17

**Mezzanine Environmental Indemnity Agreement**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## MEZZANINE ENVIRONMENTAL INDEMNITY AGREEMENT

**THIS MEZZANINE ENVIRONMENTAL INDEMNITY AGREEMENT** (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**") made as of the [__] day of [_____], 2024 by **SILVER STAR MEZZANINE BORROWER, LLC**, a Delaware limited liability company, having an address at [_____] (together with its successors and permitted assigns, "**Borrower**"), and **SILVER STAR PROPERTIES REIT, INC.**, a Maryland corporation, having an address at [_____] (together with its successors and permitted assigns, "**Principal**", and together with Borrower and each of their respective successors and permitted assigns, collectively, "**Indemnitor**"), in favor of **RMWC SILVER STAR MEZZANINE LLC**, a Delaware limited liability company, having an address at 130 East 59th Street, 13th Floor, Suite A, New York, New York 10022 (together with its successors and assigns, "**Indemnitee**"), and other Indemnified Parties (as defined below).

### RECITALS:

A.      [BSPRT CRE Finance, LLC], a Delaware limited liability company, as mortgage lender ("**Mortgage Lender**"), is making a loan in the original principal amount of up to [_____ and 00/100 Dollars ($_____)] (the "**Mortgage Loan**") to [_____], a Delaware limited liability company ("**Mortgage Borrower**"), pursuant to a Loan Agreement dated as of the date hereof (as the same may be amended, supplemented, replaced or otherwise modified form time to time, the "**Mortgage Loan Agreement**"), between Mortgage Borrower and Mortgage Lender, which Mortgage Loan is evidenced by a Promissory Note, dated as of the date hereof (as the same may be amended, supplemented, replaced or otherwise modified form time to time, the "**Mortgage Note**"), made by Mortgage Borrower in favor of Mortgage Lender and secured by, among other things, the Security Instrument (as defined in the Mortgage Loan Agreement), pursuant to which Mortgage Borrower has granted a first priority lien on the Property (as defined in the Security Instrument).

B.      Indemnitee is prepared to make a loan (the "**Loan**") to Borrower pursuant to that certain Mezzanine Loan Agreement, dated as of the date hereof, between Borrower and Indemnitee (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement.

C.      Principal acknowledges that it has a direct or indirect ownership interest in Borrower and will receive substantial economic and other benefits from Indemnitee's making the Loan to Borrower.

D.      Indemnitee is unwilling to make the Loan unless Indemnitor agrees to provide the indemnification, representations, warranties, covenants and other matters described in this Agreement for the benefit of the Indemnified Parties.

E.      Indemnitor is entering into this Agreement to induce Indemnitee to make the Loan.

1

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**AGREEMENT**

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Indemnitor hereby represents, warrants, covenants and agrees for the benefit of the Indemnified Parties as follows:

1.    <u>Environmental Representations and Warranties</u>.    Except for those matters disclosed in the environmental report(s) prepared and delivered to Indemnitee in connection with the closing of the Loan, or as otherwise disclosed in writing to Lender on or prior to the closing of the Loan (whether one or more, individually and collectively, as the context requires, the "**Environmental Report**"):

(a)    to Borrower's actual knowledge, there are no Hazardous Substances (as defined below) in, at, on, above or under the Property that violate applicable Environmental Law, except those that are stored and used in compliance with all Environmental Law (as defined below);

(b)    there are no past, present or threatened Releases (as defined below) of Hazardous Substances in, at, on, above, under or from the Property that violate applicable Environmental Law and which have not been fully remediated in accordance with Environmental Law;

(c)    to Borrower's actual knowledge, there is no imminent threat of any Release of Hazardous Substances migrating to the Property;

(d)    there are no nor have there been underground storage tanks or landfills in, on or under the Property;

(e)    the Property is not now nor has it ever been licensed under Environmental Law as a treatment, storage, disposal or transfer of hazardous waste facility;

(f)    there is no past nor present non-compliance with Environmental Law, or with permits issued pursuant thereto, in connection with the Property which has not been fully remediated in accordance with Environmental Law;

(g)    Indemnitor does not know of, and has not received, any written or oral notice, claim or other communication from any Person (including, but not limited to, a Governmental Authority) relating to (i) Hazardous Substances or Remediation (as defined below) thereof, (ii) possible liability of any Person pursuant to any Environmental Law relating to the Property, (iii) environmental conditions or non-compliance with Environmental Law in connection with the Property, or (iv) any actual or threatened administrative or judicial proceedings in connection with any of the foregoing;

(h)    Intentionally deleted.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

(i)     except as otherwise disclosed in writing to Indemnitee, there are no prior or current complaints by tenants or occupants at the Property regarding water infiltration or water damage or leaks or odors related thereto that have not otherwise been remedied;

(j)     to Indemnitor's actual knowledge, no Microbial Matter (as defined below) is present in the indoor air of the Property at concentrations exceeding ambient air levels and the Property currently displays no evidence of the growth of Microbial Matter to any degree for which any Governmental Authority would recommend or require removal thereof by remediation professionals;

(k)     there are no Environmental Liens existing or threatened with respect to the Property; and

(l)     Indemnitor has truthfully and fully provided to Indemnitee, in writing, any and all information relating to conditions in, at, on, above, under or from the Property that is known to Indemnitor and that is contained in files and records of Indemnitor or a Person under the control of Indemnitor, including, but not limited to, any reports relating to Hazardous Substances in, at, on, above, under or from the Property and/or to the environmental condition of the Property.

