# EXHIBIT A

**Purchase Agreement**

## PURCHASE AND SALE AGREEMENT

1. **PARTIES:** Hartman SPE, LLC, a Delaware limited liability company ("Seller") agrees to sell and convey to Texas Trust Credit Union, a Texas chartered credit union ("Buyer"), and Buyer agrees to buy from Seller, the following property for the consideration and upon and subject to the terms, provisions and conditions hereinafter set forth in this Purchase and Sale Agreement (the "Contract"). Notwithstanding the foregoing, the agreement by Seller to sell and convey the Property to Buyer and to close the sale is qualified in its entirety by the approval and authorization of such sale and conveyance by Seller's lender, and the United States Bankruptcy Court of Delaware. On or about September 13, 2023, the Seller filed a voluntary petition for reorganization under chapter 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court of Delaware (the "Bankruptcy Court"). The Seller's case is No. 23-11452 (the "Bankruptcy Case"). The parties acknowledge that this Contract shall not be effective unless and until approved by the Bankruptcy Court. For purposes of this Contract, the term "Effective Date" means the date on which the Seller has received Bankruptcy Court approval of this Contract pursuant to a final order of the Bankruptcy Court and Seller and Buyer have signed this Contract.

2. **PROPERTY:** A tract of land located at 1521 North Cooper Street, Arlington, Tarrant County, Texas (the "Land"), together with all buildings and other improvements located on, attached to, or used in connection therewith (the "Improvements"); all privileges and appurtenances pertaining thereto, including any right, title and interest of Seller in and to adjacent streets, alleys or rights-of-way; all easements benefiting the Land and Improvements, and all addenda thereto (the "Appurtenances"); the Land is described as set out on Exhibit "A", attached hereto and incorporated herein by reference; together with: (i) all assignable licenses, permits, certificates of occupancy and other approvals issued by any governmental or quasi-governmental authority pertaining to the use, operation or maintenance of the Land and Improvements which are in Seller's possession and control (the "Licenses and Permits"); (ii) all keys and combinations to all doors, cabinets, safes, enclosures and other locking items or areas on or about the Land and Improvements which are in Seller's possession or control; (iii) all plans, engineering and other reports, surveys and specifications pertaining to the Land and Improvements which are in Seller's possession and control; (iv) all furniture, fixtures, equipment, and other tangible items owned by Seller and located at the Property ("FF&E"); (v) to the extent assignable by Seller to Buyer, all of Seller's right, title and interest in any and all names (excluding entity names), brochures, manuals, illustrations, drawings, photographs, reports, studies, improvements to all such property, whether in hard copy or electronic form (the "Intellectual Property"); (vi) all of Seller's right, title, and interest in any leases, licenses, occupancy agreements, or other agreements demising space in and providing for the use or occupancy of the Land and Improvements (collectively, "Leases"), and the security deposits for the Leases; (vii) to the extent assignable by Seller to Buyer, all of Seller's right, title, and interest in and to any service or maintenance contracts for the provision of labor, services, materials, or supplies relating to the ownership, maintenance, and operation of the Land and Improvements and FF&E and which are expressly assumed by Buyer under this Contract unless terminated or rejected by Buyer as set forth in Section 12.D.(3) (each a "Service Contract," and collectively, "Service Contracts"). The above listed items are herein collectively called the "Property". The Land, Improvements and Appurtenances are herein referred to collectively as the "Real Property".

3. **CONTRACT SALES PRICE:**

Immediately available funds, payable at closing Eight Million Seven Hundred Fifty Thousand and No/100 Dollars ($8,750,000.00) (the "Sales Price").

The Sales Price is not based upon the number of acres/square feet comprising the Property as determined by the Survey (defined below) and is not subject to adjustment based upon the Survey.

4. **EARNEST MONEY, INDEPENDENT CONSIDERATION AND EFFECTIVE DATE:**

As a condition precedent to the validity of this Contract, within two (2) business days after Seller and Buyer execute this Contract, Buyer shall deposit with the Title Company (defined below) as Earnest Money (the "Earnest

Money"), the sum of Eighty Seven Thousand Five Hundred and No/100 Dollars ($87,500.00) in the form of immediately available funds.

As independent consideration for the rights granted to Buyer hereunder, One Hundred and No/100 Dollars ($100.00) of the Earnest Money shall be independent consideration and nonrefundable to Buyer (the "Independent Consideration"). The Independent Consideration is non-refundable to Buyer. However, the Independent Consideration shall be applied against the Sales Price at Closing. In the event Buyer fails to consummate this Contract for any reason other than Buyer's right of termination provided in Section 7.A, the Title Company shall forward the Independent Consideration to Seller upon receipt of a notice from Seller certifying that Buyer has elected to terminate the Contract.

5. **SURVEY:** Within fifteen (15) days from the Effective Date hereof, Seller shall deliver to Buyer a copy of any existing survey for the Real Property ("Seller's Survey"). Seller agrees to execute a No Change Affidavit in Seller's standard form approved by the Title Company at Closing. Buyer may, at its cost and expense, cause the Seller's Survey to be updated. In such event, Buyer shall provide Seller and the Title Company with copies of the same within twenty (20) days after the date Buyer receives Seller's Survey. If Buyer does not provide an updated survey, then Seller's Survey shall be defined as the "Survey" herein. If Buyer provides an updated survey, then such updated survey shall be defined as the "Survey" herein.

6. **TITLE COMMITMENT:** Within fifteen (15) days from the Effective Date hereof, Seller shall cause the Title Company (hereinafter defined) to deliver to Buyer an Owner's Title Insurance Policy Commitment issued by Republic Title of Texas, Inc. Attention: Jeff Porter, 2626 Howell Street, 10th Floor, Dallas, Texas 75204, Telephone: (214) 855-8820, Fax: (972) 516-2520, Email: jporter@republictitle.com (the "Title Company"), covering the Real Property and committing to issue an Owner's Policy of Title Insurance (the "Title Policy") to Buyer, with legible copies of all instruments and documents referred to therein as exceptions to title ("Title Commitment").

7. **APPROVAL PERIOD AND TITLE:**

A.      Title Review. Buyer shall have fifteen (15) days after its receipt of the last of (i) its receipt of the Title Commitment and (ii) the receipt of the Survey or if Buyer updates the Seller's Survey, the date by which Buyer must obtain the same, whichever occurs first to review them and to deliver in writing to Seller such objections as Buyer may have to anything contained in them. In addition to the matters listed in paragraph (B) of this Section 7, any such item to which Buyer shall not timely object shall be deemed a "Permitted Exception." If there are objections by Buyer to matters of title which are not listed in paragraph (B) of this Section 7, Seller shall have the option, but not the obligation to satisfy them prior to the fifth (5th)business day preceding the expiration of the Feasibility Period (as that term is defined in Section 8. of this Contract), but Seller shall not be required to incur any cost to do so. If Seller does not deliver the election notice responding to Buyer's objections on or prior to the deadline set forth above, Seller shall be deemed to have elected not to cure or satisfy all of Buyer's objections. If Seller delivers written notice to Buyer at least five (5) days before the expiration of the Feasibility Period that Seller is unable or unwilling to satisfy any of such objections, or alternatively, if Seller fails to timely deliver any election notice responding to Buyer's objections, Buyer must elect, prior to the expiration of the Feasibility Period, to either accept such title as Seller is able to convey or terminate this Contract by written notice to Seller delivered within said Feasibility Period. Whether Buyer elects to accept such title as Seller may convey, or terminate the Contract, as contemplated by the immediately preceding sentence, Buyer shall have no other rights or remedies against Seller because of Seller's inability to cure, or election or deemed election not to cure, said title objections or convey such title. Should Buyer fail to expressly elect to accept such title as Seller may convey or terminate this Contract within the allotted period, Buyer shall be deemed to have elected to accept such title as Seller may convey. Notwithstanding anything contained herein to the contrary, Seller may not, at any time after the Effective Date and during the pendency of this Contract, place any encumbrances and/or restrictions, except to the extent required by applicable law or required by any condemnation action or deed in lieu thereof, on the Property without the prior written consent of Buyer, not to be unreasonably withheld.

B.      Permitted Exceptions. Buyer hereby agrees that the following exceptions to be described in the Title Commitment are hereby deemed to be "Permitted Exceptions": (i) zoning ordinances, (ii) standby fees,

taxes and assessments for the current year, (iii) utility easements common to any subdivision of which the Property is a part, and (iv) exceptions required by the Texas State Board of Insurance; however:

(1)    the exception as to area and boundaries shall be deleted, except for "any shortages in area"; and, if deleted, such deletion shall be an expense of Buyer;

(2)    the exception as to restrictive covenants shall be deleted or list only Permitted Exceptions approved or deemed approved pursuant to Section 7.A.;

(3)    the exception as to taxes shall be limited to taxes for the current year which are not yet due and payable and subsequent years, and subsequent assessments for prior years due to changes in land usage or ownership;

(4)    there shall be no standard exception for rights of parties in possession;

(5)    there shall be no exception for visible and apparent easements;

Buyer shall have no right to terminate this Contract based on any objection to such items.

C.    <u>Title to be Conveyed</u>: Seller shall have and will convey to Buyer good and indefeasible title to the Property free and clear of any and all encumbrances except the Permitted Exceptions at the Closing.