2.    <u>Environmental Covenants</u>.  Indemnitor covenants and agrees that:

(a)     all uses and operations on or of the Property, whether by Indemnitor, Mortgage Borrower or any other Person, shall be in compliance with all Environmental Law and permits issued pursuant thereto;

(b)     that Indemnitor shall not cause or intentionally permit (i) any Releases or threatened Releases of Hazardous Substances in, at, on, above, under or from the Property, (ii) treatment, storage, disposal or transfer of hazardous waste operations at, on or under the Property, or (iii) underground storage tanks at, on or under the Property;

(c)     there shall be no Hazardous Substances in, at, on, above or under the Property, except those that are (i) in compliance with all Environmental Law and (ii) fully disclosed to Indemnitee in writing upon Indemnitor's receipt of knowledge of the same;

(d)     Indemnitor shall (and shall cause Mortgage Borrower to) keep the Property free and clear of all Environmental Liens;

(e)     subject to the rights of Tenants under Leases, Indemnitor shall (and shall cause Mortgage Borrower to), at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to <u>Paragraph 3</u> of this Agreement, including, but not limited to, providing all relevant information and making knowledgeable Persons available for interviews;

3

(f)　　subject to the rights of Tenants under Leases and upon Indemnitee's receipt of factual evidence that would reasonably indicate that there are Hazardous Substances on the Property that would violate applicable Environmental Law, Indemnitor shall (and shall cause Mortgage Borrower to), at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with an Individual Property, by an independent environmental consultant approved by Indemnitee, pursuant to any reasonable written request of Indemnitee (including, but not limited to, sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), and share with Indemnitee the reports and other results thereof, and Indemnitee and the other Indemnified Parties shall be entitled to rely on such reports and other results thereof;

(g)　　Indemnitor shall (and shall cause Mortgage Borrower to), at its sole cost and expense, comply with all reasonable written requests of Indemnitee to (i) effectuate Remediation or obtain a no further action letter for any condition (including, but not limited to, a Release or threatened Release of any Hazardous Substances) in, at, on, above, under or from the Property in full compliance of Environmental Law or reasonably required by Indemnitee based upon recommendations and observations of an independent environmental consultant approved by Indemnitee; (ii) comply with any Environmental Law and with permits issued pursuant thereto; (iii) comply with any directive from any Governmental Authority; and (iv) take any other reasonable action necessary or appropriate for protection of human health and safety or the environment;

(h)　　Indemnitor shall not do or knowingly allow (and shall not cause or permit Mortgage Borrower to do or allow) any tenant or occupant or other user of the Property to do any act or omit to take any action that (i) causes or materially increases the dangers to human health and safety or the environment, (ii) poses an unreasonable risk of harm to any Person (whether on or off the Property), (iii) impairs or may impair the value of the Property (including any Individual Property), (iv) is contrary to any requirement of any insurer, (v) constitutes a public or private nuisance, (vi) constitutes physical waste, or (vii) violates any covenant, condition, agreement or easement applicable to the Property;

(i)　　Indemnitor shall (and shall cause Mortgage Borrower to) use commercially reasonable efforts to enforce the applicable provisions of the Leases in order to prevent tenants or occupants or other users of the Property from taking any action that violates any applicable Environmental Law, impairs or may impair the value of the Property (including any Individual Property), constitutes a public or private nuisance, constitutes waste or violates any covenant, condition, agreement or easement applicable to the Property;

(j)　　Indemnitor shall immediately notify Indemnitee in writing of (i) any presence or Release or threatened Release of Hazardous Substances in, at, on, above, under, from or migrating towards the Property, which is either (A) in violation of or in excess of a reportable quantity under any Environmental Law or permit issued pursuant thereto, (B) in amounts that are not ordinarily and customarily used or stored in properties similar to the Property for the purposes of cleaning or other maintenance or

4

operations, or (C) had not been previously fully disclosed to Indemnitee in writing; (ii) any non-compliance with any Environmental Law related in any way to the Property, including any operations thereon; (iii) any actual or potential imposition of an Environmental Lien; (iv) any required or proposed Remediation of environmental conditions relating to the Property; and/or (v) any written or oral notice, claim or other communication of which any Indemnitor or Mortgage Borrower becomes aware from any source whatsoever (including, but not limited to, a Governmental Authority) relating in any way to Hazardous Substances or Remediation thereof, possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Agreement;

(k)      Indemnitor shall (and shall cause Mortgage Borrower to) comply with any and all local, state or federal laws, legislation, regulations, guidelines or statutes in effect with respect to Microbial Matter; and

(l)      Indemnitor shall, within five (5) Business Days of receipt thereof, give written notice to Indemnitee of (i) any notice, advice or other communication from any Governmental Authority or any source whatsoever with respect to Hazardous Substances on, from or affecting the Property, and (ii) any legal action brought against Indemnitor, Mortgage Borrower or related to the Property, with respect to which Indemnitor or Mortgage Borrower may have liability under this Agreement.

3.      <u>Indemnified Rights/Cooperation and Access</u>.  In the event the Indemnified Parties have reason to believe that an environmental hazard or non-compliance with Environmental Law or permit issued pursuant thereto exists in, at, on, above, under or from or to the Property upon reasonable notice from Indemnitee, Indemnitor shall (and shall cause Mortgage Borrower to), at Indemnitor's sole cost and expense, promptly cause an independent engineer or consultant reasonably satisfactory to the Indemnified Parties to conduct any environmental assessment or audit (the scope of which shall be determined in the sole and absolute discretion of the Indemnified Parties) and take any samples of soil, groundwater or other water, air, or building materials or any other invasive testing requested by Indemnitee and promptly deliver to Indemnitee the results of any such assessment, audit, sampling or other testing; <u>provided</u>, <u>however</u>, if such results are not delivered to Indemnitee within a reasonable period or if the Indemnified Parties have reason to believe that any such environmental hazard or non-compliance exists on the Property that, in the reasonable judgment of the Indemnified Parties, endangers any tenant or occupant or other user of the Property or their guests or the general public or any other Person or may materially and adversely affect the value of the Property, upon reasonable notice to Indemnitor, the Indemnified Parties and any other Person designated by the Indemnified Parties, including, but not limited to, any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times (subject to the rights of Tenants under Leases) to assess any and all aspects of the environmental condition of the Property and its use, including, but not limited to, conducting any environmental assessment or audit (the scope of which shall be determined in the sole and absolute discretion of the Indemnified Parties) and

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

taking samples of soil, groundwater or other water, air, or building materials, and reasonably conducting other invasive testing. Indemnitor shall (and shall cause Mortgage Borrower to) cooperate with and provide the Indemnified Parties and any such Person designated by the Indemnified Parties with access to the Property, subject to the rights of Tenants under Leases.