## 8. **FEASIBILITY PERIOD**:

A.    <u>Feasibility Study</u>. Buyer is granted the right to conduct an engineering and/or market and economic feasibility study (the "Feasibility Study") of the Property, including a physical inspection of all Real Property and make such other investigations of the Property as it may desire. Buyer shall have until the forty fifth (45th) day after the Effective Date (the "Feasibility Period") to perform such studies and inspections; and in this regard, Buyer or its designated agents may, after having given reasonable prior notice, not less than twenty-four (24) hours advance notice by telephone or email, to Seller, to enter upon the Real Property for purposes of such analysis, examinations or other tests and inspections which may be deemed appropriate by Buyer. Seller or any or its representatives, agents, contractors, or employees shall have the right to accompany Buyer upon Buyer's inspection of the Real Property, but such right shall not delay Buyer's access to the Real Property. Buyer must obtain Seller's consent and approval prior to conducting any invasive and intrusive soil and engineering tests on the Real Property. In conducting any investigations, inspections, tests and studies of the Real Property, Buyer and its designated agents and representatives shall: (i) not unreasonably interfere with Seller's current operation, use and maintenance of the Real Property; (ii) not damage any part of the Real Property or any personal property owned or held by Seller or any third party; (iii) not injure or otherwise cause bodily harm to Seller or any of its partners, agents, contractors and employees, or any tenant or other third party; (iv) maintain commercial general liability insurance in the amount of One Million Dollars ($1,000,000.00) and on terms otherwise reasonably satisfactory to Seller covering any accident arising in connection with the presence of Buyer or its designated agents and representatives on the Real Property and shall deliver a certificate of insurance verifying such coverage to Seller, naming Seller as an additional insured, prior to any entry upon the Real Property; (v) promptly pay when due the costs of all tests, investigations, studies and examinations done with regard to the Real Property; (vi) not permit any liens to attach to the Real Property by reason of the exercise of its rights hereunder; (vii) restore the Real Property and personal property as close as commercially reasonably possible to the condition in which the same was found before any such inspections, tests or studies were undertaken; and (viii) not reveal or disclose any information obtained prior to Closing concerning the Property to anyone outside Buyer's organization except in accordance with the confidentiality standards set forth in Section 21.

Buyer shall instruct its employees, representatives, contractors or agents not to communicate about the existence of the Contract or any possible transaction relating to the Property with any of Seller's employees, representatives, contractors or agents, except as otherwise expressly authorized by Seller in writing. Buyer further agrees to take commercially reasonable measures not to discuss the sale of the Property, this Contract, and/or

Buyer's anticipated future plans for the Property within earshot of any of Seller's employees, representatives, contractors or agents at the Real Property, and to use commercially reasonable efforts to schedule entry on the Real Property at such times to minimize the number of Seller's employees, representative, contractors or agents, that may be present on the Real Property. Further, Buyer shall instruct its employees, representatives, contractors and agents not to wear or otherwise display any logos, tradenames or other marks that would identify Buyer's employees, agents or representatives as being related to Buyer during their entry upon the Real Property. Buyer shall conduct its inspection of the Real Property in a commercially reasonable manner to minimize interference with Seller's or any tenant's use of the Real Property.

       B.    <u>Property Information</u>. Incident to Buyer's Feasibility Study, Seller shall, within fifteen (15) days after the Effective Date, deliver to Buyer, or otherwise make available to Buyer, complete and legible copies of those items relating to the Property (the "Property Information") listed on Exhibit "B" attached hereto to the extent Seller is currently in possession and control of such items. Seller has no obligation to create any reports, financial statements or schedules under this Section. Seller reserves the right, for a period of one (1) year following the date of Closing, to make copies of all Property Information, including but not limited to tenant documents that are provided to Buyer in accordance with this Section 8(B). **Buyer acknowledges and agrees that the Property Information set forth in Exhibit "B" and any other documents and information provided to Buyer by or on behalf of Seller (including, without limitation, any environmental reports, tests or results) have been, are, and will be furnished merely as a courtesy and under the express condition that Seller expressly disclaims any and all representations and warranties with respect thereto and Buyer shall make its independent verification of the accuracy of the documents and information. Buyer agrees that it shall not attempt to assert any liability against Seller by reason of Seller's having furnished such documents and/or information or for the reason of any such documents and/or information becoming or proving to have been incomplete, incorrect, or inaccurate in any respect.**

       C.    <u>Buyer's Termination Right</u>. If Buyer determines, in Buyer's sole judgment, that the Property is not suitable for any reason for Buyer's intended use or purpose, then Buyer may on written notice to Seller on or before the expiration of the Feasibility Period terminate this Contract, and the Earnest Money shall be returned to Buyer. If the written notice is not given to Seller within such period, this condition and any and all objections with respect to the Feasibility Study shall be deemed to have been waived by Buyer for all purposes, and the Earnest Money shall be nonrefundable (except as delineated in Sections 16, 18 and 19). In the event this Contract shall not close, Buyer shall restore the Real Property as close as is commercially reasonably possible to its condition if changed due to the tests and inspections performed by Buyer and shall provide Seller with a copy of the results of any tests and inspections made by Buyer, excluding any market and economic feasibility studies ("Reports"). **Seller acknowledges and agrees that the Reports and any other documents and information provided to Seller by or on behalf of Buyer (including, without limitation, any environmental reports, tests or results) have been, are, and will be furnished merely as a courtesy and under the express condition that Buyer expressly disclaims any and all representations and warranties with respect thereto and Seller shall make its independent verification of the accuracy of the Reports. Seller agrees that it shall not attempt to assert any liability against Buyer by reason of Buyer's having furnished such Reports or for the reason of any such reports becoming or proving to have been incomplete, incorrect, or inaccurate in any respect.** Seller acknowledges and agrees that Buyer may expend substantial sums of money in connection with its investigation of the Property and that such expenditures shall be deemed as additional consideration for this Contract.

       D.    <u>Buyer's Indemnity</u>. Except to the extent caused by the negligence or willful misconduct of any of the Indemnitees, Buyer shall further indemnify, defend, protect and hold Seller and its representatives, agents, employees and contractors (collectively, "Indemnitees") harmless from and against any and all liens, claims, losses, liabilities, damages, costs, expense, causes of action and expense (including reasonable attorneys' fees and court costs) arising out of the exercise of Buyer's rights under this Section 8. The terms of this Section shall survive the Closing or earlier termination of this Contract.



E. <u>Conditions Precedent</u>. Buyer's obligation to consummate the transaction contemplated herein is conditioned upon satisfaction of each of the following conditions at or prior to the Closing, any one or more of which conditions precedent may be waived by Buyer in Buyer's sole discretion:

(1)     <u>Representations and Warranties.</u> None of the representations and warranties of Seller set forth in Section 17 hereof shall be untrue or inaccurate in any material respect;

(2)     <u>Seller's Covenants</u>.  From and after the expiration of the Buyer's Feasibility Period, Seller shall not (i) enter into any lease affecting the Property, (ii) enter into any modification, amendment or termination of any of the tenant teases (other than a termination which results from a default by a tenant beyond any applicable notice and cure period), (iii) consent to any assignment or sublease under any of the tenant leases, (iii) enter into any new service contracts for the Property which would survive Closing, or (iv) undertake any capital improvement project exceeding $100,000.00 in each instance, except to the extent the same is required by applicable law, ordinances, any REA, or to comply with any other restriction, or to comply with any Lease, or to prevent the Property from becoming a potential hazard to person or property.

(3)     <u>Tenant Estoppels.</u> Buyer shall have received tenant estoppel certificates substantially in the form attached hereto as Exhibit "G" from tenants occupying an aggregate of not less than seventy five percent (75%) of the leased space in the Improvements, including all tenants occupying 10,000 or more rentable square feet, it being understood that (i) subject to the terms of Section 13, Seller shall use commercially reasonable efforts to obtain such certificates from all tenants, but shall not be obligated to make any payment or incur any liability or obligation in order to obtain such certificates; (ii) Seller may, at its option, deliver a certificate from Seller certifying as to substantially the same information as would otherwise have been provided with respect to not more than ten percent (10%) of the leased space in the Improvements for purposes of satisfying the foregoing requirements; and (iii) if Seller is unable to obtain such estoppel certificates from the requisite number of tenants and Seller is unable or unwilling to provide certificates from Seller satisfying such requirement, then Buyer may either waive such requirement and proceed with the Closing or terminate this Contract by delivering written notice to Seller on or before Closing, in which event the Earnest Money shall be returned to Buyer and the parties shall be relieved of any further liability hereunder.

9.  **CLOSING**: The Closing of the sale, including funding of the Sales Price, shall occur on or before fifteen (15) days after the expiration of the Feasibility Period at 11:00 a.m., Central Standard Time, unless otherwise agreed by the parties (the "Closing Date").

A. <u>Seller's Closing Obligations</u>. At closing (the "Closing"), Seller shall deliver to Buyer, at Seller's sole cost and expense, the following:

(1)     A duly executed and acknowledged Special Warranty Deed, in substantially the form attached as Exhibit "C", conveying good and indefeasible title in fee simple to all of the Property to Buyer, free and clear of any and all liens, encumbrances, conditions, easements, assessments, reservations and restrictions, subject to the Permitted Exceptions.

(2)     A duly executed Bill of Sale, in substantially the form attached as Exhibit "D", containing special warranties of title, conveying title to the FF&E, to Buyer, free and clear of all liens.

(3)     Title Company's confirmation of its obligation to issue an Owner's Policy of Title Insurance in the full amount of the Sales Price, dated as of Closing insuring Buyer's fee simple title to the Real Property to be good and indefeasible, subject only to the Permitted Exceptions.