4.      <u>Indemnification</u>.  Indemnitor covenants and agrees, at its sole cost and expense, to protect, defend, indemnify, release and hold Indemnified Parties harmless from and against any and all Losses (as defined below) imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any presence of any Hazardous Substances in, at, on, above, under, from or migrating to the Property; (b) any past, present or threatened Release of Hazardous Substances in, at, on, above, under, from or migrating to the Property; (c) any activity by Indemnitor, Mortgage Borrower, any Person affiliated with Indemnitor, Mortgage Borrower and/or any tenant or occupant or other user of the Property in connection with any actual, proposed or threatened use, treatment, storage, holding, existence, disposition or other Release, generation, production, manufacturing, processing, refining, control, management, abatement, removal, handling, transfer or transportation to or from the Property of any Hazardous Substances at any time located in, at, under, on, above, from or migrating to the Property; (d) any activity by Indemnitor, Mortgage Borrower, any Person affiliated with Indemnitor, Mortgage Borrower and/or any tenant or occupant or other user of the Property in connection with any actual or proposed Remediation of any Hazardous Substances at any time located in, at, under, on, above, from or migrating to the Property, whether or not such Remediation is voluntary or pursuant to court or administrative order, including, but not limited to, any removal, remedial or corrective action; (e) any past, present or threatened non-compliance or violations of any Environmental Law (or permits issued pursuant to any Environmental Law) in connection with the Property or operations thereon, including, but not limited to, any failure by Indemnitor, Mortgage Borrower, any Person affiliated with Indemnitor, Mortgage  Borrower and/or any tenant or occupant or other user of the Property to comply with any order of any Governmental Authority in connection with any Environmental Law; (f) the imposition, recording or filing or the threatened imposition, recording or filing of any Environmental Lien encumbering the Property; (g) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in this Agreement; (h) any past, present or threatened injury to, destruction of or loss of natural resources in any way connected with the Property, including, but not limited to, costs to investigate and assess such injury, destruction or loss; (i) any acts of Indemnitor, Mortgage  Borrower, any Person affiliated with Indemnitor, Mortgage Borrower and/or any tenant or occupant or other user of the Property in arranging for disposal or treatment, or arranging with a transporter for transport for disposal or treatment, of Hazardous Substances at any facility or incineration vessel containing such or similar Hazardous Substances; (j) any acts of Indemnitor, Mortgage Borrower, any Person affiliated with any Indemnitor, Mortgage Borrower and/or any tenant or occupant or other user of the Property in accepting any Hazardous Substances for transport to disposal or treatment facilities, incineration vessels or sites from which there is a Release, or a threatened Release of any Hazardous Substance which causes the incurrence of costs for Remediation; (k) any liability, Losses or claims arising under any statutory or common law or tort law theory, including, but not limited to, damages assessed for private or public nuisance or for the conducting of an abnormally dangerous activity on or near

6

the Property, to the extent the same relates to Remediation, Hazardous Substances or Environmental Law; and (l) any misrepresentation or inaccuracy in any representation or warranty relating to Remediation, Hazardous Substances or Environmental Law or breach or failure to perform any covenants or other obligations pursuant to this Agreement, the Loan Agreement or the other Loan Documents, in each case to the extent the same relates to Remediation, Hazardous Substances or Environmental Law.

5.     <u>Duty to Defend and Attorneys and Other Fees and Expenses</u>.   Upon written request by any Indemnified Party, Indemnitor shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals reasonably approved by the Indemnified Parties against any action, inquiry or other matter for which such Indemnified Party is indemnified pursuant to this Agreement. Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding, providing that no compromise or settlement shall be entered without Indemnitor's consent, which consent shall not be unreasonably withheld.   Upon demand, Indemnitor shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

6.     <u>Definitions</u>.   As used in this Agreement, the following terms shall have the following meanings:

The term "**Environmental Law**" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances and/or relating to liability for or costs of other actual or threatened danger to human health or the environment. The term "**Environmental Law**" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including, but not limited to, Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; the Oil Pollution Act of 1990; and the Rivers and Harbors Appropriation Act.   The term "**Environmental Law**" also includes, but is not limited to, any present and future federal, state and local laws, statutes, ordinances, rules, regulations, permits or authorizations and the like, as well as common law: (a) conditioning transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property; (b) requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any Governmental Authority or other Person, whether or not in

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

connection with transfer of title to or interest in property; (c) imposing conditions or requirements in connection with permits or other authorization for lawful activity; (d) relating to nuisance, trespass or other causes of action related to the Property involving environmental matters; or (e) relating to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Property and involving environmental matters.

The term "**Environmental Lien**" means any lien, restriction or other encumbrance imposed pursuant to any Environmental Law, regardless of whether due to any act or omission of Indemnitor or any other Person.

The term "**Hazardous Substances**" includes but is not limited to any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Law or that may have a negative impact on human health or the environment, including, but not limited to, Microbial Matter, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives, but excluding substances of kinds and in amounts ordinarily and customarily used or stored in properties similar to the Property for the purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Law.

The term "**Indemnified Parties**" includes Indemnitee, any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved with the servicing of the Loan, any Person in whose name the security interest created by the Pledge Agreement is or will have been filed, Persons who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, Investors or prospective Investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, but not limited to, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of, or following a foreclosure of, the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Indemnitee's assets and business).

The term "**Legal Action**" means any claim, suit or proceeding, whether administrative or judicial in nature.

The term "**Losses**" includes any losses, damages, natural resource damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including, but not limited, to strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, costs of Remediation (whether or not performed voluntarily), amounts paid in settlement, foreseeable and unforeseeable consequential damages, litigation costs, attorneys' fees, engineers' fees, environmental consultants' fees, and investigation costs (including, but not limited to, costs for

sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), of whatever kind or nature, and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

The term "**Microbial Matter**" means fungi or bacterial matter which reproduces through the release of spores or splitting of cells or other means, including, but not limited to, mold, mildew, fungi, fungal spores, fragments and metabolites, such as mycotoxins and microbial organic compounds, and viruses, whether or not any of the same are living.

The term "**Release**" with respect to any Hazardous Substance includes, but is not limited to, any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing (including the abandonment or discarding of barrels, containers or other open or closed receptacles containing Hazardous Substances) into the environment or other movement of Hazardous Substances.

The term "**Remediation**" includes, but is not limited to, any response, remedial, removal, or corrective action; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to prevent, cure or mitigate any Release of any Hazardous Substance; any action to comply with any Environmental Law or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances or to anything referred to herein.