(4)     A certification in a form to be provided or approved by Buyer, signed by Seller under penalties of perjury, containing the following: (i) Seller's U.S. Taxpayer Identification Number; (ii) the address of Seller; and a statement that Seller is not a foreign person or a disregarded entity within the meaning of Sections 1445 and 7701 of the IRC (i.e., Seller is not a nonresident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in Internal Revenue Code of 1986 and applicable regulations).

(5)     Furnish evidence of its capacity and authority for the Closing of this transaction.

(6)     An Assignment and Assumption Agreement for the Leases, in substantially the form attached as Exhibit "E".

(7)     A certified rent roll for the Real Property containing the information specified in the Property Information and certified by Seller to be true and correct as of the Closing Date.

(8)     A duly executed written notice for delivery by Buyer to each of the tenants under the Leases notifying them of the sale and conveyance of the Real Property, directing the tenants to pay rent to Buyer at the address specified by Buyer in such notice and acknowledging that the security deposits under the Leases have been transferred to Buyer.

(9)     All keys to all locks on the Real Property in the possession and control of Seller and all documents in the possession of the Seller pertaining to tenants of the Real Property, including, but not limited to, all original leases, applications, correspondence and credit reports relating to each such tenant;

(10)    To the extent available and in Seller's possession and control, all necessary Licenses and Permits issued by appropriate governmental authorities and utility companies when the Improvements were completed;

(11)    To the extent in Seller's possession and control, all plans, specifications, mechanical, electrical and plumbing layouts, operating manuals, leasing information and other similar information in the possession of Seller and utilized in connection with the operation of the Real Property;

(15)    Any and all other items contemplated by the terms of this Agreement or reasonably required by Buyer or its legal counsel or by the Title Company in order for Seller to close this transaction;

(16)    A duly executed General Assignment in substantially the form attached as Exhibit "F"; and

(17)    A bills paid affidavit and all other necessary documents reasonably required by the Title Company to close this transaction.

B.     Buyer's Closing Obligations. At Closing, Buyer shall perform the following:

(1)     Pay the Sales Price, in immediately available funds.

(2)     Furnish evidence of its capacity and authority for the Closing of this transaction.

(3)     Furnish to any third party lender, at Buyer's expense, a Mortgagee Policy of title insurance issued by the Title Company for any applicable Deed(s) of Trust required herein.



      (4)      Execute all other necessary documents reasonably required by the Title Company to close this transaction.

C.    Possession. Upon satisfaction of each party's obligations at Closing, Seller shall deliver possession of the Property to Buyer, subject only to the rights of tenants in possession and the Permitted Exceptions.

10.    **BROKER'S FEE:** Buyer and Seller acknowledge that they have not dealt with any real estate broker in connection with this transaction except Younger Partners ("Seller's Broker") and Darrel Higginbotham of Higginbotham Realty ("Buyer's Broker"). Seller agrees to pay a brokerage fee to Seller's Broker per a separate agreement between Seller's Broker and Seller. If closing occurs, Buyer's Broker's commission, in the amount of two percent (2%) of the Sales Price, will be the responsibility of Seller. The terms of this Section shall survive the Closing.

11.    **EXPENSES TO BE PAID IN CASH AT OR PRIOR TO CLOSING:**

A.    Seller's Expenses. All costs of releasing existing loans and recording the releases which encumber the Property; standard premium for Owner's Title Policy; tax statements; preparation of Deed; one-half of any escrow fee; Seller's attorney's fees; and other expenses stipulated to be paid by Seller under other provisions of this Contract.

B.    Buyer's Expenses. All expenses incident to any loan (e.g., loan procurement or transfer fees; preparation of Note, Deed of Trust and other loan documents; recording fees; Mortgagee Policy of Title Insurance; pre-payable interest; credit reports); one-half of any escrow fee; copies of restrictions, easements, reservations or conditions affecting the Property; recordation of the Deed; Buyer's attorney's fees; Buyer's engineering and appraisal fees; all expenses associated with any Title Policy endorsements, including without limitation the deletion of the area and boundary exception as contemplated by Section 7.B.(1), and expenses stipulated to be paid by Buyer under other provisions of this Contract.

C.    Other Expenses. Any expenses, charges and fees of closing not specifically allocated herein or incurred by a specific party shall be borne by the parties in accordance with general custom in Tarrant County, Texas, or if no such custom exists, shall be borne equally by the parties.

12.    **PRORATIONS:** Prorations shall be made as of the Closing Date as if Buyer were in title for the entire Closing Date. The following shall be prorated and adjusted between Seller and Buyer:

A.    Taxes. To the extent not paid by tenants under the terms of the Leases, all non-delinquent real estate taxes on the Property shall be prorated as of the date of Closing. If the Closing takes place before the real estate taxes are fixed for the tax year in which the Closing occurs, the apportionment of real estate taxes shall be made on the basis of the real estate taxes for the most recent ascertainable tax year and shall be final. All delinquent taxes, if any, on the Property shall be paid at the Closing from Seller's funds. Any tax refunds received by Buyer which are allocable to the period prior to Closing shall be paid by Buyer to Seller.

B.    Assessments. To the extent not paid by tenants under the terms of the Leases, all non-delinquent assessments on the Property shall be prorated as of the date of Closing. For purposes of this Section 12(B) assessments shall include, without limitation, property owner association fees and assessments, if any. All delinquent assessments, if any, on the Property shall be paid in accordance with the terms of the Bankruptcy Court sale order. If Seller is no longer subject to the Bankruptcy Case, any assessments shall be prorated and paid in accordance with the provisions of Section 12(A) above.

C.    Utilities. Buyer shall notify the utility companies within five (5) business days after the Closing that all utility bills for the period commencing on the Closing are to be sent to Buyer. In addition to the Sales Price, if Buyer agrees to assume any utility accounts established by Seller, Buyer shall pay to Seller an amount equal to the total of the utility deposits held by utility companies with respect to such accounts and Seller shall

assign to Buyer all of Seller's right, title and interest in any such utility deposits. Otherwise, Seller reserves the right to receive a return of all other utility deposits and in such cases, Buyer shall arrange for substitute deposits with the utility companies as may be required. If following the Closing either Buyer or Seller receives a bill for utilities or other services provided to the Property for the period in which the Closing occurred, then Buyer and Seller shall equitably prorate the bill. Notwithstanding the foregoing, Buyer shall transfer all utility accounts serving the Property to the name of the Buyer within ten (10) days after Closing. If Buyer fails to transfer utility accounts serving the Property to the name of the Buyer within such ten (10) day period, Buyer shall pay or, if necessary, reimburse Seller for the cost of such service promptly upon submission of an invoice by Seller for such costs and Seller may terminate such utility service.

D.    Rental Income. The following terms relate to leases for the rental of space in the Property to tenants of Seller ("Leases").

(1)    Rent. Uncollected rent shall not be prorated at Closing but shall be subject to post-closing adjustments in accordance with Section 12(D)(2) below. Buyer shall have the right to collect delinquent rent. After Closing, Buyer shall apply all rent collected by Buyer from a tenant in the following order (i) to tenant's current monthly rental payment, and then (ii) to prior delinquent payments in the inverse order of their maturity, remitting to Seller, any balance properly allocable to Seller's period of ownership within ten (10) days of receipt. Buyer shall bill and use commercially reasonable efforts to collect such rent arrearages applicable to the period of Seller's ownership, but shall not be obligated to engage a collection agency or take legal action or exclude the tenant from possession to collect any rent arrearages. Seller may also seek collection, provided that Seller shall have no right to terminate any Lease or any tenant's occupancy under any Lease. Any Rent collected or received by Seller after the Closing representing rent for periods after Closing shall be immediately remitted to Buyer. This provision shall survive the Closing.

(2)    Post-Closing Adjustment. Any prorations not determined or not agreed upon as of the Closing shall be paid by Buyer to Seller, or by Seller to Buyer, as the case may be, in cash as soon as practicable following the Closing but in no event later than 90 days from the Closing. The parties shall cooperate and share information sufficient to make a final determination on any and all estimated prorations described in this Section 12(D).

All operating expense payments, including, for these purposes, payments with respect to taxes, assessments, and/or insurance premiums, made or to be made by each tenant for the entire lease year during which the Closing occurs, including end-of-year adjustments, if any, shall be prorated between Seller and Buyer and reconciled in the following manner: As soon as practical after the expiration of the calendar year in which the Closing occurs, but in any event prior to the date required by any tenant's Lease, Buyer shall incorporate any amounts due to Seller hereunder into a single post-closing bill for operating expense charges to such tenant, in which event the amounts paid with respect to such bill, as and when paid, shall be apportioned between Seller and Buyer based on the ratio of pre-Closing and post-Closing operating expenses (taking into account any operating expense estimated and retained by Seller at Closing). Seller shall reasonably cooperate with Buyer in preparing such reconciliation statements and providing (to the extent not already provided) applicable back-up data reasonably requested necessary to prepare the same. Buyer agrees to submit to Seller for its review and input the proposed reconciliation statements prior to the same being sent to the tenants. Buyer shall use its good faith, commercially reasonable efforts to collect such operating expense charges. If based on such year-end calculations the landlord owes a refund, credit, or other sums to any one or more tenants under the Leases for an overpayment of such tenant's or tenants' pro rata share of operating expense charges (except to the extent that such refund or credit is caused by the Buyer increasing any tenant's monthly estimated operating expense charges after the Closing or recalculating the amount of square footage of

20230335.20230485/5285534.6



the relevant premises), Seller agrees to pay to Buyer as soon as practical an amount equal to Buyer's pro rata share of such refunds, credits, or other sums, in the aggregate, owed to such tenants, which sums are attributable to the portion of the annual period including the Closing Date during which Seller owned the Property. Upon receipt of the same, Buyer agrees to promptly refund such sums to the tenant. Buyer further agrees to make available to Seller, from time to time, upon demand, for Seller's or Seller's representatives' review Buyer's reconciliation of the operating expense charges for the year in which the Closing occurs.