7. <u>Unimpaired Liability</u>.  The liability of Indemnitor under this Agreement shall in no way be limited or impaired by, and Indemnitor hereby consents to and agrees to be bound by, any amendment or modification of the provisions of the Note, the Loan Agreement, the Pledge Agreement or any other Loan Document to or with Indemnitee by Borrower, Principal, Mortgage Borrower or any Person who succeeds Borrower, Principal, Mortgage Borrower or any Person as owner of the Property.  In addition, the liability of Indemnitor under this Agreement shall in no way be limited or impaired by (i) any extensions of time for performance required by the Note, the Loan Agreement, the Pledge Agreement or any of the other Loan Documents, (ii) any sale or transfer of all or part of the Property or any sale or transfer of all or part of the Collateral or the Loan, (iii) except as provided herein, any exculpatory provision in the Note, the Loan Agreement, the Pledge Agreement, or any of the other Loan Documents limiting Indemnitee's recourse to the Collateral or to any other security for the Note, or limiting Indemnitee's rights to a deficiency judgment against Indemnitor, (iv) the accuracy or inaccuracy of the representations and warranties made by Indemnitor herein and by Borrower and/or Principal under the Note, the Loan Agreement, the Pledge Agreement or any of the other Loan Documents or herein, (v) the release of Indemnitor or any other Person from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the other Loan Documents by operation of law, Indemnitee's voluntary act, or otherwise, (vi) the release or substitution in whole or in part of any security for the Note, or (vii) Indemnitee's failure file any UCC financing statements (or Indemnitee's improper recording or filing of any thereof) or to otherwise perfect, protect, secure or insure any security interest or lien given as security for the Note; and, in any such case, whether with or without notice to Indemnitor and with or without consideration.

9

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

8.    <u>Enforcement</u>.  Indemnified Parties may enforce the obligations of Indemnitor without first resorting to or exhausting any security or collateral or without first having recourse pursuant to the Note, the Loan Agreement, the Pledge Agreement, or any other Loan Documents or any of the Collateral, through foreclosure proceedings or otherwise, <u>provided</u>, <u>however</u>, that nothing herein shall inhibit or prevent Indemnitee from suing on the Note, foreclosing, or exercising any of its other rights and remedies under the Pledge Agreement.  This Agreement is not collateral or security for the Obligations of Borrower pursuant to the Loan, unless Indemnitee expressly elects in writing to make this Agreement additional collateral or security for the Obligations of Borrower pursuant to the Loan, which Indemnitee is entitled to do in its sole and absolute discretion.  It is not necessary for an Event of Default to have occurred pursuant to and as defined in the Pledge Agreement or the Loan Agreement for Indemnified Parties to exercise their rights pursuant to this Agreement.  Notwithstanding any provision of the Loan Agreement (including, without limitation, Article 12 thereof), the obligations pursuant to this Agreement are exceptions to any non-recourse or exculpation provision of the Loan Agreement; Indemnitor expressly acknowledges and agrees that it is fully and personally liable for such obligations, and such liability is not limited to the original or amortized principal balance of the Loan or the value of the Collateral.

9.    <u>Survival</u>.  The obligations and liabilities of Indemnitor under this Agreement shall fully survive indefinitely notwithstanding any termination, sexercise of any power of sale, or delivery of an assignment in lieu of foreclosure of the Pledge Agreement.

10.    <u>Interest</u>.  Any amounts payable to any Indemnified Parties under this Agreement shall become immediately due and payable on demand and, if not paid within five (5) days of such demand therefor, shall bear interest at the Default Rate.

11.    <u>Waivers</u>.  Indemnitor hereby waives and relinquishes (i) any right or claim of right to cause a marshaling of Indemnitor's assets or to cause Indemnitee or other Indemnified Parties to proceed against any of the security for the Loan before proceeding under this Agreement against Indemnitor; (ii) all rights and remedies accorded by applicable law to indemnitors or guarantors, except any rights of subrogation which Indemnitor may have, provided that the indemnity provided for hereunder shall neither be contingent upon the existence of any such rights of subrogation nor subject to any claims or defenses whatsoever which may be asserted in connection with the enforcement or attempted enforcement of such subrogation rights, including, without limitation, any claim that such subrogation rights were abrogated by any acts of Indemnitee or other Indemnified Parties; (iii) the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against or by Indemnitee or other Indemnified Parties; (iv) notice of acceptance hereof and of any action taken or omitted in reliance hereon; (v) presentment for payment, demand of payment, protest or notice of nonpayment or failure to perform or observe, or other proof, or notice or demand; and (vi) all homestead exemption rights against the obligations hereunder and the benefits of any statutes of limitations or repose.  Notwithstanding anything to the contrary contained herein, Indemnitor hereby agrees to postpone the exercise of any rights of subrogation with respect to any collateral securing the Loan until the Loan shall have been paid in full.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

12.    <u>Subrogation</u>.  Indemnitor hereby agrees to take any and all reasonable actions, including institution of legal action against third parties, necessary or appropriate to obtain reimbursement, payment or compensation from such Persons responsible for the presence of any Hazardous Substances in, at, under, on, above, from or migrating to the Property or otherwise obligated by law to bear the cost.  The Indemnified Parties shall be and hereby are subrogated to all of Indemnitor's rights now or hereafter in such claims.

13.    <u>Indemnitor's Representations and Warranties</u>.  Each Indemnitor represents and warrants that:

(a)    it has the full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; the execution, delivery and performance of this Agreement by Indemnitor has been duly and validly authorized; and all requisite action has been taken by Indemnitor to make this Agreement valid and binding upon Indemnitor, enforceable in accordance with its terms;

(b)    its execution of, and compliance with, this Agreement is in the ordinary course of business of Indemnitor and will not result in the breach of any term or provision of the charter, by-laws, partnership, operating or trust agreement, or other governing instrument of Indemnitor or result in the breach of any term or provision of, or conflict with or constitute a default under, or result in the acceleration of any obligation under, any agreement, indenture or loan or credit agreement or other instrument to which Indemnitor or the Collateral is subject, or result in the violation of any law, rule, regulation, order, judgment or decree to which Indemnitor or the Collateral is subject;

(c)    to the best of Indemnitor's knowledge, there is no action, suit, proceeding or investigation pending or threatened against it which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of Indemnitor, or in any material impairment of the right or ability of Indemnitor to carry on its business substantially as now conducted, or in any material liability on the part of Indemnitor, or which would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of Indemnitor contemplated herein, or which would be likely to impair materially the ability of Indemnitor to perform under the terms of this Agreement;

(d)    it does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(e)    to the best of Indemnitor's knowledge, no approval, authorization, order, license or consent of, or registration or filing with, any Governmental Authority or other Person, and no approval, authorization or consent of any other Person is required in connection with this Agreement; and

(f)    this Agreement constitutes a valid, legal and binding obligation of Indemnitor, enforceable against it in accordance with the terms hereof.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

14.    <u>No Waiver</u>.  No delay by any Indemnified Party in exercising any right, power or privilege under this Agreement shall operate as a waiver of any such privilege, power or right.