Any estimated amount for operating expense charges for any tenant shall be retained by Seller up to the amount of the pre-Closing operating expense charges payable by such tenant, and any excess shall be paid or credited to Buyer upon the final reconciliation by Buyer. Any operating expense estimates for any tenant received by Buyer after Closing which pertain to pre-Closing operating expense charges payable by such tenant shall be paid or credited to Seller upon the final reconciliation pursuant to this Section.

(3)    <u>Service Contracts</u>.   Buyer and Seller agree that Buyer will not assume any property management agreements, leasing commission agreements or binding agreements affecting the Property at Closing. On or before the twentieth (20th) day of Buyer's Feasibility Period, Buyer shall deliver written notice to Seller ("Service Contracts Notice") specifying any Service Contracts for which Buyer wants to have Seller deliver notices of termination at Closing (each a "Terminated Contract," and collectively, "Terminated Contracts"), provided that the effective date of the termination after Closing will be subject to the express terms of the Terminated Contracts. Buyer and Seller mutually agree to use reasonable efforts to assume or terminate the Service Contracts. If Buyer fails to deliver the Service Contracts Notice by the twentieth (20th) day of Buyer's Feasibility Period for the specific Service Contracts delivered to Buyer, there will be no Terminated Contracts and Buyer will assume all Service Contracts at Closing. Buyer shall assume the obligations arising from and after the Closing Date under the Service Contracts that are not terminable as of the Closing Date without notice, expense or liability to Seller.   Amounts paid or payable under the Service Contracts shall be prorated for the period prior to Closing.  If after the Closing, either Seller or Buyer receives a bill for services provided under the Service Contracts for the period in which the Closing occurred, Buyer and Seller shall equitably prorate the bill.

(4)    <u>Security Deposits</u>. The tenant security deposits (together with any accrued interest thereon as may be required by law or contract) shall be credited to Buyer as of the date of Closing in the amounts then held by Seller.

(5)    <u>Tenant Improvement Allowances</u>. Buyer shall receive a credit for any unused tenant improvement allowances existing on the date of the Closing for those leases executed prior to the Effective Date.

E.    <u>Method of Proration</u>.  All prorations shall be made as of the date of Closing based on actual days elapsed.

F.    <u>Survival</u>.  All of the preceding provisions of this Section 12 shall survive Closing until fully performed but in no event later than one (1) year after the Closing Date.

13.  **ESTOPPEL CERTIFICATES:**  Seller shall use commercially reasonable efforts to obtain Estoppel Certificates from all tenants occupying space at the Real Property, which certificates shall be substantially in the form attached hereto as Exhibit "G" (or in the form, if any, prescribed in the applicable Lease). Failure by Seller to timely obtain such Estoppel Certificates shall not constitute a default by Seller.

14.  **ASSIGNABILITY:** Buyer may assign this Contract only with the written approval of Seller which shall not be unreasonably withheld; provided, Buyer may, without Seller's written consent, assign this Contract in whole

or in part to another entity which is owned, related to, managed or affiliated with Buyer. Upon any such assignment, such assignee shall succeed to all of the rights and obligations of the assignor hereof and shall, for all purposes hereof, be substituted as and be deemed the Buyer provided that the assignor shall remain jointly and severally liable for the obligations hereunder.

15.   **APPLICATION OF EARNEST MONEY:** At Closing, the Earnest Money shall be applied to the Sales Price.

16.   **DEFAULT:**

A.   Seller Default. If Seller shall fail to consummate this Contract for any reason, except (i) the United States Bankruptcy Court of Delaware or Seller's lender's failure to approve of the sale of the Property, (ii) Buyer's default, or Buyer's termination of this Contract pursuant to a right to terminate given herein, or (iii) defaults under any material obligation hereunder (which is not cured within five (5) business days after receipt of written notice), Buyer must elect, as its exclusive remedy, to either bring suit to enforce specific performance of this Contract, provided such suit is brought within sixty (60) days from the date of such breach, or terminate this Contract. If Buyer elects to terminate the Contract under the terms of the immediately preceding sentence, Buyer shall receive a refund of the Earnest Money. Upon tender of said Earnest Money to Buyer, the rights and obligations of all parties hereto shall terminate and both parties shall be released from all further liabilities herein. Notwithstanding the foregoing, but subject to the limitations in Section 17, Buyer in no way or manner waives any right to bring suit for damages or for any other remedies available at law or in equity to Buyer in the event of a breach of any of the representations and warranties of Seller set forth in Section 17 hereof of which Buyer gains knowledge within one (1) year after the Closing. Notwithstanding anything herein to the contrary, if Seller shall fail to consummate this Contract due to an approval listed in (i) above, Buyer's sole remedy shall be to terminate this Contract and receive a refund of the Earnest Money.

B.   Buyer Default. If Buyer shall fail to consummate this Contract for any reason, except Seller's default or the termination of this Contract pursuant to a right to terminate given herein, or defaults under any material obligation hereunder (which is not cured within five (5) business days after receipt of written notice), Buyer shall be in default hereunder, Seller, as its sole and exclusive remedy, shall be entitled to terminate this Contract and receive the Earnest Money as liquidated damages for the breach of this Contract. Buyer and Seller agree that it would be impractical and extremely difficult to estimate the damages which Seller may suffer as a result thereof. Therefore, Buyer and Seller do hereby agree that the amount of the Earnest Money is a reasonable estimate of the total net detriment that Seller would suffer in the event that Buyer breaches this Contract and fails to complete the purchase of the Property. Upon receipt of a notice from Seller certifying that Buyer has failed to consummate this Contract for any reason or has breached this Contract, the Title Company shall forward the Earnest Money to Seller.

C.   MUTUAL RELEASE. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, BOTH PARTIES HEREBY DISCLAIM AND RELEASE THE OTHER FROM ALL LIABILITY FOR DAMAGES INCLUDING, WITHOUT LIMITATION, ACTUAL, SPECIAL, INCIDENTAL AND CONSEQUENTIAL DAMAGES, CAUSED BY EITHER PARTY'S FAILURE TO CONSUMMATE THE TRANSACTION HEREIN CONTEMPLATED OR ANY OTHER ACT OR OMISSION OF EITHER PARTY; PROVIDED, HOWEVER, THAT THIS RELEASE PROVISION SHALL NOT LIMIT EITHER PARTY'S RIGHT TO (i) RECEIVE REIMBURSEMENT FOR OR RECOVER DAMAGES IN CONNECTION WITH ANY INDEMNIFICATION PROVISION CONTAINED HEREIN, (ii) RECOVER ATTORNEYS' FEES AND COURT COSTS PURSUANT TO SECTION 16.D., AND/OR (iii) PURSUE ANY AND ALL REMEDIES AVAILABLE AT LAW OR IN EQUITY IN THE EVENT THAT FOLLOWING ANY TERMINATION OF THIS CONTRACT, BUYER OR ANY PARTY RELATED TO OR AFFILIATED WITH BUYER ASSERT ANY CLAIMS OR RIGHT TO THE PROPERTY THAT WOULD OTHERWISE DELAY OR PREVENT SELLER FROM HAVING CLEAR AND INDEFEASIBLE TITLE TO THE PROPERTY.

D.   Attorneys' Fees. If any action or proceeding is commenced by either party to enforce its rights or remedies under this Contract, the prevailing party in such action or proceeding, including any bankruptcy,

insolvency or appellate proceedings, shall be entitled to recover its reasonable attorneys' fees and court costs incurred therewith.

17.    **REPRESENTATIONS AND AGREEMENTS OF SELLER**: Seller hereby makes the following AGREEMENTS and REPRESENTATIONS AND WARRANTIES to Buyer, which representations and warranties shall be deemed made by Seller to Buyer also as of Closing Date:

    A.    Representations.

        1.    Authority. Seller is duly authorized and empowered to sell said Property, except that this Agreement and the terms hereof are subject to approval of Seller's lender to sell said Property.

        2.    Taxes. Seller has paid, or will pay at Closing, through the current year, all taxes, charges, debts and other assessments due by the Seller with respect to the Property.

        3.    Litigation. Except for the Bankruptcy Case and as disclosed on Exhibit "H", Seller has received no written notice of any action, suit, proceeding or claim affecting the Property or any portion thereof, any litigation instituted or threatened regarding the Property or any injury occurring on the Property, or affecting Seller and/or relating to or arising out of the ownership, operation, use or occupancy of the Property pending or being prosecuted before any court or arbitrator, or by any governmental authority.

        4.    Condemnation; Legal Action. Seller has received no written notice of pending or threatened condemnation or similar proceeding affecting the Real Property or pending public improvements, liens, or special assessments in, about, or outside the Real Property that will affect the Real Property or access to it, nor any legal action of any kind affecting the Real Property that will affect Buyer, nor is any such legal action presently contemplated.

        5.    Governmental Requirements. Seller has received no written notice of any current violation of applicable laws, ordinances, regulations, statutes, rules, and restrictions pertaining to and affecting the Property, and Seller's performance of this Contract will not result in any breach of, constitute any default under, or result in imposition of any lien or encumbrance on the Real Property under any agreement or other instrument to which Seller is a party or by which Seller or the Property might be bound.