15.    <u>Transfer of Loan</u>.  Article 9 of the Loan Agreement is hereby incorporated by reference as if fully set forth herein.  Indemnitor hereby agrees to cooperate in fulfilling any obligation of Borrower under Article 9 of the Loan Agreement.

16.    <u>Notices</u>.  All notices, demands, requests, consents, approvals or other communications permitted or required to be given under this Agreement shall be given in accordance with the applicable terms and conditions of the Loan Agreement (provided that the notice address for Principal shall be as set forth in the Guaranty).

17.    <u>Governing Law; Submission to Jurisdiction</u>.  The governing law and related provisions set forth in Section 15.4 of the Loan Agreement (including, without limitation, any authorized agent provisions thereof) are hereby incorporated by reference as if fully set forth herein (with Indemnitor substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to Indemnitor hereunder.  Indemnitor hereby certifies that it has received and reviewed the Loan Agreement (including, without limitation, Section 15.4 thereof).  In the event of any conflict or inconsistency between any of the other terms and conditions of this Agreement and this Section 17, this Section 17 shall control.

18.    <u>**Waiver of Trial by Jury**</u>.  **INDEMNITOR HEREBY, AND INDEMNITEE BY ACCEPTANCE HEREOF, EACH AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE, TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, THE PLEDGE AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY INDEMNITOR AND INDEMNITEE AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. INDEMNITOR AND INDEMNITEE EACH IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.**

19.    <u>Duplicate Originals; Counterparts</u>.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement.  The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

20.    <u>No Oral Change</u>.  This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Indemnitor or any Indemnified Party, but only by an agreement in

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

21.    <u>Headings, Etc</u>.    The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

22.    <u>Joint and Several Liability</u>.    If Indemnitor consists of more than one Person or party, the obligations and liabilities of each such Person or party hereunder shall be joint and several.

23.    <u>Number and Gender</u>.    All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Person or Persons referred to may require.

24.    <u>Successors and Assigns</u>.    Without limiting the effect of specific references in any provision of this Agreement, the term "**Indemnitor**" shall be deemed to refer to each and every Person comprising an Indemnitor from time to time, as the sense of a particular provision may require, and to include the heirs, executors, administrators, legal representatives, successors and permitted assigns of Indemnitor, all of whom shall be bound by the provisions of this Agreement, provided that no obligation of Indemnitor may be assigned except with the written consent of Indemnitee.    This Agreement shall be binding upon, and shall inure to the benefit of, Indemnitor and Indemnitee and their respective successors and permitted assigns (and each reference herein to Indemnitee shall be deemed to include its successors and assigns).    This Agreement shall also inure to the benefit of Indemnified Parties and their respective successors, permitted assigns, heirs and legal representatives forever.    Indemnitee may sell, assign, pledge, participate, transfer or delegate, as applicable, to one or more Persons, all or a portion of its rights and obligations under this Agreement and the other Loan Documents.    Any assignee or transferee of Indemnitee shall be entitled to all the benefits afforded to Indemnitee under this Agreement.    Indemnitor shall not have the right to assign, delegate or transfer its rights or obligations under this Agreement without the prior written consent of Indemnitee, and any attempted assignment, delegation or transfer without such consent shall be null and void.

25.    <u>Release of Liability</u>.    Any one or more parties liable upon or in respect of this Agreement may be released without affecting the liability of any party not so released.

26.    <u>Rights Cumulative</u>.    The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies which Indemnitee has under the Note, the Pledge Agreement, the Loan Agreement or the other Loan Documents or would otherwise have at law or in equity.

27.    <u>Inapplicable Provisions</u>.    If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement, and the remaining provision of this Agreement shall remain in full force and effect

13

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement, unless such continued effectiveness of this Agreement, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

28.   <u>Miscellaneous</u>.   (a) Wherever pursuant to this Agreement (i) Indemnitee (or any other Indemnified Party) exercises any right given to it to approve or disapprove any matter, (ii) any arrangement or term is to be satisfactory to Indemnitee (or any other Indemnified Party), or (iii) any other decision or determination is to be made by Indemnitee (or any other Indemnified Party), the decision of Indemnitee (or such other Indemnified Party) to approve or disapprove such matter, all decisions that arrangements or terms are satisfactory to Indemnitee (or such other Indemnified Party) or not satisfactory and all other decisions and determinations made by Indemnitee (or such other Indemnified Party), shall be in the sole and absolute discretion of Indemnitee (or such other Indemnified Party) and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b)   Wherever pursuant to this Agreement it is provided that Indemnitor pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees and disbursements of Indemnitee and the other Indemnified Parties, whether retained outside law firms, or as reimbursements for the expenses of in-house legal staff or otherwise.

(c)   All references herein to "the Property" shall be deemed to refer either to each Individual Property or to the Property as a whole, as the context may require.  It is the intent of the parties that the term Property be construed broadly to afford Indemnitee comprehensive coverage under this Agreement.

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, this Agreement has been executed by Indemnitor as of the day and year first above written.

**INDEMNITOR**:

[Signature pages sent separately]

# EXHIBIT A-18

**Mezzanine Collateral Assignment of Interest Rate Cap Agreement**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## MEZZANINE COLLATERAL ASSIGNMENT OF
## INTEREST RATE CAP AGREEMENT

**MEZZANINE COLLATERAL ASSIGNMENT OF INTEREST RATE CAP AGREEMENT**, dated as of **[_____]**, 2024 (this "**Assignment**"), made by **SILVER STAR MEZZANINE BORROWER, LLC**, a Delaware limited liability company, having its principal place of business at **[_____]** ("**Assignor**") in favor of **RMWC SILVER STAR MEZZANINE LLC**, a Delaware limited liability company, having an address at 130 East 59th Street, 13th Floor, Suite A, New York, New York 10022 (together with its successors and assigns, "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings assigned such terms in that certain Mezzanine Loan Agreement, of even date herewith, between Assignor, as borrower, and Assignee, as lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").