        6.    Leases. Copies of the Leases, including all amendments and related documents which are used in Seller's day to day operations and on which Seller relies, have been delivered or made available to Buyer; the Leases are in full force and effect, landlord is not in default, and no events have occurred that, with notice or the passage of time or both, would constitute a default by landlord; and the Leases have not been modified nor have any concessions been made with respect to them unless expressly stated in them.

        7.    Terrorist Organizations Lists. Neither Seller nor, to Seller's actual knowledge, any of its respective partners, members, shareholders, owners, employees, officers, directors, representatives, or agents is or will become a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control of the Department of the Treasury (including those named on the OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action.

        8.    Service Contracts. Copies of the Service Contracts, including all amendments and related documents, which are used in Seller's day to day operations and on which Seller relies, have been delivered or made available to Buyer.

9.      No Exploration or Extracting of Minerals. There is no drilling or exploration for or extraction, fracking, removal, or production of, any mineral, gas, oil or the like from the surface of the Real Property and Seller shall not undertake, or cause or permit third parties, to perform such mining or extraction on the Real Property.

10.     No Other Offers. There are no other contracts for sale or purchase agreements, or the like affecting the Property being purchased.

11.     Environmental. Seller has received no written notice of any Hazardous Materials stored on, incorporated into, located on, present in or used on the Real Property in current violation of, and requiring remediation under, any laws, ordinances, statutes, codes, rules or regulations. For purposes of this Contract, the term "Hazardous Materials" shall mean any substance which is or contains: (i) any "hazardous substance" as now or hereafter defined in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Section 9601 et seq.) ("CERCLA") or any regulations promulgated under CERCLA; (ii) any "hazardous waste" as now or hereafter defined the Recourse Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.) ("RCRA") or regulations promulgated under RCRA; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.); (iv) gasoline, diesel fuel or other petroleum hydrocarbons; (v) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) radon gas; and (viii) any additional substances or materials which are now or hereafter classified or considered to be hazardous or toxic under any laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders and decrees now or hereafter enacted, promulgated, or amended, of the United States, the state, the county, the city or any other political subdivision in which the Real Property is located and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Real Property, the Real Property or the use of the Real Property relating to pollution, the protection or regulation of human health, natural resources or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or waste into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

12.     Seller Not Foreign Person. Seller is not a foreign person or entity as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and Buyer is not obligated to withhold portions of the Sales Price for the benefit of the Internal Revenue Service.

B.      Agreements of Seller: From the Effective Date until the Closing:

1.      Maintain Property. Maintain the Property in substantially the same manner in which the Property was maintained immediately prior to the Effective Date, ordinary wear and tear excepted.

2.      No Rights of Possession. Not enter into any lease or agreement granting a third party the right to possess any of the Property unless such lease or contract will be fully performed and terminated on or before Closing.

3.      No Encumbrances. Not knowingly enter into any agreement which would constitute an encumbrance on the Property, except Leases in the ordinary course of business and to the extent required by applicable law.

If, prior to Closing, Buyer discovers that any of the representations and warranties are untrue in any "material" respect, Buyer shall have the option, as its sole and exclusive remedies, to (i) terminate this Contract in writing at any time prior to the Closing Date or (ii) waive such breach of representations and warranties and close the transactions contemplated hereby, without reduction in the Sales Price. If Buyer terminates this Contract pursuant to the preceding sentence, Seller shall reimburse Buyer for all out-of-pocket expenses, including attorneys' fees,



which Buyer has incurred in entering into this Contract, and performing its due diligence review of the Property, not to exceed $20,000.00. If, after Closing hereunder, Buyer discovers that any of the representations and warranties expressly set forth in the Contract are untrue, Buyer shall be entitled to damages by reason of breach of such representations and warranties during the period described above (if Buyer notifies Seller of such claim within one (1) year after Closing and suit is filed for such breach no later than the day after the second anniversary of the Closing as provided above) except for consequential damages, and further provided that in no event shall Seller's liability hereunder exceed $20,000.00. Notwithstanding anything to the contrary contained in this Contract, if the Buyer knows (or has reason to know) that any representations and warranties is not true and correct as of the date of the Closing and shall elect to acquire the Property notwithstanding such fact, the Buyer shall not be entitled to commence any action to recover damages from the Seller due to such representations and warranties failing to be true, and Buyer shall not be entitled to rely on any such representations and warranties.

18.   **CONDEMNATION:** If condemnation proceedings are commenced against any material portion of the Property prior to Closing, Buyer may, at its option, either (i) terminate this Contract by written notice to Seller given within ten (10) days after Buyer is advised of the commencement of condemnation proceedings, whereupon the Earnest Money shall be returned to Buyer and neither party shall have any further obligation hereunder, or (ii) elect to close this transaction, in which event Buyer may appear and defend in such condemnation proceedings, and all amounts paid or received on account of such taking, at the option of Buyer, shall be either payable to Seller (with the Sales Price reduced by the same amount), or payable to Buyer (with the Sales Price not to be reduced). If Buyer fails to notify Seller of its election prior to the expiration of such ten (10) day period, Buyer shall be deemed to have terminated this Contract pursuant to (i) above.

19.   **CASUALTY:** If, prior to the Closing Date, all or any material portion of the Property is damaged by any casualty, except where such event is occasioned by a willful or negligent act of Buyer or its employees, agents, contractors or representatives, then Buyer may elect by written notice delivered to Seller within ten (10) days after Buyer learns of such damage (and the Closing shall be extended, if necessary, to give Buyer such ten (10) day period to respond to such notice) to terminate this Contract. If Buyer so terminates this Contract, then the Title Company shall refund the Earnest Money (and all interest thereon) to Buyer, and neither party shall have any further obligations under this Contract (other than those obligations that expressly survive the termination of this Contract). If Buyer does not elect to terminate this Contract within that ten (10) day period, then this Contract shall remain in full force and effect and Buyer shall close on the Property without any credit for such damage. Notwithstanding anything to the contrary in this Section 19, Seller shall have no obligation to repair or restore the Property after any casualty. If Seller is unable or unwilling to repair or restore the Property after any such casualty, Buyer may, as its sole remedy, (i) terminate this Contract and receive a refund of the Earnest Money, or (ii) accept at Closing: (a) the Property in its damaged condition and (b) an assignment of any insurance proceeds Seller is entitled to receive along with the insurer's consent to the assignment.

20.   **FURNITURE. FIXTURES AND EQUIPMENT:** As set forth above in Section 9.A.(2), at Closing, Seller shall convey to Buyer title to the FF&E. Buyer acknowledges and agrees that, such transfer of the FF&E is made on an **"AS IS" CONDITION AND BASIS WITH ALL FAULTS**.

21.   **CONFIDENTIALITY:** Buyer agrees to treat all information received with respect to the Property (the "Confidential Information"), whether such information is obtained from Seller or from Buyer's own due diligence investigations (including, without limitation, any environmental reports, Sales Price of the Property or any other economic terms of this Contract), in a confidential manner. Buyer shall not disclose any such information to any third parties, other than such disclosure (a) to legal counsel, consultants, accountants, employees, officers or directors, advisers, investors, equity owners, lenders, any beneficiaries of any related trust, and contractors (existing and prospective) as may be required in connection with the transactions contemplated hereby (such disclosure to be made expressly subject to this confidentiality requirement), (b) which is reasonably necessary to exercise its rights or remedies under this Contract, or (c) to comply with applicable law. Buyer agrees to keep this Contract confidential and not make any public announcements or disclosures with respect to the subject matter of this Contract prior to Closing without the written consent of Seller. In addition to any other remedies available to the parties, the parties shall have the right to seek equitable relief, including, without limitation, injunctive relief



or specific performance, against each other in order to enforce the provisions of this Section. The provisions of this Section 21 shall survive any termination of this Contract and Closing.

22. **MISCELLANEOUS:**

A.  <u>Notices</u>. Any notice, request, demand, instruction or other communication to be given to either party hereunder, except those required to be delivered at Closing, shall be in writing, and shall be delivered, either, (a) by telephonic facsimile communication, (b) by United States Mail, as a registered or certified item, return receipt requested, (c) nationally recognized overnight or local courier service, or (d) by electronic mail (provided that a copy of such notice is also provided in another manner authorized above). Any of the Notices may be delivered by the parties hereto or by their respective attorneys. Any notice delivered by telephonic facsimile communication or electronic mail shall be deemed effective after being transmitted to the applicable telephone facsimile numbers or email addresses set forth below (with an electronic receipt or other evidence of confirmation). Notices delivered by overnight or local courier shall be effective upon receipt. Notices delivered by registered or certified mail shall be deemed effective two (2) days after being deposited in a post office or other depository under the care or custody of the United States Postal Service, enclosed in a wrapper with proper postage affixed, with return receipt requested, or on the date of refusal to accept delivery of the notice. All such notices shall be addressed to the applicable party at the addresses shown on the signature pages hereto.

B.  <u>Applicable Law</u>. This Contract shall be construed under and in accordance with the laws of the State of Texas.

C.  <u>Successors and Assigns</u>. This Contract shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns.

D.  <u>Invalid Clause</u>. In case anyone or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

E.  <u>Integration</u>. This Contract constitutes the sole and only agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties concerning the subject matter herein contained and cannot be changed except by their written consent

F.  <u>Time, Dates</u>. Time is of the essence of this Contract. If the last day of a time period falls on a weekend or holiday, the period will be extended to include the next business day.

G.  <u>Gender References</u>. Words of any gender used in this Contract shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.