1.    For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Assignor, Assignor hereby assigns, grants, delivers and transfers to Assignee, as collateral, all of its interest, whether now owned or hereafter acquired, now existing or hereafter arising, wherever located, in, to and under that certain Confirmation and Agreement (Reference Number **[_____]**), dated **[_____]**, 20**[__]**, between Assignor and **[_____]**, as the counterparty thereunder ("**Counterparty**") (together with that certain ISDA Master Agreement (Multicurrency-Cross Border) form deemed to have been executed by Assignor and Counterparty concurrently with the Confirmation and Agreement pursuant to the terms of such Confirmation and Agreement, the "**Interest Rate Cap Agreement**"), including, but not limited to, any and all rights that such Assignor may now or hereafter have to any and all payments, disbursements, distributions or proceeds (collectively, "**Payments**") owing, payable or required to be delivered to Assignor on account of the Interest Rate Cap Agreement with respect to the period commencing on the date hereof and ending on the date on which Borrower shall have repaid the Loan in its entirety, and all proceeds of any or all of the foregoing (collectively, the "**Cap Collateral**"). Assignor hereby grants to Assignee a security interest in and to the Interest Rate Cap Agreement, the Cap Collateral and all Proceeds (as defined in the Uniform Commercial Code adopted in the State of New York (the "**UCC**")) thereof, to have and to hold the same, unto Assignee, its successors and assigns, and Assignor covenants and agrees to cause all Payments to be made directly to Assignee. This Assignment constitutes additional security for the obligations of Assignor secured by the Loan Agreement and secured or evidenced by the other Loan Documents.

2.    Counterparty hereby consents to the assignment contained in Paragraph 1 hereof and agrees that it will make any Payments that become payable under or pursuant to the Interest Rate Cap Agreement directly into the Interest Rate Cap Reserve Account (or into such other Account as Lender may designate) until such time as this Assignment is terminated or otherwise canceled, at which time Counterparty will be instructed to make payments to or on behalf of Assignor.

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

3.      Prior to the occurrence of an Event of Default, Payments received by Assignee shall be deposited into the Interest Rate Cap Reserve Account (or into such other Account as Lender may designate) and applied to payments becoming due under the Note, as and when such payments are due.  Upon the occurrence and during the continuance of an Event of Default (a) Payments received by Assignee may be applied by Assignee to any principal, interest and other amounts owing by Borrower under the Note and the other Loan Documents in such order and priority as Assignee shall determine in its sole and absolute discretion and (b) Assignee shall be entitled to exercise all remedies provided in the UCC with respect to the security interest being granted herein.

4.      Except in connection with permitted transfers or encumbrances that do not require Assignee's written consent or approval pursuant to the Loan Documents, Assignor hereby covenants and agrees that Assignor shall not, without first obtaining Assignee's or its successor's or assign's written consent, convey, assign, sell, mortgage, encumber, pledge, hypothecate, grant a security interest in, grant an option or options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration) the Interest Rate Cap Agreement.  Assignor and Counterparty hereby covenant and agree that neither Assignor nor Counterparty shall, without first obtaining Assignee's or its successor's or assign's written consent, amend, modify, cancel or terminate the Interest Rate Cap Agreement.  Assignee agrees to be bound by all of the terms, covenants and conditions of the Interest Rate Cap Agreement to which Assignor is bound.

5.      In the event that for any reason the Interest Rate Cap Agreement ever expires, or is terminated, rescinded or revoked and, as a result thereof, a termination fee or such similar payment is owing to Assignor by Counterparty, such sum is and shall be considered a Payment and a part of the Cap Collateral and shall be held and disbursed by Assignee in accordance with the terms hereof; provided, however, that so long as no Event of Default has occurred and is continuing, Assignee will (a) make such termination fee or similar payment available to Assignor to be applied to the reasonable and customary costs and expenses payable by Assignor in connection with Assignor's replacement of the Interest Rate Cap Agreement and (b) disburse the balance of such termination fee or similar payment to Assignor if Assignor has replaced the Interest Rate Cap Agreement in accordance with the terms and provisions of this Assignment and the other Loan Documents, and such replacement Interest Rate Cap Agreement is in fact in full force and effect.

6.      Assignor represents and warrants that:  (a) it has the full power, right and authority to assign its interest in the Cap Collateral, (b) Assignor owns the Cap Collateral free and clear of all liens and claims of others and Assignor has not transferred, assigned, granted a security interest in or otherwise encumbered its interest in and to the Cap Collateral other than in favor of Assignee, (c) no security agreement, financing statement or other document is on file or of record in any public office with respect to the Cap Collateral, other than in favor of Assignee, (d) the obligation of Counterparty under the Interest Rate Cap Agreement to make Payments is not subject to any defense or counterclaim arising from any act or omission of Assignor or any Affiliate of Assignor, (e) the location of its chief executive office is the address set forth in the caption to this Assignment and (f) upon the filing of UCC Financing Statements naming

2

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

Assignor as debtor and Assignee as secured party in the Office of the Secretary of State of the State of Delaware, Assignee will have a first priority perfected lien on the Cap Collateral.

7.      Assignor covenants and agrees with Assignee as follows:  (a) it will comply with all terms of the Interest Rate Cap Agreement within the time periods provided therein, (b) it will not (i) waive any material provision of the Interest Rate Cap Agreement, (ii) fail to deliver a copy of any notice received from Counterparty to Assignee, or (iii) without the prior written consent of Assignee, fail to exercise any right thereunder and (c) it will not change the location of its state of organization from the location specified in the caption to this Assignment unless, in conjunction therewith, Assignor executes and delivers to Assignee such additional UCC Financing Statements as Assignee shall reasonably request to allow for Assignee's continued prior and perfected lien on the Cap Collateral.