H.  <u>Counterparts and Facsimile Signatures</u>. To facilitate execution, this Contract may be executed in one or more counterparts as may be convenient or required. All counterparts shall collectively constitute a single instrument. Further, each counterpart may be executed and sent via fax or electronic mail of a .PDF document to the other party and such fax or electronic signature shall be valid and binding against the party signing.

I.  <u>Further Contracts</u>. Buyer acknowledges that Seller has extensively marketed the Property for sale and that Seller has the right to continue discussions with interested parties and to enter into contracts with other potential buyers which would become effective upon termination of this Contract or default by Buyer hereunder.

23. **NO REPRESENTATIONS OR WARRANTIES BY SELLER; ACCEPTANCE OF PROPERTY; DISCLAIMER.**



BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE WARRANTY OF TITLE AS SET OUT IN THE DEED), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, OR (H) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, AND SPECIFICALLY, THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, BUYER IS, EXCEPT AS EXPRESSLY SET FORTH HEREIN, RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AT THE CLOSING AGREES TO ACCEPT THE PROPERTY AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION; PROVIDED, SELLER HAS NO REASON TO BELIEVE SAME IS INACCURATE OR INCOMPLETE IN ANY MATERIAL RESPECT. EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER/AGENT, EMPLOYEE, SERVANT, OR OTHER PERSON.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER (FOR ITSELF AND ITS SUCCESSORS, SUCCESSORS IN INTEREST AND ASSIGNS) RELEASES, ACQUITS, AND FOREVER DISCHARGES SELLER FROM, AND WAIVES, ANY AND ALL LIABILITIES, CLAIMS, CAUSES OF ACTION, DAMAGES, AND OTHER RELIEF, WHETHER AT LAW OR IN EQUITY AND WHETHER IN CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, IN CONNECTION WITH, AS A RESULT OF, OR OTHERWISE WITH REGARD TO THE CONDITION OF THE PROPERTY, IMPROVEMENTS AND OTHER ASSETS, INCLUDING BUT NOT LIMITED TO THEIR ENVIRONMENTAL CONDITION, EXCEPT FOR CLAIMS MADE BY UNRELATED THIRD PARTIES. THIS GENERAL RELEASE SHALL BE APPLICABLE, WITHOUT LIMITATION, TO ANY AND ALL LIABILITIES, CLAIMS, CAUSES OF ACTION, DAMAGES, AND OTHER RELIEF AVAILABLE UNDER ANY HAZARDOUS SUBSTANCE LAW, EXCEPT FOR CLAIMS MADE BY UNRELATED THIRD PARTIES.

BUYER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY

AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS, WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT OF THE PROPERTY. IT IS UNDERSTOOD AND AGREED THAT THE SALES PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY BUYER SUBJECT TO THE FOREGOING. THE PROVISIONS OF THIS SECTION SHALL SURVIVE CLOSING AND SHALL BE INCORPORATED INTO THE DEED.

THE FOLLOWING PAGE IS THE SIGNATURE PAGE

**THIS CONTRACT MAY BE EXECUTED** in multiple originals, on this the _____ day of _____, 2024.

| **BUYER:** | **SELLER:** |
|---|---|
| Texas Trust Credit Union, a Texas chartered credit union | Hartman SPE, LLC, a Delaware limited liability company |
| By: | By: Hartman SPE Management, LLC, its manager |
| Printed Name: James Minge | Printed Name: |
| Title: CEO. | Title: |
| Date: 3/1/2024 | Date: |
| Address: P.O. Box 2260 Mansfield, TX 76063 | Address: 2909 Hillcroft, Suite 420 Houston, Texas 77057 |
| Phone No: 214-766-9885 | Phone No.: (713) 467-2222 |
| Fax No.: 972-595-1295 | |
| Email: jminge@texastrustcu.org | Email: dave@silverstarreit.com |

**Buyer's Attorney:**
Name: Dan A. White

Address:
500 W. 7th St., Suite 600
Fort Worth, Texas 76102

Phone No:  (817) 332-3245
Fax No.: (817) 877-4781

Email: dwhite@popehardwicke.com

**With Copy To:**

**Seller's Attorney:**
Name: Adrienne Collins, General Counsel

Address:
2909 Hillcroft, Suite 420
Houston, Texas 77057

Phone No: (713) 467-2222

Email: acollins@silverstarreit.com

**With Copy To:**

Hirsch & Westheimer, P.C.
Attn: Brad Rauch and Rachele Miller

Address:
1415 Louisiana, 36th Floor
Houston, Texas 77002

Phone No: (713) 220-5181

Email: brauch@hirschwest.com
Email: rmiller@hirschwest.com

## TITLE COMPANY RECEIPTS

Receipt of fully executed contract:                Receipt of Earnest Money:


_____                _____
By:                                                            By:

Dated:                                                       Dated:

## EXHIBIT "A"

## LEGAL DESCRIPTION OF PROPERTY

[To be inserted prior to execution]

20230335.20230485/5285534 6

## EXHIBIT "B"

## PROPERTY INFORMATION SELLER TO DELIVER

1.  Seller's Survey, site plan or plans of the Real Property;

2.  Copies of any previous environmental reports, soils reports, condition reports, tests, or results relating to the Real Property;

3.  Copies of any marketing used for the Real Property and photos;

4.  Evidence that the Real Property is properly zoned for its current use and is in compliance with all applicable building and other codes and requirements, along with copies of all Permits and Licenses;

5.  Copies of any and all Leases and Service Contracts including, without limitation, lease guaranties, service and maintenance contracts, replacement contracts, construction contracts, bonds, warranties, guarantees, antenna and other telecommunications contracts, equipment leases, elevator maintenance contracts, and janitorial contracts relating to or affecting the Property;

6.  Seller's standard rent roll for the Real Property;

7.  Itemized inventory of the FF&E;

8.  Operating reports compiled by or furnished to the Seller concerning the income from, and operation and maintenance costs of, the Real Property for the preceding two (2) years;

9.  Such architectural drawings and plans and specifications as are available to Seller for the Improvements constructed on the Land, including site plans, floor plans, mechanical, electrical and plumbing plans, and security plans; and

10. A description of any and all work in progress on the Real Property and any and all work scheduled to be performed on the Real Property during the next ninety (90) days.

20230335.20230485/5285534.6

## EXHIBIT "C"

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

### SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF TARRANT | § | |

THAT **HARTMAN SPE, LLC**, a Delaware limited liability company ("**Grantor**"), acting by and through its duly authorized representative and pursuant to that Order Authorizing and Approving the Private Sale of Certain Nonresidential Real Property Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases of Nonresidential Real Property, and Granting Related Relief, Case No. 23-11452 (MFW), issued by the Judge Mary F. Walrath of the United States Bankruptcy Court of the District of Delaware on _____, in consideration of the sum of Ten Dollars ($10.00) cash and other good and valuable considerations in hand paid by Grantee, the receipt of which is hereby acknowledged, has GRANTED, SOLD and CONVEYED and by these presents does GRANT, SELL and CONVEY, unto **TEXAS TRUST CREDIT UNION**, a _____ ("**Grantee**") with a mailing address of _____, all of that certain real property located at 1521 North Cooper Street, situated in Arlington, Tarrant County, Texas being more particularly described on **Exhibit A** attached hereto and incorporated herein by reference (the "Property"); and all improvements located at the Property; together with all and singular, the rights and appurtenances pertaining to any of the foregoing, including without limitation, the right of Grantor, if any, in and to strips and gores, adjacent streets, alleys, easements, rights-of-way, rights of ingress and egress thereto.

This conveyance is subject to all restrictions, covenants, agreements, easements, mineral leases, mineral interests, and all other matters of record in Tarrant County, including without limitation, those matters set forth on **Exhibit B** attached hereto and made a part hereof (the "Permitted Exceptions").

Except for the special warranty of title contained herein or the other documents delivered by Grantor to Grantee on the date hereof, and except as expressly stated and limited in that certain Purchase and Sale Agreement dated effective _____, as amended, between Grantor and Grantee, Grantee is acquiring the Property in "AS IS, WHERE IS" condition.

TO HAVE AND TO HOLD the Property, together with all and singular the rights, hereditaments and appurtenances thereto belonging, unto the said Grantee, and Grantee's successors and assigns, forever. Grantor hereby binds itself, its successors and assigns to warrant and forever defend the title to the Property unto the said Grantee, and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof, by, through or under Grantor but not otherwise, subject to the Permitted Exceptions.

Ad valorem taxes for the year 2024 have been prorated between Grantor and Grantee through the date hereof and Grantee expressly assumes the payment of such taxes for such year and all subsequent years.