8.      Assignor further covenants and agrees with Assignee that it will at any time and from time to time, upon the written request of Assignee, and at the sole expense of Assignor, promptly and duly execute and deliver such further instruments and documents and take such further action as Assignee may reasonably request for the purpose of obtaining or preserving the full benefits of this Assignment and of the rights and powers herein granted, including, without limitation, the filing of any financing or continuation statements under the UCC.  Assignor also hereby authorizes Assignee to file any such financing or continuation statement without the signature of Assignor to the extent permitted by applicable law.  A carbon, photographic or other reproduction of this Assignment shall be sufficient as a financing statement for filing in any jurisdiction.

9.      This Assignment does not include the delegation to Assignee of any of Assignor's duties, responsibilities or obligations under the Interest Rate Cap Agreement, Assignor remaining liable to perform all duties, responsibilities and obligations to be performed by Assignor thereunder, and Assignee shall not have any obligation or liability under the Interest Rate Cap Agreement or by reason of or arising out of this Assignment or the receipt by Assignee of any Payment and Assignor specifically agrees to indemnify and forever hold Assignee harmless from any claim or liability on account thereof, including, without limitation, attorneys' fees incurred, except to the extent arising from the fraud, gross negligence, illegal acts or willful misconduct of Assignee, its agents, employees or contractors.

10.      Assignee shall only be accountable for Payments actually received by it hereunder.  Assignee's sole duty with respect to the custody, safekeeping and physical preservation of the Cap Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Assignee deals with similar property for its own account.  Neither Assignee nor any of its directors, officers, employees or agents (i) shall be liable for failure to demand, collect or realize upon all or any part of the Cap Collateral, or for any delay in doing so, or (ii) shall be under any obligation to (a) sell or otherwise dispose of any Cap Collateral upon the request of any Assignor or any other person or (b) take any other action whatsoever with regard to the Cap Collateral or any part thereof.  The powers conferred on Assignee hereunder are solely to protect Assignee's interests in the Cap Collateral and shall not impose any duty upon Assignee to exercise any such powers.  Assignee shall be accountable only for amounts it actually receives as a result of the exercise of such powers, and neither it nor

any of its officers, directors, employees or agents shall be responsible to Assignor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

11.     Any notices required to be given under this Assignment shall be given in the manner provided in Section 15.5 of the Loan Agreement.

12.     This Assignment may not be modified, amended or terminated except by a written agreement executed by all of the parties hereto.

13.     Any provision of this Assignment that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

14.     Assignee shall not by any act (except by a written instrument), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof. No failure by Assignee to exercise, nor any delay by Assignee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by Assignee of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Assignee may otherwise have on any future occasion.  The rights and remedies of Assignee herein provided are cumulative, may be exercised singularly or concurrently, and are not exclusive of any rights or remedies provided by law.

15.     The parties hereto hereby notify Counterparty of this Assignment and the security interests granted to Assignee hereunder and instruct Counterparty to make all payments to be made under or pursuant to the terms of the Interest Rate Cap Agreement, without set-off, defense or counterclaim, to Assignee in accordance with written instructions (subject to the terms hereof) delivered by Assignee, its successors or assigns, to Counterparty at the address set forth under its signature hereto.

16.     The governing law and related provisions set forth in Section 15.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein (with Borrower and Counterparty substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to Borrower and Counterparty hereunder.  In the event of any conflict or inconsistency between any of the other terms and conditions of this Agreement and this Section 16, this Section 16 shall control.

17.     This Assignment shall terminate upon the earlier to occur of (a) the termination or expiration of the Interest Rate Cap Agreement and (b) the payment in full of the Loan.

18.     This Assignment shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective successors and assigns.  If more than one Person has executed

this Assignment as "Assignor," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

19.     This Assignment may be executed in any number of counterparts each of which shall be an original, but all of which shall constitute one instrument.

20.     Assignee shall have the right to assign this Assignment and its obligations hereunder in connection with an assignment of the Loan.  The parties hereto acknowledge that following the execution and delivery of this Assignment, Assignee may sell, transfer and assign this Assignment, the Loan and the other Loan Documents.  All references to "Assignee" hereunder shall be deemed to include the assigns of Assignee and the parties hereto acknowledge that actions taken by Assignee hereunder may be taken by Assignee's agents and by the agents of the assigns of Assignee.

21.     The provisions of <u>Section 12.1</u> of the Loan Agreement are hereby incorporated by reference as if fully set forth herein.

22.     In consideration of the foregoing agreement by Counterparty, Assignor agrees that (a) Counterparty shall be entitled to conclusively rely (without any independent investigation) on any notice or instructions from Assignee in respect of the Interest Rate Cap Agreement and (b) Counterparty shall be held harmless and shall be fully indemnified by Assignor, from and against any and all claims, other than those arising out of the gross negligence or willful misconduct of Counterparty, and from and against any damages, penalties, judgments, liabilities, losses or expenses (including attorney's fees and disbursements) reasonably incurred by Counterparty as a result of the assertion of any claim, by any person or entity, arising out of, or otherwise related to, any actions taken or omitted to be taken by Counterparty in reliance upon any such instructions or notice provided by Assignee.  Except as may be expressly permitted pursuant to the terms or provisions of the Interest Rate Cap Agreement, Counterparty covenants with Assignee that Counterparty shall not terminate or amend any of the terms or provisions of the Interest Rate Cap Agreement during the term of this Assignment without the prior written consent of Assignee, which consent may be withheld by Assignee in its reasonable discretion.

23.     THE PARTIES HEREBY AGREE THAT (A) COUNTERPARTY'S EXECUTION BELOW BY ELECTRONIC MEANS SHALL HAVE THE SAME LEGAL EFFECT AS COUNTERPARTY'S ORIGINAL SIGNATURE AND THE PARTIES MAY RELY UPON THE BINDING AND ENFORCEABLE EFFECT OF SUCH ELECTRONIC SIGNATURE, AND (B) THAT THE DELIVERY OF COUNTERPARTY'S SIGNATURE BY ELECTRONIC DELIVERY IN .PDF FORMAT SHALL HAVE THE SAME LEGAL EFFECT AS THE DELIVERY OF COUNTERPARTY'S ORIGINAL SIGNATURE AND THE PARTIES MAY RELY UPON THE BINDING AND ENFORCEABLE EFFECT OF SUCH DELIVERY.  AS SOON AS REASONABLY PRACTICAL, COUNTERPARTY SHALL PROVIDE AN ORIGINAL SIGNATURE TO ASSIGNEE.