EXCEPT FOR THE REPRESENTATIONS EXPRESSLY SET FORTH IN THE REAL ESTATE PURCHASE CONTRACT DATED EFFECTIVE _____, 2024, AS AMENDED (THE "**CONTRACT**"), GRANTEE ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THE CONTRACT, GRANTOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE WARRANTY OF TITLE AS SET OUT IN THIS DEED), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH GRANTEE MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, OR (H) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, AND SPECIFICALLY, THAT GRANTOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, GRANTEE IS, EXCEPT AS EXPRESSLY SET FORTH HEREIN, RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY GRANTOR AND AT THE CLOSING AGREED TO ACCEPT THE PROPERTY AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST GRANTOR (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT GRANTOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION; PROVIDED, GRANTOR HAS NO REASON TO BELIEVE SAME IS INACCURATE OR INCOMPLETE IN ANY MATERIAL RESPECT. EXCEPT AS EXPRESSLY SET FORTH HEREIN, GRANTOR IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER/AGENT, EMPLOYEE, SERVANT, OR OTHER PERSON.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, GRANTEE (FOR ITSELF AND ITS SUCCESSORS, SUCCESSORS IN INTEREST AND ASSIGNS) RELEASES, ACQUITS, AND FOREVER DISCHARGES GRANTOR FROM, AND WAIVES, ANY AND ALL LIABILITIES, CLAIMS, CAUSES OF ACTION, DAMAGES, AND OTHER RELIEF, WHETHER AT LAW OR IN EQUITY AND WHETHER IN CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, IN CONNECTION WITH, AS A RESULT OF, OR OTHERWISE WITH REGARD TO THE CONDITION OF THE PROPERTY, IMPROVEMENTS AND OTHER ASSETS, INCLUDING BUT NOT LIMITED TO THEIR ENVIRONMENTAL CONDITION, EXCEPT FOR CLAIMS MADE BY UNRELATED THIRD PARTIES. THIS GENERAL RELEASE SHALL BE APPLICABLE, WITHOUT LIMITATION,

22

TO ANY AND ALL LIABILITIES, CLAIMS, CAUSES OF ACTION, DAMAGES, AND OTHER RELIEF AVAILABLE UNDER ANY HAZARDOUS SUBSTANCE LAW, EXCEPT FOR CLAIMS MADE BY UNRELATED THIRD PARTIES.

GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS, WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT OF THE PROPERTY. IT IS UNDERSTOOD AND AGREED THAT THE SALES PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY GRANTOR AND PURCHASED BY GRANTEE SUBJECT TO THE FOREGOING.

EXECUTED on the date of the acknowledgement below but to be effective as of _____, 2024.

*[Signature Page Follows]*

**GRANTOR:**

**HARTMAN SPE, LLC,**
a Delaware limited liability company

By:  Hartman SPE Management, LLC,
      a Delaware limited liability company,
      its Manager

      By:_____
      Name:_____
      Title: _____

THE STATE OF TEXAS      §
                          §
COUNTY OF _____      §

      This instrument was acknowledged before me on _____, 2024 by
_____, _____ of Hartman SPE Management, LLC, a Delaware limited liability company, Manager of Hartman SPE, LLC, a Delaware limited liability company, in such capacity and on behalf of said limited liability companies.

                                     _____
                                     Notary Public, State of Texas

AFTER RECORDING, RETURN TO:

## EXHIBIT A

## LEGAL DESCRIPTION

# EXHIBIT B

## PERMITTED EXCEPTIONS

20230335.20230485/5285534.6

## EXHIBIT "D"

## BILL OF SALE

THE STATE OF TEXAS     §

    §      KNOW ALL MEN BY THESE PRESENTS: THAT

COUNTY OF TARRANT    §

    **HARTMAN SPE, LLC**, a Delaware limited liability company ("**Assignor**"), for good and valuable consideration paid by **TEXAS TRUST CREDIT UNION**, a _____ ("**Assignee**"), hereby has granted, bargained, sold, transferred and delivered, and by these presents, does grant, bargain, sell, transfer and deliver unto Assignee, its successors and assigns, all of Assignor's right, title and interest in and to all furniture, fixtures, equipment, appliances and other items of tangible personal property used in direct connection with the operation of the Property (collectively, "**Personal Property**") ("**Property**" as defined in that certain Special Warranty Deed (the "**Deed**"), of even date herewith, executed by Assignor, as grantor, in favor of Assignee, as grantee), and which (for tangible personal property) are now located upon the Property.

    Assignor represents and warrants to Assignee that Assignor has not previously assigned or otherwise transferred any right, title or interest in the Personal Property.

    WITHOUT IN ANY WAY LIMITING ASSIGNEE'S RIGHTS AS A RESULT OF ANY BREACH OF REPRESENTATION, WARRANTY OR COVENANT UNDER THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED _____, AS AMENDED ("**CONTRACT**"), ASSIGNEE ACCEPTS THE PERSONAL PROPERTY, ON AN "AS IS, WHERE IS" BASIS, AND "WITH ALL FAULTS." EXCEPT AS MAY BE EXPRESSLY SET FORTH IN THE CONTRACT, ASSIGNOR, AS SELLER, HAS NOT MADE, AND DOES NOT MAKE, ANY EXPRESS OR IMPLIED WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER WITH RESPECT TO THE PERSONAL PROPERTY, INCLUDING, BUT NOT LIMITED TO: TITLE; MERCHANTABILITY; FITNESS FOR ANY PARTICULAR PURPOSE; ITS DESIGN OR CONDITION; ITS QUALITY OR CAPACITY; WORKMANSHIP OR COMPLIANCE WITH THE REQUIREMENTS OF ANY LAW, RULE, SPECIFICATION OR CONTRACT PERTAINING THERETO; PATENT INFRINGEMENT; OR LATENT DEFECTS.

    THIS BILL OF SALE IS EXECUTED as of _____, 2024.

### ASSIGNOR:

**HARTMAN SPE, LLC**,
a Delaware limited liability company

By:    Hartman SPE Management, LLC,
       a Delaware limited liability company,
       its Manager

By: _____
Name: _____
Title: _____

4

**EXHIBIT "E"**

**ASSIGNMENT AND ASSUMPTION OF LEASES**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: THAT |
| COUNTY OF TARRANT | § | |

    **HARTMAN SPE, LLC**, a Delaware limited liability company ("**Assignor**"), for and in consideration of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration to Assignor in hand paid by **TEXAS TRUST CREDIT UNION**, a _____ ("**Assignee**"), the receipt and sufficiency of which consideration are hereby acknowledged and confessed, has ASSIGNED, TRANSFERRED and DELIVERED, and by these presents does ASSIGN, TRANSFER and DELIVER, unto Assignee, all of Assignor's right, title and interest in and to (i) the leases and other agreements described or referred to on **Exhibit A** attached hereto and made a part hereof for all purposes and all guaranties thereof and security therefor, if any (the "**Leases**"); (ii) all sums payable pursuant to the Leases which are allocable to any period of time after the date hereof (the "**Rents**"); and (iii) those sums set forth on **Exhibit A** hereto, representing security and other deposits paid to Assignor by the current tenants under the Leases (the "**Deposits**"). The Leases, the Rents, and the Deposits are collectively referred to herein as the "**Property**." The Leases affect that real property situated in Tarrant County, Texas described on **Exhibit B** attached hereto and made a part hereof which has this day been conveyed by Assignor to Assignee.

    Assignor has executed and delivered this Assignment and Assumption of Leases and has assigned, transferred, and delivered the Property, and Assignee has received and accepted this Assignment and Assumption of Leases and has purchased the Property, WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, except as otherwise set forth in this Assignment and Assumption of Leases and as set forth in the Contract between Assignor and Assignee and Assignee hereby assumes and agrees to be liable for and to perform all duties, obligations, undertakings, and agreements of Assignor under the Leases which first accrue or occur on or after the date hereof.

    Assignor shall indemnify, defend and hold Assignee and Assignee's successors and assigns harmless from and against any third party claim, demand, cause of action, charge, judgment, damage, liability, cost or expense (including, without limitation, reasonable attorney's fees and legal costs) (A) arising out of the Leases in connection with events occurring prior to the date of this Assignment or (B) arising out of any claim by any tenant arising prior to the date of this Assignment with respect to any security or other tenant deposit but only to the extent of the amount of such deposit payable to a tenant which was not transferred by Assignor to Assignee.

    Assignee shall indemnify, defend and hold Assignor and Assignor's successors and assigns harmless from and against any third party claim, demand, cause of action, charge, judgment, damage, liability, cost or expense (including, without limitation, reasonable attorney's fees and legal costs) (A) arising out of the Leases in connection with events occurring on and after the date of this Assignment or (B) arising out of any claim by any tenant arising on or after the date of this Assignment with respect to its security or other tenant deposit but only to the extent of the amount of such deposit which was transferred by Assignor to Assignee and not returned to such tenant by Assignee.

    This Assignment and Assumption of Leases may be executed in multiple counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. To facilitate execution of this Assignment and Assumption of Leases, Assignor and Assignee may execute and exchange by electronic mail as a portable document format or other electronic imaging,

5

counterparts of the signature pages, which shall be deemed original signatures for all purposes. This Assignment and Assumption of Leases shall be governed by, and construed under, the laws of the State of Texas.

EFFECTIVE as of the _____ day of _____, 2024.

*[Signature Pages Follow]*

6

**ASSIGNOR:**

**HARTMAN SPE, LLC,**
a Delaware limited liability company

By:  Hartman SPE Management, LLC,
     a Delaware limited liability company,
     its Manager

     By:_____
     Name:_____
     Title:_____

**ASSIGNEE:**

_____,
a _____

By:

By:_____
Name:_____
Title: _____

# EXHIBIT A

## LEASES AND DEPOSITS

# EXHIBIT B

## LEGAL DESCRIPTION

## EXHIBIT "F"

## GENERAL ASSIGNMENT

**THIS GENERAL ASSIGNMENT** (this "*Assignment*") is made as of _____, 2024 (the "*Effective Date*"), by and between **HARTMAN SPE, LLC**, a Delaware limited liability company (the "*Assignor*"), and **TEXAS TRUST CREDIT UNION**, a _____ (the "*Assignee*").

## RECITALS:

This Assignment is made with respect to the following facts:

A.    Assignor has, as of the Effective Date, sold, transferred, conveyed and assigned to Assignee the real property described in **Exhibit A** hereto and made a part hereof (the "*Land*"), together with all right, title and interest of Assignor in and to the buildings and other improvements located on the Land (the "*Improvements*"; the Land and the Improvements are collectively referred to as the "*Real Property*").