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, Assignor and Assignee have duly executed this Assignment on the day and year first written above.

**ASSIGNOR:**

[Signature pages sent separately]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**ASSIGNEE:**


[Signature pages sent separately]

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**THE UNDERSIGNED HEREBY ACKNOWLEDGES RECEIPT OF NOTICE OF THE FOREGOING ASSIGNMENT AND CONSENTS THERETO AND AGREES THAT THE UNDERSIGNED SHALL HEREAFTER CAUSE ALL PAYMENTS REQUIRED TO BE MADE BY THE UNDERSIGNED PURSUANT TO THE TERMS OF THE INTEREST RATE CAP AGREEMENT TO BE MADE DIRECTLY TO ASSIGNEE, ITS SUCCESSORS OR ASSIGNS, IN ACCORDANCE WITH WRITTEN INSTRUCTIONS (BUT SUBJECT TO THE TERMS OF THE ASSIGNMENT) TO BE DELIVERED BY ASSIGNEE, ITS SUCCESSORS OR ASSIGNS, TO THE UNDERSIGNED AT THE ADDRESS SET FORTH BELOW.  THE UNDERSIGNED FURTHER AGREES THAT ALL SUCH PAYMENTS SHALL BE MADE TO ASSIGNEE WITHOUT SET-OFF, DEFENSE OR COUNTERCLAIM.  THE UNDERSIGNED AGREES THAT IT SHALL NOT AMEND OR MODIFY THE INTEREST RATE CAP AGREEMENT WITHOUT THE PRIOR WRITTEN CONSENT OF ASSIGNEE, ITS SUCCESSORS OR ASSIGNS.**

**COUNTERPARTY:**

[_____],
a [_____]
By: _____
        Name:
        Title:

Address:  [_____]
          [_____]
          [_____]
          [_____]
          Attention:  [_____]
          Email:  [_____]
          Facsimile No.:  (\_\_\_) \_\_\_-\_\_\_\_
          Telephone No.:  (\_\_\_) \_\_\_-\_\_\_\_

Date:  _____, 20\_\_\_\_

Reference No.:  _____

# EXHIBIT A-19

**Mezzanine Borrower's Certificate**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## BORROWER'S CERTIFICATION

In connection with that certain mezzanine loan (the "**Loan**") being made by **RMWC SILVER STAR MEZZANINE LLC**, a Delaware limited liability company, having an address at 130 East 59th Street, 13th Floor, Suite A, New York, New York 10022 (together with its successors and/or assigns, "**Lender**") to **SILVER STAR MEZZANINE BORROWER, LLC**, a Delaware limited liability company, having an address at [_____] ("**Borrower**"), which Loan is secured by the Property, the undersigned hereby represents, warrants and certifies to Lender as of this [____] day of [_____], 2024:

1.      Attached hereto as <u>Exhibit A</u> is a true, complete and accurate copy of the rent roll of the Property and there has been no material adverse change in the rent roll since the date thereof.

2.      Attached hereto as <u>Exhibit B</u> is a true complete and correct copy of the current annual budget for the Property.

3.      Attached hereto as <u>Exhibit C</u> are true, complete and accurate copies (including all amendments thereto) of the following documents with respect to Borrower:  (i) articles of incorporation, articles of organization, certificate of formation or certificate of limited partnership (or similar document), as applicable, (ii) bylaws, operating agreement or partnership agreement (or similar document), as applicable, (iii) good standing certificate or certificate of existence (or similar document), as applicable, in the state in which Borrower is formed or organized, (iv) qualification to do business in the state in which the Property is located, if different from the state in which Borrower is formed or organized and (v) if applicable, authorizing consents or resolutions, as applicable.

4.      Attached hereto as <u>Exhibit D</u> are true, complete and accurate copies (including all amendments thereto) of the following documents with respect to Mortgage Borrower (as defined in that certain Mezzanine Loan Agreement dated as of the date hereof between Borrower and Lender):   (i) articles of incorporation, articles of organization, certificate of formation or certificate of limited partnership (or similar document), as applicable, (ii) bylaws, operating agreement or partnership agreement (or similar document), as applicable, (iii) good standing certificate or certificate of existence (or similar document), as applicable, in the state in which Borrower is formed or organized, (iv) qualification to do business in the state in which the Property is located, if different from the state in which Borrower is formed or organized and (v) if applicable, authorizing consents or resolutions, as applicable.

5.      Attached hereto as <u>Exhibit E</u> is a true, complete and accurate copy (including all amendments thereto) of each operations and maintenance plan applicable to the Property (individually and, if more than one, collectively, the "**O&M Program**").

6.      Attached hereto as <u>Exhibit F</u> are true, complete and accurate copies (including all amendments thereto) of the following documents with respect to Guarantor:  (i) articles of incorporation, articles of organization, certificate of formation or certificate of limited

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

partnership (or similar document), as applicable, (ii) bylaws, operating agreement or partnership agreement (or similar document), as applicable, (iii) good standing certificate or certificate of existence (or similar document), as applicable, in the state in which Guarantor is formed or organized and (iv) if applicable, authorizing consents or resolutions, as applicable.

7.      Attached hereto as <u>Exhibit G</u> is a true, complete and accurate copy (including all amendments thereto) of the Business Plan (including the related budget).

Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed thereto in that certain Mezzanine Loan Agreement by and between Borrower and Lender of even date herewith (the "**Loan Agreement**").

**[NO FURTHER TEXT ON THIS PAGE]**

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**IN WITNESS WHEREOF**, the undersigned has caused this certificate to be executed as of the day and year first above written.

BORROWER:

**SILVER STAR MEZZANINE BORROWER, LLC**, a Delaware limited liability company

By:_____
   Name:
   Title:

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT A**

(RENT ROLL)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT B**

(ANNUAL BUDGET)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT C**

(BORROWER ORGANIZATIONAL DOCUMENTS)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

# EXHIBIT D

(MORTGAGE BORROWER ORGANIZATIONAL DOCUMENTS)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

## EXHIBIT E

(O&M PROGRAM)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT F**

(GUARANTOR ORGANIZATIONAL DOCUMENTS)

(attached hereto)

*Draft Dated 2/15/2024*
*Non-Binding*
*Subject to Ongoing Review and Revision*

**EXHIBIT G**

(BUSINESS PLAN)

(attached hereto)