B.    In connection with its conveyance of the Real Property to Assignee, Assignor has agreed to assign to Assignee all of Assignor's right, title and interest in and to certain property and contract rights and other matters more fully described herein.

## ASSIGNMENT:

**NOW, THEREFORE**, for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignment.    Assignor transfers, grants, conveys and assigns to Assignee all of Assignor's right, title and interest in and to the following:

1.1    The service contracts and service contracts rights specified in **Exhibit B** hereto (collectively, the "*Contracts*"); and

1.2    To the extent assignable without the consent or approval of any other Person (as defined herein), the following rights, privileges and materials to the extent that they relate solely to the use or operation of the Real Property:

1.2.1    Unexpired warranties, guaranties and sureties;

1.2.2    Governmental permits, licenses, certificates and authorizations, including, without limitation, building and construction permits, development agreements, utility permits, certificates of occupancy, and permits, licenses, certificates and authorizations;

1.2.3    Site plans, surveys, soil and substratus studies, architectural, construction and building drawings, plans and specifications, engineering plans and studies, electrical and mechanical plans and studies, floor plans, landscape plans, environmental assessment reports, engineering, structural or physical inspection reports, feasibility studies, marketing plans and promotional materials, tenant questionnaires and studies, Americans with Disabilities Act/Title 24 and other accessibility reports, and other plans and studies of any kind if existing and in Assignor's possession and control;

GENERAL ASSIGNMENT – Exhibit F
20230335.20230485/5285534.6

1.2.4    Brochures, manuals, lists of prospective tenants, advertising materials and assignable telephone numbers;

1.2.5    Any and all names (excluding entity names),    illustrations, drawings, photographs,  reports, studies, improvements to all such property, whether in hard copy or electronic form (the "Intellectual Property"); and

1.2.6    Other rights, privileges and appurtenances owned by Assignor and used solely in connection with the operation of the Real Property.

For purposes of this Assignment, "*Person*" means any one or more natural persons, corporations, partnerships, limited liability companies, firms, trusts, trustees or other entities, or any federal, state, local or municipal government or any department, commission, board, bureau, agency, instrumentality, unit or taxing authority thereof.

Further, Assignor hereby releases and quitclaims to Assignee any right, title or interest in and to the name "Skymark" or "Skymark Tower".

2.    Indemnity by Assignor.  Assignor agrees to defend, indemnify and hold Assignee (and its successors and assigns) harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever (including, without limitation, reasonable attorneys' fees and expenses) paid, incurred or suffered by, or asserted against, Assignee (and its successors and assigns) under the Contracts on or after the Effective Date and relating to events occurring or liabilities or obligations occurring and accruing under the Contracts prior to the Effective Date.

3.    Assumption.  Assignee assumes all liabilities and obligations of Assignor under the Contracts that relate to the periods on and after the Effective Date and agrees to perform all obligations of Assignor under the Contracts which are to be performed or which become due on or after the Effective Date.

4.    Indemnity by Assignee.  Assignee agrees to be responsible for and to defend, indemnify and hold Assignor (and its successors and assigns) harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever (including, without limitation, reasonable attorneys' fees and expenses) paid, incurred or suffered by, or asserted against, Assignor (and its successors and assigns) under the Contracts on or after the Effective Date and relating to events occurring or liabilities or obligations occurring and accruing under the Contracts on or after the Effective Date.

5.    Successors and Assigns.  This Assignment shall be binding upon and inure to the benefit of the parties' respective successors and assigns.

6.    Counterparts.  This Assignment may be executed in counterparts, each of which shall be deemed a duplicate original.  One or more counterparts or copies of this Assignment may be executed by one of the parties hereto, and some different counterparts or copies executed by the other party hereto. Each counterpart or copy hereof executed by a party hereto shall be binding upon such party executing the same even though the other party hereto may execute one or more different counterparts or copies and all counterparts or copies hereof so executed will constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the Effective Date.

**ASSIGNOR:**

HARTMAN SPE, LLC,
a Delaware limited liability company

By:    Hartman SPE Management, LLC,
       a Delaware limited liability company,
       Its Manager

       By:_____
       Name:_____
       Title:_____

**ASSIGNEE:**

TEXAS TRUST CREDIT UNION,
a _____

By: _____
Name: _____
Title:_____

**EXHIBIT "G"**

**FORM OF ESTOPPEL CERTIFICATE**

_____, a _____ ("**Tenant**"), is the tenant of space (the "**Premises**") under that certain _____ dated _____ *[, as amended by that certain dated _____] ([as amended,]* the "**Lease**") made with_____, a _____ ("**Landlord**"), covering the Premises in Landlord's building (the "**Building**") located at _____. _____ or assigns ("**Buyer**") is purchasing the Building. _____ ("**Lender**") is financing the purchase.

Tenant hereby certifies to Landlord, Buyer, Lender and their respective successors and assigns as follows:

1.      Attached hereto as Exhibit A is a true, correct and complete copy of the Lease, together with all amendments thereto.

2.      The Lease is in full force and effect and has not been modified, supplemented or amended in any way except as set forth in Exhibit A.

3.      The Lease represents the entire agreement between the parties as to leasing of the Premises, and there are no other agreements, written or oral, which affect the occupancy of the Premises by Tenant.

4.      The interest of Tenant in the Lease has not been assigned, subleased, encumbered or pledged as security except as follows: _____.

5.      The Premises are comprised of approximately _____ square feet of rentable area located on the _____ floor of the building.

6.      The commencement date of the term of the Lease was _____.

7.      The expiration date of the term of the Lease is _____, including any presently exercised option or renewal term, and Tenant has no right to renew, extend or cancel the Lease or to lease additional space in the Building, except as expressly set forth in the Lease.

8.      Monthly base rent currently payable under the Lease is $_____, and such rent has been paid through _____. The Lease requires Tenant to pay its pro rata share of real estate taxes, utilities and operating expenses for the Premises. Tenant's pro rata share is _____%. Tenant is obligated to pay all other sums and additional rent as stated in the Lease, and Tenant's payment of such amounts are current.

9.      All insurance required of Tenant under the Lease has been provided by Tenant, and all premiums due thereunder have been paid.

10.     Tenant has no option or right of first refusal to purchase all or any part of the Premises (or the land or Building of which the Premises are a part), and has no right or interest with respect to the Premises or the Building other than as Tenant under the Lease. Tenant has no option or right of first refusal to rent additional space in the Building except as set forth in section _____ of the Lease.

11.     All conditions of the Lease to be performed by Landlord and necessary to the enforceability of the Lease have been satisfied. On this date there are no existing defenses, offsets, claims or credits which Tenant has against the enforcement of the Lease. Each and every term, condition, covenant and agreement, including without limitation, the agreement to pay rent are binding on Tenant.

12.    The Premises have been delivered to Tenant in accordance with the terms of the Lease. Any contributions required by the Lease to be paid by Landlord to date for improvements to the Premises have been paid in full except as follows: _____.    Any improvements or work required under the Lease to be made by Landlord to date have been completed to the satisfaction of Tenant except as follows: _____.  Charges for all labor and materials used or furnished in connection with improvements and/or alterations made for the account of Tenant in the Building have been paid in full.  Tenant has accepted the Premises, subject to no conditions other than those set forth in the Lease.  Tenant has entered into occupancy of the Premises.

13.    Tenant has made no agreement with Landlord or any agent, representative or employee of Landlord concerning free rent, partial rent, rebate of rental payments or any other similar rent concession except as expressly set forth in section ____ of the Lease.  No rents have been prepaid more than one month in advance, and all rents, have commenced to accrue;

14.    To Tenant's actual knowledge, there are no defaults by Tenant or Landlord under the Lease, and no event has occurred or condition exists that would with the passage of time notice, or both, constitute a default under the Lease.  As of the date hereof, there are no existing defenses, offsets, claims or credits which Tenant has against the enforcement of the Lease.

15.    Tenant has paid to Landlord a security deposit in the amount of $_____ in the form of _____ [*cash/letter of credit*];

16.    Tenant has all governmental permits, licenses and consents required for the activities and operations being conducted or to be conducted by it in or around the Building.

17.    As of the date hereof, there are no actions, whether voluntary or otherwise, pending against Tenant or any guarantor of the Lease under the bankruptcy or insolvency laws of the United States or any state thereof.

Tenant acknowledges that this Estoppel Certificate is being given in order (i) to induce Buyer to acquire and Lender to finance acquisition of the Building and (ii) to induce Buyer to assume the obligations of Landlord under the Lease from and after such acquisition.  Landlord, Buyer and Lender are entitled to rely upon this Estoppel Certificate.

**TENANT:**

_____,
a _____

By: _____
Name: _____
Title: _____

## EXHIBIT "H"

## DISCLOSURES

Seller hereby discloses the existence of *Allen R. Hartman and Hartman vREIT XXI, Inc. v. Silver Star Properties REIT, Inc., Hartman Income REIT Property Holdings, LLC, Hartman XXI Advisors, LLC, Silver Star Property Management, Inc., Hartman SPE, LLC, Hartman Income REIT, Inc., and Hartman Retail I, DST* filed under Cause No. 2023-17944 in the 133rd Judicial District Court of Harris County, Texas. Seller considers this lawsuit to be frivolous and vexatious by a related party and has commenced action to dismiss the same.

The parties agree that in the event Seller cannot convey the Property with a title policy free and clear of the above referenced suit, Seller shall not be in default under this Contract but Buyer shall have no obligation to close this transaction. In such event, Buyer shall be entitled to a refund of the Earnest Money and Independent Consideration.